# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

SKYLINE POTATO COMPANY, INC.,
A Colorado Corporation,

       Plaintiff,

vs.                                                                      No. CIV 10-0698 JB/RHS

TAN-O-ON MARKETING, INC. d/b/a TMI;
a Colorado corporation with a principal place
of business in New Mexico, HI-LAND POTATO
COMPANY, INC., a Colorado corporation;
GERALD R. ANDERSON, in his individual
capacity and As Director/Shareholder of Tan-O-On
Marketing Inc., JULIE A. ANDERSON, in her
individual capacity and as Director/Shareholder
of Tan-O-On Marketing Inc., MARK LOUNSBURY,
in his individual capacity and as Director/Shareholder
of Tan-O-On Marketing Inc., BILL METZ, in his
individual capacity and As Director/Shareholder of
Tan-O-On Marketing Inc., and CARL WORLEY,
in his individual capacity, as Director/Shareholder of
Tan-O-On Marketing Inc., and as Director/Shareholder
Hi Land Potato Company,

       Defendants,

and

FOLSON FARM CORPORATION,
POTANDON PRODUCE, L.L.C.,
MART PRODUCE CORPORATION,
BILLINGSLEY PRODUCE SALES,
INC., ALSUM PRODUCE, INC., and
PETERSON BROS. RIVER VALLEY
FARMS, INC.,

       Intervening Plaintiffs,

vs.

TAN-O-ON MARKETING, INC. d/b/a TMI, and
HI-LAND POTATO COMPANY, INC.,

Defendants,

and

TAN-O-ON MARKETING, INC. d/b/a TMI;
GERALD R. ANDERSON, JULIE A. ANDERSON,

Third-Party Plaintiffs,

vs.

HI-LAND POTATO COMPANY, INC.;
and CARL WORLEY, RPE, INC.
and RUSSELL WYSOCKI,

Third-Party Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) Tan-O-On Marketing Inc.'s Motion to Amend Third Party Complaint for Fraud and Theft of Trade Secrets and Unjust Enrichment, filed February 2, 2012 (Doc. 105)("Motion to Amend"); and (ii) Defendants Hi-Land Potato Company, Inc.'s and Carl Worley's Motion to Dismiss Fraud and Fraud-Related Claims in Third Party Complaint and to Dismiss Claims Filed by Gerald and Julie Anderson in Their Individual Capacities, filed February 7, 2012 (Doc. 109)("Feb. 7, 2012 MTD").  The Court held a hearing on April 13, 2012.  The primary issues are: (i) whether there are sufficient allegations in Defendant Tan-O-On Marketing, Inc.'s Third Party Complaint for Fraud and Theft of Trade Secrets and Unjust Enrichment at 2-10, filed October 14, 2011 (Doc.  72)("Amended Third-Party Complaint"), to satisfy rule 9(b) of the Federal Rules of Civil Procedure's heightened pleading standards with regards to a common-law fraud claim; (ii) whether Tan-O-On Marketing has adequately pled a common-law fraudulent-conveyance claim in its Amended Third-Party Complaint; (iii) whether Tan-O-On Marketing has adequately pled a fraudulent-transfer claim in its Amended Third Party

claim; (iv) whether the Court should grant Tan-O-On Marketing leave to amend to present additional allegations and claims against Third-Party Defendants RPE, Inc. and Russell Wysocki (the "RPE, Inc. Parties"); and (v) whether the Court should grant Tan-O-On Marketing leave to amend to present additional allegations and claims against Defendants Hi-Land Potato Company and Carl Worley (the "Hi-Land Potato Parties"). The Court will grant in part and deny in part the Feb. 7, 2012 MTD. There are not sufficient allegations in the Amended Third-Party Complaint to satisfy rule 9(b)'s heightened pleading standards with regards to a common-law fraud claim. There are sufficient allegations in the Amended Third-Party Complaint for a fraudulent-conveyance claim to satisfy rule 12(b)(6)'s standards and rule 9(b)'s heightened pleading standards. There are sufficient allegations in the Amended Third-Party Complaint regarding the claim under the New Mexico Uniform Fraudulent Transfer Act, N.M.S.A. 1978, §§ 56-10-14 to -25 ("UFTA"), that Tan-O-On Marketing asserts against the Hi-Land Potato Parties to survive dismissal under rule 12(b)(6) and rule 9(b). The Court will grant in part and deny in part the Motion to Amend. Consistent with the agreement between Tan-O-On Marketing and the RPE, Inc. Parties at the hearing on April 13, 2012, the Court will grant Tan-O-On Marketing leave to amend its claims for unjust enrichment and theft of trade secrets asserted against the RPE, Inc. Parties, but will deny leave to amend the remaining claims it seeks to assert against the RPE, Inc. Parties. The Court will also deny Tan-O-On Marketing leave to amend regarding its common-law fraud and claims under the New Mexico Unfair Practices Act, N.M.S.A. 1978, §§ 57-12-1 to -26 ("UPA"), that Tan-O-On Marketing seeks to assert against the Hi-Land Potato Parties, because permitting leave to amend would be futile and unfairly prejudicial to the Hi-Land Potato Parties. The Court will grant leave to amend regarding the fraudulent-conveyance claims which Tan-O-On Marketing seeks to assert against Hi-Land Potato, given that the additional allegations primarily flesh out allegations which were already in

Tan-O-On Marketing's prior pleadings.  The Court will grant leave to amend the claims for unjust enrichment and theft of trade secrets asserted against the Hi-Land Potato Parties in light of the agreement the parties reached at the hearing on April 13, 2012.

## FACTUAL BACKGROUND

In the current pleading, the Tan-O-On Parties assert claims for fraud, unjust enrichment, and theft of trade secrets against the Hi-Land Potato Parties and the RPE, Inc. Parties.  See Amended Third-Party Complaint at 2-10.  Tan-O-On Marketing engaged in interstate commerce regarding the sale of produce with Skyline Potato and the Intervening Plaintiffs.[1]  See Amended Third-Party Complaint ¶¶ 12-13, at 3.  "On June 15, 2010, the Secretary of Agriculture of the United States Department of Agriculture issued a reparation order and award which provided that Tan-O-On Marketing is indebted to Skyline Potato in the amount of $81,282.39 . . . ."  Amended Third-Party Complaint ¶ 14, at 3.  In February 2006, Shannon Casey and Shawna Casey purchased Tan-O-On Marketing from Defendants Gerald Anderson and Julie Anderson through a stock purchase agreement.  See Amended Third-Party Complaint at ¶¶ 15-16, at 4.  Before the Caseys' purchase of Tan-O-On Marketing, the company "had a long standing reputation in the industry for prompt payments to all growers of potatoes immediately upon receipt of payments for potatoes delivered by Tan-O-On Marketing."  Amended Third-Party Complaint ¶ 17, at 4.

In late 2009, Shannon Casey resigned from and closed Tan-O-On Marketing.  See Amended Third-Party Complaint ¶¶ 18, 20, at 5.  After closing Tan-O-On Marketing, the Caseys relocated to Monte Vista, Colorado, where Hi-Land Potato locates its business.  See Amended Third-Party

---

[1]The Intervening Plaintiffs include: (i) Folson Farm Corporation; (ii) Potandon Produce, L.L.C.; (iii) Mart Produce Corporation; (iv) Billingsley Produce Sales, Inc.; (v) Alsum Produce, Inc.; and (vi) Peterson Bros. River Valley Farms, Inc.

Complaint ¶ 20, at 5.  Although the Caseys represented that they had abandoned their positions with Tan-O-On Marketing, they later established a new bank account for the company in Monte Vista. See Amended Third-Party Complaint ¶ 21, at 5-6.  The Caseys deposited approximately $1.8 million of Tan-O-On Marketing's receivables into the new account and then paid those proceeds to Hi-Land Potato instead of paying Tan-O-On Marketing's Perishable Agricultural Commodities Act, 7 U.S.C. §§ 499a-499t ("PACA"), trust creditors, such as Skyline Potato and the Intervening Plaintiffs.  See Amended Third-Party Complaint ¶ 21, at 6.  At the time this transfer of funds occurred, the Hi-Land Potato Parties were aware of Tan-O-On Marketing's "insolvency, and the Casey's plan to strip the company of its assets."  Amended Third-Party Complaint ¶ 21, at 6.  "This [conduct] was [all] part of a scheme to defraud [Tan-O-On Marketing] and Gerald R. Anderson and Julie Anderson and was intentional and known . . . ."  Amended Third-Party Complaint ¶ 24, at 7.

Before January 2010, Hi-Land Potato did not broker sales of potatoes, because it relied on Tan-O-On Marketing to sell its product.  See Amended Third-Party Complaint ¶ 22, at 6.  At the time Shannon Casey shut down Tan-O-On Marketing, the company was the largest potato supplier in the country to The Kroger Co., a national grocery chain.  See Amended Third-Party Complaint ¶ 18, at 5.  Kroger Co. does not transact business with a potato broker unless the broker has a Kroger Co. vendor number.  See Amended Third-Party Complaint ¶ 18, at 5.  Hi-Land Potato transferred customer relationships, monthly orders from Kroger Co., and other proprietary information, without authority, permission, or compensation to RPE, Inc.  See Amended Third-Party Complaint ¶ 25, at 7.  After the transfer of Tan-O-On Marketing assets to RPE, Inc., RPE, Inc. announced the opening of a Monte Vista sales division and hired Shannon Casey as the operation's director.  See Amended Third-Party Complaint ¶ 26, at 7.  RPE, Inc. now handles the sales of potatoes from Hi-Land Potato, including the sales relationship with Kroger Co.  See Amended Third-Party Complaint ¶ 27, at 7-8.

When Shannon Casey shut down Tan-O-On Marketing, neither Hi-Land Potato nor RPE, Inc. had

a vendor number with Kroger Co.  See Amended Third-Party Complaint ¶ 18, at 5.  The transfer of

Tan-O-On Marketing assets from Tan-O-On Marketing to Hi-Land Potato to RPE, Inc. constitutes

a breach of the PACA trust and a fraudulent transfer, because Skyline Potato and the Intervening

Plaintiffs remain uncompensated for their transactions with Tan-O-On Marketing.  See Amended

Third-Party Complaint ¶¶ 28, 34, at 8-9.  Fraudulent transfers "were made to or for the benefit of

Hi-Land Potato Company Inc., Carl Worley and RPE, Inc. and Russell Wysocki insiders of TMI on

antecedent debts, and were made without consideration."  Amended Third-Party Complaint ¶ 40,

at 10.

### PROCEDURAL BACKGROUND

On July 23, 2010, Skyline Potato filed its Petition for Enforcement of USDA PACA Order

and Award of Damages; Complaint for Violation of Federal Unfair Trade Practices Provision in

PACA (7 U.S.C. § 499b), Breach of Contract, Breach of Covenant of Good Faith and Fair Dealing,

Fraud, Money Owed on Open Account, and Prayer for Declaratory Relief and Piercing of the

Corporate Veil against Defendants Tan-O-On Marketing, Inc., Hi-Land Potato, G. Anderson, J.

Anderson, Mark Lounsbury, Bill Metz, and Carl Worley.  See Doc. 2 ("Original Complaint").  On

March 1, 2011, the parties filed their Joint Status Report and Provisional Discovery Plan.  See Doc.

29 ("JSR").  The JSR states that "Third Party Claimants should be allowed until June 30, 2011 to

move to amend the pleadings and until June 30, 2011 to join additional parties in compliance with

the requirements of Fed.R.Civ.P. 15(a)."  JSR at 3.  On March 9, 2011, the Court issued its Order

Adopting Joint Status Report and Provisional Discovery Plan.  See Doc. 36 ("Order Adopting JSR").

In its Order Adopting JSR, the Court adopted the parties' JSR.  See Order Adopting JSR at 1.

On July 8, 2011, the Intervening Plaintiffs filed their Complaint in Intervention against

Tan-O-On Marketing and Hi-Land Potato.  See Doc. 60.  Against Tan-O-On Marketing, the Intervening Plaintiffs assert the following claims: (i) Count I -- Declaratory Relief Validating PACA Trust Claim (7 U.S.C. § 499e(c)(3) and (4)); (ii) Count II -- Enforcement of Payment from PACA Trust Assets (7 U.S.C. § 499e(c)(5)); (iii) Count III -- Violation of  PACA: Failure to Maintain PACA Trust Assets and Creation of Common Fund (7 U.S.C. § 499e(c)); (iv) Count IV --  Violation of the PACA:  Failure to Pay Promptly (7 U.S.C. § 499b(4)); and (v) Count V -- Breach of Contract. See Complaint in Intervention at 4-9.  Against Hi-Land Potato, the Intervening Plaintiffs assert the following claims: (i) Count VI -- Conversion and Unlawful Retention of PACA Trust Assets; (ii) Count VII -- Fraudulent Transfer; (iii) Count VIII --  Constructive Trust; and (iv) Count IX -- Unjust Enrichment.  See Complaint in Intervention at 10-13.

On October 14, 2011, the Tan-O-On Parties filed their Amended Third-Party Complaint. See Doc. 72.  The Tan-O-On Parties assert the following claims: (i) Fraud; (ii) Unjust Enrichment; and (iii) Theft or Conversion of Trade Secrets and Corporate and Personal Assets. See Amended Third-Party Complaint at 3-10.

On October 21, 2011, Skyline Potato filed its First Amended Complaint.  See Doc. 73. Skyline Potato asserts the following counts against the Defendants: (i) Count I -- Enforcement of Order and Collection under the PACA Trust (7 U.S.C. § 499e); (ii) Count II -- Violation of PACA Unfair Business Conduct Provision (7 U.S.C. § 499b); (iii) Count III -- Breach of Written Contract; (iv) Count IV -- Breach of Implied Covenants of Good Faith and Fair Dealing; (v) Count V -- Quantum Meruit; (vi) Count VI -- Conversion and Unlawful Retention of Plaintiff's Property and PACA Trust Assets; (vii) Count VII -- Fraud; (viii) Count VIII -- Money Owed on Open Account; (ix) Count IX -- Violation of PACA: Failure to Maintain PACA Trust Assets and Creation of a Common Fund (7 U.S.C. § 499e(c)); (x) Count X -- Fraudulent Transfer; (xi) Count XI --

Constructive Trust; and (xii) Count XII -- Prayer for the Remedy of "Piercing of the Corporate Veil." First Amended Complaint at 7-19.

On January 9, 2012, the RPE, Inc. Parties filed their Third-Party Defendants RPE, Inc. and Russell Wysocki's Motion to Dismiss Third-Party Plaintiff's Fraud-Related Claims. See Doc. 90 ("Jan. 9, 2012 MTD"). The RPE, Inc. Parties assert that the Tan-O-On Parties "articulate no discrete causes of action, and instead appear to generally contend that Movants are liable to them under theories of (a) theft of trade secrets, (b) unjust enrichment, and (c) fraud." Jan. 9, 2012 MTD at 2. The RPE, Inc. Parties alleged that the Tan-O-On Parties cannot plead fraud with sufficient specificity to satisfy rule 9(b)'s heightened pleading standards. See Jan. 9, 2012 MTD at 2-6. On January 23, 2012, the RPE, Inc. Parties filed their Third-Party Defendants RPE, Inc. and Russell Wysocki's Motion to Dismiss Claims Filed by Gerald and Julie Anderson. See Doc. 94 ("Jan. 23, 2012 MTD"). The RPE, Inc. Parties seek dismissal of the claims which the Andersons have asserted against them on the basis that the Andersons cannot bring claims for injuries Tan-O-On Marketing suffered. See Jan. 23, 2012 MTD at 1-4.

On February 2, 2012, the Tan-O-On Parties filed their Motion to Amend. See Doc. 105. In this filing, the Andersons acknowledge that they have voluntarily dismissed their individual claims against the Hi-Land Potato Parties and the RPE, Inc. Parties, and that Tan-O-On Marketing is the only one of the Tan-O-On Parties still asserting claims. See Motion to Amend at 2. The Andersons concede that the RPE, Inc. Parties are correct in their Motion to Dismiss, "therefore all claims for damages in favor of the Andersons individually are hereby stipulated to be dismissed by the [C]ourt including non-movants, [the] Hi-Land Potato [Parties]." Motion to Amend at 2. Tan-O-On Marketing argues that its Second Amended Third Party Complaint for Fraud and Theft of Trade Secrets and Unjust Enrichment and Unfair Trade Practices, filed February 2, 2012 (Doc. 105-

-8-

1)("Second Amended Third-Party Complaint"), contains sufficient allegations to plead with particularity fraud against the Hi-Land Potato Parties and the RPE, Inc. Parties.  Motion to Amend at 3.  Against the Hi-Land Potato Parties, Tan-O-On Marketing represents that it asserts claims for "a fraudulent conveyance in favor of Hi Land Potato Company and Carl Worley, individually, unjust enrichment, fraudulent theft of trade secrets, proprietary information, and unfair trade practices." Motion to Amend at 3.  Against the RPE, Inc. Parties, Tan-O-On Marketing represents that it alleges a claim of fraud based on "unjust enrichment and theft of trade secrets and proprietary information." Motion to Amend at 3.  Tan-O-On Marketing asserts "that a party should be granted leave to amend if there has been no undue delay, bad faith or dilatory tactics, undue prejudice to opposing parties, or repeated failure to cure deficiencies by amendments previously allowed."  Motion to Amend at 3 (citing Youell v. Russell, No. 04-1396, 2007 WL 709041, at *1-2 (D.N.M. Feb. 14, 2007)(Browning, J.)).  Tan-O-On Marketing contends that "the purpose of Rule 15(a) is to provide maximum opportunity for each claim to be decided on its merits rather than procedural niceties." Motion to Amend at 3.  Tan-O-On Marketing argues that it meets theses standards, because it became aware of new information regarding RPE, Inc.'s financial dealings which was not available until December 20, 2011, a date after it had filed its previous pleadings.  See Motion to Amend at 4.

