# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

SKYLINE POTATO COMPANY, INC.,

      Plaintiff,

vs.                                                                                  No. CIV 10-0698 JB/RHS

HI-LAND POTATO COMPANY, INC.,
CARL WORLEY, GERALD R. ANDERSON,
and JULIE A. ANDERSON,

      Defendants,

and

TAN-O-ON MARKETING, INC.,

      Defendant/Third-Party Plaintiff,

vs.

HI-LAND POTATO COMPANY, INC.,
CARL WORLEY, RPE, INC., and RUSSELL WYSOCKI,

      Third-Party Defendants.

FOLSON FARM CORPORATION,
MART PRODUCE CORPORATION,
BILLINGSLEY PRODUCE SALES, INC.,
ALSUM PRODUCE, INC., and
PETERSON BROS. RIVER VALLEY
FARMS, INC.,

      Intervening Plaintiffs,

vs.

TAN-O-ON MARKETING, INC., and
HI-LAND POTATO COMPANY, INC.,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) Defendants Hi-Land Potato Company Inc. and Carl Worley's Motion for Summary Judgment Against Skyline Potato Company, Inc. and the Folson Farm Group, filed August 8, 2012 (Doc. 250); and (ii) Plaintiff and Interviewing Plaintiffs' Joint Motion for Partial Summary Judgment and Incorporated Memorandum of Law, filed August 8, 2012 (Doc. 253).  The Court held a hearing on September 27, 2012.  The primary issues are: (i) whether Defendant Hi-Land Potato Company, Inc. ("Hi-Land Potato") is a trust beneficiary of Defendant Tan-O-On Marketing, Inc.'s trust pursuant to the Perishable Agricultural Commodities Act, 7 U.S.C. §§ 499a -t, ("PACA"); and (ii) whether Hi-Land Potato breached its duty as a co-beneficiary of Tan-O-On Marketing's PACA trust when it received full payment for potato shipments that Tan-O-On Marketing arranged while the other PACA co-beneficiaries went unpaid. The Court concludes that, because a supplier becomes a beneficiary of a commission merchant's, dealer's, or broker's PACA trust automatically upon transfer of the supplier's produce's title, Hi-Land Potato was a beneficiary of Tan-O-On Marketing's PACA trust.  The Court concludes that, in light of Tan-O-On Marketing operating out of Hi-Land Potato's premises, Hi-Land Potato handling the billing, bookkeeping, and collection for its potato shipments Tan-O-On Marketing arranged, and Tan-O-On Marketing paying Hi-Land Potato fully for its potatoes, while other producers went unpaid, a genuine issue of material fact exists whether Hi-Land Potato violated the duty it owed its co-beneficiaries of Tan-O-On Marketing's PACA trust by participating in Tan-O-On Marketing's breach of the PACA trust.  The Court thus cannot properly grant summary judgment on either motion.

## FACTUAL BACKGROUND

This lawsuit arises from Defendant Tan-O-On Marketing's failure to pay Plaintiff  Skyline

Potato Company, Inc. ("Skyline Potato"), and Intervening Plaintiffs Folson Farm Corporation, Mart Produce Corporation, Billingsley Produce Sales, Inc., Alsum Produce, Inc., and Peterson Bros. River Valley Farms, Inc. (together "Folson Farm Group") for sales of potatoes they made to Tan-O-On Marketing between October and December 2009. During that time period, Tan-O-On Marketing paid Hi-Land for potatoes that Hi-Land shipped to customers between October and December 2009.

## 1.    <u>Background of the Parties.</u>

This dispute arises out of Tan-O-On Marketing, a produce broker and sales agent, ceasing its business operations without paying fully the produce suppliers for whom it acted as a produce broker. <u>See</u> Deposition of Gerald Anderson at 57:11-25 (taken May 7-8, 2012), filed August 8, 2012 (Doc. 252-1)("Anderson Depo."). At all times material to this case, Skyline Potato and the Folson Farm Group were produce-sellers operating under valid PACA licenses issued by the United States Department of Agriculture (U.S.D.A.). <u>See</u> Affidavit of Bryan R. Folson, President and Treasurer of Folson Farm Corporation in Support of Plaintiff and Intervening Plaintiffs' Motion for Summary Judgment ¶ 6, at 2, (executed July 24, 2012), filed August 8, 2012 (Doc. 253-5); Affidavit of Chod Sill, Sales Agent of Billingsley Produce Sales, Inc. in Support of Plaintiff and Intervening Plaintiffs' Motion for Summary Judgment ¶ 6, at 2, (not executed), filed August 8, 2012 (Doc. 253-6); Affidavit of Jim McBride, Sales Manager of Mart Produce Corp. in Support of Plaintiff and Intervening Plaintiffs' Motion for Summary Judgment ¶ 6, at 2, (executed July 18, 2012), filed August 8, 2012 (Doc. 253-7); Affidavit of Lawrence Alsum, President of Alsum Farms & Produce, Inc. f/k/a Alsum Produce, Inc. in Support of Plaintiff and Intervening Plaintiffs' Motion for Summary Judgment ¶ 6, at 2, (executed July 24, 2012), filed August 8, 2012 (Doc. 253-8); Affidavit of Art Peterson, President of Peterson Bros. River Valley Farms, Inc. in Support of Plaintiff and Intervening Plaintiffs' Motion for Summary Judgment ¶ 6, at 2, (executed July 24, 2012), filed

August 8, 2012 (Doc. 253-9); Affidavit of Michael D. Jones, Chief Financial Officer of Skyline

Potato Co. in Support of Plaintiff and Intervening Plaintiffs' Motion for Summary Judgment ¶ 6, at

2, (executed July 27, 2012), filed August 8, 2012 (Doc. 253-10); Plaintiff and Intervening Plaintiffs'

Joint Motion for Partial Summary Judgment and Incorporated Memorandum of Law ¶ 16, at 8, filed

August 8, 2012 (Doc. 253)("Skyline and FFG's MSJ")(setting forth this fact); Defendant Hi-Land

Potato Company Inc.'s Response to Plaintiff and Intervening Plaintiffs' Motion for Partial Summary

Judgment at 8, filed August 27, 2012 (Doc. 266)("Response to Skyline and FFG's MSJ")(not

disputing this fact).[1] Hi-Land Potato has been a potato producer, shipping potatoes to customers such

as Kroger Co. and Kroger Co.'s predecessor, King Soopers, for thirty-four years.  See Declaration

of Carla J. Worley ¶ 3, at 2, filed August 8, 2012 (Doc. 252-2)("Carla Worley Decl.");  Defendants

Hi-Land Potato Company Inc. and Carl Worley's Motion for Summary Judgment Against Skyline

Potato Company Inc. and the Folson Farm Group ¶ 2, at 5, filed August 8, 2012 (Doc. 250)("Hi-

Land Potato MSJ")(setting forth this fact); Plaintiff and Intervening Plaintiffs' Joint Opposition to

Hi-Land Potato Company, Inc. and Carl Worley's Motion [sic] Summary Judgment at 3, filed

August 27, 2012 (Doc. 265)("Response to Hi-Land Potato's MSJ").[2]  At all times material to this

---

[1]Hi-Land Potato states that some of Skyline Potato and the Folson Farm Group's alleged undisputed material facts are undisputed for purposes of summary judgment. See Response to Skyline and FFG's MSJ at 8 ("Solely for purposes of this motion, Facts 2, 4, 7, 8, 10, 13, 16-22, and 23 are undisputed.").

[2]Skyline Potato and the Folson Farm Group dispute this fact: "This statement is not accurate to the extent that it suggests that Hi-Land grows potatoes. Hi-Land Potato sells potatoes that are grown by Worley seed Company and Blue Sky Farms."  Response to Hi-Land Potato's MSJ at 3 (citing Deposition of Carla Worley 55:3-8 (taken May 17, 2012), filed August 27, 2012 (Doc. 265-2)("Carla Worley Depo.")).  D.N.M.LR-Civ. 56.1(b) states:

> The Response must contain a concise statement of the material facts cited by the movant as to which the non-movant contends a genuine issue does exist. Each fact in dispute must be numbered, must refer with particularity to those portions of the

case, Tan-O-On Marketing's income has been exclusively derived from produce sales.  See

Deposition of Carla Worley 23:13-25:21, 29:22-32:2 (taken May 17, 2012), filed August 8, 2012

(Doc. 253-3)("Carla Worley Depo."); Deposition of Shannon Casey 139:8-11, 144:8-12; 160:3-5,

214:11-16 (taken Oct. 22, 2010), filed August 8, 2012 (Doc. 253-1)("2010 Shannon Casey Depo.")[3];

---

record upon which the non-movant relies, and must state the number of the movant's
fact that is disputed. All material facts set forth in the Memorandum will be deemed
undisputed unless specifically controverted.

D.N.M.LR-Civ. 56. 1(b).  The local rules regarding summary judgment thus require the responding
party to "specifically controvert[]" the movant's fact, or else the fact is deemed admitted.
D.N.M.LR-Civ. 56.1(b).  Because Hi-Land Potato's statement of fact is that Hi-Land Potato is a
producer of potatoes, not a grower of potatoes, Skyline Potato and the Folson Farm Group do not
specifically controvert this fact.  Because the words "producer" and "grower" may be different, the
Court will deem Hi-Land Potato's fact admitted.

[3]Hi-Land Potato contends that the Court should strike exhibits 1 and 4 to Skyline and FFG's
MSJ -- Shannon Casey's and Anderson's depositions from Shannon Casey's 2010 bankruptcy
proceeding -- "and disregard Skyline's and FFG's claimed Undisputed Material Facts . . . (Nos. 1-6,
9-10 and 13-14) to the extent they rely solely on these exhibits for evidentiary support."  Response
to Skyline and FFG's MSJ at 3.  They ask the Court to strike these exhibits, because "Skyline and
FFG attempt to use the depositions of these witnesses from Shannon Casey's 2010 bankruptcy
adversary proceeding, to which Hi-Land was not a party."   Response to Skyline and FFG's MSJ
at 3.  Hi-Land Potato asserts that, to rely on these depositions as evidence, Skyline Potato and the
Folson Farm Group "bear the burden of establishing that such testimony is admissible under Rule
32(a) [of the Federal Rules of Civil Procedure]."  Response to Skyline and FFG's MSJ at 3 (citing
Garcia-Martinez v. City and County of Denver, 392 F.3d 1187, 1191 (10th Cir. 2004)("The
proponent of the deposition bears the burden of proving that it is admissible under Rule 32(a).")).
The Court recognizes that it cannot rely on testimony that will not be admissible at trial; the Court
can rely, however, on evidence submitted in a form that would be inadmissible at trial as long as the
evidence would eventually be in an admissible form:

This does not mean that evidence must be submitted as "a form that would be
admissible at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 324 . . . (1986). Indeed,
parties may submit affidavits even though affidavits are often inadmissible hearsay
at trial on the theory that the same facts may ultimately be presented at trial in an
admissible form. Bryant v. Farmers Ins. Exch., 432 F.3d 1114, 1122 (10th Cir.
2005).  However, "[t]o determine whether genuine issues of material fact make a
jury trial necessary, a court necessarily may consider only the evidence that would
be available to the jury" in some form. Argo v. Blue Cross and Blue Shield of
Kansas, Inc., 452 F.3d 1193, 1199 (10th Cir. 2006)(citing Truck Ins. Exch. v.

Skyline and FFG's MSJ ¶ 4, at 6 (setting forth this fact); Response to Skyline and FFG's MSJ at 8 (not disputing this fact).

       a.     **Tan-O-On Marketing.**

Tan-O-On Marketing was involved in carrying on the business of buying wholesale quantities of perishable agricultural commodities -- "produce" -- from produce suppliers and re-selling the produce to its customers. See Anderson Depo. at 57:11-25; Hi-Land Potato MSJ ¶ 1, at 5 (setting forth this fact); Response to Hi-Land Potato's MSJ at 5 (not disputing this fact); Skyline and FFG's MSJ ¶ 2, at 5 (setting forth this fact); Response to Skyline and FFG's MSJ at 8 (not disputing this fact). Gerald Anderson organized Tan-O-On Marketing in the 1990s, with the company's principal place of business located in Hi-Land Potato's packing shed in Monte Vista, Colorado. See Anderson Depo. at 7:13-8:5; 8:22-11:3; Carla Worley Decl. ¶ 5, at 2-3; Hi-Land Potato's MSJ ¶ 5, at 6 (setting forth this fact).[4] Carl Worley served as a director of Tan-O-On Marketing at Anderson's request until his resignation around 2005, but was never a shareholder or

_____

MagneTek, Inc., 360 F.3d 1206, 1216 (10th Cir. 2004)(affirming summary judgment, in light of the available evidence, because "[j]ury verdicts may not be based on speculation or inadmissible evidence or be contrary to uncontested admissible evidence")).

Trevizo v. Adams, 455 F.3d 1155, 1160 (10th Cir. 2006). Thus, although Shannon Casey's and Anderson's 2010 depositions may not be admissible at trial in this case, because Shannon Casey and Anderson will be available to testify at trial, the Court concludes that it is able rely on the factual assertions in this evidence because the assertions may be admissible at trial when Shannon Casey and Anderson testify.

[4]Skyline Potato and the Folson Farm Group respond to this fact by stating that "[t]his statement omits the fact that TMI relocated its operations to Albuquerque in 1996, where it remained until October of 2009." Response to Hi-Land Potato's MSJ at 4 (citing Additional Excerpts of May 8, 2012 Deposition of Gerald Anderson at 19:21-24; 109:5-18, filed August 27, 2012 (Doc. 265-3)). That a statement of fact omits related facts does not dispute the fact asserted, and does not "specifically controvert[]" the fact or facts asserted. D.N.M.LR-Civ. 56. 1(b). The Court will therefore deem this fact undisputed.

officer.  See Anderson Depo. at 19:11-20:14; Carl Worley Deposition at 39:9-25 (taken May 16,

2012), filed August 8, 2012 (Doc. 252-4)("Carl Worley Depo."); Hi-Land Potato MSJ ¶ 6, at 6

(setting forth this fact); Response to Hi-Land Potato MSJ at 4 (not disputing this fact).  In 2006,

Anderson and his wife, Tan-O-On Marketing's sole shareholders, sold the company to Shannon

Casey, one of Tan-O-On Marketing's salesmen.  See Anderson Depo. at 50:4-24; 52:17-53:13; Hi-

Land Potato's MSJ ¶ 7, at 6 (setting forth this fact); Response to Hi-Land Potato's MSJ at 4 (not

disputing this fact).  After Anderson sold Tan-O-On Marketing to Shannon Casey, he had no

intention at any point to resume his involvement with Tan-O-On marketing at any time.  See

Anderson Depo. at 87:9-24; Hi-Land Potato's MSJ ¶ 8, at 6 (setting forth this fact); Response to Hi-

Land Potato's MSJ at 6 (not disputing this fact).