On February 7, 2012, the Hi-Land Potato Parties filed their Feb. 7, 2012 MTD.  See Doc. 109.  The Hi-Land Potato Parties seek dismissal of all the claims that the Tan-O-On Parties assert against them.  See Feb. 7, 2012 MTD at 2.  The Hi-Land Potato Parties note that the Tan-O-On Parties have "conceded that they have failed to plead a claim for fraudulent conveyance," but that "[i]t is unclear whether this concession is limited to the fraudulent conveyance claims against RPE and Wysocki, or whether it extends to all third party defendants."  Feb. 7, 2012 MTD at 3.  The Hi-

Land Potato Parties assert that Tan-O-Marketing fails "to set forth any of the factual predicates that would allow it to properly state a claim for common law fraud." Feb. 7, 2012 MTD at 3. Regarding a claim for fraudulent conveyance, the Hi-Land Potato Parties contend that Tan-O-Marketing must, to satisfy rule 9(b), plead facts regarding: (i) the property subject to the transfer; (ii) the timing and, if applicable, frequency of the transfer; and (iii) the consideration paid. See Feb. 7, 2012 MTD at 6. The Hi-Land Potato Parties assert that Tan-O-On Marketing has not stated a fraudulent-transfer claim under UFTA that can survive dismissal under rule 12(b)(6), given that Tan-O-On Marketing has not alleged that it is a creditor within the meaning of the UFTA and given that Tan-O-On Marketing "is the debtor in connection with the PACA assets at issue." Feb. 7, 2012 MTD at 8-10 (emphasis in original). Alternatively, the Hi-Land Potato Parties contend that the allegations for fraudulent transfer do not satisfy rule 9(b). See Feb. 7, 2012 MTD at 10-11.

On February 17, 2012, the RPE, Inc. Parties filed their Third Party Defendants RPE, Inc. and Russell Wysocki's Response in Opposition to Third Party Plaintiff Tan-O-On Marketing Inc.'s Motion to Amend Third Party Complaint. See Doc. 112 ("RPE, Inc. Parties' Response to Motion to Amend"). The RPE, Inc. Parties ask the Court to deny the Motion to Amend, because the amendments are "futile, untimely, and unfairly prejudicial to [the RPE, Inc. Parties]." RPE, Inc. Parties' Response to Motion to Amend at 2. The RPE, Inc. Parties argue that Tan-O-On Marketing's fraud allegations are futile, because they would be subject to dismissal and because Tan-O-On Marketing does not allege that it relied on the purportedly false statements that RPE, Inc. made. See RPE, Inc. Parties' Response to Motion to Amend at 3. The RPE, Inc. Parties assert that Tan-O-On Marketing's UPA claim is defective, because Tan-O-On Marketing "does not allege that it was a purchaser of goods or services" as required to obtain relief under the UPA. RPE, Inc. Parties' Response to Motion to Amend at 4. They argue that the proposed amendment is untimely, because

the deadline to amend pleadings passed seven months before Tan-O-On Marketing filed the Motion

to Amend and because Tan-O-On Marketing has no adequate explanation for the delay.  See RPE,

Inc. Parties' Response to Motion to Amend at 4.  The RPE, Inc. Parties contend that the information

upon which Tan-O-On Marketing relies to assert that the Motion to Amend is timely "rings hollow,"

because the information it received does not consist of facts relevant to the claims Tan-O-On

Marketing asserts.  RPE, Inc. Parties' Response to Motion to Amend at 5.  They also argue that Tan-

O-On Marketing waited an additional five weeks after receipt of this information to file the Motion

to Amend.  See RPE, Inc. Parties' Response to Motion to Amend at 5.  They contest the proposed

amendments based on unfair prejudice, because the "proposed amended pleading is plainly a

'moving target,' in that it seeks to propose new theories of relief."  RPE, Inc. Parties' Response to

Motion to Amend at 5.  Finally, the RPE, Inc. Parties argue that, if Tan-O-Marketing is permitted

to amend its complaint, the Court would have to alter the schedule of proceedings and that they

would require additional discovery.  See RPE, Inc. Parties' Response to Motion to Amend at 6.

They assert that granting the motion would result in unfair prejudice that is "both significant and

self-evident."  RPE, Inc. Parties' Response to Motion to Amend at 6.

On February 21, 2012, the Hi-Land Potato Parties filed their Response to Tan-O-On's

Motion to Amend Third Party Complaint for Fraud and Theft of Trade Secrets and Unjust

Enrichment.  See Doc. 113 ("Hi-Land Potato Parties' Response to Motion to Amend").  The Hi-

Land Potato Parties argue that the Court should deny the Motion to Amend, because the request for

amendment is untimely and because the proposed amendments would be futile.  See Hi-Land Potato

Parties' Response to Motion to Amend at 1.  The Hi-Land Potato Parties contend that this motion

is more untimely than in comparable cases, because Tan-O-On Marketing filed it: (i) close to the

conclusion of discovery; (ii) after expert witness disclosures have occurred; and (iii) at a time when

the trial date is approaching.  See Hi-Land Potato Parties' Response to Motion to Amend at 1.  The Hi-Land Potato Parties also argue that the information on which Tan-O-On Marketing relies to assert that its motion was timely "appears to have nothing to do with allegations against [the] Hi-Land [Potato Parties]."  Hi-Land Potato Parties' Response to Motion to Amend at 3.  They contend that "the proposed complaint does not correct the defects that led [Tan-O-On Marketing] to agree to the dismissal of the fraud-based claims alleged in its first amended complaint."  Hi-Land Potato Parties' Response to Motion to Amend at 3.  The Hi-Land Potato Parties' argue that Tan-O-On Marketing's new UPA claim will not survive a motion to dismiss.  See Hi-Land Potato Parties' Response to Motion to Amend at 4.  They assert that the UPA claim is subject to dismissal, because "Tan-O-On [Marketing] has not alleged any misrepresentation or UPA-proscribed act at all."  Hi- Land Potato Parties' Response to Motion to Amend at 4.  The Hi-Land Potato Parties contend that the Court should deny the Motion to Amend, because they would suffer "great prejudice" if Tan-O-On Marketing is "given a third bite at the apple, especially at this late stage in the litigation."  Hi-Land Potato Parties' Response to Motion to Amend at 5.  Tan-O-On Marketing did not file a written reply brief to the RPE, Inc. Parties' Response to Motion to Amend nor to the Hi-Land Potato Parties' Response to Motion to Amend.

On February 21, 2012, Tan-O-On Marketing filed its Response to Hi-Land Potato Company, Inc. and Carl Worley's Motion to Dismiss Fraud Claims and Dismissal of Individual Claims by Andersons.  See Doc. 114 ("Response to Feb. 7, 2012 MTD").  Tan-O-On Marketing asserts that the Hi-Land Potato Parties are "correct that allegations of fraud were not plead with specificity as required by Federal rule 9(b) and therefore Tan-O-On Marketing, Inc. hereby requests the Court allow" it "to file a Second Amended Complaint to properly plead allegations that specify the fraudulent acts against Hi-Land and Carl Worley."  Response to Feb. 7, 2012 MTD at 3.  Tan-O-On

Marketing

> states that reformation of its Complaint to state separate Counts against each
> Defendant is possible now that evidence has been produced by Kroger, Inc. and Hi-
> Land Potato Company, Inc. which details with precision the unjust enrichment and
> the theft of trade secrets and business opportunity from Tan-O-On Marketing, Inc.,
> conversion of PACA trust funds, and fraud by Hi-Land Potato Company, Inc. and
> Carl Worley individually.

Response to Feb. 7, 2012 MTD at 3.  Tan-O-On Marketing then proceeds to set out some of the

evidence that supports its claims.  See Response to Feb. 7, 2012 MTD at 4-15.  Tan-O-On Marketing

contends that "Hi-Land Potato Company, Inc. effectively cut out the middle man [Tan-O-On

Marketing] by Invoicing for potato sales made by its employee Shannon Casey while he was

receiving a [Tan-O-On Marketing] paycheck."  Response to Feb. 7, 2012 MTD at 16.  Tan-O-On

Marketing asserts that the property which was the subject of a fraudulent conveyance was the "loads

of potatoes sold by Shannon Casey evidenced by Hi-Land Invoices 1414 through 1782 which were

first seen by TMI representatives this month."  Response to Feb. 7, 2012 MTD at 16.  Tan-O-On

Marketing relates that "[t]he timing began as late as October 21, 2009 and included daily sales of

PACA commodities and continued until December 2, 2009 and evidently thereafter."  Response to

Feb. 7, 2012 MTD at 16.  Tan-O-On Marketing asserts that "[e]ach Invoice carried the PACA notice

for immediate payment, however the billing was directed to Hi-Land and the money was diverted

to Sunflower Bank, eventually paid by check to Hi-Land."  Response to Feb. 7, 2012 MTD at 16.

Tan-O-On Marketing notes that "[t]here was a lot of secrecy employed to attempt to hide the

fraudulent conveyance from the USDA, the PACA industry, Tan-O-On Marketing, Inc., Terry

Wright a TMI contractor, and the Andersons."  Response to Feb. 7, 2012 MTD at 17.  "Tan-O-On

Marketing, Inc. admits vague and undirected allegations in its first Amended Complaint because this

scheme was elaborate and secretive and remained unrevealed until February 2010."  Response to

Feb. 7, 2012 MTD at 18.  Tan-O-On Marketing represents that, to establish its common-law fraud

claim:

> 1) The misrepresentation of fact is the continuing statements by Carl Worley that he was continuing to do business with TMI and everything was fine and he didn't know anything about what Shannon Casey was doing since he wasn't his employee anyways.  This positive Worley professed to Gerald Anderson, Terry Wright and the PACA industry.  At the same time Mr. Worley was issuing Invoices from Hi-Land Potato Company to sell potatoes and receive 1.6 million dollars that belonged to TMI.  2) Carl Worley knew when he deposited check from Sunflower Bank that TMI was unable to pay other producers so that every check he cashed guaranteed another PACA producer would go unpaid.  3) The entire scheme was designed by Worley to deceive TMI until the assets of the company were totally defalcated and dissipated. 4) The Andersons and Terry Wright didn't take legal action until they were both ruined and TMI was insolvent.

Response to Feb. 7, 2012 MTD at 18.  Regarding a claim for unjust enrichment and theft of trade

secrets, Tan-O-On Marketing states "that its Kroger number 048970 was appropriated by Hi-Land

Potato Company, Inc. for use by the Caseys and Mr. Worley from December 2, 2009 until July 1,

2010 to steal Tan-O-On Marketing, Inc.'s business opportunities for a total gross sales proceeds of

$2.992 million dollars."  Response to Feb. 7, 2012 MTD at 19.

On February 23, 2012, the Court filed its Stipulated Order Dismissing Fraud Claims Filed

by Tan-O-On Marketing, Inc., Against RPE, Inc. and Russell Wysocki.  See Doc. 116 ("Feb. 23,

2012 Order #1").  The Feb. 23, 2012 Order #1 relates that Tan-O-On Marketing and the RPE, Inc.

Parties agree that the Court should grant the Jan. 9, 2012 MTD.  See Feb. 23, 2012 Order #1, at 1.

The Feb. 23, 2012 Order #1 states that "[t]his dismissal should not be deemed to constitute a

decision by the Court on Tan-O-On Marketing, Inc.'s motion for leave to file a second amended

third-party complaint against RPE, Inc., and Russell Wysocki (Doc. 105), which is contested and

remains pending."  Feb. 23, 2012 Order #1, at 1-2.  The Feb. 23, 2012 Order #1 provides: "This

dismissal should not be deemed to impact Tan-O-On Marketing, Inc.'s claim against RPE, Inc. and

-14-

Russell Wysocki for unjust enrichment, which remains pending." Feb. 23, 2012 Order #1, at 2.

On February 23, 2012, the Court filed its Stipulated Order Dismissing Claims Filed by Third-Party Plaintiffs Gerald and Julie Anderson in Their Individual Capacities. See Doc. 117 ("Feb. 23, 2012 Stipulated Order #2"). The Feb. 23, 2012 Stipulated Order #2 states that the Tan-O-On Parties, the Hi-Land Potato Parties, and the RPE, Inc. Parties agree: (i) that the January 23, 2012 MTD the RPE, Inc. Parties have filed "should be granted"; and (ii) the Feb. 7, 2012 MTD "should be granted to the extent it seeks dismissal of claims filed by Gerald and Julie Anderson in their individual capacities, but should otherwise remain pending." The Feb. 23, 2012 Stipulated Order #2, at 1.

On March 7, 2012, the Hi-Land Potato Parties filed their Hi-Land Potato Company, Inc.'s Reply in Support of Its Motion to Dismiss Fraud and Fraud-Related Claims in Third Party Complaint and to Dismiss Claims Filed by Gerald and Julie Anderson in Their Individual Capacities. See Doc. 125 ("Reply to Response to Feb. 7, 2012 MTD"). The Hi-Land Parties state that "Tan-O-On's response to the motion appears to concede that its 'allegations of fraud were not plead (sic) with specificity as required by Federal Rule 9(b).'" Reply to Response to Feb. 7, 2012 MTD at 1 (alteration in original)(quoting Response to Feb. 7, 2012 MTD at 3). The Hi-Land Potato Parties assert that permitting amendment would be futile, and that both Tan-O-On Marketing's live pleading and proposed pleading are inadequate. See Reply to Response to Feb. 7, 2012 MTD at 2.

At the hearing on April 13, 2012, Tan-O-On Marketing asserted that new information has become available to it recently regarding improper payments from Hi-Land Potato to Shannon Casey as well as improper use of Tan-O-On Marketing's Kroger Co. vendor number. See Transcript of Hearing at 8:6-17:23 (taken April 13, 2012)(Robinson)("Tr.").[2] Tan-O-On Marketing asserted

---

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

that this information illustrates the questionable conduct that occurred during the transition of ownership for Tan-O-On Marketing.  See Tr. at 11:24-12:18 (Robinson).  It stated that this information revealed that Shannon Casey opened a bank account in Monte Vista in 2009, which constitutes fraud given that he represented that he was Tan-O-On Marketing's sole owner.  See Tr. at 12:19-25 (Robinson).  Tan-O-On Marketing argued that, after opening that bank account, Shannon Casey fraudulently conveyed funds in the account to Hi-Land Potato despite debts Tan-O-On Marketing owed to potato producers.  See Tr. at 13:1-10 (Robinson).  According to Tan-O-On Marketing, the information it has received confirms that fraud occurred, because the deposits in the older bank account for Tan-O-On Marketing began to drop significantly in September 2009.  See Tr. at 15:23-16:14 (Robinson).

The Hi-Land Potato Parties pointed out that, in the Tan-O-On Parties Amended Third-Party Complaint filed on October 14, 2011, the Tan-O-On Parties alleged causes of action for unjust enrichment, and theft of trade secrets, as well as allegations relating to fraud and fraudulent transfer. See Tr. at 22:7-13 (Bohnhoff).  The Hi-Land Potato Parties argued that the Motion to Amend was untimely, because the parties had agreed in the JSR to June 30, 2011, as the deadline for amendments.  See Tr. at 24:22-25:2 (Bohnhoff).  The Hi-Land Potato Parties asserted that the allegations in Tan-O-On Marketing's proposed Second Amended Third-Party Complaint are not the result of recent discovery.  See Tr. at 25:7-9 (Bohnhoff).  It noted that Tan-O-On Marketing stated in its response that it uncovered this allegedly fraudulent conduct in  February, 2010.  See Tr. at 25:7-13 (Bohnhoff)(citing Response to Feb. 7, 2012 MTD at 17).  The Hi-Land Potato Parties contended that Tan-O-On Marketing had previously asserted many allegations relating to the same underlying conduct throughout this lawsuit.  See Tr. at 25:14-25 (Bohnhoff).  They argued that the information upon which Tan-O-On Marketing relies only quantifies damages rather than provides

additional information needed to plead fraud allegations with specificity. See Tr. at 26:9-12 (Bohnhoff).

The Hi-Land Potato Parties also asserted that amendment of the common-law fraud, fraudulent-conveyance, and UPA claims Tan-O-On Marketing has asserted is futile, because Tan-O-On Marketing makes no allegations that the Hi-Land Potato Parties made misrepresentations or that Tan-O-On Marketing relied on any misrepresentations. See Tr. at 27:18-25 (Bohnhoff). The Hi-Land Potato Parties emphasized that Tan-O-On Marketing did not plead the necessary elements to assert a fraudulent-conveyance claim given that Tan-O-On Marketing has not pled that it is a creditor. See Tr. at 28:3-19, 29:2 (Bohnhoff). The Hi-Land Potato Parties elaborated: (i) that Shannon Casey, at the time he was working for Tan-O-On Marketing, had full knowledge of what was occurring such that Tan-O-On Marketing likely had knowledge of what was occurring; and (ii) that this knowledge undercuts reliance. See Tr. at 52:7-25. The Hi-Land Potato Parties asserted that, if Tan-O-On Marketing seeks to assert claims for unjust enrichment and theft of trade secrets, they would not oppose those claims through a motion to dismiss, but would instead use summary judgment or disprove those claims at trial. See Tr. at 29:11-17 (Bohnhoff). The Hi-Land Potato Parties argued that Tan-O-On Marketing's allegations regarding a UPA violation are futile, because Tan-O-On Marketing has not pled, as required under the UPA, that the Hi-Land Potato Parties made a false or misleading statement. See Tr. at 30:19-24 (Bohnhoff). The Hi-Land Potato Parties asserted that the proposed Second Amended Third-Party Complaint contains the same defects. See Tr. at 29:25-30:3 (Bohnhoff). The Hi-Land Potato Parties requested that the Court deny the Motion to Amend as untimely, or, alternatively, limit the amendments to only the unjust enrichment and theft-of-trade-secrets claims. See Tr. 31:4-16 (Bohnhoff).