        Between 2006 and 2010, Tan-O-On Marketing's President Shannon Casey managed and

controlled Tan-O-On Marketing's accounts payable and receivable, including payments from its

checking accounts.  See In re: Shannon P. Casey, Petitioner, No. 11-0131, 2011 WL 3645678, at

**5-6 (USDA Jul. 6 2011)(findings of fact 4-7); Deposition of Shannon Casey 66:10-18 (taken May

15, 2012), filed August 8, 2012 (Doc. 253-13)("2012 Shannon Casey Depo.")(admitting to signing

Kroger Co. vendor number in 2007); 2010 Shannon Casey Depo. at 18:10-19:4, 24:1-11, 50:25-51:6,

125:2-9, 133:21-24, 137:22-138:1, 160:3-5; Skyline and FFG's MSJ ¶ 3, at 6 (setting forth this fact);

Response to Skyline and FFG's MSJ at 6 (not disputing this fact).  By the end of 2008, conflict had

developed between Shannon Casey and the Andersons regarding the "salary" and promissory note

payments Shannon Casey had to pay to the Andersons, because of Tan-O-On Marketing's level of

profitability and the minimal duties that the Andersons had in Tan-O-On Marketing's business.  See

2012 Shannon Casey Depo. at 16:10-17:3 (Doc. 252-5); Hi-Land Potato's MSJ ¶ 9 at 6 (setting forth

this fact); Response to Hi-Land Potato's MSJ at 4 (not disputing this fact).  In May of 2009,

Shannon Casey "fired" the Andersons from their positions, stopped paying their salaries, and actively began trying to find a way to buy out their rights in the promissory note, leaving Shannon Casey as the President and CEO of Tan-O-On Marketing and the Andersons with no continuing involvement.  See Anderson Depo. at 83:22-84:21; 84:4-9; 85:18-87:2; 120:7-14; Hi-Land Potato's MSJ ¶¶ 10-11, at 6-7 (setting forth this fact); Response to Hi-Land Potato's MSJ at 4 (not disputing this fact).   In early 2009, Bank of Albuquerque, the bank at which Tan-O-On Marketing had historically maintained its bank accounts, did not renew Tan-O-On Marketing's line of credit, leaving Tan-O-On Marketing to rely exclusively on its receivables to pay its bills.  See 2012 Anderson Depo. at 26:3-27:15; 46:19-47:9; 91:2-18; 2012 Shannon Casey Depo. at 8:8-9:6; 10:19-11:10; 45:3-6; 2010 Shannon Casey Depo. at 94:7-96:7; 132:18-21; 192:14-193:5; 218:17-219:12; 219:23-221:1; Skyline and FFG's MSJ ¶ 5, at 6 (setting forth this fact); Response to Skyline and FFG's MSJ at 6.[5]

### b.    Hi-Land Potato.

---

[5]While admitting that this fact is undisputed, Hi-Land Potato submits the additional fact that "the Bank of Albuquerque refused to continue the line of credit only because Anderson refused to continue the guaranty."  Response to Skyline and FFG's MSJ at 6 (citing 2012 Anderson Depo. at 91:2-18).  Hi-Land Potato also argues that Anderson refused to continue as guaranty knowing "that terminating the line of credit . . . would create an insurmountable cash flow problem for Tan-O-On Marketing during the 2009-2010 selling season."   Response to Skyline and FFG's MSJ at 6. D.N.M.LR-Civ. 56.1(b) states in relevant part:

> The Response may set forth additional facts other than those which respond to the Memorandum which the non-movant contends are material to the resolution of the motion. Each additional fact must be lettered and must refer with particularity to those portions of the record upon which the non-movant relies.

D.N.M.LR-Civ. 56. 1(b).  These additional facts that Hi-Land Potato adds do not "specifically controvert[]," D.N.M.LR-Civ. 56. 1(b), Hi-Land Potato's statement of fact, but rather are additional facts. The Court will therefore deem this fact admitted.  Additionally, because Hi-Land Potato does not letter these additional facts, nor refer the court with particularity to the portion of the record upon which Hi-Land Potato relies, the Court will not add these additional facts as findings of fact.

Tan-O-On Marketing acted as a sales agent for Hi-Land Potato from the 1990s to the end of 2009.  In this sales agency relationship, Tan-O-On Marketing arranged sales to customers, but Hi-Land Potato shipped the potatoes directly from its shed to the customers.  Because of these direct shipments, Hi-Land Potato has known the names of the end customers of its potatoes, and had direct contact and relationships with the customers.  See Anderson Depo. at 64:23-66:17; Carla Worley Decl. ¶¶ 6-7; Purchase Order (Printed December 31, 2008), filed August 8, 2012 (Doc. 252-3)("Dec. 31, 2008 Purchase Order"); Hi-Land Potato MSJ ¶ 3, at 6 (setting forth this fact).[6]  Hi-Land Potato and Metz Potato Company ("Metz Potato"), one of Hi-Land Potato's neighbor produce suppliers, were Tan-O-On Marketing's "principal shippers."  Anderson Depo. at 8:6-14.  See Hi-Land Potato's MSJ ¶ 4, at 5 (setting forth this fact); Response to Hi-Land Potato's MSJ at 3 (noting that Anderson testified that "Hi-Land and Metz were TMI's 'principal suppliers.'").

### 2.    The Business Operations of Tan-O-On Marketing at Issue.

---

[6]Skyline Potato and the Folson Farm Group dispute this fact and assert that this statement is not accurate: "While the shipping records disclose the identity of TMI's customer, there is no evidence of direct sales from Hi-Land to TMI's customer, there is no evidence of direct sales from Hi-Land to TMI's customers prior to October of 2009, or of any direct relationship between HI-Land and those customers."  Response to Hi-Land Potato's MSJ at 3.  Local rule 56.1(b) requires that "Each fact in dispute . . . must refer with particularity to those portions of the record upon which the non-movant relies," or they will be deemed waived.  D.N.M.LR-Civ. 56.1(b).  Neither Anderson's deposition nor Carla Worley's Declaration specifically give a time frame for the period in which Hi-Land Potato shipped potatoes directly to its customers.  See Anderson Depo. 64:23-65:14; Carla Worley Decl. ¶¶ 6-7.  The Dec. 31, 2008 Purchase Order that Hi-Land Potato cites, however, designates Hi-Land Potato as the "Shipper" and King Soopers as the "Ship To" address, and is affirmative proof that Hi-Land Potato directly shipped potatoes before October 2009.  Dec. 31, 2008 Purchase Order.  Proving a negative affirmatively always presents parties with a quandary.  Nevertheless, to do so in this case, Skyline Potato and the Folson Farm Group could have asked Hi-Land Potato in one of the depositions whether there were direct sales to Hi-Land's customers before October 2009 and pointed the Court to that question and response.  Skyline Potato and the Folson Farm Group have not done so here.  Because Skyline Potato and the Folson Farm Group have not referred with particularity to the portions of the record which they rely on to specifically controvert this fact, the Court deems it admitted.  See D.N.M.LR-Civ. 56.1(b).

In mid-October 2009, Shannon Casey traveled to Monte Vista to meet with Hi-Land Potato's

principals to ask if Tan-O-On Marketing could establish an office at Hi-Land Potato's packing shed.

See 2012 Shannon Casey Depo. at 18:25-20:9; Hi-Land Potato's MSJ ¶ 12, at 7 (setting forth this

fact).[7]  An agreement was reached shortly after the meeting with Carla Worley, a principal of Hi-

Land Potato; in lieu of rent for the office space, telephone, and internet provided to Tan-O-On

Marketing, Tan-O-On Marketing would give Hi-Land Potato a discount from 25 cents to 22 cents

per hundredweight of potatoes on Tan-O-On Marketing's fee.  See 2012 Shannon Casey Depo. at

21:2-15; 218:12-23; Carla Worley Decl.¶ 9, at 4; Hi-Land Potato's MSJ ¶ 13, at 7 (setting forth this

fact).[8]  Hi-Land Potato also agreed, as part of this arrangement, to Shannon Casey's request that Hi-

---

[7] Skyline Potato and the Folson Farm Group assert that part of Hi-Land Potato's statement misrepresents the evidence: "Hi-Land's use of the phrase 'as Anderson had done in the 1990s' suggests that Casey's decision was influenced by TMI's connections to Hi-Land early in its history of TMI [sic].  There is no evidence that supports this suggestion."  Response to Hi-Land Potato's MSG at 4.  Nowhere in any portion of Shannon Casey's deposition that Hi-Land cites in support of this proposition does Shannon Casey state that Tan-O-On Marketing or Anderson had ever before had an office in Monte Vista.  On the other hand, Skyline Potato and The Folson Farm Group do not dispute that Anderson organized the business at Monte Vista when he opened Tan-O-On Marketing in the 1990s.  See Response to Hi-Land Potato's MSJ at 4 (only objecting to the statement of fact regarding Anderson opening the office in Monte Vista because it omits that he moved its operations to Albuquerque in 1996).  Because the Skyline Potato and the Folson Farm Group do not "specifically controvert[]" any portion of Hi-Land Potato's proposed fact, the Court will deem the fact admitted.  D.N.M.LR-Civ. 56.1(b).

[8] Hi-Land Potato's statement provides that "Carla Worley . . . reached an agreement with Shannon Casey . . . ."  Hi-Land Potato's MSJ ¶ 13, at 7.  The Court notes that Skyline Potato and the Folson Farm Group bring to the Court's attention, in regards to Hi-Land Potato's statement, that "[t]his statement is inaccurate. The agreement was not reached with Shannon Casey; instead it was reached with his wife, Shawna Casey."  Response to Hi-Land Potato's MSJ at 4.  Because Skyline Potato and the Folson Farm Group have specifically numbered this fact, and provided a response to it, they are abiding by D.N.M.LR-Civ. 56.1(b), specifically controverting this fact, and contending it is material.  There were 703 pages filed up to this point, and an additional 241 pages filed after Skyline Potato and the Folson Farm Group filed their Response to Hi-Land Potato's MSJ -- totaling 943 pages.  Skyline and the Folson Farm Group nevertheless refer the Court to Shannon Casey's testimony that "[m]ost of the details were handled by [Shannon Casey's] wife," 2012 Shannon Casey Depo. at 20:23, or that Shannon Casey's "wife handled [the negotiation] part of [the deal],"

-10-

Land Potato start handling the billing, bookkeeping, and collection for the shipments of Hi-Land Potato's and Metz Potato's potatoes that Tan-O-On Marketing had arranged.  Hi-Land Potato saw this arrangement as a benefit, because it would eliminate the confusion, mistakes, and payment delay that Hi-Land Potato had experienced in their relationship with Tan-O-On Marketing during the previous year.  See Carla Worley Decl. ¶ 9, at 4; Hi-Land Potato's MSJ ¶ 15, at 7 (setting forth this fact).[9]

_____

2012 Shannon Casey Depo. at 175:16-17.  Skyline Potato and the Folson Farm Group apparently believe that this fact goes to Hi-Land Potato's inequitable conduct; that Hi-Land Potato was making deals with Shawna Casey behind Shannon Casey's back.  Shannon Casey testified, however, that the arrangement was "a mutual proposition" agreeable to both parties at the time they discussed it.  2012 Shannon Casey Depo. at 20:12-15.  If Hi-Land was being paid less for each of its shipments arranged by Tan-O-On Marketing, whether it was Shannon Casey or Shawna Casey who brokered the deal, it seems to have helped increase the eventual res of the trust to which Skyline Potato and The Folson Farm Group claim they are entitled.  Skyline Potato and the Folson Farm Group nevertheless dispute the fact as Hi-Land Potato proposes it. The portions of the record to which they refer the Court, however, supports that Shannon Casey made the agreement, and that Shawna Casey worked out the details of the agreement that had been made. The Court thus deems the fact admitted.

[9]Skyline Potato and the Folson Farm Group dispute multiple parts of Hi-Land Potato's statement.  They first assert that, to the extent Carla Worley's Decl. states that this arrangement would eliminate confusion, mistakes, and late payments in the past, Skyline Potato and The Folson Farm Group contend that "there is no evidence whatsoever of any history of mistakes, [or] confusion."  They then argue that this arrangement was not Hi-Land Potato merely acquiescing to Shannon Casey's request, as Hi-Land Potato submits:

> Skyline and Folson Farm Group submit this accounting arrangement was part of a scheme devised by TMI and Hi-Land to segregate TMI's relationship with and sales to Kroger in order to ensure that Hi-Land alone was paid for the produce supplied to TMI.  This was done without regard to the PACA creditors of TMI.

Response to Hi-Land Potato's MSJ at 4.  Skyline Potato and the Folson Farm Group assert that Carla Worley's Declaration conflicts with her deposition testimony, because, in her deposition, she "testified that she could only speculate that Casey sought this change in TMI's arrangement with Hi-Land in order to reduce TMI's costs."  Response to Hi-Land Potato's MSJ at 5.  Local rule 56.1(b) requires that "[e]ach fact in dispute . . . must refer with particularity to those portions of the record upon which the non-movant relies" or they will be deemed waived.  D.N.M.LR-Civ. 56.1(b). With regard to Skyline Potato and the Folson Farm Group's first two arguments, that there was no evidence of past confusion or mistakes, and that the accounting arrangement was a scheme, Skyline

## PROCEDURAL BACKGROUND

Skyline Potato filed its First Amended Petition and Complaint, Prayer for Declaratory Relief and Piercing the Corporate Veil, on July 23, 2010.  See Doc 2 ("Skyline Complaint").  The Folson Farm Group filed their Complaint in Intervention on July 8, 2011.  See Doc. 60 ("FFG Complaint"). Skyline Potato and the Folson Farm Group allege that Tan-O-On Marketing and Hi-Land Potato were engaged in a scheme by which Hi-Land Potato knew it was receiving payment to the detriment of Tan-O-On Marketing's other PACA trust creditors.  Skyline Potato and the Folson Farm Group assert that Tan-O-On's obligations under PACA extend to Hi-Land Potato.  Skyline Potato and the Folson Farm Group demand that Hi-Land Potato disgorge sufficient funds to pay the entire amount of Skyline Potato's and the Folson Farm Group's claims against Tan-O-On Marketing.  Skyline Potato and the Folson Farm Group allege that Tan-O-On Marketing transferred PACA trust assets to Hi-Land and that any such transfers are a breach of the PACA trust.  See Skyline Complaint ¶87, at 13; FFG Complaint ¶¶ 41-42, at 10.  Skyline Potato qualifies this assertion by noting that the transfers were "made to Hi-Land in preference of other PACA trust creditors," Skyline Complaint ¶87, at 13; this statement acknowledges that Hi-Land Potato was a PACA creditor as well.  The Folson Farm Group asserts that "Hi-Land must hold any PACA Trust Assets having come into its

_____

Potato and the Folson Farm Group fail to direct the Court with particularity to the portion of the record on which they rely. Thus, because Skyline Potato and the Folson Farm Group have not referred the Court to portions of the record which specifically controvert this fact, the Court deems it admitted.  See D.N.M.LR-Civ. 56.1(b).  With regard to the third argument -- that Carla Worley has changed her testimony -- Skyline Potato and the Folson Farm Group refer the Court to Carla Worley's deposition testimony, where she testified that she could only speculate that Shannon Casey sought this change to reduce Tan-O-On Marketing's costs.  Carla Worley's testimony specifically controverts that Tan-O-On Marketing entered into this agreement in fact to reduce costs.  Because Skyline Potato and the Folson Farm Group have referred the Court to the portion of the record with particularity on which they rely to specifically controvert this fact, the Court will deem this fact in dispute. Thus, the Court will omit from the facts that Shannon Casey requested that Hi-Land Potato keep the accounting and bookkeeping to reduce Tan-O-On Marketing's costs.

possession as a trustee for the benefit of [the Folson Farm Group]," FFG Complaint ¶ 43, at 10, and seeks as damages against Hi-Land Potato the full amount it contends Tan-O-On Marketing owes it, $343,159.40, plus interest from the date each invoice to Tan-O-On Marketing became past due, costs, and attorneys' fees, less any monies it receives from the PACA trust assets, see FFG Complaint ¶¶43-44, at 10.