The Court then sought to clarify the timeliness issue and the prejudice that the Hi-Land

Potato Parties would face from amendment. See Tr. at 33:19-34:17 (Court, Bohnhoff). The Hi-Land Potato Parties argued that the timeliness issue was pressing, because: (i) the discovery deadline is June 4, 2012; (ii) four Hi-Land Potato witnesses and a Kroger employee must still be deposed; and (iii) G. Anderson and Shannon Casey are scheduled to be deposed again. See Tr. at 34:13-35:11 (Bohnhoff). With regards to the issue of prejudice, the Court pointed out that, in each of the Tan-O-On Parties' pleadings, including the proposed Second Amended Third-Party Complaint, there has been some fraud claim. See Tr. at 35:13-16 (Court). The Hi-Land Potato Parties argued that the prejudice they face is based on what they referred to as the moving target created by new, different fraud allegations that appear each time that the Tan-O-On Parties file a pleading. See Tr. at 35:18-22 (Bohnhoff). The Hi-Land Potato Parties then stated that they would be receptive to the Court denying the Motion to Amend with regards to the common-law fraud, fraudulent-conveyance, and UPA claims while granting leave with regards to claims for unjust enrichment and theft of trade secrets, because those causes of action appear in the Tan-O-On Parties' earlier pleadings. See Tr. at 36:25-37:9 (Court, Bohnhoff).

The Court then heard argument in opposition to the Motion to Amend from the RPE, Inc. Parties. See Tr. at 37:15-16 (Court). The RPE, Inc. Parties argued that the Court should deny the Motion to Amend, because permitting amendment would be futile. See Tr. at 40:8-10 (Feuchter). The RPE, Inc. Parties emphasized that Tan-O-On Marketing's fraud claims are futile, because the proposed Second Amended Third-Party Complaint does not plead the elements necessary to establish a cause of action based on fraud. See Tr. at 40:8-15 (Feuchter). They elaborated that Tan-O-On Marketing does not allege in its proposed pleading that it relied on misrepresentations that RPE, Inc. made. See Tr. at 40:21-41:9 (Feuchter). The RPE, Inc. Parties also argued that the UPA claim was futile, because the theory of relief sought does not fit the facts of the case, given that the

UPA applies to the sale of goods and services for buyers seeking to sue sellers. See Tr. at 41:17-19 (Feuchter). The RPE, Inc. Parties contended that they would suffer unfair prejudice if the Court permitted Tan-O-On Marketing to add in a fraud claim, because the original fraud claims had been dismissed, for a period of approximately three months, and because they did not conduct discovery regarding allegations of fraud. See Tr. at 42:3-43:5 (Feuchter, Court). The RPE, Inc. Parties requested that the Court deny the Motion to Amend, and leave only claims for unjust enrichment and theft of trade secrets in Tan-O-On Marketing's pleadings. See Tr. at 43:22-44:3 (Feuchter, Court). The Court inquired whether the RPE, Inc. Parties would oppose the Court permitting amendment on the unjust enrichment and theft-of-trade-secrets claims, but deny amendment regarding the common-law fraud, fraudulent-conveyance, and UPA claims for untimeliness. See Tr. at 44:9-17 (Court, Feuchter). The RPE, Inc. Parties agreed with the Court's proposal on the basis that the proposed amendments regarding the unjust enrichment and theft-of-trade-secrets claims were primarily factual in nature. See Tr. at 44:9-19 (Court, Feuchter).

Skyline Potato and the Intervening Plaintiffs stated that they had no response to the Motion to Amend. See Tr. at 44:23-45:2 (Court, Esquivel, Jaramillo). Tan-O-On Marketing agreed that proceeding against the RPE, Inc. Parties on only the unjust enrichment and theft-of-secrets claims was appropriate, because it did not detrimentally rely on statements RPE, Inc. made, and could not establish either a fraud claim or a UPA claim. See Tr. at 46:15-24 (Robinson, Court). Tan-O-Marketing argued that the Court should permit it to pursue fraud claims against the Hi-Land Potato Parties based on the information it received in December, 2011, and because it had asserted those claims in all of its pleadings. See Tr. at 47:4-16 (Robinson, Court). The Court then indicated that, because there is no opposition to granting the Motion to Amend on unjust enrichment and theft-of-trade-secrets claims, it would permit those amendments, but would not permit amendments

-19-

regarding the common-law fraud, fraudulent-conveyance, and UPA claims . See Tr. at 48:23-49:2 (Court).  Tan-O-On Marketing agreed to this resolution concerning the RPE, Inc. Parties but maintained that the Court should permit the claims for common-law fraud, fraudulent conveyance, and UPA violations against the Hi-Land Potato Parties.  See Tr. at 49:4-24 (Robinson, Court, Bohnhoff).  Tan-O-On Marketing asserted that it could show reliance on invoices it received, because it thought Shannon Casey and Worley were accurately providing information to it regarding Tan-O-On Marketing's sale. See Tr. at 51:20-52:2 (Robinson). The Hi-Land Potato Parties asserted that, if Tan-O-On Marketing's former president Shannon Casey had full knowledge of the circumstances, there was no misrepresentation or misunderstanding.  See Tr. at 52:7-20 (Bohnhoff). The Court indicated that it would need to decide whether the fraud claims were adequately pled in the Amended Third-Party Complaint or the Second Amended Third-Party Complaint.  See Tr. at 53:16-23 (Court).

## RELEVANT LAW REGARDING AMENDMENT OF PLEADINGS

Rule 15(a)(2) provides: "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Under rule 15(a), the court should freely grant leave to amend a pleading where justice so requires.  See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. 571, 579-80 (D.N.M. 2010)(Browning, J.); Youell v. Russell, No. 04-1396, 2007 WL 709041, at *1-2 (D.N.M. Feb. 14, 2007)(Browning, J.); Burleson v. ENMR-Plateau Tele. Coop., No. 05-0073, 2005 WL 3664299, at *1-2 (D.N.M. Sept. 23, 2005)(Browning, J.).  The Supreme Court of the United States has stated that, in the absence of an apparent reason such as "undue delay, bad faith or dilatory motive . . . repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of

amendment, etc.," leave to amend should be freely given.  Fomen v. Davis, 371 U.S. 178, 182

(1962).  Furthermore, the United States Court of Appeals for the Tenth Circuit has held that district

courts should grant a plaintiff leave to amend when doing so would yield a meritorious claim.  See

Curley v. Perry, 246 F.3d 1278, 1284 (10th Cir. 2001).  See also In re Thornburg Mortg., Inc. Sec.

Litig., 265 F.R.D. at 579-80.

A court should deny leave to amend under rule 15(a), however, where the proposed

"amendment would be futile."  Jefferson Cnty. Sch. Dist. v. Moody's Investor's Serv., 175 F.3d 848,

859 (10th Cir. 1999).  See In re Thornburg Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80.  An

amendment is "futile" if the pleading "as amended, would be subject to dismissal."  In re Thornburg

Mortg., Inc. Sec. Litig., 265 F.R.D. at 579-80 (citing TV Commc'ns Network, Inc. v. Turner

Network Television, Inc., 964 F.2d 1022, 1028 (10th Cir. 1992)).  A court may also deny leave to

amend "upon a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory

motive, [or] failure to cure deficiencies by amendments previously allowed."  In re Thornburg

Mortg., Inc. Sec. Litig., 265 F.R.D. at 579 (quoting Frank v. U.S. W., Inc., 3 F.3d 1357, 1365-66

(10th Cir. 1993)).  The Tenth Circuit has also noted:

> It is well settled in this circuit that untimeliness alone is a sufficient reason to deny
> leave to amend, see Woolsey v. Marion Laboratories, Inc., 934 F.2d 1452, 1462
> (10th Cir. 1991); Las Vegas Ice & Cold Storage Co. v. Far West Bank, 893 F.2d
> 1182, 1185 (10th Cir. 1990); First City Bank v. Air Capitol Aircraft Sales, 820 F.2d
> 1127, 1133 (10th Cir. 1987), especially when the party filing the motion has no
> adequate explanation for the delay, Woolsey, 934 F.2d at 1462.  Furthermore,
> "[w]here the party seeking amendment knows or should have known of the facts
> upon which the proposed amendment is based but fails to include them in the
> original complaint, the motion to amend is subject to denial."  Las Vegas Ice, 893
> F.2d at 1185.

Frank v. U.S. W., Inc., 3 F.3d at 1365-66.  "The . . . Tenth Circuit has emphasized that '[t]he

purpose of [rule 15(a)] is to provide litigants the maximum opportunity for each claim to be decided

-21-

on its merits rather than on procedural niceties.'" B.T. ex rel. G.T. v. Santa Fe Pub. Schs., No. 05-1165, 2007 WL 1306814, at *2 (D.N.M. Mar. 12, 2007)(Browning, J.)(quoting Minter v. Prime Equip. Co., 451 F.3d 1196, 1204 (10th Cir. 2006)).

The Tenth Circuit has recognized that there is an open issue as to rule 16 of the Federal Rules of Civil Procedure's application to amendments to pleadings once the time for seeking leave for pleading amendments has passed under a scheduling order. See Bylin v. Billings, 568 F.3d 1224, 1232 n.10 (10th Cir. 2009)("Because we decline to consider the Bylins' Rule 16 argument, we leave for another day the question of whether this circuit should apply Rule 16 when a party seeks to amend a pleading after a court-imposed deadline."). "Rule 16 only allows such amendments for 'good cause,' an arguably more stringent standard than the standards for amending a pleading under Rule 15." Bylin v. Billings, 568 F.3d at 1230 (quoting Fed. R. Civ. P. 16(b)(4)). Rule 16(b)(4) states: "A schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). The rule "focuses on the diligence of the party seeking leave to modify the scheduling order to permit the proposed amendment." Advanced Optics Elecs., Inc. v. Robins, 769 F.Supp.2d 1285, 1313 (D.N.M. 2010)(Browning, J.). "Properly construed, 'good cause' means that scheduling deadlines cannot be met despite a party's diligent efforts." Advanced Optics Elecs., Inc. v. Robins, 769 F.Supp.2d at 1313. See Gerald v. Locksley, No. 10-0721, 2011 WL 3510845, at *13-14 (D.N.M. Aug. 1, 2011)(Browning, J.)(same). The Tenth Circuit has noted that there is a "'rough similarity' between the 'undue delay' standard of Rule 15 and the 'good cause' standard of Rule 16." Bylin v. Billings, 568 F.3d at 1231. Thus, the Tenth Circuit has indicated that the application of the rule 16 standard will often lead to the same outcome as applying the rule 15 standard. See Bylin v. Billings, 568 F.3d at 1231-32.

This Court has previously stated that its rule 16(b) good-cause inquiry focuses on the

diligence of the party seeking to amend the scheduling order.  See Walker v. THI of N.M. at Hobbs Ctr., 262 F.R.D. 599, 602-03 (D.N.M. 2009)(Browning, J.); Guidance Endodontics, LLC v. Dentsply Int'l, Inc., No. 08-1101, 2009 WL 3672505, at *2-3 (D.N.M. Sept. 29, 2009)(Browning, J.); Trujillo v. Bd. of Educ. of the Albuquerque Pub. Schs., Nos. 02-1146 and 03-1185, 2007 WL 2296955, at *3 (D.N.M. June 5, 2007)(Browning, J.).  The United States District Court for the District of South Carolina has stated:

> Rule 16(b)'s "good cause" standard is much different than the more lenient standard contained in Rule 15(a).  Rule 16(b) does not focus on the bad faith of the movant, or the prejudice to the opposing party.  Rather, it focuses on the diligence of the party seeking leave to modify the scheduling order to permit the proposed amendment. Properly construed, "good cause" means that scheduling deadlines cannot be met despite a party's diligent efforts.  In other words, this court may "modify the schedule on a showing of good cause if [the deadline] cannot be met despite the diligence of the party seeking the extension." Carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief.

Dilmar Oil Co., Inc. v. Federated Mut. Ins. Co., 986 F.Supp. 959, 980 (D.S.C. 1997)(citations omitted), aff'd on other grounds, 129 F.3d 116 (4th Cir. 1997).  See Denmon v. Runyon, 151 F.R.D. 404, 407 (D. Kan. 1993)(affirming an order denying the plaintiff's motion to amend after the deadline which the scheduling order established had passed and stating that, "[t]o establish 'good cause,' the party seeking to extend the deadline must establish that the scheduling order's deadline could not have been met with diligence"). Cf. SIL-FLO, Inc. v. SFHC, Inc., 917 F.2d 1507, 1518-19 (10th Cir. 1990)(affirming, under rule 16(b), denial of a motion to amend an answer to include a compulsory counterclaim filed three months after the scheduling order deadline).

In In re Kirkland, 86 F.3d 172 (10th Cir. 1996), the Tenth Circuit dealt with the definition of "good cause" in the context of rule 4(j).[3]  The Tenth Circuit noted:

---

[3]The version of rule 4(j) the Tenth Circuit discussed in In re Kirkland was the version in effect after the 1983 amendments to rule 4(j).  That version of rule 4(j) provided:

> [W]ithout attempting a rigid or all-encompassing definition of "good cause," it would appear to require at least as much as would be required to show excusable neglect, as to which simple inadvertence or mistake of counsel or ignorance of the rules usually does not suffice, and some showing of "good faith on the part of the party seeking the enlargement and some reasonable basis for noncompliance within the time specified" is normally required.

86 F.3d at 175 (emphasis omitted)(internal quotation marks omitted)(quoting Putnam v. Morris, 833 F.2d 903, 905 (10th Cir. 1987)).   The Tenth Circuit explained that Putnam v. Morris "thus recognized that the two standards, although interrelated, are not identical and that 'good cause' requires a greater showing than 'excusable neglect.'"   In re Kirkland, 86 F.3d at 175.

Other courts within the Tenth Circuit have held that "the 'good cause' standard primarily considers the diligence of the party . . . [.] The party seeking an extension must show that despite due diligence it could not have reasonably met the scheduled deadlines.   Carelessness is not compatible with a finding of diligence and offers no reason for a grant of relief."   Pulsecard, Inc. v. Discover Card Servs. Inc., 168 F.R.D. 295, 301 (D. Kan. 1996)(alterations in original)(internal quotation marks omitted).   In the United States District Court for the District of Utah, the Honorable Dale A. Kimball, United States District Judge, found "good cause" existed to amend the court's scheduling order when the court decided to permit the plaintiff's counsel to withdraw as counsel. Kee v. Fifth Third Bank, No. 2:06-cv-00602-DAK-PMW, 2008 WL 183384, at *1 (D. Utah Jan. 17, 2008).   Judge Kimball reasoned: "[I]n light of the court's decision to permit [counsel] to withdraw

_____

> If a service of the summons and complaint is not made upon a defendant within 120 days after the filing of the complaint and the party on whose behalf such service was required cannot show good cause why such service was not made within that period, the action shall be dismissed as to that defendant without prejudice upon the court's own initiative with notice to such party or upon motion.   This subdivision shall not apply to service in a foreign country pursuant to subdivision (i) of this rule.

Act of Feb. 26, 1983, Pub. L. No. 97-462, 96 Stat. 2527.

. . . the court has determined that good cause exists for amending the existing scheduling order."

Kee v. Fifth Third Bank, 2008 WL 183384, at *1.

## STANDARD FOR A MOTION TO DISMISS UNDER RULE 12(b)(6)

Under rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994). The sufficiency of a complaint is a question of law, and when considering and addressing a rule 12(b)(6) motion, a court must accept as true all well-pleaded factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006); Hous. Auth. of Kaw Tribe v. City of Ponca, 952 F.2d 1183, 1187 (10th Cir. 1991).

A complaint challenged by a rule 12(b)(6) motion to dismiss does not require detailed factual allegations, but a plaintiff's burden to set forth the grounds of his or her entitlement to relief "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 546 (2007). See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)(stating that a plaintiff's complaint must set forth more than a threadbare recital "of the elements of a cause of action, supported by mere conclusory statements"). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp. v. Twombly, 550 U.S. at 545 (citation omitted). To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its

face.  See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995 (10th Cir.

2010).  "A claim has facial plausibility when the pleaded factual content allows the court to draw

the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal,

556 U.S. at 678.  "Thus, the mere metaphysical possibility that some plaintiff could prove some set

of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to

believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."

Ridge at Red Hawk, LLC v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007).  The Tenth Circuit

has stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a
> complaint: if they are so general that they encompass a wide swath of conduct, much
> of it innocent, then the plaintiffs "have not nudged their claims across the line from
> conceivable to plausible."  The allegations must be enough that, if assumed to be
> true, the plaintiff plausibly (not just speculatively) has a claim for relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(citations omitted).

### RELEVANT LAW REGARDING PLEADING ALLEGATIONS OF FRAUD

A plaintiff must plead "a short and plain statement of the claim showing that the pleader is

entitled to relief."  Fed. R. Civ. P. 8(a)(2).  Fraud claims, however, must meet more stringent

standards.  See Fed. R. Civ. P. 9(b).  "In alleging fraud or mistake, a party must state with

particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other

conditions of a person's mind may be alleged generally."  Fed. R. Civ. P. 9(b).  "The requirements

of Rule 9(b) must be read in conjunction with the principles of Rule 8, which calls for pleadings to

be 'simple, concise, and direct, . . . and to be construed as to do substantial justice.'"  Schwartz v.

Celestial Seasonings, Inc., 124 F.3d 1246, 1252 (10th Cir. 1997).

"With respect to rule 9(b)'s scope, a court should require parties to plead a cause of action

with particularity when that cause of action contains allegations grounded in fraud."  Two Old

Hippies, LLC v. Catch the Bus, LLC, 784 F.Supp.2d 1200, 1207 (D.N.M. 2011)(Browning, J.)(citing 2 J. Moore, J. Parness & J. Smith, Moore's Federal Practice § 9.03(1)(d), at 9-20 (3d ed. 2008)).   On the other hand, a plaintiff may plead claims based on negligent or innocent misrepresentations, to the extent those claims do not require proof of fraud, in accordance with the more relaxed standards of rule 8(a).   See Tricontinental Indus., Ltd. v. Pricewaterhouse Coopers, LLP, 475 F.3d 824, 833 (7th Cir. 2007)(recognizing that rule 9(b)'s heightened pleading standard does not apply to negligent-misrepresentation claim); Gen. Elec. Capital Corp. v. Posey, 415 F.3d 391, 395-96 (5th Cir. 2005)(concluding that negligent-misrepresentation claim needs only to satisfy rule 8(a)'s notice pleading standard); Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1104-05 (9th Cir. 2003)("Allegations of non-fraudulent conduct need satisfy only the ordinary notice pleading standards of Rule 8(a)."); Carl Kelley Const. LLC v. Danco Techs, 656 F.Supp.2d 1323, 1346 (D.N.M. 2009)(Browning, J.)(citing City of Raton v. Ark. River Power Auth., 600 F.Supp.2d at 1142-44, 1153)("[U]nlike with fraudulent misrepresentation, rule 8's notice pleading standard governs [negligent misrepresentations].")).