Hi-Land Potato and Worley move the Court, pursuant to rule 56 of the Federal Rules of Civil Procedure, for an order granting summary judgment in their favor on all of the claims asserted against them in Skyline Potato's First Amended Complaint and Folson Farm's Complaint. See Hi-Land Potato MSJ at 1. Skyline Potato and the Folson Farm Group move the Court, pursuant to rule 56, for an order granting partial summary judgment in their favor on whether Hi-Land Potato unlawfully received PACA trust assets. See Skyline and FFG's MSJ at 3.

The Court held a hearing on September 27, 2012. The parties began by agreeing that Skyline Potato and the Folson Farm Group have abandoned all of their claims except for the PACA claims. See Transcript of Hearing at 4:21-5:14 (September 27, 2012)(Bohnhoff, Court, Jaramillo, Esquivel) ("Tr.").[10] Hi-Land Potato began by stating that it contends it is undisputed that the funds Tan-O-On Marketing received for Hi-Land Potato's produce, that it used to pay Hi-Land Potato, were kept separate from the money that Tan-O-On Marketing received for other sellers' produce. See Tr. at 6:6-25 (Bohnhoff). Hi-Land Potato also stated what it contended were the undisputed facts and the parties' arguments, and argued that there is no evidence to support Skyline Potato and the Folson Farm Group's claim that Hi-Land Potato had an agreement with and acted in concert with Tan-O-On Marketing to ensure that Hi-Land Potato was paid before any of the Tan-O-On Marketing's other

---

[10]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version. Any final transcript may contain slightly different page and/or line numbers.

produce sellers.  See Tr. at 7:9-19 (Bohnhoff).  The most that Skyline Potato and the Folson Farm Group can contend, Hi-Land Potato argued, is that Hi-Land Potato knew that it was receiving preference payments, but that a PACA creditor's knowledge that it is "receiving a preference payment even from an [insolvent] debtor . . . [does not] establish a fraudulent transfer." Tr. at 7:25-8:19(Bohnhoff).

Hi-Land Potato contended that the following undisputed facts make it a trust beneficiary under PACA as a matter of law: Hi-Land Potato shipped $1.66 million worth of potatoes, Tan-O-On Marketing was paid $1.66 million for that shipment, and then Tan-O-On Marketing paid $1.66 million to Hi-Land Potato for those shipments.  See Tr. at 8:20-9:11 (Bohnhoff). With regard to Skyline Potato and the Folson Farm Group's argument that Hi-Land Potato was not a trust beneficiary because it failed to invoice Tan-O-On Marketing or otherwise provide statutory notice of its intent to preserve PACA benefits, Hi-Land Potato argued that, because Hi-Land Potato was a paid seller rather than an unpaid seller, under PACA it did not have to do anything to preserve its right as a beneficiary.  See Tr. at 9:22-10:18 (Bohnhoff).  A paid seller, Hi-Land Potato argued, does not need to do anything to preserve its benefits under PACA, because PACA operates to give an unpaid seller benefits over non-produce seller creditors.  See Tr. at 10:18-21 (Bohnhoff).  Hi-Land Potato argued that Skyline Potato and the Folson Farm Group are attempting to assert that, to preserve its rights as a PACA trust beneficiary, Hi-Land Potato has to prove that it was paid within forty days.  See Tr. at 11:2-9 (Bohnhoff).  Hi-Land Potato contended that Skyline Potato and the Folson Farm Group, as the Plaintiffs in this case asserting that Hi-Land Potato is not a trust beneficiary, are thus trying to shift the burden.  See Tr. at 11:12-17 (Bohnhoff).  Rather, because this action is at the summary judgment stage, with the burden at summary judgment on the same party it will be at trial, Hi-Land Potato asserted that it is Skyline Potato's and the Folson Farm Group's

-14-

burden to establish as an undisputed material fact that Hi-Land Potato was not paid by Tan-O-On

Marketing within forty days of shipment.  See Tr. at 11:18-25 (Bohnhoff).  Alternatively, Hi-Land

Potato argued, even if the burden is Hi-Land Potato's, Skyline Potato and the Folson Farm Group

"still had to at least identify the issue, [that there was] no payment within 40 days, in their

statements of fact in their original summary judgment," because, while a party does not need to

affirmatively present evidence to meet its burden, it "still need[s] to assert that there is no evidence

on the part of the opposing party."  Tr. at 13:3-11 (Bohnhoff).

## RELEVANT LAW REGARDING PACA

Congress enacted PACA[11] in 1930 "to prevent unfair business practices and promote

financial responsibility in the fresh fruit and produce industry."  Boulder Fruit Exp. & Heger

Organic Farm Sales v. Transp. Factoring, Inc., 251 F.3d 1268, 1271 (9th Cir. 2001)(citing Sunkist

Growers, Inc. V. Fisher, 104 F.3d 280, 282 (9th Cir. 1997)).  Congress amended PACA in 1984 to

"protect the public interest,"and to remedy the problem of suppliers or sellers of produce being the

last to get paid by an insolvent merchant, dealer, or broker, "caused by financing arrangements under

which commission merchants, dealers, or brokers, . . . encumber or give lenders a security interest

in . . . any receivables or proceeds from the sale of such commodities or products . . . ."  7 U.S.C.

§ 499e(c)(1).  Congress created the PACA trust, defined in § 499e(c)(2), as a remedy:

> Perishable agricultural commodities received by a commission merchant, dealer, or
> broker in all transactions, and all inventories of food or other products derived from
> perishable agricultural commodities, and any receivables or proceeds from the sale

---

[11]Only once has the United States Court of Appeals for the Tenth Circuit cited to PACA
section five, 7 U.S.C. § 499e, and then only in passing.  See Spano v. Western Fruit Growers, 83
F.2d 150, 151 (10th Cir. 1936)(noting that § 499e "provides that any commission merchant, dealer
or broker who thus rejects such a perishable commodity shall be liable for the damages sustained
in consequence of his action").  The Supreme Court of the United States has never referenced or
cited to any provision of PACA.

> of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents.

7 U.S.C. § 499(3)(c)(2).  "Congress explained that 'the purpose of the trust is to increase the legal protection for unpaid sellers and suppliers of perishable agricultural commodities until full payment of sums due have been received by them.'"  H.C. Schmieding Produce v. Alfa Quality Produce, 597 F. Supp. 2d 313, 315-16 (E.D.N.Y. 2009)(quoting "R" Best Produce, Inc. V. Shulman-Rabin Marketing Corp., 467 F.3d 238, 241 (2d Cir. 2006))(internal alterations omitted).

## 1. Creation and Participation in the PACA Trust.

"Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194 (1985)(citing American Tobacco Co. v. Patterson, 456 U.S. 63, 68 (1982)).  In construing § 944e to determine the scope of the statutory trust, the Court must read the statute as a whole, rather than reading only § 944e(c)(2).  See United States v. Atl. Research Corp., 551 U.S. 128, 135 (2007)("Statutes must be read as a whole.")(quoting King v. St. Vincent's Hospital, 502 U.S. 215, 221 (1991)).  Section 499e(c), paragraphs 2-4, of Title 7 of the United States Code provides:

> **(2)** Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents. Payment shall not be considered to have been made if the supplier, seller, or agent receives a payment instrument which is dishonored. The provisions of this subsection shall not apply to transactions between a cooperative association, as defined in section 1141j(a) of Title 12, and its members.

**(3)** The unpaid supplier, seller, or agent shall lose the benefits of such trust unless such person has given written notice of intent to preserve the benefits of the trust to the commission merchant, dealer, or broker within thirty calendar days (i) after expiration of the time prescribed by which payment must be made, as set forth in regulations issued by the Secretary, (ii) after expiration of such other time by which payment must be made, as the parties have expressly agreed to in writing before entering into the transaction, or (iii) after the time the supplier, seller, or agent has received notice that the payment instrument promptly presented for payment has been dishonored. The written notice to the commission merchant, dealer, or broker shall set forth information in sufficient detail to identify the transaction subject to the trust. When the parties expressly agree to a payment time period different from that established by the Secretary, a copy of any such agreement shall be filed in the records of each party to the transaction and the terms of payment shall be disclosed on invoices, accountings, and other documents relating to the transaction.

**(4)** In addition to the method of preserving the benefits of the trust specified in paragraph (3), a licensee may use ordinary and usual billing or invoice statements to provide notice of the licensee's intent to preserve the trust. The bill or invoice statement must include the information required by the last sentence of paragraph (3) and contain on the face of the statement the following: "The perishable agricultural commodities listed on this invoice are sold subject to the statutory trust authorized by section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499e(c)). The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received.".

7 U.S.C. § 499e(c)(2)-(4).

The first step in construing a statute requires the court to "determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997). The inquiry stops there "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" Robinson v. Shell Oil Co., 519 U.S. at 340 (citing United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 240 (1989)). Whether the statutory language is plain on its face or ambiguous "is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Robinson v. Shell Oil Co., 519 U.S. at 341 (citing Estate of

Cowart v. Nicklos Drilling Co., 505 U.S. 469, 477 (1992)).

### a.   The PACA Trust Arises Automatically and the Produce Supplier is a PACA Beneficiary Upon Transfer of the Produce's Title.

Read in the context of the statute as a whole, the required notice provisions of § 499e(c)(3) and § 499e(c)(4) support the interpretation that the PACA trust arises automatically and a produce supplier becomes a PACA beneficiary upon transfer of title to the produce. This conclusion follows from the language that, if an unpaid supplier does not abide by the notice provisions within the statutory time period -- if it does not "preserve" its benefits -- it "lose[s]" the benefits of the trust with regard to that particular shipment:

> The unpaid supplier, seller, or agent shall lose the benefits of such trust unless such person has given written notice of intent to preserve the benefits of the trust to the commission merchant, dealer, or broker within thirty calendar days (i) after expiration of the time prescribed by which payment must be made, as set forth in the regulations issued by the Secretary, (ii) after the expiration of such other time by which payment must be made, as the parties have expressly agreed to in writing before entering into the transaction, or (iii) after the time the supplier, seller or agent has received notice that the payment instrument promptly presented for payment has been dishonored.

7 U.S.C. § 499e(c)(3) (emphasis added). The PACA statute as a whole, however, is silent as to anything a supplier needs to do beyond being a supplier to become a PACA beneficiary. Because the PACA notice provisions in § 499e(c)(3) and § 499e(c)(4) operate to strip the PACA beneficiary of the PACA trust benefits unless the beneficiary acts to retain the benefits, the supplier had to have been a PACA beneficiary to lose the benefits. Section 499e(c)(4) provides an additional method to "preserve" the PACA benefits. See § 499e(c)(4) ("In addition to the method of preserving the benefits of the trust specified in paragraph (3), a licensee may use ordinary and usual billing or invoice statements to provide notice of the licensee's intent to preserve the trust benefits . . . .")(emphasis added). The required notice provisions of § 499e(c)(3) and § 499e(c)(4), therefore,

support the interpretation that a supplier automatically granted PACA beneficiary status upon sale

of the produce.

The United States Courts of Appeal have also found that suppliers become PACA trustees

automatically upon sale of the produce.  The United States Court of Appeals for the Ninth Circuit

has stated:

> The trust automatically arises in favor of a produce seller upon delivery of produce
> and is for the benefit of all unpaid suppliers or sellers involved in the transaction
> until full payment of the sums owing has been received.

In re Milton Poulos, Inc., 947 F.2d 1351, 1352 (9th Cir. 1991)(citing  7 U.S.C. § 499e(c)(2)).  See

Patterson Frozen Foods, Inc. v. Crown Foods Intern., Inc., 307 F.3d 666, 669 (7th Cir. 2002)("This

floating trust is automatically created when the dealer accepts the goods so long as the supplier

complies with the specific notice requirements set out in 7 U.S.C. § 499e(c) and 7 C.F.R. §

46.46(f).")(citing Greg Orchards & Produce, Inc. v. Roncone, 180 F.3d 888, 890-91 (7th Cir. 1999)).

D.M. Rothman & Co., Inc. v. Korea Commercial Bank of New York, 411 F.3d 90, 96 (2d Cir.

2005)("[A] PACA trust is automatically established each time a broker or merchant purchases

perishable commodities upon credit . . . ."); Skone & Connors Produce, Inc. v. Panattoni, 37 F.3d

1506, *1 (9th Cir. 1994)(unpublished table opinion)("When Skone & Connors Produce, Inc.

delivered potatoes to FreshPict's client a nonsegregated trust was automatically created under the

Perishable Agricultural Commodities Act (PACA).").

**b.**      **The Statute Creates a Single PACA Floating Trust for the Benefit of All
Beneficiaries.**

Section § 499e(c)(2) covers "commodities received . . . in all transactions," but also states

that the proceeds and receivables "shall be held . . . in trust for the benefit of all unpaid suppliers or

sellers . . . involved in the transaction until full payment of the sums owing in connection with such

-19-

transactions." 7 U.S.C. § 499e(c)(2) (emphasis added).  Throughout § 499e(c)(3) and § 499e(c)(4),

Congress refers only to "such trust" or "the trust."  On the other hand, it might be possible to

interpret § 499e(c)(4) as providing for multiple PACA trusts, reading the language that "[t]he seller

of these commodities retains a trust claim over these commodities" to provide for separate trusts for

each individual contract or shipment.  7 U.S.C. § 499e(c)(4).  The language "[t]he seller of these

commodities retains a trust claim over these commodities" may also be construed, however, as a

means of including each shipment in the trust's res and preserving the extension of the PACA trusts

benefits to each shipment.  7 U.S.C. § 499e(c)(4).  Thus, rather than creating a separate PACA trust

for each shipment, failing to provide the seller with the notice required by § 499e(c)(3) or §

499e(c)(4) results in the particular shipment not being covered under the PACA trust, and thus not

counting toward the supplier's *pro rata* share.  If, on the other hand, the statute were to provide

multiple individual PACA trusts for each shipment, tracing would become a necessary and a

principle part of recovering PACA trust assets.  With multiple individual PACA trusts, the proceeds

of each produce shipment would become trust assets of a distinct PACA trust.  For a PACA

beneficiary to enforce its PACA trust benefits when the trustee misses payments for a shipment, the

supplier would necessarily have to trace the PACA trustee's assets to prove that such assets are the

proceeds of its individual PACA trust.  Such tracing would be necessary so that the assets of one

PACA trust could be distinguished from the assets of other beneficiaries' PACA trusts, or even the

beneficiary's separate PACA trusts for which the PACA trustee has not missed payments.  More

likely, by including the language "these commodities" only in the notice provisions and excluding

it from the provision creating the PACA trust, Congress intended that, if a supplier is not diligent

in giving the PACA trustee notice of its intent for a shipment to be part of the PACA trust, the

PACA trust benefits do not extend to that particular shipment.  See Burlington N. & Santa Fe. Ry.

Co. v. White, 548 U.S. 53, 62 (2006))("We normally presume that, where [Congress'] words differ . . . , 'Congress acts intentionally and purposely in the disparate inclusion or exclusion.'")(quoting Russello v. United States, 464 U.S. 16, 23 (1983)).