"The primary motives that animate rule 9(b) help illuminate the reason for limiting the rule's reach to claims grounded in fraud." S2 Automation LLC v. Micron Tech., No. 11-0884, 2012 WL 843706, at *6 (D.N.M. 2012)(Browning, J.).   First, the requirement of pleading with particularity protects defendants' reputations from the harm attendant to accusations of fraud or dishonest conduct.   See United States ex rel. Harrison v. Westinghouse Savannah River Co., 353 F.3d 908, 921 (4th Cir. 2003)("Rule 9(b) protects defendants from harm to their goodwill and reputation." (internal quotation marks omitted)); Guidry v. Banks of LaPlace, 954 F.2d 278, 288 (5th Cir. 1992)("[The particularity requirement] stems from the obvious concerns that general, unsubstantiated charges of fraud can do damage to a defendant's reputation.").   Second, the

requirement to plead with particularity puts defendants on notice of the allegedly fraudulent conduct so that they can formulate a defense. See United States ex rel. Harrison v. Westinghouse Savannah River Co., 353 F.3d at 921. A related goal of rule 9(b) is to prevent plaintiffs from tagging on specious fraud claims to their pleadings in an attempt "to induce advantageous settlements or for other ulterior purposes." Banker's Trust Co. v. Old Republic Ins. Co., 959 F.2d 677, 683 (7th Cir. 1992).

The Tenth Circuit has fleshed out the components necessary to a successful rule 9(b) pleading. In Sheldon v. Vermonty, 246 F.3d 682, 2000 WL 1774038 (10th Cir. 2000)(unpublished table decision), the Tenth Circuit held that the plaintiff had alleged with sufficient particularity a violation of the Securities Exchange Act of 1934. See 2000 WL 1774038, at *4. The Tenth Circuit concluded that the complaint

> adequately met Rule 9(b) requirements. First, as the district court acknowledged, the Complaint alleged misrepresentations with background information as to date, speaker, and the medium of communication. . . . Second, certain of the alleged misrepresentations involved profitable expectations arising from an unowned and inoperable meat-packing plant, a nonexistent lumber company, and fabricated contracts. Accepting Sheldon's allegations as true, these are patently false statements of present fact. The district court erred in determining they were mere conclusory allegations of falsity and in characterizing them as fraud by hindsight. . . . Third, the allegations of scienter were sufficient. In securities fraud cases, although speculation and conclusory allegations will not suffice, great specificity is not required if the plaintiff alleges enough facts to support a strong inference of fraudulent intent.

2000 WL 1774038, at *5 (citations omitted)(internal quotation marks omitted). "At a minimum, Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud." United States ex rel. Schwartz v. Coastal Healthcare Grp., Inc., 232 F.3d 902, 2000 WL 1595976, at * 3 (10th Cir. 2000)(unpublished table decision). "To survive a motion to dismiss, an allegation of fraud must 'set forth the time, place, and contents of the false representation, the

identity of the party making the false statements and the consequences thereof.'" Midgley v. Rayrock Mines, Inc., 374 F.Supp.2d 1039, 1047 (D.N.M. 2005)(Browning, J.)(quoting Schwartz v. Celestial Seasonings, Inc., 124 F.3d at 1252). "On the other hand, rule 9(b) does not require specific knowledge regarding the defendant's state of mind." Midgley v. Rayrock Mines, Inc., 374 F.Supp.2d at 1047.

## RELEVANT LAW REGARDING FRAUD

The elements of fraudulent misrepresentation are: "(i) a misrepresentation of fact, (ii) either knowledge of the falsity of the representation or recklessness on the part of the party making the misrepresentation, (iii) intent to deceive and to induce reliance on the misrepresentation, and (iv) detrimental reliance on the misrepresentation." Pedroza v. Lomas Auto Mall, Inc., 600 F.Supp.2d 1162, 1167 (D.N.M. 2009)(Browning, J.)(quoting Cain v. Champion Window Co. of Albuquerque, 142 N.M. 209, 216, 164 P.3d 90, 97 (Ct. App. 2007))(internal quotation marks omitted). Fraudulent "[i]ntent may be inferred from the circumstances surrounding the dealings . . . ." Maxey v. Quintana, 84 N.M. 38, 42, 499 P.2d 356, 360 (Ct. App. 1972). While New Mexico courts have not discussed third-party liability for fraud, the general rule is:

> The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved.

Pedroza v. Lomas Auto Mall, Inc., 600 F.Supp.2d 1162, 1167 (D.N.M. 2009)(citing Restatement (Second) of Torts § 533 (2009)).

## RELEVANT LAW REGARDING NEW MEXICO'S UFTA

N.M.S.A. § 56-10-18 provides:

-29-

A.      A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

      (1)      with actual intent to hinder, delay or defraud any creditor of the debtor; or

      (2)      without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

            (a)      was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

            (b)      intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

B.      In determining actual intent under Paragraph (1) of Subsection A of this section, consideration may be given, among other factors, to whether:

      (1)      the transfer or obligation was to an insider;

      (2)      the debtor retained possession or control of the property transferred after the transfer;

      (3)      the transfer or obligation was disclosed or concealed;

      (4)      before the transfer was made or obligation was incurred, the debtor has been sued or threatened with suit;

      (5)      the transfer was of substantially all the debtor's assets;

      (6)      the debtor absconded;

      (7)      the debtor removed or concealed assets;

      (8)      the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

      (9)      the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10)     the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11)     the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

N.M.S.A. 1978, § 56-10-18.  New Mexico courts have referred to these items listed in subsection (B) as "badges of fraud."  Ellen Equip. Corp. v. C.V. Consultants & Assocs., Inc., 144 N.M. 55, 57, 183 P.3d 940, 942 (Ct. App. 2008)(citing First Nat'l Bank in Albuquerque v. Abraham, 97 N.M. 288, 292, 639 P.2d 575, 579 (1982)).  "A creditor may establish a prima facie case through proof of badges of fraud."  First Nat'l Bank in Albuquerque v. Abraham, 97 N.M. at 292, 639 P.2d at 579.

N.M.S.A. 1978, § 56-10-15(D) defines a creditor as "a person who has a claim."  N.M.S.A. 1978, § 56-10-15(D).  N.M.S.A. 1978, § 56-10-15(F) defines a debtor as "a person who is liable on a claim."  N.M.S.A. 1978, § 56-10-15(F).  N.M.S.A. 1978, § 56-10-15(C) defines a claim as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured."  N.M.S.A. 1978, § 56-10-15(C).  The National Conference of Commissioners on Uniform States Laws' Uniform Fraudulent Transfer Act § 1(3) provides the same definition for claim as that which appears in N.M.S.A. 1978, § 56-10-15(C).  See Unif. Fraudulent Transfer Act § 1(3) (1984).  Comment (3) to the Uniform Fraudulent Transfer Act states: "The definition of 'claim' is derived from § 101(4) of the Bankruptcy Code."  Unif. Fraudulent Transfer Act § 1 cmt. (3).[4]  Interpreting 11 U.S.C.

---

[4]Under New Mexico law, when interpreting a statute, a court may consider "a settled judicial construction in another jurisdiction as of the time a statute or rule is borrowed from the other jurisdiction," or "a judicial construction of the same or similar statute or rule of this or another state."  N.M.S.A. 1978, § 12-2A-20(B)(1)-(2).  Accord Corum v. Roswell Senior Living, LLC, 149 N.M. 287, 248 P.3d 329, 331-32 (Ct. App. 2010).  The Court has previously held, when interpreting a securities statute under New Mexico law, that New Mexico courts would find comments to the uniform act persuasive.  See Genesee Cnty. Emps.' Ret. Sys. v. Thornburg Mortg' Sec. Trust 2006-3, 825 F.Supp.2d 1082, 1230 (D.N.M. 2011)(Browning, J.)("The New Mexico Securities Act, although containing some variations, is patterned after the Uniform Securities Act approved in 1985

§ 101(4), the Supreme Court has stated:

> As is apparent, Congress chose expansive language in both definitions relevant to this case.  For example, to the extent the phrase "right to payment" is modified in the statute, the modifying language ("whether or not such right is . . .") reflects Congress' broad rather than restrictive view of the class of obligations that qualify as a "claim" giving rise to a "debt."  See also H.R. Rep. No. 95-595, supra, at 309, U.S. Code Cong. & Admin. News 1978, p. 6266 (describing definition of "claim" as "broadest possible" and noting that Code "contemplates that all legal obligations of the debtor . . . will be able to be dealt with in the bankruptcy case"); accord, S. Rep. No. 95-989, supra, at 22, U.S. Code Cong. & Admin. News 1978, p. 5808.

Penn. Dep't of Pub. Welfare v. Davenport, 495 U.S. 552, 558 (1990), superseded by statute on other grounds Criminal Victims Protection Act of 1990, Pub. L. No. 101-581, § 3, 104 Stat. 2865, as stated in Johnson v. Home State Bank, 501 U.S. 78 (1991).

### RELEVANT LAW REGARDING THE NEW MEXICO UNFAIR PRACTICES ACT

"The UPA provides individual and class action remedies for unfair, deceptive, or unconscionable trade practices."  Valdez v. Metro. Prop. & Cas. Ins. Co., No. 11-0507, 2012 WL 1132414, at *19 (D.N.M. Mar. 31, 2012)(Browning, J.)(citing Quynh Truong v. Allstate Ins. Co., 147 N.M. 583, 590, 227 P.3d 73, 80 (2010)).  "Generally speaking, the UPA is designed to provide a remedy against misleading identification and false or deceptive advertising."  Lohman v. Daimler-Chrysler Corp., 142 N.M. 437, 442, 166 P.3d 1091, 1096 (Ct. App. 2007).  To state a claim under the UPA, a complaint must allege:

> (1) the defendant made an oral or written statement, a visual description or a representation of any kind that was either false or misleading; (2) the false or misleading representation was knowingly made in connection with the sale, lease, rental, or loan of goods or services in the regular course of the defendant's business; and (3) the representation was of the type that may, tends to, or does deceive or mislead any person.

---

by the National Conference of Commissioners on Uniform State Laws.  Thus, a New Mexico court would find interpretations of the Uniform Securities Act persuasive." (citation omitted)(internal quotation marks omitted)).

Lohman v. Daimler-Chrysler Corp., 142 N.M. at 439, 166 P.3d at 1093 (citing N.M.S.A. 1978, § 57-12-2(D); Stevenson v. Louis Dreyfus Corp., 112 N.M. 97, 100, 811 P.2d 1308, 1311 (1991)).  "The gravamen of an unfair trade practice is a misleading, false, or deceptive statement made knowingly in connection with the sale of goods or services."  Diversey Corp. v. Chem-Source Corp., 125 N.M. 748, 754, 965 P.2d 332, 338 (Ct. App. 1998).

## ANALYSIS

The Court will grant in part and deny in part the Feb. 7, 2012 MTD.  There are not sufficient allegations in the Amended Third-Party Complaint to satisfy rule 9(b)'s heightened pleading standards with regards to a common-law fraud claim.  There are sufficient allegations in the Amended Third-Party Complaint for a fraudulent-conveyance claim to satisfy rule 12(b)(6)'s standards and rule 9(b)'s heightened pleading standards.  There are sufficient allegations in the Amended Third-Party Complaint regarding the UFTA claim Tan-O-On Marketing asserts against the Hi-Land Potato Parties to survive dismissal under rule 12(b)(6) and rule 9(b).  The Court will grant in part and deny in part the Motion to Amend.  Consistent with the agreement between Tan-O-On Marketing and the RPE, Inc. Parties at the hearing on April 13, 2012, the Court will grant Tan-O-On Marketing leave to amend its claims for unjust enrichment and theft of trade secrets asserted against the RPE, Inc. Parties, but will deny leave to amend the remaining claims it seeks to assert against the RPE, Inc. Parties.  The Court will deny leave to amend regarding the common-law fraud and UPA claims that Tan-O-On Marketing seeks to assert against the Hi-Land Potato Parties, because permitting leave to amend would be futile and unfairly prejudicial to the Hi-Land Potato Parties.  The Court will grant leave to amend regarding the fraudulent-conveyance claims which Tan-O-On Marketing seeks to assert against Hi-Land Potato, given that the additional allegations primarily flesh out allegations which were already in Tan-O-On Marketing's prior pleadings.  The

Court will grant leave to amend the claims for unjust enrichment and theft of trade secrets asserted against the Hi-Land Potato Parties in light of the agreement the parties reached at the hearing on April 13, 2012.

## I.   THE COURT WILL GRANT IN PART AND DENY IN PART THE FEB. 7, 2012 MTD.

The Court will grant in part and deny in part the Feb. 7, 2012 MTD. There are not sufficient allegations in the Amended Third-Party Complaint to satisfy rule 9(b)'s heightened pleading standards with regards to a common-law fraud claim. There are, however, sufficient allegations in the Amended Third-Party Complaint for a fraudulent-conveyance claim to satisfy rule 12(b)(6)'s standards and rule 9(b)'s heightened pleading standards. Additionally, there are sufficient allegations in the Amended Third-Party Complaint regarding the UFTA claim Tan-O-On Marketing asserts against the Hi-Land Potato Parties to survive dismissal under rule 12(b)(6) and rule 9(b).

### A.   RELEVANT ALLEGATIONS FROM THE AMENDED THIRD-PARTY COMPLAINT.

The relevant allegations in the Amended Third-Party Complaint as they relate to the Feb. 7, 2012 MTD are as follows. In February 2006, the Caseys purchased Tan-O-On Marketing from the Andersons through a stock purchase agreement. See Amended Third-Party Complaint at ¶¶ 15-16, at 4. Before the Caseys' purchase of Tan-O-On Marketing, the company "had a long standing reputation in the industry for prompt payments to all growers of potatoes immediately upon receipt of payments for potatoes delivered by Tan-O-On Marketing." Amended Third-Party Complaint ¶ 17, at 4.

In late 2009, Shannon Casey resigned from and closed Tan-O-On Marketing. See Amended Third-Party Complaint ¶¶ 18, 20, at 5. After closing Tan-O-On Marketing, the Caseys relocated to Monte Vista -- where Hi-Land Potato locates its business. See Amended Third-Party Complaint

¶ 20, at 5.  Although the Caseys represented that they had abandoned their positions with Tan-O-On Marketing, they later established a new bank account for the company in Monte Vista.  See Amended Third-Party Complaint ¶ 21, at 5-6.  The Caseys deposited approximately $1.8 million of Tan-O-On Marketing's receivables into the new account and then paid those proceeds to Hi-Land Potato instead of Tan-O-On Marketing's PACA trust creditors, such as Skyline Potato and the Intervening Plaintiffs.  See Amended Third-Party Complaint ¶ 21, at 6.  "This [conduct] was [all] part of a scheme to defraud [Tan-O-On Marketing] and Gerald R. Anderson and Julie Anderson and was intentional and known . . . ."  Amended Third-Party Complaint ¶ 24, at 7.

Before January 2010, Hi-Land Potato did not broker sales of potatoes, because it relied on Tan-O-On Marketing to sell its product.  See Amended Third-Party Complaint ¶ 22, at 6.  At the time Shannon Casey shut down Tan-O-On Marketing, the company was the largest supplier of potatoes to Kroger Co.  See Amended Third-Party Complaint ¶ 18, at 5.  Kroger Co. does not transact business with a potato broker unless the broker has a Kroger Co. vendor number.  See Amended Third-Party Complaint ¶ 18, at 5.  Hi-Land Potato transferred Tan-O-On Marketing's customer relationships, monthly orders from Kroger Co., and other proprietary information, without authority, permission, or compensation to RPE, Inc.  See Amended Third-Party Complaint ¶ 25, at 7.  After the transfer of Tan-O-On Marketing assets to RPE, Inc., RPE, Inc. announced the opening of a Monte Vista sales division and hired Shannon Casey as the operation's director.  See Amended Third-Party Complaint ¶ 26, at 7.  RPE, Inc. now handles the sales of potatoes from Hi-Land Potato, including the sales relationship with Kroger Co.  See Amended Third-Party Complaint ¶ 27, at 7-8.  When Shannon Casey shut down Tan-O-On Marketing, neither Hi-Land Potato nor RPE, Inc. had a vendor number with Kroger Co.  See Amended Third-Party Complaint ¶ 18, at 5.

The transfer of Tan-O-On Marketing assets from Tan-O-On Marketing to Hi-Land Potato

to RPE, Inc. constitutes a breach of the PACA trust and a fraudulent transfer, because Skyline Potato and the Intervening Plaintiffs remain uncompensated for their transactions with Tan-O-On Marketing.  See Amended Third-Party Complaint ¶¶ 28, 34, at 8-9.  Fraudulent transfers "were made to or for the benefit of Hi-Land Potato Company Inc., Carl Worley and RPE, Inc. and Russell Wysocki insiders of TMI on antecedent debts, and were made without consideration."  Amended Third-Party Complaint ¶ 40, at 10.

### B.   TAN-O-ON MARKETING'S AMENDED THIRD-PARTY COMPLAINT DOES NOT ADEQUATELY ALLEGE A COMMON-LAW FRAUD CLAIM TO SURVIVE DISMISSAL UNDER RULE 9(b).

The elements of fraudulent misrepresentation under New Mexico law[5] are: "(i) a

---

[5]The parties do not address whether New Mexico law applies to this dispute.  The Hi-Land Potato Parties cite New Mexico law to state the elements of common-law fraud.  See Feb. 7, 2012 MTD at 7 (listing the elements of common-law fraud "[u]nder New Mexico law").  Tan-O-On Marketing similarly cites New Mexico law to define the elements of common-law fraud.  See Response to Feb. 7, 2012 MTD at 18 (citing authority for the "common law fraud principals [sic] to be followed in New Mexico").  Thus, the parties do not appear to dispute that New Mexico law applies to the claims asserted in this case.