The Court's conclusion that there is one singular PACA trust comports with the United States Department of Agriculture's regulations interpreting the statutory trust in §499e(2). The Department of Agriculture has interpreted the statute to create a single PACA trust, stating that "[t]rust assets are to be preserved as a nonsegregated 'floating' trust." 7 C.F.R. § 46.46(b). This nonsegregated floating trust permits the commingling of trust assets. The Department of Agriculture notes that its regulations interpreting the statutory trust and identifying it specifically as a floating trust "clarifies the intent of Congress." Regulations Under the Perishable Agricultural Commodities Act; Addition of Provisions To Effect a Statutory Trust, 49 Fed. Reg. 45,735, 45,738 (Nov. 20, 1984). Thus, the Department of Agriculture designed the statutory trust regulations to effect what it saw as Congress' intent in its 1984 amendments to PACA that created the trust:

> Section 5(c)(2) impresses a trust for the benefit of all unpaid sellers or suppliers on perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions . . . and any receivables or proceeds from the sale of such commodities or products until full payment is made of the sums owing in connection with such transactions . . . . The trust impressed by section 5(c)(2) is a nonsegregated 'floating trust' made up of all a firm's commodity related liquid assets, under which there may be a commingling of trust assets . . . . Since commingling is contemplated, all trust assets would be subject to the claims of unpaid seller-suppliers and agents to the extent of the amount owed them.

H.R. Rep. No. 98-543, at 5 (emphasis added). Because the regulations interpreting the statutory trust in §499e(2) comport with the Court's construction of the statute's plain language and with the intent expressed in the House Report, the Department of Agriculture's definition of the trust in 7 C.F.R. § 46.46(b) is a reasonable statutory interpretation. The Supreme Court has directed federal courts to accept a government agency's reasonable interpretation of a statue where Congress has

intentionally left the interpretation to the agency.  See Chevron, U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 845 (1984)("If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.")(quoting United States v. Shimer, 367 U.S. 374, 382 (1961)). The Court therefore concludes that the Department of Agriculture's definition of the PACA trust in 7 C.F.R. § 46.46(b) as a single ongoing floating trust is entitled to the Court's deference.

The House Report's stated intent that a supplier automatically becomes a participant in the trust suggests the construction of the statute to create a single ongoing PACA trust.

> As each supplier, seller, or agent transfers ownership, possession, or control of perishable agricultural commodities to a commission merchant, dealer, or broker, such supplier, seller, or agent will automatically become a participant in the trust. Trust participants who file, in accordance with the provisions of this act, to preserve their right to benefits remain trust beneficiaries until they have received payment in full. When Payment is received for individual produce shipments the amount of the trust will be reduced accordingly.

H.R. Rep. No. 98-543, at 5 (1983) reprinted in 1983 U.S.C.C.A.N. 405, 408 (emphasis added). Congress stated that a supplier automatically "becomes a participant in the trust," rather than stating that a PACA trust is automatically created.  The Court believes that Congress did so purposefully and intentionally, concluding that Congress' purpose was to provide a single ongoing trust rather than individual separate trusts created each time a supplier ships its produce.

The United States Court of Appeals for the Second Circuit's conclusion that "a single PACA trust exists for the benefit of all of the sellers to a Produce Debtor, and continues in existence until all of the outstanding beneficiaries have been paid in full," supports the Court's conclusion.  In re Kornblum & Co., Inc., 81 F.3d 280, 286 (2d Cir. 1996).  The Second Circuit, tasked with interpreting whether § 499e(c)(2) created a single trust or multiple trusts, noted that all of the

language in the statutory provision counsels in favor of a single trust, except the phrase "involved in the transaction." 81 F.3d at 286 (quoting 7 U.S.C. § 499(e)(2)).  The Second Circuit construed this phrase "as having the meaning, in context, of 'involved in any such transaction,' thereby harmonizing with the balance of the language in § 499e(c)(2)." In re Kornblum & Co., Inc., 81 F.3d at 286.  The Second Circuit concluded that this construction is reasonable based on the fact that the rest of the language in § 499e(c)(2) refers to "all transactions":

> As previously noted, § 499e(c)(2) directs that
>
> > commodities received . . . in all transactions, and all inventories of food or other products derived [therefrom], and any receivables or proceeds from the sale of such commodities or products, shall be held . . . in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received.
>
> [7 U.S.C. § 499e(c)(2)] (emphasis added). All of the emphasized language points to a single, undifferentiated trust for the benefit of all sellers or suppliers of Produce except the phrase "involved in the transaction," which we do not read as countermanding the clear import of the balance of the statutory language.

81 F.3d at 286.  The Second Circuit's construction is reasonable, because by providing that "commodities . . . [of] all transactions . . . and any receivables or proceeds from the sale of such commodities" shall be held in trust, it is reasonable to conclude that Congress intended to make one trust with the res consisting of the proceeds of all transactions.  The Second Circuit also noted that its interpretation was proper under Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., because "the regulation . . . implement[ing] the statutory trust, 7 C.F.R. § 46.46, clearly delineates a single, undifferentiated trust for the benefit of all sellers and suppliers." In re Kornblum & Co., Inc., 81 F.3d at 286.

### 2.      Required Notice for the Continuation of PACA Trust Benefits.

Although a supplier becomes a PACA trust beneficiary automatically upon the merchant's, dealer's, or broker's acceptance of the goods, the supplier's protection as a PACA trust beneficiary for the commodities shipped in the particular transaction requires that the supplier provide the PACA trustee the notice required in § 499e(c)(3) or § 499e(c)(4).  See 7 U.S.C. § 499(e)(c)(3-4). The Ninth Circuit has held: "The unpaid supplier loses the benefits of the trust unless [it] gives written notice of . . . intent to preserve the benefits of the trust to the produce dealer and files the notice with the United States Department of Agriculture ("USDA") within the statutorily prescribed time period."  In re Milton Poulos, Inc., 947 F.2d at 1352-53 (citing 7 U.S.C. § 499e(c)(3)).  See In re Lombardo Fruit and Produce Co., 12 F.3d 110, 112 (8th Cir. 1993)("[T]he unpaid supplier or seller loses the benefits of the trust protection unless it 'has given written notice of intent to preserve the benefits of the trust . . . .'").  See also 49 Fed. Reg. at 45,738 ("The legislation is clear that an absolute precondition to pursuing trust assets held by a defaulting buyer or receiver is the filing of a written notice by the seller, supplier or agent after a failure to pay within the prescribed time periods has elapsed.").  To remain entitled to PACA benefits and the privilege of being escalated to a priority creditor, a PACA beneficiary must adhere to the statutory requirements.  See Idahoan Fresh v. Advantage Produce, Inc., 157 F.3d 197, 203 (3d Cir. 1998)("The plain language of section 499e(c)(3), in particular Congress's use of the term 'shall,' unambiguously requires that an agreement to extend the payment term be in writing in order for the seller to preserve its PACA trust benefits.").

If a PACA beneficiary does not adhere to the statutory requirements, the PACA beneficiary loses its trust benefits and becomes an unsecured creditor of the PACA trustee.  See In re Lombardo Fruit and Produce Co., 12 F.3d at 114.  In re Lombardo Fruit and Produce Co., the United States Court of Appeals for the Eighth Circuit held that a shipper who could not prove that it strictly

adhered to the statutory notice requirements in § 499e(c)(3) or § 499e(c)(4) had lost "its entitlement to PACA trust protection," and could not collect payments from trust assets in front of the secured creditors of the trustee. 12 F.3d at 114.  The supplier submitted a letter from the supplier as evidence of a written agreement to extend the payment period from ten days to thirty days.  See 12 F.3d at 113.  Because the letter was undated, however, the Eighth Circuit found this insufficient proof that the parties "'expressly agreed to [extend the deadline] in writing before entering into' the underlying transaction for produce." In re Lombardo Fruit and Produce Co., 12 F.3d at 113 (quoting 7 U.S.C. § 499e(c)(3)(ii))(emphasis in original).  The Eighth Circuit held that the supplier's failure to strictly adhere to the statute in preserving its PACA beneficiary status resulted in loss of its ability to enforce the trust benefits and to enjoin the PACA trustee's secured creditor from exercising its priority interest in the PACA trustee's accounts receivable.  See In re Lombardo Fruit and Produce Co., 12 F.3d at 112.

### 3. General Trust Law Principles Apply to PACA Trusts.

The United States Circuit Courts of Appeal, in construing PACA, have uniformly held that "[t]he interpretation of PACA trust interests is guided by general trust principles to the extent there is no conflict with the statute." In re Arctic Exp. Inc., 636 F.3d 781, 798 (6th Cir. 2011)(quoting Consumers Produce Co. v. Volante Wholesale Produce, Inc., 16 F.3d 1374, 1381 (3d Cir.1994)). See R Best Produce, Inc. v. Shulman-Robin Marketing Corp., 467 F.3d 238, 242 (2d Cir. 2006)(noting that the Second Circuit has "previously noted that PACA trusts are 'governed by general principles of trust law.'")(quoting Albee Tomato, Inc. v. A.B. Shalom Produce Corp., 155 F.3d 612, 615 (2d Cir 1998)); Bear Mountain Orchards, Inc. v. Mich-Kim, Inc., 623 F.3d 163, 167 (3d Cir. 2010)("General trust principles of trust law apply to trusts created under PACA . . . .")(quoting Nickey Gregory Co., LLC v. AgriCap, LLC, 597 F.3d 591, 595 (4th Cir. 2010)); Reaves

Brokerage Co., Inc. v. Sunbelt Fruit & Vegetable Co., Inc., 336 F.3d 410, 413 (5th Cir. 2003)("General principles of trust law govern PACA trusts."); Boulder Fruit Exp. & Heger Organic Farm Sales v. Transp. Factoring, Inc., 251 F.3d at 1271 ("We apply general trust principles to questions involving the PACA trust, unless those principles directly conflict with PACA."); Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir.1997)("General principles of trust law govern the PACA trust . . . ."). This interpretation is sound, because § 499e(2) expressly uses the word trust, thus indicating Congress intended the PACA trusts to be administered under general trust principles like any other trust. See In re Arctic Exp. Inc., 636 F.3d at 794 (6th Cir. 2011)(noting that "common law principles apply to the formation of [Congress' numerous] statutory trusts").

The United States Circuit Courts of Appeal have consistently looked to the Restatement of the Law of Trusts to provide the general principles of trust law. "[A] trust involves three elements: (1) a trustee, who holds the trust property and is subject to duties to deal with it for the benefit of one or more others; (2) one or more beneficiaries, to whom and for whose benefit the trustee owes the duties with respect to the trust property; and (3) trust property, which is held by the trustee for the beneficiaries." In re Arctic Exp. Inc., 636 F.3d at 794 (quoting Restatement (Third) of Trusts § 2, cmt. f). Thus, in Consumers Produce Co. v. Volante Wholesale Produce, Inc., the United States Court of Appeals for the Third Circuit held that, because the transferee met the requirements in Restatements (Second) of Trusts § 284, which exempts a third-party transferee from liability where the third-party is a bona fide purchaser for value without notice that the transfer was in breach of the trust, the transferee was not required to disgorge the payments made in breach of the PACA trust. See 16 F.3d at 1385. Similarly, in C.H.Robinson Co. v. Trust Co. Bank, N.A., the United States Court of Appeals for the Eleventh Circuit concluded that the district court erred in determining that a third-party transferee with knowledge of the existence of the PACA trust was

-26-

required to disgorge payments made in breach of the trust, because the court did not faithfully apply

general trust law  principles:

> First, the district court erred in its conclusion that transferee liability under traditional
> trust law turns on "actual knowledge of the trust." . . . A transferee takes property
> free of trust if he received it for value and without notice of the <u>breach</u> of trust. "If
> the trustee transfers trust property in breach of trust to a transferee for value, the
> transferee takes free of the trust although he had notice of the existence of the trust,
> unless he has notice that the trustee is committing a breach of trust in making the
> transfer." <u>Restatement (Second) of Trusts</u> § 296. . . .  Second, the district court
> erroneously created an exception to general trust principles by imposing transferee
> liability upon lenders which happen to have a security interest in trust assets. We
> conclude that such an exception is inconsistent with established precedent and the
> intent of Congress.

<u>C.H. Robinson Co. v. Trust Co. Bank, N.A.</u>, 952 F.2d 1311, 1314 (11th Cir. 1992)(emphasis in

original).

Under general trust principles, because the merchant's, dealer's, or broker's proceeds from

the sales of produce commodities under PACA are held in trust for the suppliers as PACA trust

beneficiaries, the merchant, dealer, or broker becomes a PACA trustee subject to a trustee's

fiduciary duties.  "An individual who is in a position to control the assets of the PACA trust and fails

to preserve them, may be held personally liable to the trust beneficiaries for breach of fiduciary

duty." <u>See</u> <u>Coosemans Specialties, Inc. v. Gargiulo</u>, 485 F.3d 701, 705 (2d Cir. 2007).  <u>See</u> <u>Weis-</u>

<u>Buy Servs., Inc. v. Paglia</u>, 411 F.3d 415, 422 (3d Cir. 2005)(analyzing whether the plaintiff's claim

against the PACA trustee failed, because the statute of limitations for a trustee's breach of fiduciary

duty claim had run).  "PACA trust rights may be enforced . . . through a court action for breach of

fiduciary trust . . . permit[ting] recovery against both the corporation and its controlling officers."

<u>Patterson Frozen Foods, Inc. v. Crown Foods Intern., Inc.</u>, 307 F.3d 666, 669 (7th Cir. 2002)(citing

<u>Golman-Hayden Co. v. Fresh Source Produce, Inc.</u>, 217 F.3d 348, 351 (5th Cir.2000)).  <u>See</u> <u>Farm-</u>

<u>Wey Produce, Inc. v. Wayne Bowman Co., Inc.</u>, 973 F. Supp. 778, 785 (E.D. Tenn.

1997)(concluding that PACA trustee did not violate its fiduciary duty as a trustee, because it did not violate its duty under Restatement (Second) of Trusts § 174, "to exercise the skill and care of a person of ordinary prudence . . . in dealing with his own property").

### 4.       PACA Beneficiaries' Protections and Remedies To Prevent the Dissipation of Funds.

The PACA trust was created to protect a supplier and PACA beneficiary by ensuring that the assets of the trust, the proceeds from the shipment of produce, are not dissipated before the suppliers are paid. The first protection for suppliers from a merchant's, dealer's, or broker's dissipation of PACA trust funds is to seek an injunction. Section 499e(5) provides the equitable remedies available to suppliers under PACA: "The several district courts of the United States are vested with jurisdiction specifically to entertain (i) actions by trust beneficiaries to enforce payment from the trust, and (ii) actions by the Secretary to prevent and restrain dissipation of the trust." 7 U.S.C. § 499e(c)(5). Dissipation is defined as "any act or failure to act which could result in the diversion of trust assets or which could prejudice or impair the ability of unpaid suppliers, sellers, or agents to recover money owed in connection with produce transactions." 7 C.F.R. § 46.46. Courts have construed § 499e(5) to mean that both the Secretary of Agriculture and district courts can enjoin a merchant, dealer, or broker, to prevent the dissipation of trust assets. See Tanimura & Antle, Inc. v. Packed Fresh Produce, 222 F.3d 132, 137 (3d Cir. 2000)("§ 499e(c)(5)(ii) . . . authorizes the district court to entertain . . . injunctive relief on behalf of trust beneficiaries, thereby adding to, instead of detracting from, available common law remedies.")(reversing the district court for failing to enjoin dissipation of PACA trust funds); Frio Ice, S.A. v. Sunfruit, Inc., 918 F.2d 154, 158 (11th Cir. 1990)("[W]e find the district court's interpretation of Section 499e(c)(4), as limiting injunctive relief to suits brought by the Secretary, to be incorrect."). See also JSG Trading Corp.

v. Tray-Wrap Inc., 917 F.2d 75, 79 (2d Cir. 1990)(noting that the court saw "nothing in the Act that would prohibit the court from exercising its traditional equity powers to grant a preliminary injunction at the instance of a private litigant if the normal standards for such relief are met").