As New Mexico is the forum state for the United States District Court for the District of New Mexico, the Court looks to New Mexico choice-of-law rules to determine which state's substantive law applies.  See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941); Gen. Protecht Grp., Inc. v. Leviton Mfg. Co., No. 10-1020, 2010 WL 5559750, at *6 (D.N.M. Nov. 30, 2010)(Browning, J.).  In New Mexico, the choice-of-law analysis is a two-step process.  See Terrazas v. Garland & Loman, Inc., 140 N.M. 293, 296, 142 P.3d 374, 377 (Ct. App. 2006).  First, the Court must characterize the "area of substantive law -- e.g., torts, contracts, domestic relations -- to which the law of the forum assigns a particular claim or issue."  Terrazas v. Garland & Loman, Inc., 140 N.M. at 296, 142 P.3d at 377.  The next step is to apply New Mexico's choice-of-law rule.  See Terrazas v. Garland & Loman, Inc., 140 N.M. at 296, 142 P.3d at 377.

In tort actions, New Mexico courts follow the doctrine of lex loci delicti commissi and apply the law of the place where the wrong took place.  See Torres v. State, 119 N.M. 609, 613, 894 P.2d 386, 390 (1995).  See also Mosley v. Titus, 762 F.Supp.2d 1298, 1314 (D.N.M. 2010)(Browning, J.).  The place of the wrong is the location of the last act necessary to complete the injury.  See Torres v. State, 119 N.M. at 619, 894 P.2d at 390.  Where the elements of the underlying claim include harm, the place of the wrong is the place where the harm occurred.  See First Nat'l Bank in Albuquerque v. Benson, 89 N.M. 481, 482, 553 P.2d 1288, 1289 (Ct. App. 1976).  The Supreme Court of New Mexico has said that it will not use the place-of-wrong-rule, however, if application of the rule would violate New Mexico public policy.  See Torres v. State, 119 N.M. at 619, 894 P.2d at 390.  The Court of Appeals of New Mexico has interpreted this principle to mean that, although

misrepresentation of fact,  (ii) either knowledge of the falsity of the representation or recklessness

on the part of the party making the misrepresentation, (iii) intent to deceive and to induce reliance

on the misrepresentation, and (iv) detrimental reliance on the misrepresentation." Cain v. Champion

Window Co. of Albuquerque, 142 N.M. at 216, 164 P.3d at 97 (internal quotation marks omitted).

"At a minimum, Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of

the alleged fraud." United States ex rel. Schwartz v. Coastal Healthcare Grp., Inc., 2000 WL

1595976, at *3. "To survive a motion to dismiss, an allegation of fraud must 'set forth the time,

place, and contents of the false representation, the identity of the party making the false statements

and the consequences thereof.'" Midgley v. Rayrock Mines, Inc., 374 F.Supp.2d at 1047 (quoting

Schwartz v. Celestial Seasonings, Inc., 124 F.3d at 1252). "On the other hand, rule 9(b) does not

require specific knowledge regarding the defendant's state of mind." Midgley v. Rayrock Mines,

Inc., 374 F.Supp.2d at 1047.

  Tan-O-On Marketing has not pled any fraudulent statement allegedly attributable to either

---

there is a strong presumption in favor of application of the place-of-the-wrong rule, in some
situations, a court may depart from the general rule if another state has a more significant interest
in having its law apply.  See Estate of Gilmore, 124 N.M. 119, 946 P.2d 1130 (Ct. App. 1997).

  Tan-O-On Marketing alleges that it "had its principal place of business in New Mexico at
the times relevant to this cause of action." Amended Third-Party Complaint ¶ 1, at 2. Common-law
fraud is a tort claim, which means that the place-of-wrong rule applies under New Mexico choice-of-
law rules. Many of the events giving rise to the dispute between Tan-O-On Marketing and the Hi-
Land Potato Parties occurred in New Mexico, with the Caseys ultimately moving to Colorado. Tan-
O-On Marketing alleges that it opened a bank account in Albuquerque and that the Caseys
misappropriated funds from those accounts to divert them to an account in Colorado. Tan-O-On
Marketing does not allege that it engages in any significant business in Colorado. Given that the
alleged financial harm occurred in New Mexico, where Tan-O-On Marketing maintained its bank
account, the place of the alleged wrong is New Mexico, where the alleged harm to Tan-O-On
Marketing occurred. See First Nat'l Bank in Albuquerque v. Benson, 89 N.M. at 482, 553 P.2d at
1289. Nothing about this case indicates that another state has a more significant interest than New
Mexico in having its law apply. Consequently, without further guidance from the parties, the Court
concludes that New Mexico law applies to this dispute.

Worley or Hi-Land Potato.  One of the key elements of a common-law fraud claim is the existence of a misrepresentation.  To satisfy rule 9(b)'s requirements, the plaintiff must plead the contents of the allegedly false representation.  See Midgley v. Rayrock Mines, Inc., 374 F.Supp.2d at 1047. Tan-O-On Marketing has not met that requirement in its Amended Third-Party Complaint. Furthermore, without allegations regarding a statement, Tan-O-On Marketing cannot show that it relied on a misrepresentation.  Tan-O-On Marketing briefly alleges that: "While the Casey's claim to have abandoned their positions with and any interest in TMI, they nevertheless established a new bank account for TMI in Monte Vista, Colorado at the Sunflower Bank."  Amended Third-Party Complaint ¶ 21, at 6-7.  Drawing all reasonable inferences in Tan-O-On Marketing's favor, the Caseys were at some point acting as agents for Hi-Land Potato.  This allegation is ambiguous, as it does not appear to refer to a specific statement that the Caseys made to anyone.  Furthermore, to the extent the allegation relates that the Caseys made a misrepresentation, Tan-O-On Marketing does not allege that it was made to them, or allege the time and place the Caseys made the statement.  One could read the allegation as stating that the Caseys made the representation to a bank in Monte Vista.[6]  Tan-O-On Marketing also does not allege that it relied on this statement.  Thus, the Court

_____

[6]As the Court has previously stated, "[w]hile New Mexico courts have not discussed third-party liability for fraud," the general rule courts follow is:

> The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved.

Pedroza v. Lomas Auto Mall, Inc., 600 F.Supp.2d at 1167 (citing Restatement (Second) of Torts § 533 (2009)).  There are no allegations suggesting that, and Tan-O-On Marketing has not argued that, this theory of fraud is applicable to the allegations in the Second Amended Third-Party Complaint.

will dismiss the common-law fraud claim.

### C.   TAN-O-ON MARKETING'S AMENDED THIRD-PARTY COMPLAINT ADEQUATELY ALLEGES A FRAUDULENT-CONVEYANCE CLAIM.

Regarding a claim for fraudulent conveyance, the Hi-Land Potato Parties contend that Tan-O-Marketing must, to plead a common-law claim for fraudulent conveyance, allege the following elements: (i) the property subject to the transfer; (ii) the timing and, if applicable, frequency of the transfer; and (iii) the consideration paid.  See Feb. 7, 2012 MTD at 6 (citing Trustees of Eighth Dist. Elec. Pension Fund v. Wasatch Front Elec. & Const., LLC, No. 2:09-cv-00632, 2010 WL 3792196, at *1 n.10 (D. Utah Sept. 22, 2010)).   Tan-O-On Marketing appears to agree that these same elements are necessary to assert a claim for fraudulent conveyance, as it also cites Trustees of Eighth District Electrical Pension Fund v. Wasatch Front Electric & Construction, LLC in its Response to Feb. 7, 2012 MTD.  See Response to Feb. 7, 2012 MTD at 17.

The parties do not address whether a common-law fraudulent-conveyance claim exists under New Mexico law.  Trustees of Eighth District Electrical Pension Fund v. Wasatch Front Electric & Construction, LLC refers to a common-law claim for "intentional fraudulent transfer."  2010 WL 3792196, at *1 n.10.  The Court has located a Supreme Court of New Mexico case that states the following:

> To make a conveyance a fraudulent transfer, a fraudulent intent participated in by both parties to the transaction must exist.  National Mut. Savings & Loan Ass'n v. Lake, 47 N.M. 223, 141 P.2d 188.  The conveyance must be made with the intention of the debtor to delay, hinder or defraud creditors and such intention be known to the party to whom the conveyance is made.

First Nat'l Bank of Santa Fe v. Ruebush, 62 N.M. 42, 46, 304 P.2d 569, 571 (1956).  The Supreme Court of New Mexico has also stated: "[T]he burden of proof is at all times on the creditor who attacks a conveyance on the ground that it is fraudulent and in furtherance of a design to hinder and

delay and defraud creditors." Nat'l Mut. Savings & Loan Ass'n v. Lake, 47 N.M. 223, 141 P.2d at

191.  "The presence or absence of insolvency of a grantor while perhaps not necessarily a sole

determinative factor in arriving at a conclusion on the question of intent is nevertheless an important

and powerful one." Nat'l Mut. Savings & Loan Ass'n v. Lake, 47 N.M. 223, 141 P.2d at 191.

Courts have generally not applied the term creditor in a narrow fashion. See 37 Am. Jur. 2d

Fraudulent Conveyances and Transfers § 120, at 619 (2001)("A creditor as to whom a fraudulent

conveyance is void is not necessarily one who has a demand for money which is due or running to

maturity.").  The Restatement of Restitution also recognizes the general principle that, "[w]here the

owner of property transfers it in fraud of third persons, the transferee holds the property subject to

their claims, unless he is a bona fide purchaser." Restatement of Restitution § 168 (1937).[7]

----

[7]The Supreme Court of New Mexico has cited the Restatement of Restitution as
authoritative. See, e.g., Chase Manhattan Bank v. Candelaria, 135 N.M. 527, 530, 90 P.3d 985, 988
(2004)(citing the Restatement of Restitution); Otero v. Jordan Rest. Enters., 122 N.M. 187, 191, 922
P.2d 569, 573 (1996) (quoting Restatement of Restitution).  Federal courts must determine what a
state's Supreme Court would do if confronted with the same issue. See Erie R.R. Co. v. Tompkins,
304 U.S. 64, 78 (1938).  In Stoner v. New York Life Insurance Co., 311 U.S. 464 (1940), the
Supreme Court explained that, "in cases where jurisdiction rests on diversity of citizenship, federal
courts, under the doctrine of Erie Railroad Co. v. Tompkins . . . must follow the decisions of
intermediate state courts in the absence of convincing evidence that the highest court of the state
would decide differently." 311 U.S. at 467.  "In particular, this is true where the intermediate state
court has determined the precise question in issue in an earlier suit between the same parties, and
the highest court of the state has refused review." Stoner v. N.Y. Life Insurance Co., 311 U.S. at
467.  See Adams-Arapahoe Joint Sch. Dist. No. 28-J v. Cont'l Ins. Co., 891 F.2d 772, 774 (10th Cir.
1989)("With respect to issues which the Colorado Supreme Court has not addressed, we may
consider all available resources, including Colorado appellate court decisions, other state and federal
decisions, and the general trend of authority, to determine how the Colorado Supreme Court would
construe the law in this case.").  As the Tenth Circuit explained in Wade v. Emcasco Insurance Co.,
483 F.3d 657 (10th Cir. 2007):

> In cases arising under diversity jurisdiction, the federal court's task is not to reach
> its own judgment regarding the substance of the common law, but simply to ascertain
> and apply the state law. . . . The federal court must follow the most recent decisions
> of the state's highest court. . . . Where no controlling state decision exists, the federal
> court must attempt to predict what the state's highest court would do. . . .  In doing
> so, it may seek guidance from decisions rendered by lower courts in the relevant

The relevant allegations against the Hi-Land Potato Parties as they relate to the fraudulent-conveyance claim are as follows.  In late 2009, Shannon Casey resigned from and closed Tan-O-On Marketing.  See Amended Third-Party Complaint ¶¶ 18, 20, at 5.  After closing Tan-O-On Marketing, the Caseys relocated to Monte Vista -- where Hi-Land Potato locates its business.  See Amended Third-Party Complaint ¶ 20, at 5.  Although the Caseys represented that they had abandoned their positions with Tan-O-On Marketing, they later established a new bank account for the company in Monte Vista.  See Amended Third-Party Complaint ¶ 21, at 5-6.  The Caseys deposited approximately $1.8 million of Tan-O-On Marketing's receivables into the new account and then paid those proceeds to Hi-Land Potato instead of Tan-O-On Marketing's PACA trust creditors, such as Skyline Potato and the Intervening Plaintiffs.  See Amended Third-Party Complaint ¶ 21, at 6.  At the time this transfer of funds occurred, the Hi-Land Potato Parties were aware of Tan-O-On Marketing's "insolvency, and the Casey's plan to strip the company of its assets."  Amended Third-Party Complaint ¶ 21, at 6.  "This [conduct] was [all] part of a scheme to defraud [Tan-O-On Marketing] and Gerald R. Anderson and Julie Anderson and was intentional and known . . . ."  Amended Third-Party Complaint ¶ 24, at 7.  The transfer of Tan-O-On Marketing assets from Tan-O-On Marketing to Hi-Land Potato to RPE, Inc. constitutes a breach of the PACA trust and a fraudulent transfer, because Skyline Potato and the Intervening Plaintiffs remain uncompensated for their transactions with Tan-O-On Marketing.  See Amended Third-Party Complaint ¶¶ 28, 34, at 8-9.  Fraudulent transfers "were made to or for the benefit of Hi-Land Potato

state . . . . appellate decisions in other states with similar legal principles . . . . district court decisions interpreting the law of the state in question, . . . and the general weight and trend of authority in the relevant area of law. . . .  Ultimately, however, the Court's task is to predict what the state supreme court would do.  Our review of the district court's interpretation of state law is de novo.

483 F.3d at 665-66 (citations omitted)(internal quotation marks omitted).

Company Inc., Carl Worley and RPE, Inc. and Russell Wysocki insiders of TMI on antecedent debts, and were made without consideration." Amended Third-Party Complaint ¶ 40, at 10.

The Hi-Land Potato Parties and Tan-O-On Marketing, without addressing New Mexico law, agree that the following elements are necessary to plead a common-law fraudulent-conveyance claim for rule 12(b)(6) purposes: (i) the property subject to the transfer; (ii) the timing and, if applicable, frequency of the transfer; and (iii) the consideration paid. Tan-O-On Marketing alleges that the Hi-Land Potato Parties, along with the Caseys, acted intentionally to fraudulently transfer Tan-O-On Marketing's assets to the Hi-Land Potato Company. See Amended Third-Party Complaint ¶¶ 24, 40, at 7, 10. Tan-O-On Marketing alleges that the Caseys transferred $1.8 million to the Hi-Land Potato Parties. See Amended Third-Party Complaint ¶ 21, at 6. Tan-O-On Marketing alleges that the Caseys began to transfer these assets to the Hi-Land Potato Parties in approximately late 2009 after Tan-O-On Marketing's closing. See Amended Third-Party Complaint ¶¶ 18, 20-21, at 5-6. Tan-O-On Marketing alleges that no consideration was paid for these transfers. See Amended Third-Party Complaint ¶ 40, at 10. Tan-O-On Marketing also provides various allegations that provide some factual context for the allegedly fraudulent transfers -- such as the Caseys' involvement in this conduct and that the transfers have some relation to PACA. It is worth noting that, although the Caseys are the ones whom Tan-O-On Marketing has alleged have done the act of fraudulently transferring funds, the transferees to those funds -- here the Hi-Land Potato Parties -- are proper defendants in a lawsuit seeking to set aside a fraudulent conveyance. See 37 Am. Jur. 2d Fraudulent Conveyances and Transfers § 187, at 664-65. As American Jurisprudence 2d has explained:

> All parties interested in the controversy concerning a fraudulent conveyance, or who may be affected by the judgment rendered therein, should be made parties. For instance, in an action by a creditor to nullify a donation of immovable property

from a debtor to his children, the children were indispensible parties under the state statute, where the children, as owners of the property, had an interest in the action that would have been directly affected by any judgment rendered therein. On the other hand, persons having no interest in such controversy and against whom no relief can be granted, should not be joined as party defendants.

37 Am. Jur. 2d Fraudulent Conveyances and Transfers § 187, at 664-65 (footnotes omitted).

Furthermore, the allegations satisfy rule 9(b)'s heightened pleadings standards. Fraudulent-conveyance claims normally require compliance with rule 9(b)'s heightened pleading standards. See 5A C. Wright & A. Miller, Federal Practice and Procedure § 1297, at 10 (3d ed. Supp. 2012)("Claims of fraudulent transfer or fraudulent conveyance in connection with a person or corporation going bankrupt are also subject to the heightened standard of Rule 9(b)."); 37 Am. Jur. 2d Fraudulent Conveyances and Transfers § 196, at 670 (citing Fromer v. Yogel, 50 F.Supp.2d 227 (S.D.N.Y. 1999))("Generally, fraudulent conveyance claims must be alleged with particularity."). Rule 9(b)'s standards have greater importance when the plaintiff did not have a claim against the defendant until after the allegedly fraudulent conveyance occurred, because actual intent to defraud is necessary to establish a fraudulent-conveyance claim in those circumstances:

Similarly, the rule invalidating fraudulent preferences has been applied in favor of subsequent, as well as existing, creditors. However, if the property was conveyed by the debtor without actual fraudulent intention, the subsequent creditor may not question the transaction, although the conveyance may have been voluntary or without consideration. It is not sufficient for a subsequent creditor to make out a case of merely constructive fraud, founded on such facts as lack of consideration or insolvency on the part of the transferor; he must establish fraud in fact or actual fraud, and he must assume the burden of proof in this respect.