The second protection to PACA beneficiaries is their priority interest in the PACA trust's assets. Congress designed the 1984 amendment to PACA to provide PACA trust beneficiaries with a superior interest in the PACA trust assets over creditors with security interests in those same assets, allowing the suppliers to recover first in the merchant's, dealer's, or broker's, -- the PACA trustee's -- bankruptcy. Thus, "a PACA trustee holds legal title to PACA trust assets but the seller retains an equitable interest in the assets pending full payment, so that the Bankruptcy Code excludes PACA trust assets from the PACA trustee's bankruptcy estate." C.H. Robinson Co. v. Alanco Corp., 239 F.3d 483, 487 (citing In re Kornblum, 81 F.3d at 284; In re San Joaquin Food Serv., Inc., 958 F.2d 938, 939 (9th Cir. 1992)). As amongst beneficiaries, when a PACA trustee becomes insolvent, the legislative intent suggests, and courts have enforced PACA to require, the trust's assets are distributed first to the PACA beneficiaries *pro rata*. See In re Milton Poulos, Inc., 947 F.2d 1351, 1353 (9th Cir. 1991)(holding that all suppliers who had "properly perfected their PACA trust rights [] are entitled to their *pro rata* share of the trust assets"); H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., 597 F. Supp. 2d at 316 ("Included in the trust protection provided by PACA is not only an elevated priority over other creditors but also the right to a *pro rata* distribution of trust assets in the event of insolvency."). See also 49 Fed. Reg. at 45,735-36 ("Where a court is involved, USDA would recommend to the court that the available trust assets be distributed on a pro-rata basis to all beneficiaries who have protected their right to trust benefits."). Two United States District Courts have analyzed whether one supplier/beneficiary is liable to another when one beneficiary receives a priority payment before the PACA trustee becomes

-29-

insolvent, each reaching a different conclusion.  Compare Fresh Kist Produce, LLC v. Choi Corp., Inc., 223 F. Supp. 2d 1 (concluding that the defendant produce supplier was required to disgorge payments made to it by the seller), with H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., 597 F. Supp. 2d 313 (concluding that the supplier did not have to disgorge payments it received from the buyer).

### 5.     The Fiduciary Relationship of PACA Beneficiaries.

It is a general proposition in debtor/creditor law, and the Supreme Court has held, that "except as forbidden by the bankrupt law, a debtor has the right to prefer one creditor over another, and that the vigilant creditor is entitled to the advantage secured by his watchfulness and attention to his own interests."  Blennerhassett v. Sherman, 105 U.S. 100, 117 (1881).  Under trust law, however, because of the nature of a co-beneficiary relationship, creditors who are also co-beneficiaries of a trust additionally owe their co-beneficiaries duties that contain a fiduciary element. See G.  Bogert & G. Bogert,  The Law of Trusts and Trustees § 191 (Rev. 2d ed. 1979)("Co-beneficiaries . . . are in a fiduciary relation to each other . . . .")(cited in the Reporter's Notes on Restatement (Third) Trusts § 104).

### a.     General Trust Law Duties of Co-Beneficiaries.

The duties owed to co-beneficiaries under general trust principles govern the duties that suppliers owe each other as PACA trust beneficiaries.  See Fresh Kist Produce, LLC v. Choi Corp., Inc., 223 F. Supp. 2d at 12 (noting that a dispute between two suppliers is "a dispute between two beneficiaries"), amended sub nom. Fresh Kist Produce, LLC v. Choi Corp., Inc., 251 F. Supp. 2d 138 (D.D.C. 2003).  Under general principles of trust law, a beneficiary is liable to its co-beneficiaries for participating in a trustee's breach of the trust.  See Restatement (Second) of Trusts § 256(4) ("If one of several beneficiaries participates with the trustee in a breach of trust . . . , [that]

beneficiary is personally liable to the extent of the loss, and [the beneficiary's] interest is subject to a charge for the amount of loss . . . .); Restatement (Third) of Trusts § 104 (1)(c) ("A beneficiary is not personally liable to the trust except to the extent . . . the trust suffered a loss resulting from a breach of trust in which the beneficiary participated . . . ."). Comment f to Restatement (Third) of Trusts § 104 describes conduct which constitutes a beneficiary's participation in a breach of the trust:

> Certainly, the beneficiary participates in a breach of trust if the beneficiary performs, or joins in performing, an act the beneficiary knows is a breach. Otherwise, the question of what conduct of the beneficiary constitutes participation in a breach of a trust is a question of degree. For example, a beneficiary has participated in a breach of trust if the beneficiary induced the misconduct knowing that it would or might be a breach of trust. However, mere knowledge of, or consent to, the breach, without more, is insufficient to constitute participation . . . .

Restatement (Third) of Trusts § 104, cmt. f. The Reporter's Notes on § 104, comment f, direct the reader to A. Scott & M. Ascher, Scott and Ascher on Trusts § 25.2.6.3 (5th ed., 2007), for more information "[o]n a beneficiary's duty to other beneficiaries not to participate in a breach of trust."

Restatement (Third) of Trusts § 104, Reporter's Notes on cmt. f. Professors Austin W. Scott and Mark L. Ascher suggest that co-beneficiaries have duties to one another beyond the duty not to participate in a breach of the trust: "Although there is not the same fiduciary relationship between trust beneficiaries as there is between them and the trustee, there is enough of a fiduciary element in their relationship to make it inequitable for one to seek to obtain an advantage over another."

Scott and Ascher on Trusts § 25.2.6.3, at 1866. Similarly, the late Professor George G. Bogert, and George T. Bogart, which the Reporter's Notes on § 104 also cite, state that beneficiaries have duties to each other, at least to a certain extent, as fiduciaries. See G. G. Bogert & G. T. Bogert, The Law of Trusts and Trustees § 191 ("Co-beneficiaries . . . are in a fiduciary relation to each other in the sense that one beneficiary may not secretly secure for himself a special advantage in the trust

administration."). Thus, the Court concludes that PACA beneficiaries, as co-owners of the equitable interest in the PACA trust, have some limited fiduciary duties to the other beneficiaries of the PACA trust, including at least the duty not to affirmatively seek an unfair advantage over their co-beneficiaries.

### b. Case Law Addressing the Duties of PACA Co-Beneficiaries.

While no authority is precisely on point with the unique facts and issues in this case, two cases present contrasting conclusions regarding the trust responsibilities of PACA beneficiaries. In the end, the Court believes that Fresh Kist Produce, LLC v. Choi Corp., Inc. may come closest to reflecting Congress' intent to protect PACA beneficiaries. What that means, procedurally, is that general trust principles protect PACA beneficiaries to the extent of trust law, but no more.

### 1) Fresh Kist Produce, LLC v. Choi Corp., Inc.

A plaintiff supplier, Fresh Kist, and defendant suppliers, J.C. Watson ("JCW"), Norfolk Banana ("Norfolk"), and Berkley Tomato ("Berkley"), in Fresh Kist Produce, LLC v. Choi Corp., Inc. all sold perishable agricultural commodities to a common produce dealer, Washington Wholesale Produce Company ("WWP"). See 223 F. Supp. 2d at 4. On June 5, 2001, JCW filed a complaint against WWP for breach of contract, alleging that WWP owed JCW $75,946.20 for produce sold and also alleging that WWP was insolvent. See 223 F. Supp. 2d at 5. WWP and JCW reached an agreement out of court in which WWP would pay a sum certain monthly to JCW until the balance was paid. See 223 F. Supp. 2d at 5. After several payments over two months, WWP failed to make the payments, and JCW filed an amended complaint to obtain the balance owed. See 223 F. Supp. 2d at 5. Fresh Kist then contacted JCW and asked if it would waive the potential conflict of interest in having a common attorney represent both Fresh Kist and JCW; JCW would not waive the conflict. See Fresh Kist Produce, LLC v. Choi Corp., Inc., 223 F. Supp. 2d at 5. On

-32-

August 28, 2001, Fresh Kist initiated an action against JCW and WWP requesting a temporary restraining order to enjoin the dealer from paying the rest of the amount owed to JCW, and establishing a non-party PACA claim procedure.  See 223 F. Supp. 2d at 5.  Fresh Kist alleged that JCW, Norfolk, and Berkley "must disgorge the PACA benefits received from WWP after they learned that WWP was insolvent."  223 F. Supp. 2d at 5-6.

The Honorable Ricardo M. Urbina, United States District Judge for the District of Columbia, framed the issue in front of it as "whether PACA requires a beneficiary with knowledge of a PACA trust's insolvency to set up a mechanism for all beneficiaries to submit claims for the remaining funds." Fresh Kist Produce, LLC v. Choi Corp., Inc., 223 F. Supp. 2d at 8.  Recognizing that PACA trusts are governed by general trust principles, the court answered in the affirmative, noting: "Under trust law, co-beneficiaries are in a fiduciary relationship with each other so that one beneficiary may not secretly secure for himself a special advantage in the trust administration." Fresh Kist Produce, LLC v. Choi Corp., Inc., 223 F. Supp. 2d at 8 (citing G. Bogert & G. Bogert, The Law Of Trusts And Trustees § 191, at 478 (2d ed.1979)).  The court found that, under PACA, "the law compels a beneficiary with knowledge of a trust's insolvency to refrain from securing for itself a greater advantage than its co-beneficiaries." 223 F. Supp. 2d at 8.  Thus, the court concluded that PACA requires beneficiaries to "employ pro rata distribution when one of them has belief or knowledge of the trust's insolvency," rather than waiting until the PACA trustee becomes fully insolvent or bankrupt.  223 F. Supp. 2d at 9. The court based this conclusion on three considerations: (i) that it is a breach of a fiduciary duty to co-beneficiaries where a trustee who is also a creditor "secure[s] itself by the depletion of assets which, in the event of the debtor's insolvency it would be obliged to share ratably with all of the debtor's creditors," 223 F. Supp. 2d at 8 (quoting Dabney v. Chase Nat'l Bank of City of New York, 196 F.2d 668, 672-73 (2d Cir. 1952)(Learned Hand, J.); (ii) that

"when a trustee pays one beneficiary and becomes bankrupt, a court may set aside this preference," 223 F. Supp. 2d at 8 (citing G. Bogert & G. Bogert, The Law of Trusts and Trustees § 191, at 478-79); and (iii) that an insolvent PACA trust's "assets are distributed among beneficiaries *pro rata*," Fresh Kist Produce, LLC v. Choi Corp., Inc., 223 F. Supp. 2d at 8 (citing In re Milton Poulos, Inc., 947 F.2d at 1352).  Judge Urbina thus required JWC, the supplier who had previously sued WWP, to disgorge the payments it had received since the prior suit, concluding that, because JWC's complaint in that case alleged that the dealer was insolvent at the time, the defendant supplier at that time had the requisite knowledge of the PACA trustee's insolvency. 223 F. Supp. 2d at 11.

**2)      H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc.**

In H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., the intervening supplier plaintiff, Amco Produce, Inc. ("Amco Produce"), amended its complaint to add a claim against the original supplier plaintiffs, Wm. Rosenstein & Sons, Co. and Eagle Fruit Traders, LLC (together, "Rosenstein & Sons"), seeking disgorgement of payments made to Rosenstein & Sons for participation in the dissipation of the PACA trust's assets.  597 F. Supp. 2d at 315.  "Specifically, Amco has alleged that Rosenstein, despite either knowing or having information that would have led it to reasonably know of defendants' financial instability or insolvency, received PACA trust assets from defendants in payment of Rosenstein's pre-existing claims."  597 F. Supp. 2d at 315.

The Honorable Brian M. Cogan, United States District Judge for the Eastern District of New York, distilled the issues to two questions the court had to resolve:

> When interpreting the trust provisions of PACA, the Second Circuit has held that "general trust law applies to PACA trusts unless such law directly conflicts with the PACA statute." Thus, we must ask two questions: (1) does general trust law create a cause of action in favor of a creditor of an insolvent corporation to set aside preferential payments made to another creditor of the corporation; and (2) if not, does PACA modify the general trust law by creating such a claim and enforcement mechanism?

-34-

H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., 597 F. Supp. 2d at 316 (quoting

D.M. Rothman & Co., Inc. v. Korea Commercial Bank of New York, 411 F.3d at 94)(internal

citations and alterations omitted).

In answering the first question, Judge Cogan first posited that under the common law that

any insolvent business, not just a PACA trustee, holds its assets in trusts for its creditors, resulting

in the directors of the insolvent corporation serving as trustees, imposing upon them a fiduciary duty

to the corporation's creditors.  See 597 F. Supp. 2d at 316 (citing In re Poseidon Pool & Spa

Recreational, Inc., 391 F.R. 234, 241 (Bankr. E.D.N.Y. 2008)).  "This is no different than the duty

that exists under PACA, except that PACA arguably expands, or at least clarifies that, this obligation

additionally includes "controlling persons, not just directors." 597 F. Supp. 2d at 316.  Judge Cogan

also stated that payment of *bona fide* debts of an insolvent corporation to outsiders is not improper

under common law, "despite the fact that these payments deplete the remaining assets available for

creditors."  597 F. Supp. 2d at 316-17 (citing In re Sharp Int'l Corp., 403 F.3d 43, 54 (2d Cir.

2005)("[A] mere preference between creditors does not constitute bad faith . . . . Nor does it matter

that the preferred creditor knows that the debtor is insolvent.")).  Judge Cogan pointed out: "By

allowing preferential payments, the common law recognizes the business reality that distressed

debtors must make hard decisions about who to pay and who not to pay."  H.C. Schmieding Produce

Co., Inc. v. Alfa Quality Produce, Inc., 597 F. Supp. 2d at 317.

Judge Cogan noted that the case law has been abrogated: first, by "bar[ring] insolvent

corporations from preferring their insiders over outside creditors," see Southern Indus., Inc. v.

Jeremias, 66 A.D.2d 178, 184, 41 N.Y.S.2d 945 (2d Dep't 1987)); and second, via "the preference

recovery provision of the Bankruptcy Code, which establishes a ninety-day (or one year, for

insiders) preference recovery," 11 U.S.C. § 547(b)(4)(A).  H.C. Schmieding Produce Co., Inc. v.

Alfa Quality Produce, Inc., 597 F. Supp. 2d at 317.  There is no subjective inquiry regarding the preference payments recovered under the Bankruptcy Code's clawback provision.  See 597 F. Supp. 2d at 317 ("It does not matter if the creditor knew or should have known at the time he received the payment that the debtor was insolvent, or if he pressured or refrained from pressuring the debtor for payment.").

Judge Cogan concludes that there is nothing in PACA suggesting a change to the common law's allowance of *bona fide* preference payments to creditors:

> I see nothing in PACA that changes the common law in this regard. As explained above, the purpose of PACA is to elevate the priority of produce sellers over other classes of creditors; PACA does not create any special rights among such produce sellers *inter se*. An insolvent corporation in any business owes a fiduciary duty to its creditors not to dissipate assets, but preference payments by definition reflect the payment of bona fide debts and thus are not a breach of any fiduciary duty. PACA appears to merely codify this principle in the produce business under the law of trusts, not change it.

H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., 597 F. Supp. 2d at 318.  Judge Cogan did not accept Amco Produce's argument that the distribution of the assets of an insolvent PACA trustee *pro rata* to the PACA beneficiaries implies that Congress intended that a PACA beneficiary/creditor should be required to disgorge any preference payments made just before insolvency:

> [I]t is important not to confuse PACA's clearly stated requirement of *pro rata* distribution with the creation of an implied preference recovery action that could be brought by one creditor against another. . . .  However, it is a far cry from recognizing the concept of *pro rata* distribution to creating a remedy for preference payments that would actually increase the trust and which, at least as the instant case is presently postured, might constitute the entirety of the trust corpus (as no res has yet been identified for this trust). Without some guidance from Congress under PACA, there is no basis for implying such a remedy.