37 Am. Jur. 2d Fraudulent Conveyances and Transfers § 124, at 623 (footnotes omitted).[8] As the

[8]In comparison, courts do not usually require a plaintiff to comply with rule 9(b) when it is not necessary to establish, as an element of a fraudulent-conveyance claim, that the defendant acted with fraudulent intent:

From this, the Court concludes that with respect to Counts One and Two, Fed.R.Civ.P. 9(b) does not apply. Count One claims that the decedent, Orlando

-43-

Second Circuit has stated: "As 'actual intent to hinder, delay, or defraud' constitutes fraud, it must be pled with specificity, as required by Fed.R.Civ.P. 9(b)." In re Sharp Int'l Corp., 403 F.3d 43, 56 (2d Cir. 2005). Tan-O-On Marketing has not alleged that it had any claim against the Hi-Land Potato Parties before the allegedly fraudulent conveyances orchestrated by the Caseys occurred. The Caseys were some of Tan-O-On Marketing's corporate executives, and corporations, including Tan-O-On Marketing, can maintain actions against their corporate executives for breaches of their duties to the corporation. See Pueblo Bancorporation v. Lindoe, Inc., 37 P.3d 492, 499 (Colo. App. 2001)("The officers, directors, and controlling shareholders of a corporation have a fiduciary duty to act in good faith and in a manner they reasonably believe to be in the best interests of the corporation and its shareholders.").[9] Viewing the facts in the light most favorable to Tan-O-On

_____

> Schiappa, made voluntary transfers of valuable property to the defendant without receiving reasonably equivalent value at a time he was insolvent or otherwise became insolvent as result of the transfers. Similarly, with respect to Count Two, the plaintiffs contend that Orlando Schiappa was engaged in a business for which his remaining assets were unreasonably small in relation to such business and that during such time period he made transfers of property to the defendants without receiving a reasonably equivalent value in exchange. No actual fraud or deliberate misrepresentation is alleged in either count. Moreover, under the Ohio Fraudulent Transfer Act, the plaintiff is not required to plead any actual intent to defraud on the part of the transferor, Orlando Schiappa. Thus, Counts One and Two need not meet the heightened pleading requirements of 9(b).

Van-American Ins. Co. v. Schiappa, 191 F.R.D. 537, 542 (S.D. Ohio 2000)(citation omitted).

[9]Tan-O-On Marketing alleges that it "had its principal place of business in New Mexico at the times relevant to this cause of action." Amended Third-Party Complaint ¶ 1, at 2. Skyline Potato has alleged that Tan-O-On Marketing was incorporated in Colorado. See First Amended Complaint ¶ 2, at 2 (citing Certificate at 1 (dated June 28, 1995), filed July 23, 2010 (Doc. 2-1)). Under both the Restatement (First) Conflicts of Law and the Restatement (Second) Conflicts of Law, the general rule is that the law of the state where a corporation was incorporate governs the liability of corporate officers' and directors' liability. See Restatement (Second) Conflicts of Law § 309 (1969)(stating that "[t]he local law of the state of incorporation will be applied to determine the existence and extent of a director's or officer's liability to the corporation, its creditors and shareholders," unless "some other state has a more significant relationship . . . to the parties and the transaction"); Restatement (First) Conflicts of Law § 187 (1934)(stating that "the existence and

-44-

Marketing, it would also have a claim against Shannon Casey for converting its assets.  Under New Mexico law, "[c]onversion is the unlawful exercise of dominion and control over property belonging to another in defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful detention after demand has been made."  Sec. Pac. Fin. Servs., Inc. v. Signfilled Corp., 125 N.M. 38, 44, 956 P.2d 837, 843 (Ct. App. 1998).  Thus, Tan-O-On Marketing would have had claims against the Caseys after the alleged fraudulent conveyances occurred, requiring Tan-O-On Marketing to plead that the Hi-Land Potato Parties had actual intent to defraud Tan-O-On Marketing.

The relatively few rule 9(b) cases that address fraudulent-conveyance or fraudulent-transfer claims indicate that Tan-O-On Marketing's allegations are sufficient to satisfy rule 9(b)'s standards. Addressing New York's fraudulent-transfer statute in the context of rule 9(b), the United States Court of Appeals for the Second Circuit has stated:

> "Due to the difficulty of proving actual intent to hinder, delay, or defraud creditors, the pleader is allowed to rely on 'badges of fraud' to support his case, i.e., circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." Wall St. Assocs. v. Brodsky, 257 A.D.2d 526, 529, 684 N.Y.S.2d 244, 247 (1st Dep't 1999) (internal citations and quotation marks omitted).  These "badges of fraud" may include (inter alia): "a close relationship between the parties to the alleged fraudulent transaction; a questionable transfer not in the usual course of business; inadequacy of the consideration; . . . and retention of control of the property by the transferor after the conveyance." Id.; see also HBE Leasing I, 48 F.3d at 639 ("Actual fraudulent intent . . . may be inferred from the circumstances surrounding the transaction, including the relationship among the parties and the secrecy, haste, or unusualness of the transaction."); In re Kaiser, 722 F.2d 1574, 1582-83 (2d Cir.1983).

---

extent of the liability of shareholders, officers or directors of a corporation to a creditor of the corporation for a violation of law by them, is determined by the law of the state of incorporation"). The Supreme Court of Colorado has followed the Restatement (Second) Conflicts of Law when addressing this choice-of-law issue.  See Ficor, Inc. v. McHugh, 639 P.2d 385, 391 (Colo. 1982)(citing Restatement (Second) Conflicts of Law § 309).  Absent additional guidance from the parties, the Court will assume that Colorado law would apply to matters related to Tan-O-On Marketing's corporate governance.

In re Sharp Int'l Corp., 403 F.3d at 56.  The Second Circuit has also stated that the following circumstances are among "the circumstances from which courts have inferred intent to defraud":

> [C]oncealment of facts and false pretenses by the transferor, reservation by him of rights in the transferred property, his absconding with or secreting the proceeds of the transfer immediately after their receipt, the existence of an unconscionable discrepancy between the value of property transferred and the consideration received therefor . . . [and] the creation by an oppressed debtor of a closely-held corporation to receive the transfer of his property.

In re Kaiser, 722 F.2d at 1582 (alterations in original).  Tan-O-On Marketing has alleged a close relationship between the Caseys and the Hi-Land Potato Parties, given that it has alleged that the Caseys planned to sell Tan-O-On Marketing and begin working for Hi-Land Potato.  Tan-O-On Marketing has alleged that there was no consideration for the transfer of funds.  Tan-O-On Marketing has alleged that the Caseys were transferring funds from Tan-O-On Marketing's bank accounts to Hi-Land Potato's bank accounts.  Those allegations are sufficient to give rise to an inference of intent regarding the transfers, because the "circumstances [are] so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent."  In re Sharp Int'l Corp., 403 F.3d at 56.  Admittedly, Tan-O-On Marketing has not organized its Amended Third-Party Complaint in a straightforward manner.  Tan-O-On Marketing has, however, adequately pled a common-law fraudulent-conveyance claim.

### D.   TAN-O-ON MARKETING'S AMENDED THIRD-PARTY COMPLAINT ADEQUATELY ALLEGES A UFTA CLAIM.

N.M.S.A. § 56-10-18 provides:

A.   A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1)   with actual intent to hinder, delay or defraud any creditor of the debtor; or

      (2)      without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

            (a)      was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

            (b)      intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

**B.**      In determining actual intent under Paragraph (1) of Subsection A of this section, consideration may be given, among other factors, to whether:

      (1)      the transfer or obligation was to an insider;

      (2)      the debtor retained possession or control of the property transferred after the transfer;

      (3)      the transfer or obligation was disclosed or concealed;

      (4)      before the transfer was made or obligation was incurred, the debtor has been sued or threatened with suit;

      (5)      the transfer was of substantially all the debtor's assets;

      (6)      the debtor absconded;

      (7)      the debtor removed or concealed assets;

      (8)      the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

      (9)      the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

      (10)    the transfer occurred shortly before or shortly after a substantial debt was incurred; and

      (11)    the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

N.M.S.A. 1978, § 56-10-18.  New Mexico courts have referred to these items listed in subsection

(B) as "badges of fraud."  Ellen Equip. Corp. v. C.V. Consultants & Assocs., Inc., 144 N.M. at 57, 183 P.3d at 942.

The Hi-Land Potato Parties argue that Tan-O-On Marketing does not meet the definition of a creditor under the UFTA and that the Court should, accordingly, dismiss its UFTA claim. N.M.S.A. 1978, § 56-10-15(D) defines a creditor as "a person who has a claim."  N.M.S.A. 1978, § 56-10-15(D).  N.M.S.A. 1978, § 56-10-15(F) defines a debtor as "a person who is liable on a claim."  N.M.S.A. 1978, § 56-10-15(F).  N.M.S.A. 1978, § 56-10-15(C) defines a claim as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured."  N.M.S.A. 1978, § 56-10-15(C).  The draft of the Uniform Fraudulent Transfer Act provides the same definition for claim as that which appears in N.M.S.A. 1978, § 56-10-15(C).  See Unif. Fraudulent Transfer Act § 1(3).  Comment (3) to the Uniform Fraudulent Transfer Act states: "The definition of 'claim' is derived from § 101(4) of the Bankruptcy Code."  Unif. Fraudulent Transfer Act § 1 cmt. (3).  Interpreting 11 U.S.C. § 101(4), the Supreme Court has stated:

> As is apparent, Congress chose expansive language in both definitions relevant to this case.  For example, to the extent the phrase "right to payment" is modified in the statute, the modifying language ("whether or not such right is . . .") reflects Congress' broad rather than restrictive view of the class of obligations that qualify as a "claim" giving rise to a "debt."  See also H.R. Rep. No. 95-595, supra, at 309, U.S. Code Cong. & Admin. News 1978, p. 6266 (describing definition of "claim" as "broadest possible" and noting that Code "contemplates that all legal obligations of the debtor . . . will be able to be dealt with in the bankruptcy case"); accord, S. Rep. No. 95-989, supra, at 22, U.S. Code Cong. & Admin. News 1978, p. 5808.

Penn. Dep't of Pub. Welfare v. Davenport, 495 U.S. at 558.

Based on the statutory definitions for the term creditor, and more importantly the term claim, along with the manner in which courts have applied those terms, the potential scope of persons who can qualify as proper plaintiffs under the UFTA is "the broadest available" one a legislature could

have adopted.  Johnson v. Home State Bank, 501 U.S. at 83 ("We have previously explained that Congress intended by this language to adopt the broadest available definition of 'claim.'"). N.M.S.A. 1978, § 56-10-15(C) defines a claim broadly as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, disputed, undisputed, legal, equitable, secured or unsecured."  N.M.S.A. 1978, § 56-10-15(C).  Notably, the claim need not be one that has matured, can be disputed, can be equitable in nature, and need not be secured.  The Caseys were some of Tan-O-On Marketing's corporate executives, and corporations, including Tan-O-On Marketing, can maintain actions against their corporate executives for breaches of their duties to the corporation.  See Pueblo Bancorporation v. Lindoe, Inc., 37 P.3d at 499.  Similarly, Tan-O-On Marketing would likely have a claim for conversion against Shannon Casey.  See Sec. Pac. Fin. Servs., Inc. v. Signfilled Corp., 125 N.M. at 44, 956 P.2d at 843.  While those claims may not have arisen until the Caseys transferred or misappropriated those funds, New Mexico's UFTA permits a cause of action for fraudulent transfer, under N.M.S.A. 1978, § 56-10-18(A), "whether the creditor's claim arose before or after the transfer was made or the obligation was incurred."  N.M.S.A. 1978, § 56-10-18(A) (emphasis added).  The allegations in the Amended Third-Party Complaint are sufficient, when drawing all reasonable inferences in Tan-O-On Marketing's favor and viewing the facts in the light most favorably to it, that it is a creditor for UFTA purposes.

One of the requirements to maintain a cause of action under N.M.S.A. 1978, § 56-10-18(A), however, is that the transfer must have been made with "actual intent to hinder, delay or defraud any creditor of the debtor."  N.M.S.A. 1978, § 56-10-18(A)(1).  That requirement triggers rule 9(b)'s heightened pleading standards.  See In re Sharp Int'l Corp., 403 F.3d at 56 ("As 'actual intent to hinder, delay, or defraud' constitutes fraud, it must be pled with specificity, as required by

Fed.R.Civ.P. 9(b)."); 5A C. Wright & A. Miller, supra, § 1297, at 10 ("Claims of fraudulent transfer or fraudulent conveyance in connection with a person or corporation going bankrupt are also subject to the heightened standard of Rule 9(b)."). 37 Am. Jur. 2d Fraudulent Conveyances and Transfers § 196, at 670 ("Generally, fraudulent conveyance claims must be alleged with particularity."). This statutory requirement recognizes the common-law requirement that, when the plaintiff does not have a claim against the defendant until after the allegedly fraudulent conveyance occurred, actual intent to defraud is necessary to establish a fraudulent-conveyance claim:

> Similarly, the rule invalidating fraudulent preferences has been applied in favor of subsequent, as well as existing, creditors.  However, if the property was conveyed by the debtor without actual fraudulent intention, the subsequent creditor may not question the transaction, although the conveyance may have been voluntary or without consideration.  It is not sufficient for a subsequent creditor to make out a case of merely constructive fraud, founded on such facts as lack of consideration or insolvency on the part of the transferor; he must establish fraud in fact or actual fraud, and he must assume the burden of proof in this respect.

37 Am. Jur. 2d Fraudulent Conveyances and Transfers § 124, at 623 (footnotes omitted).

A plaintiff can rely upon the badges of fraud listed in N.M.S.A. 1978, § 56-10-18(B), among other factors, to prove the existence of intent.  See N.M.S.A. 1978, § 56-10-18(B).  Interpreting similar statutory language, other courts, such as the Second Circuit, have outlined similar badges of fraud:

> "Due to the difficulty of proving actual intent to hinder, delay, or defraud creditors, the pleader is allowed to rely on 'badges of fraud' to support his case, i.e., circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent."  Wall St. Assocs. v. Brodsky, 257 A.D.2d 526, 529, 684 N.Y.S.2d 244, 247 (1st Dep't 1999) (internal citations and quotation marks omitted).  These "badges of fraud" may include (inter alia): "a close relationship between the parties to the alleged fraudulent transaction; a questionable transfer not in the usual course of business; inadequacy of the consideration; . . . and retention of control of the property by the transferor after the conveyance."  Id.; see also HBE Leasing I, 48 F.3d at 639 ("Actual fraudulent intent . . . may be inferred from the circumstances surrounding the transaction, including the relationship among the parties and the secrecy, haste, or unusualness of the transaction."); In re Kaiser, 722

F.2d 1574, 1582-83 (2d Cir.1983).

In re Sharp Int'l Corp., 403 F.3d at 56.  Like the badge of fraud listed in N.M.S.A. 1978, § 56-10-18(B)(7), Tan-O-On Marketing has alleged that the Caseys "removed or concealed assets" as part of a scheme that benefitted the Hi-Land Potato Parties.  N.M.S.A. 1978, § 56-10-18(B)(7).  Like the badge of fraud listed in N.M.S.A. 1978, § 56-10-18(B)(9), Tan-O-On Marketing has alleged that the Caseys filed for bankruptcy such that they were "insolvent or became insolvent shortly after the transfer was made or the obligation was incurred."  N.M.S.A. 1978, § 56-10-18(B)(9).  Like the badge of fraud discussed in In re Sharp International Corp., Tan-O-On Marketing has alleged that there is "a close relationship between the parties to the alleged fraudulent transaction" given the allegations regarding the Caseys' involvement with Hi-Land Potato's business.  In re Sharp Int'l Corp., 403 F.3d at 56.  Like some of the other badges of fraud that the Second Circuit discussed in In re Sharp International Corp., Tan-O-On Marketing has alleged that the transfers to the Hi-Land Potato Parties occurred without any consideration and that they were "questionable transfer[s] not in the usual course of business."  In re Sharp Int'l Corp., 403 F.3d at 56.

"Due to the difficulty of proving actual intent to hinder, delay, or defraud creditors, the pleader is allowed to rely on 'badges of fraud' to support his case, i.e., circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent."  In re Sharp Int'l Corp., 403 F.3d at 56.  Tan-O-On Marketing has so pled here by alleging the existence of several different badges of fraud that call into question the alleged transfers from the Caseys to the Hi-Land Potato Parties.  As the Court mentioned previously, it is proper to join the Hi-Land Potato Parties as defendants to this claim in light of their alleged involvement in the transfers.  See 37 Am. Jur. 2d Fraudulent Conveyances and Transfers § 187, at 664-65 ("All parties interested in the controversy concerning a fraudulent conveyance, or who may be affected by the judgment

-51-

rendered therein, should be made parties."). Thus, Tan-O-On Marketing has adequately pled a cause of action under New Mexico's UFTA.[10]

## II.    THE COURT WILL GRANT IN PART AND DENY IN PART THE MOTION TO AMEND.

Consistent with the agreement between Tan-O-On Marketing and the RPE, Inc. Parties at the hearing on April 13, 2012, the Court will grant Tan-O-On Marketing leave to amend its claims for unjust enrichment and theft of trade secrets asserted against the RPE, Inc. Parties, but will deny leave to amend the remaining claims it seeks to assert against the RPE, Inc. Parties.  The Court will deny leave to amend the common-law fraud and UPA claims Tan-O-On Marketing seeks to assert against the Hi-Land Potato Parties, because permitting leave to amend would be futile and unfairly prejudicial to the Hi-Land Potato Parties.  The Court will grant leave to amend the fraudulent-conveyance claims which Tan-O-On Marketing seeks to assert against Hi-Land Potato given that the additional allegations primarily flesh out allegations that were already in Tan-O-On Marketing's prior pleadings.  The Court will grant leave to amend the claims for unjust enrichment and theft of trade secrets asserted against the Hi-Land Potato Parties in light of the agreement at the hearing on April 13, 2012.

_____

[10]In its Feb. 7, 2012 MTD, the Hi-Land Potato Parties sought dismissal of all claims Tan-O-On Marketing has asserted.  See Feb. 7, 2012 MTD at 2 ("This Motion seeks dismissal of all claims in the Third Party Complaint.").  At the hearing on April 13, 2012, however, the Hi-Land Potato Parties asserted that, if Tan-O-On Marketing seeks to assert claims for unjust enrichment and theft of trade secrets, they would not oppose those claims through a motion to dismiss, but would instead use summary judgment or disprove those claims at trial.  See Tr. at 29:11-17 (Bohnhoff).  Based on that concession, the Court need not evaluate dismissal under rule 12(b)(6) of Tan-O-On Marketing's claims for unjust enrichment and theft of trade secrets.  Courts are entitled to rely upon counsel's concessions.  See United States v. Ventura-Perez, 666 F.3d 670, 676 (10th Cir. 2012)("Courts could not function properly if concessions by counsel cannot be relied upon."); Texaco, Inc. v. Hale, 81 F.3d 934, 938 (10th Cir. 1996)("Even had the scope of the remand allowed the district court to consider this issue, it was entitled to rely upon Appellants' concession, and they are now without a basis for objection.").