597 F. Supp. 2d at 318.

In response to Amco Produce's argument that Judge Cogan should apply the Fresh Kist

Produce, LLC v. Choi Corp., Inc.,  "knew or should have known" standard, Judge Cogan noted that

the cases from which the "knew or should have known standard" developed were "cases dealing

either with the obligation of an interested trustee, *i.e.*, a [bank] who is both holding funds on behalf

of creditors and who [it]self has an interest in those funds, or [in Fresh Kist Produce, LLC v. Choi

Corp., Inc.,] an insider with special access to the debtor."  H.C. Schmieding Produce Co., Inc. v.

Alfa Quality Produce, Inc., 597 F. Supp. 2d at 318-19.  Judge Cogan agreed with a narrow reading

of the standard: "To be sure, a co-beneficiary who is an insider may owe a fiduciary duty to his co-

beneficiaries.  But it is his status as an insider, not as a co-beneficiary, that creates this duty."  597

F. Supp. 2d at 319.  Judge Cogan distinguished his case from Fresh Kist Produce, LLC v. Choi

Corp., Inc. and the cases it relied upon, however, noting that "Rosenstein [is not] an insider; it had

no special relationship with the debtor that allowed it to manipulate the debtor other than, perhaps,

the debtor wanted to keep doing business with it more than Amco . . . ."  597 F. Supp. 2d at 319.

Judge Cogan therefore dismissed Amco Produce's claims against Rosenstein & Sons.  597 F. Supp.

2d at 321.

> ### c. PACA Beneficiaries Have a Fiduciary Relation to their Co-Beneficiaries Such That They Owe their Co-Beneficiaries a Limited Fiduciary Duty Not to Secure a Secret or Inequitable Benefit Over their Co-Beneficiaries.

Congress acted intentionally in creating a trust to benefit all the produce suppliers, and part

of that intent was to create rights for produce suppliers beyond merely extending liability to

"controlling persons, not just directors."  Schmieding Produce Co., Inc. v. Alfa Quality Produce,

Inc., 597 F. Supp. 2d at 316.  If, as Judge Cogan suggests in H.C. Schmieding Produce Co., Inc. v.

Alfa Quality Produce, Inc., that was Congress' intention, Congress could have done so more short-

handedly than by establishing the PACA trust; it could have just tweaked the common law, which

already prevents preference payments to insiders, by also making those insiders or controlling persons personally liable.  If, as some courts have found, Congress' intention in creating the PACA trust was only to give produce suppliers, as a class, priority in their claim to the produce sellers' assets over financial creditors, as a class, Congress could have also done so without the need to create a trust; it could have drafted a provision like that in the bankruptcy code, that gives preference to secured creditors over general creditors.  See 11 U.S.C. § 507 (setting forth the order of priority for expenses and claims in bankruptcy).  Congress' intention in creating the PACA trust, however, was to impose general trust principles on all parties to the trust -- including creating fiduciary relationships, or relationships that have a fiduciary element, between  beneficiary suppliers.  Under general trust principles, a beneficiary is liable to its co-beneficiaries for its participation in a breach of the trust.  See Restatement (Third) of Trusts § 104(1)(c).  Just as PACA beneficiaries are entitled to a *pro rata* share of the PACA trustee's assets when insolvent,[12] an equitable outcome, even where the PACA beneficiaries do not know that a PACA trustee is insolvent, there is enough of a fiduciary element in their relationship as co-PACA beneficiaries to make it inequitable for one to seek to obtain an advantage over another.

---

[12]It is very difficult in most instances for a creditor to know that a debtor is insolvent.  Black's Law Dictionary defines insolvency as "having liabilities that exceed the value of assets."  Black's Law Dictionary 867 (9th ed. 2009).  In bankruptcy, insolvency has a specific definition: "The term 'insolvent' means . . . financial condition such that the sum of [the] entity's debts is greater than all of [the] entity's property, at fair valuation . . . ." 11 U.S.C. § 101(32)(A).  Creditors often know that debtors are struggling to pay them, but may not have an intimate knowledge of the debtor's balance sheet.  To not impose liability unless the co-beneficiary knows the trustee was insolvent may impose a burden that is never or rarely met.  Thus, the Court believes that, rather than bright line rules that would eliminate most beneficiary suits, the better course may be to impose liability for a beneficiary's "inequitable [conduct in] . . . seek[ing] to obtain an advantage over another," Scott and Ascher on Trusts § 25.2.6.3, at 1866, or impose liability where "one beneficiary . . . secretly secure[s] . . . a special advantage in the trust administration," Bogert & Bogert, The Law of Trusts and Trustees § 191.

The Court cannot fairly impose a rule that says any payment to one PACA beneficiary in preference over payments to the other PACA beneficiaries would be a breach of the PACA trust because it dissipates the PACA trust assets.  To impose such a rule would, in effect, amount to a finding that Congress did not allow for any preference payments to co-beneficiaries and in fact all payments should be *pro rata.*  No intent or knowledge would be necessary to impose liability.  Such a rule would effectively impose strict liability upon the PACA beneficiaries if they would ever receive more than their *pro rata* share.  The Court recognizes that trust law does not go that far and that Congress did not set up a simple mechanism for *pro rata* payments in all circumstances.  Rather, the co-beneficiary must be culpable in some way.  For example, consenting to such a breach by receiving these payments is not a breach of a beneficiary's limited fiduciary relationship with its co-beneficiaries.  See Restatement (Third) of Trusts § 104, cmt. f (noting that "mere knowledge of, or consent to, the breach, without more, is insufficient to constitute participation" subjecting a co-beneficiary to liability for a breach of the trust).  If a co-beneficiary receives a check in the mail, without any knowledge that the trustee is distinguishing between beneficiaries and actually making a preference payment which constitutes dissipation of the trust, no possible liability has been set in motion.  Moreover, if a co-beneficiary receives and unusually large check in the mail, and knows that the trustee is in fact differentiating or even preferring the beneficiary, such knowledge still does not rise to the level of participation in the breach or inequitable conduct on behalf of the beneficiary to impose liability.  Finally, if a trustee calls a co-beneficiary A and says, it will send co-beneficiary A full payment of what it owes, but will only send partial payment to the other co-beneficiaries, and co-beneficiary A consents, that consent does not trigger any liability for the co-beneficiary.  There must be more evidence of unfair affirmative action on co-beneficiary A's behalf to impose liability. In other words, PACA does not completely eliminate the common law rule allowing preference

-39-

payments and allowing vigilant creditor/suppliers to be the beneficiaries of a preference payment. Should the PACA trustee's preference payment come as a result of a PACA beneficiary's inequitable conduct of attempting to receive a preference payment, however, such conduct constitutes participation in the breach, violates the PACA beneficiary's fiduciary relationship with its co-beneficiaries, and subjects the beneficiary to liability for the harm caused by the breach in which it participated.  See Restatement (Third) of Trusts § 104(2) ("If a beneficiary is personally liable to the trust, the trust is entitled to a charge against the beneficiary's interest in the trust to secure the payment of the liability.").

## ANALYSIS

The Court concludes that Hi-Land Potato became a PACA trust beneficiary of Tan-O-On Marketing's single PACA trust, which exists for the benefit of all of its PACA beneficiaries, automatically upon transfer of Hi-Land Potato's produce's title.  To preserve the benefits of the PACA trust with regard to a particular shipment, the Court concludes that, if Hi-Land Potato remained an unpaid supplier to any shipments beyond forty days, Hi-Land Potato was required to have given proper statutory notice as provided in 7 U.S.C. § 499e(c)(3-4).  Hi-Land Potato did not adhere to the statute in providing the required notice for at least some produce shipments, and Hi-Land Potato thus lost the benefits of the PACA trust for which the proceeds were a trust asset, and became a general creditor as to the proceeds of that particular shipment.  Because there is a material dispute whether Hi-Land Potato participated in Tan-O-On Marketing's breach of its PACA trust, the Court does not find that either Hi-Land Potato or Skyline Potato and the Folson Farm Group are entitled to summary judgment as a matter of law.

I.      **BECAUSE A MATERIAL ISSUE EXISTS WHETHER HI-LAND POTATO RECEIVED PAYMENTS FORTY DAYS OR MORE AFTER SHIPMENT, WHEN THE PACA BENEFITS CEASED FOR SUCH SHIPMENTS, A GENUINE ISSUE OF**

MATERIAL FACT PRECLUDES SUMMARY JUDGMENT THAT HI-LAND POTATO IS LIABLE AS A GENERAL CREDITOR FOR RECEIPT OF PACA TRUST ASSETS.

Hi-Land Potato's MSJ argues that the PACA trust should not extend to the funds in Tan-O-On Marketing's Sunflower Bank Account -- a bank account in Colorado that Tan-O-On Marketing used exclusively for Hi-Land Potato's shipments -- contending that, because they were not co-mingled with the Bank of Albuquerque account that Tan-O-On Marketing used for the other suppliers'/PACA beneficiaries' funds, they are part of separate PACA fund to which Skyline Potato and the Folson Farm Group are not beneficiaries and therefore have no claim. See Hi-Land Potato's MSJ at 19. In its Response to Skyline and FFG's MSJ, however, Hi-Land Potato seems to abandon this argument. Skyline Potato and the Folson Farm Group argue that the Court should find that the law compels Hi-Land Potato to disgorge its payments, because Hi-Land Potato is not a PACA beneficiary, as it failed to comply with statutory requirements to retain its PACA benefits. See Skyline and FFG's MSJ at 10. Hi-Land Potato argues that there is nothing in the plain language of PACA, nor its underlying legislative intent, to support that Hi-Land Potato "is not a trust beneficiary," and throughout its argument refers to "Hi-Land's beneficiary interest in the PACA trust." Response to Skyline and FFG's MSJ at 12 (emphasis added). Hi-Land Potato became a PACA beneficiary of Tan-O-On Marketing's single PACA trust upon the customers' receipt of the produce.

A.    HI-LAND POTATO BECAME A BENEFICIARY OF A SINGLE PACA TRUST UPON THE PRODUCE'S TRANSFER OF TITLE.

The PACA trust provision, read in the context of the statute as a whole, supports the interpretation that the PACA trust arises automatically. A produce supplier becomes a PACA beneficiary upon transfer of title to the produce. Hi-Land Potato automatically became a PACA

beneficiary upon transfer of the produce's title.

### 1. Hi-Land Potato Became a Beneficiary of Tan-O-On Marketing's PACA Trust Upon the Transfer of its Potatoes' Title.

Read in the context of the statute as a whole, the required notice provisions of § 499e(c)(3) and § 499e(c)(4) support the interpretation that the PACA trust arises automatically and that a produce supplier becomes a PACA beneficiary upon transfer of title to the produce. This conclusion follows from the language that, if an unpaid supplier does not abide by the notice provisions within the statutory time period -- if it does not "preserve" its benefits -- it "lose[s]" the benefits of the trust with regard to that particular shipment:

> The unpaid supplier, seller, or agent shall lose the benefits of such trust unless such person has given written notice of intent to preserve the benefits of the trust to the commission merchant, dealer, or broker within thirty calendar days (i) after expiration of the time prescribed by which payment must be made, as set forth in the regulations issued by the Secretary, (ii) after the expiration of such other time by which payment must be made, as the parties have expressly agreed to in writing before entering into the transaction, or (iii) after the time the supplier, seller or agent has received notice that the payment instrument promptly presented for payment has been dishonored.

7 U.S.C. § 499e(c)(3) (emphasis added). The PACA statute as a whole, however, is silent as to anything a supplier needs to do beyond being a supplier to become a PACA beneficiary. Because the PACA notice provisions in § 499e(c)(3) and § 499e(c)(4) operate to strip the PACA beneficiary of the PACA trust benefits unless the beneficiary acts to retain the benefits, the supplier had to have been a PACA beneficiary to lose the benefits. Section 499e(c)(4) provides an additional method to "preserve" the PACA benefits. 7 U.S.C. § 499e(c)(4) ("In addition to the method of preserving the benefits of the trust specified in paragraph (3), a licensee may use ordinary and usual billing or invoice statements to provide notice of the licensee's intent to preserve the trust benefits . . . .")(emphasis added). The required notice provisions of § 499e(c)(3) and § 499e(c)(4), therefore,

-42-

support the interpretation that a supplier automatically granted PACA beneficiary status upon sale of the produce.  The United States Courts of Appeal have also found that suppliers become PACA trustees automatically upon sale of the produce.  The United States Court of Appeals for the Ninth Circuit has stated: "The trust automatically arises in favor of a produce seller upon delivery of produce and is for the benefit of all unpaid suppliers or sellers involved in the transaction until full payment of the sums owing has been received."  In re Milton Poulos, Inc., 947 F.2d at 1352 (citing 7 U.S.C. § 499e(c)(2)).

As with any of Tan-O-On Marketing's suppliers for which Tan-O-On Marketing acts as a "commission merchant, dealer, or broker," once title of Hi-Land Potato's potatoes was transferred, Hi-Land Potato became a beneficiary of Hi-Land Potato's trust automatically.

### 2.    The PACA Trust of Which Hi-Land Potato Became a Beneficiary is a Single, Perpetual Trust.

Section § 499e(c)(2) covers "commodities received . . . in all transactions," but also states that the proceeds and receivables "shall be held . . . in trust for the benefit of all unpaid suppliers or sellers . . . involved in the transaction until full payment of the sums owing in connection with such transactions."  7 U.S.C. § 499e(c)(2) (emphasis added).  Throughout § 499e(c)(3) and § 499e(c)(4), Congress refers only to "such trust" or "the trust."   On the other hand, it might be possible to interpret § 499e(c)(4) as providing for multiple PACA trusts, reading the language that "[t]he seller of these commodities retains a trust claim over these commodities" to provide for separate trusts for each individual contract or shipment.  7 U.S.C. § 499e(c)(4).  The language "[t]he seller of these commodities retains a trust claim over these commodities" may also be construed, however, as a means of including each shipment in the trust's res and preserving the extension of the PACA trusts benefits to each shipment.  7 U.S.C. § 499e(c)(4).  Thus, rather than creating a separate PACA trust

for each shipment, failing to provide the seller with the notice required by § 499e(c)(3) or § 499e(c)(4) results in the particular shipment not being covered under the PACA trust, and thus not counting toward the supplier's *pro rata* share.  If, on the other hand, the statute were to provide multiple individual PACA trusts for each shipment, tracing would become a necessary and a principal part of recovering PACA trust assets.  With multiple individual PACA trusts, the proceeds of each produce shipment would become trust assets of a distinct PACA trust.  For a PACA beneficiary to enforce its PACA trust benefits when the trustee misses payments for a shipment, the supplier would necessarily have to trace the PACA trustee's assets to prove that such assets are the proceeds of its individual PACA trust.  Such tracing would be necessary so that the assets of one PACA trust could be distinguished from the assets of other beneficiaries' PACA trusts or from the beneficiary's separate PACA trusts for which the PACA trustee has not missed payments.  More likely, by including the language "these commodities" only in the notice provisions and excluding it from the provision creating the PACA trust, Congress intended that, if a supplier is not diligent in giving the PACA trustee notice of its intent for a shipment to be part of the PACA trust, the PACA trust benefits do not extend to that particular shipment.  See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 62 (2006))("We normally presume that, where [Congress'] words differ . . . , 'Congress acts intentionally and purposely in the disparate inclusion or exclusion.'")(quoting Russello v. United States, 464 U.S. 16, 23 (1983)).