**A.      RELEVANT ALLEGATIONS FROM THE PROPOSED SECOND AMENDED THIRD-PARTY COMPLAINT.**

The Court will state the relevant allegations Tan-O-On Marketing has added in the Second Amended Third-Party Complaint in the light most favorable to Tan-O-On Marketing.  Regarding facts that Tan-O-On Marketing alleges in both its Amended Third-Party Complaint and Second Amended Third-Party Complaint, the Court will not repeat those facts here.  Because Tan-O-On Marketing and the RPE, Inc. Parties have agreed that the Court should deny amendment regarding the common-law fraud, fraudulent-conveyance, and UPA claims Tan-O-On Marketing seeks to add against the RPE, Inc. Parties, the Court does not recite the allegations that relate to those claims. Because Tan-O-On Marketing, the Hi-Land Potato Parties, and the RPE, Inc. Parties have agreed to permit amendment regarding the claims for unjust enrichment and theft of trade secrets asserted against the RPE, Inc. Parties and the Hi-Land Potato Parties, the Court does not recite those allegations.

Tan-O-On Marketing asserts five counts in the proposed Second Amended Third-Party Complaint: (i) Count I - Fraudulent Conveyance and Unjust Enrichment; (ii) Count II - Theft of Trade Secrets and Proprietary Information; (iii) Count III - Fraud Claims; (iv) Count IV - Unjust Enrichment and Unfair Trade Practice; and (v) Count V - Unjust Enrichment and Unfair Trade Practice.  See Second Amended Third-Party Complaint at 8-25.   Tan-O-On Marketing asserts Counts I and II against Hi-Land Potato, Counts III and IV against the RPE, Inc. Parties, and Count V against the Hi-Land Potato Parties.  See Second Amended Third-Party Complaint at 8-25.

When the Andersons entered into a stock purchase agreement to sell Tan-O-On Marketing shares to the Caseys in 2006, "[t]he contract include[d] an agreement by Shannon Casey to protect trade secrets, proprietary information, customer lists and customer relations of [Tan-O-On

Marketing]."  Second Amended Third-Party Complaint ¶ 41, at 8-9.  By November, 2009, after Shannon Casey purchased Tan-O-On Marketing from the Andersons, deposits in Tan-O-On Marketing's bank account declined by 446% compared to the previous year.  See Second Amended Third-Party Complaint ¶ 45, at 9.  "Gerald Anderson attempted to freeze" this Tan-O-On Marketing bank account "on November 15, 2009 when he became aware from Terry Wright that PACA Trust Producers . . . were not being paid."  Second Amended Third-Party Complaint ¶ 46, at 9-10.  "[B]eginning in November 2009 Shannon Casey began to deposit [Tan-O-On Marketing]'s receivables in a separate Sunflower Bank account in Monte Vista, Colorado. . . ." Second Amended Third-Party Complaint ¶ 50, at 10.  Beginning in December, 2009, "all orders for potatoes shipped under the Tan-O-On Marketing Kroger Co. vender number were made under the name of Hi-Land Potato, Inc."  Second Amended Third-Party Complaint ¶ 58, at 11.  Shortly after leaving Tan-O-On Marketing, Shannon Casey began to receive payments from Kroger Co. that were supposed to be payable to Tan-O-On Marketing.  See Second Amended Third-Party Complaint ¶ 51 at 10.  Shannon Casey continued to deposit Tan-O-On Marketing's receivables, including payments from Kroger Co. in the Monte Vista account after he resigned from Tan-O-On Marketing.  See Second Amended Third-Party Complaint ¶¶ 52-53, at 10.  "Shannon Casey sent a letter to Terry Wright on December 28, 2009 indicating [to] Mr. Wright [that he] was no longer employed" at Tan-O-On Marketing and "that Tan-O-On Marketing, Inc. was merging with Hi-Land Potato Company, Inc."  Second Amended Third-Party Complaint ¶ 55, at 11.  "All the TMI receivable deposited in the Sunflower Bank account were paid by hand written checks signed by Shannon Casey to Hi-Land Potato Company, Inc. which totaled $1,661,603.04."  Second Amended Third-Party Complaint ¶ 57, at 11.  "The majority of these funds were paid to Hi-Land after Shannon Casey had resigned from" Tan-O-On Marketing.  Second Amended Third-Party Complaint ¶ 57, at 11.  "From December 2, 2009 until

July 1, 2010 all orders for potatoes shipped under the Tan-O-On Marketing, Inc. Kroger vender number were made under the name of Hi-Land Potato, Inc." Second Amended Third-Party Complaint ¶ 58, at 11. Tan-O-On Marketing alleges that the payments to Hi-Land Potato constitute a fraudulent conveyance. See Second Amended Third-Party Complaint ¶¶ 60-61, at 12. "Hi-Land Potato Company, Inc. has converted to its own use and benefit, the proceeds of the goods delivered to" Tan-O-On Marketing "by their customers as well as the customer relationships and other assets of" Tan-O-On Marketing "valued in the cumulative amount of at least $4,500,000.00," actions which constitute unfair trade practices. Second Amended Third-Party Complaint ¶ 110, at 24.

**B.    THE COURT WILL GRANT THE MOTION TO AMEND REGARDING THE UNJUST ENRICHMENT AND THEFT-OF-TRADE-SECRETS CLAIMS ASSERTED AGAINST THE RPE, INC. PARTIES BUT WILL DENY THE MOTION TO AMEND WITH RESPECT TO THE COMMON-LAW FRAUD, FRAUDULENT-CONVEYANCE, AND UPA CLAIMS ASSERTED AGAINST THEM.**

The Court will deny the Motion to Amend with regards to the common-law fraud, fraudulent-conveyance, and UPA claims asserted against the RPE, Inc. Parties. At the hearing on April 13, 2012, the RPE, Inc. Parties requested that the Court deny the Motion to Amend and leave only claims for unjust enrichment and theft of trade secrets in Tan-O-On Marketing's pleadings. See Tr. at 43:22-44:3 (Feuchter, Court). The Court inquired whether the RPE, Inc. Parties would oppose the Court permitting amendment on the unjust enrichment and theft-of-trade-secrets claims but deny amendment regarding the common-law fraud, fraudulent-conveyance, and UPA claims for untimeliness. See Tr. at 44:9-17 (Court, Feuchter). The RPE, Inc. Parties agreed with the Court's proposal on the basis that the proposed amendments regarding the unjust enrichment and theft-of-trade-secrets claims were primarily factual in nature as opposed to an attempt to make actionable new courses of conduct. See Tr. at 44:9-19 (Court, Feuchter). Tan-O-On Marketing agreed that

proceeding against the RPE, Inc. Parties on only the unjust enrichment and theft-of-secrets claims was appropriate, because it did not detrimentally rely on statements RPE, Inc. made, and could not establish either a fraud claim or a UPA claim.  See Tr. at 46:15-24 (Robinson, Court).

Thus, the parties have agreed that the Court can permit amendment regarding the unjust enrichment and theft-of-trade-secrets claims against the RPE, Inc. Parties.  Tan-O-On Marketing has conceded that the Court may deny leave to amend regarding its common-law fraud, fraudulent-conveyance, and UPA claims.  Courts are entitled to rely upon counsel's concessions.  See United States v. Ventura-Perez, 666 F.3d 670, 676 (10th Cir. 2012)("Courts could not function properly if concessions by counsel cannot be relied upon."); Texaco, Inc. v. Hale, 81 F.3d 934, 938 (10th Cir. 1996)("Even had the scope of the remand allowed the district court to consider this issue, it was entitled to rely upon Appellants' concession, and they are now without a basis for objection.").  Thus, in light of the parties' agreement at the April 13, 2012 hearing and Tan-O-On Marketing's concessions at that hearing, the Court will permit amendment against the RPE, Inc. Parties for claims for unjust enrichment and theft of trade secrets, but deny leave to amend regarding all other claims it has sought to assert against the RPE, Inc. Parties -- specifically the common-law fraud, fraudulent-conveyance, and UPA claims.

### C.    THE COURT WILL DENY TAN-O-ON MARKETING LEAVE TO AMEND REGARDING THE COMMON-LAW FRAUD CLAIM AND UPA CLAIM IT SEEKS TO ASSERT AGAINST THE HI-LAND POTATO PARTIES.

Tan-O-On Marketing asserts five counts in the proposed Second Amended Third-Party Complaint: (i) Count I - Fraudulent Conveyance and Unjust Enrichment; (ii) Count II - Theft of Trade Secrets and Proprietary Information; (iii) Count III - Fraud Claims; (iv) Count IV - Unjust Enrichment and Unfair Trade Practice; and (v) Count V - Unjust Enrichment and Unfair Trade Practice.  See Second Amended Third-Party Complaint at 8-25.  Tan-O-On Marketing asserts

Counts I and II against Hi-Land Potato, Counts III and IV against the RPE, Inc. Parties, and Count V against the Hi-Land Potato Parties.  See Second Amended Third-Party Complaint at 8-25.

It does not appear that Tan-O-On Marketing attempts to assert a common-law fraud claim against either of the Hi-Land Potato Parties in its Second Amended Third-Party Complaint.  The titles for each of the counts that it asserts against Hi-Land Potato -- Counts I, II, and V -- and against Worley -- Count V -- do not refer to fraud.  They refer to fraudulent conveyances, but those are separate causes of action from fraud.  Thus, it does not appear that Tan-O-On Marketing is asserting a common-law fraud claim in its Second Amended Third-Party Complaint.

To the extent that Tan-O-On Marketing is seeking to assert a common-law fraud claim, it runs into the same problems it did in its previous pleadings.  It has failed to identify a misrepresentation that the Hi-Land Potato Parties made upon which it relied.  None of the additional allegations that appear in the Second Amended Third-Party Complaint cure that defect.  The elements of fraudulent misrepresentation under New Mexico law are: "(i) a misrepresentation of fact, (ii) either knowledge of the falsity of the representation or recklessness on the part of the party making the misrepresentation, (iii) intent to deceive and to induce reliance on the misrepresentation, and (iv) detrimental reliance on the misrepresentation."   Cain v. Champion Window Co. of Albuquerque, 142 N.M. at 216, 164 P.3d at 97 (internal quotation marks omitted).  "At a minimum, Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud."  United States ex rel. Schwartz v. Coastal Healthcare Grp., Inc., 2000 WL 1595976, at *3. "To survive a motion to dismiss, an allegation of fraud must 'set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof.'"  Midgley v. Rayrock Mines, Inc., 374 F.Supp.2d at 1047 (quoting Schwartz v. Celestial Seasonings, Inc., 124 F.3d at 1252).  One of the key elements of a fraud claim, an

allegation that either of the Hi-Land Potato Parties made a misrepresentation upon which Tan-O-On Marketing relied, does not appear in Tan-O-On Marketing's pleadings.  Thus, in light of the allegations in its proposed pleading, permitting amendment regarding any common-law fraud claim Tan-O-On Marketing seeks to assert would be futile.

Furthermore, given the lack of specificity regarding any common-law fraud claim Tan-O-On Marketing seeks to assert, it would be unfairly prejudicial to require the Hi-Land Potato Parties to defend against a claim with no discernible contours.  It is also does not appear that Tan-O-On Marketing has asserted a common-law fraud claim, and to the extent it has tried to do so, it would be unfairly prejudicial to require the Hi-Land Potato Parties to defend against an unclear claim buried in a parties' pleading.  The late stage of the case further counsels against permitting an ambiguous claim to come into the case.  It is worth noting that Tan-O-On Marketing asserted in one of its response briefs that it had evidence regarding misrepresentations Worley made:

> 1) The misrepresentation of fact is the continuing statements by Carl Worley that he was continuing to do business with TMI and everything was fine and he didn't know anything about what Shannon Casey was doing since he wasn't his employee anyways. This positive Worley professed to Gerald Anderson, Terry Wright and the PACA industry. At the same time Mr. Worley was issuing Invoices from Hi-Land Potato Company to sell potatoes and receive 1.6 million dollars that belonged to TMI. . . .

Response to Feb. 7, 2012 MTD at 18.  Those allegations appear nowhere in the Second Amended Third-Party Complaint.  Furthermore, Tan-O-On Marketing would still need to "set forth the time, place, and contents of the false representation, the identity of the party making the false statements and the consequences thereof."  Midgley v. Rayrock Mines, Inc., 374 F.Supp.2d at 1047 (quoting Schwartz v. Celestial Seasonings, Inc., 124 F.3d at 1252).  It has not done so.

While the Caseys and the Hi-Land Potato Parties may have engaged in some deceptive conduct that harmed Tan-O-On Marketing, a common-law fraud claim requires that the defendant

made a misrepresentation to the plaintiff upon which the plaintiff relied.  There are no allegations

regarding any misrepresentation upon which Tan-O-On Marketing relied.  Tan-O-On Marketing puts

forward an allegation that "Shannon Casey sent a letter to Terry Wright on December 28, 2009

indicating [to] Mr. Wright [that he] was no longer employed" at Tan-O-On Marketing and "that Tan-

O-On Marketing, Inc. was merging with Hi-Land Potato Company, Inc."  Second Amended Third-

Party Complaint ¶ 55, at 11.  Viewing the facts in the light most favorably to Tan-O-On Marketing,

there is a reasonable inference that Shannon Casey was acting as an agent for the Hi-Land Potato

Parties at this point in time.  Tan-O-On Marketing alleges that Wright was one of its employees.

See Second Amended Third-Party Complaint ¶ 56, at 11.  While that statement Shannon Casey

made to Wright may be a misrepresentation, Tan-O-On Marketing makes no allegation that it relied

on that statement in a way that permitted Shannon Casey or the Hi-Land Potato Parties to divert

funds from Tan-O-On Marketing to Hi-Land Potato.  To the contrary, it alleges that Wright, after

receiving this letter, "contacted Carl Worley President of Hi-Land Potato Company Inc. and told him

that Hi-Land Potato Company, Inc. was stealing his customers and diverting PACA Trust funds to

Hi-Land Potato Company Inc."  Second Amended Third-Party Complaint ¶ 56, at 11.  Furthermore,

Tan-O-On Marketing provides no explanation why it has added this allegation at this late stage of

the case given that the statement was allegedly made to one of its employees -- Wright.  Tan-O-On

Marketing has not shown that it acted with excusable neglect when it failed to include allegations

regarding the letter to Wright in its previous pleadings.  Tan-O-On Marketing also alleges that G.

Anderson was already trying to freeze Tan-O-On Marketing's bank account "on November 15, 2009

when he became aware from Terry Wright that PACA Trust Producers . . . were not being paid."

Second Amended Third-Party Complaint ¶ 46, at 9-10.  Casey then appears to have misled the bank

into thinking he was still an employee.  See Second Amended Third-Party Complaint ¶ 47, at 10

("After a meeting with Shannon Casey the Bank of Albuquerque removed the hold from TMI's account."). Tan-O-On Marketing's allegations support a conclusion that Shannon Casey acted with intent to defraud Tan-O-On Marketing to divert funds away from the company. The Court is not saying that Tan-O-On Marketing is without recourse for this alleged misconduct. Its allegations, however, do not state a claim for common-law fraud given that Tan-O-On Marketing has not alleged that it relied on any misrepresentation the Caseys or the Hi-Land Potato Parties made. The misrepresentations that Shannon Casey made which appear to have allowed him to accomplish a fraudulent course of action were to third parties, such as to a bank that he was still an employee of Tan-O-On Marketing.[11] While Tan-O-On Marketing's allegations are sufficient to state a claim for fraudulent conveyance or a UFTA violation, they do not state a common-law fraud claim.

Tan-O-On Marketing attaches two invoices to its Response to Feb. 7, 2012 MTD, one for an amount of $7175.00 and one for the amount of $7000.70. See Invoice at 31 (dated October 28, 2009), filed February 21, 2012 (Doc. 114-1)("Oct. 28, 2009 Invoice"); Invoice at 32 (dated December 16, 2009), filed February 21, 2012 (Doc. 114-1)("Dec. 16, 2009 Invoice"). Tan-O-On Marketing alleges that Shannon Casey "began to receive payments from Kroger, Inc. payable to

---

[11]As the Court has previously stated, "[w]hile New Mexico courts have not discussed third-party liability for fraud," the general rule courts follow is:

> The maker of a fraudulent misrepresentation is subject to liability for pecuniary loss to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction or type of transaction involved.

Pedroza v. Lomas Auto Mall, Inc., 600 F.Supp.2d at 1167 (citing Restatement (Second) of Torts § 533 (2009)). There are no allegations suggesting that, and Tan-O-On Marketing has not argued that, this theory of fraud is applicable to the allegations in the Second Amended Third-Party Complaint.

Tan-O-On Marketing, Inc. which listed the corporate address of Hi-Land Potato Company, Inc. at 2468 E. County Road 6N, Monte Vista, Colorado." Second Amended Third-Party Complaint ¶ 51, at 10. Tan-O-On Marketing relates that "[i]nvoices produced by Hi-Land Potato Company Inc. in February of 2012 in the above entitled cause of action proved Hi-Land was invoicing TMI sales made by Shannon Casey while he was a TMI employee in October of 2009." Response to Feb. 7, 2012 MTD at 12. Taking that scenario as true, Tan-O-On Marketing still provides no explanation why these invoices constituted a misrepresentation made to it. The sender for each invoice appears to be Hi-Land Potato, and the party billed for each invoice is Markon Inc. in the Oct. 28, 2009 Invoice and Kroger Wesco Vero in the Dec. 16, 2009 Invoice. Tan-O-On Marketing never alleges that it received, nor does it appear from the face of the invoices that Hi-Land Potato sent to it, these invoices. As Tan-O-On Marketing itself relates in its Response to Feb. 7, 2012 MTD, it discovered these invoices during the discovery process in this case. See Response to Feb. 7, 2012 MTD at 12. It is difficult to see how Tan-O-On Marketing relied on these invoices when it did not acquire them until after it filed this lawsuit. While Tan-O-On Marketing's allegations are sufficient to state a claim for fraudulent conveyance or a UFTA violation, they do not satisfy rule 9(b)'s heightened pleading standards for common-law fraud claims.