The Court's conclusion that there is one singular PACA trust comports with the United States Department of Agriculture's regulations interpreting the statutory trust in §499e(2).  The Department of Agriculture has interpreted the statute to create a single PACA trust, stating that "[t]rust assets are to be preserved as a nonsegregated 'floating' trust."  7 C.F.R. § 46.46(b). The Department of Agriculture designed the statutory trust regulations to effect what it saw as Congress'

intent in its 1984 amendments to PACA that created the trust.  See H.R. Rep. No. 98-543, at 5 ("The trust impressed by section 5(c)(2) is a nonsegregated 'floating trust' made up of all a firm's commodity related liquid assets, under which there may be a commingling of trust assets.").  The House Report's stated intent that a supplier automatically becomes a participant in the trust suggests the construction of the statute to create a single ongoing PACA trust.

> As each supplier, seller, or agent transfers ownership, possession, or control of perishable agricultural commodities to a commission merchant, dealer, or broker, such supplier, seller, or agent will automatically become a participant in the trust. Trust participants who file, in accordance with the provisions of this act, to preserve their right to benefits remain trust beneficiaries until they have received payment in full. When Payment is received for individual produce shipments the amount of the trust will be reduced accordingly.

H.R. Rep. No. 98-543, at 5 (1983) reprinted in 1983 U.S.C.C.A.N. 405, 408 (emphasis added). Congress stated that a supplier automatically "becomes a participant in the trust," rather than stating that a PACA trust is automatically created.  The Court believes that Congress did so purposefully and intentionally, concluding that Congress' purpose was to provide a single ongoing trust rather than individual separate trusts created each time a supplier ships its produce.

The Second Circuit's conclusion that "a single PACA trust exists for the benefit of all of the sellers to a Produce Debtor, and continues in existence until all of the outstanding beneficiaries have been paid in full," supports the Court's conclusion. In re Kornblum & Co., Inc., 81 F.3d at 286.  The Second Circuit, tasked with interpreting whether § 499e(c)(2) created a single trust or multiple trusts, noted that all of the language in the statutory provision counsels in favor of a single trust, except the phrase "involved in the transaction."  81 F.3d at 286 (quoting 7 U.S.C. § 499(e)(2)).  The Second Circuit construed this phrase "as having the meaning, in context, of 'involved in any such transaction,' thereby harmonizing with the balance of the language in § 499e(c)(2)."  81 F.3d at 286. The Second Circuit concluded that this construction is reasonable based on the fact that the rest of

the language in § 499e(c)(2) refers to "all transactions":

> As previously noted, § 499e(c)(2) directs that

>> commodities received . . . in all transactions, and all inventories of food or other products derived [therefrom], and any receivables or proceeds from the sale of such commodities or products, shall be held . . . in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received.

> [7 U.S.C. § 499e(c)(2)] (emphasis added). All of the emphasized language points to a single, undifferentiated trust for the benefit of all sellers or suppliers of Produce except the phrase "involved in the transaction," which we do not read as countermanding the clear import of the balance of the statutory language.

81 F.3d at 286.   The Second Circuit's construction is reasonable, because by providing that "commodities . . . [of] all transactions . . . and any receivables or proceeds from the sale of such commodities" shall be held in trust, it is reasonable to conclude that Congress intended to make one trust with the res consisting of the proceeds of all transactions.

Each time title to Hi-Land Potato's potatoes was transferred, with each separate shipment of potatoes, once the title transferred, that particular shipment became part of Tan-O-On Marketing's single PACA trust.  It is not the case that each individual shipment of Hi-Land Potatoes became its own separate PACA trust.  Were the Court to construe PACA otherwise, as creating multiple and separate PACA trusts for each produce shipment, beyond being contrary to the interpretation as creating one PACA trust to protect all PACA beneficiaries and produce shipments, such an interpretation could not easily be squared with distribution of PACA trust's assets *pro rata* to beneficiaries.  To have one PACA trust for the benefit of all of the PACA trustee's suppliers which provides equal protection to all PACA beneficiaries and all shipments covered by the PACA trust -- as opposed to multiple PACA trusts for each shipment -- is more in line with the idea of equal

-46-

protection of PACA beneficiaries upon bankruptcy via the *pro rata* distribution of the PACA

trustee's assets.  Thus, the Tan-O-On Marketing PACA trust, of which Hi-Land Potato automatically

became a beneficiary, is one single, perpetual trust that included all of Tan-O-On Marketing's other

produce suppliers, and the benefit of which extended to all shipments that the PACA trust covered.

> **B.      ALTHOUGH HI-LAND POTATO DID NOT ACT TO PRESERVE ITS BENEFITS AND THUS LOST THE PACA TRUST BENEFITS FOR ANY SHIPMENT FOR WHICH IT DID NOT RECEIVE PAYMENT WITHIN FORTY DAYS, THERE IS AN ISSUE OF MATERIAL FACT WHETHER HI-LAND POTATO WAS PAID LATER THAN FORTY DAYS AFTER SHIPMENT.**

Although Hi-Land Potato became a beneficiary of Tan-O-On Marketing's PACA trust

automatically, the benefits of which automatically covered the shipment of Hi-Land Potato's

Potatoes, because an unpaid seller must take affirmative action to preserve its PACA beneficiary

benefits, Hi-Land Potato was required to take action to preserve its benefits if it remained unpaid

at forty days. Although a supplier becomes a PACA trust beneficiary automatically upon the

merchant's, dealer's, or broker's acceptance of the goods, the supplier's protection as a PACA trust

beneficiary for the commodities shipped in the particular transaction requires that the supplier

provide the PACA trustee the notice required in § 499e(c)(3) or § 499e(c)(4).  See 7 U.S.C. §

499(e)(c)(3-4). The Ninth Circuit has held: "The unpaid supplier loses the benefits of the trust unless

[it] gives written notice of . . . intent to preserve the benefits of the trust to the produce dealer and

files the notice with the United States Department of Agriculture ("USDA") within the statutorily

prescribed time period."  In re Milton Poulos, Inc., 947 F.2d at 1352-53 (citing 7 U.S.C. §

499e(c)(3)).  See In re Lombardo Fruit and Produce Co., 12 F.3d at 112 ("[T]he unpaid supplier or

seller loses the benefits of the trust protection unless it 'has given written notice of intent to preserve

the benefits of the trust . . . .").  See also 49 Fed. Reg. at 45,738 ("The legislation is clear that an

-47-

absolute precondition to pursuing trust assets held by a defaulting buyer or receiver is the filing of a written notice by the seller, supplier or agent after a failure to pay within the prescribed time periods has elapsed.").  To remain entitled to PACA benefits and the privilege of being escalated to a priority creditor, a PACA beneficiary must adhere to the statutory requirements.  See Idahoan Fresh v. Advantage Produce, Inc., 157 F.3d at 203 ("The plain language of section 499e(c)(3), in particular Congress's use of the term 'shall,' unambiguously requires that an agreement to extend the payment term be in writing in order for the seller to preserve its PACA trust benefits.").

If a PACA beneficiary does not adhere to the statutory requirements, the PACA beneficiary loses its trust benefits and becomes an unsecured creditor of the PACA trustee.  See In re Lombardo Fruit and Produce Co., 12 F.3d at 114.  In In re Lombardo Fruit and Produce Co., the United States Court of Appeals for the Eighth Circuit held that a shipper who could not prove that it strictly adhered to the statutory notice requirements in § 499e(c)(3) or § 499e(c)(4) had lost "its entitlement to PACA trust protection," and could not collect payments from trust assets in front of the secured creditors of the trustee. 12 F.3d at 114.  The supplier submitted a letter from the supplier as evidence of a written agreement to extend the payment period from ten days to thirty days.  See 12 F.3d at 113.  Because the letter was undated, however, the Eighth Circuit found this insufficient proof that the parties "'expressly agreed to [extend the deadline] in writing before entering into' the underlying transaction for produce."  12 F.3d at 113 (quoting 7 U.S.C. § 499e(c)(3)(ii))(emphasis in original). The Eighth Circuit held that the supplier's failure to strictly adhere to the statute in preserving its PACA beneficiary status resulted in loss of its ability to enforce the trust benefits and to enjoin the PACA trustee's secured creditor from exercising its priority interest in the PACA trustee's accounts receivable.  See 12 F.3d at 112.

Where Hi-Land Potato received payment for shipment of its potatoes from Tan-O-On

Marketing within forty days, it was not an unpaid seller.  Thus, while the payments Hi-Land Potato received within the forty day window were assets of Tan-O-On Marketing's PACA trust from the time that title of the produce was transferred until the time that they money was paid to Hi-Land Potato, once Hi-Land Potato received the payment, while Hi-Land Potato remained a trust beneficiary to the extent that it had other transactions covered by Tan-O-On Marketing's PACA trust, the PACA trust benefits no longer cover the particular transaction for which Hi-Land Potato was paid.

The Court cannot soundly conclude that, because Hi-Land Potato did not provide written notice before the forty day-period required under PACA, where notice is required only to preserve benefits if full payment takes more than forty days,[13] its failure to provide the notice changed the status of the full payments that it had already received for previous shipments.  Were it otherwise, rather than providing protection to the "unpaid suppliers," 7 U.S.C. § 499e(c), PACA would provide protection only to unpaid suppliers who provided the statutory notice for every shipment.  Thus, as soon as a supplier received payment more than forty days after shipment, or merely forgot to provide the statutory notice for which it received late payment, that one slip-up would result in the

_____

[13]7 U.S.C. § 499e(3), the PACA notice provision, provides that an unpaid supplier loses the benefits of the PACA trust unless the supplier "has given written notice of intent to preserve the benefits of the trust to the commission merchant, dealer, or broker within thirty calendar days (i) after expiration of the time prescribed by which payment must be made, as set forth in regulations issued by the Secretary . . . ."  7 U.S.C. § 499e(c)(3).  The regulations provide that "[p]ayment for produce purchased by a buyer [must be made] within 10 days after the day on which the produce is accepted . . . ." 7 C.F.R. § 46.2(aa)(5).  See In re Richmond Produce Co., Inc., 112 B.R. 364, 372 (Bankr. N.D. Cal. 1990)(noting that "[a] default [which begins to run the thirty-day statutory notice period] occurs ten days following the buyer's acceptance of the produce")(citing 7 C.F.R. § 46.2(aa)).  Hi-Land Potato was a shipper and its produce was purchased by the buyer -- i.e., Kroger Co.  Hi-Land Potato was thus required to give the PACA trustee written notice of its intent to preserve its PACA benefits to within forty days of the buyer's acceptance of the produce unless Hi-Land Potato was paid fully within that time.

supplier then having to disgorge payments for all shipments, including every other shipment for which it had complied with the PACA statutory requirements. That cannot be what Congress intended in creating the PACA statute to remedy "the burden on commerce . . . caused by financing arrangements under which commission merchants, dealers, or brokers, who have not made payment for . . . commodities purchased, contracted to be purchased, or otherwise handled by them . . . encumber or give lenders a security interests [in them and their proceeds]." 7 U.S.C. § 499e(c)(1) (emphasis added).

On the other hand, because Hi-Land Potato did not timely provide notice of its intent to preserve PACA trust benefits over its shipments, it is not entitled to the PACA trust benefits of Tan-O-On Marketing's PACA trust on any shipments, the proceeds of which became assets of Tan-O-On Marketing's PACA trust, and for which Tan-O-On Marketing did not pay those PACA trust assets to Hi-Land Potato within the forty-day time period. Any such shipments for which Hi-Land Potato was not paid within the forty-day period would have not been subject to the PACA trust benefits, meaning that these payments would effectively not be included in Hi-Land Potato's interest in Tan-O-On Marketing's PACA trust. Additionally, any payments made to Hi-Land Potato more than forty days after transfer of title to the shipments are paid to Hi-Land Potato as a general creditor out of the particular PACA trust, and these PACA trust assets are received by Hi-Land Potato as a general creditor, rather than as a PACA trust beneficiary.

## II.   EVEN IF HI-LAND POTATO WERE A TRUST BENEFICIARY, A GENUINE ISSUE OF MATERIAL FACT EXISTS WHETHER HI-LAND POTATO BREACHED ITS DUTY TO THE OTHER BENEFICIARIES OF TAN-O-ON MARKETING'S PACA TRUST.

Skyline Potato and the Folson Farm Group allege that Hi-Land Potato participated in Tan-O-On Marketing's breach of the PACA trust:

> Hi-Land participated in [Tan-O-On Marketing's] TMI's breach of the statutory trust
> . . . and directly benefitted from that breach. Hi-Land was well aware of TMI's
> financial predicaments, which is why it worked in conjunction with Shannon Casey
> to isolate TMI's sale of Hi-Land potatoes from TMI's other business, segregated the
> receivables from the sale of Hi-Land's potatoes and paid 100% of those funds to Hi-
> Land in derogation of the rights of the PACA trust beneficiaries of TMI such as
> skyline and the Folson Group.

Response to Hi-Land Potato's MSJ at 15.

The dissipation of PACA trust funds equates to a common law breach of the trust.  See

Boulder Fruit Ex. & Heger Organic Farm Sales v. Transp. Factoring, Inc., 251 F.3d at 1272 (noting

that the defendants "are liable only if they had some role in causing the breach or dissipation of the

trust").  The PACA regulations define dissipation as an act "which could result in the diversion of

trust assets or which could prejudice or impair the ability of unpaid suppliers, sellers, or agents to

recover money owed in connection with produce transactions."  7 C.F.R. § 46.46.  The statute's

plain language shows that Tan-O-On Marketing's segregation of the receivables from the sale of Hi-

Land Potato's potatoes dissipated the PACA trust, because it prejudiced and impaired the ability of

Skyline Potato and the Folson Farm Group, unpaid suppliers and sellers, to recover money owed to

them.

Comment f to Restatement (Third) of Trusts § 104 describes conduct which constitutes a

beneficiary's participation in a breach of the trust:

> Certainly, the beneficiary participates in a breach of trust if the beneficiary performs,
> or joins in performing, an act the beneficiary knows is a breach. Otherwise, the
> question of what conduct of the beneficiary constitutes participation in a breach of
> trust is a question of degree.  For example, a beneficiary has participated in a breach
> of trust if the beneficiary induced the misconduct knowing that it would or might be
> a breach of trust. However, mere knowledge of, or consent to, the breach, without
> more, is insufficient to constitute participation . . . .

Restatement (Third) of Trusts § 104, cmt f.  Just as PACA beneficiaries are entitled to a *pro rata*

share of the PACA trustee's assets when insolvent, an equitable outcome, even where the PACA

beneficiaries do not know that a PACA trustee is insolvent, there is enough of a fiduciary element in their relationship as co-PACA beneficiaries to make it inequitable for one to seek to obtain an advantage over another.