Tan-O-On Marketing's UPA claim asserted in Count V encounters similar problems under rule 12(b)(6). "Generally speaking, the UPA is designed to provide a remedy against misleading identification and false or deceptive advertising." Lohman v. Daimler-Chrysler Corp., 142 N.M. at 442, 166 P.3d at 1096. To state a claim under the UPA, a complaint must allege:

(1) the defendant made an oral or written statement, a visual description or a representation of any kind that was either false or misleading; (2) the false or misleading representation was knowingly made in connection with the sale, lease, rental, or loan of goods or services in the regular course of the defendant's business; and (3) the representation was of the type that may, tends to, or does deceive or

mislead any person.

Lohman v. Daimler-Chrysler Corp., 142 N.M. at 439, 166 P.3d at 1093.  "The gravamen of an unfair

trade practice is a misleading, false, or deceptive statement made knowingly in connection with the

sale of goods or services."  Diversey Corp. v. Chem-Source Corp., 125 N.M. at 754, 965 P.2d at

338.[12]  Rule 9(b) permits a plaintiff to allege a party's "knowledge . . . generally."  Fed. R. Civ. P.

9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances

constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind

may be alleged generally.").  Unlike a common-law fraud claim, which has an element that the

defendant act with "intent to deceive and to induce reliance on the misrepresentation," Cain v.

Champion Window Co. of Albuquerque, 142 N.M. at 216, 164 P.3d at 97; accord Pedroza v. Lomas

Auto Mall, Inc., 600 F.Supp.2d at 1206 ("Accordingly, the UPA's knowingly made requirement is

met if a party was actually aware that the statement was false or misleading when made, or in the

exercise of reasonable diligence should have been aware that the statement was false or misleading."

(internal quotation marks omitted)), a UPA violation requires only that the defendant act knowingly,

see Lohman v. Daimler-Chrysler Corp., 142 N.M. at 439, 166 P.3d at 1093.  Other circuits have

reached this same conclusion when addressing claims that require only that the defendant acted

knowingly.  See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co., 631 F.3d

---

[12]When addressing a common-law fraud claim, a claim under the UPA, and a claim under
a Colorado consumer-protection statute, where the defendants allegedly made a misrepresentation
"that the buses were of a particular standard, quality or grade -- willfully misrepresenting the
condition of the buses," the Court applied -- without analyzing the issue -- rule 9(b)'s standards to
evaluate all of the claims without specifically deciding whether rule 9(b) applied to the UPA claim.
Two Old Hippies, LLC v. Catch the Bus, LLC, 784 F.Supp.2d at 1209-10 ("Count IV alleges that
the Defendants violated the New Mexico Unfair Trade Practices Act . . . . The Complaint thus states
what was said, by whom, approximately when and in what context.  This factual particularity
satisfies rule 9(b)'s pleading requirements.").  The Court there found that the allegations of
common-law fraud, of UPA violations, and of Colorado consumer-law violations met rule 9(b)'s
heightened pleading standards without addressing whether rule 9(b) applies to UPA claims.

436, 446 (7th Cir. 2011)("When a claim alleges an unfair practice [as opposed to a deceptive

practice], the relaxed pleading standards of Rule 8 do indeed govern.").  The Court has also stated,

when evaluating whether rule 9(b) applied to allegations that the defendants did not believe their

opinions when they gave them:

> Rule 9(b) states: "In alleging fraud or mistake, a party must state with
> particularity the circumstances constituting fraud or mistake.  Malice,
> intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed.
> R. Civ. P. 9(b).  By the terms of this rule, rule 9(b)'s heightened pleading standards
> do not apply to this situation.  See Fed. R. Civ. P. 9(b).  The rule states that
> heightened pleading standards apply only when the Plaintiff is "alleging fraud or
> mistake." Fed. R. Civ. P. 9(b).  "Malice, intent, knowledge, and other conditions of
> a person's mind may be alleged generally." Fed. R. Civ. P. 9(b) (emphasis added).
> Likewise, the Tenth Circuit has recognized "that Rule 9(b) requires only the
> identification of the circumstances constituting fraud, and . . . does not require any
> particularity in connection with an averment of intent, knowledge or condition of
> mind."  Schwartz v. Celestial Seasonings, Inc., 124 F.3d 1246, 1252 (10th Cir.
> 1997).  The issue here is the Rating Agency Defendants' beliefs or knowledge, which
> falls within the second provision of rule 9(b).

Genesee Cnty. Emps.' Ret. Sys. v. Thornburg Mortg. Sec. Trust 2006-3, 825 F.Supp.2d 1082, 1238

(D.N.M. 2011)(Browning, J.).  The Honorable Robert C. Brack, United States District Judge for the

District of New Mexico, has similarly concluded that UPA claims do not need to comply with rule

9(b).  See Woodard v. Fidelity Nat'l Title Ins. Co., No. 06-1170, 2007 WL 5173415, at *6 (D.N.M.

Dec. 4, 2007)(Brack, J.).  A defendant, for instance, may knowingly make a statement, but not have

an intent to defraud the plaintiff; fraud requires more than that which the UPA requires.  See Pedroza

v. Lomas Auto Mall, Inc., 600 F.Supp.2d at 1206.[13]

---

[13]The UPA has many different statutory sections and subsections, so it may be that the
elements of some causes of action under the UPA require heightened pleading under rule 9(b).  For
instance, two subsections in N.M.S.A. 1978, § 57-12-2 refer to causes of action arising from a
defendant "offering goods or services with intent not to supply them in the quantity requested by
the prospective buyer" and "offering goods or services with intent not to supply reasonable
expectable public demand." N.M.S.A. 1978, § 57-12-2(D)(9)-(10).  The Court need not address this
issue, but those provisions might require heightened pleading under rule 9(b) given that they may
have intent to defraud as a basic element of the cause of action.  Nevertheless, while Tan-O-On

The Court concludes that denying leave to amend regarding the UPA claim which Tan-O-On Marketing seeks to assert against the Hi-Land Potato Parties is appropriate on the basis that the amendment is futile, untimely, and unfairly prejudicial.  First, there are no allegations supporting a conclusion that the "misleading representation was knowingly made in connection with the sale, lease, rental, or loan of goods or services in the regular course of the defendant's business." Lohman v. Daimler-Chrysler Corp., 142 N.M. at 439, 166 P.3d at 1093.  While rule 9(b)'s heightened pleading standards do not apply, rule 12(b)(6) still requires a plaintiff to put forward a complaint that contains sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570.  There are no allegations that Tan-O-On Marketing was buying goods or services from the Hi-Land Potato Parties in the regular course of their business.  Tan-O-On Marketing, in fact, alleges that Hi-Land Potato stole its business and customers away from it.  See Second Amended Third-Party Complaint ¶ 24, at 5 ("Shawna Casey, a former school teacher with little experience in the produce industry, established a sales office at Hi-Land Potato Company, Inc. and began selling Hi-Land's potatoes directly to [Tan-O-On Marketing's] customers.").  It also alleges that the Hi-Land Potato Parties misappropriated money and various other assets from it.  The lack of allegations regarding this element -- buying goods or services -- makes the amendment futile.  Second, permitting the claim to go forward would be unfairly prejudicial to the Hi-Land Potato Parties, particularly in light of the untimeliness of the amendment at this late stage of the case.  Out of the approximately twenty-five statutory sections in the UPA, Tan-O-On Marketing has not identified any specific statutory section upon which it relies to assert a UPA claim against the Hi-Land Potato Parties.  At this last stage in the case, it

Marketing does not clarify the statutory section upon which it relies to assert a UPA claim, it does not appear that it is relying on any provision that might require compliance with rule 9(b).  Many of the provisions in the UPA require only knowing conduct.

would be unfairly prejudicial to require the Hi-Land Potato Parties to guess which out of these many

statutory sections Tan-O-On Marketing intends to rely to assert a cause of action against them.  See

Estate of Gonzales v. AAA Life Ins. Co., No. 11-0486, 2012 WL 1132333, at *18 (D.N.M. Mar. 28,

2012)(Browning, J.).  Encountering a similar situation in the context of rule 12(b)(6) motion, the

Court held:

> Because the Unfair Insurance Practices Act contains a voluminous number
> of statutory sections and subsections, it is not possible to tell from the Plaintiffs'
> pleadings what cause of action they attempt to assert under the Unfair Insurance
> Practices Act.  Consequently, MetLife does not have fair notice of the Unfair
> Insurance Practices Act claim against it.  "The need at the pleading stage for
> allegations plausibly [suggesting liability] . . . reflects the threshold requirement of
> Rule 8(a)(2) that the 'plain statement' possess enough heft to 'sho[w] that the pleader
> is entitled to relief.'"  While there are various factual allegations contained in the
> Complaint, the Court cannot determine what cause of action the Plaintiffs intend to
> set forth under the Unfair Insurance Practices Act.  There is no attempt to set forth
> the elements of a specific statutory cause of action under the Unfair Insurance
> Practices Act, a lengthy statute with comprehensive insurance regulations that
> contains approximately thirty-six different statutory sections, some of which contain
> a voluminous number of subsections proscribing a variety of different conduct.
> These different statutory sections contain a large amount of potential causes of action
> and proscribe a wide variety of different conduct.  It is difficult for the Court to say
> that the Plaintiffs' allegations, when the Court cannot even determine what cause of
> action the Plaintiffs intend to bring, provide MetLife with fair notice of the claim
> asserted against it.

Estate of Gonzales v. AAA Life Ins. Co., 2012 WL 1132333, at *18 (citations omitted).  It would

be unfairly prejudicial to permit this claim to go forward against the Hi-Land Potato Parties given

that they do not have fair notice of the claim against which they must defend.  The Court will thus

deny leave to amend regarding the UPA claim that Tan-O-On Marketing seeks to assert against the

Hi-Land Potato Parties.  The Court will also deny leave to amend regarding any common-law fraud

claim that Tan-O-On Marketing seeks to assert against the Hi-Land Potato Parties.

###    D.   THE COURT WILL GRANT TAN-O-ON MARKETING LEAVE TO AMEND THE FRAUDULENT-CONVEYANCE CLAIM IT SEEKS TO ASSERT AGAINST HI-LAND POTATO.

Tan-O-On Marketing asserts five counts in the proposed Second Amended Third-Party Complaint: (i) Count I - Fraudulent Conveyance and Unjust Enrichment; (ii) Count II - Theft of Trade Secrets and Proprietary Information; (iii) Count III - Fraud Claims; (iv) Count IV - Unjust Enrichment and Unfair Trade Practice; and (v) Count V - Unjust Enrichment and Unfair Trade Practice.  See Second Amended Third-Party Complaint at 8-25.   Tan-O-On Marketing asserts Counts I and II against the Hi-Land Potato, Counts III and IV against the RPE, Inc. Parties, and Count V against the Hi-Land Potato Parties.  See Second Amended Third-Party Complaint at 8-25.

The only fraudulent-conveyance claim Tan-O-On Marketing asserts is against Hi-Land Potato in Count I.  It has not asserted such a claim against Worley.  As the Court has already stated in its disposition of the Feb. 7, 2012 MTD, Tan-O-On Marketing adequately pled, for rule 9(b) and 12(b)(6) purposes, a common-law fraudulent-conveyance claim and a UFTA claim in its Amended Third-Party Complaint.  The same allegations remain in Tan-O-On Marketing's Second Amended Third-Party Complaint.  Tan-O-On Marketing has mainly just added additional factual allegations to flesh out those claims.  The Hi-Land Potato Parties have asserted that Tan-O-On Marketing has pled its claims in a conclusory manner by failing to include sufficient factual allegations.  The Court concludes that granting Tan-O-On Marketing leave to amend on its fraudulent-conveyance claims is appropriate given that Tan-O-On Marketing is effectively giving the Hi-Land Potato Parties for what they have asked -- more specific factual allegations.  The newly added allegations, as they relate to the fraudulent-conveyance claims, do not try to make actionable entirely new conduct in which the Hi-Land Potato Parties have engaged.  The allegations all relate to the same underlying factual circumstances set out in Tan-O-On Marketing's Amended Third-Party Complaint.  Thus, the

Hi-Land Potato Parties will not suffer unfair prejudice or surprise from the amendment.  While these amendments are occurring late in the case, the Hi-Land Potato Parties are the ones who asked for more detailed factual allegations.  The Court does not believe it is unfair to give the Hi-Land Potato Parties for what they have asked -- more factual allegations.  The Court will thus grant leave to amend as it relates to the pleadings for fraudulent conveyance in Count I and the related pleadings in the common factual background of the Second Amended Third-Party Complaint.

### E.   THE COURT WILL GRANT TAN-O-ON MARKETING LEAVE TO AMEND THE CLAIMS FOR UNJUST ENRICHMENT AND THEFT OF TRADE SECRETS ASSERTED AGAINST THE HI-LAND POTATO PARTIES.

At the hearing on April 13, 2012, the Hi-Land Potato Parties asserted that, if Tan-O-On Marketing seeks to assert claims for unjust enrichment and theft of trade secrets, they would not oppose those claims through a motion to dismiss, but would instead use summary judgment or disprove those claims at trial.  See Tr. at 29:11-17 (Bohnhoff).  The Hi-Land Potato Parties also stated that they would be receptive to denying the motion to amend with regards to the common-law fraud, fraudulent-conveyance, and UPA claims while granting with regards to claims for unjust enrichment and theft of trade secrets, because those causes of action appear in the Tan-O-On Parties' earlier pleadings.  See Tr. at 36:25-37:9 (Court, Bohnhoff).  Based on these concessions, the Court will permit amendment regarding the claims for unjust enrichment and theft of trade secrets that Tan-O-On Marketing asserts against the Hi-Land Potato Parties.  Courts are entitled to rely upon counsel's concessions.  See United States v. Ventura-Perez, 666 F.3d at 676 ("Courts could not function properly if concessions by counsel cannot be relied upon."); Texaco, Inc. v. Hale, 81 F.3d at 938 ("Even had the scope of the remand allowed the district court to consider this issue, it was entitled to rely upon Appellants' concession, and they are now without a basis for objection.").

IT IS ORDERED that: (i) Tan-O-On Marketing Inc.'s Motion to Amend Third Party

Complaint for Fraud and Theft of Trade Secrets and Unjust Enrichment, filed February 2, 2012 (Doc. 105), is granted in part and denied in part; and (ii) Defendants Hi-Land Potato Company, Inc.'s and Carl Worley's Motion to Dismiss Fraud and Fraud-Related Claims in Third Party Complaint and to Dismiss Claims Filed by Gerald and Julie Anderson in Their Individual Capacities, filed February 7, 2012 (Doc. 109), is granted in part and denied in part.  The Court will permit Defendant Tan-O-On Marketing to assert only claims for unjust enrichment and theft of trade secrets against Third-Party Defendants RPE, Inc. and Russell Wysocki consistent with the allegations presented in Tan-O-On Marketing's Second Amended Third Party Complaint for Fraud and Theft of Trade Secrets and Unjust Enrichment and Unfair Trade Practices, filed February 2, 2012 (Doc. 105-1).  The Court will not permit Tan-O-On Marketing to assert any other claim against the RPE, Inc. Parties.  The Court will not permit Tan-O-On Marketing to assert a common-law fraud claim against Defendants Hi-Land Potato Company and Carl Worley.  The Court will not permit Tan-O-On Marketing to assert a claim under the New Mexico Unfair Practices Act, N.M.S.A. 1978, §§ 57-12-1 to -26, against the Hi-Land Potato Parties.  The Court will permit Tan-O-On Marketing to assert a fraudulent-conveyance claim against Hi-Land Potato consistent with the fraudulent-conveyance claim presented in Tan-O-On Marketing's Second Amended Third-Party Complaint. The Court will permit Tan-O-Marketing to assert claims for unjust enrichment and theft of trade secrets against the Hi-Land Potato Parties consistent with the allegations in its Second Amended Third-Party Complaint.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

James T. Burns
Heather S. Jaramillo
Patrick J. Griebel
Albuquerque Business Law, P.C.
Albuquerque New Mexico

-- and --

Justin P. Pizzonia
Johanna A. Pickel
Gonzalez & Pizzonia LLC
Albuquerque, New Mexico

> *Attorneys for the Plaintiff*

Justin P. Pizzonia
Gonzalez & Pizzonia LLC
Albuquerque, New Mexico

-- and --

Katy Koestner Esquivel
Meuers Law Firm, PL
Naples, Florida

> *Attorneys for Intervening Plaintiffs Folson Farm Corporation; Potandon Produce, L.L.C.; Mart Produce Corporation; Billingsley Produce Sales, Inc.; Alsum Produce, Inc.; and Peterson Bros. River Valley Farms, Inc.*

Gordon H. Rowe III
The Rowe Law Firm, P.C.
Albuquerque, New Mexico

-- and --

Henry M. Bohnhoff
Leslie McCarthy Apodaca
Melanie B. Stambaugh
Rodey Dickason Sloan Akin & Robb, P.A.
Albuquerque, New Mexico

> *Attorneys for Defendants and Third-Party Defendants Hi-Land Potato Company, Inc. and Carl Worley*

Gordon H. Rowe III
The Rowe Law Firm, P.C.
Albuquerque, New Mexico

    *Attorneys for Defendants Mark Lounsbury and Bill Metz*

Shannon Robinson
Albuquerque, New Mexico

    *Attorney for Defendants and Third-Party Plaintiffs Tan-O-On Marketing Inc., Gerald Anderson, and Julie Anderson*

Benjamin F. Feuchter
William Spencer Reid
Keleher & McLeod
Albuquerque, New Mexico

    *Attorneys for Defendants and Third-Party Defendants RPE, Inc. and Russell Wysocki*