The Court cannot fairly impose a rule that says any payment to one PACA beneficiary in preference over payments to the other PACA beneficiaries would be a breach of the PACA trust because it dissipates the PACA trust assets. To impose such a rule would, in effect, amount to a finding that Congress did not allow for any preference payments to co-beneficiaries and in fact all payments should be *pro rata*. No intent or knowledge would be necessary to impose liability. Such a rule would effectively impose strict liability upon the PACA beneficiaries if they would ever receive more than their *pro rata* share. The Court recognizes that trust law does not go that far and that Congress did not set up a simple mechanism for *pro rata* payments in all circumstances. Rather, the co-beneficiary must be culpable in some way. For example, consenting to such a breach by receiving these payments is not a breach of a beneficiary's limited fiduciary relationship with its co-beneficiaries. See Restatement (Third) of Trusts § 104, cmt. f (noting that "mere knowledge of, or consent to, the breach, without more, is insufficient to constitute participation" subjecting a co-beneficiary to liability for a breach of the trust). If a co-beneficiary receives a check in the mail, without any knowledge that the trustee is distinguishing between beneficiaries and actually making a preference payment which constitutes dissipation of the trust, no possible liability has been set in motion. Moreover, if a co-beneficiary receives an unusually large check in the mail, and knows that the trustee is in fact differentiating or even preferring the beneficiary, such knowledge still does not rise to the level of participation in the breach or inequitable conduct on behalf of the beneficiary to impose liability. Finally, if a trustee calls a co-beneficiary A and says it will send co-beneficiary A ninety-percent payment of what it owes, but will only send half payments to the other co-

beneficiaries, and co-beneficiary A consents, that consent does not trigger any liability for co-beneficiary A.  There must be more evidence of unfair affirmative action on co-beneficiary A's behalf to impose liability.  In other words, PACA does not completely eliminate the common-law rule allowing preference payments and allowing vigilant creditor/suppliers to be the beneficiaries of a preference payment.  Should the PACA trustee's preference payment come as a result of a PACA beneficiary's inequitable conduct of attempting to receive a preference payment, however, such conduct constitutes participation in the breach, violates the PACA beneficiary's fiduciary relationship with its co-beneficiaries, and subjects the beneficiary to liability for the harm caused by the breach in which it participated.  See Restatement (Third) of Trusts § 104(2) ("If a beneficiary is personally liable to the trust, the trust is entitled to a charge against the beneficiary's interest in the trust to secure the payment of the liability.").

Thus, as beneficiaries of Tan-O-On Marketing's PACA trust, Hi-Land Potato had the same co-beneficiary duties imposed upon it as those imposed upon Skyline Potato and the Folson Farm Group: the duty not to participate in the breach of the trust by affirmatively securing an inequitable or unfair benefit over co-beneficiaries.  Because the Restatement (Third) of Trusts § 104, cmt. f, states that participating in the breach requires something more than just knowledge of the breach, in light of the definition of dissipation of a PACA trust in 7 C.F.R. § 46.46, if Hi-Land Potato only knew that Tan-O-On Marketing was having difficulty paying its bills, that knowledge and receipt of trust assets, even to the exclusion of the other co-beneficiaries, might be necessary, but would not be sufficient, to constitute a breach of its duty as a PACA trust co-beneficiary.  Hi-Land Potato handling the "billing, bookkeeping, and collection" for shipments of Hi-Land Potato's and Metz Potato's potatoes which Tan-O-On Marketing arranged, places Hi-Land Potato in a different situation than other producer co-beneficiaries who are merely receiving checks from Tan-O-On

-53-

Marketing for their shipments.  Hi-Land Potato's special relationship with Tan-O-On Marketing, handling the billing, bookkeeping, and collection for its potatoes allowed Hi-Land Potato to know exactly when and how much Tan-O-On Marketing was receiving in payment for Hi-Land's Potatoes, and also allowed Hi-Land Potato to ensure it was paid before even Tan-O-On Marketing, let alone before the other PACA co-beneficiaries.  That Tan-O-On Marketing was operating out of an office at Hi-Land Potato's packing shed only adds incentive, whether explicitly or implicitly, to Hi-Land Potato being promptly paid for shipment of its potatoes.  Nevertheless, this arrangement by itself, or this arrangement in conjunction with knowledge that Tan-O-On Marketing was struggling to pay its bills, is still insufficient to constitute Hi-Land Potato affirmatively participating in the breach of the trust by seeking to secure an unfair benefit over Tan-O-On Marketing's PACA trust's other co-beneficiaries.  If, however, Hi-Land Potato knew at the time it was handling the billing, bookkeeping, and collection for the Tan-O-On Marketing arranged-shipment of its potatoes, not only that Tan-O-On Marketing was struggling financially, but that Tan-O-On Marketing was unable to fully pay all of the PACA trust beneficiaries for shipment of their produce, then Hi-Land Potato knew that the payments Tan-O-On Marketing was making out of the PACA trust assets to Hi-Land Potato for these shipments was in lieu of payments to other suppliers/beneficiaries of Tan-O-On Marketing's PACA trust.  In that case, Hi-Land Potato's billing, bookkeeping, and collecting arrangement with Tan-O-On Marketing, and that Tan-O-On Marketing was operating out of Hi-Land Potato, combined with Hi-Land Potato's knowledge that not all the PACA trust beneficiaries were being paid, would constitute Hi-Land Potato participating in the breach of Tan-O-On Marketing's PACA trust.

Hi-Land Potato asserts as fact that

none of Hi-Land's principals knew that [Tan-O-On Marketing] was insolvent, that

it had failed to pay some of its other producers generally, or that it was wrapping up its business with outstanding obligations owed to Skyline or Folson Group specifically. [Shannon] Casey did not tell anyone associated with Hi-Land, including Carl Worley, that TMI was insolvent, that its line of credit had been terminated, that it was late in payments to other producers or that the company was struggling financially.

Hi-Land Potato's MSJ ¶ 32, at 11 (internal citations omitted).  As support for this fact, Hi-Land Potato cites to Carla Worley's Declaration.  See Carla Worley Decl.  Carla Worley states: "Neither Shannon Casey nor Shawna Casey ever told us that TMI was insolvent or struggling financially. . . . We never discussed with them whether they had missed payments to other producers . . . ."  Carla Worley Decl. ¶ 16, at 7.  Shannon Casey, in his May 15, 2012, deposition, however, stated that Hi-Land Potato and Carl Worley knew, in 2009, that Tan-O-On Marketing was "under pressure" and that Shannon Casey was "frantically searching for a solution . . . to getting people paid."  2012 Shannon Casey Depo. at 177:10-22. While this statement by Shannon Casey does not clearly state that Hi-Land Potato knew that Tan-O-On Marketing's PACA beneficiaries were not getting paid, it comes close.  In light of the totality of the evidence, including Tan-O-On Marketing asking to move its offices into Hi-Land Potato's packing shed, and Hi-Land Potato taking over the billing, bookkeeping, and collecting of its shipments to eliminate the "payment delay" it had experienced with Tan-O-On Marketing, Carla Worley Decl. ¶7, at 4, a reasonable factfinder might infer that Hi-Land Potato had this knowledge, and that inference is enough to allow the case to go to trial. Although it is undisputed that Hi-Land Potato did not know that Tan-O-On Marketing was insolvent, knowledge of insolvency is not required.  With regard to the knowledge that may be required in light of Hi-Land Potato's unique relationship with Tan-O-On Marketing, there is a genuine issue whether Hi-Land Potato knew that Tan-O-On Marketing was under financial pressure -- or struggling financially -- and whether Hi-Land Potato knew that, as part of those financial difficulties, Tan-O-

-55-

On Marketing was having difficulties or unable to pay its PACA trust beneficiaries.  Because there

is a genuine issue whether Hi-Land Potato had the degree of knowledge required to find that it was

a participant in Tan-O-On Marketing's breach of the PACA trust, the Court cannot conclude, as a

matter of law, whether Hi-Land Potato is liable to Skyline Potato, The Folson Farm Group, or any

of Tan-O-On Marketing's other PACA beneficiaries.

  This determination comports with both Fresh Kist Produce, LLC v. Choi Corp., Inc., 223 F.

Supp. 2d at 1, and H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., 597 F. Supp.

2d 313,  the only two opinions that have dealt with the issue of co-beneficiary liability.  The

supplier/beneficiary who was held liable to the other co-beneficiaries for breach of the PACA trust

in Fresh Kist Produce, LLC v. Choi Corp., Inc. had already taken the PACA trustee to court for the

trustee's missed payments and alleged that the trustee was insolvent.  Judge Urbina concluded that

"the law compels a beneficiary with knowledge of a trust's insolvency to refrain from securing for

itself a greater advantage than its co-beneficiaries."  223 F. Supp. 2d at 8.  The court in Fresh Kist

Produce, LLC v. Choi Corp., Inc. noted that "the court's narrow ruling . . .  is limited to the

circumstance in which a PACA beneficiary knows the debtor is insolvent, not where the beneficiary

merely suspects some vague financial trouble."  223 F. Supp. 2d at 11 (emphasis in original).  Judge

Urbina's opinion effectively made sure that the substance of a PACA's policy to distribute assets

*pro rata* prevailed over form -- by requiring *pro rata* distribution where the PACA trustee is

insolvent, rather than where the PACA trustee has formally declared bankruptcy.  The requirement

that a co-beneficiary have knowledge of insolvency, and what constitutes insolvency, does not

provide an easy criterion on which the Court may determine whether a co-beneficiary has adequate

knowledge so as to impose liability.  Rather than imposing this bright line rule which may not easily

be met, the Court believes that knowledge that a PACA trustee cannot fully pay all of its PACA trust

-56-

beneficiaries is the yard stick by which PACA co-beneficiary knowledge of financial difficulty should be measured.  While it is an undisputed fact that Hi-Land Potato did not know Tan-O-On Marketing was insolvent, the material issue is whether Hi-Land Potato knew that Tan-O-On Marketing was under so much financial pressure that it could not pay its PACA trust beneficiaries; that may be knowledge that violates Fresh Kist Produce, LLC v. Choi Corp., Inc.'s finding. Regardless whether that knowledge of inability to pay other co-beneficiaries is sufficient to satisfy the standard set forth in Fresh Kist Produce, LLC v. Choi Corp., Inc., this knowledge alone, as in Restatement (Third) of Trusts § 104, cmt. f., is necessary, but not sufficient for liability; there must be more than knowledge.

The Court's conclusion that, in addition to Hi-Land Potato's and Carl Worley's potentially sufficient knowledge, Hi-Land Potato's relationship with Tan-O-On Marketing may have allowed Hi-Land Potato and Carl Worley to have participates in the breach finds support in reading Judge Urbina's conclusion in Fresh Kist Produce, LLC v. Choi Corp., Inc., in conjunction with  H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., 597 F. Supp. 2d 313.  Although Judge Cogan does not distinguish, in H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., between the supplier's role as a beneficiary from its role as a creditor, that issue was not before Judge Cogan, because there were no allegations that the defendant co-beneficiary in that case participated in the PACA trustee's breach of the trust, or, as the opinion analogizes it, was "an insider."  597 F. Supp. 2d at 319.  The position as an "insider" prevents a PACA beneficiary from asserting the common-law maxim that, as a defense to the charge that it received preference payments, "a debtor has the right to prefer one creditor over another, and that the vigilant creditor is entitled to the advantage secured by his watchfulness and attention to his own interests." Blennerhassett v. Sherman, 105 U.S. at 117.  This case presents a situation that is distinguishable

from that in H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc.; Tan-O-On Marketing had its officers housed and operating from within Hi-Land Potato's warehouse, and Hi-Land Potato performed billing, bookkeeping, and collections for Hi-Land Potato's shipments that Tan-O-On Marketing arranged.  Thus, although Judge Cogan concluded that the defendant co-beneficiary was not liable in H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., the case seems to provide better support to Skyline Potato and the Folson Farm Group's gravamen here, noting that "it is [a co-beneficiary's] status as an insider, not as a co-beneficiary, that creates [the duty not to secure a special advantage over the other co-beneficiaries]."  597 F. Supp. 2d at 319.

In this case, Hi-Land Potato's relationship with Tan-O-On Marketing during the breach period, may be a which H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc. defines as an "insider."  Judge Cogan gives an analogy of what it considers to be an insider relationship when it discusses an exception to the general rule that a debtor can prefer one creditor over another: "Statutes like section 719 of the New York Business Corporation Law provide that payments made to shareholders, directors or officers of an insolvent corporation must be set aside even if they would otherwise be *bona fide*.  In effect, this bars insolvent corporations from preferring their insiders over outside creditors."  H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., 597 F. Supp. 2d at 317.  That Tan-O-On Marketing's office was within Hi-Land Potato's packing warehouse, which it rented from  Tan-O-On Marketing by discounting its fee, and that Hi-Land Potato arranged to take care of its bookkeeping on shipments of its potatoes arranged by Tan-O-On Marketing appears to place Hi-Land Potato in such an insider relationship, where Tan-O-On Marketing making payments only to Hi-Land Potato is analogous to making payments to its shareholders, officers, or directors.  That Shawna Casey, one of Tan-O-On Marketing's only two employees, and wife of the soon-to-be-owner, went to work for Hi-Land Potato and arranged sales of its potatoes to Kroger Co.,

the same job she had been doing at Tan-O-On Marketing before her new job, supports this conclusion.  Shawna Casey's change in position seems only a change in title, and may evince that Hi-Land Potato held some insider status before Tan-O-On Marketing wrapped up the business.  In light of Tan-O-On Marketing's office was in Hi-Land Potato's packing shed, and in light of Hi-Land Potato's and Tan-O-On Marketing's bookkeeping arrangement during the breach period, because there is a material issue as to the extent of Hi-Land Potato's and Carl Worley's knowledge regarding Tan-O-On Marketing's and Shannon Casey's "financial pressure" and searching for a solution to "getting people paid," H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., read in conjunction with the Restatement (Third) of Trusts § 104 counsels the Court to conclude that whether Hi-Land Potato's relationship with Tan-O-On Marketing during the breach period allowed it to secure an inequitable advantage of its PACA co-beneficiaries cannot be determined at this stage as a matter of law.

The Court therefore concludes that there is a genuine issue whether Hi-Land Potatoes participated in Tan-O-On Marketing's breach of its PACA trust and, as a matter of law, is required to disgorge the preference payments made to it by Tan-O-On Marketing.

**IT IS ORDERED** that (i) Defendants Hi-Land Potato Company Inc. and Carl Worley's Motion for Summary Judgment Against Skyline Potato Company, Inc. and the Folson Farm Group, filed August 8, 2012 (Doc. 250); and (ii) Plaintiff and Interviewing Plaintiffs' Joint Motion for Partial Summary Judgment and Incorporated Memorandum of Law, filed August 8, 2012 (Doc. 253), are denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

James T. Burns
Heather S. Jaramillo
Patrick J. Griebel
Albuquerque Business Law, P.C.
Albuquerque New Mexico

-- and --

Justin P. Pizzonia
Johanna A. Pickel
Gonzalez & Pizzonia LLC
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Gordon H. Rowe III
The Rowe Law Firm, P.C.
Albuquerque, New Mexico

-- and --

Henry M. Bohnhoff
Leslie McCarthy Apodaca
Melanie B. Stambaugh
Rodey Dickason Sloan Akin & Robb, P.A.
Albuquerque, New Mexico

     *Attorneys for Defendants and Third-Party Defendants Hi-Land Potato Company,*
      *Inc. and Carl Worley*

Gordon H. Rowe III
The Rowe Law Firm, P.C.
Albuquerque, New Mexico

     *Attorneys for Defendants Mark Lounsbury and Bill Metz*

Shannon Robinson
Albuquerque, New Mexico

     *Attorney for Defendants and Third-Party Plaintiffs Tan-O-On Marketing Inc., Gerald*
      *Anderson, and Julie Anderson*

Justin P. Pizzonia
Gonzalez & Pizzonia LLC
Albuquerque, New Mexico

-- and --

Katy Koestner Esquivel
Meuers Law Firm, PL
Naples, Florida

*Attorneys for Intervening Plaintiffs Folson Farm Corporation; Potandon Produce, L.L.C.; Mart Produce Corporation; Billingsley Produce Sales, Inc.; Alsum Produce, Inc.; and Peterson Bros. River Valley Farms, Inc.*