## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

SKYLINE POTATO COMPANY, INC.,
A Colorado Corporation,

       Plaintiff,

vs.                                     No. CIV 10-0698 JB/RHS

TAN-O-ON MARKETING, INC. d/b/a TMI;
a Colorado corporation with a principal place
of business in New Mexico; HI-LAND POTATO
COMPANY, INC., a Colorado corporation;
GERALD R. ANDERSON, in his individual
capacity and As Director/Shareholder of Tan-O-On
Marketing Inc.; JULIE A. ANDERSON, in her
individual capacity and as Director/Shareholder
of Tan-O-On Marketing Inc.; and CARL WORLEY,
in his individual capacity, as Director/Shareholder of
Tan-O-On Marketing Inc., and as Director/Shareholder
Hi Land Potato Company,

       Defendants,

and

FOLSOM FARM CORPORATION,
POTANDON PRODUCE, L.L.C.,
MART PRODUCE CORPORATION,
BILLINGSLEY PRODUCE SALES,
INC., ALSUM PRODUCE, INC., and
PETERSON BROS. RIVER VALLEY
FARMS, INC.,

       Intervening Plaintiffs,

vs.

TAN-O-ON MARKETING, INC. d/b/a TMI, and
HI-LAND POTATO COMPANY, INC.,

       Defendants,

and

TAN-O-ON MARKETING, INC. d/b/a TMI;
GERALD R. ANDERSON, JULIE A. ANDERSON,

        Third-Party Plaintiffs,

vs.

HI-LAND POTATO COMPANY, INC.;
and CARL WORLEY, RPE, INC.
and RUSSELL WYSOCKI

        Third-Party Defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

**THIS MATTER** comes before the Court on the bench trial held on October 22-October 26, 2012. The primary issues are: (i) whether Hi-Land Potato is a beneficiary of Tan-O-On Marketing's trust pursuant to the Perishable Agricultural Commodities Act, 7 U.S.C. §§ 499a-t ("PACA"); (ii) whether, as a beneficiary of Tan-O-On Marketing's PACA trust, Hi-Land Potato breached its duties to its co-beneficiaries of Tan-O-On Marketing's PACA trust when it received full payment for potato shipments that Tan-O-On Marketing arranged while its co-beneficiaries Plaintiffs Folson Farm Corporation, Mart Produce Corporation, Billingsley Produce Sales, Inc., Alsum Produce, Inc., and Peterson Bros. River Valley Farms, Inc. (collectively, "the Folson Farm Group") and Skyline Potato Company, Inc., went unpaid; (iii) whether Defendant Hi-Land Potato Company, Inc. and Carl Worley stole trade secrets from Defendants/Third-Party Plaintiffs Tan-O-On Marketing, Inc., Gerald R. Anderson, and Julie A. Anderson in violation of New Mexico's Uniform Trade Secrets Act, N.M.S.A. 1978, §§ 57-3A-1 to -7 (1989)("UTSA"); (iv) whether Hi-Land Potato and Carl Worley engaged in a fraudulent transfer of Tan-O-On Marketing's assets in violation of New Mexico's Uniform Fraudulent Transfer Act, N.M.S.A. 1978, § 56-10-14 to -25 (1989)("UFTA"); and (v) whether Hi-Land Potato and Carl Worley were unjustly enriched. The Court concludes that: (i) because a supplier becomes a beneficiary

of a commission merchant's, dealer's, or broker's PACA trust automatically upon transfer of the supplier's produce's title, Hi-Land Potato was a beneficiary of Tan-O-On Marketing's PACA trust; (ii) Hi-Land Potato did not violate its PACA trust duties to Skyline Potato or to the Folson Farm Group; (iii) Hi-Land Potato and Carl Worley did not steal trade secrets from Tan-O-On Marketing; (iv) Hi-Land Potato and Carl Worley did not fraudulently transfer Tan-O-On Marketing's assets; and (v) Hi-Land Potato and Carl Worley were not unjustly enriched.

## FINDINGS OF FACT

All parties have submitted proposed findings of fact.  See Plaintiff and Intervening Plaintiffs' Findings of Fact, Conclusions of Law, and Order, filed February 25, 2013 (Doc. 355)("Skyline Potato's and the Folson Farm Group's FOF and COL"); Defendants/Third Party Plaintiffs [sic] Findings of Fact, Conclusions of Law and Order, filed February 26, 2013 (Doc. 256)("Tan-O-On Marketing's FOF and COL"); Defendants and Third-Party Defendants Hi-Land Potato Company, Inc.'s and Carl Worley's Proposed Findings of Fact and Conclusions of Law, filed February 26, 2013 ("Hi-Land Potato's FOF and COL").  The Court has carefully considered all three sets of proposed facts and accepts some of those facts, rejects some, and finds some facts that neither party brought to its attention.  The Court sets forth its findings below.[1]

---

[1] Although the parties express many of the background facts in different ways, they do not dispute many of those facts.  The Court has, throughout its findings, synthesized the parties' proposed findings where they are fully compatible.  In many cases, the Court adopts one party's finding and declines to adopt an opposing party's finding for stylistic reasons: for example, where one party's proposed findings more completely discuss a fact than another party, the Court generally has adopted the more thorough discussion.  Where the Court adopts one party's finding and declines to adopt an opposing party's finding for a substantive reason -- that is, because the evidence better supports one finding than another -- the Court explains the reason for that conclusion in the footnotes.

Tan-O-On Marketing used a particular convention in its proposed findings of fact:

Tan-O-On Marketing, Inc. adopts as its own the Findings of Fact as filed by Plaintiff Skyline and Intervening Plaintiff Folsom Farm Group.  Wherever Tan-O-On Marketing, Inc. references a different fact or Transcript Page Number as part

1.     **Hi-Land Potato Before Tan-O-On Marketing**.

1.     The Worley family has been growing, packing, and shipping potatoes near Monte Vista, Colorado, in the San Luis Valley for many decades.  See Trial Transcript at 827:5-828:24 (taken October 25, 2012)(Doc. 338)("Oct. 25 Tr.")(Bohnhoff, Carla Worley).

2.     Hi-Land Potato is a potato "shed" or warehouse that stores, cleans, packs, and ships potatoes to grocery store chains, such as Kroger Co., and institutional customers.  See Trial Transcript at 480:2-481:11 (taken October 23, 2012)(Doc. 336)("Oct. 23 Tr.")(Robinson, Carl Worley).

3.     The Worley family started Hi-Land Potato many years ago and continues to operate it.  See Oct. 25 Tr. 825:25-827:24 (Bohnhoff, Carla Worley).

4.     Hi-Land Potato's facilities include a shed with packing facilities and a separate building that stores enough potatoes to feed about 20,000 people in a given year.  See Oct. 25 Tr. at 830:2-22 (Bohnhoff, Carla Worley).

---

of its Findings of Fact[,] that particular reference will be made in bold letters.

Tan-O-On Marketing's FOF and COL at 4.  For ease of reference, where the Court declines to adopt a proposed finding that Skyline Potato and the Folson Farm Group proposed, it cites only Skyline Potato and the Folson Farm Group's proposed finding of fact.  Where the Court declines to adopt a proposed finding that Tan-O-On Marketing proposed, it will explain that decision separately.

With respect to exhibits, the Court has adopted additional citation conventions to assist the reader.  First, the Court indicates the dates on which it admitted each document, drawing those dates from the Notice of Filing of Clerk's Handwritten Notations to Parties' Exhibit Lists to Reflect Those Exhibits Admitted at Pretrial Conference Hearing on 10/19/2012 and During the Bench Trial Held 10/22-26/12, filed October 26, 2012 (Doc. 247).  Second, for ease of reference, the Court refers to an exhibit that Hi-Land Potato and Carl Worley offered as "Hi-Land Potato's Exhibit," and to an exhibit that Tan-O-On Marketing and the Andersons offered as "Tan-O-On Marketing's Exhibit."

5.    Hi-Land Potato holds a PACA license.  See Hi-Land Potato's FOF and COL ¶ A.1, at 3.[2]

6.    Approximately forty-five employees work at the shed.  See Oct. 25 Tr. at 831:19-20 (Bohnhoff, Carla Worley).

7.    Carl Worley is the president of Hi-Land Potato and the chairman of its board of directors; he is eighty-two years old.  See Trial Transcript at 576:22-24 (taken October 24, 2012)(Doc. 337)("Oct. 24 Tr.")(Jaramillo, Carl Worley).

8.    Carl Worley, along with Hi-Land Potato's board of directors and employees, makes Hi-Land Potato's decisions.  See Oct. 24 Tr. at 573:1-574:25 (Robinson, Carl Worley).

9.    Carl Worley is worth ten-to-twelve million dollars, excluding the value of his land holdings.  See Oct. 24 Tr. 519:22-520:10 (Robinson, Carl Worley).

10.    Hi-Land Potato's Vice President is Bob Mattive, and its Secretary is Phil Smart. See Oct. 24 Tr. at 828:17-21 (Bohnhoff, Carla Worley).

11.    Carla Worley, Carl Worley's daughter, is Hi-Land Potato's treasurer.  See Oct. 24 Tr. at 828:17-21 (Bohnhoff, Carla Worley).

12.    Carla Worley, and not Carl Worley, is primarily responsible for and familiar with billings, payments, and bookkeeping, and is otherwise the person at Hi-Land Potato with primary

---

[2] The evidence that Hi-Land Potato cites for this proposition is found in Carla Worley's deposition testimony.  The Court has reviewed the record and determined that no party moved the admission of Carla Worley's deposition.  Further, no party expressly stated during trial that Hi-Land Potato holds a PACA license.  From the totality of the evidence, however, it is evident that a PACA license is required to operate in the produce industry and that Hi-Land Potato carried on business as a large-scale produce grower for many years.  Further, Hi-Land Potato's invoices include language indicating that it sold its products subject to PACA, which tends to indicate that Hi-Land Potato held a PACA license.  See Shipment and Billing Documentation for Hi-Land Potato Shipments for Which Tan-O-On Marketing paid Hi-Land Potato (dated October, 2009, to December, 2009), admitted October 19, 2012, at Pretrial Conference ("PTC") as Hi-Land Potato's Exhibit CR.  Finally, both parties' arguments effectively concede that Hi-Land Potato holds a PACA license.  The Court, therefore, concludes that, more likely than not, Hi-Land Potato holds a PACA license.

involvement in the events at issue.  <u>See</u> Oct. 23 Tr. at 498:16-24 (Robinson, Carl Worley); <u>id.</u> at 501:16-502:12 (Robinson, Carl Worley); <u>id.</u> at 505:11-18 (Robinson, Carl Worley); Oct. 24 Tr. at 576:14-1 (Jaramillo, Carl Worley); <u>id.</u> at 579:17-580:3 (Jaramillo, Carl Worley); <u>id.</u> at 589:8-11 (Esquivel, Carl Worley); <u>id.</u> at 614:23-615:11 (Robinson, Carla Worley); <u>id.</u> at 623:12-624:7 (Robinson, Carla Worley); Oct. 25 Tr. at 828:17-830:1 (Bohnhoff, Carla Worley).

13.     Carl Worley originally handled Hi-Land Potato's sales, and his wife and daughter kept the books.  <u>See</u> Oct. 25 Tr. at 833:23-24 (Carla Worley).

14.     Later, Smart briefly handled sales; however, he was not particularly well suited for that role, and Carl Worley reassumed the sales responsibilities until Hi-Land Potato hired produce salesman Gerald Anderson for that role.  <u>See</u> Oct. 25 Tr. at 833:23-834:11 (Carla Worley).

### 2.     G. Anderson.

15.     G. Anderson began his career in the produce industry in 1966 as a warehouse worker, and later as a produce salesman.  <u>See</u> Trial Transcript at 138:13-139:6 (taken October 22, 2012)(Doc. 335)("Oct. 22 Tr.")(Robinson, G. Anderson).

16.     G. Anderson was a produce salesman for various companies until he became a produce buyer for Topco Associates.  <u>See</u> Oct. 22 Tr. at 139:7-18 (Robinson, G. Anderson).

17.     While at Topco Associates, G. Anderson bought approximately $150 million in produce annually.  <u>See</u> Oct. 22 Tr. at 139:19-21 (Robinson, G. Anderson).

18.     After leaving Topco Associates, G. Anderson took a job in Monte Vista, Colorado as a potato salesman for Sergeant Produce Company, where he continued to sell to retail produce buyers.  <u>See</u> Oct. 22 Tr. at 139:23-140:24 (Robinson, G. Anderson).

19.     While at Sergeant Produce, G. Anderson formed relationships with Hi-Land Potato and other potato growers in the Monte Vista area.  <u>See</u> Oct. 22 Tr. at 138:13-142:6 ("Oct. 22 Tr.")(Robinson, G. Anderson).

20.     While G. Anderson worked at Topco Associates, he established a relationship with Kroger Co., the retail grocery chain.  <u>See</u> Oct. 23 Tr. at 308:23-309:10 (Robinson, G. Anderson).

21.     G. Anderson's relationship with Kroger Co. grew over the next ten years.  <u>See</u> Oct. 23 Tr. at 308:23-309:10 (Robinson, G. Anderson).

22.     After G. Anderson left Sergeant Produce, he and Hi-Land Potato agreed that he would act as the agent for Hi-Land Potato's potatoes.  <u>See</u> Oct. 22 Tr. at 142:7-143:14 (Robinson, G. Anderson); Oct. 23 Tr. at 263:4-265:2 (Robinson, G. Anderson); <u>id.</u> at 473:21-474:8 (Robinson, Carl Worley).

23.     G. Anderson was paid a flat fee of $0.25 per hundredweight of potatoes sold, and he worked out of an office in Hi-Land Potato's shed.  <u>See</u> Oct. 22 Tr. at 142:7-143:14 (Robinson, G. Anderson); Oct. 23 Tr. at 263:4-265:2 (Robinson, G. Anderson); <u>id.</u> at 473:21-474:8 (Robinson, Carl Worley).

24.     G. Anderson sold Hi-Land Potato's potatoes to Kroger Co. and other buyers.  <u>See</u> Oct. 23 Tr. at 309:11-14 (Robinson, G. Anderson).

25.     Kroger Co. is a valuable and sought-after customer, because it purchases significant volumes of potatoes annually, pays promptly, and pays top-of-the-market prices.  <u>See</u> Oct. 22 Tr. at 118:7-20 (Robinson, McBride); <u>id.</u> at 126:11-22 (Esquivel, McBride); Oct. 23 Tr. at 462:4-463:25 (Robinson, J. Anderson); Oct. 24 Tr. at 581:21-582:3 (Jaramillo, Carl Worley); <u>id.</u> at 628:12-629:9 (Robinson, Carla Worley).

26.     Loss of Kroger Co. as a customer is a devastating loss for a produce seller.  See Oct. 22 Tr. at 19-22 (Esquivel, McBride).

27.     To sell to Kroger Co., a supplier must execute a Kroger vendor agreement, have a Kroger vendor number, and obtain a certificate of $3,000,000.00 of liability insurance.  See Oct. 22 Tr. at 122:20-24 (Robinson, McBride); Oct. 23 Tr. at 304:22-308:11 (Robinson, G. Anderson); id. at 328:21-328:24 (Robinson, G. Anderson); id. at 464:6-9 (Robinson, Wright).

28.     Kroger Co. was Tan-O-On Marketing's biggest customer, while the government was its second largest customer.  See Oct. 22 Tr. at 148:25-149:3 (Robinson, G. Anderson).

29.     Kroger Co. requires its potato suppliers to meet certain standards for packing and grading potatoes.  See Oct. 22 Tr. at 143:15-145:15 (Robinson, G. Anderson).

30.     G. Anderson helped Hi-Land Potato meet those standards by improving quality and ensuring uniformity in the size of potatoes packed.   See Oct. 22 Tr. at 143:15-145:15 (Robinson, G. Anderson).

31.     While G. Anderson acted as Hi-Land Potato's sales agent, Hi-Land Potato invoiced the customers for the potatoes that G. Anderson sold on its behalf.  See Oct. 25 Tr. at 836:24-837:4 (Bohnhoff, Carla Worley).

**3.      Tan-O-On Marketing's Founding and Early Years.**

32.     In June of 1995, G. Anderson and a partner formed Tan-O-On Marketing, Inc.  See Articles of Incorporation of Tan-O-On Marketing, Inc. at 1 (dated June 28, 1995), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit A.

33.     Soon after, they moved Tan-O-On Marketing's potato sales operations to an office in nearby Monte Vista.  See Oct. 22 Tr. at 146:18-147:3 (Robinson, G. Anderson); Oct. 22 Tr. at 232:20-234:24 (Esquivel, G. Anderson); Oct. 23 Tr. at 261:9-262:1 (Bohnhoff, G.

Anderson); Oct. 23 Tr. at 473:21-475:25  (Robinson, Carl Worley); Oct. 25 Tr. at 834:6-834:18 (Bohnhoff, Carla Worley).

34.     From 1995 forward, Tan-O-On Marketing was a dealer engaged in the business of buying and selling wholesale quantities of perishable agricultural commodities in interstate commerce, and operated under license number 19951949 issued by the PACA Branch of the United States Department of Agriculture ("U.S.D.A.").   License Record for Tan-O-On Marketing, Inc. at 1-3 (dated August 27, 2007), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit N; Fruit and Vegetable Programs Search PACA at 1 (dated March 25, 2010), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit O.

35.     A PACA license is required to operate in the produce industry, and sellers pay careful attention to the need to renew it annually. See Oct. 22 Tr. at 74:3-74:18 (Robinson, Folson); Oct. 22 Tr. at 101:11-102:13 (Robinson, Sill).

36.     After Tan-O-On Marketing moved to Monte Vista, it began invoicing the customer directly for potatoes sold on Hi-Land Potato's behalf.  See Oct. 23 Tr. at 315:21-316:8 (Esquivel, G. Anderson); id. at 414:8-18 (Esquivel, Terry Wright); Oct. 24 Tr. at 678:3-21 (Esquivel, Carla Worley); Oct. 25 Tr. at 836:24-837:4 (Bohnhoff, Carla Worley); id. at 834:19-835:2 (Bohnhoff, Carla Worley); id. at 836:24-837:4 (Bohnhoff, Carla Worley).

37.     Hi-Land Potato would invoice Tan-O-On Marketing for product sold under brokerage agreement, and those invoices contained the language set forth in 7 U.S.C. § 499e(c)(3).[3]  See Oct. 24 Tr. at 678:3-21 (Esquivel, Carla Worley).

---

[3] That statute provides, in relevant part:

(c) Trust on commodities and sales proceeds for benefit of unpaid suppliers, sellers, or agents; preservation of trust; jurisdiction of courts

   (1) It is hereby found that a burden on commerce in perishable agricultural

38.    Before organizing Tan-O-On Marketing, G. Anderson had located his office and

principal place of business at Hi-Land Potato's shed.  <u>See</u> Oct. 23 Tr. at 474:4-475:25 (Robinson,

commodities is caused by financing arrangements under which commission merchants, dealers, or brokers, who have not made payment for perishable agricultural commodities purchased, contracted to be purchased, or otherwise handled by them on behalf of another person, encumber or give lenders a security interest in, such commodities, or on inventories of food or other products derived from such commodities, and any receivables or proceeds from the sale of such commodities or products, and that such arrangements are contrary to the public interest. This subsection is intended to remedy such burden on commerce in perishable agricultural commodities and to protect the public interest.

(2) Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents. Payment shall not be considered to have been made if the supplier, seller, or agent receives a payment instrument which is dishonored. The provisions of this subsection shall not apply to transactions between a cooperative association, as defined in section 1141j(a) of Title 12, and its members.

(3) The unpaid supplier, seller, or agent shall lose the benefits of such trust unless such person has given written notice of intent to preserve the benefits of the trust to the commission merchant, dealer, or broker within thirty calendar days (i) after expiration of the time prescribed by which payment must be made, as set forth in regulations issued by the Secretary, (ii) after expiration of such other time by which payment must be made, as the parties have expressly agreed to in writing before entering into the transaction, or (iii) after the time the supplier, seller, or agent has received notice that the payment instrument promptly presented for payment has been dishonored. The written notice to the commission merchant, dealer, or broker shall set forth information in sufficient detail to identify the transaction subject to the trust. When the parties expressly agree to a payment time period different from that established by the Secretary, a copy of any such agreement shall be filed in the records of each party to the transaction and the terms of payment shall be disclosed on invoices, accountings, and other documents relating to the transaction.

7 U.S.C. § 499e(c).

Carl Worley); Oct. 25 Tr. at 834:6-18 (Bohnhoff, Carla Worley); Articles of Incorporation of Tan-O-On Marketing, Inc. at 2-7 (Hi-Land Potato's Exhibit A).

39.     He continued thereafter to run Tan-O-On Marketing from the shed for a period of time in the 1990s.  See Oct. 23 Tr. at 261:9-262:9 (Bohnhoff, G. Anderson).

40.     Hi-Land Potato favored this arrangement.  See Oct. 23 Tr. at 261:9-262:9 (Bohnhoff, G. Anderson); see Oct. 25 Tr. at 834:6-18 (Bohnhoff, Carla Worley).

41.     In Tan-O-On Marketing's early years, it sold potatoes to Kroger Co.'s Denver, Colorado division.  See Oct. 22 Tr. at 240:24-242:18 (Esquivel, G. Anderson).

42.     Over the course of G. Anderson's operation of Tan-O-On Marketing, Tan-O-On Marketing's sales region expanded to include other divisions and subsidiaries of Kroger Co., including Topco Associates, King Soopers, Fry's Supermarkets, Dillon Companies, and City Markets.  See Oct. 22 Tr. at 145:16-146:17; id. at 240:24-242:18 (Robinson, G. Anderson).

43.     Later, Tan-O-On Marketing relocated its operations to Albuquerque, New Mexico, where it continued to sell Hi-Land Potato's potatoes to Kroger Co., which was one of Tan-O-On Marketing's principal customers. See Oct. 22 Tr. at 147:21-148:17 (Robinson, G. Anderson); id. at 232:20-234:24 (Esquivel, G. Anderson); id. at 251:24-252:16 (Esquivel, G. Anderson).

44.     When G. Anderson later moved Tan-O-On Marketing's office to Monte Vista, and then again to Albuquerque, Hi-Land Potato's principals were concerned, because they wanted their sales agent to be close to the product.  See Oct. 22 Tr. at 232:20-234:24 (Esquivel, G. Anderson); Oct. 25 Tr. at 834:6-18 (Bohnhoff, Carla Worley).

45.     Hi-Land Potato and Worley accepted Tan-O-On Marketing changing the location of its offices, however, provided it continued to do a proficient job at selling Hi-Land Potato's

potatoes.  See Oct. 23 Tr. at 474:4-475:19 (Robinson, Carl Worley); Oct. 25 Tr. at 834:6-18

(Bohnhoff, Carla Worley).

46.     As Hi-Land Potato's sales agent, Tan-O-On Marketing solicited sales of Hi-Land

Potato's potatoes to customers.  See Oct. 22 Tr. at 147:4-16 (Robinson, G. Anderson).

47.     Hi-Land Potato paid Tan-O-On Marketing a fee of twenty-five cents per 100

pounds ("hundredweight" or "cwt") of potatoes shipped.  Oct. 22 Tr. at 142:11-19 (Robinson, G.

Anderson).  See Oct. 23 Tr. at 474:13-17 (Robinson, Carla Worley); id. at 656:11-18 (Jaramillo,

Carla Worley); Transcript of Deposition of Shannon Casey at 15:15-16:9 ((taken May 15, 2012),

admitted at trial in relevant part October 26, 2012)("Casey Depo.").[4]

48.     There was not a document memorializing the agreement between Hi-Land Potato,

and either G. Anderson or Tan-O-On Marketing; the parties relied on a handshake agreement.

See Oct. 22 Tr. at 147:14-20 (Robinson, G. Anderson); Oct. 23 Tr. at 473:21-475:25 (Robinson,

Carl Worley).

49.     Between 1995 and the end of 2009, the agreement between Tan-O-On Marketing

and Hi-Land Potato remained the same: Tan-O-On Marketing would sell Hi-Land Potato's

potatoes in exchange for $0.25/cwt. See Oct. 22 Tr. at 142:11-143:7 (Robinson, G. Anderson);

_____

[4] The Court admitted the portions of Casey's deposition testimony that the parties had
designated near the close of trial.  See Oct. 26 Tr. at 1024:10-23 (Court, Jaramillo, Esquivel,
Robinson, Bohnhoff).  Although two "Caseys" are involved in this dispute -- Shannon Casey and
his wife, Shawna Casey -- because only Shannon Casey was deposed, the Court will refer to his
deposition as the "Casey Depo."
       Hi-Land Potato and Carl Worley objected to certain portions of Skyline Potato's and the
Folson Farm Group's designations of Shannon Casey's deposition testimony.  See Defendants
and Third-Party Defendants Hi-Land Potato Company, Inc.'s and Carl Worley's Objections and
Counter-Designations to Skyline's and the Folson Farm Group's Designation of Deposition
Testimony of Shannon Casey, filed October 17, 2012 (Doc. 312).  The Court will sustain the
objections in part and overrule them in part.  With respect to two of the sections to which Hi-
Land Potato and Carl Worley object -- Casey Depo. at 118:12-126:18 and Casey Depo. at
225:16-226:11 -- the Court does not rely on those sections, and the Court will, therefore, overrule
the objections to those sections as moot.  With respect to the remaining section -- Casey Depo.
176:20-177:16 -- the Court will sustain the objections, for the reasons stated at note 69.

id. at 215:25-216:4 (Jaramillo, G. Anderson); id. at 216:18-217:6 (Jaramillo, G. Anderson); Oct. 24 Tr. at 553:2-5 (Robinson, Carl Worley); id. at 555:10-13 (Robinson, Carl Worley); id. at 656:16-18 (Jaramillo, Carla Worley).

50.     Hi-Land Potato shipped potatoes directly from its shed to the customers.  See Oct. 23 Tr. at 263:4-265:2 (Bohnhoff, G. Anderson); see Oct. 25 Tr. at 836:7-23 (Bohnhoff, G. Anderson); Shipment and Billing Documentation for Hi-Land Potato Shipments for Which Tan-O-On Marketing paid Hi-Land Potato (Hi-Land Potato's Exhibit CR).

51.     As a result of the direct shipments, Hi-Land Potato always knew the names of the customers who bought its potatoes and otherwise had direct contact with them.  See Oct. 23 Tr. at 263:4-265:2 (Bohnhoff, G. Anderson); see Oct. 25 Tr. at 836:7-23 (Bohnhoff, G. Anderson); Shipment and Billing Documentation for Hi-Land Potato Shipments for Which Tan-O-On Marketing paid Hi-Land (Hi-Land Potato's Exhibit CR).

52.     Although at the beginning of Tan-O-On Marketing's sales agency relationship with Hi-Land Potato, Hi-Land Potato itself had invoiced and received payments from the customers, that arrangement changed.   See Oct. 25 Tr. at 834:19-835:12 (Bohnhoff, Carla Worley); id. at 836:24-837:11 (Bohnhoff, Carla Worley).

53.     At some point, although the direct shipments continued, Hi-Land Potato began invoicing Tan-O-On Marketing; Tan-O-On Marketing in turn would invoice the customer, the customer would pay Tan-O-On Marketing, and Tan-O-On Marketing would pay Hi-Land Potato. See Oct. 25 Tr. at 834:19-835:12 (Bohnhoff, Carla Worley); id. at 836:24-837:11 (Bohnhoff, Carla Worley).

54.     Notwithstanding these nominal sale and re-sale transactions, Hi-Land Potato nevertheless regarded the ultimate buyers, and not Tan-O-On Marketing, as its customers.  See Oct. 25 Tr. at 836:24-837:11 (Bohnhoff, Carla Worley).

55.     Skyline Potato Company, Inc., Alsum Produce, Inc., Folson Farm Corporation, Billingsley Produce Sales, Inc., Mart Produce Corporation, and Peterson Brothers River Valley Farms, Inc. are potato growers, shippers, and brokers located throughout the country.  See Oct. 22 Tr. at 17:24-18:19 (Jaramillo, Jones); Oct. 22 Tr. at 47:21-48:12 (Esquivel, Alsum); Oct. 22 Tr. at 67:10-67:22 (Esquivel, Folsom); Oct. 22 Tr. at 92:23-93:25 (Esquivel, Sill); Oct. 22 Tr. at 112:16-113:9 (Esquivel, McBride); Oct. 22 Tr. at 129:6-21 (Robinson, Peterson).

56.     Although Tan-O-On Marketing was initially formed to facilitate sales of Hi-Land Potato's and Metz Potato Company's potatoes to their customers, over time Tan-O-On Marketing began working as a broker, meaning it bought and re-sold potatoes for other producers.  See Oct. 22 Tr. 142:3-19 (Robinson, G. Anderson); id. at 146:18-148:17 (Robinson, G. Anderson); id. at 159:6-18 (Robinson, G. Anderson); id. at 263:4-12 (Bohnhoff, G. Anderson); Casey Depo. at 170:5-171.10.

57.     Tan-O-On Marketing operated on either a sales agency or a broker arrangement.  See Oct. 22 Tr. 142:3-19 (Robinson, G. Anderson); id. at 146:18-148:17 (Robinson, G. Anderson); id. at 159:6-18 (Robinson, G. Anderson); id. at 263:4-12 (Bohnhoff, G. Anderson); Casey Depo. at 170:5-171.10.

58.     When Tan-O-On Marketing acted as a broker, it made or lost money depending on whether its re-sale price for a load of potatoes was greater or less than the price at which it purchased the load.  See Oct. 23 Tr. at 263:4-265:2 (Bohnhoff, Anderson); Casey Depo. at 170:5-171:10.

59.     When Tan-O-On Marketing acted as a sales agent, as it did for Hi-Land Potato, it deducted an agreed-upon per-unit sales fee from the price at which the potatoes were sold to the customer and remitted the balance to the producer.  See Oct. 23 Tr. at 263:4-265:2 (Bohnhoff, Anderson).

60.     Under either arrangement, Tan-O-On Marketing did not take physical possession of the produce.  See Oct. 23 Tr. at 263:4-265:2 (Bohnhoff, Anderson).[5]

---

[5] The relevant testimony is confusing.  For example, at one point, Tan-O-On Marketing's counsel had the following exchange with G. Anderson:

Q.   And Hi-Land would ship those potatoes directly to the customers?

A.    Well, the sheds would load -- The trucks would load at the sheds and they would go -- they could be sent in by the customer or whoever.  They didn't send them to any specific spot.  The trucks all knew where they were going.

Q.   Sure.  But they go directly from the Hi-Land shed to the grocery store?

A.   Yeah, to the customer.

Q.   Tan-O-On never physically saw or took possession of the potatoes, right?

A.    Well, we took possession of them, yes, but we never saw them in many cases.

Q.   You never took physical possession of the potatoes, did you?

A.   Yes, we took financial possession of them.

Q.   Financial?

A.   Uh-huh.

Q.   But the potatoes don't get shipped to some Tan-O-On warehouse, do they?

A.   No.  We didn't have a warehouse.

Oct. 23 Tr. at 264:1-21 (Bohnhoff, G. Anderson).  In context, it appears that G. Anderson misheard Mr. Bohnhoff's question whether Tan-O-On Marketing "took physical possession of the potatoes" and thought Mr. Bonhoff asked about "financial possession."  From the context,

61.   Instead, the produce would be shipped by the producer directly to the customer. See Oct. 23 Tr. at 263:4-265:2 (Bohnhoff, Anderson).

62.   Starting as early as 2005,[6] Skyline Potato and the members of the Folson Farm Group[7] sold potatoes to Tan-O-On Marketing through its buyer, Terry Wright, who would resell the potatoes to Tan-O-On Marketing's customers.   See Oct. 22 Tr. at 18:20-19:13 (Jaramillo, Jones); id. at 48:22-49:21; id. at 56:5-8 (Esquivel, Alsum); id. at 68:8-69:19 (Esquivel, Folson); id. at 76:14-19 (Robinson, Folson); id. at 84:12-25 (Bohnhoff, Folson); id. at 94:1-15 (Esquivel, Sill); id. at 113:11-23, 117:4-7 (Esquivel, McBride); id. at 129:22-130:12 (Esquivel, Peterson); Oct. 23 Tr. at 333:20-337:5 (Robinson, Wright); Casey Depo. at 41:13-42:11; Topics for discussion at TMI board meeting (dated December 21, 2006), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit I.

63.   At G. Anderson's request, Carl Worley had served as one of Tan-O-On Marketing's directors, beginning in the 1990s and ending around 2006, when he resigned.   See Oct. 22 Tr. at 235:18-236:14 (Esquivel, G. Anderson); 262:14-24 (Bohnhoff, G. Anderson).

64.   His involvement as director was minimal.   See Oct. 22 Tr. at 235:18-236:14 (Esquivel, G. Anderson).[8]

_____

the Court understands G. Anderson to have meant that Tan-O-On Marketing did not take physical possession of the potatoes.

[6] Although the parties proposed that this relationship began in 2006, see Skyline Potato's and the Folson Farm Group's Proposed FOF and COL ¶ 16, at 7, testimony from the Folson Farm Group indicates that it may have begun in 2005, see Oct. 22 Tr. at 84:12-25 (Bohnhoff, Folson).

[7] As the Court has explained above, it will refer to Alsum Produce, Inc., Folson Farm Corporation, Billingsley Produce Sales, Inc., Mart Produce Corporation, and Peterson Brothers River Valley Farms, Inc. collectively as "the Folson Farm Group."

[8] Hi-Land Potato asks the Court to find that "Since 2005, neither Carl Worley nor any of Hi-Land Potato's other principals has been a director, officer, or employee of Tan-O-On

65.     While G. Anderson operated Tan-O-On Marketing, the company and G. Anderson earned a strong reputation for prompt payment and trade integrity.  See Oct. 22 Tr. at 238:12-240:18 (Esquivel, G. Anderson); Oct. 23 Tr. at 476:1-5 (Robinson, Carl Worley).

### 4.     Shannon Casey.

66.     Tan-O-On Marketing hired Shannon Casey, a former truck driver with no experience in the produce industry.  See Oct. 23 Tr. at 427:6-427:13 (Robinson, J. Anderson).

67.     Shannon Casey worked as a salesman for Tan-O-On Marketing, where he was introduced to G. Anderson's contacts and connections with Kroger Co..  See Oct. 22 Tr. at 241:20-242:18 (Esquivel, G. Anderson).

68.     Shannon Casey was a boisterous, vibrant person.  See Oct. Tr. at 601:11-602:5 (Robinson, Carla Worley).

### 5.     Tan-O-On Marketing Sold to Shannon Casey.

69.     By 2006, G. Anderson and his wife, Julie Anderson, were the sole shareholders of Tan-O-On Marketing.  See Stock Purchase Agreement at 14 (dated February 28, 2006), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit B.

70.     For his working capital, G. Anderson relied on a $350,000.00 bank line of credit and also, by that time, several hundred thousand dollars of accumulated earnings.  See Oct. 22 Tr. at 149:14-22 (Robinson, G. Anderson); id. at 150:24-151:2 (Robinson, G. Anderson); Stock Purchase Agreement at 14 (dated February 28, 2006), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit B.

71.     In 2006, G. Anderson was diagnosed with cancer.  See Oct. 22 Tr. at 155:9-156:13 (Robinson, G. Anderson); Oct. 23 Tr. at 265:3-5 (Bohnhoff, G. Anderson).

Marketing."  Hi-Land Potato's FOF and COL ¶ 10, at 5.  The testimony that Hi-Land Potato cites does not support this proposed fact.  The Court, therefore, declines to adopt the proposed fact.

72.     On February 28, 2006, G. Anderson and J. Anderson, the then owners of Tan-O-On Marketing, sold Tan-O-On Marketing to Shannon Casey for $500,000.00.  See Stock Purchase Agreement (Hi-Land Potato's Exhibit B); Addendum to Stock Purchase Agreement (dated June 21, 2006), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit C; Second Addendum to Stock Purchase Agreement (dated January 1, 2007), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit D; Shannon Casey Employment Agreement at 1-4 (dated March 22, 2007), admitted  October 19, 2012 as Hi-Land Potato's Exhibit G; Restated Promissory Note (dated June 22, 2007), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit H; Oct. 22 Tr. at 155:9-160:7 (Robinson, G. Anderson).[9]

73.     At that time, Tan-O-On Marketing's gross sales were twelve to seventeen million dollars annually. See Oct. 22 Tr. at 160:11-160:16 (Robinson, G. Anderson).

74.     The sales price would be paid over the course of ten years.  See Oct. 22 Tr. at 155:9-160:7 (Robinson, G. Anderson);  Oct. 23 Tr. at 266:21-267:3 (G. Anderson); Stock Purchase Agreement at 3 (Hi-Land Potato's Exhibit B); Second Addendum to Stock Purchase Agreement at 2 (Hi-Land Potato's Exhibit D).

75.      The Andersons knew that Shannon Casey had no assets, no credit, and no means to make even a down payment.  See Oct. 22 Tr. at 152:4-20 (Robinson, G. Anderson); Oct. 23 Tr. at 279:17-280:3 (Bohnhoff, G. Anderson); id. at 442:11-443:6 (Robinson, Julie Anderson).

76.     The Andersons' and Shannon Casey's agreement provided that, while ownership of Tan-O-On Marketing's stock was transferred to Shannon Casey and he became the owner of

---

[9] The parties subsequently changed the total purchase price and the payment terms: the Andersons would sell the company to Shannon Casey for $600,000.00, to be paid in monthly installments of $5,000 over ten years.  See Oct. 23 Tr. at 443:7-25 (Robinson, J. Anderson); Second Addendum to Stock Purchase Agreement at 2 (Hi-Land Potato's Exhibit D).

the company, the stock was placed in escrow.  See Oct. 23 Tr. at 266:17-269:24 (Bohnhoff, G. Anderson); Stock Purchase Agreement at 1-5 (Hi-Land Potato's Exhibit B).

77.     Pursuant to a promissory note, Shannon Casey would pay for the stock with monthly installment payments of $5,000.00 for ten years; the parties understood the payments would be made from Tan-O-On Marketing's operating account.  See Oct. 23 Tr. at 266:17-269:24 (Bohnhoff, G. Anderson); id. at 444:1-14 (Robinson, J. Anderson); Restated Promissory Note ¶ A, at 1 (Hi-Land Potato's Exhibit H).

78.     When Shannon Casey made his yearly payment, ten percent of the stock would be released from escrow and given to him.  See Oct. 23 Tr. at 266:17-268:4 (Bohnhoff, G. Anderson).

79.     The Andersons could vote the stock that remained in escrow, however, and upon default the Andersons could recover the escrowed stock.  See Oct. 23 Tr. at 266:17-269:24 (Bohnhoff, G. Anderson); Stock Purchase Agreement at 5 (Hi-Land Potato's Exhibit B); Second Addendum to Stock Purchase Agreement at 1-3 (Hi-Land Potato's Exhibit D).

80.     The Andersons remained on Tan-O-On Marketing's board of directors and both had employment agreements with the company, although with minimized roles.  See Oct. 23 Tr. at 444:1-14 (Robinson, J. Anderson); Addendum to Stock Purchase Agreement at 2-3 (Hi-Land Potato's Exhibit C); G. Anderson Employment Agreement at 1-4 (dated March 22, 2007), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit E; J. Anderson Employment Agreement at 1-4 (dated March 22, 2007), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit F.

81.     The terms of the sale provided that the Andersons would remain on Tan-O-On Marketing's board of directors, and receive a salary and medical benefits.  See Addendum to

Stock Purchase Agreement at 2-3 (Hi-Land Potato's Exhibit C); G. Anderson Employment

Agreement at 1-4 (Hi-Land Potato's Exhibit E); J. Anderson Employment Agreement at 1-4,

(Hi-Land Potato's Exhibit F).

82.     The bank line of credit that previously had served as Tan-O-On Marketing's

working capital was terminated at the time of the sale of the company to Shannon Casey.  See

Oct. 22 Tr. at 152:4-21 (Robinson, G. Anderson); Oct. 23 Tr. at 279:17-280:3 (Bohnhoff, G.

Anderson); Casey Depo. at 8:5-13.

83.     Because working capital was necessary for Tan-O-On Marketing's survival and

because Shannon Casey had no credit of his own, the Andersons agreed to mortgage their home

as collateral for a new bank line of credit for Tan-O-On Marketing.  See Oct. 22 Tr. at 152:4-21

(Robinson, G. Anderson); Oct. 23 Tr. at 279:17-280:3 (Bohnhoff, G. Anderson); Casey Depo. at

8:5-13.

84.     At the time of the sale, Hi-Land Potato was Tan-O-On m=Marketing's largest

supplier, followed by Metz Potato; Tan-O-On Marketing also purchased potatoes from other

growers nationwide, which allowed it to sell potatoes to Kroger Co. on a year-round basis.  See

Oct. 22 Tr. at 156:6-160:7 (Robinson, G. Anderson).

**6.     Tan-O-On Marketing Under Shannon Casey.**

85.     Between 2006 and 2010, Tan-O-On Marketing's president Shannon Casey

managed and controlled Tan-O-On Marketing's day-to-day operations, and controlled Tan-O-On

Marketing's accounts payable and receivable, including payments from Tan-O-On Marketing's

bank accounts. See Oct. 25 Tr. at 837:23-838:1 (Bohnhoff, Carla Worley); Casey Depo. at 7:23-

8:4; Stock Purchase Agreement *passim* (Hi-Land Potato's Exhibit B); Shannon Casey

Employment Agreement at 1-4 (Hi-Land Potato's Exhibit G); Topics for discussion at TMI

board meeting at 1-2 (Hi-Land Potato's Exhibit I); 4th Quarter TMI Board Meeting 2008 Year
End at 1-2 (dated February 12, 2009), admitted October 9, 2012 at PTC as Hi-Land Potato's
Exhibit J.

86.     After Shannon Casey's purchase of Tan-O-On Marketing, his wife, Shawna
Casey, started working at Tan-O-On Marketing.  See Oct. 23 Tr. at 445:6-446:17 (Robinson,
Julie Anderson).

87.     Before her employment with Tan-O-On Marketing, Shawna Casey had been a
waitress, with no experience in sales or relationship with Kroger Co.  See Oct. 22 Tr. at 242:19-
243:11 (Esquivel, G. Anderson); Oct. 23 Tr. at 445:6-446:17 (Robinson, J. Anderson).

88.     Between 2006 and early 2009, under Shannon Casey's leadership, Tan-O-On
Marketing maintained a reputation for prompt payment among suppliers. See Oct. 23 Tr. at
385:19-386:17 (Bohnhoff, Terry Wright).

89.     Tan-O-On Marketing's primary assets consisted of cellular telephones, a
computer, a desk, an office, and its relationship with Kroger Co.  See Oct. 25 Tr. at 975:7-21; id.
at 976:4-980:1 (Bohnhoff, Carla Worley); Casey Depo. at 136:5-7, 137:4-138:10.

90.     During Shannon Casey's tenure as president of Tan-O-On Marketing, the
company began selling potatoes to additional Kroger Co. divisions.  See Oct. 22 Tr. at 167:4-14
(Robinson, G. Anderson); id. at 240:24-242:18 (Esquivel, G. Anderson); Oct. 23 Tr. at 462:4-
463:25 (Robinson, J. Anderson).

91.     Terry Wright began working as a contract salesman for Tan-O-On Marketing in
2006, around the time of the sale of the company to Casey.  See Oct. 23 Tr. at 383:12-385:9
(Bohnhoff, Wright); Topics for discussion at TMI board meeting at 1 (Hi-Land Potato's Exhibit
I).

92.     Wright had worked as a salesman in the produce industry for many years.  See Oct. 23 Tr. at 332:8-10 (Robinson, Wright); id. at 339:13-17 (Robinson, Wright).

93.     It is common in the industry for produce brokers to hire their competition's salespersons as a means of gaining business.  See Oct. 23 Tr. at 385:6-9 (Bohnhoff, Wright).

94.     Tan-O-On Marketing hired Wright with the agreement and understanding that he would bring with him his suppliers and customers.   See Oct. 23 Tr. at 383:12-385:9 (Bohnhoff, Wright); Topics for discussion at TMI board meeting at 1 (Hi-Land Potato's Exhibit I).

95.     Wright operated out of Idaho.   See Oct. 22 Tr. at 199:10-13 (Robinson, G. Anderson).[10]

96.     Although Tan-O-On Marketing's sales continued to improve under Casey's leadership, the company's overall financial condition did not reflect this improvement.

97.     In 2006, Tan-O-On Marketing's balance sheet and tax return showed the company was earning a profit.  See Tan-O-on [sic] Balance Sheet As of December 31, 2006 at 1-2 (dated December 31, 2006), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit P; Tan-O-On Marketing's 2006 Tax Return at 1 (dated March 9, 2007), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit X.

98.     In 2007, Tan-O-On Marketing's books did not balance, and Tan-O-On Marketing's tax returns for 2007 and 2008 showed that the company was losing money.  See Tan-O-on [sic] Profit & Loss January through December 2007 at 1-2 (date illegible), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit S; Tan-O-on [sic] Profit & Loss January through December 2007 at 1-3 (dated July 2, 2008), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit T; Tan-O-on [sic] Profit & Loss January through December 2008 at 1-2

_____

[10] Hi-Land Potato asks the Court to find that Wright operated out of his home in Idaho.  See Hi-Land Potato's FOF and COL ¶ 16, at 6.  Although that proposed fact may well be true, the transcript does not reflect it.  The Court will not, therefore, adopt this proposed fact.

(dated February 22, 2012), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit U; Tan-O-on Profit & Loss January through December 2008 at 1-2 (dated February 22, 2012), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit V); Tan-O-On Marketing's 2007 Tax Return at 1 (dated July 9, 2008), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit Y; Tan-O-On Marketing's 2008 Tax Return at 1-2 (no date provided), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit Z.

### 7. **Tan-O-On Marketing and the Andersons Part Ways in 2009.**

99.     In the fall of 2008 tensions mounted between Shannon Casey and the Andersons over compensation to the Andersons; Shannon Casey later terminated G. Anderson's access to Tan-O-On Marketing's phones and computers. See Casey Depo. at 16:15-17:14; Oct. 22 Tr. at 169:10-169:24 (Robinson, G. Anderson); id. at 226:24-227:4 (Jaramillo, G. Anderson); Oct. 23 Tr. at 348:16-349:7 (Robinson, Terry Wright).

100.     By the end of 2008, conflict had developed between Shannon Casey and the Andersons.  See Oct. 22 Tr. at 177:18-180:19 (Robinson, G. Anderson); Casey Depo. at 16:15-17:14.

101.     Shannon Casey objected to, among other things, the magnitude of the salary and promissory note payments he had to make to the Andersons in light of both Tan-O-On Marketing's level of profitability and the Andersons' continuing responsibilities.  See Oct. 22 Tr. at 177:18-180:19 (Robinson, G. Anderson); Casey Depo. at 16:15-17:14.

102.     As of early 2009, Shannon Casey was openly hostile toward G. Anderson as a result of disputes between the two over Tan-O-On Marketing's finances.  See Oct. 22 Tr. at 221:13-223:18 (Jaramillo, G. Anderson).

103.    After February 8, 2009, Shannon Casey avoided G. Anderson's calls.  <u>See</u> Oct. 22 Tr. at 221:13-223:18 (Jaramillo, G. Anderson).

104.    Throughout 2009, Wright noticed: (i) Shannon Casey's increasing hostility towards G. Anderson; (ii) difficulty collecting his pay from Tan-O-On Marketing; and (iii) difficulty getting in touch with Shannon Casey.  <u>See</u> Oct. 23 Tr. at 349:8-351:9 (Robinson, Wright); <u>id.</u> at 415:6-415:17 (Esquivel, Wright).[11]

105.    This situation continued into the summer of 2009, and Wright noticed that Tan-O-On Marketing slowed in payments to its suppliers in late fall of 2009.  <u>See</u> Oct. Tr. at 349:8-351:9 (Robinson, Wright).

106.    In a letter dated April 30, 2009, Shannon Casey purported to fire the Andersons, terminating their employment with and compensation from Tan-O-On Marketing.  Letter from Shannon Casey to Gerald R. and Julie Anderson at 1-2 (dated April 30, 2009), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit K.

107.    In that letter, Shannon Casey instructed the Andersons to communicate with him only through his attorney and indicated his intention to renegotiate certain aspects of his purchase of Tan-O-On Marketing.  <u>See</u> Oct. 22 Tr. at 177:18-184:2 (G. Anderson); Letter from Shannon Casey to Gerald R. and Julie Anderson at 1-2 (Hi-Land Potato's Exhibit K); Casey Depo. at 17:15-18:2.

108.    Moreover, Shannon Casey stated that, if the Andersons refused to renegotiate the terms of the sale, he would pay the balance of the promissory note, thereby eliminating their involvement with Tan-O-On Marketing.  <u>See</u> Oct. 22 Tr. at 177:18-184:2 (G. Anderson); Letter

---

[11] Skyline Potato, the Folson Farm Group, and Tan-O-On Marketing also ask the Court to find that Wright noticed that Shannon Casey was complaining about Tan-O-On Marketing's finances.  <u>See</u> Skyline Potato's and the Folson Farm Group's FOF and COL ¶ 32, at 11; Tan-O-On Marketing's FOF and COL ¶ 33, at 12-13.  The cited testimony does not support that proposed fact.  The Court will not, therefore, adopt it.

from Shannon Casey to Gerald R. and Julie Anderson at 1-2 (Hi-Land Potato's Exhibit K); Casey Depo. at 17:15-18:2.

109.   At the same time, the Andersons declined to continue providing collateral for Tan-O-On Marketing's bank line of credit, and the line of credit was terminated.  See Oct. 23 Tr. at 279:13-280:17 (Bohnhoff, G. Anderson).

110.   Following the conflict with the Andersons, the line of credit was paid in full with money from Tan-O-On Marketing's operating account and then closed.  See Casey Depo. at 10:19-11:10; id. at 150:4-25; id. at 209:11-21.

111.   Tan-O-On Marketing historically had maintained its bank accounts at Bank of Albuquerque, which also extended a line of credit to Tan-O-On Marketing.  See Oct. 22 Tr. at 149:14-22 (Robinson, G. Anderson).[12]

112.   A potato broker's major buying and selling season is in the last portion of the calendar year.  See Oct. 23 Tr. at 276:22-277:16 (Bohnhoff, G. Anderson); id. at 320:22-322:3 (Bohnhoff, G. Anderson); Casey Depo. at 8:14-21; id. at 9:4-6.

113.    Particularly during the last portion of the year, because they must pay their sellers before their buyers pay them, potato brokers can face cash flow demands that they must meet with some source of working capital.  See Oct. 23 Tr. at 276:22-277:16 (Bohnhoff, G. Anderson); id. at 320:22-322:3 (Bohnhoff, G. Anderson); Casey Depo. at 8:14-21, 9:4-6.

114.   Tan-O-On Marketing typically had a cash flow shortage from the late summer through late October of each because of market forces; it relied on the line of credit to endure

---

[12] The transcript refers to an account with Bank of America.  See Oct. 22 Tr. at 149:16. The Court, however, concludes that this reflects a transcription error or a misstatement by the witness, because it is clear from other evidence that the relevant bank account was at the Bank of Albuquerque.  Shannon Casey corrected a similar slip of the tongue by his questioner during his deposition.  See Casey Depo. at 8:5-21.

those months.   See Oct. 23 Tr. at 276:16-277:10 (Bohnhoff, G. Anderson); 320:22-322:7 (Esquivel, G. Anderson); Casey Depo. at 8:5-8:21; id. at 9:4-9:6; id. at 10:19-11:10.[13]

115.   Cash flow would typically improve between November and January as customers began paying for potatoes purchased in October, when the sales season had begun.   See Oct. 23 Tr. at 321:14-24.  (Esquivel, G. Anderson).

116.   This change left Casey without a source of working capital, aside from receivables, to address the cash flow shortage that could be expected to develop in the fall of 2009.  See Casey Depo. at 10:19-11:10.[14]

117.   After the line of credit was closed in early 2009, Tan-O-On Marketing's exclusive source of working capital was its receivables, which were insufficient to pay Tan-O-On Marketing's expenses.   See Casey Depo. at 10:19-11:10.

118.   In May, 2009, as the result of the mounting problems in their dealings with Shannon Casey, the Andersons travelled to Monte Vista to visit Hi-Land Potato and other area growers.   See Oct. 22 Tr. at 184:23-186:17 (Robinson, G. Anderson); Oct. 23 Tr. at 312:12-14 Robinson, Julie Anderson); id. at 313:4-314:6 (Robinson, Julie Anderson); id. at 456:12-457:2 (Robinson, Julie Anderson).

119.   Anderson wanted to see how things were going between those growers and Tan-O-On Marketing.   See Oct. 22 Tr. at 184:23-186:17 (Robinson, G. Anderson); Oct. 23 Tr. at

---

[13] Counsel for Tan-O-On Marketing, Skyline Potato, and the Folson Farm Group objected to many of the questions that Hi-Land Potato asked Shannon Casey during his deposition on the basis that they are leading.  With respect to the portions of Shannon Casey's deposition on which the Court relies, the Court has reviewed the questions to which counsel objected, and concludes that the questions, although precise and, in some cases, targeted to bring about a "yes" or "no" answer, are not truly leading questions, because they are not calculated to replace Casey's memory with the memory of Hi-Land Potato's counsel.  The Court will, therefore, overrule the objections.

[14] The Court overrules objections to this testimony on the basis that the questions were leading for the reasons it stated in footnote 13.

312:12-14 Robinson, Julie Anderson); id. at 313:4-314:6 (Robinson, Julie Anderson); id. at 456:12-457:2 (Robinson, Julie Anderson).

120.    During that trip, Carl Worley assured G. Anderson that Tan-O-On Marketing was paying Hi-Land Potato on time and that things were going well with Shannon Casey.  See Oct. 22 Tr. at 184:23-186:17 (Robinson, G. Anderson); Oct. 23 Tr. at 312:12-14 Robinson, Julie Anderson); id. at 313:4-314:6 (Robinson, Julie Anderson); id. at 456:12-457:2 (Robinson, Julie Anderson).

121.    Despite that Shannon Casey owed the Andersons approximately $465,000.00 for the sale of Tan-O-On Marketing, Shannon Casey last offered the sale of Tan-O-On Marketing for approximately $300,000.00.   See Oct. 22 Tr. at 183:14-184:2 (Robinson, G. Anderson); Letter from Shannon Casey to Gerald R. and Julie Anderson at 2 (Hi-Land Potato's Exhibit K).

122.    In response, the Andersons informed Shannon Casey's attorney that they preferred Shannon Casey to pay off the balance of the note, which they believed Casey was doing with the assistance of Tim May of Frenchman Valley,[15] a potato grower in Nebraska.  See Oct. 22 Tr. at 160:1-10 (Robinson, G. Anderson); id. at 177:18-184:2 (Robinson, G. Anderson); Oct. 23 Tr. at 448:4-449:7 (Robinson, Julie Anderson).

123.    Frenchman Valley was a larger grower than Hi-Land Potato.  See Oct. 25 Tr. at 941:8-944:22 (Robinson, Carla Worley).

124.    In late July of 2009, the Andersons signed various documents to effectuate the sale of Tan-O-On Marketing to Shannon Casey, including their resignations as directors and

---

[15] Tan-O-On Marketing, Skyline Potato, and the Folson Farm Group ask the Court to find that Tim May worked for Metz Potato, see Tan-O-On Marketing's FOF and COL ¶ 38, at 14; Skyline Potato's and the Folson Farm Group's FOF and COL ¶ 35, at 12.  The Court believes that their statement that May worked for Metz Potato was an oversight: other questioning and testimony indicates that May worked for Frenchman Valley.  See, e.g., Oct. 22 Tr. at 160:1-5 (Robinson, G. Anderson)); Casey Depo. at 31:1-16.

officers from the company.  <u>See</u> Anderson Fax *passim* (dated July 23, 2009), admitted October 19, 2012 at PTC as Hi-Land Potato's Exhibit L; Oct. 22 Tr. at 177:18-184:2 (Robinson, G. Anderson);

125.   This left Shannon Casey as the president and CEO in full and sole control of the company.  <u>See</u> Oct. 22 Tr. at 177:18-184:2 (Robinson, G. Anderson); Oct. 23 Tr. at 270:15-274:8 (Bohnhoff, G. Anderson).[16]

126.   Tan-O-On Marketing's board of directors did not act to restrict Shannon Casey's authority as the company's CEO and president, specifically including his authority to open bank accounts, and deposit and write checks on those accounts.  <u>See</u> Oct. 22 Tr. at 177:18-184:2 (Robinson, G. Anderson); Oct. 23 Tr. at 270:15-271:18 (Bohnhoff, G. Anderson).[17]

127.   Despite this, Casey's buyout did not come to fruition. <u>See</u> Oct. 22 Tr. at 177:18-184:2 (Robinson, G. Anderson); Oct. 23 Tr. at 270:15-271:18 (Bohnhoff, G. Anderson); <u>id.</u> at 448:4-449:7 (Robinson, Julie Anderson); Casey Depo. at 17:15-18:2; <u>id.</u> at 31:1-14; <u>id.</u> 91:18-93:10.

128.   By August, 2009, there were no communications between Casey and G. Anderson and J. Anderson, who remained cut off from all information about what was happening with Tan-O-On Marketing and unable to remotely access Tan-O-On Marketing's computers.  <u>See</u> Oct.

---

[16] Although G. Anderson resisted firmly concluding that Shannon Casey was in full control as a legal matter, once Shannon Casey removed the Andersons from Tan-O-On Marketing, Shannon Casey was the sole remaining officer.  The Court, therefore, concludes that, more likely than not, Shannon Casey was in full and sole control of Tan-O-On Marketing.

[17] Although G. Anderson claimed that he did not know whether Tan-O-On Marketing's board of directors acted to restrict Shannon Casey's authority, there is no evidence that Tan-O-On Marketing's board of directors acted to restrict Shannon Casey's authority.  The Court, therefore, concludes that, more likely than not, Tan-O-On Marketing's board of directors did not act to restrict Shannon Casey's authority.

23 Tr. at 270:15-271:18 (Bohnhoff, G. Anderson); id. at 449:8-14 (Robinson, J. Anderson); id. at 458:23-459:4 Robinson, J. Anderson).

129.    During the summer if not extending into the fall of 2009, Casey was pre-occupied trying to negotiate with Tim May to buy out the Andersons' promissory note.  See Oct. 23 Tr. at 269:21-270:14 (Bohnhoff, G. Anderson); 349:8-350:14 (Robinson, Wright); Oct. 25 Tr. at 839:9-25 (Bohnhoff, Carla Worley); Casey Depo. at 18:21-24.

130.    During this period and extending into October, 2009, however, Tan-O-On Marketing continued to buy and re-sell potatoes, and Tan-O-On Marketing was timely paying its potato suppliers.  See Oct. 23 Tr. at 269:21-270:14 (Bohnhoff, G. Anderson); id. at 349:8-350:14 (Robinson, Wright); Oct. 25 Tr. at 839:9-25 (Bohnhoff, Carla Worley); Casey Depo. at 18:21-24; Tan-O-On, Inc. Customer Balance Detail as of December 31, 2011 at, e.g., 4-5, 8-9 (dated February 17, 2012), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit AD; Tan-O-On Marketing's Bank of Albuquerque Operating Account x505 October, 2009 Statement Detail passim, (dated 10/31/09), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit AF; Vendor Balance Detail: All Transactions at 1-13 (dated June 8, 2012), admitted October 19, 2012, at PTC as Tan-O-On Marketing's Exhibit 4(a)(showing Billingsley, Peterson and Folson shipments); Frenchman Valley Produce Invoices for August and September 2009 passim (various dates), admitted October 19, 2012, at PTC as Tan-O-On Marketing's Exhibit 11 (showing Frenchman Valley shipments).

131.    Throughout 2009, G. Anderson remained very sick with his cancer.  See Oct. 22 Tr. at 181:4-19 (Robinson, G. Anderson); Oct. 23 Tr. at 265:3-266:16 (Bohnhoff, G. Anderson).

132.    G. Anderson's condition limited his physical activities, he could not sleep, and he was in pain.  See Oct. 22 Tr. at 181:4-19 (Robinson, G. Anderson); Oct. 23 Tr. at 265:3-266:16 (Bohnhoff, G. Anderson).

133.    No Tan-O-On Marketing shareholders or directors meetings have been held since early 2009.  See Oct. 23 Tr. at 284:11-286:4 (Bohnhoff, G. Anderson).

134.    The Andersons have not retrieved the stock of Tan-O-On Marketing from escrow. See Oct. 23 Tr. at 284:11-286:4 (Bohnhoff, G. Anderson).[18]

135.    In a PACA administrative proceeding, the U.S.D.A. determined that the Andersons were persons "responsibly connected" to Tan-O-On Marketing.  Oct. 23 Tr. 460:11-24 (Bohnhoff, J. Anderson).

136.    Most of his memory of December, 2009, was a "black wall"; his recollection of dates at that time is, therefore, imperfect.  Oct. 23 Tr. at 265:3-266:16 (Bohnhoff, G. Anderson).

   **8.    Tan-O-On Marketing's Struggles During the 2009 Potato Season.**

137.    The 2008/2009 potato sales season ended in June or July of 2009, and the 2009 potato harvest was expected to begin in September and would last four weeks -- until October. See Oct. 25 Tr. at 830:25-831:18 (Bohnhoff, Carla Worley); Casey Depo. at 18:3-16.

138.    A typical season would begin after the harvest and would typically last until somewhere between mid-May and mid-July.  See Oct. 25 Tr. at 830:25-831:18 (Bohnhoff, Carla Worley); Casey Depo. at 18:3-16.

---

[18] When Hi-Land Potato's counsel asked G. Anderson whether the stock was still in escrow and whether he had tried to retrieve it and assert ownership over it, G. Anderson stated that he did not "know where the stock is." Oct. 23 Tr. at 284:11-16 (Bohnhoff, G. Anderson).  It is reasonable to infer that, if the Andersons had retrieved the stock from escrow, he would know where the stock is.  The Court, therefore, concludes that, more likely than not, the Andersons did not retrieve the stock of Tan-O-On Marketing from escrow.

139.    The market prices for potatoes dropped in 2009, which caused Tan-O-On Marketing's revenue to drop. See Casey Depo. at 220:8-18.

140.    In September, 2009, Tan-O-On Marketing's PACA license expired, because Casey did not renew it.  See Oct. 23 Tr. at 282:17-282:20 (Bohnhoff, G. Anderson); Oct. 23 Tr. at 459:14-460:10 (Robinson, J. Anderson); License Record for Tan-O-On Marketing, Inc. at 11-15 (Hi-Land Potato Exhibit N; Fruit and Vegetable Programs Search PACA at 1 (Hi-Land Potato's Exhibit O).

141.    As of that date, which preceded all of the events that are the focus of this proceeding, Tan-O-On Marketing was not authorized to buy and re-sell produce, and thus effectively was out of business.  See Oct. 22 Tr. at 101:23-102:8 (Robinson, Sill); Oct. 23 Tr. at 282:17-282:20 (Bohnhoff, G. Anderson); id. at 459:14-460:10 (Robinson, J. Anderson); License Record for Tan-O-On Marketing, Inc. at 11-15 (Hi-Land Potato Exhibit N; Fruit and Vegetable Programs Search PACA at 1 (Hi-Land Potato's Exhibit O).

142.    As of September, 2009, Hi-Land Potato was still unable to resolve problems collecting payments from Tan-O-On Marketing from the prior year's season.  See Oct. 24 Tr. at 605:12-19 (Robinson, Carla Worley); id. at 671:14-20 (Esquivel, Carla Worley); Oct. 25 Tr. at 838:20-839:8 (Bohnhoff, Carla Worley).

143.    Through Shannon Casey, Hi-Land Potato knew of Tan-O-On Marketing's ongoing problems with bookkeepers over the years.  See Oct. 24 Tr. at 604:18-605:19 (Robinson, Carla Worley); id. at 671:5-8 (Esquivel, Carla Worley); Oct. 25 Tr. at 838:20-839:8 (Bohnhoff, Carla Worley); id. at 968:9-971:9 (Bohnhoff, Carla Worley).

144.    In September and early October of 2009, no one answered Tan-O-On Marketing's telephones, and Hi-Land Potato was unable to communicate with anyone at Tan-O-On

Marketing.   See Oct. 24 Tr. at 529:9-532:7 (Robinson, Carl Worley); id. at 586:23-587:12 (Esquivel, Carl Worley); id. at 591:21-593:3 (Esquivel, Carl Worley).

145.   As a result of Tan-O-On Marketing's lack of communication along with the upcoming sales season, Hi-Land Potato was concerned about having a sales force to sell its potatoes.   See Oct. 24 Tr. at 569:12-571:7 (Robinson, Carl Worley); id. at 586:23-587:12 (Esquivel, Carl Worley).

146.   Tan-O-On Marketing's silence was a topic of discussion and a source of concern for Hi-Land Potato, which, as a result, attempted to contact G. Anderson.   See Oct. 24 Tr. at 529:9-532:7 (Robinson, Carl Worley); id. at 569:12-571:7 (Robinson, Carl Worley); id. at 591:21-593:3 (Esquivel, Carl Worley).

147.   Hi-Land Potato was concerned about Tan-O-On Marketing's failure to communicate, because this silence indicated that Tan-O-On Marketing was not, at that time, doing much business or bringing in money.   See Oct. 24 Tr. at 586:23-587:12 (Esquivel, Carl Worley); id. at 592:5-593:3 (Esquivel, Carl Worley).

148.   Tan-O-On Marketing had few overhead expenses aside from a telephone, computer equipment, and a desk: the only significant problems that Tan-O-On Marketing could have had were problems with potato supply, customer demand, or cash flow.   See Oct. 23 Tr. at 318:16-320:21 (Esquivel, G. Anderson).

149.   This speculation about Hi-Land Potato's activities during September and early October, 2009, did not, however, put Hi-Land Potato on notice that it was not paying other potato suppliers or give Hi-Land Potato a sound reason to conclude that Tan-O-On Marketing was unable to pay its bills, because it was possible that Tan-O-On Marketing was still getting

income from potatoes that it had sold in the past.  See Oct. 24 Tr. at 592:25-593:3 (Esquivel, Carl Worley).

150.   In the fall of 2009, when Wright tried to contact Shannon Casey, he discovered that Shannon Casey was at Hi-Land Potato's offices.  See Oct. 23 Tr. at 393:3-23 (Bohnhoff, Wright).[19]

### 9.   **Shannon Casey's October, 2009, Meeting with Hi-Land Potato's Principals, and the Resulting Agreement Between Tan-O-On Marketing and Hi-Land Potato.**

151.   Hi-Land Potato first had contact with Shannon Casey around 2005 or 2006, after he began working for Tan-O-On Marketing as a salesperson.  See Oct. 25 Tr. at 837:12-838:19 (Bohnhoff, Carla Worley).

152.   Shannon Casey took over responsibility for Tan-O-On Marketing's relationship with Hi-Land Potato in 2007.  See Oct. 23 Tr. at 272:2-10 (Bohnhoff, G. Anderson).

153.   As of September, 2009, the Worleys had a working, but not a personal, relationship with Shannon Casey.  See Oct. 25 Tr. at 837:12-838:19 (Bohnhoff, Carla Worley).

154.   In October, 2009, Hi-Land Potato knew to whom Tan-O-On Marketing was selling, including Kroger Co. and King Soopers.  See Oct. 23 Tr. at 496:21-498:24 (Robinson, Carl Worley).

---

[19] Skyline Potato and the Folson Farm Group ask the Court to conclude that "[t]here is no evidence that the arrangement between [Shannon] Casey and Hi-Land [Potato] was disclosed to Terry Wright."  Skyline Potato's and the Folson Farm Group's FOF and COL ¶ 57, at 20.  The cited testimony establishes only that, when Wright called Shannon Casey between September 1, 2009 and October 15, 2009, Shannon Casey was at Hi-Land Potato.  See Oct. 23 Tr. at 393:3-23 (Bohnhoff, Wright).  Moreover, insofar as the proposed fact would, if true, tend to show that Shannon Casey and Hi-Land Potato had made this arrangement with untoward secrecy, it was Skyline Potato's and the Folson Farm Group's burden to demonstrate this fact.  Because the cited testimony does not demonstrate the proposed fact, the Court declines to adopt the proposed fact.

155.    In mid-October, 2009, following his failure to work out a business arrangement with May, Shannon Casey traveled to Monte Vista to meet with Hi-Land Potato's principals. See Casey Depo. at 18:25-20:9.

156.    The meeting took place sometime following completion of Hi-Land Potato's potato harvest, but before its selling season began on October 21.  See Oct. 24 Tr. at 602:24-603:9 (Robinson, Carla Worley); Oct. 25 Tr. at 840:1-18 (Bohnhoff, Carla Worley).

157.    At the meeting, Shannon Casey said that he was unhappy with his agreement with the Andersons and complained that Tan-O-On Marketing was not as profitable as he thought it would be, and indicated that he wanted to reduce its costs.  See Oct. 24 Tr. at 524:23-526:24 (Robinson, Carl Worley); id. at 654:2-10 (Jaramillo, Carla Worley); id. at 670:19-671:4 (Esquivel, Carla Worley).

158.    Shannon Casey said he did not want to live in Albuquerque anymore and instead wanted to be closer to a daughter who lived in Grand Junction, Colorado.  See Oct. 24 Tr. at 653:7-14 (Jaramillo, Carla Worley); Oct. 25 Tr. at 973:18-22 (Robinson, Carla Worley).

159.    Shannon Casey wanted to move to Monte Vista, and he discussed with Hi-Land Potato's principals establishing a Tan-O-On Marketing office at Hi-Land Potato's shed.  See Oct. 24 Tr. at 653:7-654:1 (Jaramillo, Carla Worley).

160.    Shannon Casey also asked Hi-Land Potato's principals if they wanted to buy the Anderson promissory note or otherwise invest in Tan-O-On Marketing.  See Oct. 25 Tr. at 973:18-974:22 (Robinson, Carla Worley); id. at 984:5-10 (Bohnhoff, Carla Worley); Casey Depo. at 22:16-23:8; id. at 173:24-174:7; id. at 179:7-18.[20]

----

[20] Shannon Casey could not recall whether the conversation about the promissory note included in the stock purchase occurred during the October, 2009, meeting or whether that discussion was separate.  See Casey Depo. at 170:7-18. Given that other testimony suggests that the parties discussed the stock purchase at the October, 2009, meeting, see, e.g., Oct. 25 Tr. at

161.    Shannon Casey did not disclose to Hi-Land Potato any information about Tan-O-On Marketing's finances, whether Tan-O-On Marketing owed money to its produce suppliers, that Tan-O-On Marketing lost its capital line of credit, and that Tan-O-On Marketing was upside down financially.  See Oct. 23 Tr. at 497:6-499:21 (Robinson, Carl Worley); Oct. 25 Tr. at 901:21-902:18 (Jaramillo, Carla Worley); id. at 962:2-963:20 (Robinson, Carla Worley); id. at 972:9-974:19 (Robinson, Carla Worley.

162.    In October, 2009, Hi-Land Potato knew to which Kroger, Co. divisions Tan-O-On Marketing was selling potatoes.  See Oct. 23 Tr. at 498:3-22 (Robinson, Carl Worley).[21]

163.    Despite this lack of negative information, Hi-Land Potato saw no advantage to buying Tan-O-On Marketing and immediately rejected Casey's proposal.  See Oct. 23 Tr. at 499:22-501:9 (Robinson, Carl Worley); Oct. 24 Tr. at 587:13-587:18 (Esquivel, Carl Worley); id. at 593:4-594:19 (Esquivel, Carl Worley); Oct. 25 Tr. at 901:21-903:24 (Jaramillo, Carla Worley, 962:2-965:5 (Robinson, Carla Worley).[22]

---

524:23-525:10 (Robinson, Carl Worley); id. at 587:13-18 (Esquivel, Carl Worley); id. at 593:4-8 (Robinson, Carl Worley); id. at 963:2-4 (Robinson, Carla Worley), the Court concludes that the parties most likely also discussed the closely related promissory-note issue at the same meeting.

[21] Although Carl Worley could not, at the time of trial, recall to which Kroger Co. divisions Tan-O-On Marketing sold potatoes, he testified that Hi-Land Potato knew, in October, 2009, to whom Shannon Casey sold.  See Oct. 23 Tr. at 498:3-24 (Robinson, Carl Worley).

[22] Skyline Potato and the Folson Farm Group ask the Court to conclude that "[i]t is unlikely that Hi-Land would have immediately rejected Shannon Casey's proposal for a merger or buy-out if it knew nothing of Tan-O-On's financial condition."  Skyline Potato's and the Folson Farm Group's FOF and COL ¶ 48, at 17.  The Court declines to adopt this inference.  Hi-Land Potato  rejected Shannon Casey's proposal because it did not "want to be in the business of selling, as a sales agency."  Oct. 25 Tr. at 902:12-14 (Jaramillo, Carla Worley).  Hi-Land Potato has, therefore, provided a more plausible basis for its decision to decline Shannon Casey's proposal, and Skyline Potato and the Folson Farm Group have not proved that their explanation is more likely than Hi-Land Potato's explanation.  The Court, therefore, declines to adopt this proposed fact.

Skyline Potato and the Folson Farm Group also ask the Court to conclude that "Hi-Land's primary concern was continuing its relationship with Tan-O-On, which would ensure the

164.    Hi-Land Potato was, however, receptive to the proposed office arrangement, because having its sales agent in-house and close to the product would benefit Hi-Land Potato. See Oct. 25 Tr. at 840:14-18 (Bohnhoff, Carla Worley); id. at 901:21-903:1 (Jaramillo, Carla Worley).

165.    Hi-Land Potato had no immediate or subsequent interest in Shannon Casey's buyout proposal, and there were no further discussions regarding any form of merging the two businesses.  See Oct. 23 Tr. at 497:6-10 (Robinson, Carl Worley); Oct. 25 Tr. at 840:14-18 (Bohnhoff, Carla Worley); id. at 842:23-845:13 (Bohnhoff, Carla Worley); id. at 901:21-903:1 (Jaramillo, Carla Worley); id. at 962:21-963:20 (Robinson, Carla Worley); Casey Depo. at 22:16-23:8; id. at 179:7-18.[23]

166.    Tan-O-On Marketing and Hi-Land Potato did not work out all of the details of the office/rent arrangement at the October, 2009, meeting, but during the following days Carla Worley worked out the details with Shannon Casey and his wife, Shawna Casey, who had been working as a Tan-O-On Marketing salesperson.  See Oct. 25 Tr. at 840:1-841:7 (Bohnhoff, Carla Worley).

---

sale of Hi-Land's potatoes to Kroger." Skyline Potato's and the Folson Farm Group's FOF and COL ¶ 49, at 16.  The testimony that Skyline Potato and the Folson Farm Group cite for this proposed fact does not, however, establish the proposed fact.  See Oct. 24 Tr. at 528:6-529:11 (Robinson, Carl Worley).  Although the testimony establishes that Hi-Land Potato was concerned about continuing its relationship with Tan-O-On Marketing, it does not establish that this concern was Hi-Land Potato's primary concern, or that Hi-Land Potato was concerned about continuing that relationship because it would ensure the sale of its potatoes to Kroger Co.  The Court will not, therefore, adopt this proposed fact.

[23] Hi-Land Potato suggests a more specific reason it approved of having Tan-O-On in-house: "Hi-Land had always found it beneficial to have its sales agent close by, and liked the idea of returning to having an in-house sales agent, as Anderson had been in the 1990s."  Hi-Land Potato's FOF and COL ¶ 29, at 9.  It cites the deposition of Carl Worley to support this fact.  The Court has reviewed the record and determined that no party moved the admission of his deposition.  The Court declines to adopt this fact or any other fact that relies solely on Carl Worley's deposition testimony.

167.     Hi-Land Potato and Tan-O-On Marketing discussed the physical arrangement of the office at length.  See Oct. 24 Tr. at 654:11-655:12 (Jaramillo, Carla Worley); Oct. 25 Tr. at 840:1-841:7 (Bohnhoff, Carla Worley).

168.     The office in Hi-Land Potato's shed contains a reception area with the facsimile-transmission machine, and Carl Worley's office is adjacent to the reception area.  See Oct. 25 Tr. at 845:19-846:24 (Bohnhoff, Carla Worley); id. at 916:2-916:19 (Esquivel, Carla Worley).

169.     Also adjacent to the reception area is a second office, and then past that second office is a third office called the "back office."  See Oct. 25 Tr. at 845:19-846:24 (Bohnhoff, Carla Worley); id. at 916:2-916:19 (Esquivel, Carla Worley).

170.     Tan-O-On Marketing occupied the "back office," which is accessible only by passing through the second office.  Oct. 25 Tr. at 845:19-846:24 (Bohnhoff, Carla Worley); id. at 916:2-916:19 (Esquivel, Carla Worley).

171.     Hi-Land Potato also agreed to provide Tan-O-On Marketing with an office, a desk, a telephone, and internet service.  See Oct. 24 Tr. at 654:11-655:12 (Jaramillo, Carla Worley); Casey Depo. at 218:15-218:23.

172.     Tan-O-On Marketing also was permitted to use Hi-Land Potato's facsimile-transmission machine.  See Oct. 25 Tr. at 846:11-24 (Bohnhoff, Carla Worley).

173.     Tan-O-On Marketing and Hi-Land Potato agreed that, in lieu of rent for the office space, and telephone and internet connections, that Tan-O-On Marketing needed, Tan-O-On Marketing would give Hi-Land Potato a three-cent discount -- from twenty-five cents to twenty-two cents per hundredweight of potatoes -- on Tan-O-On Marketing's sales agency fee.  See Oct.

24 Tr. at 579:3-5 (Jaramillo, Carl Worley); id. at 652:13-657:4 (Jaramillo, Carla Worley);[24] Oct.

25 Tr. at 845:14-18 (Jaramillo, Carla Worley); Casey Depo. at 20:24-21:23;[25] id. at 218:8-23.

174.    Also as part of this arrangement, and at Shannon Casey's request, Hi-Land Potato

agreed to take over the billing, bookkeeping, and collection on shipments of Hi-Land Potato and

Metz Potato potatoes that Tan-O-On Marketing arranged.   See Oct. 24 Tr. at 645:10-646:11

(Robinson, Carla Worley); id. at 655:10-656:20 (Jaramillo, Carla Worley); Oct. 25 Tr. at 841:2-

842:22 (Bohnhoff, Carla Worley).[26]

175.    Hi-Land Potato agreed to this billing, bookkeeping, and collection arrangement,

because it would eliminate the delay that resulted from two steps of issuing checks -- first by the

customer and then by Tan-O-On Marketing -- and because its customers preferred purchasing

direct from the producer.   See Oct. 24 Tr. 657:24-658:12 (Jaramillo, Carla Worley).

176.    In addition, Hi-Land Potato had experienced confusion and mistakes with Tan-O-

On Marketing's bookkeeping over the previous year, and Hi-Land Potato understood that

Shannon Casey was also not satisfied with his existing bookkeeping arrangements.   See Oct. 24

Tr. at 671:5-20 (Esquivel, Jaramillo); Oct. 25 Tr. at 838:20-839:8 (Bohnhoff, Carla Worley); id.

at 841:2-842:22 (Bohnhoff, Carla Worley).

---

[24] Carla Worley was initially unsure whether the discounted rate was twenty-two cents per hundredweight or twenty-three cents per hundredweight.   See Oct. 24 Tr. at 656:14-657:4 (Jaramillo, Carla Worley).   In light of the other testimony that clearly states that the discounted rate was 22 cents, see Casey Depo. at 21:2-15, the Court concludes that the discounted rate was 22 cents per hundred weight.

[25] Tan-O-On Marketing's counsel objected to some of the questioning during this portion of Shannon Casey's deposition on the basis that the questions were leading.   The questions that developed the testimony on which the Court relies are not leading, for the reasons stated in note 13, and the Court will, therefore, overrule the objection.

[26] Hi-Land Potato identifies Metz Potato with more specificity in its findings of fact.   See Hi-land Potato's FOF and COL ¶ 31, at 10.   It relies, however, on Carla Worley's deposition, which the Court never admitted into evidence.   The Court does not, therefore, include this proposed fact -- of specific details of Metz Potato -- in its findings of fact.

177.    The additional burden was not significant, because Hi-Land Potato already had to do the bookkeeping so that it could bill Tan-O-On Marketing for the shipments.  See Oct. 25 Tr. at 834:19-835:2 (Bohnhoff, Carla Worley); id. at 841:2-842:22 (Bohnhoff, Carla Worley); id. at 904:18-25 (Jaramillo, Carla Worley); id. at 968:9-971:9 (Bohnhoff, Carla Worley).

178.    The 2009 arrangement effectively marked a return to the billing arrangement Hi-Land Potato originally had with G. Anderson in the 1990s.  See Oct. 25 Tr. at 834:19-835:2 (Bohnhoff, Carla Worley); id. at 841:2-842:22 (Bohnhoff, Carla Worley); id. at 904:18-25 (Jaramillo, Carla Worley); id. at 968:9-971:9 (Bohnhoff, Carla Worley).

179.    The billing, bookkeeping, and collection arrangement was limited to shipments of Hi-Land Potato's and Metz Potato' potatoes.  See Oct. 25 Tr. at 841:2-842:22 (Bohnhoff, Carla Worley); id. at 970:11-16 (Bohnhoff, Carla Worley).

180.    Hi-Land Potato did not agree to, nor did it ever handle, any billing, bookkeeping or collection for shipments of potatoes from any of Tan-O-On Marketing's other suppliers, including Skyline Potato or the Folson Farm Group.  See Oct. 25 Tr. at 841:2-842:22 (Bohnhoff, Carla Worley); id. at 970:11-16 (Bohnhoff, Carla Worley).

181.    Hi-Land Potato knew Shannon Casey intended to instruct Kroger Co. and Larroc Limited to remit payment directly to Hi-Land Potato -- in Hi-Land Potato's name at the Hi-Land Potato address; Hi-Land Potato did not protest Shannon Casey's decision.  See Oct. 24 Tr. at 643:22-644:17 (Robinson, Carla Worley); id. at 646:7-646:14 (Robinson, Carla Worley).

182.    Hi-Land Potato authorized Shannon Casey to act on its behalf to have the checks from Kroger Co. come to Hi-Land Potato.  See Oct. 25 Tr. at 928:10-941:7 (Robinson, Carla Worley).[27]

---

[27] The record does not clearly reflect whether Hi-Land Potato authorized Shannon Casey to use a particular means to accomplish this result.  That is, Carla Worley testified in response to

183.    There was not, however, an agreement to change Tan-O-On Marketing's name to Hi-Land Potato, and Shannon Casey was not authorized to represent to Tan-O-On Marketing's customers that a name change or merger took place. See Oct. 25 Tr. at 887:14-889:2 (Bohnhoff, Carla Worley); id. at 909:19-913:20 (Bohnhoff, Carla Worley); id. at 928:10-941:7 (Robinson, Carla Worley).

184.    Shannon Casey told Hi-Land Potato in October, 2009, that he would arrange with the customers who were purchasing Hi-Land Potato's and Metz Potato's potatoes to have payments sent directly to Hi-Land Potato.  See Oct. 24 Tr. at 627:16-628:7 (Robinson, Carla Worley); id. at 643:22-644:8 (Robinson, Carla Worley); id. at 675:4-678:2 (Esquivel, Carla Worley); id. at 889:24-890:20 (Bohnhoff, Carla Worley).

185.    Hi-Land Potato benefitted from this arrangement, because it received direct payment from Tan-O-On Marketing's customers, thus eliminating delay from the time it would have taken Tan-O-On Marketing to pay Hi-Land Potato.  See Oct. 24 Tr. at 657:24-658:12 (Jaramillo, Carla Worley); Oct. 25 Tr. at 841:8-842:17 (Bohnhoff, Carla Worley).

186.    Hi-Land Potato also benefitted by having its sales agent located in its office.  See Oct. 24 Tr. at 590:16-591:20 (Esquivel, Carl Worley).

187.    Despite these benefits, the purpose of the billing, bookkeeping and collection arrangement with Tan-O-On Marketing was not to ensure preference payments.  See Oct. 25 Tr. at 878:13-25 (Bohnhoff, Carla Worley).

---

a hypothetical that, if Shannon Casey needed to change Tan-O-On Marketing's name to Hi-Land to change the remitter address, Hi-Land Potato would have agreed to that arrangement.  See Oct. 25 Tr. at 932:9-17 (Robinson, Carla Worley). This response to a hypothetical question is not an admission that Hi-Land Potato, in fact, authorized Shannon Casey to change Tan-O-On Marketing's name to Hi-Land Potato.

188.    Shannon Casey's request to move Tan-O-On Marketing caused Carl Worley enough concern that he attempted to contact G. Anderson to discuss the status of their relationship.  See Oct. 24 Tr. at 521:13-20 (Robinson, Carl Worley).

189.    G. Anderson was not aware of the October, 2009, arrangement between Tan-O-On Marketing and Hi-Land Potato.  See Oct. 22 Tr. at 190:25-195:25 (Robinson, G. Anderson); id. at 224:13-16 (Jaramillo, G. Anderson).

190.    Shannon Casey did not inform Hi-Land Potato that Tan-O-On Marketing had lost its source of working capital.  See Oct. 24 Tr. at 843:7-844:20 (Bohnhoff, Carla Worley); id. at 964:4-15 (Robinson, Carla Worley).

191.    Although Hi-Land Potato may have known or had notice that Tan-O-On Marketing was experiencing difficulties, none of the problems of which Hi-Land Potato had notice or knowledge in October, 2009, were severe enough to give Hi-Land Potato notice that Tan-O-On Marketing was unable to pay its suppliers.  See Oct. 24 Tr. at 479:17-24 (Robinson, Carl Worley); id. at 527:17-530:17 (Robinson, Carl Worley); id. at 586:23-587:1 (Esquivel, Carl Worley); Oct. 25 Tr. at 839:9-25 (Bohnhoff, Carla Worley); id. at 843:7-844:20 (Bohnhoff, Carla Worley); id. at 964:4-15 (Robinson, Carla Worley); id. at 971:21-972:19 (Robinson, Carla Worley); Casey Depo. at 29:11-24.[28]

_____

[28] Hi-Land Potato largely disclaims knowledge of Tan-O-On Marketing's financial position. See Hi-Land Potato's FOF and COL ¶ 34, at 10-11.  The Court is not persuaded.  Hi-Land Potato had accounting trouble related to Tan-O-On Marketing with respect to the previous growing season, supra Finding of Fact 176, and had had difficulty reaching Tan-O-On Marketing in the weeks before the meeting, supra Findings of Fact 143-44.  At a minimum, this evidence suggests notice that all was not well at Tan-O-On Marketing.  The Court does not, therefore, credit Hi-Land Potato's near-total disclaimer of knowledge of Tan-O-On Marketing's financial condition.

Tan-O-On Marketing, Skyline Potato, and the Folson Farm Group advance a different narrative: they contend that Hi-Land Potato knew that Tan-O-On Marketing was in a "precarious financial position" and that Tan-O-On Marketing could not pay its producers.  Skyline Potato and the Folson Farm Group's FOF and COL ¶ 47, at 15-16; Tan-O-On Marketing's FOF and

10.   **Performance of the Billing, Bookkeeping, and Collection Arrangement: Overview and Contents of the Invoices.**

192.   The 2009-2010 potato-selling season began in late October, 2009, following completion of the potato harvest.   See Oct. 24 Tr. at 603:4-24 Robinson, Carla Worley); Shipment and Billing Documentation for Hi-land Potato Shipments for Which Tan-O-On Marketing paid Hi-Land Potato *passim* (Hi-Land Potato's Exhibit CR).

193.   Hi-Land Potato's arrangement with Tan-O-On Marketing lasted until the end of the year.   See Oct. 24 Tr. at 603:4-24 Robinson, Carla Worley); Shipment and Billing Documentation for Hi-land Potato Shipments for Which Tan-O-On Marketing paid Hi-Land Potato *passim* (Hi-Land Potato's Exhibit CR).

194.   Between October 17, 2009 and February 1, 2010, Terry Wright, on behalf of Tan-O-On, entered into contracts with Skyline Potato and the Folson Farm Group for the purchase and sale of approximately $452,507.24 of potatoes; including interest and subtracting amounts paid by Tan-O-On Marketing or Shannon Casey, approximately $569,196.13 of which remained unpaid as of the date of trial.   See Oct. 22 Tr. at 19:17-20:18 (Jaramillo, Jones); id. at 50:7-50:24 (Esquivel, Alsum); id. at 69:17-71:18 (Esquivel, Folson); id. at 95:11-97:17 (Esquivel, Sill); id.

---

COL ¶ 50, at 17-18.  The Court has reviewed the testimony cited to support this contention and concludes that the testimony does not establish the proposed fact.  The testimony establishes two independent facts: (i) Hi-Land Potato knew that Shannon Casey was under pressure; and (ii) Shannon Casey was under financial pressure, particularly with respect to suppliers to Tan-O-On Marketing.  See, e.g., Tan-O-On Marketing's FOF and COL ¶ 47, at 15-16 (quoting Casey Depo. at 177:10-178:12).  This testimony does not establish that Hi-Land Potato knew that Tan-O-On Marketing was under financial pressure and could not pay its producers; it establishes that Hi-Land Potato only knew that Shannon Casey was under financial pressure.  Moreover, as the Court's finding states, other testimony establishes that Hi-Land Potato did not know that Tan-O-On Marketing could not pay its producers.

In the end, the Court concludes that its Finding of Fact more accurately takes into account the evidence than any of the parties' submissions: Hi-Land Potato had notice that Tan-O-On Marketing was experiencing some financial difficulties.  Hi-Land Potato did not, however, know the full extent of those problems or that Tan-O-On Marketing was failing to pay producers.

at 114:19-116:21 (Esquivel, McBride); id. at 131:7-132:25 (Esquivel, Peterson); Summary of Skyline Invoices; Skyline Invoices and Bills of Lading to Tan-O-On Marketing at 1 (various dates), admitted October 19, 2012, at PTC as Skyline Potato's and the Folson Farm Group's Exhibit 1; Summary of Folson Farm Invoices; Invoices to Tan-O-On Marketing and Invoice at 1 (various dates), admitted October 19, 2012, at PTC as Skyline Potato and Folson Farm Group's Exhibit 13); Summary of Alsum Produce Invoices; Invoices and Purchase Orders to Tan-O-On at 1 (various dates), admitted October 19, 2012, at PTC as Skyline Potato and Folson Farm Group's Exhibit 17; Summary of Billingsley Produce Sales Invoices; Invoices and Bills of Lading to Tan-O-On at 1 (various dates), admitted October 19, 2012, at PTC as Skyline Potato and Folson Farm Group's Exhibit 20; Summary of Mart Produce Corporation Invoices; Invoices and Bills of Lading to Tan-O-On at 1 (various dates), admitted October 19, 2012, at PTC as Skyline Potato and Folson Farm Group's Exhibit 22; Summary of Peterson Bros. River Valley Farms Invoices; Invoices and Bills of Lading to Tan-O-On at 1 (various dates), admitted October 19, 2012, at PTC as Skyline Potato and Folson Farm Group's Exhibit 26.

195.    Specifically, this $569,196.13 figure reflects the following calculations:

|  | Invoice Amount | Accrued Interest Before Trial | Payments Received From Tan-O-On and/or Casey | Total Owed |
|---|---|---|---|---|
| **Skyline Potato** | $87,714.39 | $37,672.43 | $3,680.98 | $121,705.84 |
| **Folson Farms** | $147,013.50 | $61,218.65 | $42,652.17 | $165,579.98 |
| **Alsum Produce** | $55,093.62 | $28,415.68 | $2,495.00 | $81,014.30 |
| **Billingsley Produce** | $65,421.10 | $35,291.09 | $18,980.26 | $81,731.93 |
| **Mart Produce** | $90,162.10 | $39,312.25 | $24,869.96 | $104,604.39 |
| **Peterson Brothers** | $7,102.56 | $3,778.81 | $321.65 | $10,559.69 |
| **Total** | $452,507.24 |  |  | $565,196.13 |

See Summary of Skyline Invoices; Skyline Invoices and Bills of Lading to Tan-O-On Marketing at 1 (Skyline Potato's and the Folson Farm Group's Exhibit 1); Summary of Folson Farm Invoices; Invoices to Tan-O-On Marketing and Invoice at 1 (Skyline Potato and Folson Farm Group's Exhibit 13); Summary of Alsum Produce Invoices; Invoices and Purchase Orders to Tan-O-On at 1 (Skyline Potato and Folson Farm Group's Exhibit 17); Summary of Billingsley Produce Sales Invoices; Invoices and Bills of Lading to Tan-O-On at 1 (Skyline Potato and Folson Farm Group's Exhibit 20); Summary of Mart Produce Corporation Invoices; Invoices and Bills of Lading to Tan-O-On at 1 (Skyline Potato and Folson Farm Group's Exhibit 22); Summary of Peterson Bros. River Valley Farms Invoices; Invoices and Bills of Lading to Tan-O-On at 1 (Skyline Potato and Folson Farm Group's Exhibit 26).[29]

---

[29] The parties disputed the amount in their proposed findings of fact. Skyline Potato and the Folson Farm Group stated that approximately $452,507,24 remained unpaid at the time of trial. See Skyline Potato's and the Folson Farm Group's FOF and COL ¶ 66, at 22. The phrasing in the proposed finding of fact was error: the Court's review of the exhibits reveals that the outstanding invoices added up to $452,507.24 excluding both interest and any payments received from either Tan-O-On or Shannon Casey.

Tan-O-On Marketing, which based its proposed findings on Skyline Potato's and the Folson Farm Group's proposed findings, changed the proposed finding to state that the parties contracted "for the purchase and sale of **approximately $649,000.00** of potatoes, all of which remains unpaid." Tan-O-On Marketing's Proposed FOF and COL ¶ 78, at 25 (emphasis in original). To support this different figure, Tan-O-On Marketing cites Wright's testimony, which states that, according to a "rough tabulation" that he did in early January, 2010, the "total amount of money that Tan-O-On Marketing had not paid producers for deliveries that had been made . . . was like $649,000." Oct. 23 Tr. at 353:11-19 (Robinson, Wright). Tan-O-On Marketing has neither provided this purported "rough tabulation" to the Court nor explained its basis. The Court sees no sound basis in the facts that the other parties have provided to corroborate Wright's "rough tabulation." The Court, therefore, declines to adopt Tan-O-On Marketing's proposed finding.

Skyline Potato and the Folson Farm Group ask the Court to conclude that "[t]he invoices [they] issued . . . demonstrate that Tan-O-On purchased more than $230,000 in potatoes during the year 2009, and that the weight of those purchases exceeded 2,000 pounds." Skyline Potato's and the Folson Farm Group's FOF and COL ¶ 67, at 22. The Court's review of the exhibits that Skyline Potato and the Folson Farm Group cite does not, however, support this fact: the Court cannot determine how Skyline Potato and the Folson Farm Group arrived at either figure. The Court will not, therefore, adopt this proposed fact.

196.    At the time of those sales, Skyline Potato and the Folson Farm Group were produce dealers operating under valid PACA licenses that the U.S.D.A. issued.  See Oct. 22 Tr. at 22:7-22:20 (Jaramillo, Jones); id. at 49:25-50:6 (Esquivel, Alsum); id. at 69:2-69:14 (Esquivel, Folson); id. at 94:19-95:7 (Esquivel, Sill); id. at 114:2-114:15 (Esquivel, McBride); id. at 130:13-131:6 (Esquivel, Peterson); Skyline PACA License at 1 (no date provided), admitted October 19, 2012 as PTC Skyline Potato and Folson Farm Group's Exhibit 11); Folson Farm PACA License Records at Folson Group 181-83 (no date provided), admitted October 19, 2012, at PTC as Skyline Potato and Folson Farm Group's Exhibit 15; Alsum Produce PACA License Records at Folson Group 179 (no date provided), admitted October 19, 2012, at PTC as Skyline Potato and Folson Farm Group's Exhibit 19; Folson Group 178 Billingsley PACA License Records at Folson Group 178-80 (no date provided), admitted October 19, 2012, at PTC as Skyline Potato and Folson Farm Group's Exhibit 21); (Mart Produce PACA License Records at Folson Group 185 (no date provided), admitted October 19, 2012, at PTC as Skyline Potato and Folson Farm Group's Exhibit 23; Peterson PACA License Records at Folson Group 186 (no dates provided), admitted October 19, 2012, at PTC as Skyline Potato and Folson Farm Group's Exhibit 27.[30]

197.    At the time of these sales, Folson Farms owed $80,561.60 to Tan-O-On Marketing.  See Oct. 22 Tr. at 70:2-71:8 (Esquivel, Folson); Letter from Bryan Folson to

---

[30] Skyline Potato and the Folson Farm Group ask the Court to conclude that, "[a]t the time of those sales, neither Terry Wright, Skyline, nor the Folson Group knew about the arrangement between Tan-O-On and Hi-Land."  See Skyline Potato's and the Folson Farm Group's FOF and COL ¶ 68, at 23.  The testimony that Skyline Potato and the Folson Farm Group cite for the proposed fact does not, however, support the proposed fact.  The testimony demonstrates, at most, that one member of the Folson Farm Group did not know of the arrangement, see Oct. 22 Tr. at 55:20-23 (Jaramillo, Alsum), and that Wright did not know of the arrangement, see Oct. 23 Tr. at 361:4-364:8 (Robinson, Wright).  The Court will not, therefore, adopt this proposed fact.

Shannon Casey at 1 (dated March 2, 2009), admitted October 19, 2012, at PTC as Skyline Potato's and the Folson Farm Group's Exhibit 14.

198.     Folson Farms later notified Tan-O-On Marketing that it would set off this amount from the amounts that Tan-O-On Marketing owed it.  See Oct. 22 Tr. at 70:2-71:8 (Esquivel, Folson); Letter from Bryan Folson to Shannon Casey at 1 (Skyline Potato's and the Folson Farm Group's Exhibit 14).

199.     Tan-O-On Marketing did not respond or otherwise object to Folson Farms' figure. See Oct. 22 Tr. at 70:2-71:8 (Esquivel, Folson).

200.     The potatoes that Skyline Potato and the Folson Farm Group sold to Tan-O-On Marketing arrived in good order, with no rejections or problems as to quality.  See Oct. 22 Tr. at 20:19-20:25 (Jaramillo, Jones); id. at 50:25-51:5 (Esquivel, Alsum); id. at 71:12-71:14 (Esquivel, Folson); id. at 96:3-96:11 (Esquivel, Sill); id. at 115:6-115:9 (Esquivel, McBride); id. at 132:2-132:7 (Esquivel, Peterson).

201.     The invoices that Skyline Potato and the Folson Farm Group issued to Tan-O-On Marketing included the following statement:

> The perishable agricultural commodities listed on this invoice are sold subject to the statutory trust authorized by section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499e(c)).[31]  The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received.

---

[31] The invoices' statements of this language differ in capitalization and abbreviation, but the expression is identical.  Compare Summary of Folson Farm Invoices; Invoices to Tan-O-On Marketing and Invoice (Skyline Potato's and the Folson Farm Group's Exhibit 13)(". . . authorized by Section 5(c) of the Perishable Agricultural Commodities Act") with Summary of Mart Produce Corporation Invoices; Invoices and Bills of Lading to Tan-O-On at 1 (Skyline Potato and Folson Farm Group's Exhibit 22)(" authorized by section 5(c) of the P.A.C.A.").

Summary of Skyline Invoices; Skyline Invoices and Bills of Lading to Tan-O-On Marketing (Skyline Potato's and the Folson Farm Group's Exhibit 1); Summary of Folson Farm Invoices; Invoices to Tan-O-On Marketing and Invoice (Skyline Potato and Folson Farm Group's Exhibit 13); Summary of Alsum Produce Invoices; Invoices and Purchase Orders to Tan-O-On (Skyline Potato and Folson Farm Group's Exhibit 17); Summary of Billingsley Produce Sales Invoices; Invoices and Bills of Lading to Tan-O-On (Skyline Potato and Folson Farm Group's Exhibit 20); Summary of Mart Produce Corporation Invoices; Invoices and Bills of Lading to Tan-O-On at 1 (Skyline Potato and Folson Farm Group's Exhibit 22);  Summary of Peterson Bros. River Valley Farms Invoices; Invoices and Bills of Lading to Tan-O-On (Skyline Potato and Folson Farm Group's Exhibit 26).

202.    The invoices that Alsum Produce and Billingsley Produce issued to Tan-O-On Marketing reflect payment terms of ten days after the day on which the produce was accepted. See Oct. 22 Tr. at 51:6-51:8 (Esquivel, Alsum); id. at 95:24-96:2 (Esquivel, Sill); Summary of Alsum Produce Invoices; Invoices and Purchase Orders to Tan-O-On at, e.g., 2 (Skyline Potato's and the Folson Farm Group's Exhibit 17); Summary of Billingsley Produce Sales Invoices; Invoices and Bills of Lading to Tan-O-On at Folson Group 071 (Skyline Potato and Folson Farm Group's Exhibit 20).

203.    The invoices that Mart Produce, Skyline Potato, Folson Farm, and Peterson Brothers issued reflect payment terms of twenty, twenty-one, thirty, and thirty days, respectively, after the day on which the produce was accepted.  See Summary of Mart Produce Corporation Invoices; Invoices and Bills of Lading to Tan-O-On (Skyline Potato and Folson Farm Group's Exhibit 22);  Summary of Skyline Invoices; Skyline Invoices and Bills of Lading to Tan-O-On Marketing (Skyline Potato's and the Folson Farm Group's Exhibit 1); Summary of Folson Farm

Invoices; Invoices to Tan-O-On Marketing and Invoice (Skyline Potato and Folson Farm Group's Exhibit 13); Summary of Peterson Bros. River Valley Farms Invoices; Invoices and Bills of Lading to Tan-O-On (Skyline Potato and Folson Farm Group's Exhibit 26); Oct. 22 Tr. at 115:13-20 (Esquivel, McBride); id. at 21:7-11 (Jaramillo, Jones); id. at 23:21-24:1 (Jaramillo, Jones); id. at 71:18-24 (Esquivel, Folson); id. at 131:16-21 (Esquivel, Peterson).

204.    There is no separate agreement between Mart Produce, Skyline Potato, Folson Farm, or Peterson Brothers to Tan-O-On Marketing memorializing the payment terms set forth on the invoices.  See Oct. 22 Tr. at 115:13-20 (Esquivel, McBride); id. at 23:21-24:1 (Jaramillo, Jones); id. at 71:18-71:24 (Esquivel, Folson); id. at 131:16-131:21 (Esquivel, Peterson).

205.    This arrangement was not common in the industry, because it would expose to the grower the broker's primary assets -- customer lists and information regarding pricing -- which are the basis for competition in the industry.  See Oct. 22 Tr. at 22:21-23:14 (Jaramillo, Jones); id. at 43:20-45:15 (Jaramillo, Jones); id. at 54:14-53:4 (Esquivel, Alsum); id. at 72:11-73:1 (Esquivel, Folson); id. at 98:1-9 (Esquivel, Sill).[32]

### 10.    Performance of the Billing, Bookkeeping, and Collection Arrangement: The Conduct of the Arrangement from October, 2009, through December, 2009.

206.    From October through December, 2009, Tan-O-On Marketing had two categories of sales: (i) those made by Wright operating out of Idaho, which included the sale of the Skyline Potato's and the Folson Farm Group's potatoes; and (ii) those made by Shannon Casey and Shawna Casey operating out of Tan-O-On Marketing's office located in Monte Vista, which

---

[32] Skyline Potato and the Folson Farm Group also ask the Court to conclude that this arrangement would, by itself, "be an indicator of financial problems."  Skyline Potato's and the Folson Farm Group's FOF and COL ¶ 69, at 23.  The only testimony that supports that proposed fact, however, is that of one representative of the Folson Farm Group, who said that such a proposal would be "[u]nusual, I guess.  It would probably indicate something was not going well for that company, would be my assumption."  Oct. 22 Tr. at 53:2-4 (Esquivel, Alsum).  This speculative statement is expressly predicated on the witness' assumption.  The Court will not, therefore, adopt this proposed fact.

included the sale of Hi-Land Potato's and Metz Potato's produce.  See Oct. 22 Tr. at 40:20-49:12 (Bohnhoff, Jones, Jaramillo, Esquivel); id. at 56:2-8 (Robinson, Alsum); id. at 68:8-19 (Esquivel, Folson); id. at 94:1-10 (Esquivel, Sill); id. at 113:14-114:1 (Esquivel, McBride); id. at 117:4-7 (Robinson, McBride); id. at 129:22-130:7 (Esquivel, Peterson); id. at 199:10-13 (Robinson, Anderson); Oct. 25 Tr. at 841:20-842:1 (Bohnhoff, Carla Worley).

207.    During this period, Shannon or Shawna Casey would communicate with a customer to arrange shipments of Hi-Land Potato's and Metz Potato's produce, and then prepare the purchase orders and bills of lading for these sales.  See Oct. 25 Tr. at 846:25-849:7 (Bohnhoff, Carla Worley).

208.    Tan-O-On Marketing would deliver the documents across the office to Hi-Land Potato.  See Oct. 25 Tr. at 846:25-849:7 (Bohnhoff, Carla Worley).

209.    Hi-Land Potato or Metz Potato then would load the trucks and give the bill of lading for the shipment to the driver of the truck transporting the shipment.  See Oct. 25 Tr. at 846:25-849:7 (Bohnhoff, Carla Worley).

210.    Hi-Land Potato coordinated with Metz Potato, and prepared and sent the invoices and other billing documentation to customers, with the exception of Kroger Co., which the Caseys invoiced electronically.[33]  See Oct. 24 Tr. at 638:20-389:1 (Carla Worley); Oct. 25 Tr. at 849:8-851:17 (Bohnhoff, Carla Worley).

_____

[33] For electronic invoicing, the Caseys used iTrade, an online tool that Kroger Co. used for placing and paying for orders from suppliers.  See Oct. 22 Tr. at 160:9-161:23 (Robinson, G. Anderson); id. at 217:16-218:17 (Jaramillo, G. Anderson).  Kroger Co. placed orders with Tan-O-On through iTrade, which the Caseys would confirm electronically by logging into Tan-O-On Marketing's iTrade account.  See Oct. 22 Tr. at 186:18-196:10 (Robinson, G. Anderson); Oct. 23 Tr. at 368:20-374:19 (Robinson, Terry Wright); Shipment and Billing Documentation for Hi-land Potato Shipments for Which Tan-O-On Marketing paid Hi-Land Potato (Hi-Land Potato's Exhibit CR).  Tan-O-On Marketing would invoice Kroger Co. through iTrade.  See Oct. 25 Tr. at 849:8-852:18 (Bohnhoff, Carla Worley).  The Caseys would print the iTrade screens, which Hi-Land used as a purchase order document and as an invoice.  See Oct. 25 Tr. at 849:8-852:18

211.    Historically, Tan-O-On Marketing's invoices had been consecutively numbered using five-digit invoice numbers.  See Oct. 22 Tr. at 186:18-187:9 (Robinson, G. Anderson); id. at 194:12-195:9 (Robinson, G. Anderson); Oct. 23 Tr. at 338:1-5 (Robinson, Wright); id. at 369:22-371:11 (Robinson, Wright); Oct. 24 Tr. at 607:14-608:7 (Robinson, Carla Worley).

212.    When Tan-O-On Marketing and Hi-Land Potato began sales under the new billing arrangement, the utilized Hi-Land Potato's four-digit invoice numbers, beginning with invoices 1414, to allow Hi-Land Potato to track Tan-O-On Marketing's sales in its books -- that is, to simplify record-keeping.  See Oct. 23 Tr. at 369:22-371:11 (Robinson, Wright); Oct. 24 Tr. at 607:14-608:7 (Robinson, Carla Worley); Hi-Land Potato Company, Inc. Invoices for Tan-O-On Marketing, Sales Invoice number 1414 through 1793 and all invoices issued in 2010 (various dates), admitted October 19, 2012, at PTC as Tan-O-On Marketing's Exhibit 7.

213.    All but three customers -- Kroger Co., Larroc Limited, and Markon, Inc. -- immediately began sending their payments directly to Hi-Land Potato, as contemplated, but Hi-Land Potato did not start receiving payments directly from Kroger Co., Larroc Limited, and Markon, Inc. until December.  See Oct. 24 Tr. at 627:16-628:7 (Robinson, Carla Worley); id. at 638:3-639:11 (Robinson, Carla Worley); id. at 643:22-644:8 (Robinson, Carla Worley); id. at 675:4-678:2 (Esquivel, Carla Worley);

214.    Instead, between November, 2009 and early January, 2010, Tan-O-On Marketing received payments for 283 shipments of Hi-Land Potato's and Metz Potato's potatoes, with a bill totaling $1,661,603.14, from Kroger Co., Larroc Limited, and Markon, Inc..  See Oct. 24 Tr. at 638:3-639:11 (Robinson, Carla Worley); id. at 675:4-678:2 (Esquivel, Carla Worley); Oct. 25 Tr. at 869:5-871:11 (Bohnhoff, Carla Worley); id. at 873:6-875:4 (Bohnhoff, Carla Worley); Tan-O-

_____

(Bohnhoff, Carla Worley); Shipment and Billing Documentation for Hi-land Potato Shipments for Which Tan-O-On Marketing paid Hi-Land Potato *passim* (Hi-Land Potato's Exhibit CR).

On Marketing's Sunflower Bank Account x507, November, 2009 Statement *passim* (dated November 30, 2009), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit AN; Tan-O-On Marketing's Sunflower Bank Account x507, December, 2009 Statement *passim* (dated December 31, 2009), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit AO; Tan-O-On Marketing's Sunflower Bank Account x507, January, 2010 Statement *passim* (dated January 31, 2013), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit AP; Tan-O-On Marketing's checks to Hi-Land Potato *passim* (dated November, 2009 to January, 2010)*, admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit BG; Reconciliation of Tan-O-On Marketing's checks to Hi-Land Potato Shipments at HLPC 5742-5761 (various dates), admitted in relevant part October 25, 2012 as Hi-Land Potato's Exhibit BH; Second Supplemental Declaration of Carla Worley ¶ 2, at 1-2 (dated September 21, 2012), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit CK; Shipment and Billing Documentation for Hi-land Potato Shipments for Which Tan-O-On Marketing paid Hi-Land Potato *passim* (Hi-Land Potato's Exhibit CR).

215.    Tan-O-On Marketing in turn wrote checks to Hi-Land Potato reimbursing it for the 283 shipments.[34]  See Hi-Land Potato's Tan-O-On Marketing's Sunflower Bank Account x507, November, 2009 Statement *passim* (Hi-Land Potato's Exhibit AN); Tan-O-On Marketing's Sunflower Bank Account x507, December, 2009 Statement *passim* (Hi-Land Potato's Exhibit AO); Tan-O-On Marketing's Sunflower Bank Account x507, January, 2010

---

[34] From October, 2009, through January, 2010, Hi-Land Potato was not paid for two additional shipments arranged by Tan-O-On Marketing, worth a total value of approximately $11,000.00-12,000.00.   To that extent, Hi-Land Potato was not paid in full by Tan-O-On Marketing.  See Oct. 25 Tr. at 875:8-20 (Bohnhoff, Carla Worley).

The total bill added up to $1,661,603.14.  See Oct. 25 Tr. at 873:13-874:21 (Bohnhoff, Carla Worley).  With respect to the bills those 283 shipments for which Tan-O-On Marketing paid Hi-Land Potato, there were two additional minor discrepancies, but those differences total less than $200.00.  See Oct. 25 Tr. at 874:5-875:4 (Bohnhoff, Carla Worley).

Statement *passim* (Hi-Land Potato's Exhibit AP); Tan-O-On Marketing's checks to Hi-Land Potato *passim* (Hi-Land Potato's Exhibit BG); Reconciliation of TMI checks to Hi-Land Potato Shipments at HLPC 5742-5761; Second Supplemental Declaration of Carla Worley ¶¶ 1-3, at 1-2 (Hi-Land Potato's Exhibit CK); Shipment and Billing Documentation for Hi-land Potato Shipments for Which Tan-O-On Marketing paid Hi-Land Potato *passim* (Hi-Land Potato's Exhibit CR); Checks from Tan-O-On to Hi-Land at Bates 001-017 (various dates), admitted October 19, 2012, at PTC as Skyline Potato's and the Folson Farm Group's Exhibit 29.

216.    Tan-O-On Marketing's checks were delivered between November, 2009, through January, 2010.  See Hi-Land Potato's Tan-O-On Marketing's Sunflower Bank Account x507, November, 2009 Statement *passim* (Hi-Land Potato's Exhibit AN); Tan-O-On Marketing's Sunflower Bank Account x507, December, 2009 Statement *passim* (Hi-Land Potato's Exhibit AO); Tan-O-On Marketing's Sunflower Bank Account x507, January, 2010 Statement *passim* (Hi-Land Potato's Exhibit AP); Tan-O-On Marketing's checks to Hi-Land Potato *passim* (Hi-Land Potato's Exhibit BG); Reconciliation of Tan-O-On Marketing's checks to Hi-Land Potato Shipments at HLPC 5742-5761 (Hi-Land Potato's Exhibit BH); Second Supplemental Declaration of Carla Worley ¶¶ 1-3, at 1-2 (Hi-Land Potato's Exhibit CK); Shipment and Billing Documentation for Hi-land Potato Shipments for Which Tan-O-On Marketing paid Hi-Land Potato *passim* (Hi-Land Potato's Exhibit CR); Checks from Tan-O-On to Hi-Land at Bates 001-017 (Skyline Potato's and the Folson Farm Group's Exhibit 29).

217.    Hi-Land Potato then paid Metz Potato for its portion of the shipments and also paid the freight charges.  See Oct. 24 Tr. 638:3-639:11 (Robinson, Carla Worley); Oct. 25 Tr. at 871:1-24 (Bohnhoff, Carla Worley); id. at 873:6-875:4 (Bohnhoff, Carla Worley); id. at 980:10-981:19 (Bohnhoff, Carla Worley); Trial Transcript at 999:18-1000:6 (taken October 26,

2012)(Doc. 339)("Oct. 26 Tr.")(Bohnhoff, Wellborn); Hi-Land Potato's Tan-O-On Marketing's Sunflower Bank Account x507, November, 2009 Statement *passim* (Hi-Land Potato's Exhibit AN); Tan-O-On Marketing's Sunflower Bank Account x507, December, 2009 Statement *passim* (Hi-Land Potato's Exhibit AO); Tan-O-On Marketing's Sunflower Bank Account x507, January, 2010 Statement *passim* (Hi-Land Potato's Exhibit AP); Tan-O-On Marketing's checks to Hi-Land Potato *passim* (Hi-Land Potato's Exhibit BG); Reconciliation of Tan-O-On Marketing's checks to Hi-Land Potato Shipments at HLPC 5742-5761 (Hi-Land Potato's Exhibit BH); Second Supplemental Declaration of Carla Worley ¶¶ 1-3, at 1-2 (Hi-Land Potato's Exhibit CK); & Shipment and Billing Documentation for Hi-land Potato Shipments for Which Tan-O-On Marketing paid Hi-Land Potato *passim* (Hi-Land Potato's Exhibit CR); Checks from Tan-O-On to Hi-Land at Bates 001-017 (Skyline Potato's and the Folson Farm Group's Exhibit 29).

218.    Hi-Land Potato received payment from Tan-O-On Marketing for all but fourteen of these 283 shipments within forty days of each shipment for which there was payment.  <u>See</u> Oct. 24 Tr. at 667:17-669:19 (Bohnhoff, Carla Worley); Oct. 25 Tr. at 876:7-877:4 (Bohnhoff, Carla Worley); Hi-Land Potato's Exhibit CK ¶¶ 4-5, at 2-3.

219.    Payment was made for those fourteen shipments were paid between forty-three and forty-seven days of shipment; the total amount of the payments for these over-forty-day shipments was $88,190.15.  <u>See</u> Oct. 24 Tr. at 667:17-669:19 (Bohnhoff, Carla Worley); Oct. 25 Tr. at 876:7-877:4 (Bohnhoff, Carla Worley); Second Supplemental Declaration of Carla Worley ¶¶ 4-5, at 2-3 (Hi-Land Potato's Exhibit CK)

220.    Sometime between October, 2009, and January, 2010, Hi-Land Potato received a check for $7,770.00 from a customer that appeared to be a double payment; Hi-Land Potato

remitted a check for the same amount to Tan-O-On Marketing.  See Oct. 25 Tr. at 875:21-876:6 (Bohnhoff, Carla Worley).

221.    Hi-Land Potato was not paid twice for these shipments and instead received payment for these shipments only by way of the checks from Tan-O-On Marketing.  See Oct. 25 Tr. at 875:5-24 (Bohnhoff, Carla Worley); Oct. 26 Tr. at 999:18-1000:20 (Bohnhoff, Carla Worley); Tan-O-On Marketing's checks to Hi-Land Potato *passim* (Hi-Land Potato's Exhibit BG); Reconciliation of Tan-O-On Marketing's checks to Hi-Land Potato Shipments *passim* (Hi-Land Potato's Exhibit BH); Shipment and Billing Documentation for Hi-land Potato Shipments for Which Tan-O-On Marketing paid Hi-Land Potato *passim* (Hi-Land Potato's Exhibit CR).

222.    Hi-Land Potato calculated the sales fee it owed to Tan-O-On Marketing for these potato sales at the agreed rate of twenty-five cents per hundredweight and paid Tan-O-On Marketing $36,577.07.  See Oct. 25 Tr. at 871:12-872:12 (Bohnhoff, Carla Worley); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, December, 2009 Statement Detail *passim* (dated December 31, 2009), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit AJ; Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, January, 2010 Statement Detail *passim*, admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit AK); Hi-Land Potato Sales Fee Payments to TMI at 1-3 (no date provided), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit BJ.

223.    Tan-O-On Marketing did not dispute that this amount was accurate, and it deposited these payments in its Bank of Albuquerque account.  See Oct. 25 Tr. at 871:12-872:12 (Bohnhoff, Carla Worley); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, 12/09 Statement Detail *passim* (Hi-Land Potato's Exhibit AJ); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, January, 2010 Statement Detail *passim* (Hi-Land

Potato's Exhibit AK); Hi-Land Potato Sales Fee Payments to Tan-O-On Marketing at 1-3 (Hi-Land Potato's Exhibit BJ).

224.    Hi-Land Potato did not handle any of the billing, bookkeeping, or collection of payments for Tan-O-On Marketing's other suppliers or for the customers to whom those suppliers' potatoes were shipped. See Oct. 25 Tr. at 841:2-842:22 (Bohnhoff, Carla Worley); id. at 880:1-883:2 (Bohnhoff, Carla Worley).

225.    Wright, who had his office in Idaho, originated many of those sales and shipments. See Oct. 22 Tr. at 199:10-13 (Robinson, G. Anderson); Casey Depo. at 26:22-27:17.[35]

226.    Moreover, customer checks for these shipments were sent to Tan-O-On Marketing's Albuquerque office. See Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, October, 2009 Statement (dated October 31, 2009), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit AE; Tan-O-On Marketing's Bank of Albuquerque Operating Account x505 October, 2009 Statement Detail *passim* (Hi-Land Potato's Exhibit AF); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, November, 2009 statement *passim* (dated November 30, 2009), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit AG; Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, November, 2009 Statement Detail *passim* (dated November 31, 2009), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit AH; Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, December, 2009 Statement *passim* (dated December 31, 2009), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit AI; Hi-Land Potato's Tan-O-On Marketing's Sunflower Bank Account x507, November, 2009 Statement *passim* (Hi-Land Potato's Exhibit

_____

[35] Although Shannon Casey only testified that he did not give Hi-Land Potato access to those producers and customers that Wright serviced, see Casey Depo. at 26:22-27:17, because Wright serviced many customers, the Court infers that Wright originated many other sales.

AN); Tan-O-On Marketing's Sunflower Bank Account x507, December, 2009 Statement *passim* (Hi-Land Potato's Exhibit AO); Tan-O-On Marketing's Sunflower Bank Account x507, January, 2010 Statement *passim* (Hi-Land Potato's Exhibit AP).

227.    Notwithstanding the physical proximity between Hi-Land Potato's office and the office Tan-O-On Marketing used at Hi-Land Potato's shed, Hi-Land Potato did not see or have access to Tan-O-On Marketing's records of those transactions, and did not discuss that aspect of Tan-O-On Marketing's business with the Caseys.  See Oct. 25 Tr. at 877:16-878:25 (Bohnhoff, Carla Worley); id. 880:1-883:2 (Bohnhoff, Carla Worley); Casey Depo. at 26:22-27:17.

228.    The limited billing, bookkeeping, and collection arrangement between Hi-Land Potato and Tan-O-On Marketing did not allow Hi-Land Potato to know when and how much Tan-O-On Marketing was receiving in payment for Hi-Land Potato's potato shipments.  See Oct. 25 Tr. at 877:5-15 (Bohnhoff, Carla Worley); id. at 881:9-15 (Bohnhoff, Carla Worley).

229.    In any event, Hi-Land Potato did not see any of the customer payment checks that Tan-O-On Marketing received, including those that Kroger Co., Larroc Limited, and Markon, Inc. continued to send to Tan-O-On Marketing in payment of the Hi-Land Potato shipments; the great majority of the payment checks for the Hi-Land Potato shipments were sent to Tan-O-On Marketing's Albuquerque office.  See October 25 Tr. at 877:5-15 (Bohnhoff, Carla Worley); id. at 881:9-15 (Bohnhoff, Carla Worley); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, October, 2009 Statement *passim* (Hi-Land Potato's Exhibit AE); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505 October, 2009 Statement Detail *passim* (Hi-Land Potato's Exhibit AF);  Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, November, 2009 statement *passim* (Hi-Land Potato's Exhibit AG); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, November, 2009 Statement Detail

*passim* (Hi-Land Potato's Exhibit AH); Tan-O-On Marketing's Bank of Albuquerque Operating

Account x505, December, 2009 Statement *passim* (Hi-Land Potato's Exhibit AI); Tan-O-On

Marketing's Bank of Albuquerque Operating Account x505, December 2009 Statement Detail

*passim* (Hi-Land Potato's Exhibit AJ); Tan-O-On Marketing's Bank of Albuquerque Operating

Account x505, January, 2010 Statement Detail *passim* (Hi-Land Potato's Exhibit AK); Hi-Land

Potato's Tan-O-On Marketing's Sunflower Bank Account x507, November, 2009 Statement

*passim* (Hi-Land Potato's Exhibit AN); Tan-O-On Marketing's Sunflower Bank Account x507,

December, 2009 Statement *passim* (Hi-Land Potato's Exhibit AO); Tan-O-On Marketing's

Sunflower Bank Account x507, January, 2010 Statement *passim* (Hi-Land Potato's Exhibit AP).

230.    Hi-Land Potato and Shannon Casey did not discuss arrangements to ensure that

Hi-Land Potato was paid for its potato shipments in preference over other producers being paid.

See Oct. 25 Tr. at 877:16-878:25 (Bohnhoff, Carla Worley).

231.    Hi-Land Potato and Shannon Casey never discussed whether Tan-O-On

Marketing should pay Hi-Land Potato versus Tan-O-On Marketing's other suppliers.  See Oct.

25 Tr. at 877:16-878:25 (Bohnhoff, Carla Worley)

232.    In addition to the change in the invoicing system, there was a change in internal

tracking: before Tan-O-On Marketing moved to Monte Vista in October, 2009, it had tracked all

sales using software called Produce Magic, which Wright could remotely access from his office

in Idaho.  See Oct. 22 Tr. at 160:11-161:23 (Robinson, G. Anderson); Oct. 23 Tr. at 337:9-

338:14 (Robinson, Wright); id. at 375:5-376:20 (Esquivel, Wright).

233.    Between October, 2009, and January, 2010, Wright noticed that Shannon Casey's

sales were no longer entered in Produce Magic.  See Oct. 23 Tr. at 368:21-374:17 (Robinson,

Wright); id. at 405:25-407:3 (Bohnhoff, Wright).

234.   Despite this discovery, from October, 2009, through December, 2009 -- and after December 31, 2009 -- using Tan-O-On Marketing's login information to iTrade, Wright could see that Tan-O-On Marketing continued to sell to Kroger Co. and the orders that originated from Shannon Casey.   See Oct. 23 Tr. at 368:21-374:17 (Robinson, Wright); id. at 405:25-407:3 (Bohnhoff, Wright).

### 11.   November, 2009: Conflict Within Tan-O-On Marketing; Tan-O-On Marketing's Sunflower Bank Account.

235.   In October, 2009, or November, 2009, Wright called G. Anderson and informed him that Tan-O-On Marketing was falling behind in its payments to suppliers.   See Oct. 22 Tr. at 224:13-226:23 (Jaramillo, G. Anderson).

236.   G. Anderson called Frenchman Valley, Hi-Land Potato, and Metz Potato.   See Oct. 22 Tr. at 225:3-6 (Jaramillo, G. Anderson).

237.   Carl Worley and a representative of Metz Potato told G. Anderson that Hi-Land Potato was paid in full.   See Oct. 22 Tr. at 224:13-226:23 (Jaramillo, G. Anderson).[36]

238.   Tan-O-On Marketing had maintained an operating account with the Bank of Albuquerque.   See Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, October, 2009 Statement passim (Hi-Land Potato's Exhibit AE); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505 October, 2009 Statement Detail passim (Hi-Land Potato's Exhibit AF);  Tan-O-On Marketing's Bank of Albuquerque Operating Account x505 November, 2009 statement passim, (Hi-Land Potato's Exhibit AG); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, November, 2009 Statement Detail passim (Hi-Land Potato's Exhibit AH); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, December, 2009 Statement passim (Hi-Land Potato's Exhibit AI); Tan-O-On Marketing's Bank

_____

[36] There is no cited testimony related to whether Frenchman Valley represented that it had been paid in full.

of Albuquerque Operating Account x505, December 2009 Statement Detail *passim* (Hi-Land Potato's Exhibit AJ); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, January, 2010 Statement Detail *passim* (Hi-Land Potato's Exhibit AK).

239. In mid-November, 2009, G. Anderson stopped payment of a check that Shannon Casey had written to Frenchman Valley, one of Tan-O-On Marketing's largest suppliers. See Oct. 25 Tr. at 941:8-944:22 (Robinson, Carla Worley).

240. Shannon Casey was so upset about the situation that he dropped what he was doing and drove from Monte Vista to Albuquerque to sort out the situation. See Oct. 25 Tr. at 941:8-944:22 (Robinson, Carla Worley).

241. When Shannon Casey returned to Monte Vista, Hi-Land Potato learned that the check was payable to Frenchman Valley Produce, a larger grower than Hi-Land Potato, and that Shannon Casey wired the money to Frenchman Valley to ensure payment. See Oct. 25 Tr. at 941:8-944:22 (Robinson, Carla Worley).

242. Carla Worley learned about the Frenchman-Valley-check incident through conversation with Shannon Casey. See Oct 25 Tr. at 941:8-944:1 (Bohnhoff, Carla Worley).

243. On November 15, 2009, Hi-Land Potato learned that a dispute had arisen between G. Anderson and Shannon Casey regarding what Tan-O-On Marketing's suppliers would be paid. See Oct. 24 Tr. at 599:10-600:8 (Robinson, Carla Worley).

244. In late November, 2009, while fully in control of Tan-O-On Marketing, Shannon Casey decided to open another account with Sunflower Bank in Monte Vista after G. Anderson stopped payment of the Frenchman Valley check. See Agreement for Tan-O-On Marketing's Sunflower Bank Account x507 at 1, dated November 23, 2009, admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit AM).

245.    Shannon Casey opened this account based on his lawyer's advice to keep G. Anderson from interfering with his attempts to pay customers.  See Oct. 25 Tr. at 941:8-944:1 (Robinson, Carla Worley); Casey Depo. at 28:17-29:10; id. at 211:24-212:5.[37]

246.    The account lists Tan-O-On Marketing's address as 2480 East Country Road, 6 N. in Monte Vista -- the same address as Hi-Land Potato.  See Casey Depo. at 130:2-131:2; Agreement for Tan-O-On Marketing's Sunflower Bank Account x507 at 1 (Hi-Land Potato's Exhibit AM).

247.    Shannon Casey opened this account without the Andersons' consent or input.  See Oct. 22 Tr. at 212:16-213:22 (Robinson, G. Anderson); id. at 214:10-214:25 (Robinson, G. Anderson); Casey Depo. at 182:14-182:23; id. at 211:24-212:2.

248.    Shannon and Shawna Casey were authorized signatories on the Sunflower Bank account.  See Agreement for Tan-O-On Marketing's Sunflower Bank Account x507 at 1 (Hi-Land Potato's Exhibit AM).

---

[37] Tan-O-On Marketing's counsel objected to cited questions as leading.  The Court will overrule the objection, for the reasons it gave in note 13.  That testimony provides:

> Q      Now, I understand your prior testimony.  You did not involve the Andersons in your decision to open up the Sunflower account?
>
> A      Correct.
>
> Q      Why didn't you involve them in that decision?
>
> A      I didn't want that account being tampered with, as the operating account was being tampered with.

Casey Depo. at 211:24-212:5.  The Court will overrule the objection.  The second question is not a leading question, but is open-ended.  Although the first question could be construed as a leading question, the Court infers that the question only summarizes Casey's prior testimony to reorient the witness and lay the groundwork for the second, non-leading question; it is more transitional than leading.  It is the answer to the second question which informs the Court's Finding of Fact.  The Court will, therefore, overrule the objection.

249.    Their signatory authority was not conditioned on their continued employment with Tan-O-On Marketing, and it was not otherwise limited or terminated.  See Agreement for Tan-O-On Marketing's Sunflower Bank Account x507 at 1 (Hi-Land Potato's Exhibit AM).

250.    Neither G. Anderson nor any other representative of Tan-O-On Marketing ever took any steps to terminate either of the Caseys' authority to write checks on any Tan-O-On Marketing bank account.  See Oct. 23 Tr. at 271:23-274:17 (Bohnhoff, G. Anderson).

251.    Hi-Land Potato understood in the fall of 2009 that Shannon Casey had taken over management and control of Tan-O-On Marketing; Hi-Land Potato had no notice of any restriction on his authority that would prevent him from opening the Sunflower Bank account and writing checks on it.  See Oct. 25 Tr. at 879:1-8 (Bohnhoff, Carla Worley).

252.    Hi-Land Potato banks at Sunflower Bank.  See Oct. 24 Tr. at 589:12-14 (Esquivel, Carl Worley).[38]

253.    Hi-Land Potato had no influence over or other participation with Shannon Casey's decision to open the second account, including in which bank he would open it, except that Carl Worley introduced Shannon Casey to the Sunflower Bank personnel.  See Oct. 24 Tr. at 532:18-533:6 (Robinson, Carl Worley); Casey Depo. at 29:6-10.

254.    Shannon Casey chose to use the Sunflower Bank account for deposits of shipments of Hi-Land Potato's and Metz Potato's potatoes: between November 23, 2009 and January 13, 2010, Tan-O-On Marketing deposited approximately $1,693,504.59 in proceeds

_____

[38] Skyline Potato and the Folson Farm Group ask the Court to conclude that "[t]he fact that Tan-O-On also began banking at Sunflower Bank meant that there was a shortened time for checks from Tan-O-On to Hi-Land to clear."  Skyline Potato's and the Folson Farm Group's FOF and COL ¶ 88, at 27.  The testimony cited to support this fact does not, however, support the proposed fact: although Carl Worley speculated that the time for funds to clear was low, he did not make a comparison between the speed with which checks would clear before Tan-O-On Marketing began to bank at Sunflower Bank and after Tan-O-On Marketing began to bank at Sunflower Bank.  See Oct. 24 Tr. at 590:16-591:20.  The Court will not, therefore, adopt this proposed fact.

from its sale of Hi-Land Potato's and Metz Potato's produce to Kroger Co., Larroc Limited, and Markon, Inc. into the Sunflower Bank account. See Oct. 24 Tr. at 665:16-666:1 (Esquivel, Carla Worley); Oct. 26 Tr. at 999:18-1000:1 (Bohnhoff, Wellborn); Casey Depo. at 36:24-37:10; Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, November, 2009 Statement Detail *passim* (Hi-Land Potato's Exhibit AH); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, December 2009 Statement Detail *passim* (Hi-Land Potato's Exhibit AJ); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, January, 2010 Statement Detail *passim* (Hi-Land Potato's Exhibit AK); Hi-Land Potato's Tan-O-On Marketing's Sunflower Bank Account x507, November, 2009 Statement *passim* (Hi-Land Potato's Exhibit AN); Tan-O-On Marketing's Sunflower Bank Account x507, December, 2009 Statement *passim* (Hi-Land Potato's Exhibit AO); Tan-O-On Marketing's Sunflower Bank Account x507, January, 2010 Statement *passim* (Hi-Land Potato's Exhibit AP).

255. Shannon Casey mailed payments from Tan-O-On Marketing's sale of potatoes shipped by Tan-O-On Marketing's other suppliers to Bank of Albuquerque and, later, to Gerald Anderson. See Casey Depo. at 37:16-39:12-39:20; id at 39:12-39:22; id. at 40:4-15; id. at 41:8-41:12; id. at 212:12-21; Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, October, 2009 Statement *passim* (Hi-Land Potato's Exhibit AE); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505 October, 2009 Statement Detail *passim* (Hi-Land Potato's Exhibit AF); Tan-O-On Marketing's Bank of Albuquerque Operating Account November, 2009 statement x505 *passim*, (Hi-Land Potato's Exhibit AG); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, November, 2009 Statement Detail *passim* (Hi-Land Potato's Exhibit AH); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, December, 2009 Statement *passim* (Hi-Land Potato's Exhibit AI); Tan-O-On Marketing's Bank

of Albuquerque Operating Account x505, December 2009 Statement Detail *passim* (Hi-Land Potato's Exhibit AJ); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, January, 2010 Statement Detail *passim* (Hi-Land Potato's Exhibit AK).[39]

256.   Shannon Casey used the Sunflower Bank account to make payments to Hi-Land Potato and the Bank of Albuquerque account to make payments to other suppliers.  See Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, November, 2009 Statement Detail *passim* (Hi-Land Potato's Exhibit AH); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, December 2009 Statement Detail *passim* (Hi-Land Potato's Exhibit AJ); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, January, 2010 Statement Detail *passim* (Hi-Land Potato's Exhibit AK); Hi-Land Potato's Tan-O-On Marketing's Sunflower Bank Account x507, November, 2009 Statement *passim* (Hi-Land Potato's Exhibit AN); Tan-O-On Marketing's Sunflower Bank Account x507, December, 2009 Statement *passim* (Hi-Land Potato's Exhibit AO); Tan-O-On Marketing's Sunflower Bank Account x507, January, 2010 Statement *passim* (Hi-Land Potato's Exhibit AP).

257.   Shannon Casey transferred, however, approximately $32,000.00 from the Sunflower Bank account to the Bank of Albuquerque account, and deposited Hi-Land Potato's checks in payment of Tan-O-On Marketing's sales agency fees in the Bank of Albuquerque account.  See Oct. 25 Tr. at 991:3-16 (Bohnhoff, Wellborn); Oct. 26 Tr. at 1000:7-13 (Bohnhoff, Wellborn); Casey Depo. at 36:24-37:10; Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, November, 2009 Statement Detail *passim* (Hi-Land Potato's Exhibit AH); Tan-

---

[39] Skyline Potato and the Folson Farm Group ask the Court to conclude that Shannon Casey mailed payments to Gerald Anderson "for deposit into Tan-O-On Marketing's operating account."  Skyline Potato's and the Folson Farm Group's FOF and COL ¶ 90, at 27.  The cited testimony does not, however, support this proposed purpose.  See Casey Depo. at 37:16-39:12-39:20; id at 39:12-39:22; id. at 40:4-15; id. at 41:8-41:12; id. at 212:12-21.  The Court will not, therefore, adopt this proposed fact.

O-On Marketing's Bank of Albuquerque Operating Account x505, December 2009 Statement Detail *passim* (Hi-Land Potato's Exhibit AJ); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, January, 2010 Statement Detail *passim* (Hi-Land Potato's Exhibit AK); Hi-Land Potato's Tan-O-On Marketing's Sunflower Bank Account x507, November, 2009 Statement *passim* (Hi-Land Potato's Exhibit AN); Tan-O-On Marketing's Sunflower Bank Account x507, December, 2009 Statement *passim* (Hi-Land Potato's Exhibit AO); Tan-O-On Marketing's Sunflower Bank Account x507, January, 2010 Statement *passim* (Hi-Land Potato's Exhibit AP).

258.    Between November 23, 2009 and January 13, 2010, Tan-O-On Marketing issued 17 checks from the Sunflower Bank account to Hi-Land Potato in the total amount of $1,660,603.04.   See Oct. 24 Tr. at 589:15-22 (Esquivel, Carl Worley); id. at 665:16-666:1 (Esquivel, Carla Worley); Oct. 26 Tr. at 1000:2-1000:6 (Bohnhoff, Wellborn).

259.    Hi-Land Potato was the only supplier paid from the Sunflower Bank account.   See Casey Depo. at 78:8-16.

260.    Tan-O-On Marketing paid Hi-Land Potato in full.   See Oct. 25 Tr. at 589:15-589:22 (Esquivel, Carl Worley).

261.    Hi-Land Potato received $88,190.15 over forty days after delivery.   See Oct. 24 Tr. at 666:2-669:19; Oct. 25 Tr. at 876:7-877:4 (Esquivel, Carla Worley); Second Supplemental Declaration of Carla Worley ¶¶ 4-5, at 2-3 (Hi-Land Potato's Exhibit CK).

262.    Shannon Casey did not hide the existence of Tan-O-On Marketing's Sunflower Bank account.   See Oct. 25 Tr. at 877:5-12 (Bohnhoff, Carla Worley).

263.    G. Anderson had access to and saw Tan-O-On Marketing's Bank of Albuquerque account statements, which reflected deposits of checks drawn on the Sunflower Bank account.

See Oct. 23 Tr. 274:19-276:15 (Bohnhoff, G. Anderson); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, November, 2009 Statement Detail at 44 (Hi-Land Potato's Exhibit AH).

264.    Hi-Land Potato did not have access to or control over Tan-O-On Marketing's Sunflower Bank account; indeed, Hi-Land Potato had no contact or other involvement with any of Tan-O-On Marketing's bank accounts.  See Oct. 25 Tr. at 877:5-879:8 (Bohnhoff, Carla Worley); Casey Depo. at 26:22-27:2.

265.    At all times the Sunflower Bank account was under Shannon Casey's exclusive control, and the funds deposited therein were freely available to satisfy Tan-O-On Marketing's outstanding obligations to Skyline Potato and the Folson Farm Group.  See Oct. 25 Tr. at 877:5-879:8 (Bohnhoff, Carla Worley); Casey Depo. at 26:22-27:2.

266.    Notwithstanding the physical proximity between Hi-Land Potato's office and the office Tan-O-On Marketing used at Hi-Land Potato's shed, Hi-Land Potato did not have any discussion with Shannon Casey about, and had no knowledge about, influence or control over, or participation with his decisions about which customer payment checks he would deposit in which Tan-O-On Marketing bank account, which suppliers he would pay with the funds that he had available in either the Sunflower Bank or the Bank of Albuquerque accounts, or whether he would pay Hi-Land Potato or any other supplier in preference over other suppliers out of either of these accounts.  See Oct. 25 Tr. at 877:16-879:3 (Bohnhoff, Carla Worley); id. at 973:9-17 (Robinson, Carla Worley).

267.    Hi-Land Potato did not influence Shannon Casey's decisions to pay amounts owed to Hi-Land Potato as opposed to other producers with the funds on deposit in the

Sunflower Bank account.   See Oct. 25 Tr. at 877:16-879:3 (Bohnhoff, Carla Worley); id. at 973:9-17 (Robinson, Carla Worley).[40]

268.   Skyline Potato's and the Folson Farm Group's loss resulted from Shannon Casey's unilateral decision that he was going to pay Hi-Land Potato in preference over them, irrespective where the funds he used were located; Skyline Potato and the Folson Farm Group would have suffered the same loss they suffered even if Shannon Casey had deposited the payments for the Hi-Land Potato shipments in Tan-O-On Marketing's Bank of Albuquerque account.[41]

269.   Because Skyline Potato and the Folson Farm Group did not attempt to locate and freeze any of Tan-O-On Marketing's bank accounts, that some of Tan-O-On Marketing's cash

---

[40] Tan-O-On Marketing asks the Court to find that the "arrangement between Hi-Land and [Tan-O-On Marketing] segregated monies paid to Tan-O-On from Kroger, Markon, and Larroc in order to ensure and speed up payment to Hi-Land Potato and Metz Potato." Tan-O-On Marketing's FOF and COL ¶ 30, at 58. The Court has reviewed the testimony that Tan-O-On Marketing cited to support this proposed fact and declines to adopt the proposed fact.

Tan-O-On Marketing first cites Wright's opinion that Shannon Casey selectively chose which producers he paid. See Oct. 23 Tr. at 411:10-411:22 (Robinson, Terry Wright). As the Court explained at the time,

> I think he stated what the basis of the belief is. All he said is these are things he believes, so I'll let him state what his beliefs are, but I don't think he's offered a basis for those beliefs in the statement, so to the extent that those are his beliefs, I'll admit them for his beliefs.

Oct. 23 Tr. at 412:9-13 (Court). Because Wright did not explain the basis for his belief for any other purpose and because of the Court's concerns about Wright's credibility, see note 73, the Court will not credit his testimony on this issue.

Tan-O-On Marketing's second source is Carla Worley's description of the arrangement. See Tan-O-On Marketing's FOF and COL ¶ 30, at 58 (citing Oct. 25 Tr. at 968:9-973:8 (Bohnhoff, Carla Worley)). Nothing in Carla Worley's testimony supports this proposed fact. The Court, therefore, declines to adopt the proposed fact.

[41] The Court makes this finding on the preponderance of the evidence based on the totality of the record.

was deposited in Sunflower Bank did not stymy any effort by Skyline Potato or the Folson Farm Group to take assets. [42]

270. That is, Skyline Potato and the Folson Farm Group were not impaired in obtaining payment for their shipments because some portion of the PACA trust *res* was deposited in the Sunflower Bank account. [43]

271. More customer payments were deposited into and more funds were paid out of Tan-O-On Marketing's Bank of Albuquerque account than the Sunflower Bank account during the period from October, 2009, through January, 2010. See Oct. 25 Tr. at 990:10-991:23 (Bohnhoff, Wellborn); Oct. 26 Tr. at 997:17-1000:20 (Bohnhoff, Wellborn); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505 October, 2009 Statement Detail *passim* (Hi-Land Potato's Exhibit AF); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, November, 2009 Statement Detail *passim* (Hi-Land Potato's Exhibit AH); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, December 2009 Statement Detail *passim* (Hi-Land Potato's Exhibit AJ); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, January, 2010 Statement Detail *passim* (Hi-Land Potato's Exhibit AK); Hi-Land Potato's Tan-O-On Marketing's Sunflower Bank Account x507, November, 2009 Statement *passim* (Hi-Land Potato's Exhibit AN); Tan-O-On Marketing's Sunflower Bank Account x507, December, 2009 Statement *passim* (Hi-Land Potato's Exhibit AO); Tan-O-On Marketing's Sunflower Bank Account x507, January, 2010 Statement *passim* (Hi-Land Potato's Exhibit AP).

---

[42] The Court makes this finding on the preponderance of the evidence based on the totality of the record.

[43] The Court makes this finding on the preponderance of the evidence based on the totality of the record.

272.    Numerous suppliers were paid for potato shipments out of the Bank of Albuquerque account between October, 2009, and January, 2010: for example, approximately $1.3 million was paid to Frenchman Valley, and $295,464 was paid to Skyline Potato and the Folson Farm Group, including payments that were made as late as December 6, 2010.  See Oct. 22 Tr. at 85:15-86:20 (Bohnhoff, Folson); id. at 89:10-24 (Bohnhoff, Folson); id. at 106:2-25 (Bohnhoff, Sill); id. at 134:16-136:8 (Bohnhoff, Peterson); Oct. 25 Tr. at 991:17-23 (Bohnhoff, Wellborn); Oct. 26 Tr. at 997:17-998:22 (Bohnhoff, Wellborn); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, 12/09 Statement Detail at 72 (Hi-Land Potato's Exhibit AJ); Vendor Balance Detail: All Transactions at 13 (Tan-O-On Marketing's Exhibit 4(a)).

**12.    Hi-Land Potato's Direct Sales to Kroger Co. and Other Customers.**

    **A.    Kroger Co.'s Records.**

273.    Under the limited billing, bookkeeping, and collection arrangement that Hi-Land Potato worked out with Tan-O-On Marketing in October, 2009, Shannon Casey was to notify the customers to whom Hi-Land Potato and Metz Potato shipped potatoes that Hi-Land Potato would be billing directly and arrange for the customers to pay Hi-Land Potato directly for those shipments.  See Oct. 24 Tr. at 627:16-628:7 (Robinson, Carla Worley); id. at 643:22-644:8 (Robinson, Carla Worley); id. at 676:7-25 (Esquivel, Carla Worley); Oct. 25 Tr. at 870:11-20 (Bohnhoff, Carla Worley); id. at 889:24-890:7 (Bohnhoff, Carla Worley).

274.    Hi-Land Potato understood that this arrangement would involve a substitution of the entity being paid and not a change of Tan-O-On Marketing's name to Hi-Land Potato.  See Oct. 24 Tr. at 627:16-628:7 (Robinson, Carla Worley); id. at 643:22-644:8 (Robinson, Carla Worley); id. at 646:12-14 (Robinson, Carla Worley); id. at 672:6-9 (Esquivel, Carla Worley); id.

at 676:7-25 (Esquivel, Carla Worley); Oct. 25 Tr. at 870:11-20 (Bohnhoff, Carla Worley); id. at 889:24-890:7 (Bohnhoff, Carla Worley).

275.    Shannon Casey did not promptly notify and make arrangements with Kroger Co., Larroc Limited, and Markon, Inc. for direct billing by and payment to Hi-Land Potato.  See Oct. 24 Tr. at 627:24-628:7 (Robinson, Carla Worley); id. at 676:7-678:2 (Jaramillo, Carla Worley).

276.    As of late November, 2009, Kroger Co. continued to send payments payable to Tan-O-On Marketing and not to Hi-Land Potato.  See Oct. 25 Tr. at 889:3-890:20 (Bohnhoff, Carla Worley).

277.    Carla Worley and Shannon Casey discussed the status of Shannon Casey changing the remittance information with Kroger Co. to ensure Kroger Co. paid Hi-Land Potato directly.  See Oct. 25 Tr. at 889:3-890:20 (Bohnhoff, Carla Worley).

278.    A third discussion took place in mid-December, 2009, and Hi-Land Potato understood that Shannon Casey had taken care of the Kroger Co. payment arrangement.  See Oct. 25 Tr. at 889:3-890:20 (Bohnhoff, Carla Worley).

279.    Hi-Land Potato never had a Kroger Co. vendor number, never entered into a Kroger Co. vendor agreement, and never procured the required insurance.  See Oct. 23 Tr. at 481:16-482:3 (Robinson, Carl Worley); Oct. 24 Tr. at 556:25-557:13 (Robinson, Carl Worley); id. at 557:15-562:11 (Robinson, Carl Worley); id. at 565:9-568:9 (Robinson, Carl Worley); id. at 581:12-581:20 (Jaramillo, Carl Worley); id. at 588:8-589:6 (Esquivel, Carl Worley); id. at 650:17-651:1 (Robinson, Carla Worley); id. at 662:17-664:20 (Jaramillo, Carla Worley); Oct. 25 Tr. at 893:12-894:21 (Robinson, Carla Worley); id. at 933:23:-934:22 (Robinson, Carla Worley); id. at 937:22-941:7 (Robinson, Carla Worley); id. at 951:3-953:25 (Robinson, Carla Worley); id. at 959:11-960:15 (Robinson, Carla Worley).

280.     Instead, Kroger Co. told Hi-Land Potato that it was easier for Tan-O-On Marketing to simply change its name and address to Hi-Land Potato's by filling out a two-page change-of-address form than it would be for Hi-Land Potato to complete the Kroger vendor agreement and apply for a Kroger vendor number.  See Oct. 24 Tr. at 553:20-555:8 (Robinson, Carl Worley); id. at 561:5-562:11 (Robinson, Carl Worley); id. at 562:24-563:13 (Robinson, Carl Worley); id. at 565:9-567:5 (Robinson, Carl Worley).[44]

281.     The Kroger vendor agreement signed by Tan-O-On Marketing requires the supplier to "notify Kroger's Accounts Payable in writing of any change to Vendor's 'remit to address.'  Failure to do so will delay future payments.  Notification information for the various Kroger entities is available from the Kroger representative."   Oct. 25 Tr. at 937:4-939:2 (Robinson, Carla Worley); Application to Kroger, Co. from Tan-O-On Marketing at Bates 005 (dated April 20, 2007), admitted October 19, 2012, at PTC as Tan-O-On Marketing's Exhibit 17.[45]

282.     Carl Worley and Carla Worley discussed the fact that Kroger Co. advised Tan-O-On Marketing to simply change its name to Hi-Land Potato, and Hi-Land Potato readily complied with Kroger Co.'s instructions.  See Oct. 24 Tr. at 562:24-563:13 (Robinson, Carl Worley); id. at 565:9-567:5 (Robinson, Carl Worley); Oct. 25 Tr. at 922:9-19 (Robinson, Carla

---

[44] The Court considers this testimony about Kroger Co.'s statements only insofar as the testimony explains Hi-Land Potato's decision to fill out the change-of-address form and not for the truth of the matters that Kroger Co. asserted.

[45] The trial transcript says that this statement comes from "Defendant/Third-Party Plaintiffs' Exhibit 37 Bates 005," and Tan-O-On cites this exhibit in its Proposed Findings of Fact and Conclusions of Law.  Oct. 25 Tr. at 937:6 (Robinson); Tan-O-On Marketing's FOF and COL ¶ 108, at 32.  Exhibit 37 is unrelated to the subject of this finding, and the quoted language appears in Exhibit 17.

Worley); <u>id.</u> at 923:7-924:17 (Robinson, Carla Worley); <u>id.</u> at 939:23-941:7 (Robinson, Carla Worley).

283.    Hi-Land Potato made this change because it was critical to maintain the relationship with Kroger Co. and to ensure that Hi-Land Potato could continue to sell directly to Kroger Co.  <u>See</u> Oct. 24 Tr. at 554:6-9 (Robinson, Carl Worley); <u>id.</u> at 561:18-562:11 (Robinson, Carl Worley); <u>id.</u> at 563:9-21 (Robinson, Carl Worley).[46]

284.    Kroger Co.'s files contain a letter on Hi-Land Potato's letterhead that Shannon Casey sent to Kroger Co. late in the evening of December 29, 2009, stating that Tan-O-On Marketing was changing its name to Hi-Land Potato.  <u>See</u> Kroger Affidavit, Amended Affidavit and Documents at KR000011-KR000013 (no date provided), admitted in relevant part October 19, 2012 as Skyline Potato and the Folson Group's Exhibit 30.

285.    This statement was false: (i) Hi-Land Potato was not aware of and had no involvement with the December 29, 2009 letter, other than Hi-Land Potato had given Shannon Casey a signed IRS form W-9; (ii) Hi-Land Potato never agreed that Tan-O-On Marketing could change its name to Hi-Land Potato, or to any merger or other combination of the companies that would have that end result; (iii) Hi-Land Potato had never authorized Shannon Casey to use its letterhead or to state that Tan-O-On Marketing had changed its name to Hi-Land Potato.  <u>See</u>

---

[46]    While Carla Worley attempts to discredit her father's testimony as the product of confusion by an 82-year-old man, he has never been deemed incompetent or unfit to testify until he offered potentially damaging testimony.  <u>See</u> Oct. 25 Tr. at 891:9-891:16 (Bohnhoff, Carla Worley); <u>id.</u> at 893:4-893:11 (Robinson, Carla Worley); <u>id.</u> at 908:4-909:10 (Esquivel, Carla Worley); <u>id.</u> at 919:19-920:9 (Robinson, Carla Worley); <u>id.</u> at 933:23-934:22 (Robinson, Carla Worley); <u>id.</u> at 944:24-946:11 (Robinson, Carla Worley).  The Court finds Ms. Worley's attempt to discredit her father's testimony as a general matter unpersuasive.
    The Court notes that the trial transcript at 891:9 states that Mr. Robinson was questioning Carla Worley.  From the context, it is clear that this statement was a typographical error and that the true questioner was Mr. Bohnhoff.  <u>See</u> Oct. 25 Tr. at 891:9-25 (Bohnhoff, Jaramillo, Court, Bohnhoff, Robinson).

Oct. 24 Tr. at 552:5-11 (Robinson, Carl Worley); Oct. 25 Tr. at 886:16-888:23 (Bohnhoff, Carla Worley); id. at 935:1-8 (Robinson, Carla Worley).[47]

286.    Kroger Co. has documents showing that, somewhere between December 29, 2009, and January 4, 2010, Kroger Co. changed Tan-O-On Marketing's name and address from 7110 Second Street, NW, Albuquerque, New Mexico to Hi-Land Potato, 2468 East County Road 6 North, Monte Vista, Colorado.  See Kroger Affidavit, Amended Affidavit and Documents at KR000009, KR000014; Oct. 25 Tr. at 553:6-19 (Robinson, Carl Worley); id. at 565:9-568:9 (Robinson, Carl Worley); id. at 572:2-574:5 (Robinson, Carl Worley); id. at 620:25-621:9 (Robinson, Carla Worley); id. at 647:21-648:12 (Robinson, Carla Worley).[48]

---

[47] Kroger Co.'s internal and other records reflecting the administrative arrangements it made in connection with the substitution of Hi-Land for Tan-O-On Marketing as the entity that would be paid for potato shipments from Hi-Land Potato are inconsistent.  While some of the forms suggest an understanding that Tan-O-On Marketing was changing its name to Hi-Land Potato, see Kroger Affidavit, Amended Affidavit and Documents at KR000010, other forms, particularly the IRS Forms W-9, reflect an understanding that Hi-Land Potato was being substituted as a different entity that would be selling the potatoes to Kroger Co. and being paid for them, see Kroger Affidavit, Amended Affidavit and Documents at KR000012, KR000014, KR000015, KR000017.

[48] The Court notes admitted the documents on which it relies here only to show what information Kroger Co. received and what Kroger Co. did with that information, but not for the truth of the matters that the documents assert.  See Oct. 24 Tr. at 550:19-551:4 (Court); id. at 565:4-9 (Court); id. at 572:2-7 (Robinson, Bohnhoff, Court).

It is impossible to determine whether the Kroger Co. employees who filled out the forms were confused as a result of Shannon Casey's actions and misunderstood that Tan-O-On Marketing was changing its name to Hi-Land Potato, or whether they correctly understood that Hi-Land Potato had been substituted as a different entity that would be paid for the potato shipments and deliberately filled out the wrong forms for purposes of expediency.  Skyline Potato, the Folson Farm Group, and Tan-O-On Marketing did not obtain the testimony of a Kroger, Co. employee who could explain the documents and what happened.  Because Skyline Potato, the Folson Farm Group, and Tan-O-On Marketing bore the burden to prove that Kroger Co. understood that Tan-O-On Marketing had changed its name to Hi-Land Potato, these documents do not disturb the Court's finding that Kroger Co. did not understand that Tan-O-On Marketing had changed its name to Hi-Land Potato.

287.    Within the limits of honesty and legality, Hi-Land Potato was always willing to do what was necessary to accomplish the change in the entity that was being paid for the shipments.  See Oct. 24 Tr. at 614:6-616:17 (Robinson, Carla Worley); Oct. 25 Tr. at 887:14-25 (Bohnhoff, Carla Worley); id. at 888:13-889:7 (Bohnhoff, Carla Worley); id. at 891:9-12 (Bohnhoff, Carla Worley); id. at 893:4-9 (Robinson, Carla Worley); id. at 923:10-15 (Robinson, Carla Worley); id. at 981:20-982:3 (Bohnhoff, Carla Worley).

288.    Hi-Land Potato had no part in the creation of the Kroger Co. records, and no Hi-Land Potato employees ever spoke with anyone at Kroger Co. or otherwise knew about these records.  See Oct. 24 Tr. at 614:6-616:17 (Robinson, Carla Worley); Oct. 25 Tr. at 887:14-25 (Bohnhoff, Carla Worley); id. at 888:13-889:7 (Bohnhoff, Carla Worley); id. at 891:9-12 (Bohnhoff, Carla Worley); id. at 893:4-9 (Robinson, Carla Worley); id. at 923:10-15 (Robinson, Carla Worley); id. at 981:20-982:3 (Bohnhoff, Carla Worley).[49]

289.    Candy Mercuri was Kroger Co.'s potato buyer for the entire country in 2009 and 2010; she decided which suppliers would be given purchase orders from Kroger Co.  See Transcript of Deposition of Candy Mercuri at 8:19-25, taken May 9, 2012, admitted in relevant part on October 26, 2012)("Mercuri Depo.").[50]

---

[49] The Court declines to adopt Skyline Potato's and the Folson Farm Group's contrary finding of fact, see Skyline Potato's and the Folson Farm Group's FOF and COL ¶ 104, at 31, because Carla Worley's disclaimer of knowledge is credible.

The Court also declines to adopt Tan-O-On Marketing's proposed finding that "Carl Worley admits that if transferring the Kroger vend[o]r number is more than a bookkeeping procedure then they got the wrong advice," Tan-O-On Marketing's FOF and COL ¶ 113, at 34, because the testimony that Tan-O-On Marketing cites for this statement does not support the statement.  See Oct. 24 Tr. at 562:1-6 (Robinson, Carl Worley).

[50] The Court admitted the designated portions of Candy Mercuri's deposition on October 26, 2012.  See Oct. 26 Tr. at 1024:10-23 (Court, Jaramillo, Esquivel, Robinson, Bohnhoff).

290.    Mercuri knew that: (i) Tan-O-On Marketing had stopped acting as Hi-Land Potato's sales agent and otherwise doing business, see Mercuri Depo. at 25:16-26:8; id. at 28:23-29:13; id. at 32:11-33:5; id. at 107:14-108:6;[51] and (ii) Hi-Land Potato, a separate entity, was now selling potatoes directly to Kroger Co., see Mercuri. Depo. at 28:23-29:13; id. at 32:11-33:5.

291.    Mercuri did not, therefore, understand that Tan-O-On Marketing had changed its name to Hi-Land Potato, but thought that Tan-O-On Marketing was no longer doing business. See Mercuri Depo. at 25:16-26:8; id. at 28:23-29:13; id. at 32:11-33:5; id. at 107:14-108:6.

292.    Kroger Co.'s direct purchases of potatoes from Hi-Land Potato did not result from a belief that Tan-O-On Marketing had changed its name to Hi-Land Potato; it instead resulted from Kroger, Co.'s long history with Hi-Land Potato.  See Mercury Depo. at 150:23-151:7.

### B.    Kroger Co. Vendor Number.

293.    Hi-Land Potato was never aware that Tan-O-On Marketing had a Kroger Co. vendor number, or that Kroger Co. had assigned a Kroger Co. vendor number to Hi-Land Potato. See Oct. 25 Tr. at 893:15-23 (Robinson, Carla Worley); Casey Depo. at 31:21-32:2.

294.    Kroger Co. vendor numbers are not treated as confidential information.  See Oct. 23 Tr. at 300:23-302:18 (Bohnhoff, G. Anderson); Casey Depo. at 215:14-22: Mercuri Depo. at 127:8-14; Application to Kroger, Co. from Tan-O-On Marketing at Bates 006 (Tan-O-On Marketing Exhibit 17).[52]

---

[51] Counsel for the Folson Farm Group objected to the form of  the following question: "So you could not have sent a purchase order to Tan-O-On at any point after January of 2010, correct?"  Mercuri Depo. at 1707:18-21.  The Court will overrule the objection, because the question is clear.

[52] It was Tan-O-On Marketing's burden to demonstrate that Kroger Co. vendor numbers are treated as confidential  It has not carried that burden: there is no evidence that the assignment of a Kroger Co. vendor number is anything other than a routine, administrative function for record-keeping purposes.  The Court, therefore, concludes that its finding has a sound basis in the facts.

295.    Mercuri, who made potato buying decisions for Kroger Co., did not use the vendor numbers in her work.  See Mercuri Depo. at 19:21-20:1; id. at 48:2-9; id. at 124:20-126:3.

296.    A Kroger Co. vendor number is not anything other than a routine, administrative function for record-keeping purposes.[53]

297.    It is solely up to Kroger Co. to assign a given Kroger Co. vendor number to a supplier or to take way that vendor number.  See Oct. 23 Tr. at 300:8-16 (Bohnhoff, G. Anderson).

298.    Anderson did not believe Tan-O-On Marketing could sell its Kroger Co. vendor number.  See Oct. 23 Tr. at 300:8-16 (Bohnhoff, G. Anderson); Mercuri Depo. at 108:7-22; id. at 109:11-110:2; id. at 116:2-14.

299.    Kroger Co. was always free to terminate its vendor agreement with Tan-O-On Marketing.  See Oct. 23 Tr. at 298:6-8 (Bohnhoff, G. Anderson); id. at 300:5-7 (Bohnhoff, G. Anderson).

### C.    Kroger Co.'s  Buying Decisions.

300.    For the most part, Kroger Co. buys directly from growers and not from brokers or sales agents.  See Mercuri Depo. at 44:5-12;[54] id. at 117:18-118:6.

---

[53] It was Tan-O-On Marketing's burden to demonstrate that a vendor number is treated as a trade secret.  It has not carried that burden: there is no evidence that the assignment of a Kroger Co. vendor number is anything other than a routine, administrative function for record-keeping purposes.  The Court, therefore, concludes that its finding has a sound basis in the facts.

[54] Hi-Land Potato's counsel objected to the form of one question within this citation.  See Mercuri Depo. at 44:7.  He did not, however, object to the form of the question that elicited this response.  Moreover, Hi-Land Potato cited this section of the deposition in its proposed findings of fact and conclusions of law.  See Hi-Land Potato's FOF and COL ¶ 103, at 27.  Hi-Land Potato's citation of this portion of the deposition indicates that it no longer wishes to pursue the objection.  The Court will, therefore, overrule the objection; moreover, there is no problem with the question's form.

301.     Kroger Co. viewed Hi-Land Potato -- not Tan-O-On Marketing -- as its supplier of potatoes.  See  Mercuri Depo. at 32:11-33:5; id. at 94:23-95:8;[55] id. at 105:18-106:8.[56]

302.     Kroger Co. chose to buy Hi-Land Potato's potatoes, not because of any relationship that Tan-O-On Marketing cultivated or because of Tan-O-On Marketing's vendor number, but because it valued Hi-Land Potato's product and had a  long history of buying from Hi-Land Potato.  See Mercuri Depo. at 32:11-33:5; id. at 141:22-142:13; id. at 150:22-151:7.

303.     Under Kroger Co.'s standard procedure, the assignment of a Kroger Co. vendor number would have followed Mercuri's decision to buy potatoes directly from Hi-Land Potato; the claim to using a vendor number does not precede the buying decision.  See  Mercuri Depo. at 141:22-142:13.[57]

---

[55] Hi-Land Potato's counsel objected to the form of two questions within this citation. See Mercuri Depo. at 94:5, 95:1.  Hi-Land Potato cited this section of the deposition in its proposed findings of fact and conclusions of law.  See Hi-Land Potato's FOF and COL ¶ 103, at 27.  Hi-Land Potato's citation of this portion of the deposition indicates that it no longer wishes to pursue the objection.  The Court will, therefore, overrule the objection; moreover, although the second question could have been clearer, the lack of clarity does not undermine the purpose for which the Court cites Mercuri's testimony -- i.e., to establish that Kroger, Co. considered Hi-Land Potato and not Tan-O-On Marketing to be its potato supplier.

[56] Hi-Land Potato asks the Court to find that "Kroger Co. understood [Tan-O-On Marketing's] role was that of sales agent."  Hi-Land Potato's FOF and COL ¶ G.103, at 27.  The Court has reviewed the testimony that supports this view and determined that it stretches the testimony too far.  Mercuri acknowledged, in passing, that Hi-Land Potato had sold to Kroger, Co. "through Tan-O-On" Marketing, but did not state that Hi-Land Potato knew that Tan-O-On Marketing was a sales agent.  Mercuri Depo. at 33:2-5.  Although the Court finds that Kroger, Co. knew that Hi-Land Potato was its supplier of potatoes -- which implicitly excludes Tan-O-On Marketing as its supplier of potatoes -- the Court does not think that negative implication extends to allow the Court to find that Kroger, Co. defined Tan-O-On Marketing's role as that of a sales agent.

[57] There is no evidence that Hi-Land Potato's other customers -- namely, Larroc Limited and Markon, Inc. -- were any different.

### D.      Hi-Land Potato's Direct Sales.

304.    Hi-Land Potato had direct and longstanding relationships with some of its customers.  See Oct. 25 Tr. at 836:7-837:11 (Bohnhoff, Carla Worley); Mercuri Depo. at 150:23-151:7.

305.    Tan-O-On Marketing and Hi-Land Potato never had a non-compete agreement. See Oct. 22 Tr. at 147:17-20 (Robinson, G. Anderson); Oct. 23 Tr. at 296:15-298:5 (Bohnhoff, G. Anderson); id. at 474:13-25 (Robinson, Carl Worley).

306.    Hi-Land Potato was always free to terminate its relationship with Tan-O-On Marketing at any time; Hi-Land Potato was under no contractual or other prohibition from using another broker or sales agent, or from selling potatoes directly to customers.  See Oct. 22 Tr. at 147:17-20 (Robinson, G. Anderson); Oct. 23 Tr. at 296:15-298:5 (Bohnhoff, G. Anderson); id. at 474:13-25 (Robinson, Carl Worley).

307.    Hi-Land Potato was always free to hire Shawna Casey: Tan-O-On Marketing did not have a non-compete agreement with Shawna Casey, and G. Anderson was unaware of any such agreement that would prevent her from leaving Tan-O-On Marketing and joining a competitor or Hi-Land Potato.  See Oct. 23 Tr. at 303:1-6 (Bohnhoff, G. Anderson); Oct. 24 Tr. at 651:24-652:1 (Robinson, Carla Worley).

308.    Hi-Land Potato neither took advantage of Tan-O-On Marketing's relationship with Kroger Co. or any other customer, nor appropriated that relationship by causing Kroger Co. to believe that Tan-O-On Marketing was changing its name to Hi-Land Potato, as opposed to Hi-

Land Potato being substituted as a new supplier.  See Casey Depo. at 24:16-24;[58] Mercuri Depo. at 25:16-26:0; id. at 28:23-29:13; id. at 32:11-33:5; id. at 150:23-151:7.

### 13. **Late December, 2009: Shannon Casey Leaves Tan-O-On Marketing**.

309.   On December 29 or 30, 2009, Shannon Casey told Carla Worley that he and Shawna were going to be leaving Tan-O-On Marketing.   See Oct. 24 Tr. at 598:19-599:9 (Robinson, Carla Worley); id. at 639:7-11 (Robinson, Carla Worley); id. at 658:13-16 (Jaramillo, Carla Worley); id. at 658:13-16 (Jaramillo, Carla Worley); id. at 659:12-17 (Jaramillo, Carla Worley).

---

[58] Counsel for Tan-O-On Marketing, Skyline Potato, and the Folson Farm Group objected to certain questions in the cited section, stating that they are leading questions.  This section of the testimony reads:

Q.     All right.  Did you ever agree with Hi-Land to give away Tan-O-On's business to Hi-Land?

A.     No.

Q.     Did you ever agree to give Tan-O-On's customers to Hi-Land?

A.     No.

Q.     Did you ever consider that you had it within your power to give Kroger's business to Hi-Land?

A.     No.

Casey Depo. at 24:16-24.  The Court will overrule the objection, because the questions do not suggest the answer; indeed, it is difficult to think of another way to phrase these questions that would obtain the same information.

Counsel for the Folson Farm Group also registered "a standing objection to the leading nature of the question being asked during the entire course of this deposition."  Casey Depo. at 25:19-23.  When pressed for more specificity, counsel conceded that the characterization that "all" of Hi-Land Potato's questions were leading "may not be accurate," but stated that "the bulk of the questions are leading."  Casey Depo. at 25:25-26:5.  Such a vague objection, without more specificity, does not allow the Court to rule on whether any particular question is proper.  Moreover, the Court's review of Hi-Land Potato's questions does not reveal that they were leading.  The Court will, therefore, overrule the Folson Farm Group's standing objection.

310.     Hi-Land Potato understood that Shannon Casey would be staying for some period of time to wrap up Tan-O-On Marketing's business.   See Oct. 25 Tr. at 954:14-956:22 (Robinson, Carla Worley).[59]

311.     Shannon Casey did not tell Carla Worley that he had resigned effective as of December 20, 2009.   See Oct. 25 Tr. at 883:19-884:2 (Bohnhoff, Carla Worley).

312.     Hi-Land Potato did not influence or otherwise participate in the Caseys' decision to leave Tan-O-On Marketing.[60]

313.     Wright spoke with Carl Worley in a telephone call, in which he informed Carl Worley that Shannon Casey had sent him a letter stating that "Tan-O-On is going to be subsumed as a part of Hi-Land Potato" and that any creditors would be paid.   Oct. 23 Tr. at 366:13-23 (Robinson, Wright).

314.     Shannon Casey later said the statements in the letter were "wishful thinking" and "a mistake."   Casey Depo. at 30:2-20; id. at 109:12-110:1; id. at 111:17-20; id. at 183:25-184:8; id. at 186:21-190:14; id. at 222:14-223:8.[61]

---

[59] The Court declines to adopt Skyline Potato's and the Folson Farm Group's contrary proposed finding, see Skyline Potato's and the Folson Farm Group's FOF and COL ¶ 105, at 31, because the evidence does not show that Hi-Land Potato knew that Tan-O-On Marketing was closing its doors.   Indeed, the evidence that Skyline Potato and the Folson Farm Group cite supports the opposite proposition: that Shannon Casey would no -longer work for Tan-O-On Marketing, but that Hi-Land Potato did not know that Tan-O-On Marketing was closing its doors.   See Oct. 24 Tr. at 658:13-16 (Jaramillo, Carla Worley).

[60] It was Skyline Potato's, the Folson Group's, and Tan-O-On Marketing's burden to demonstrate that Hi-Land Potato influenced Shannon Casey's decision to leave, but those parties introduced no evidence of that proposition.   Because those parties did not carry their burden of proof, the Court makes this finding.

[61] Tan-O-On Marketing asks the Court to conclude that Casey would not "have sent the letter if he believed the statements were false when written."   Tan-O-On Marketing's FOF and COL ¶ 116, at 34-35.   The Court has reviewed the testimony that Tan-O-On Marketing cited for this proposition and determined that it does not support Tan-O-On Marketing's proposed fact. See Tan-O-On Marketing's FOF and COL ¶ 116, at 34-35 (citing Casey Depo. at 30:2-20; id. at

315.    In January, 2010, Wright began calling the companies from which he bought produce on Tan-O-On Marketing's behalf, and learned that Tan-O-On Marketing had not paid for a substantial amount of produce[62] and that payments to those suppliers stopped in October, 2009.  See Oct. 23 Tr. at 352:11-354:7 (Robinson, Wright); id. at 390:9-17 (Bohnhoff, Wright).[63]

### 14.    **Hi-Land Potato's Responds to Shannon Casey's Departure From Tan-O-On Marketing.**

316.    Once Hi-Land Potato learned that Shannon Casey and Shawna Casey would be leaving Tan-O-On Marketing, Hi-Land Potato faced an urgent problem: it needed to make alternative arrangements for someone to continue arranging sales and shipments of Hi-Land Potato's potatoes to its customers.  See Oct. 23 Tr. at 283:14-21 (Bohnhoff, G. Anderson); id. at 476:6-478:18 (Robinson, Carl Worley); id. at 482:21-484:1 (Robinson, Carl Worley); id. at 485:20-486:8 (Robinson, Carl Worley); Oct. 25 Tr. at 977:15-979:18 (Robinson, Carla Worley).

317.    Hi-Land Potato had a number of customers, including Kroger Co., to whom they made regular, including daily, shipments of potatoes.  See Oct. 23 Tr. at 283:14-21 (Bohnhoff, G. Anderson); id. at 476:6-478:18 (Robinson, Carl Worley); id. at 482:21-484:1 (Robinson, Carl Worley); id. at 485:20-486:8 (Robinson, Carl Worley); Oct. 25 Tr. at 977:15-979:18 (Robinson, Carla Worley).

318.    If Hi-Land Potato could not find someone immediately to continue arranging shipments of potatoes to them, Hi-Land Potato could lose these customers' business.  See Oct. 23

_____

109:12-110:1; id. at 111:17-20; id. at 183:25-184:8; id. at 186:21-190:14; id. at 222:14-223:8). At most, the testimony supports the notion that Shannon Casey believed that Tan-O-On Marketing was shutting down operations and not that it would be subsumed into Hi-Land Potato. The Court, therefore, declines to adopt this fact.

[62] Wright estimated this amount at $649,000.  The Court does not believe that this is an accurate figure, for the reasons the Court discussed in note 29.

[63] Hi-Land Potato asks the Court to find that: "On December 31, 2009, Terry Wright learned that he was being terminated from Tan-O-On Marketing."

Tr. at 283:14-21 (Bohnhoff, G. Anderson); id. at 476:6-478:18 (Robinson, Carl Worley); id. at 482:21-484:1 (Robinson, Carl Worley); id. at 485:20-486:8 (Robinson, Carl Worley); Oct. 25 Tr. at 977:15-979:18 (Robinson, Carla Worley).

319.    Carl Worley first tried to contact G. Anderson to find out if he would continue selling potatoes for Hi-Land Potato after Shannon Casey left Tan-O-On Marketing.  See Oct. 23 Tr. 476:6-478:12 (Robinson, Carl Worley); id. at 482:4-484:1 (Robinson, Carl Worley); id. at 485:23-486:25 (Robinson, Carl Worley); id. at 487:14-20 (Robinson, Carl Worley).[64]

320.    Anderson never returned Worley's calls.  See Oct. 23 Tr. 476:6-478:12 (Robinson, Carl Worley); id. at 482:4-484:1 (Robinson, Carl Worley); id. at 485:23-486:25 (Robinson, Carl Worley); id. at 487:14-20 (Robinson, Carl Worley).

---

[64] The evidence that Tan-O-On Marketing offered to rebut Carl Worley's testimony, which Carla Worley corroborated, about his late December calls to G. Anderson is not persuasive.  While G. Anderson denies that Carl Worley tried to call him, see Oct. 23 Tr. at 322:8-11 (Bohnhoff, G. Anderson), in view of Anderson's illness, his memory at the end of December, 2009, is questionable.  In any event, Anderson admits that he made no affirmative effort to contact Hi-Land Potato and offer to continue serving as its sales agent.  See Oct. 23 Tr. at 283:22-24 (Bohnhoff, G. Anderson).

Hi-Land Potato raised a second rebuttal to the evidence that Tan-O-On Marketing offered to rebut Carl Worley's testimony: in its view,

> the phone records introduced by [Tan-O-On Marketing, see Service Detail -- Long Distance Usage (dated December 16, 2009), admitted October 25, 2013 at trial as Tan-O-On Marketing's Exhibit 38,] are incomplete.  They do not show Hi-Land's cell phone usage, and they do not even contain itemization of all long distance calls made on Hi-Land's multiple land lines ((719) 852-4096, (719) 852-4097, (719) 852-5453 and (719) 852-5550 (see HLPC5545)).  These documents, therefore, are not evidence that Worley, who did not have a specific phone line of his own, Tr. 950:16-20, did not try to call Anderson.

Hi-Land Potato's FOF and COL at 18 n.4.  Hi-Land Potato did not, however, provide a copy of HLPC5545, and the Court's copy of Tan-O-On Marketing's Exhibit 38 does not include that page.  Because the Court cannot independently verify Hi-Land Potato's argument, it does not base its conclusion on this argument.

321.    Hi-Land Potato could not hire Shannon Casey, because he had signed a non-compete agreement with Tan-O-On Marketing.  See Shannon Casey Employment Agreement ¶ 5, at 3 (Hi-Land Potato's Exhibit G).

322.    After trying unsuccessfully to reach G. Anderson, out of necessity,[65] Hi-Land Potato hired Shawna Casey to fill the salesperson role on a temporary basis.  See Oct. 24 Tr. at 597:16-598:24 (Robinson, Carla Worley); id. at 639:7-17 (Robinson, Carla Worley); id. at 659:12-662:16 (Jaramillo, Carla Worley); Hi-Land Potato's Employment Files Related to Shannon and Shawna Casey at HLPC 0163-0185 (various dates), admitted October 19, 2012, at PTC as Tan-O-On Marketing's Exhibit 29.

323.    Although she was inexperienced, Hi-Land Potato was "stop-gapping a hole" -- that is, it was "hoping that she would be able to help [it] until [it] found" a different solution. See Oct. 24 Tr. at 659:12-662:16 (Jaramillo, Carla Worley).

324.    G. Anderson did not return to continue Tan-O-On Marketing's operations, and, as a result, Tan-O-On Marketing effectively went out of business by the end of January, 2010.  See Oct. 23 Tr. at 283:14-24 (Bohnhoff, G. Anderson); id. at 284:11-16 (Bohnhoff, G. Anderson); id. at 285:12-286:4 (Bohnhoff, G. Anderson).

325.    Shawna Casey worked at Hi-Land Potato for the remainder of the 2009-2010 selling season, selling Hi-Land Potato's potatoes directly to customers.  See Oct. 25 Tr. at 881:19-24 (Bohnhoff, Carla Worley); id. at 899:25-900:11 (Bohnhoff, Carla Worley).

---

[65] Hi-Land Potato asks the Court to conclude that Hi-Land Potato hired Shawna Casey "at Shannon Casey's suggestion."  Hi-Land Potato's FOF and COL ¶ 68, at 19.  The testimony that would support this fact is found in Carla Worley's deposition, see Carla Worley Depo. at 45:9-20.  As the Court has explained, the Court did not admit into evidence.  The Court will not, therefore, adopt this proposed fact.

326.    Despite his resignation from Tan-O-On Marketing, Shannon Casey was still writing checks from Tan-O-On accounts in 2010, after his resignation.    See Tan-O-On Marketing's Sunflower Bank Account x507, 01/10 Statement *passim*.

327.    In 2009 and 2010, $78,557 in Tan-O-On Marketing's funds were transferred to G. Anderson.  See Oct. 25 Tr. at 1001:4-1002:12 (Bohnhoff, Wellborn).

328.    Shannon Casey delivered checks to Carla Worley on January 11, 12 and 13, 2010, representing final payment for the shipments of Hi-Land Potato's potatoes for which Tan-O-On Marketing had received payment.  See Oct. 24 Tr. at 639:7-640:3 (Robinson, Carla Worley); Tan-O-On Marketing's checks to Hi-Land Potato (Hi-Land Potato's Exhibit BG); Hi-Land Potato Sales Fee Payments to Tan-O-On Marketing *passim* (Hi-Land Potato's Exhibit BJ).

329.    When Casey delivered the January 13 check, he told Carla Worley that this act was one of his last as a Tan-O-On Marketing employee and that he was turning everything over to G. Anderson.  See Oct. 24 Tr. at 639:7-640:3 (Robinson, Carla Worley).

330.    Shortly thereafter, Carla Worley delivered the final payment of Tan-O-On Marketing's sales agency fee to Shannon Casey.  See Oct. 24 Tr. at 639:7-640:3 (Robinson, Carla Worley).

331.    Hi-Land Potato did not understand that Shannon Casey terminated his employment with Tan-O-On Marketing until sometime after January 13, 2010.  See Oct. 24 Tr. at 639:7-640:3 (Robinson, Carla Worley); Oct. 25 Tr. at 877:1-8 (Bohnhoff, Carla Worley); id. at 883:19-23 (Bohnhoff, Carla Worley); Tan-O-On Marketing's checks to Hi-Land Potato *passim* (Hi-Land Potato's Exhibit BG); Hi-Land Potato Sales Fee Payments to Tan-O-On Marketing *passim* (Hi-Land Potato's Exhibit BJ).

332.    Hi-Land Potato understood that Shannon Casey retained authority to write checks through at least January 13, 2010.  See Oct. 24 Tr. at 639:7-640:3 (Robinson, Carla Worley); Oct. 25 Tr. at 877:1-8 (Bohnhoff, Carla Worley); id. at 883:19-23 (Bohnhoff, Carla Worley); Tan-O-On Marketing's checks to Hi-Land Potato *passim* (Hi-Land Potato's Exhibit BG); Hi-Land Potato Sales Fee Payments to Tan-O-On Marketing *passim* (Hi-Land Potato's Exhibit BJ).

333.    Hi-Land Potato had no notice that Shannon Casey had resigned at any earlier date or was no longer authorized to write checks on Tan-O-On Marketing's bank accounts.[66]  See Oct. 25 Tr. at 883:19-23 (Bohnhoff, Carla Worley); id. at 954:14-958:6 (Robinson, Carla Worley).

334.    After receiving its last check from Tan-O-On Marketing, Hi-Land Potato began selling to Kroger Co. directly and stopped paying a sales agency fee to Tan-O-On.  See Oct. 24 Tr. at 639:18-640:3 (Robinson, Carla Worley); id. at 916:20-917:7 (Esquivel, Carla Worley).[67]

---

[66] Tan-O-On Marketing attempted to introduce into evidence a January 15, 2010, letter written by a lawyer who at the time was representing Shannon Casey.  See Letter from David T. Thuma to John Kubiak and Shannon Robinson, dated January 15, 2010, offered as Tan-O-On Marketing's Exhibit 14, not admitted for the truth of the matters asserted. The letter was inadmissible, because it is hearsay.  See Fed. R. Evid. 801.  Shannon Casey had not given this letter, or any other notice that he was resigning, to Hi-Land Potato or anyone else on December 20, 2009.  The Court, therefore, excluded the evidence for the truth of the matters that it asserts at the pre-trial conference.  See Transcript of Hearing at 19:13-20:2 (Court), taken October 19, 2012.  The Court allowed the parties to use it for impeachment purposes.  See Transcript of Hearing at 20:1-2 (Court).

[67] Tan-O-On Marketing asks the Court to conclude that its "business was taken over seamlessly by Hi-Land Potato Company, Inc. in January [2]010.  Julie Anderson Tr[.] 477:3-6, 19-25. (Julie Anderson)."  Tan-O-On Marketing's FOF and COL ¶ 123, at 36-37 (citation in original).  The cited location in the trial transcript is unrelated, which leads the Court to conclude that Tan-O-On Marketing intended to cite J. Anderson's deposition for this proposition.  No party moved J. Anderson's deposition into evidence.  Moreover, unlike with Carl Worley's deposition and Carla Worley's deposition, the Court does not have a copy of J. Anderson's deposition.  The Court will not, therefore, adopt this proposed fact.

335.    As of March 31, 2010, Tan-O-On had $168,564.00 in funds derived from the sale of produce available to pay the company's debts.  See Oct. 26 Tr. at 1002:16-1003:12 (Bohnhoff, Wellborn).

336.    In 2011 and 2012, $160,800.00 was transferred to Tan-O-On Marketing's attorney in this case.  See Checks to Shannon Robinson (dated August 16, 2011), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit AW.

337.    The balance was paid to Skyline Potato and the Folson Farm Group.  See Summary of Skyline Invoices; Skyline Invoices and Bills of Lading to Tan-O-On Marketing (Skyline Potato's and the Folson Farm Group's Exhibit 1); Summary of Folson Farm Invoices; Invoices to Tan-O-On Marketing and Invoice (Skyline Potato and Folson Farm Group's Exhibit 13); Summary of Alsum Produce Invoices; Invoices and Purchase Orders to Tan-O-On (Skyline Potato and Folson Farm Group's Exhibit 17); Summary of Billingsley Produce Sales Invoices; Invoices and Bills of Lading to Tan-O-On (Skyline Potato and Folson Farm Group's Exhibit 20); Summary of Mart Produce Corporation Invoices; Invoices and Bills of Lading to Tan-O-On at 1 (Skyline Potato and Folson Farm Group's Exhibit 22);  Summary of Peterson Bros. River Valley Farms Invoices; Invoices and Bills of Lading to Tan-O-On (Skyline Potato and Folson Farm Group's Exhibit 26).

### 15.    Hi-Land Potato's Knowledge of Tan-O-On Marketing's Financial Condition.

#### A.    The Worleys.

338.    Although the Worleys knew about the Caseys' personal financial problems, the Worleys did not know the extent of Tan-O-On Marketing's cash flow problems or that it could not pay producers.  See Casey Depo. at 29:11-24; id. at 178:13-179:6;[68] id. at 221:22-222:10.[69]

---

[68] Shannon Casey's and Hi-Land Potato's counsel objected to the form of the questions that elicited this portion of Shannon Casey's testimony on the basis that they were misleading.

339.    Carl Worley understood that, when a business shuts down, it must pay its bills, including those from utility providers and producers.  See Oct. 23 Tr. at 492:18-493:3 (Robinson, Carl Worley).

---

See Casey Depo. at 178:13-6. The Court overrules the objection. First, the Court notes that Hi-Land Potato offered this portion of the testimony to support this finding of fact, see Hi-Land Potato's FOF and COL ¶ F.75, at 20.  The Court will, therefore, treat the objection as waived. Moreover, the Court concludes that, even if the question might be misleading in that it suggested that Hi-Land Potato knew of Tan-O-On Marketing's financial difficulties, the question did not mislead Shannon Casey: he unequivocally stated that "Hi-Land Potato was never aware of the company's issues, Tan-O-on's [sic] issues."  Casey Depo. at 179:5-6.  The Court, therefore, overrules the objection.

[69] Shannon Casey testified that the Worleys were "aware" or "knew" that he was "under some pressure."  Casey Depo. at 176:20-179:6.  Shannon Casey's and Hi-Land Potato's counsel objected to questions that elicited that portion of Shannon Casey's testimony.  See Casey Depo. 177:7-15.  Further, Hi-Land Potato objected to Skyline Potato's and the Folson Farm Group's designation of Casey Depo. at 176:20-177:16, asserting that these questions seek speculation and answers which lack foundation.  See Defendants and Third-Party Defendants Hi-Land Potato Company, Inc.'s and Carl Worley's Objections and Counter-Designations to Skyline's and the Folson Farm Group's Designation of Deposition Testimony of Shannon Casey at 1.  The Court agrees with Hi-Land Potato that Shannon Casey gave no testimony that would establish a foundation for how he knew what the Worleys knew.  He also admitted that he was making an assumption about the Worleys' knowledge.  See Casey Depo. at 221:22-222:10.  This testimony, therefore, lacks foundation, is speculative, and, thus, is inadmissible.  See Casey Depo. at 221:22-222:10.
    Even if considered, however, it does no more than say that the Worleys knew that he was having financial problems -- and no more -- something that the Court concludes from admissible testimony. Hi-Land Potato implicitly recognized as much, because it substantially repeated its argument that the testimony was inadmissible in its proposed findings of fact:

> [Shannon Casey] gave no testimony that would establish a foundation for how he knew what the Worleys Knew.  He also admitted that he was making an assumption about the Worleys' knowledge.  This testimony, therefore, is speculative and inadmissible. . . . Further, in his deposition testimony Casey denied that the Worleys knew about [Tan-O-On Marketing's] cash flow problems and other financial condition, and instead knew only about the Caseys' personal financial problems.

Hi-Land Potato's FOF and COL ¶ F.74-75, at 20.

340.    From this background understanding, Carl Worley understood that Tan-O-On Marketing owed money to its produce suppliers.   See Oct. 23 Tr. at 479:17-24 (Robinson, Carl Worley).

341.    The Worleys did not, however, understand that Tan-O-On Marketing could pay Hi-Land Potato only if it did not pay other producers.[70]

### B.    The Andersons.

342.    The Andersons met with Carl Worley and Audrey Worley in the spring of 2009. See Oct. 22 Tr. at 184:23-185:12 (Robinson, G. Anderson); id. at 312:12-314:6 (Robinson, G. Anderson).[71]

343.    During that meeting, the Andersons asked the Worleys generally how things were going, whether Hi-Land Potato was being paid, and whether Hi-Land Potato had any problems with Shannon Casey, and the Worleys told the Andersons that everything was fine.  See Oct. 22 Tr. at 184:23-185:12 (Robinson, G. Anderson); id. at 312:12-314:6 (Robinson, G. Anderson).

344.    The Andersons said nothing about any problems with other suppliers not being paid.  See Oct. 22 Tr. at 184:23-185:12 (Robinson, G. Anderson); id. at 312:12-314:6 (Robinson, G. Anderson).

345.    At this meeting, the Andersons also expressed no concerns about Shannon Casey's other allegedly improper behavior.   See Oct. 22 Tr. at 184:23-185:12 (Robinson, G.

---

[70] It was Skyline Potato's and the Folson Farm Group's burden to prove that the Worleys understood that Tan-O-On Marketing could Pay Hi-Land Potato only if it did not pay other producers.  Those parties have not carried that burden, and the Court, therefore, makes this finding.

[71] J. Anderson's memory of these events was less clear.  See Oct. 22 Tr. id at 456:12-458:22 (Robinson, J. Anderson).  G. Anderson's memory was sufficiently clear that the Court can reconstruct the conversation.

Anderson); id. at 312:12-314:6 (Robinson, G. Anderson); id. at 456:12-458:22 (Robinson, Julie Anderson).

346.    G. Anderson called Carl Worley in October or November 2009.  See Oct. 22 Tr. at 224:22-225:25 (Jaramillo, G. Anderson).

347.    During that alleged telephone call, however, G. Anderson only asked Carl Worley the same general questions that the Andersons asked at the April 2009 meeting: how things were going, whether Hi-land Potato was being paid, and whether Hi-Land Potato was happy with Shannon Casey.  See Oct. 22 Tr. at 224:22-225:25 (Jaramillo, G. Anderson).

348.    During that telephone call, G. Anderson did not give Carl Worley notice of any problems, financial or otherwise.  See Oct. 22 Tr. at 224:22-225:25 (Jaramillo, G. Anderson).

### C.    Terry Wright.[72]

349.    Wright's suppliers would call him first if there was a problem with late payments from Tan-O-On Marketing.  See Oct. 23 Tr. at 389:16-390:17 (Bohnhoff, Wright).

350.    He did not know, however, that his producers were not being paid until January 4, 2010, when he called them to find out the status of Tan-O-On Marketing's payments.  See Oct. 23 Tr. at 352:18-353:10 (Robinson, Wright); id. at 389:16-390:17 (Bohnhoff, Wright).

---

[72] Wright was, in many respects, not a credible witness: he demonstrated a poor memory for dates, see Oct. 23 Tr. at 370:8-13 (Robinson, Wright); id. at 372:23-373:6 (Robinson, Wright); id. at 404:19-406:10 (Bohnhoff, Wright, Robinson); Hi-Land Potato Company, Inc. Invoices for Tan-O-On Marketing, Sales Invoice number 1414 through 1793 and all invoices issued in 2010 (Tan-O-On Marketing's Exhibit 7); he equivocated when confronted with a deposition admission that he speculated and jumped to conclusions about Hi-Land's actions at the end of 2009, see Tr. 391:13-392:20 (Bohnhoff, Wright); he readily admitted hostility toward Hi-Land Potato and Carl Worley in particular, see Tr. 378:20-380:11 (Bohnhoff, Worley)); and he produced a fictitious "letter" that he said he received from Carl Worley but which did not originate with Hi-Land Potato, see Tr. 358:4-23 (Robinson, Wright); id. at 407:16-408:20 (Robinson, Wright); id. at 895:24-899:19 (Bohnhoff, Carla Worley); Letter from Carl L. Worley to "To Whom It May Concern" at 1 (dated March 10, 2009), admitted October 25, 2012 as Hi-Land Potato's Exhibit CS).

351.    Wright tried to contact Shannon Casey at Hi-Land Potato.  See Oct. 23 Tr. at 357:12-25 (Robinson, Wright); id. at 359:6-11 (Robinson, Wright).

352.    Wright called Carl Worley multiple times after January 4, 2010, and verbally attacked Carl Worley, saying: (i) Wright had received a letter from Shannon Casey stating that Tan-O-On Marketing and Hi-Land Potato were merging,[73] and Wright accused Carl Worley of taking over Tan-O-On Marketing; (ii) the letter also said that Wright did not have to worry about getting paid his commissions and Tan-O-On Marketing's creditors getting paid; and (iii) Wright assumed Carl Worley would pay these obligations.  See Oct. 23 Tr. at 359:12-367:19 (Robinson, Carl Worley); id. at 395:2-12 (Bohnhoff, Wright); id. at 402-403:15 (Bohnhoff, Wright).[74]

353.    Wright accused Hi-Land Potato of assuming the primary asset of Tan-O-On Marketing -- its relationship with Kroger Co. -- and of participating in a scheme with Shannon Casey that resulted in nonpayment for over $650,000.00 in produce supplied to Tan-O-On Marketing.   See Oct. 23 Tr. at 359:12-367:19 (Robinson, Carl Worley); id. at 395:2-12 (Bohnhoff, Wright); id. at 402-403:15 (Bohnhoff, Wright).

354.    Carl Worley repeatedly denied that Hi-Land Potato had taken over Tan-O-On Marketing or that the companies had merged, and that Hi-Land Potato had any responsibility to pay Tan-O-On Marketing's debts.  See Oct. 23 Tr. at 359:12-367:19 (Robinson, Carl Worley); id. at 395:2-12 (Bohnhoff, Wright); id. at 402-403:15 (Bohnhoff, Wright).

_____

[73] Casey repudiated the letter. See Finding of Fact 314.  Therefore, the letter is a prior inconsistent statement that, because it was not given under oath, is hearsay that is inadmissible for its truth.  See Fed. R. Evid. 801(d)(1)(A); Regan-Touhy v. Walgreen Co., 526 F.3d 641, 651 (10th Cir. 2008); United States v. Silverstein, 737 F.2d 864, 867 (10th Cir. 1984); Montoya v. Bd. of County Comm'rs, No.10-106, slip op. at *89 (D.N.M. 2012) (Browning, J.).

[74] Worley did not recall this conversation happening.  Oct. 24 Tr. at 589:23-590:12 (Esquivel, Carl Worley).  Given the specificity of Wright's recollection of these conversations and that Worley could not categorically deny that the conversations occurred, the Court concludes that the conversations occurred.

355.    During these telephone calls, Wright did not tell Carl Worley that other suppliers were late in being paid, the amount of those suppliers' unpaid bills, that Tan-O-On Marketing was not going to be paying, or that Tan-O-On Marketing was not able to pay the other suppliers. See Oct. 23 Tr. at 359:12-367:19 (Robinson, Carl Worley).

356.    Wright told Worley only that, like Hi-Land Potato, the other producers had not yet been paid.  See Oct. 23 Tr. at 359:12-367:19 (Robinson, Carl Worley).

357.    Worley had no notice, on the basis of Wright's telephone calls: (i) of the size of Tan-O-On Marketing's obligations to its other suppliers or for how long the suppliers had not been paid; (ii) that Casey would not be paying these other suppliers in the future, i.e., that Tan-O-On Marketing was unable to pay them in full.  See Oct. 23 Tr. at 359:12-367:19 (Robinson, Carl Worley); id. at 395:2-12 (Bohnhoff, Wright); id. at 402-403:15 (Bohnhoff, Wright).

358.    Further, at the time, Tan-O-On Marketing still owed Hi-Land Potato money -- that is, all Carl Worley and Hi-Land Potato could know from Wright was that there were other suppliers in the same position as Hi-Land Potato.  See Oct. 23 Tr. at 359:12-367:19 (Robinson, Carl Worley); Hi-Land Potato's Tan-O-On Marketing's Sunflower Bank Account x507, November, 2009 Statement passim (Hi-Land Potato's Exhibit AN); Tan-O-On Marketing's Sunflower Bank Account x507, December, 2009 Statement passim (Hi-Land Potato's Exhibit AO); Tan-O-On Marketing's Sunflower Bank Account x507, January, 2010 Statement passim (Hi-Land Potato's Exhibit AP); Tan-O-On Marketing's checks to Hi-Land Potato passim (Hi-Land Potato's Exhibit BG); Reconciliation of Tan-O-On Marketing's checks to Hi-Land Potato Shipments at HLPC 5742-5761 (Hi-Land Potato's Exhibit BH); Second Supplemental Declaration of Carla Worley ¶¶ 1-3, at 2-3 (Hi-Land Potato's Exhibit CK); Shipment and Billing Documentation for Hi-land Potato Shipments for Which Tan-O-On Marketing paid Hi-Land

Potato *passim* (Hi-Land Potato's Exhibit CR); Checks from Tan-O-On to Hi-Land Potato *passim*.

### D.    Skyline Potato and the Folson Farm Group.

359.    Brian Folson of Folson Farms tried to call Shannon Casey at Hi-Land Potato sometime in late December, 2009, or early January, 2010, and spoke to Shawna Casey during that attempt.  See Oct. 22 Tr. at 78:24-82:1 (Robinson, Folson); id. at 82:20-84:1 (Bohnhoff, Folson).

360.    Folson did not talk to Carl Worley or Carla Worley, and he did not tell the Hi-Land Potato receptionist anything more than that he was trying to talk to Casey.  See Oct. 22 Tr. at 78:24-82:1 (Robinson, Folson); id. at 82:20-84:1 (Bohnhoff, Folson).

361.    Jim McBride of Mart Produce talked to Carl Worley sometime in January or February, 2010, and said that he was trying to collect money from Tan-O-On Marketing; Worley responded that he had "nothing to do with it" and told McBride not to bother him.  Oct. 22 Tr. at 120:23-122:6 (Robinson, McBride); id. at 125:24-126:3 (Bohnhoff, McBride).

362.    McBride did not mention the amount of his unpaid bill or how long it had been unpaid.  See Oct. 22 Tr. at 120:23-122:6 (Robinson, McBride); id. at 125:24-126:3 (Bohnhoff, McBride).

363.    None of the other representatives of Skyline Potato or the Folson Farm Group entities had any earlier or more substantial conversations with Worley regarding Tan-O-On Marketing's failure to pay them.  See Oct. 22 Tr. at 30:2-4 (Robinson, Jones); id. at 56:2-4 (Robinson, Alsum); id. at 99:23-24 (Robinson, Sill); id. at 133:8-16 (Robinson, Peterson).

364.    The representatives of Skyline Potato, Folson Farms, and Alsum Produce did not realize they had a problem with not being paid by Tan-O-On Marketing until late December,

2009 or early January, 2010.  See Oct. 22 Tr. at 29:4-7 (Robinson, Jones); id. at 54:15-17 (Robinson, Alsum); id. at 77:8-16 (Robinson, Folson).

365.    None of the representatives of Skyline Potato or the Folson Farm Group entities knew or thought that Hi-Land Potato became involved with their transactions.[75]

366.    Skyline Potato and the Folson Farm Group sent their invoices to Tan-O-On Marketing's Albuquerque office.  See Summary of Skyline Invoices & Skyline Invoices and Bills of Lading to Tan-O-On Marketing at Plaintiff Skyline's Prod.0000260-0000302 (Skyline Potato and Folson Farm Group's Exhibit 1); Summary of Folson Farm Invoices; Invoices to Tan-O-On Marketing and Invoices at Folson Group 035-047 (Skyline Potato and Folson Farm Group's Exhibit 13); Summary of Alsum Produce Invoices; Invoices and Purchase Orders to Tan-O-O at Folson Group 002-025 (Skyline Potato and Folson Farm Group's Exhibit 17); Summary of Billingsley Produce Sales Invoices; Invoices and Bills of Lading to Tan-O-On  at Folson Group 070-092 (Skyline Potato and Folson Farm Group's Exhibit 20); Summary of Mart Produce Corporation Invoices; Invoices and Bills of Lading to Tan-O-On at 049-099 (Skyline Potato and Folson Farm Group's Exhibit 22); Summary of Peterson Bros. River Valley Farms Invoices; Invoices and Bills of Lading to Tan-O-On  at Folson Group 101-102 (Skyline Potato and Folson Farm Group's Exhibit 26).

    E.    The Worleys.

367.    When Casey announced on December 29 or 30, 2009, that he was going to be leaving Tan-O-On Marketing, Carl Worley and Carla Worley understood that he would be wrapping up Tan-O-On Marketing's business, and that this wrapping-up meant that Tan-O-On Marketing owed and needed to pay its suppliers.  See Oct. 23 Tr. at 477:19-478:6 (Robinson,

---

[75] It was Skyline Potato's and the Folson Farm Group's burden to demonstrate that they thought that Hi-Land Potato had become involved with their transactions.  The Court makes this finding because those parties have not provided evidence of the contrary fact.

Carla Worley); id. at 479:17-24 (Robinson, Carl Worley); id. at 488:6-495:3 (Robinson, Carl Worley); id. at 954:14-958:6 (Robinson, Carla Worley).

368.    Shannon Casey did not say, however, that he was late on those payments, that the amounts he owed were large, or that he would be unable to pay the other suppliers; Shannon Casey's statement was not notice that Tan-O-On Marketing would not be able to pay all of its suppliers.    See Oct. 23 Tr. at 477:19-478:6 (Robinson, Carla Worley); id. at 479:17-24 (Robinson, Carl Worley); id. at 488:6-495:3 (Robinson, Carl Worley); id. at 954:14-958:6 (Robinson, Carla Worley).

369.    Particularly given that at the time Tan-O-On Marketing also owed substantial sums to Hi-Land Potato, Shannon Casey's statement also was not notice that he intended to pay Hi-Land Potato in preference over Tan-O-On Marketing's other suppliers.    See Oct. 23 Tr. at 477:19-478:6 (Robinson, Carla Worley); id. at 479:17-24 (Robinson, Carl Worley); id. at 488:6-495:3 (Robinson, Carl Worley); id. at 954:14-958:6 (Robinson, Carla Worley).

370.    On and before January 13, 2010, while Hi-Land Potato had notice that other suppliers had not been paid for all of their potato shipments, it had no notice or knowledge that Tan-O-On Marketing was not going to be paying the suppliers, or that it was not able to pay its suppliers.    See Oct. 23 Tr. at 493:19-495:2 (Robinson, Carl Worley); id. at 509:23-510:17 (Robinson, Carl Worley); Oct. 25 Tr. at 885:6-14 (Bohnhoff, Carla Worley); id. at 886:5-15 (Bohnhoff, Carla Worley); id. at 954:14-958:16 (Bohnhoff, Carla Worley); Tan-O-On Marketing's checks to Hi-Land Potato *passim*.

371.    Hi-Land Potato had no notice or knowledge that the payments Tan-O-On Marketing made to it, both before and after January 1, 2010, were in lieu of payments to other suppliers.    See Oct. 23 Tr. at 493:19-495:2 (Robinson, Carl Worley); id. at 509:23-510:17

(Robinson, Carl Worley); Oct. 25 Tr. at 885:6-14 (Bohnhoff, Carla Worley); id. at 886:5-15 (Bohnhoff, Carla Worley); id. at 954:14-958:16 (Bohnhoff, Carla Worley); Tan-O-On Marketing's checks to Hi-Land Potato *passim* (Hi-Land Potato's Exhibit BH).

372.    That other suppliers had not yet been paid in full as of January 4, 2010 is consistent with Shannon Casey's statement that he would be wrapping up Tan-O-On Marketing's business and the fact that as of that date Tan-O-On Marketing also owed money to Hi-Land Potato.    See Oct. 23 Tr. at 493:19-495:2 (Robinson, Carl Worley); id. at 509:23-510:17 (Robinson, Carl Worley); Oct. 25 Tr. at 885:6-14 (Bohnhoff, Carla Worley); id. at 886:5-15 (Bohnhoff, Carla Worley); id. at 954:14-958:16 (Bohnhoff, Carla Worley); Tan-O-On Marketing's checks to Hi-Land Potato *passim* (Hi-Land Potato's Exhibit BH).

373.    Hi-Land Potato reasonably understood at the time it was receiving its final payments in mid-January, 2010, that Shannon Casey also was in the process of making final payments to Tan-O-On Marketing's other suppliers.    See Oct. 23 Tr. at 493:19-495:2 (Robinson, Carl Worley); id. at 509:23-510:17 (Robinson, Carl Worley); Oct. 25 Tr. at 885:6-14 (Bohnhoff, Carla Worley); id. at 886:5-15 (Bohnhoff, Carla Worley); id. at 954:14-958:16 (Bohnhoff, Carla Worley); Tan-O-On Marketing's checks to Hi-Land Potato *passim* (Hi-Land Potato's Exhibit BH).

374.    Hi-Land Potato did not procure, encourage, solicit, facilitate, or otherwise attempt to receive a preference payment from Tan-O-On Marketing.    See Oct. 25 Tr. at 878:8-25 (Bohnhoff, Carla Worley).[76]

---

[76] Hi-Land Potato asks the Court to conclude that it "did not attempt to obtain an advantage over [Tan-O-On Marketing's] other produce suppliers."  Hi-Land Potato's FOF and COL ¶ 89, at 24.  The cited testimony does not, however, demonstrate that Hi-Land Potato did not attempt to procure an advantage over Tan-O-On Marketing's other suppliers.  The Court makes a similar finding elsewhere, based on the weight of the cumulative evidence.

16.     **Hi-Land Potato's Gain from the Events of October, 2009, to January, 2010.**

375.    Tan-O-On Marketing did not transfer $1,661,603.14[77] to Hi-Land Potato without consideration; it paid Hi-Land Potato this amount in consideration for Hi-Land Potato's previous shipments of potatoes to Kroger Co., Larroc Limited, and Markon, Inc., which were worth that amount.  See Oct. 25 Tr. at 869:9-874:4 (Bohnhoff, Carla Worley); Oct. 26 Tr. at 999:18-1000:20 (Bohnhoff, Wellborn); Tan-O-On Marketing's checks to Hi-Land Potato *passim* (Hi-Land Potato's Exhibit BG); Reconciliation of Tan-O-On Marketing's checks to Hi-Land Potato Shipments *passim* (Hi-Land Potato's Exhibit BH); Second Supplemental Declaration of Carla Worley ¶¶ 1-3, at 2-3 (Hi-Land Potato's Exhibit CK); Shipment and Billing Documentation for Hi-land Potato Shipments for Which Tan-O-On Marketing paid Hi-Land Potato *passim* (Hi-Land Potato's Exhibit CR).

376.    Tan-O-On Marketing paid Hi-Land Potato only for the potatoes that it shipped to Kroger Co., Larroc Limited, and Markon, Inc.; Hi-Land Potato was paid market value and was paid only once.  See Oct. 25 Tr. at 866:4-25 (Bohnhoff, Carla Worley);[78] id. at 875:5-7 (Bohnhoff, Carla Worley); id. at 875:21-876:6 (Bohnhoff, Carla Worley).

---

[77]    In her testimony, Hi-Land Potato's expert witness represented that the total disbursement made to Hi-Land Potato was "$1,661,603."  Oct. 26 Tr. at 1000:4-6 (Bohnhoff, Wellborn).  In her Second Supplemental Declaration, Carla Worley provided a more precise amount: $1,661,603.14.  See Second Supplemental Declaration of Carla Worley ¶ 2, at 1-2 (Hi-Land Potato's Exhibit CK).  In its Proposed Findings of Fact and Conclusions of Law, Hi-Land Potato adopted Carla Worley's amount.  See Hi-Land Potato's FOF and COL ¶ H.109, at 28.  Nothing of significance to the Court's resolution of the case turns on the fourteen-cent difference between these amounts.

[78] Carla Worley testified that these invoices reflected the transactions between Hi-Land Potato, Larroc Limited, Kroger Co., and Markon, Inc. "for which Tan-O-On paid us checks from."  Oct. 25 Tr. at 866:23-25 (Bohnhoff, Carla Worley).  There being no evidence that Tan-O-On paid Hi-Land Potato in a fashion other than checks, the Court concludes that its finding that Tan-O-On Marketing paid Hi-Land Potato only for the potatoes it shipped to Kroger Co., Larroc Limited, and Markon, Inc. has a sound basis in the facts.

377.    Hi-Land Potato did not take over Tan-O-On Marketing's business.[79]

378.    Hi-Land Potato did not benefit from, and instead was hurt by, the demise of Tan-O-On Marketing.  See Oct. 25 Tr. at 661:17-662:6 (Jaramillo, Carla Worley); id. at 883:15-18 (Bohnhoff, Carla Worley); id. at 899:20-901:9 (Bohnhoff, Carla Worley); Casey Depo. at 24:16-24, 26:23-28:2.

379.    The three-cent discount on Tan-O-On Marketing's sales fee that Hi-Land Potato received in exchange for providing office space, and for limited billing, bookkeeping, and collection services, was reasonable.  See Oct. 24 Tr. at 656:21-657:23 (Jaramillo, Carla Worley); Casey Depo. at 21:2-23; id. at 34:9-35:12.[80]

## 17.    **"Merger," "Takeover" and "Segregation."**

380.    There was no agreement, understanding, consideration, desire on Hi-Land Potato's part to merge Tan-O-On Marketing and Hi-Land Potato; any representation Shannon Casey made to Wright that the entities were going to merge was false.  See Oct. 24 Tr. 521:20-572:18 (Robinson, Carl Worley); Oct. 25 Tr. at 842:23-845:13 (Bohnhoff, Carla Worley);  id. at 879:14-883:18 (Bohnhoff, Carla Worley); id. at 901:21-903:1 (Jaramillo, Carla Worley); Casey Depo. at 22:3; id. at 23:8; id. at 30:2-25; id. at 109:4-110:1; id. at 111:17-112:12; id. at 188:24-191:14; id. at 195:11-24; id. at 222:11-223:8.

---

[79] It was Tan-O-On Marketing's burden to demonstrate that Hi-Land Potato took over Tan-O-On Marketing's business.  The evidence demonstrates that, once Hi-Land Potato began to sell its products directly to Kroger Co., it had effectively eliminated the function that Tan-O-On Marketing performed vis-à-vis Kroger Co.  The evidence does not, however, demonstrate that Hi-Land Potato took over Tan-O-On Marketing's business in any other sense.  The Court, therefore, adopts this finding.

[80] Hi-Land Potato asks the Court to conclude that this arrangement "did not provide Hi-Land with any economic gain or otherwise enrich it."  Hi-Land Potato's FOF and COL ¶ 112, at 29.  That proposed statement stretches the facts too far: although the benefit that Hi-Land Potato received was reasonable, Hi-Land Potato would not have entered into the arrangement if it did not benefit in some sense.  The Court, therefore, declines to adopt this characterization of the facts.

381.    There was no agreement, understanding, or discussion that Hi-Land Potato would handle the billing, bookkeeping, and collection for its and Metz Potato's potato shipments for the purpose of ensuring Hi-Land Potato was paid in preference over other suppliers; no such purpose was discussed in late October, 2009, when the arrangement was worked out[81] or at any later time.  See Oct. 25 Tr. at 878:13-25 (Bohnhoff, Carla Worley).

382.    There was no merger of Tan-O-On Marketing and Hi-Land Potato; Tan-O-On Marketing and Hi-Land Potato never combined any aspect of their respective operations.  See Oct. 25 Tr. at 841:20-842:22 (Bohnhoff, Carla Worley).[82]

383.    Rather, Tan-O-On Marketing transferred one function -- the billing, bookkeeping, and collections related to shipments of Hi-Land Potato's and Metz Potato's potatoes -- to Hi-Land Potato.  See Oct. 25 Tr. at 841:20-842:22 (Bohnhoff, Carla Worley).

384.    Hi-Land Potato never handled the billing, bookkeeping and collection for potato shipments for Tan-O-On Marketing's other suppliers.  See Oct. 25 Tr. at 841:20-842:22 (Bohnhoff, Carla Worley).

385.    Hi-Land Potato had no other involvement with the rest of Tan-O-On Marketing's purchases or sales, including purchases and re-sales of potatoes from Skyline Potato or from any of the Folson Farm Group entities.  See Oct. 25 Tr. at 880:1-883:2 (Bohnhoff, Carla Worley); Casey Depo. at 24:16-24; id. at 27:3-12.

386.    Hi-Land Potato did not begin buying potatoes from Skyline Potato, the Folson Farm Group, or any of the other suppliers from whom Tan-O-On Marketing previously had

_____

[81] In fact, this situation would be improbable, because Tan-O-On Marketing was not missing payments to Hi-Land Potato at that time.  See Oct. 26 Tr. at 971:21-972:1 (Robinson, Carla Worley).

[82] It was Tan-O-On Marketing's burden to demonstrate that Tan-O-On Marketing had merged with Hi-Land Potato.  There being no evidence that the entities merged, the Court makes this finding.

bought potatoes.  See Oct. 25 Tr. at 880:1-883:2 (Bohnhoff, Carla Worley); Casey Depo. at 24:16-24; id. at 27:3-12.

387.   Hi-Land Potato did not begin selling to any of the customers Terry Wright had serviced.  See Oct. 25 Tr. at 880:1-883:2 (Bohnhoff, Carla Worley); Casey Depo. at 24:16-24; id. at 27:3-12.

388.   Hi-Land Potato had no access to any of the records from Tan-O-On Marketing's purchases from or payments to its other suppliers, or Tan-O-On Marketing's sales to or payments received from customers who bought those suppliers' potatoes.  See Oct. 25 Tr. at 880:1-883:2 (Bohnhoff, Carla Worley); Casey Depo. at 26:23-27:17.

389.   As a result, those records could not notify Hi-Land Potato whether Tan-O-On Marketing was being paid by customers for potatoes shipped by other suppliers or whether other suppliers were being paid.  See Oct. 25 Tr. at 880:1-883:2 (Bohnhoff, Carla Worley); Casey Depo. at 26:23-27:17.

390.   Tan-O-On Marketing's customers, including Kroger Co., Larroc Limited, and Markon, Inc., continued after October, 2009, to send payment checks -- even for Hi-Land Potato's shipments -- to Tan-O-On Marketing's Albuquerque office.  See Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, November, 2009 Statement Detail *passim* (Hi-Land Potato's Exhibit AH); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, December 2009 Statement Detail *passim* (Hi-Land Potato's Exhibit AJ); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, January, 2010 Statement Detail *passim* (Hi-Land Potato's Exhibit AK); Hi-Land Potato's Tan-O-On Marketing's Sunflower Bank Account x507, November, 2009 Statement *passim* (Hi-Land Potato's Exhibit AN); Tan-O-On Marketing's Sunflower Bank Account x507, December, 2009 Statement *passim* (Hi-Land

Potato's Exhibit AO); Tan-O-On Marketing's Sunflower Bank Account x507, January, 2010 Statement *passim* (Hi-Land Potato's Exhibit AP).

391.    Hi-Land Potato had no access to or knowledge of these payments.  <u>See</u> Oct. 25 Tr. at 880:1-883:2 (Bohnhoff, Carla Worley); Casey Depo. at 26:23-27:17.

392.    Hi-Land Potato had no access to Tan-O-On Marketing's payroll or commission records for its employees or contractors, including Shannon Casey, Shawna Casey, and Wright. <u>See</u> Oct. 25 Tr. at 883:3-14 (Bohnhoff, Carla Worley).

393.    Notwithstanding the physical proximity after the Caseys began using Hi-Land Potato's back office, Hi-Land Potato never had any access to Tan-O-On Marketing's bank accounts or records, or internal bookkeeping or accounting records.  <u>See</u> Oct. 25 Tr. at 877:13-878:25 (Bohnhoff, Carla Worley); <u>id.</u> at 880:1-883:2 (Bohnhoff, Carla Worley); <u>id.</u> at 885:6-25 (Bohnhoff, Carla Worley);  Casey Depo. at 26:22-27:2;  Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, October, 2009 Statement *passim* (Hi-Land Potato's Exhibit AE); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505 October, 2009 Statement Detail *passim* (Hi-Land Potato's Exhibit AF);  Tan-O-On Marketing's Bank of Albuquerque Operating Account x505 November, 2009 statement *passim*, (Hi-Land Potato's Exhibit AG); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, November, 2009 Statement Detail *passim* (Hi-Land Potato's Exhibit AH); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, December, 2009 Statement *passim* (Hi-Land Potato's Exhibit AI); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, December 2009 Statement Detail *passim* (Hi-Land Potato's Exhibit AJ); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, January, 2010 Statement Detail *passim* (Hi-Land Potato's Exhibit AK).

394.    Hi-Land Potato did not have control over Tan-O-On Marketing's actions, and, in particular, Hi-Land Potato did not control Tan-O-On Marketing's decisions in late 2009 and early 2010 about which produce suppliers it would pay.  See Casey Depo. at 27:25-28:2.

### 18.    Skyline Potato's and the Folson Farm Group's Efforts to Collect.

395.    Tan-O-On Marketing's payment practices were historically reliable, and were not a cause of concern for Skyline Potato and members of the Folson Farm Group.  See Oct. 22 Tr. at 24:24-25:7 (Robinson, Jones); id. at 33:15-34:4 (Bohnhoff, Jones); id. at 105:8-106:5 (Bohnhoff, Sill).

396.    Tan-O-On Marketing's payments to Skyline Potato and the Folson Farm Group continued through the end of December, 2009.  See Oct. 22 Tr. at 28:18-29:14 (Robinson, Jones); id. at 33:15-34:4 (Bohnhoff, Jones); id. at 34:19-35:16 (Bohnhoff, Jones); id. at 45:25-46:15 (Jaramillo, Jones); id. at 54:15-20 (Robinson, Alsum); id. at 62:15-63:9 (Bohnhoff, Alsum); id. at 77:8-79:20 (Robinson, Folson); id. at 84:12-25 (Bohnhoff, Folson); id. at 85:15-87:2 (Bohnhoff, Folson); id. at 89:10-24 (Bohnhoff, Folson); 98:19-25 (Robinson, Sill); id. at 103:3-104:12 (Bohnhoff, Sill); id. at 105:8-106:5 (Bohnhoff, Sill); id. at 117:8-118:2 (Robinson, McBride); id. at 133:8-16 (Robinson, Peterson).

397.    While Tan-O-On Marketing made payments at a slower pace, Skyline Potato and the Folson Farm Group had no indication until late in December, 2009, or in January, 2010, that Tan-O-On Marketing would not ultimately pay the amounts owed.  See Oct. 22 Tr. at 28:18-29:14 (Robinson, Jones); id. at 33:15-34:4 (Bohnhoff, Jones); id. at 34:19-35:16 (Bohnhoff, Jones); id. at 45:25-46:15 (Jaramillo, Jones); id. at 54:15-20 (Robinson, Alsum); id. at 62:15-63:9 (Bohnhoff, Alsum); id. at 77:8-79:20 (Robinson, Folson); id. at 84:12-25 (Bohnhoff, Folson); id. at 85:15-87:2 (Bohnhoff, Folson); id. at 89:10-24 (Bohnhoff, Folson); id. at 98:19-25

(Robinson, Sill); <u>id.</u> at 103:3-104:12 (Bohnhoff, Sill); <u>id.</u> at 105:8-106:5 (Bohnhoff, Sill); <u>id.</u> at 117:8-118:2 (Robinson, McBride); <u>id.</u> at 133:8-16 (Robinson, Peterson).[83]

398.   In late December, 2009, to early January, 2010, payments from Tan-O-On Marketing stopped, and Skyline Potato and members of the Folson Farm Group learned that it was highly unlikely they would be paid.  <u>See</u> Oct. 22 Tr. at 28:18-29:14 (Robinson, Jones); <u>id.</u> at 34:19-35:16 (Bohnhoff, Jones);  <u>id.</u>  at  45:25-46:15  (Jaramillo, Jones);  <u>id.</u>  at  54:15-55:5 (Robinson, Alsum); <u>id.</u> at 57:4-23 (Robinson, Alsum); <u>id.</u> at 59:1-60:1 (Robinson, Alsum); <u>id.</u> at 62:15-63:9 (Bohnhoff, Alsum); <u>id.</u> at 77:8-79:20 (Robinson, Folson); <u>id.</u> at 80:5-82:1 (Robinson, Folson); <u>id.</u> at 84:12-25 (Bohnhoff, Folson); <u>id.</u> at 85:15-87:2 (Bohnhoff, Folson); <u>id.</u> at 89:10-24 (Bohnhoff, Folson); <u>id.</u> at 98:19-25 (Robinson, Sill); <u>id.</u> at 99:13-19 (Robinson, Sill);  <u>id.</u> at 103:3-104:12 (Bohnhoff, Sill); <u>id.</u> at 105:8-106:5 (Bohnhoff, Sill); <u>id.</u> at 117:8-118:2 (Robinson, McBride); <u>id.</u> at 120:11-122:7 (Mart);  <u>id.</u> at 133:8-16 (Robinson, Peterson).

399.   Some members of the Folson Farm Group called G. Anderson, Shannon Casey, or Wright, but their efforts in seeking payment were unsuccessful.  <u>See</u> Oct. 22 Tr. at 28:18-29:14 (Robinson, Jones); <u>id.</u> at 33:15-34:4 (Bohnhoff, Jones); <u>id.</u> at 34:19-35:16 (Bohnhoff, Jones); <u>id.</u> at  45:25-46:15  (Jaramillo, Jones);  <u>id.</u>  at  54:15-20  (Robinson, Alsum);  <u>id.</u>  at  62:15-63:9 (Bohnhoff, Alsum); <u>id.</u> at 77:8-79:20 (Robinson, Folson); <u>id.</u> at 84:12-25 (Bohnhoff, Folson); <u>id.</u> at 85:15-87:2 (Bohnhoff, Folson); <u>id.</u> at 89:10-24 (Bohnhoff, Folson); <u>id.</u> at 98:19-25 (Robinson, Sill); <u>id.</u> at 103:3-104:12 (Bohnhoff, Sill); <u>id.</u> at 105:8-106:5 (Bohnhoff, Sill); <u>id.</u> at 117:8-118:2 (Robinson, McBride); <u>id.</u> at 133:8-16 (Robinson, Peterson).

---

[83] Skyline Potato and the Folson Farm Group ask the Court to "find[] that Tan-O-On Marketing slowed in its payments to Skyline Potato and the Folson Farm Group, but continued to pay in an apparent effort to forestall any collection or legal proceedings from them."  Skyline Potato's and the Folson Farm Group's FOF and COL ¶ 119, at 34-35.  Skyline Potato and the Folson Farm Group do not cite evidence to support that proposed fact, and the Court, therefore, declines to adopt it.

400.    On January 15, 2010, and again on March 29, 2010, Skyline Potato sent letters to Tan-O-On Marketing informing it of Skyline's intent to preserve PACA trust benefits.  See Letter from Michael D. Jones to Tan-O-On Marketing, Inc. (dated January 15, 2010), admitted October 19, 2012, at PTC as Skyline Potato's and the Folson Farm Group's Exhibit 4; Letter from Michael D. Jones to Tan-O-On Marketing at Skyline Prod. 0000306 (dated March 29, 2010), admitted October 19, 2012, at PTC as Skyline Potato's and the Folson Farm Group's Exhibit 9.

401.    On February 11, 2010, Skyline Potato filed informal and formal reparation complaints against Tan-O-On Marketing before the U.S.D.A.'s PACA branch.  See Letter from Michael D. Jones to Jerry W. Taylor Including Informal U.S.D.A. Complaint by Skyline Potato Against Tan-O-On Marketing at Skyline Prod. 0000248-0000302 (dated February 11, 2010), admitted October 19, 2012, at PTC as Skyline Potato's and the Folson Farm Group's Exhibit 6; Letter from Michael D. Jones to Jerry W. Taylor Including Formal U.S.D.A. Complaint by Skyline Potato against Tan-O-On Marketing at Skyline Prod. 0000186-0000247 (dated February 11, 2010), admitted October 19, 2012, at PTC as Skyline Potato's and the Folson Farm Group's Exhibit 7; Letter from U.S.D.A. to Skyline Potato at Skyline Prod. 0000175-176 (dated February 17, 2010), admitted October 19, 2012, at PTC as Skyline Potato's and the Folson Farm Group's Exhibit 8.

402.    Alsum Produce filed an informal PACA complaint on January 12, 2010.  See Alsum Produce Informal Complaint (dated January 12, 2010), admitted October 19, 2012, at PTC as Skyline Potato's and the Folson Farm Group's Exhibit 18.

403.    Mart Produce filed a formal PACA complaint on March 17, 2010.  <u>See</u> Mart Produce Formal Complaint (dated March 17, 2010), admitted October 19, 2012, at PTC as Skyline Potato's and the Folson Farm Group's Exhibit 24.

404.    Skyline Potato and the Folson Farm Group have received a total of $93,000.02 from Shannon Casey and Tan-O-On Marketing in payment for produce sold to Tan-O-On Marketing.  <u>See</u> Oct. 22 Tr. at 21:25-22:2 (Jaramillo, Jones; <u>id.</u> at 52:25-52:10 (Esquivel, Alsum); <u>id.</u> at 72:5-72:10 (Esquivel, Folson); <u>id.</u> at 97:19-22 (Esquivel, Sill); <u>id.</u> at 116:14-21 (Esquivel, McBride); <u>id.</u> at 132:13-15 (Esquivel, Peterson); Summary of Skyline Invoices; Skyline Invoices and Bills of Lading to Tan-O-On Marketing at 1 (Skyline Potato's and the Folson Farm Group's Exhibit 1); Summary of Folson Farm Invoices; Invoices to Tan-O-On Marketing and Invoice at 1 (Skyline Potato and Folson Farm Group's Exhibit 13); Summary of Alsum Produce Invoices; Invoices and Purchase Orders to Tan-O-On at 1 (Skyline Potato and Folson Farm Group's Exhibit 17); Summary of Billingsley Produce Sales Invoices; Invoices and Bills of Lading to Tan-O-On at 1 (Skyline Potato and Folson Farm Group's Exhibit 20); Summary of Mart Produce Corporation Invoices; Invoices and Bills of Lading to Tan-O-On at 1 (Skyline Potato and Folson Farm Group's Exhibit 22);  Summary of Peterson Bros. River Valley Farms Invoices; Invoices and Bills of Lading to Tan-O-On at 1 (Skyline Potato and Folson Farm Group's Exhibit 26).

405.   Specifically, the $93,000.02 figure reflects the following calculations:

| | Payments received from Tan-O-On Marketing | Payments received from Shannon Casey | Total payments received |
|---|---|---|---|
| **Skyline Potato** | $3,680.98 | N/A | $3,680.98 |
| **Alsum Produce** | $2,495.00 | N/A | $2,495.00 |
| **Folson Farm** | $6,657.69 | $35,994.48 | $42,652.17 |
| **Billingsley Produce** | $2,962.67 | $16,017.59 | $18,980.26 |
| **Mart Produce** | $3,882.02 | $20,987.94 | $24,869.96 |
| **Peterson Brothers** | $321.65 | N/A | $321.65 |
| **Total** | | | $93,000.02 |

See Oct. 22 Tr. at 21:25-22:2 (Jaramillo, Jones; id. at 52:25-52:10 (Esquivel, Alsum); id. at 72:5-72:10 (Esquivel, Folson); id. at 97:19-22 (Esquivel, Sill); id. at 116:14-21 (Esquivel, McBride); id. at 132:13-15 (Esquivel, Peterson); Summary of Skyline Invoices; Skyline Invoices and Bills of Lading to Tan-O-On Marketing at 1 (Skyline Potato's and the Folson Farm Group's Exhibit 1); Summary of Folson Farm Invoices; Invoices to Tan-O-On Marketing and Invoice at 1 (Skyline Potato and Folson Farm Group's Exhibit 13); Summary of Alsum Produce Invoices; Invoices and Purchase Orders to Tan-O-On at 1 (Skyline Potato and Folson Farm Group's Exhibit 17); Summary of Billingsley Produce Sales Invoices; Invoices and Bills of Lading to Tan-O-On at 1 (Skyline Potato and Folson Farm Group's Exhibit 20); Summary of Mart Produce Corporation Invoices; Invoices and Bills of Lading to Tan-O-On at 1 (Skyline Potato and Folson Farm Group's Exhibit 22);  Summary of Peterson Bros. River Valley Farms Invoices; Invoices and Bills of Lading to Tan-O-On at 1 (Skyline Potato and Folson Farm Group's Exhibit 26).[84]

---

[84] Skyline Potato and the Folson Farm Group ask the Court to find that, "[i]n 2011 and 2012, Skyline and the Folson Group received a total of $89,000.01 in payments for Produce sold to Tan-O-On."  Skyline Potato's and the Folson Farm Group's FOF and COL ¶ 80, at 24-25.  The $89,000.01 figure does not accurately tabulate the amounts that the cited testimony and exhibits support.  The Court's calculation, set forth above, accurately reflects the cited testimony and exhibits.

19.   **Skyline Potato's and the Folson Farm Group's Failure to Pursue Other PACA Trust Assets.**

A.   **Customer Payments and Receivables.**

406.   Tan-O-On Marketing had money in the bank after January 13, 2010: Tan-O-On Marketing's Bank of Albuquerque operating account had a balance of over $43,000.00 as of January 22, 2010.  See Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, January, 2010 Statement Detail *passim* (Hi-Land Potato's Exhibit AK).

407.   On that day, G. Anderson transferred these funds to his personal bank account, and he assumed control over additional customer payments totaling approximately $120,000.00.[85]   See Oct. 23 Tr. at 287:10-295:9 (Bohnhoff, G. Anderson); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, January, 2010 Statement Detail *passim* (Hi-Land Potato's Exhibit AK); Letter from G. Anderson to Bank of Albuquerque at 1 (dated January 22, 2010), admitted October 19, 2012 at PTC as Hi-Land Potato's Exhibit AQ; Anderson Bank of Albuquerque Account x603 February 15, 2010 Statement *passim* (dated February 15, 2010), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit AR; Anderson Bank of Albuquerque Account x603 2010 Statements (date range from February 16, 2010 to January 15, 2011), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit AS; Anderson Bank of Albuquerque Account x603, 2011 Statements (date range January 16, 2011 to January 15, 2012), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit AT; Anderson Bank of Albuquerque Account x603, 2012 Statements (date range from January 16, 2012 to April 15, 2012), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit AU; Tan-O-On Marketing's Bank of Albuquerque Account x926, January, 2010 Statement (dated

---

[85] Hi-Land Potato asks the Court to conclude that the additional customer payments totaled approximately $130,000.00.  See Hi-Land Potato's FOF and COL ¶ 122, at 41.  This amount was an error: based on G. Anderson's testimony and the exhibits that Hi-Land Potato's counsel discussed with G. Anderson, the correct amount is approximately $120,000.00.

February 28, 2010), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit AY; Tan-O-On Marketing's Bank of Albuquerque Acct. x926, 2010-2012 Statements (date range from February 23, 2010 to January 31, 2012), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit AZ; Tan-O-On Marketing's Bank of Albuquerque Acct. x926, August, 2011 Statement (dated August 31, 2011), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit BA.

408.    At least $140,500.00 of the money in G. Anderson's control, which was part of the PACA trust *res*, see Oct. 23 Tr. at 287:25-288:1 (Bohnhoff, G. Anderson), was paid to Tan-O-On Marketing's attorney.  See Anderson Bank of Albuquerque Account x603 February 15, 2010 Statement *passim* (Hi-Land Potato's Exhibit AR); Anderson Bank of Albuquerque Account x603 2010 Statements (Hi-Land Potato's Exhibit AS); Anderson Bank of Albuquerque Account x603, 2011 Statements (Hi-Land Potato's Exhibit AT); Anderson Bank of Albuquerque Account x603, 2012 Statements (Hi-Land Potato's Exhibit AU); Letters from Shannon Robinson to Katy Koestner Esquivel Containing Checks from Tan-O-On Marketing to Skyline Potato and the Folson Farm Group (dated April 2, 2012 and April 5, 2012), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit AV; Checks to Shannon Robinson (Hi-Land Potato's Exhibit AW); Tan-O-On Marketing's Bank of Albuquerque Account x926, January, 2010 Statement (Hi-Land Potato's Exhibit AY); Tan-O-On Marketing's Bank of Albuquerque Acct. x926, 2010-2012 Statements (Hi-Land Potato's Exhibit AZ); Tan-O-On Marketing's Bank of Albuquerque Acct. x926, August, 2011 Statement (Hi-Land Potato's Exhibit BA).[86]

---

[86] Hi-Land Potato asks the Court to conclude that "[o]ther amounts were spent on miscellaneous expenses."  Hi-Land Potato's FOF and COL ¶ 123, at 31.  Although that statement may be true, the evidence that Hi-Land Potato cites does not support the assertion.  The Court, therefore, declines to adopt this proposed fact.

409.   With the exception of a $20,000.00 payment that Tan-O-On Marketing made to Skyline and Folson Farm Group's counsel in April 2012,[87] Skyline Potato and the Folson Farm Group took no steps to locate and obtain these funds.[88]   See Oct. 23 Tr. at 287:10-295:9 (Bohnhoff, G. Anderson); Anderson Bank of Albuquerque Account x603 February 15, 2010 Statement *passim* (Hi-Land Potato's Exhibit AR); Anderson Bank of Albuquerque Account x603 2010 Statements (Hi-Land Potato's Exhibit AS); Anderson Bank of Albuquerque Account x603, 2011 Statements (Hi-Land Potato's Exhibit AT); Anderson Bank of Albuquerque Account x603, 2012 Statements (Hi-Land Potato's Exhibit AU); Letters from Shannon Robinson to Katy Koestner Esquivel Containing Checks from Tan-O-On Marketing to Skyline Potato and the Folson Farm Group (dated April 2, 2012 and April 5, 2012), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit AV; Checks to Shannon Robinson (Hi-Land Potato's Exhibit AW); Tan-O-On Marketing's Bank of Albuquerque Account x926, January, 2010 Statement (Hi-Land Potato's Exhibit AY); Tan-O-On Marketing's Bank of Albuquerque Acct. x926, 2010-2012 Statements (Hi-Land Potato's Exhibit AZ); Tan-O-On Marketing's Bank of Albuquerque Acct. x926, August, 2011 Statement (Hi-Land Potato's Exhibit BA).

---

[87] In January, 2013, Skyline Potato and the Folson Farm Group received payment from Tan-O-On Marketing of, or otherwise credited against the amounts that remain owed to them, another $7,770.00.  See Electronic Mail Transmission from Katy Koestner Esquivel to Hank Bohnhoff, dated January 11, 2013, filed January 24, 2013 (Doc. 343-3); Electronic Mail Transmission from Heather S. Jaramillo to Hank Bohnhoff, dated January 11, 2013, filed January 24, 2013 (Doc. 343-4); Electronic Mail Transmission from Hank Bohnhoff to Heather S. Jaramillo, dated January 11, 2013, filed January 24, 2013 (Doc. 343-5); and Electronic Mail Transmission from Katy Koestner Esquivel to Hank Bohnhoff, dated January 14, 2013, filed January 24, 2013 (Doc. 343-6).

[88] If Skyline Potato and the Folson Farm Group had proved liability and damages, it would have been Hi-Land Potato's burden to prove that they had failed to mitigate their damages.  Because there is no evidence that Skyline Potato and the Folson Farm Group took steps to locate and obtain these funds, the Court makes this finding and concludes that Skyline Potato and the Folson Farm Group did not mitigate their damages.

410.    As of August 15, 2012, Tan-O-On Marketing's accounting records reflected an accounts receivable balance of $269,234.14, with the final invoices listed dated January 7, 2010. See Oct. 25 Tr. at 738:13-17 (Bohnhoff, Brown); Tan-O-On, Inc. Customer Balance Detail as of December 31, 2011 (dated February 17, 2012), admitted October 19, 2012, at PTC as Tan-O-On Marketing's Exhibit 4(l).[89]

411.    Skyline Potato, the Folson Farm Group and G. Anderson did not make any effort to collect any remaining amount of unpaid receivables.  See Oct. 23 Tr. at 295:19-296:14 (Bohnhoff, G. Anderson); Casey Depo. at 48:12-49:8; Tan-O-On, Inc. A/R Aging Detail (dated August 15, 2012), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit AB); Tan-O-On, Inc. Customer Balance Detail as of December 31, 2011 (Tan-O-On Marketing's Exhibit 4(l)).[90]

---

[89] Tan-O-On Marketing asks the Court to conclude that, according to Sheryl Brown, an accountant who worked for Tan-O-On Marketing, "the accounts receivable recorded on Quick Books dated back to before 2008," and "the Quick Books data was being manipulated by data input as late as January 13, 2010."  Tan-O-On Marketing's FOF and COL ¶ 127, at 37.  The testimony that Tan-O-On Marketing cited to support this proposed fact does not, however, support the assertion.  See Oct. 24 Tr. at 723:15-18 (Robinson, Brown); id. at 734:15-19 (Robinson, Brown).  Moreover, the Court has reviewed Brown's testimony and determined that, although it establishes that certain invoices in Tan-O-On Marketing's system "were increased on January 13," 2013, Oct. 24 Tr. at 720:21-25 (Brown), the Court does not otherwise find that her testimony establishes any fact of significance.

[90] Hi-Land Potato asks the Court to conclude that Tan-O-On Marketing's "accounting records reflect over $130,000 in unpaid receivables, even after reducing those receivables by the customer payments that were received after January 1, 2010."  Hi-Land Potato's FOF and COL ¶ 124, at 32.  Although the testimony and exhibits that Hi-Land Potato cites in support of this fact demonstrate that, as of August 15, 2012, Tan-O-On Marketing's accounting records reflected an accounts receivable balance of $269,234.14, with the final invoices listed dated January 7, 2010, the testimony and exhibits do not substantiate the proposed post-reduction $130,000.00 figure. The Court will not, therefore, adopt this proposed fact.

412.     Because customers paid Tan-O-On Marketing for the potatoes that Skyline Potato and the Folson Farm Group shipped, those funds should have been available to pay Skyline Potato and the Folson Farm Group.[91]

**B.     Tan-O-On Marketing; Tan-O-On Marketing's Principals; Wright.**

413.     G. Anderson owes Tan-O-On Marketing approximately $170,000.00.  See Oct. 26 Tr. at 1000:13-1006:21 (Bohnhoff, Wellborn); id. at 1020:15-1021:8 (Bohnhoff, Wellborn); id. at 1022:3-17 (Robinson, Wellborn); Tan-O-On Marketing's 2008 Tax Return at Schedule L, Line 14, Statement 5 (no date provided), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit Z; Table of Tan-O-On Marketing's Account 4100: Accum. Adj. Acct. Gerald Anderson at 1 (dated November 19, 2009), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit AA).

414.     Neither Skyline Potato nor the Folson Farm Group has taken any steps to collect this amount from G. Anderson.[92]

415.     The Folson Farm Group did not sue Anderson, either as a general creditor or as a Tan-O-On Marketing control person.[93]

-----

[91] If Skyline Potato and the Folson Farm Group had proved liability and damages, it would have been Hi-Land Potato's burden to prove that they had failed to mitigate their damages.  Because there is no evidence that these funds were not available, the Court makes this finding and concludes that Skyline Potato and the Folson Farm Group did not mitigate their damages.

[92] If Skyline Potato and the Folson Farm Group had proved liability and damages, it would have been Hi-Land Potato's burden to prove that they had failed to mitigate their damages.  Because there is no evidence that they took steps to collect this amount from G. Anderson, the Court makes this finding and concludes that Skyline Potato and the Folson Farm Group did not mitigate their damages.

[93] The Court makes this finding on the preponderance of the evidence based on the totality of the record.

416.   Tan-O-On Marketing failed to pay amounts due to other produce suppliers.  See U.S.D.A. Default Order -- McNeil Fruit & Vegetable LLC at 1 (dated April 22, 2012), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit CL; Default Order -- Lenz Farms (dated August 26, 2010), admitted on October 19, 2012 at PTC as Hi-Land Potato's Exhibit CM; Tan-O-On Marketing Exhibit 4A at 13.[94]

417.   Neither Skyline Potato nor the Folson Farm Group notified these suppliers of the pendency of this lawsuit and solicited their joinder in a claim for pro rata distribution of PACA trust assets.[95]

418.   In and after October, 2009, Tan-O-On Marketing paid, out of customer payment revenue deposited into its Bank of Albuquerque operating account, over $45,000.00 in periodic draws of $769.23 and additional commissions to Wright's company, T.W. Logistics,[96] and $10,000.00 in promissory note payments to the Andersons.  See Oct. 23 Tr. at 333:20-334:5

---

[94] If Skyline Potato and the Folson Farm Group had proved liability and damages, it would have been Hi-Land Potato's burden to prove that they had failed to mitigate their damages.  Because there is no evidence that Skyline Potato and/or the Folson Farm Group made any effort to notify these suppliers of the pendency of this lawsuit and solicit their joinder in a claim for pro rata distribution of PACA trust assets, the Court makes this finding and concludes that Skyline Potato and the Folson Farm Group did not mitigate their damages.

[95] If Skyline Potato and the Folson Farm Group had proved liability and damages, it would have been Hi-Land Potato's burden to prove that they had failed to mitigate their damages.  Because there is no evidence that Skyline Potato and the Folson Farm Group notified these suppliers of the pendency of this lawsuit and solicited their joinder in a claim for pro rata distribution of PACA trust assets, the Court makes this finding and concludes that Skyline Potato and the Folson Farm Group did not mitigate their damages.

[96] The $769.23 draws and other electronic funds transfers to Wright are identified on the Bank of Albuquerque statements as "TANOON MARKETI 01-SETT-0012NCA."  Tan-O-On Marketing's Bank of Albuquerque Operating Account x505 October, 2009 Statement Detail passim (Hi-Land Potato's Exhibit AF);  Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, November, 2009 Statement Detail passim (Hi-Land Potato's Exhibit AH); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, December 2009 Statement Detail passim (Hi-Land Potato's Exhibit AJ); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, January, 2010 Statement Detail passim (Hi-Land Potato's Exhibit AK).

(Robinson, Wright); id. at 380:12-383:11 (Bohnhoff, Wright); id. at 1001:14-1002:1 (Bohnhoff, Wellborn); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505 October, 2009 Statement Detail *passim* (Hi-Land Potato's Exhibit AF); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, November, 2009 Statement Detail *passim* (Hi-Land Potato's Exhibit AH); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, December 2009 Statement Detail *passim* (Hi-Land Potato's Exhibit AJ); Tan-O-On Marketing's Bank of Albuquerque Operating Account x505, January, 2010 Statement Detail *passim* (Hi-Land Potato's Exhibit AK).

419.   Neither Skyline Potato nor the Folson Farm Group sued Wright as a general creditor.[97]

420.   The Court has entered default judgment on Skyline Potato's and the Folson Farm Group's PACA claims against Tan-O-On Marketing.  See Default Judgment Order at 2, filed March 23, 2012 (Doc. 140); Default Judgment at 1-2, filed June 21, 2012 (Doc. 205).

C.    **The Casey Bankruptcy.**

421.   On February 5, 2010, the Caseys filed a Chapter 7 Petition in the United States Bankruptcy Court for the District of New Mexico.  See Casey Bankruptcy Petition, No. 10-10492 (dated February 5, 2010), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit BQ.[98]

---

[97] The Court makes this finding on the preponderance of the evidence based on the totality of the record.

[98] The Court admitted this document, not for the truth of the matters asserted therein, but for the purpose of showing that a bankruptcy proceeding was taking place, and that the parties had notice of that proceeding.  See Transcript of Pretrial Conference at 90:5-15 (taken October 19, 2012)("PTC Transcript")(Court).

422.    Although Skyline and all of the Folson Farm Group's members received notice of his bankruptcy, only Folson Farm, Mart Produce, and Billingsley Produce sued Casey in bankruptcy court as a control person.  <u>See</u> Casey Bankruptcy Schedules, No. 10-10492 (dated February 9, 2010), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit BR;[99] Folson Farm Group's Second Amended Complaint to Determine Dischargeability of Debt, No. 10-1069 (dated May 7, 2010), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit BV;[100] Memorandum Opinion on Defendant's Motion to Dismiss Adversary Proceeding (dated August 26, 2011), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit CB.[101]

423.    Folson Farm, Mart Produce, and Billingsley Produce obtained a judgment for the entire amount of their claim, approximately $305,000.00, but agreed to give Shannon Casey a satisfaction of judgment upon payment of only $80,000.00.  <u>See</u> Joint Settlement Stipulation, No. 10-1068 (dated November 29, 2011), admitted October 19, 2012, at PTC as Hi-Land Potato's

---

[99] The Court admitted this document, not for the truth of the matters asserted therein, but for the purpose of showing that a bankruptcy proceeding was taking place and that the parties had notice of that proceeding.  <u>See</u> PTC Transcript Conference at 90:5-15 (taken October 19, 2012)(Court).

[100] At the PTC, the Court admitted this document, not for the truth of the matters asserted therein, but for the purpose of showing that a bankruptcy proceeding was taking place and that the parties had notice of that proceeding.  <u>See</u> Transcript of Pretrial Conference at 90:5-15 (taken October 19, 2012)(Court).  At trial, the Court admitted this document for the purpose of showing that the document was filed, and that the parties took certain actions and positions.  <u>See</u> Oct. 26 Tr. at 1028:14-10:35 (Bohnhoff, Court, Jaramillo, Esquivel, Robinson).

[101] At the PTC, the Court admitted this document, not for the truth of the matters asserted therein, but for the purpose of showing that a bankruptcy proceeding was taking place and that the parties had notice of that proceeding.  <u>See</u> PTC Transcript at 90:5-15 (taken October 19, 2012)(Court).  At trial, the Court admitted this document for the purpose of showing that the parties took certain actions and positions, and as evidence of the fact that the bankruptcy court made a decision.  <u>See</u> Oct. 26 Tr. at 1028:14-10:35 (Bohnhoff, Court, Jaramillo, Esquivel, Robinson).

Exhibit CC;[102] Stipulated Final Judgment, No. 10-1068 (dated November 30, 2011), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit CD.[103]

424.    The settlement was a business decision made to avoid the expense and uncertainty of liquidating a judgment against Shannon Casey.  See Oct. 23 Tr. at 110:7-111:15 (Esquivel, Sill).[104]

425.    Skyline Potato elected not to pursue an adversary case against the Caseys, because it did not believe that Shannon Casey had assets available to pay, and because Skyline Potato did not want to add to its losses with additional legal costs. See Oct. 22 Tr. at 35:17-24 (Bonhoff, Jones).

426.    In addition, Tan-O-On Marketing and the Andersons did not assert timely claims against Shannon Casey in his bankruptcy.   See Debtor's Motion to Dismiss Counterclaims of Gerald and Julie Anderson, No. 10-1068 (dated December 14, 2010), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit BY; Order on Shannon Patrick Casey's Motion to Dismiss

---

[102] At the PTC, the Court admitted this document, not for the truth of the matters asserted therein, but for the purpose of showing that a bankruptcy proceeding was taking place and that the parties had notice of that proceeding.  See PTC Transcript at 90:5-15 (taken October 19, 2012)(Court).  At trial, the Court admitted this document for the fact that the parties took certain actions and positions, and that the judgment existed.   See Oct. 26 Tr. at 1028:14-10:35 (Bohnhoff, Court, Jaramillo, Esquivel, Robinson).

[103] At the PTC, the Court admitted this document, not for the truth of the matters asserted therein, but for the purpose of showing that a bankruptcy proceeding was taking place and that the parties had notice of that proceeding.  See PTC Transcript at 90:5-15 (taken October 19, 2012)(Court).  At trial, the Court admitted this document for the fact that the parties took certain actions and positions, and that the judgment existed.   See Oct. 26 Tr. at 1028:14-10:35 (Bohnhoff, Court, Jaramillo, Esquivel, Robinson).

[104] Folson Farm, Mart Produce, Billingsley Produce, Skyline Potato, and the other Folson Farm Group intervenors did not offer any evidence that Shannon Casey could not pay any more, but there was no evidence that he could pay more.  It would be speculative for the Court to make any finding about Shannon Casey's ability to pay.

Gerald and Julie Andersons' [sic] Counterclaims, No. 10-1068 (dated March 28, 2011), admitted October 19, 2012, at PTC as Hi-Land Potato's Exhibit CA.[105]

   **19.      Interest and Attorney's Fees.**

427.   Skyline Potato's and the Folson Farm Group's claims for recovery of pre-judgment interest and attorney's fees are based on language in the invoices that they sent to Tan-O-On Marketing.  See Skyline Potato's and the Folson Farm Group's FOF and COL at 61-67.

428.   Neither Skyline Potato nor the Folson Farm Group had a written contract with Hi-Land Potato.[106]

429.   The language in Skyline Potato's invoices provides that, "[i]n the event of default in payment, Seller may recover from Buyer interest, actual attorney's fees and other costs associated with collection."  E.g., Summary of Skyline Invoices; Skyline Invoices and Bills of Lading to Tan-O-On Marketing at Plaintiff Skyline's Prod.0000260 (Skyline Potato's and the Folson Farm Group's Exhibit 1); id. at Plaintiff Skyline's Prod.0000262.

430.   The Skyline Potato invoice form allows Skyline Potato to recover interest at the maximum allowable interest rate, but does not specify an interest rate.  See, e.g., Summary of Skyline Invoices; Skyline Invoices and Bills of Lading to Tan-O-On Marketing at Plaintiff

---

[105] At the PTC, the Court admitted this document, not for the truth of the matters asserted therein, but for the purpose of showing that a bankruptcy proceeding was taking place and that the parties had notice of that proceeding.  See Transcript of Pretrial Conference at 90:5-15 (taken October 19, 2012)(Court).  At trial, the Court admitted this document for the purpose of showing that the document was filed, that the parties took certain actions and positions, that the judgment existed, and that the bankruptcy court made a decision.  See Oct. 26 Tr. at 1028:14-10:35 (Bohnhoff, Court, Jaramillo, Esquivel, Robinson).

[106] If Skyline Potato and the Folson Farm Group had proved liability, it would have been their burden to show that they were entitled to interest and attorneys' fees.  Because there is no evidence that Skyline Potato or the Folson Farm Group had a written contract with Hi-Land Potato, the Court makes this finding.

Skyline's Prod.0000260 (Skyline Potato's and the Folson Farm Group's Exhibit 1); id. at Plaintiff Skyline's Prod.0000262.

431.    "Buyer" in Skyline Potato's invoices refers to Tan-O-On Marketing.  See Oct. 22 Tr. at 43:2-12 (Bohnhoff, Jones).

432.    The language in Folson Farm's invoices does not contain any language providing for recovery of interest or attorney's fees.  See Oct. 22 Tr. at 90:23-91:22 (Bohnhoff, Folson); e.g., Summary of Folson Farm Invoices; Invoices to Tan-O-On Marketing and Invoice at Folson Group 035 (Skyline Potato and Folson Farm Group's Exhibit 13); id. at Folson Group 036.

433.    The language in Alsum Produce's invoices provides: "Interest shall accrue on any past-due account balance at the rate of 1.5% per month (18% per annum).  Buyer agrees to pay all costs of collection, including attorneys' fees."  See, e.g., Summary of Alsum Produce Invoices; Invoices and Purchase Orders to Tan-O-On at Folson Group 002 (Skyline Potato's and the Folson Farm Group's Exhibit 17); id. at Folson Group 003.

434.    "Buyer" in the Alsum Produce invoices refers to Tan-O-On Marketing.  See Oct. 22 Tr. at 63:10-18 (Bohnhoff, Alsum).

435.    The language in Billingsley Produce's invoices provides: "Should any action be commenced between the parties to this contract . . . the prevailing party in such action shall be entitled to ... an award as and [sic] for the actual attorney's fees and costs.... 1.5% per month will be charged on past due accounts (18% annual percentage rate)." E.g., Summary of Billingsley Produce Sales Invoices; Invoices and Bills of Lading to Tan-O-On at Folson Group 71 (Skyline Potato and Folson Farm Group's Exhibit 20); id. at Folson Group 074.

436.    The phrase "the parties to this contract" in Billingsley Produce's invoices refers to Billingsley Produce and Tan-O-On Marketing.  See Oct. 22 Tr. at 109:10-25 (Bohnhoff, Sill).

437.     The language in Mart Produce's invoices provides: "In the event legal action is commenced to collect the sums due under this invoice, the prevailing party shall be entitled to recover all court costs and attorney fees incurred thereby as damages in addition to any principal balance then remaining[ ]due." E.g., Summary of Mart Produce Corporation Invoices; Invoices and Bills of Lading to Tan-O-On at 049 (Skyline Potato and Folson Farm Group's Exhibit 22); id. at Folson Group 050.

438.     The Mart Produce invoices do not provide for accrual of interest.  See Oct. 22 Tr. at 115:21-116:13 (Robinson, McBride); Summary of Mart Produce Corporation Invoices; Invoices and Bills of Lading to Tan-O-On at 049 (Skyline Potato and Folson Farm Group's Exhibit 22); id. at Folson Group 050.

439.     The language in Peterson Brothers' invoices provides: "Notice:[ ]Payment to be made in U.S. funds past due invoices at 1-1/2% per month which is an annual charge of 18%.  If overdue accounts are referred to an attorney, you agree[ ]to pay our reasonable attorney's fees plus cost of all legal action as an additional charge under the contract of sale covered by this invoice." E.g., Summary of Peterson Bros. River Valley Farms Invoices; Invoices and Bills of Lading to Tan-O-On  at Folson Group 101 (Skyline Potato and Folson Farm Group's Exhibit 26); id. at 102.

440.     The word "you" in Peterson Brothers' invoices refers to Tan-O-On Marketing. Oct. 22 Tr. at 136:12-137:10 (Bohnhoff, Peterson).

441.     In sum, the Andersons built Tan-O-On Marketing, a produce brokerage firm, from the ground up.  They built a successful business and a good name for themselves: they were, for a time, a valuable channel between producer growers and produce retailers.  They built formidable relationships, most importantly, for this case, with retailer Kroger Co. and producer

Hi-Land Potato.  When G. Anderson fell ill and decided to retire, however, the Andersons decided to sell Tan-O-On Marketing.

442.    The Andersons did not pick the best of business partners.  They sold most of their interest in Tan-O-On Marketing -- their professional life's work -- to Shannon Casey, a trucker-turned-salesman who lacked experience running a business.  The Andersons valued this business too highly; because Shannon Casey did not have much financial experience, he agreed to the overcharge in agreeing to the Andersons' price.  Shawna Casey, Shannon Casey's wife and a former waitress, soon started work as a salesperson, again, without experience in her new field.  Over time, Shannon Casey's relationship with the Andersons soured, because he thought -- and learned the hard way -- that, under the terms of the sale, the Andersons made too much money for Tan-O-On Marketing to be profitable for him.  Shannon Casey then "fired" the Andersons from their remaining duties.

443.    The Caseys' inexperience surfaced when Tan-O-On Marketing ran into financial trouble.  In a last-ditch effort to survive, Shannon Casey pitched an unconventional arrangement to Hi-Land Potato, perhaps Tan-O-On Marketing's most important producer: the parties would have a unique billing relationship, and Tan-O-On Marketing would operate from Hi-Land Potato's facilities, but the entities would remain separate in other respects.  Shannon Casey also tentatively asked whether Hi-Land Potato's principals would consider investing in Tan-O-On Marketing.

444.    Hi-Land Potato had reason to suspect that all was not well with Tan-O-On Marketing.  The entities had a recent communication breakdown, and Hi-Land Potato knew that: (i) Shannon Casey was under financial pressure; (ii) Shannon Casey thought Tan-O-On Marketing should be making more money; and (iii) Shannon Casey he had not been happy with

Tan-O-On Marketing's past accounting practices.  Hi-Land Potato did not, however, know the gravity of Tan-O-On Marketing's problems: specifically, it did not know that Tan-O-On Marketing could not pay its other producers and that it could only pay Hi-Land Potato by shorting those other producers.   Hi-Land Potato decided to go along with the billing arrangement: the arrangement would eliminate paperwork and payment delays, and it liked the idea of having its sales force in-house, like it had years before.  Hi-Land Potato did not, however, explore the investment opportunity, because it did not want to enter the sales business.

445.   The billing arrangement worked for a brief time, but Tan-O-On Marketing eventually collapsed.  Hi-Land Potato, frantic to sell its product, could not hire Shannon Casey, because he had signed a non-compete arrangement with Tan-O-On Marketing.  Hi-Land Potato could, however, hire Shawna Casey, because she had not signed a non-compete with Tan-O-On Marketing.  In the process, Hi-Land Potato assumed control over its relationship with Kroger Co. Kroger Co. did not mind the difference: rather than dealing with Hi-Land Potato, its trusted producer, only through a middleman, it could now deal directly with Hi-Land Potato.  Kroger Co. and Hi-Land Potato had stumbled onto the realization that Tan-O-On Marketing had not only become defunct, but its involvement in their relationship had become obsolete.

446.   The Andersons, believing they got the short end of the deal, accused Hi-Land Potato and the Worleys of fraud.  Skyline Potato and the Folson Farm Group, other producers, learned -- partially through departed ex-employee Wright -- of Hi-Land Potato's fortune and accused Hi-Land Potato of bilking them of their statutory trust benefits.  From the Skyline Potato's, the Folson Farm Group's, and Andersons' viewpoint, Hi-Land Potato had been a vulture, circling Tan-O-On Marketing until it succumbed, then picking it clean.  The evidence shows that Hi-Land Potato was in the right place at the right time and that it protected its own

interests, but not that it used its relationship with Tan-O-On Marketing to intentionally take advantage of fellow PACA trust beneficiaries.

447.    Regarding the Andersons' claims, although Hi-Land Potato and Tan-O-On Marketing did not merge in the legal sense of the term, this case is a story of vertical integration and its collateral damage.  What feels unfair to the Andersons is not the consequence of any deception by the Worleys, but of the invisible hand of the market, which swept away the need for the intermediary function that Tan-O-On Marketing once provided between Kroger Co. and Hi-Land Potato.

## **PROCEDURAL BACKGROUND**

### 1.    **Skyline Potato's Claims.**

1.    In Skyline Potato's Petition for Enforcement of USDA PACA Order and Award of Damages; Complaint for violation of Federal Unfair Trade Practices Provision in PACA (7 USC 499b), Breach of Contract, Breach of Covenant of Good Faith and Fair Dealing, Fraud, Money Owed on Open Account, and Prayer for Declaratory Relief and Piercing of the Corporate Veil, filed July 23, 2010 (Doc. 2)("Skyline Potato's Original Complaint"), it raised the following causes of action, without distinguishing among the Defendants: (i) "Petition for Enforcement of Order and Collection Under the PACA Trust," Skyline Potato's Original Complaint at 7-8; (ii) "Violation of PACA Unfair Business Conduct Provision," Skyline Potato's Original Complaint at 9; (iii) "Breach of Written Contract," Skyline Potato's Original Complaint at 9-10; (iv) "Breach of Implied Covenants of Good Faith and Fair Dealing," Skyline Potato's Original Complaint at 10-12; (v) "Quantum Meruit," Skyline Potato's Original Complaint at 12; (vi) "Conversion," Skyline Potato's Original Complaint at 12; "Fraud," Skyline Potato's Original Complaint at 13-14; (vii) "Money Due on an Open Account," Skyline Potato's Original

Complaint at 14-15; and (viii) "Prayer for the Remedy of 'Peircing the Corporate Veil,'" Skyline Potato's Original Complaint at 15-16.  Skyline Potato named the following entities as the Defendants: Tan-O-On Marketing; Hi-Land Potato; G. Anderson; J. Anderson; Mark Lounsbury and Bill Metz, in their "individual capacity[ies] and as Director[s]/Shareholder[s] of Tan-O-On Marketing"; and Carl Worley, individually, "as Director/Shareholder of Tan-O-On Marketing Inc., and as Director/Shareholder of Hi-Land Potato Company."  Skyline Potato's Original Complaint at 1.

2.     In its Memorandum Opinion and Order, filed January 24, 2011 (Doc. 23)(" MTD MOO"), the Court granted: i) the Motion to Dismiss as to Defendant Bill Metz, filed September 13, 2010 (Doc. 7); (ii) the Motion to Dismiss as to Defendant Mark Lounsbury, filed September 13, 2010 (Doc. 9); and (iii) the Unopposed Motion to Dismiss Defendants Hiland [sic] Potato Company, Mark Lounsbury, Bill Metz, and Carl Worley Without Prejudice, filed September 22, 2010 (Doc. 12), thereby dismissing Bill Metz, Mark Lounsbury, Carl Worley, and Hi-Land Potato.  See MTD MOO at 9.

3.     At a hearing held on October 3, 2011, the Court granted Skyline Potato Company's Opposed Motion for Leave to File Amended Complaint, filed June 7, 2011 (Doc. 54).  The Court memorialized this decision in its Memorandum Opinion and Order, filed November 23, 2011 (Doc. 83), and its Amended Memorandum Opinion and Order, filed December 2, 201 (Doc. 85).

4.     In its First Amended Petition and Complaint, Prayer for Declaratory Relief and Piercing of the Corporate Veil, filed October 21, 2011 (Doc. 73)("Skyline Potato's First Amended Complaint"), Skyline Potato asserts the following claims, without distinguishing among the Defendants for each claim: (i) "Petition for Enforcement of Order and Collection

Under the PACA Trust," Skyline Potato's First Amended Complaint ¶¶ 37-51, at 7-9; (ii) "Violation of PACA Unfair Business Conduct Provision," Skyline Potato's First Amended Complaint ¶¶ 52-57, at 9-10; (iii) "Breach of Written Contract," Skyline Potato's First Amended Complaint ¶¶58-65, at 10-11; (iv) "Breach of Implied Covenants of Good Faith and Fair Dealing," Skyline Potato's First Amended Complaint ¶¶66-77, at 11-12; (v) "Quantum Meruit," Skyline Potato's First Amended Complaint ¶¶78-80, at 12-13; (vi) "Conversion and Unlawful Retention of Plaintiff's Property and PACA Trust Assets," Skyline Potato's First Amended Complaint ¶¶ 81-89, at 13-14; (vii) fraud, see Skyline Potato's First Amended Complaint ¶¶ 90-97, at 14-15; (viii) "Money Due on an Open Account," Skyline Potato's First Amended Complaint ¶¶ 98-101, at 15-16; (ix) "Violation of PACA -- Failure to Maintain PACA Trust Assets and Creation of a Common Fund," Skyline Potato's First Amended Complaint ¶¶102-108, at 16-17; (x) fraudulent transfer, see Skyline Potato's First Amended Complaint ¶¶ 109-115, at 17; (xi) "Constructive Trust," Skyline Potato's First Amended Complaint ¶¶116-121, at 18; and (xii) "Prayer for the Remedy of 'Peircing [sic] the Corporate Veil,'" Skyline Potato's First Amended Complaint ¶¶122-126, at 19-20.

5.    The Court entered default judgment on Skyline Potato's PACA claims against Tan-O-On Marketing.  See Default Judgment Order at 2, filed March 23, 2012 (Doc. 140).

6.    In the Court's Stipulated Order Granting Joint Motion for Dismissal of Certain Claims by Plaintiff Skyline Potato Company Against Defendant Tan-O-On Marketing, filed April 18, 2012 (Doc. 158)("Stipulated Order"), the Court granted the parties' Joint Motion for Dismissal of Certain Claims by Plaintiff Skyline Potato Company against Defendants Tan-O-On Marketing, Inc.[,] Hi-Land Potato Company, Inc., and Carl Worley, filed April 17, 2012 (Doc. 155) and dismissed a number of claims.  As against Tan-O-On Marketing, the Court dismissed

Skyline Potato's claims for: (iv) "Breach of Implied Covenants of Good Faith and Fair Dealing"; (v) "Quantum Meruit"; (vii) fraud; (viii) "Money Due on an Open Account"; (x) fraudulent transfer; (xi) "Constructive Trust"; and (xii) "Prayer for Remedy of Piercing the Corporate Veil." Stipulated Order at 2. Against Hi-Land Potato and Carl Worley, the Court dismissed:  (i) "Petition for Enforcement of Order and Collection Under the PACA Trust," (ii) "Violation of PACA Unfair Business Conduct Provision"; (iii) "Breach of Written Contract"; (iv) "Breach of Implied Covenants of Good Faith and Fair Dealing"; (vii) fraud; (viii) "Money Due on an Open Account"; (ix) "Violation of PACA -- Failure to Maintain PACA Trust Assets and Creation of a Common Fund"; and (xii) "Prayer for the Remedy of Piercing the Corporate Veil."  Stipulated Order at 2-3.

7.       In their Stipulation for Voluntary Dismissal of Claims Asserted by Intervening Plaintiff Potandon Produce, L.L.C. Against Defendant Tan-O-On Marketing, Inc. and Third Party Defendants Hi-Land Potato Company, Inc. and Carl Worley, filed April 25, 2012 (Doc. 167)("Potandon Produce Stipulation"), the parties stipulated to dismiss all claims by Potandon Produce against Tan-O-On Marketing, Hi-Land Potato, and Carl Worley.  See Potandon Produce Stipulation at 1.

8.       During summary judgment briefing, Skyline Potato abandoned a number of claims.  The Court held a hearing on multiple motions for summary judgment on September 27, 2012, where Skyline Potato confirmed that it had abandoned all but the PACA claims.  See Transcript of Hearing at 4:20-5:5 (taken September 27, 2012)(Bohnhoff, Court, Jaramillo).[107]

9.       In the Pretrial Order, filed October 18, 2012 (Doc. 315), Skyline Potato and the Folson Farm Group indicated that they brought a claim only with respect to the alleged breach of

---

[107] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

the PACA trust.  See Pretrial Order at 4.

### 2.     The Folson Farm Group.

10.     In their Complaint in Intervention, filed July 8, 2011 (Doc. 60), Folson Farm, Potandon Produce,, Mart Produce, Billingsley Produce, Alsum Produce, and Peterson Brothers asserted claims for: (i) "Declaratory Relief Validating PACA Trust Claim" against Tan-O-On Marketing, Complaint in Intervention ¶¶6-16, at 4-6; (ii) "Enforcement of Payment From PACA Trust Assets" against Tan-O-On Marketing, Complaint in Intervention ¶¶ 17-21, at 6-7; (iii) "Violation of the PACA: Failure To Maintain PACA Trust Assets and Creation of Common Fund" against Tan-O-On Marketing, Complaint in Intervention ¶¶ 22-28 78; (iv) "Violation of PACA: Failure to Pay Promptly" against Tan-O-On Marketing, Complaint in Intervention ¶¶ 29-34, at 8-9; (v) breach of contract against Tan-O-On Marketing, see Complaint in Intervention ¶¶ 35-39, at 9-10; (vi) "Conversion and Unlawful Retention of PACA Trust Assets" against Hi-Land Potato, Complaint in Intervention ¶¶ 40-45, at 10-11; (vii) fraudulent transfer against Hi-Land Potato, see Complaint in Intervention ¶¶46-53, at 11-12; (viii) "Constructive Trust" against Hi-Land Potato, Complaint in Intervention ¶¶54-58, at 12-13; and (ix) unjust enrichment against Hi-Land Potato, see Complaint in Intervention ¶¶59-63, at 13-14.

11.     The Court entered default judgment on the Folson Farm Group's PACA claims against Tan-O-On Marketing.  See Default Judgment at 1-2, filed June 21, 2012 (Doc. 205).

12.     During summary judgment briefing, the parties abandoned a number of claims. The Court held a hearing on multiple motions for summary judgment on September 27, 2012, where the Court recognized, and the Folson Farm Group confirmed, that it had abandoned all but the PACA claims.  See Transcript of Hearing at 4:1-9 (taken September 27, 2012)(Court,

Esquivel).[108]

13.     In the Pretrial Order, Skyline Potato and the Folson Farm Group indicated that they brought a claim only with respect to the alleged breach of the PACA trust.  See Pretrial Order at 4.

### 3.     G. Anderson's, J. Anderson's, and Tan-O-On Marketing's Claims.

14.     In G. Anderson and J. Anderson's Third Party Complaint for Fraud, filed February 22, 2011 (Doc. 26)("Andersons' Complaint"), G. Anderson and J. Anderson purported to assert various fraud claims against Hi-Land Potato and Carl Worley.   Andersons' Complaint at 1-4.

15.     In what is labeled on the docket as Tan-O-On Marketing's, G. Anderson's, and J. Anderson's "Amended Third-Party Complaint for Fraud and Theft of Trade Secrets and Unjust Enrichment," filed October 14, 2011 (Doc. 72), those parties purported to assert, under a single heading, claims for "Fraud, Unjust Enrichment Theft or Conversion of Trade Secrets and Corporate and Personal Assets" against Hi-Land Potato, Carl Worley, and two additional Defendants: RPE, Inc. and Russell Wysocki.  Amended Third-Party Complaint at 3.

16.     In its Memorandum Opinion and Order, filed July 4, 2012 (Doc. 214)("Motion to Amend MOO"), the Court granted in part and denied in part:  (i) Tan-O-On Marketing Inc.'s Motion to Amend Third Party Complaint for Fraud and Theft of Trade Secrets and Unjust Enrichment, filed February 2, 2012 (Doc. 105); and (ii) Defendants Hi-Land Potato Company, Inc.'s and Carl Worley's Motion to Dismiss Fraud and Fraud-Related Claims in Third Party Complaint and to Dismiss Claims Filed by Gerald and Julie Anderson in Their Individual Capacities, filed February 7, 2012 (Doc. 109).  Motion to Amend MOO at 67-68.  The Court

---

[108] Although the transcript of the hearing identifies Katy Koestner Esquivel only as an "unidentified speaker," Transcript of Hearing at 4:9, from the context, it is evident that the Folson Farm Group's counsel, Ms. Esquivel, made this statement.

explained:

> The Court will permit Defendant Tan-O-On Marketing to assert only claims for unjust enrichment and theft of trade secrets against Third-Party Defendants RPE, Inc. and Russell Wysocki consistent with the allegations presented in Tan-O-On Marketing's Second Amended Third Party Complaint for Fraud and Theft of Trade Secrets and Unjust Enrichment and Unfair Trade Practices, filed February 2, 2012 (Doc. 105-1).  The Court will not permit Tan-O-On Marketing to assert any other claim against the RPE, Inc. Parties.  The Court will not permit Tan-O-On Marketing to assert a common-law fraud claim against Defendants Hi-Land Potato Company and Carl Worley.  The Court will not permit Tan-O-On Marketing to assert a claim under the New Mexico Unfair Practices Act, N.M.S.A. 1978, §§ 57-12-1 to -26, against the Hi-Land Potato Parties.  The Court will permit Tan-O-On Marketing to assert a fraudulent-conveyance claim against Hi-Land Potato consistent with the fraudulent-conveyance claim presented in Tan-O-On Marketing's Second Amended Third-Party Complaint.  The Court will permit Tan-O-Marketing to assert claims for unjust enrichment and theft of trade secrets against the Hi-Land Potato Parties consistent with the allegations in its Second Amended Third-Party Complaint.

Motion to Amend MOO at 68.

17.     In their Amended Third Party Complaint for Fraudulent Conveyance and Theft of Trade Secrets and Unjust Enrichment, filed July 26, 2012 (Doc. 240)("Tan-O-On Marketing's Second Amended Complaint"), Tan-O-On Marketing asserted claims for: (i) fraudulent conveyance against Hi-Land Potato, see Tan-O-On Marketing's Second Amended Complaint ¶¶ 39-62, at 8-12; (ii) theft of trade secrets and proprietary information against Hi-Land Potato, see Tan-O-On Marketing's Second Amended Complaint ¶¶ 62-80, at 12-17; (iii) theft of trade secrets against RPE, Inc. and Russell Wysocki, Tan-O-On Marketing's Second Amended Complaint ¶¶ 81-103, at 17-22; (iv) "Unjust Enrichment and Unfair Trade Practice" against RPE, Inc. and Russell Wysocki, Tan-O-On Marketing's Second Amended Complaint ¶¶102-108, at 22-23; and (v) unjust enrichment against Hi-Land Potato and Carl Worley, see Tan-O-On Marketing's Second Amended Complaint ¶¶ 109-113, at 24-25.

18.     In their Stipulation of Dismissal of All Claims Against RPE, Inc., and Russell

Wysocki with Prejudice, filed August 14, 2012 (Doc. 257), the parties informed the Court that they stipulated to "dismissal with prejudice of any and all claims that any of them asserted, or could have asserted, in this matter against Third-Party Defendant RPE, Inc., Third-Party Defendant Russell Wysocki, or their respective employees, agents, and/or assigns."  Stipulation of Dismissal of All Claims Against RPE, Inc., and Russell Wysocki with Prejudice at 1.  The parties also informed the Court that, "following said dismissal, there are no claims remaining in this matter against" RPE, Inc. or Wysocki, "and they are no longer parties to this action." Stipulation of Dismissal of All Claims Against RPE, Inc., and Russell Wysocki with Prejudice at 1-2.

19.     In the Pretrial Order, G. Anderson, J. Anderson, and Tan-O-On Marketing indicated that they brought claims for theft of trade secrets, fraudulent conveyance, and unjust enrichment.  See Pretrial Order at 5.

### 4.     Hi-Land Potato and Carl Worley.

20.     In Third-Party Defendant Hi-Land Potato Company, Inc.'s and Carl Worley's Answer to Third-Party Complaint for Fraudulent Conveyance, Theft of Trade Secrets, and Unjust Enrichment, and Counterclaim Against Tan-O-On Marketing, Inc., filed August 10, 2012 (Doc. 256), Hi-Land Potato and Carl Worley contend that, if the Court finds them liable to Skyline Potato or the Folson Farm Group, they are "entitled to indemnification, contribution, and/or subrogation against [Tan-O-On Marketing] for the amount of such liability."  Third-Party Defendant Hi-Land Potato Company, Inc.'s and Carl Worley's Answer to Third-Party Complaint for Fraudulent Conveyance, Theft of Trade Secrets, and Unjust Enrichment, and Counterclaim Against Tan-O-On Marketing, Inc. at 13.  In Third-Party Defendant Hi-Land Potato Company, Inc.'s and Carl Worley's Amended Answer to Third-Party Complaint for Fraudulent

Conveyance, Theft of Trade Secrets, and Unjust Enrichment, and Counterclaim Against Tan-O-On Marketing, Inc., filed August 15, 2012 (Doc. 259), Hi-Land Potato and Carl Worley assert the same theory of liability. See Third-Party Defendant Hi-Land Potato Company, Inc.'s and Carl Worley's Amended Answer to Third-Party Complaint for Fraudulent Conveyance, Theft of Trade Secrets, and Unjust Enrichment, and Counterclaim Against Tan-O-On Marketing, Inc. at 13.

21.     In the Pretrial Order, Hi-Land Potato indicates that the Court should offset its liability, if any, from G. Anderson and Tan-O-On Marketing's assets. See Pretrial Order at 4.

## CONCLUSIONS OF LAW

## I.   HI-LAND POTATO DID NOT BREACH ITS DUTIES UNDER THE PACA TRUST.

1.     Congress enacted PACA[109] in 1930 "to prevent unfair business practices and promote financial responsibility in the fresh fruit and produce industry." Boulder Fruit Exp. & Heger Organic Farm Sales v. Transp. Factoring, Inc., 251 F.3d 1268, 1271 (9th Cir. 2001)(citing Sunkist Growers, Inc. V. Fisher, 104 F.3d 280, 282 (9th Cir. 1997)). Congress amended PACA in 1984 to "protect the public interest," and to remedy the problem of suppliers or sellers of produce being the last to get paid by an insolvent merchant, dealer, or broker, "caused by financing arrangements under which commission merchants, dealers, or brokers, . . . encumber or give lenders a security interest in . . . any receivables or proceeds from the sale of such commodities or products . . . ." 7 U.S.C. § 499e(c)(1). Congress created the PACA trust, defined in § 499e(c)(2), as a remedy:

---

[109] Only once has the United States Court of Appeals for the Tenth Circuit cited to PACA section five, 7 U.S.C. § 499e, and then only in passing. See Spano v. Western Fruit Growers, 83 F.2d 150, 151 (10th Cir. 1936)(noting that § 499e "provides that any commission merchant, dealer or broker who thus rejects such a perishable commodity shall be liable for the damages sustained in consequence of his action"). The Supreme Court of the United States has never referenced or cited to any PACA provision.

> Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents.

7 U.S.C. § 499(3)(c)(2).  "Congress explained that 'the purpose of the trust is to increase the legal protection for unpaid sellers and suppliers of perishable agricultural commodities until full payment of sums due have been received by them.'"  H.C. Schmieding Produce v. Alfa Quality Produce, 597 F. Supp. 2d 313, 315-16 (E.D.N.Y. 2009)(quoting "R" Best Produce, Inc. v. Shulman-Rabin Marketing Corp., 467 F.3d 238, 241 (2d Cir. 2006))(internal alterations omitted).

**A.  BECAUSE HI-LAND POTATO RECEIVED PAYMENTS FORTY DAYS OR MORE AFTER SOME SHIPMENTS AND FAILED TO PRESERVE ITS PACA BENEFITS -- AT WHICH POINT THE PACA BENEFITS CEASED FOR SUCH SHIPMENTS -- HI-LAND POTATO IS A GENERAL CREDITOR FOR THOSE PACA TRUST ASSETS.**

**1.  <u>Hi-Land Potato Automatically Became a Beneficiary of a Single PACA Trust for the Benefit of All Beneficiaries Immediately Upon its Produce's Transfer of Title</u>.**

2.  "Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose."  Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 194 (1985)(citing American Tobacco Co. v. Patterson, 456 U.S. 63, 68 (1982)).  In construing § 944e to determine the scope of the statutory trust, the Court must read the statute as a whole, rather than reading only § 944e(c)(2).  See United States v. Atl. Research Corp., 551 U.S. 128, 135 (2007)("Statutes must be read as a whole.")(quoting King v. St. Vincent's Hospital, 502 U.S. 215, 221 (1991)).  Section 499e(c), paragraphs 2-4, of Title 7 of the United States Code provides:

(**2**) Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents. Payment shall not be considered to have been made if the supplier, seller, or agent receives a payment instrument which is dishonored. The provisions of this subsection shall not apply to transactions between a cooperative association, as defined in section 1141j(a) of Title 12, and its members.

(**3**) The unpaid supplier, seller, or agent shall lose the benefits of such trust unless such person has given written notice of intent to preserve the benefits of the trust to the commission merchant, dealer, or broker within thirty calendar days (i) after expiration of the time prescribed by which payment must be made, as set forth in regulations issued by the Secretary, (ii) after expiration of such other time by which payment must be made, as the parties have expressly agreed to in writing before entering into the transaction, or (iii) after the time the supplier, seller, or agent has received notice that the payment instrument promptly presented for payment has been dishonored. The written notice to the commission merchant, dealer, or broker shall set forth information in sufficient detail to identify the transaction subject to the trust. When the parties expressly agree to a payment time period different from that established by the Secretary, a copy of any such agreement shall be filed in the records of each party to the transaction and the terms of payment shall be disclosed on invoices, accountings, and other documents relating to the transaction.

(**4**) In addition to the method of preserving the benefits of the trust specified in paragraph (3), a licensee may use ordinary and usual billing or invoice statements to provide notice of the licensee's intent to preserve the trust. The bill or invoice statement must include the information required by the last sentence of paragraph (3) and contain on the face of the statement the following: "The perishable agricultural commodities listed on this invoice are sold subject to the statutory trust authorized by section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499e(c)). The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received.".

7 U.S.C. § 499e(c)(2)-(4).

     3.      The first step in construing a statute requires the court to "determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in

the case." Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997). The inquiry stops there "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" Robinson v. Shell Oil Co., 519 U.S. at 340 (citing United States v. Ron Pair Enterprises, Inc., 489 U.S. 235, 240 (1989)). Whether the statutory language is plain on its face or ambiguous "is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Robinson v. Shell Oil Co., 519 U.S. at 341 (citing Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 477 (1992)).

4.     Read in the context of the statute as a whole, the required notice provisions of § 499e(c)(3) and § 499e(c)(4) support the interpretation that the PACA trust arises automatically and a produce supplier becomes a PACA beneficiary upon transfer of title to the produce. This conclusion follows from the language that, if an unpaid supplier does not abide by the notice provisions within the statutory time period -- if it does not "preserve" its benefits, it "lose[s]" the benefits of the trust with regard to that particular shipment:

> The unpaid supplier, seller, or agent shall lose the benefits of such trust unless such person has given written notice of intent to preserve the benefits of the trust to the commission merchant, dealer, or broker within thirty calendar days (i) after expiration of the time prescribed by which payment must be made, as set forth in the regulations issued by the Secretary, (ii) after the expiration of such other time by which payment must be made, as the parties have expressly agreed to in writing before entering into the transaction, or (iii) after the time the supplier, seller or agent has received notice that the payment instrument promptly presented for payment has been dishonored.

7 U.S.C. § 499e(c)(3) (emphasis added). The PACA statute as a whole, however, is silent as to anything a supplier needs to do beyond being a supplier to become a PACA beneficiary. Because the PACA notice provisions in § 499e(c)(3) and § 499e(c)(4) operate to strip the PACA beneficiary of the PACA trust benefits unless the beneficiary acts to retain the benefits, the supplier has to have been a PACA beneficiary to lose the 7 U.S.C. Section 499e(c)(4) provides

an additional method to "preserve" the PACA benefits.  See § 499e(c)(4) ("In addition to the method of underlining preserving the benefits of the trust specified in paragraph (3), a licensee may use ordinary and usual billing or invoice statements to provide notice of the licensee's intent to preserve the trust benefits . . . .")(emphasis added). The required notice provisions of § 499e(c)(3) and § 499e(c)(4), therefore, support the interpretation that a supplier is automatically granted PACA beneficiary status upon sale of the produce.

5.      The United States Courts of Appeal have also found that suppliers become PACA trustees automatically upon sale of the produce.  The United States Court of Appeals for the Ninth Circuit has stated:  "The trust automatically arises in favor of a produce seller upon delivery of produce and is for the benefit of all unpaid suppliers or sellers involved in the transaction until full payment of the sums owing has been received." In re Milton Poulos, Inc., 947 F.2d 1351, 1352 (9th Cir. 1991)(citing  7 U.S.C. § 499e(c)(2)).  See Patterson Frozen Foods, Inc. v. Crown Foods Intern., Inc., 307 F.3d 666, 669 (7th Cir. 2002)("This floating trust is automatically created when the dealer accepts the goods so long as the supplier complies with the specific notice requirements set out in 7 U.S.C. § 499e(c) and 7 C.F.R. § 46.46(f).")(citing Greg Orchards & Produce, Inc. v. Roncone, 180 F.3d 888, 890-91 (7th Cir. 1999)); D.M. Rothman & Co., Inc. v. Korea Commercial Bank of New York, 411 F.3d 90, 96 (2d Cir. 2005)("[A] PACA trust is automatically established each time a broker or merchant purchases perishable commodities upon credit . . . ."); Skone & Connors Produce, Inc. v. Panattoni, 37 F.3d 1506, *1 (9th Cir. 1994)(unpublished table opinion)("When Skone & Connors Produce, Inc. delivered potatoes to FreshPict's client a nonsegregated trust was automatically created under the Perishable Agricultural Commodities Act (PACA).").

6.      The PACA trust provision, read in the context of the statute as a whole, supports

the interpretation that the PACA trust arises automatically.  As a produce supplier, therefore, Hi-Land Potato automatically became a PACA beneficiary upon transfer of the produce's title.  As with any of Tan-O-On Marketing's suppliers for which Tan-O-On Marketing acts as a "commission merchant, dealer, or broker," 7 U.S.C. § 499(3)(c)(2), once title to Hi-Land Potato's potatoes was transferred, Hi-Land Potato automatically became a beneficiary of Tan-O-On Marketing's trust.

7.      Section § 499e(c)(2) covers "commodities received . . . in all transactions," but also states that the proceeds and receivables "shall be held . . . in trust for the benefit of all unpaid suppliers or sellers . . . involved in the transaction until full payment of the sums owing in connection with such transactions."  7 U.S.C. § 499e(c)(2) (emphasis added).  Throughout § 499e(c)(3) and § 499e(c)(4), Congress refers only to "such trust" or "the trust."  On the other hand, it might be possible to interpret § 499e(c)(4) as providing for multiple PACA trusts, reading the language that "[t]he seller of these commodities retains a trust claim over these commodities" to provide for separate trusts for each individual contract or shipment.  7 U.S.C. § 499e(c)(4).  The language "[t]he seller of these commodities retains a trust claim over these commodities" may also be construed, however, as a means of including each shipment in the trust's res and preserving the extension of the PACA trusts benefits to each shipment.  7 U.S.C. § 499e(c)(4).  Thus, rather than creating a separate PACA trust for each shipment, failing to provide the seller with the notice required by § 499e(c)(3) or § 499e(c)(4) results in the particular shipment not being covered under the PACA trust, and thus not counting toward the supplier's *pro rata* share.  If, on the other hand, the statute were to provide multiple individual PACA trusts for each shipment, tracing would become a necessary and a principle part of recovering PACA trust assets.  With multiple individual PACA trusts, the proceeds of each produce shipment

- 132 -

would become trust assets of a distinct PACA trust.  For a PACA beneficiary to enforce its PACA trust benefits when the trustee misses payments for a shipment, the supplier would necessarily have to trace the PACA trustee's assets to prove that such assets are the proceeds of its individual PACA trust.  Such tracing would be necessary so that the assets of one PACA trust could be distinguished from the assets of other beneficiaries' PACA trusts or even the beneficiary's separate PACA trusts for which the PACA trustee has not missed payments.  More likely, by including the language "these commodities," 7 U.S.C. § 499e(c)(4), only in the notice provisions and excluding it from the provision creating the PACA trust, Congress intended that, if a supplier is not diligent in giving the PACA trustee notice of its intent for a shipment to be part of the PACA trust, the PACA trust benefits do not extend to that particular shipment.  See Burlington N. & Santa Fe. Ry. Co. v. White, 548 U.S. 53, 62 (2006))("We normally presume that, where [Congress'] words differ . . . , 'Congress acts intentionally and purposely in the disparate inclusion or exclusion.'")(quoting Russello v. United States, 464 U.S. 16, 23 (1983)).

8.    The Court's conclusion that there is one singular PACA trust comports with the U.S.D.A.'s regulations interpreting the statutory trust in §499e(2).  The U.S.D.A. has interpreted the statute to create a single PACA trust, stating that "[t]rust assets are to be preserved as a nonsegregated 'floating' trust."  7 C.F.R. § 46.46(b).  This nonsegregated floating trust permits the commingling of trust assets.  The U.S.D.A. notes that its regulations interpreting the statutory trust and identifying it specifically as a floating trust "clarifies the intent of Congress."  Regulations Under the Perishable Agricultural Commodities Act; Addition of Provisions To Effect a Statutory Trust, 49 Fed. Reg. 45,735, 45,738 (Nov. 20, 1984).  Thus, the U.S.D.A. designed the statutory trust regulations to effect what it saw as Congress' intent in its 1984 amendments to PACA that created the trust:

> Section 5(c)(2) impresses <u>a</u> <u>trust</u> <u>for</u> <u>the</u> <u>benefit</u> <u>of</u> <u>all</u> unpaid sellers or suppliers on perishable agricultural commodities received by a commission merchant, dealer, or broker <u>in</u> <u>all</u> <u>transactions</u> . . . and any receivables or proceeds from the sale of such commodities or products until full payment is made of the sums owing in connection with such transactions . . . .  The trust impressed by section 5(c)(2) <u>is a nonsegregated 'floating trust' made up of all a firm's commodity</u> <u>related liquid assets, under which there may be a commingling of trust assets</u> . . . . Since commingling is contemplated, all trust assets would be subject to the claims of unpaid seller-suppliers and agents to the extent of the amount owed them.

H.R. Rep. No. 98-543, at 5 (emphasis added).   Because the regulations interpreting the statutory trust in §499e(2) comport with the Court's construction of the statute's plain language and with the intent expressed in the House Report, the U.S.D.A.'s definition of the trust in 7 C.F.R. § 46.46(b) is a reasonable statutory interpretation.  The Supreme Court has directed federal courts to accept a government agency's reasonable interpretation of a statue where Congress has "delegated authority to the agency generally to make rules carrying the force of law, and . . . the agency interpretation claiming deference was promulgated in the exercise of that authority." United States v. Mead Corp., 533 U.S. 218, 226.  See Chevron, U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 845 (1984)("If this choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.")(quoting United States v. Shimer, 367 U.S. 374, 382 (1961)).  Congress delegated authority to make such rules to the U.S.D.A.'s Secretary.  See 7 U.SC. 499(*o*).  The Court therefore concludes that the U.S.D.A.'s definition of the PACA trust in 7 C.F.R. § 46.46(b) as a single ongoing floating trust is entitled to the Court's deference.

9.   The House Report's stated intent that a supplier automatically becomes a participant in the trust suggests the construction of the statute to create a single ongoing PACA trust.

> As each supplier, seller, or agent transfers ownership, possession, or control of perishable agricultural commodities to a commission merchant, dealer, or broker, such supplier, seller, or agent will automatically become a participant in the trust. Trust participants who file, in accordance with the provisions of this act, to preserve their right to benefits remain trust beneficiaries until they have received payment in full. When Payment is received for individual produce shipments the amount of the trust will be reduced accordingly.

H.R. Rep. No. 98-543, at 5 (1983) reprinted in 1983 U.S.C.C.A.N. 405, 408 (emphasis added).

Congress stated that a supplier automatically "becomes a participant in the trust," rather than stating that a PACA trust is automatically created. The Court believes that Congress did so purposefully and intentionally, concluding that Congress' purpose was to provide a single ongoing trust rather than individual separate trusts created each time a supplier ships its produce.

10.     The United States Court of Appeals for the Second Circuit's conclusion that "a single PACA trust exists for the benefit of all of the sellers to a Produce Debtor, and continues in existence until all of the outstanding beneficiaries have been paid in full," supports the Court's conclusion. In re Kornblum & Co., Inc., 81 F.3d 280, 286 (2d Cir. 1996). The Second Circuit, tasked with interpreting whether § 499e(c)(2) created a single trust or multiple trusts, noted that all of the language in the statutory provision counsels in favor of a single trust, except the phrase "involved in the transaction." 81 F.3d at 286 (quoting 7 U.S.C. § 499(e)(2)). The Second Circuit construed this phrase "as having the meaning, in context, of 'involved in any such transaction,' thereby harmonizing with the balance of the language in § 499e(c)(2)." In re Kornblum & Co., Inc., 81 F.3d at 286. The Second Circuit concluded that this construction is reasonable based on the fact that the rest of the language in § 499e(c)(2) refers to "all transactions":

> As previously noted, § 499e(c)(2) directs that
>
> > commodities received . . . in all transactions, and all inventories of food or other products derived [therefrom], and any receivables or

> proceeds from the sale of such commodities or products, shall be
> held . . . in trust for the benefit of all unpaid suppliers or sellers of
> such commodities or agents involved in the transaction, until full
> payment of the sums owing in connection with such transactions
> has been received.
>
> [7 U.S.C. § 499e(c)(2)] (emphasis added). All of the emphasized language points
> to a single, undifferentiated trust for the benefit of all sellers or suppliers of
> Produce except the phrase "involved in the transaction," which we do not read as
> countermanding the clear import of the balance of the statutory language.

81 F.3d at 286. The Second Circuit's construction is reasonable, because by providing that

"commodities . . . [of] all transactions . . . and any receivables or proceeds from the sale of such

commodities" shall be held in trust, it is reasonable to conclude that Congress intended to make

one trust with the res consisting of the proceeds of all transactions. The Second Circuit also

noted that its interpretation was proper under Chevron, U.S.A., Inc. v. Natural Res. Def. Council,

Inc., because "the regulation . . . implement[ing] the statutory trust, 7 C.F.R. § 46.46, clearly

delineates a single, undifferentiated trust for the benefit of all sellers and suppliers." In re

Kornblum & Co., Inc., 81 F.3d at 286.

    11.    Each time title to Hi-Land Potato's potatoes was transferred -- with each separate

shipment of potatoes -- that particular shipment became part of Tan-O-On Marketing's single

PACA trust. It is not the case that each individual shipment of Hi-Land Potatoes became its own

separate PACA trust. Were the Court to construe PACA otherwise, as creating multiple and

separate PACA trusts for each produce shipment, beyond being contrary to the interpretation as

creating one PACA trust to protect all PACA beneficiaries and produce shipments, such an

interpretation could not easily be squared with distribution of PACA trust's assets *pro rata* to

beneficiaries. To have one PACA trust for the benefit of all of the PACA trustee's suppliers that

provides equal protection to all PACA beneficiaries and all shipments covered by the PACA

trust  -- as opposed to multiple PACA trusts for each shipment -- is more in line with the idea of

equal protection of PACA beneficiaries upon bankruptcy via the *pro rata* distribution of the PACA trustee's assets.   Thus, the Tan-O-On Marketing PACA trust, of which Hi-Land Potato automatically became a beneficiary, is one single, perpetual trust that included all of Tan-O-On Marketing's other produce suppliers, and the benefit of which extended to all shipments that the PACA trust covered.

> **2.**     **Hi-Land Potato Did Not Act to Preserve its Benefits and Thus Lost the PACA Trust Benefits for Those Shipments for Which it Did Not Receive Payment Within Forty Days.**

12.     Although a supplier becomes a PACA trust beneficiary automatically upon the merchant's, dealer's, or broker's acceptance of the goods, the supplier's protection as a PACA trust beneficiary for the commodities shipped in the particular transaction requires that the supplier provide the PACA trustee the notice required in § 499e(c)(3) or § 499e(c)(4).   See 7 U.S.C. § 499(e)(c)(3-4). The Ninth Circuit has held: "The unpaid supplier loses the benefits of the trust unless [it] gives written notice of . . . intent to preserve the benefits of the trust to the produce dealer and files the notice with the United States Department of Agriculture . . . within the statutorily prescribed time period."  In re Milton Poulos, Inc., 947 F.2d at 1352-53 (citing 7 U.S.C. § 499e(c)(3)).   See In re Lombardo Fruit and Produce Co., 12 F.3d 110, 112 (8th Cir. 1993)("[T]he unpaid supplier or seller loses the benefits of the trust protection unless it 'has given written notice of intent to preserve the benefits of the trust . . . .").   See also 49 Fed. Reg. at 45,738 ("The legislation is clear that an absolute precondition to pursuing trust assets held by a defaulting buyer or receiver is the filing of a written notice by the seller, supplier or agent after a failure to pay within the prescribed time periods has elapsed.").   To remain entitled to PACA benefits and the privilege of being escalated to a priority creditor, a PACA beneficiary must adhere to the statutory requirements.  See Idahoan Fresh v. Advantage Produce, Inc., 157 F.3d

197, 203 (3d Cir. 1998)("The plain language of section 499e(c)(3), in particular Congress's use of the term 'shall,' unambiguously requires that an agreement to extend the payment term be in writing in order for the seller to preserve its PACA trust benefits.").

13.     If a PACA beneficiary does not adhere to the statutory requirements, the PACA beneficiary loses its trust benefits and becomes an unsecured creditor of the PACA trustee.  See In re Lombardo Fruit and Produce Co., 12 F.3d at 114.  In In re Lombardo Fruit and Produce Co., the United States Court of Appeals for the Eighth Circuit held that a shipper who could not prove that it strictly adhered to the statutory notice requirements in § 499e(c)(3) or § 499e(c)(4) had lost "its entitlement to PACA trust protection," and could not collect payments from trust assets in front of the secured creditors of the trustee. 12 F.3d at 114.  The supplier submitted a letter from the supplier as evidence of a written agreement to extend the payment period from ten days to thirty days.  See 12 F.3d at 113.  Because the letter was undated, however, the Eighth Circuit found this insufficient proof that the parties "'expressly agreed to [extend the deadline] in writing before entering into' the underlying transaction for produce." In re Lombardo Fruit and Produce Co., 12 F.3d at 113 (quoting 7 U.S.C. § 499e(c)(3)(ii))(emphasis in original).   The Eighth Circuit held that the supplier's failure to strictly adhere to the statute in preserving its PACA beneficiary status resulted in loss of its ability to enforce the trust benefits and to enjoin the PACA trustee's secured creditor from exercising its priority interest in the PACA trustee's accounts receivable.  See In re Lombardo Fruit and Produce Co., 12 F.3d at 112.

14.     Where Hi-Land Potato received payment for shipment of its potatoes from Tan-O-On Marketing within forty days, it was not an unpaid seller.  Thus, while the payments Hi-Land Potato received within the forty day window were assets of Tan-O-On Marketing's PACA trust from the time that title of the produce was transferred until the time that they money was

paid to Hi-Land Potato, once Hi-Land Potato received the payment, while Hi-Land Potato remained a trust beneficiary to the extent that it had other transactions covered by Tan-O-On Marketing's PACA trust, the PACA trust benefits no longer cover the particular transaction for which Hi-Land Potato was paid.

15.     Although Hi-Land Potato became a beneficiary of Tan-O-On Marketing's PACA trust automatically -- the benefits of which automatically covered the shipment of Hi-Land Potato's Potatoes -- because an unpaid seller must take affirmative action to preserve its PACA beneficiary benefits, Hi-Land Potato was required to take action to preserve its benefits if it remained unpaid at forty days.  7 U.S.C. § 499e(3), the PACA notice provision, provides that an unpaid supplier loses the PACA trust's benefits unless the supplier "has given written notice of intent to preserve the benefits of the trust to the commission merchant, dealer, or broker within thirty calendar days (i) after expiration of the time prescribed by which payment must be made, as set forth in regulations issued by the Secretary . . . ."  7 U.S.C. § 499e(c)(3).  The regulations provide that "[p]ayment for produce purchased by a buyer [must be made] within 10 days after the day on which the produce is accepted . . . ."  7 C.F.R. § 46.2(aa)(5).  See In re Richmond Produce Co., Inc., 112 B.R. 364, 372 (Bankr. N.D. Cal. 1990), overruling on other grounds recognized by In Re Ebro Foods, Inc., 44 B.R. 759, 765 (Bankr. N.D. Ill. 2011)(noting that "[a] default [which begins to run the thirty-day statutory notice period] occurs ten days following the buyer's acceptance of the produce")(citing 7 C.F.R. § 46.2(aa)).  Hi-Land Potato was a shipper and its produce was purchased by the buyer -- i.e., Kroger Co.  Hi-Land Potato was thus required to give the PACA trustee written notice of its intent to preserve its PACA benefits within forty days of the buyer's acceptance of the produce unless Hi-Land Potato was paid fully within that time.

16.     Because Hi-Land Potato did not provide written notice before the forty day-period required under PACA, where notice is required only to preserve benefits if full payment takes more than forty days, its failure to provide the notice did not change the status of the full payments that it had already received for previous shipments.  Were it otherwise, rather than providing protection to the "unpaid suppliers," 7 U.S.C. § 499e(c), PACA would provide protection only to unpaid suppliers who provided the statutory notice for every shipment.  Thus, were the rule to the contrary, as soon as a supplier receives payment more than forty days after shipment, or merely forgets to provide the statutory notice for shipments for which it received late payment, that one slip-up would result in the supplier then having to disgorge payments for all shipments, including every other shipment for which it had complied with the PACA statutory requirements.  That result cannot be what Congress intended in creating the PACA statute to remedy "the burden on commerce . . . caused by financing arrangements under which commission merchants, dealers, or brokers, who have not made payment for . . . commodities purchased, contracted to be purchased, or otherwise handled by them on behalf of another person, encumber or give underlining{lenders} a security interests [in them and their proceeds]."  7 U.S.C. § 499e(c)(1) (emphasis added).

17.     On the other hand, because Hi-Land Potato did not timely provide notice of its intent to preserve PACA trust benefits over certain shipments, it is not entitled to the PACA trust benefits of Tan-O-On Marketing's PACA trust on any shipments, the proceeds of which became assets of Tan-O-On Marketing's PACA trust, and for which Tan-O-On Marketing did not pay those PACA trust assets to Hi-Land Potato within the forty-day time period.  Those shipments for which Hi-Land Potato was not paid within the forty-day period were not subject to the PACA trust benefits.  These payments effectively would not, therefore, be included in Hi-Land Potato's

interest in Tan-O-On Marketing's PACA trust.  Additionally, any payments made to Hi-Land Potato more than forty days after transfer of title to the shipments were paid to Hi-Land Potato as a general creditor out of the particular PACA trust, and Hi-Land Potato received those PACA trust assets as a general creditor and not as a PACA trust beneficiary.

### C.   HI-LAND POTATO DID NOT BREACH ITS TRUST DUTIES AS A GENERAL CREDITOR OR AS A CO-BENEFICIARY OF TAN-O-ON MARKETING'S PACA TRUST.

18.    The United States Circuit Courts of Appeal, in construing PACA, have uniformly held that "[t]he interpretation of PACA trust interests is guided by general trust principles to the extent there is no conflict with the statute."  In re Arctic Exp. Inc., 636 F.3d 781, 798 (6th Cir. 2011)(quoting Consumers Produce Co. v. Volante Wholesale Produce, Inc., 16 F.3d 1374, 1381 (3d Cir.1994)).  See R Best Produce, Inc. v. Shulman-Robin Marketing Corp., 467 F.3d 238, 242 (2d Cir. 2006)(noting that the Second Circuit has "previously noted that PACA trusts are 'governed by general principles of trust law.'")(quoting Albee Tomato, Inc. v. A.B. Shalom Produce Corp., 155 F.3d 612, 615 (2d Cir 1998)); Bear Mountain Orchards, Inc. v. Mich-Kim, Inc., 623 F.3d 163, 167 (3d Cir. 2010)("General trust principles of trust law apply to trusts created under PACA . . . .")(quoting Nickey Gregory Co., LLC v. AgriCap, LLC, 597 F.3d 591, 595 (4th Cir. 2010)); Reaves Brokerage Co., Inc. v. Sunbelt Fruit & Vegetable Co., Inc., 336 F.3d 410, 413 (5th Cir. 2003)("General principles of trust law govern PACA trusts."); Boulder Fruit Exp. & Heger Organic Farm Sales v. Transp. Factoring, Inc., 251 F.3d at 1271 ("We apply general trust principles to questions involving the PACA trust, unless those principles directly conflict with PACA."); Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir.1997)("General principles of trust law govern the PACA trust . . . .").  This interpretation is sound, because § 499e(2) expressly uses the word trust, thus indicating Congress intended the

PACA trusts to be administered under general trust principles like any other trust.  See In re Arctic Exp. Inc., 636 F.3d at 794 (6th Cir. 2011)(noting that "common law principles apply to the formation of [Congress' numerous] statutory trusts").

19.     The United States Circuit Courts of Appeal have consistently looked to the Restatement of the Law of Trusts to provide the general principles of trust law.

> [A] trust involves three elements: (1) a trustee, who holds the trust property and is subject to duties to deal with it for the benefit of one or more others; (2) one or more beneficiaries, to whom and for whose benefit the trustee owes the duties with respect to the trust property; and (3) trust property, which is held by the trustee for the beneficiaries."

In re Arctic Exp. Inc., 636 F.3d at 794 (quoting Restatement (Third) of Trusts § 2, cmt. f).  Thus, in Consumers Produce Co. v. Volante Wholesale Produce, Inc., the United States Court of Appeals for the Third Circuit held that, because the transferee met the requirements in Restatements (Second) of Trusts § 284, which exempts a third-party transferee from liability where the third-party is a bona fide purchaser for value without notice that the transfer was in breach of the trust, the transferee was not required to disgorge the payments made in breach of the PACA trust.  See 16 F.3d at 1385.  Similarly, in C.H. Robinson Co. v. Trust Co. Bank, N.A., the United States Court of Appeals for the Eleventh Circuit concluded that the district court erred in determining that a third-party transferee with knowledge of the existence of the PACA trust was required to disgorge payments made in breach of the trust, because the court did not faithfully apply general trust law  principles:

> First, the district court erred in its conclusion that transferee liability under traditional trust law turns on "actual knowledge of the trust." . . . A transferee takes property free of trust if he received it for value and without notice of the breach of trust. "If the trustee transfers trust property in breach of trust to a transferee for value, the transferee takes free of the trust although he had notice of the existence of the trust, unless he has notice that the trustee is committing a breach of trust in making the transfer." Restatement (Second) of Trusts § 296. . . . Second, the district court erroneously created an exception to general trust

- 142 -

> principles by imposing transferee liability upon lenders which happen to have a security interest in trust assets. We conclude that such an exception is inconsistent with established precedent and the intent of Congress.

C.H. Robinson Co. v. Trust Co. Bank, N.A., 952 F.2d 1311, 1314 (11th Cir. 1992)(emphasis in original).

20.     Under general trust principles, because the merchant's, dealer's, or broker's proceeds from the sales of produce commodities under PACA are held in trust for the suppliers as PACA trust beneficiaries, the merchant, dealer, or broker becomes a PACA trustee subject to a trustee's fiduciary duties.  "An individual who is in a position to control the assets of the PACA trust and fails to preserve them, may be held personally liable to the trust beneficiaries for breach of fiduciary duty."  Coosemans Specialties, Inc. v. Gargiulo, 485 F.3d 701, 705 (2d Cir. 2007).  See Weis-Buy Servs., Inc. v. Paglia, 411 F.3d 415, 422 (3d Cir. 2005)(analyzing whether the plaintiff's claim against the PACA trustee failed, because the statute of limitations for a trustee's breach of fiduciary duty claim had run).  "PACA trust rights may be enforced . . . through a court action for breach of fiduciary trust . . . permit[ting] recovery against both the corporation and its controlling officers."  Patterson Frozen Foods, Inc. v. Crown Foods Intern., Inc., 307 F.3d 666, 669 (7th Cir. 2002)(citing Golman-Hayden Co. v. Fresh Source Produce, Inc., 217 F.3d 348, 351 (5th Cir.2000)).  See Farm-Wey Produce, Inc. v. Wayne Bowman Co., Inc., 973 F. Supp. 778, 785 (E.D. Tenn. 1997)(concluding that PACA trustee did not violate its fiduciary duty as a trustee, because it did not violate its duty under Restatement (Second) of Trusts § 174 "to exercise the skill and care of a person of ordinary prudence . . . in dealing with his own property").

### 1.     PACA Beneficiaries' Protections and Remedies to Prevent the Dissipation of Funds.

21.     The PACA trust was created to protect a supplier and PACA beneficiary by

ensuring that the assets of the trust, the proceeds from the shipment of produce, are not dissipated before the suppliers are paid.  The first protection for suppliers from a merchant's, dealer's, or broker's dissipation of PACA trust funds is to seek an injunction.  Section 499e(5) provides the equitable remedies available to suppliers under PACA: "The several district courts of the United States are vested with jurisdiction specifically to entertain (i) actions by trust beneficiaries to enforce payment from the trust, and (ii) actions by the Secretary to prevent and restrain dissipation of the trust."  7 U.S.C. § 499e(c)(5).  Dissipation is defined as "any act or failure to act which could result in the diversion of trust assets or which could prejudice or impair the ability of unpaid suppliers, sellers, or agents to recover money owed in connection with produce transactions."  7 C.F.R. § 46.46.  Courts have construed § 499e(5) to mean that both the Secretary of the U.S.D.A. and district courts can enjoin a merchant, dealer, or broker to prevent the dissipation of trust assets.  See Tanimura & Antle, Inc. v. Packed Fresh Produce, 222 F.3d 132, 137 (3d Cir. 2000)("§ 499e(c)(5)(ii) . . . authorizes the district court to entertain . . . injunctive relief on behalf of trust beneficiaries, thereby adding to, instead of detracting from, available common law remedies.")(reversing the district court for failing to enjoin dissipation of PACA trust funds); Frio Ice, S.A. v. Sunfruit, Inc., 918 F.2d 154, 158 (11th Cir. 1990)("[W]e find the district court's interpretation of Section 499e(c)(4), as limiting injunctive relief to suits brought by the Secretary, to be incorrect.").  See also JSG Trading Corp. v. Tray-Wrap Inc., 917 F.2d 75, 79 (2d Cir. 1990)(noting that the court saw "nothing in the Act that would prohibit the court from exercising its traditional equity powers to grant a preliminary injunction at the instance of a private litigant if the normal standards for such relief are met").

22.    The second protection to PACA beneficiaries is their priority interest in the PACA trust's assets.  Congress designed the 1984 amendment to PACA to provide PACA trust

beneficiaries with a superior interest in the PACA trust assets over creditors with security interests in those same assets, allowing the suppliers to recover first in the merchant's, dealer's, or broker's -- the PACA trustee's -- bankruptcy. Thus, "a PACA trustee holds legal title to PACA trust assets but the seller retains an equitable interest in the assets pending full payment, so that the Bankruptcy Code excludes PACA trust assets from the PACA trustee's bankruptcy estate." C.H. Robinson Co. v. Alanco Corp., 239 F.3d 483, 487 (2d Cir. 2001)(citing In re Kornblum, 81 F.3d at 284; In re San Joaquin Food Serv., Inc., 958 F.2d 938, 939 (9th Cir. 1992)). As amongst beneficiaries, when a PACA trustee becomes insolvent, the legislative intent suggests, and courts have enforced PACA to require, the trust's assets are distributed first to the PACA beneficiaries *pro rata*. See In re Milton Poulos, Inc., 947 F.2d 1351, 1353 (9th Cir. 1991)(holding that all suppliers who had "properly perfected their PACA trust rights [] are entitled to their *pro rata* share of the trust assets"); H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., 597 F. Supp. 2d at 316 ("Included in the trust protection provided by PACA is not only an elevated priority over other creditors but also the right to a *pro rata* distribution of trust assets in the event of insolvency."). See also 49 Fed. Reg. at 45,735-36 ("Where a court is involved, USDA would recommend to the court that the available trust assets be distributed on a pro-rata basis to all beneficiaries who have protected their right to trust benefits."). Two United States District Courts have analyzed whether one supplier/beneficiary is liable to another when one beneficiary receives a priority payment before the PACA trustee becomes insolvent, each reaching a different conclusion. Compare Fresh Kist Produce, LLC v. Choi Corp., Inc., 223 F. Supp. 2d 1 (D.D.C. 2002)(concluding that the defendant produce supplier was required to disgorge payments made to it by the seller), with H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., 597 F. Supp. 2d 313 (E.D.N.Y.

2009)(concluding that the supplier did not have to disgorge payments it received from the buyer).

### 2.     The Fiduciary Relationship of PACA Beneficiaries.

23.     It is a general proposition in debtor/creditor law, and the Supreme Court has held, that "except as forbidden by the bankrupt law, a debtor has the right to prefer one creditor over another, and that the vigilant creditor is entitled to the advantage secured by his watchfulness and attention to his own interests." Blennerhassett v. Sherman, 105 U.S. 100, 117 (1881). Under trust law, however, because of the nature of a co-beneficiary relationship, creditors who are also co-beneficiaries of a trust additionally owe their co-beneficiaries duties that contain a fiduciary element. See G.  Bogert & G. Bogert, The Law of Trusts and Trustees § 191 (Rev. 2d ed. 1979)("Co-beneficiaries . . . are in a fiduciary relation to each other . . . .")(cited in the Reporter's Notes on Restatement (Third) Trusts § 104).

### a.     General Trust Law Duties of Co-Beneficiaries.

24.     The duties owed to co-beneficiaries under general trust principles govern the duties that suppliers owe to each other as PACA trust beneficiaries. See Fresh Kist Produce, LLC v. Choi Corp., Inc., 223 F. Supp. 2d at 12 (noting that a dispute between two suppliers is "a dispute between two beneficiaries"), amended sub nom. Fresh Kist Produce, LLC v. Choi Corp., Inc., 251 F. Supp. 2d 138 (D.D.C. 2003). Under general principles of trust law, a beneficiary is liable to its co-beneficiaries for participating in a trustee's breach of the trust. See Restatement (Second) of Trusts § 256(4) ("If one of several beneficiaries participates with the trustee in a breach of trust . . . , [that] beneficiary is personally liable to the extent of the loss, and [the beneficiary's] interest is subject to a charge for the amount of loss . . . .); Restatement (Third) of Trusts § 104 (1)(c) ("A beneficiary is not personally liable to the trust except to the extent . . . the

- 146 -

trust suffered a loss resulting from a breach of trust in which the beneficiary participated . . . .").

Comment f to Restatement (Third) of Trusts § 104 describes conduct which constitutes a

beneficiary's participation in a breach of the trust:

> Certainly, the beneficiary participates in a breach of trust if the beneficiary performs, or joins in performing, an act the beneficiary knows is a breach. Otherwise, the question of what conduct of the beneficiary constitutes participation in a breach of trust is a question of degree. For example, a beneficiary has participated in a breach of trust if the beneficiary induced the misconduct knowing that it would or might be a breach of trust. However, mere knowledge of, or consent to, the breach, without more, is insufficient to constitute participation . . . .

Restatement (Third) of Trusts § 104, cmt. f.  The Reporter's Notes on § 104, comment f, direct

the reader to A. Scott & M. Ascher, Scott and Ascher on Trusts § 25.2.6.3 (5th ed., 2007), for

more information "[o]n a beneficiary's duty to other beneficiaries not to participate in a breach

of trust." Restatement (Third) of Trusts § 104, Reporter's Notes on cmt. f.  Professors Austin W.

Scott and Mark L. Ascher suggest that co-beneficiaries have duties to one another beyond the

duty not to participate in a breach of the trust: "Although there is not the same fiduciary

relationship between trust beneficiaries as there is between them and the trustee, there is enough

of a fiduciary element in their relationship to make it inequitable for one to seek to obtain an

advantage over another."  Scott and Ascher on Trusts § 25.2.6.3, at 1866.  Similarly, the late

Professor George G. Bogert and George T. Bogert, which the Reporter's Notes on § 104 also

cite, state that beneficiaries have duties to each other, at least to a certain extent, as fiduciaries.

See G. G. Bogert & G. T. Bogert, The Law of Trusts and Trustees § 191 ("Co-beneficiaries . . .

are in a fiduciary relation to each other in the sense that one beneficiary may not secretly secure

for himself a special advantage in the trust administration.").  Thus, the Court concludes that

PACA beneficiaries, as co-owners of the equitable interest in the PACA trust, have some limited

fiduciary duties to the other beneficiaries of the PACA trust, including at least the duty not to affirmatively seek an advantage over their co-beneficiaries.

**b.    Case Law Addressing the Duties of PACA Co-Beneficiaries.**

25.    While no authority is precisely on point with the unique facts and issues in this case, two cases present contrasting conclusions regarding the trust responsibilities of PACA beneficiaries.  In the end, the Court believes that Fresh Kist Produce, LLC v. Choi Corp., Inc. may come closest to reflecting Congress' intent to protect PACA beneficiaries.   What that conclusion means is that general trust principles protect PACA beneficiaries to the extent of trust law, but no more.

**i.    Fresh Kist Produce, LLC v. Choi Corp., Inc.**

26.    In Fresh Kist Produce, LLC v. Choi Corp., Inc., a plaintiff supplier, Fresh Kist, and defendant suppliers, J.C. Watson ("JCW"), Norfolk Banana, and Berkley Tomato all sold perishable agricultural commodities to a common produce dealer, Washington Wholesale Produce Company ("WWP").  223 F. Supp. 2d at 4.  On June 5, 2001, JCW filed a complaint against WWP for breach of contract, alleging that WWP owed JCW $75,946.20 for produce sold and also alleging that WWP was insolvent.  See 223 F. Supp. 2d at 5.  WWP and JCW reached an agreement out of court in which WWP would pay a sum certain monthly to JCW until the balance was paid.  See 223 F. Supp. 2d at 5.  After several payments over two months, WWP failed to make the payments, and JCW filed an amended complaint to obtain the balance owed. See 223 F. Supp. 2d at 5.  Fresh Kist then contacted JCW. and asked if it would waive the potential conflict of interest in having a common attorney represent both Fresh Kist and JCW; JCW would not waive the conflict.  See 223 F. Supp. 2d at 5.  On August 28, 2001, Fresh Kist initiated an action against JCW and WWP requesting a temporary restraining order to enjoin

WWP from paying the rest of the amount owed to JCW, and establishing a procedure for non-parties to assert PACA claims.  See 223 F. Supp. 2d at 5.  Fresh Kist alleged that JCW, Norfolk Banana, and Berkley Tomato "must disgorge the PACA benefits received from WWP after they learned that WWP was insolvent."  223 F. Supp. 2d at 5-6.

27.    The Honorable Ricardo M. Urbina, United States District Judge for the District of Columbia, framed the issue in front of the court as "whether PACA requires a beneficiary with knowledge of a PACA trust's insolvency to set up a mechanism for all beneficiaries to submit claims for the remaining funds."  Fresh Kist Produce, LLC v. Choi Corp., Inc., 223 F. Supp. 2d at 8.  Recognizing that general trust principles govern PACA trusts, Judge Urbina answered in the affirmative, noting: "Under trust law, co-beneficiaries are in a fiduciary relationship with each other so that one beneficiary may not secretly secure for himself a special advantage in the trust administration."  Fresh Kist Produce, LLC v. Choi Corp., Inc., 223 F. Supp. 2d at 8 (citing G. Bogert & G. Bogert, The Law Of Trusts And Trustees § 191, at 478 (2d ed.1979)).  The court found that, under PACA, "the law compels a beneficiary with knowledge of a trust's insolvency to refrain from securing for itself a greater advantage than its co-beneficiaries."  223 F. Supp. 2d at 8.  Thus, Judge Urbina concluded that PACA requires beneficiaries to "employ *pro rata* distribution when one of them has belief or knowledge of the trust's insolvency," rather than waiting until the PACA trustee becomes fully insolvent or bankrupt.  223 F. Supp. 2d at 9. Judge Urbina based this conclusion on three considerations: (i) that it is a breach of a fiduciary duty to co-beneficiaries where a trustee who is also a creditor "secure[s] itself by the depletion of assets which, in the event of the debtor's insolvency it would be obliged to share ratably with all of the debtor's creditors," 223 F. Supp. 2d at 8 (quoting Dabney v. Chase Nat'l Bank of City of New York, 196 F.2d 668, 672-73 (2d Cir. 1952)(Learned Hand, J.); (ii) that "when a trustee pays one

beneficiary and becomes bankrupt, a court may set aside this preference," 223 F. Supp. 2d at 8 (citing G. Bogert & G. Bogert, The Law of Trusts and Trustees § 191, at 478-79); and (iii) that an insolvent PACA trust's "assets are distributed among beneficiaries *pro rata*," Fresh Kist Produce, LLC v. Choi Corp., Inc., 223 F. Supp. 2d at 8 (citing In re Milton Poulos, Inc., 947 F.2d at 1352). Judge Urbina thus required JWC, the supplier who had previously sued WWP, to disgorge the payments it had received since the prior suit, concluding that, because JWC's complaint in that case alleged WWP was insolvent at the time, JCW, the defendant supplier at that time had the requisite knowledge of the PACA trustee's insolvency. 223 F. Supp. 2d at 11.

### ii.   H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc.

28.    In H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., the intervening supplier plaintiff, Amco Produce, Inc. ("Amco Produce"), amended its complaint to add a claim against the original supplier plaintiffs, Wm. Rosenstein & Sons, Co. and Eagle Fruit Traders, LLC (together, "Rosenstein & Sons"), seeking disgorgement of payments made to Rosenstein & Sons for participation in the dissipation of the PACA trust's assets. 597 F. Supp. 2d at 315. "Specifically, Amco has alleged that Rosenstein, despite either knowing or having information that would have led it to reasonably know of defendants' financial instability or insolvency, received PACA trust assets from defendants in payment of Rosenstein's pre-existing claims." 597 F. Supp. 2d at 315.

29.    The Honorable Brian M. Cogan, United States District Judge for the Eastern District of New York, distilled the issues to two questions that he had to resolve:

When interpreting the trust provisions of PACA, the Second Circuit has held that "general trust law applies to PACA trusts unless such law directly conflicts with the PACA statute." Thus, we must ask two questions: (1) does general trust law create a cause of action in favor of a creditor of an insolvent corporation to set aside preferential payments made to another creditor of the corporation; and (2) if

not, does PACA modify the general trust law by creating such a claim and enforcement mechanism?

597 F. Supp. 2d at 316 (quoting D.M. Rothman & Co., Inc. v. Korea Commercial Bank of New York, 411 F.3d at 94)(internal citations and alterations omitted).

30.     In answering the first question, Judge Cogan first posited that, under the common law, any insolvent business, not just a PACA trustee, holds its assets in trusts for its creditors, resulting in the directors of the insolvent corporation serving as trustees, imposing upon them a fiduciary duty to the corporation's creditors.  See 597 F. Supp. 2d at 316 (citing In re Poseidon Pool & Spa Recreational, Inc., 391 F.R. 234, 241 (Bankr. E.D.N.Y. 2008)).  "This is no different than the duty that exists under PACA, except that PACA arguably expands, or at least clarifies that, this obligation additionally include 'controlling persons, not just directors.'"  597 F. Supp. 2d at 316.  Judge Cogan also stated that payment of bona fide debts of an insolvent corporation to outsiders is not improper under common law, "despite the fact that these payments deplete the remaining assets available for creditors."  597 F. Supp. 2d at 316-17 (citing In re Sharp Int'l Corp., 403 F.3d 43, 54 (2d Cir. 2005)("[A] mere preference between creditors does not constitute bad faith . . . .  Nor does it matter that the preferred creditor knows that the debtor is insolvent.")).  Judge Cogan pointed out: "By allowing preferential payments, the common law recognizes the business reality that distressed debtors must make hard decisions about who to pay and who not to pay."  H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., 597 F. Supp. 2d at 317.

31.     Judge Cogan noted that the case law has been abrogated: first, by "bar[ring] insolvent corporations from preferring their insiders over outside creditors," Southern Indus., Inc. v. Jeremias, 66 A.D.2d 178, 184, 41 N.Y.S.2d 945 (2d Dep't 1987)); and second, via "the preference recovery provision of the Bankruptcy Code, which establishes a ninety-day (or one

year, for insiders) preference recovery," 11 U.S.C. § 547(b)(4)(A).  <u>H.C. Schmieding Produce</u>

<u>Co., Inc. v. Alfa Quality Produce, Inc.</u>, 597 F. Supp. 2d at 317.  There is no subjective inquiry

regarding the preference payments recovered under the Bankruptcy Code's clawback provision.

<u>See</u> <u>H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc.</u>597 F. Supp. 2d at 317 ("It

does not matter if the creditor knew or should have known at the time he received the payment

that the debtor was insolvent, or if he pressured or refrained from pressuring the debtor for

payment.").

      32.    Judge Cogan concludes that there is nothing in PACA suggesting a change to the

common law's allowance of bona fide preference payments to creditors:

> I see nothing in PACA that changes the common law in this regard. As explained
> above, the purpose of PACA is to elevate the priority of produce sellers over other
> classes of creditors; PACA does not create any special rights among such produce
> sellers *inter se*. An insolvent corporation in any business owes a fiduciary duty to
> its creditors not to dissipate assets, but preference payments by definition reflect
> the payment of bona fide debts and thus are not a breach of any fiduciary duty.
> PACA appears to merely codify this principle in the produce business under the
> law of trusts, not change it.

597 F. Supp. 2d at 318.  Judge Cogan did not accept Amco Produce's argument that the

distribution of the assets of an insolvent PACA trustee *pro rata* to the PACA beneficiaries

implies that Congress intended that a PACA beneficiary/creditor should be required to disgorge

any preference payments made just before insolvency:

> [I]t is important not to confuse PACA's clearly stated requirement of *pro rata*
> distribution with the creation of an implied preference recovery action that could
> be brought by one creditor against another. . . .  However, it is a far cry from
> recognizing the concept of *pro rata* distribution to creating a remedy for
> preference payments that would actually increase the trust and which, at least as
> the instant case is presently postured, might constitute the entirety of the trust
> corpus (as no res has yet been identified for this trust). Without some guidance
> from Congress under PACA, there is no basis for implying such a remedy.

597 F. Supp. 2d at 318.

- 152 -

33.     In response to Amco Produce's argument that Judge Cogan should apply Fresh Kist Produce, LLC v. Choi Corp., Inc.'s "knew or should have known" standard, Judge Cogan noted that the cases from which the "knew or should have known" standard developed were "cases dealing either with the obligation of an interested trustee, *i.e.*, a [bank] who is both holding funds on behalf of creditors and who [it]self has an interest in those funds, or [as in Fresh Kist Produce, LLC v. Choi Corp., Inc.,] an insider with special access to the debtor."  597 F. Supp. 2d at 318-19.  Judge Cogan agreed with a narrow reading of the standard: "To be sure, a co-beneficiary who is an insider may owe a fiduciary duty to his co-beneficiaries.  But it is his status as an insider, not as a co-beneficiary, that creates this duty."  597 F. Supp. 2d at 319. Judge Cogan distinguished his case from Fresh Kist Produce, LLC v. Choi Corp., Inc. and the cases upon which it relied, however, noting that "Rosenstein [is not] an insider; it had no special relationship with the debtor that allowed it to manipulate the debtor other than, perhaps, the debtor wanted to keep doing business with it more than Amco . . . ."  597 F. Supp. 2d at 319. Judge Cogan therefore dismissed Amco Produce's claims against Rosenstein & Sons.  See 597 F. Supp. 2d at 321.

> **iii.    PACA Beneficiaries Have a Fiduciary Relation to their Co-Beneficiaries Such That They Owe their Co-Beneficiaries a Limited Fiduciary Duty Not to Secure a Secret or Inequitable Benefit Over their Co-Beneficiaries.**

34.     Congress acted intentionally in creating a trust to benefit all the produce suppliers, and part of that intent was to create rights for produce suppliers beyond merely extending liability to "controlling persons, not just directors."  Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., 597 F. Supp. 2d at 316.  If, as Judge Cogan suggests in H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., it was Congress' intention only to extend liability to controlling persons as well as directors, Congress could have done so more short-

handedly than by establishing the PACA trust; it could have simply tweaked the common law, which already prevents preference payments to insiders, by also making those insiders or controlling persons personally liable.  If, as some courts have found, Congress' intention in creating the PACA trust was to give produce suppliers, as a class, only priority over financial creditors, as a class, in their claims to the produce sellers' assets, Congress could have also done so without the need to create a trust; it could have drafted a provision like that in the bankruptcy code, which gives preference to secured creditors over general creditors.  See 11 U.S.C. § 507 (setting forth the order of priority for expenses and claims in bankruptcy).  Congress' intention in creating the PACA trust, however, was to impose general trust principles on all parties to the trust -- including creating fiduciary relationships, or relationships that have a fiduciary element, between  beneficiary suppliers.  Under general trust principles, a beneficiary is liable to its co-beneficiaries for its participation in a breach of the trust.  See Restatement (Third) of Trusts § 104(1)(c).  Just as PACA beneficiaries are entitled to a *pro rata* share of the PACA trustee's assets when insolvent, an equitable outcome, even where the PACA beneficiaries do not know that a PACA trustee is insolvent, there is enough of a fiduciary element in their relationship as co-PACA beneficiaries to make it inequitable for one to seek to obtain an advantage over another.

35.     It is very difficult in most instances for a creditor to know that a debtor is insolvent.  Black's Law Dictionary defines insolvency as "having liabilities that exceed the value of assets."  Black's Law Dictionary 867 (9th ed. 2009).  In bankruptcy, insolvency has a specific definition: "The term 'insolvent' means . . . financial condition such that the sum of [the] entity's debts is greater than all of [the] entity's property, at fair valuation . . . ."  11 U.S.C. § 101(32)(A).  Creditors often know that debtors are struggling to pay them, but may not have an intimate

knowledge of the debtor's balance sheet.  To not impose liability unless the co-beneficiary knows the trustee was insolvent may impose a burden that is never or rarely met.  Thus, the Court believes that, rather than bright line rules that would eliminate most beneficiary suits, the better course may be to impose liability for a beneficiary's "inequitable [conduct in] . . . seek[ing] to obtain an advantage over another," Scott and Ascher on Trusts § 25.2.6.3, at 1866, or impose liability where "one beneficiary . . . secretly secure[s] . . . a special advantage in the trust administration," Bogert & Bogert, The Law of Trusts and Trustees § 191.

36.     The Court cannot fairly impose a rule that says any payment to one PACA beneficiary in preference over payments to the other PACA beneficiaries would be a breach of the PACA trust because it dissipates the PACA trust assets.  To impose such a rule would, in effect, amount to a finding that Congress did not allow for any preference payments to co-beneficiaries and in fact all payments should be *pro rata.*  No intent or knowledge would be necessary to impose liability.  Such a rule would effectively impose strict liability upon the PACA beneficiaries if they would ever receive more than their *pro rata* share.  The Court recognizes that trust law does not go that far and that Congress did not set up a simple mechanism for *pro rata* payments in all circumstances.  Rather, the co-beneficiary must be culpable in some way.  For example, consenting to such a breach by receiving these payments is not a breach of a beneficiary's limited fiduciary relationship with its co-beneficiaries.  See Restatement (Third) of Trusts § 104, cmt. f (noting that "mere knowledge of, or consent to, the breach, without more, is insufficient to constitute participation" subjecting a co-beneficiary to liability for a breach of the trust).  If a co-beneficiary receives a check in the mail, without any knowledge that the trustee is distinguishing between beneficiaries and actually making a preference payment which constitutes dissipation of the trust, no possible liability has been set in

- 155 -

motion.  Moreover, if a co-beneficiary receives an unusually large check in the mail, and knows that the trustee is in fact differentiating or even preferring the beneficiary, such knowledge still does not rise to the level of participation in the breach or inequitable conduct on behalf of the beneficiary to impose liability.  Finally, if a trustee calls a co-beneficiary A and says it will send co-beneficiary A full payment of what it owes, but will only send partial payment to the other co-beneficiaries, and co-beneficiary A consents, that consent does not trigger any liability to the co-beneficiary for co-beneficiary A.  There must be more evidence of unfair affirmative action on co-beneficiary A's behalf to seek or secure an advantage to impose liability.  In other words, PACA does not completely eliminate the common-law rule allowing preference payments and allowing vigilant creditor/suppliers to be the beneficiaries of a preference payment.  Should the PACA trustee's preference payment come as a result of a PACA beneficiary's conduct of attempting to receive or secure a preference payment or other advantage, however, such conduct constitutes participation in the breach, violates the PACA beneficiary's fiduciary relationship with its co-beneficiaries, and subjects the beneficiary to liability for the harm caused by the breach in which it participated.  See Restatement (Third) of Trusts § 104(2) ("If a beneficiary is personally liable to the trust, the trust is entitled to a charge against the beneficiary's interest in the trust to secure the payment of the liability.").

37.    As beneficiaries of Tan-O-On Marketing's PACA trust, Hi-Land Potato had the same co-beneficiary duties imposed upon it as those imposed upon Skyline Potato and the Folson Farm Group: the duty not to participate in the breach of the trust by affirmatively securing an advantage over co-beneficiaries.  Because the Restatement (Third) of Trusts § 104, cmt. f, states that participating in the breach requires something more than just knowledge of the breach, because of the definition of dissipation of a PACA trust in 7 C.F.R. § 46.46 and because Hi-Land

Potato knew only that Tan-O-On Marketing was having difficulty paying some of its bills, that knowledge and receipt of trust assets, even to the exclusion of the other co-beneficiaries, is not sufficient to constitute a breach of its duty as a PACA trust co-beneficiary.

38.     That Hi-Land Potato handled the billing, bookkeeping, and collection for shipments of Hi-Land Potato's and Metz Potato's potatoes which Tan-O-On Marketing arranged places Hi-Land Potato in a different situation than other producer co-beneficiaries who were merely receiving checks from Tan-O-On Marketing for their shipments.  Hi-Land Potato's special relationship with Tan-O-On Marketing -- handling the billing, bookkeeping, and collection for its potatoes -- allowed Hi-Land Potato to know exactly when and how much Tan-O-On Marketing was receiving in payment for Hi-Land Potato's produce, and also allowed Hi-Land Potato to get paid; although this payment came before Tan-O-On Marketing and the other PACA co-beneficiaries, Hi-Land Potato did not know that fact at the time.  That Tan-O-On Marketing was operating out of an office at Hi-Land Potato's packing shed only adds incentive, whether explicitly or implicitly, to Hi-Land Potato being promptly paid for shipment of its potatoes.

39.     Nevertheless, this arrangement by itself, or this arrangement in conjunction with knowledge that Tan-O-On Marketing was struggling to pay its bills, is still insufficient to constitute Hi-Land Potato affirmatively participating in the breach of the trust by seeking to secure an advantage over Tan-O-On Marketing's PACA trust's other co-beneficiaries.  Hi-Land Potato did not know at the time it was handling the billing, bookkeeping, and collection for the Tan-O-On Marketing arranged-shipment of its potatoes that Tan-O-On Marketing was unable to fully pay all of the PACA trust beneficiaries for shipment of their produce.  It did not, therefore, know that the payments Tan-O-On Marketing was making out of the PACA trust assets to Hi-

Land Potato for these shipments was in lieu of payments to other suppliers/beneficiaries of Tan-O-On Marketing's PACA trust.   In context, Hi-Land Potato's billing, bookkeeping, and collecting arrangement with Tan-O-On Marketing, and Tan-O-On Marketing's operating out of Hi-Land Potato's facilities, combined with Hi-Land Potato's knowledge that not all the PACA trust beneficiaries were being paid, would constitute Hi-Land Potato participating in the breach of Tan-O-On Marketing's PACA trust.

40.     Although Hi-Land Potato knew that Shannon Casey was under financial pressure, from which it could infer that Tan-O-On Marketing was under financial pressure, Hi-Land Potato did not know that, as part of that financial pressure, Tan-O-On Marketing was unable to pay its PACA trust beneficiaries.   For that reason, Hi-Land Potato lacked the degree of knowledge required to find that it was a participant in Tan-O-On Marketing's breach of the PACA trust.

41.     This determination comports with both Fresh Kist Produce, LLC v. Choi Corp., Inc. and H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., the only two opinions that have dealt with the issue of co-beneficiary liability.  The supplier/beneficiary who was held liable to the other co-beneficiaries for breach of the PACA trust in Fresh Kist Produce, LLC v. Choi Corp., Inc. had already taken the PACA trustee to court for the trustee's missed payments and alleged that the trustee was insolvent.   Judge Urbina concluded that "the law compels a beneficiary with knowledge of a trust's insolvency to refrain from securing for itself a greater advantage than its co-beneficiaries."   223 F. Supp. 2d at 8.  The court in Fresh Kist Produce, LLC v. Choi Corp., Inc. noted that "the court's narrow ruling . . .  is limited to the circumstance in which a PACA beneficiary knows the debtor is insolvent, not where the beneficiary merely suspects some vague financial trouble."   223 F. Supp. 2d at 11 (emphasis in original).  Judge Urbina's opinion effectively made sure that the substance of a PACA's policy to distribute assets

*pro rata* prevailed over form by requiring *pro rata* distribution where the PACA trustee is insolvent, rather than where the PACA trustee has formally declared bankruptcy.   The requirement that a co-beneficiary have knowledge of insolvency, and what constitutes insolvency, does not provide an easy criterion on which the Court may determine whether a co-beneficiary has adequate knowledge so as to impose liability.   Rather than imposing this bright line rule which may not easily be met, the Court believes that knowledge that a PACA trustee cannot fully pay all of its PACA trust beneficiaries is the yard stick by which PACA co-beneficiary knowledge of financial difficulty should be measured.   While it is an undisputed fact that Hi-Land Potato did not know Tan-O-On Marketing was insolvent, the material issue is whether Hi-Land Potato knew that Tan-O-On Marketing was under so much financial pressure that it could not pay its PACA trust beneficiaries; that knowledge may violate Fresh Kist Produce, LLC v. Choi Corp., Inc.'s standard, and in the Court's opinion, would.   Regardless whether that knowledge of inability to pay other co-beneficiaries is sufficient to satisfy the standard set forth in Fresh Kist Produce, LLC v. Choi Corp., Inc., which the Court believes to be the case, this knowledge alone, as Restatement (Third) of Trusts § 104, cmt. f. makes clear, is necessary, but not sufficient for liability; there must be more than knowledge.

42.   The Court's conclusion that, in addition to Hi-Land Potato's and Carl Worley's potentially sufficient knowledge, Hi-Land Potato's relationship with Tan-O-On Marketing may have allowed Hi-Land Potato and Carl Worley to have participates in the breach finds support in reading Judge Urbina's conclusion in Fresh Kist Produce, LLC v. Choi Corp., Inc., in conjunction with  H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc.  Although Judge Cogan does not distinguish, in H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., between the supplier's role as a beneficiary from its role as a creditor, that issue

was not before Judge Cogan, because there were no allegations that the defendant co-beneficiary in that case participated in the PACA trustee's breach of the trust, or, as the opinion analogizes it, was "an insider."  597 F. Supp. 2d at 319.  The position as an "insider" prevents a PACA beneficiary from asserting the common-law maxim that, as a defense to the charge that it received preference payments, "a debtor has the right to prefer one creditor over another, and that the vigilant creditor is entitled to the advantage secured by his watchfulness and attention to his own interests."  Blennerhassett v. Sherman, 105 U.S. at 117.  This case presents a situation that is distinguishable from that in H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc.; Tan-O-On Marketing had its officers housed and operating from within Hi-Land Potato's warehouse, and Hi-Land Potato performed billing, bookkeeping, and collections for Hi-Land Potato's shipments that Tan-O-On Marketing arranged.  Thus, although Judge Cogan concluded that the defendant co-beneficiary was not liable in H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., the case seems to provide better support to Skyline Potato's and the Folson Farm Group's argument here, noting that "it is [a co-beneficiary's] status as an insider, not as a co-beneficiary, that creates [the duty not to secure a special advantage over the other co-beneficiaries]."  597 F. Supp. 2d at 319.

43.     Neither Carl Worley's nor Hi-Land Potato's relationship with Tan-O-On Marketing during the breach period is a situation which H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc. defines as an "insider."   Judge Cogan explained that, although common-law trust principles generally allowed preferential payments, statutes have made targeted changes to this policy: "Statutes like section 719 of the New York Business Corporation Law provide that payments made to shareholders, directors or officers of an insolvent corporation must be set aside even if they would otherwise be bona fide.  In effect, this bars

insolvent corporations from preferring their insiders over outside creditors." H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., 597 F. Supp. 2d at 317.  Although Carl Worley had been a director for Tan-O-On Marketing, his involvement was minimal, and his tenure ended before the Andersons sold the company to Shannon Casey.  With respect to Hi-Land Potato, that Tan-O-On Marketing's office was within Hi-Land Potato's packing warehouse, which it rented from  Tan-O-On Marketing by discounting its fee, and Hi-Land Potato arranged to take care of its bookkeeping on shipments of its potatoes arranged by Tan-O-On Marketing, does not place Hi-Land Potato in the same position as a shareholder, director, or officer.  Although Tan-O-On Marketing had a close relationship with Hi-Land Potato, the closeness of their relationship was limited to a few functions: their quasi-landlord-tenant relationship, their physical proximity, and the billing arrangement.  In many other respects -- most importantly, with respect to Tan-O-On Marketing's relationship to other producers -- the arrangement did not give Hi-Land Potato such an intimate degree of knowledge and control over Tan-O-On Marketing that it is analogous to a shareholder, director, or officers.  That Shawna Casey went to work for Hi-Land Potato and arranged sales of its potatoes to Kroger Co., the same job she had been doing at Tan-O-On Marketing before her new job, does not convert Hi-Land Potato into an insider on the level of a shareholder, director, or officer.  Shawna Casey brought some experience to Hi-Land Potato from Tan-O-On Marketing, and performed a similar function for Hi-Land Potato, but that did not give Hi-Land Potato intimate knowledge or control over Tan-O-On Marketing that would allow it to secure an inequitable advantage over the co-beneficiaries of Tan-O-On Marketing's PACA trust.  There is no evidence that she had knowledge that Shannon Casey was not paying Skyline Potato or the Folson Farm Group, but even if the Court could infer knowledge, there is no evidence she passed on that information to Hi-Land Potato.

> **iv.    Because Hi-Land Potato Did Not Have Reason to Know that Tan-O-On Marketing Was Acting Improperly, it Does Not Need to Disgorge Those PACA Trust Funds it Took as a General Creditor.**

44.     Under the <u>Restatement (Third) of Trusts</u>,

(1) A trustee may maintain a proceeding against a third party on behalf of the trust and its beneficiaries.

(2) A beneficiary may maintain a proceeding related to the trust or its property against a third party only if:

> (a) the beneficiary is in possession, or entitled to immediate distribution, of the trust property involved; or

> (b) the trustee is unable, unavailable, unsuitable, or improperly failing to protect the beneficiary's interest.

(3) In appropriate circumstances, a trustee ad litem may be appointed to consider and, if appropriate, to maintain a proceeding against a third party on behalf of the trust and its beneficiaries.

<u>Restatement (Third) of Trusts</u> § 107.

45.     There are, however, limits to third-party liability.   <u>The Restatement (Third) of Trust explains</u>:

(1) A third party is protected from liability in dealing with or assisting a trustee who is committing a breach of trust if the third party does so without knowledge or reason to know that the trustee is acting improperly.

(2) A third party who acquires an interest in trust property through a breach of trust is entitled to retain or enforce the interest to the extent the third party is protected as a bona fide purchaser.

(3) In dealing with a trustee, a third party need not:

> (a) inquire into the extent of the trustee's powers or the propriety of their exercise; or

> (b) ensure that assets transferred to the trustee are properly applied to trust purposes.

<u>Restatement (Third) of Trusts</u> § 108.

46.     Some courts have imposed a limited duty to inquire in the PACA context.  The

Third Circuit has stated: "In the PACA context, a duty of inquiry arises when a third-party

transferee has knowledge that a produce purchaser/trustee is not paying produce suppliers or is in

financial difficulty." Consumers Produce Co. v. Volante Wholesale Produce, Inc., 16 F.3d at

138.  The Honorable Collins J. Seitz, then the former Chief Judge of the Third Circuit, wrote the

opinion, which the Honorable Anthony J. Scirica and the Honorable Samuel A. Alito, Jr., then

United States Circuit Judge for the United States Court of Appeals for the Third Circuit,

continued in a footnote appended to that sentence:

> A third party's knowledge that a transfer involves a PACA trustee and the transfer
> of trust assets is insufficient alone to create a duty of inquiry.  As noted
> previously, the explanatory note to the regulations implementing the PACA trust
> states that, "[t]rust assets are available for other uses by the buyer or receiver. For
> example, trust assets may be used to pay other creditors.  It is the buyer's
> responsibility as trustee to insure that it has sufficient assets to assure prompt
> payment of produce and that any beneficiary under the trust will receive full
> payment." Explanatory Note, 49 Fed. Reg. 45738 (1984).  The transfer of trust
> assets is legitimized by the explanatory note and third party transferees should
> only be put on inquiry as to a breach of the trust if they are aware of facts under
> the circumstances which indicate that suppliers are not being paid or that the
> trustee has insufficient assets to both make the transfer and pay suppliers.

16 F.3d at 138 n.6.  The Eleventh Circuit has imposed a similar duty to inquire.  See C.H.

Robinson Co. v. Trust Co. Bank, N.A., 952 F.2d at 1315-16 & n.4 ("[A] person has notice of a

breach of trust when he has actual knowledge of the breach or when he has knowledge of such

facts that he should ascertain by inquiry whether the trustee is committing a breach of trust"

(citation omitted)).

47.     While the Court agrees that, in the PACA context, a duty of inquiry arises when a

co-beneficiary has knowledge that a producer is not being paid, the Court does not agree that

duty arises merely from knowing that the trustee These decisions do not, however, reflect the

most recent developments in trust law.   The Third Circuit predicated its ruling on the

- 163 -

Restatement (Second) of Trusts § 297 comment a, which provides:

> [a] third person has notice of a breach of trust not only when he knows of the breach, but also when he should know of it; that is *when he knows facts which under the circumstances would lead a reasonably intelligent and diligent person to inquire whether the trustee is a trustee and whether he is committing a breach of trust*, and if such inquiry when pursued with reasonable intelligence and diligence would give him knowledge or reason to know that the trustee is committing a breach of trust.

Consumers Produce Co. v. Volante Wholesale Produce, Inc., 16 F.3d at 1383 (quoting Restatement (Second) of Trusts § 297 cmt. a (emphasis in Third Circuit's opinion, but not in the Restatement (Second) of Trusts).  Were that statement of the law the only source before the Court, it would arrive at the same conclusion as did the Third Circuit.[110]

48.     While the Court agrees that, in the PACA context, a duty of inquiry arises when a co-beneficiary is receiving payment and has knowledge that a produce purchaser/trustee is not paying other produce suppliers, the Court does not agree that such a duty arises merely for knowing that the purchaser/trustee is having financial difficulty, or for knowing that the purchaser/trustee, like any other business, needs to pay its bills.  The Restatement (Second) of Trusts does not reflect modern practice in this narrow area.  The Restatement (Third) of Trusts consciously jettisoned the Restatement (Second) of Trusts' duty to inquire and explained:

> d. *No duty to inquire into trustee powers or application of assets.* A third party, in dealing with a trustee, need not inquire into the extent of the trustee's powers or the propriety of their exercise, nor is the third party responsible to see that assets transferred to the trustee will be properly applied to trust purposes.  Knowledge of and compliance with the powers and duties of the trusteeship are responsibilities of the trustee, whose fiduciary obligations are enforceable by the beneficiaries. In modern law, third parties are ordinarily (Comment *b*) entitled to assume proper conduct by trustees with whom they deal.

---

[110] The Court cannot conceive of a Third Circuit panel with which it would be slower to disagree.  The Court clerked for then-Chief Judge Seitz; the Honorable Anthony J. Scirica went on to become Chief Judge of the Third Circuit; and the Honorable Samuel A. Alito, Jr. became an Associate Justice of the Supreme Court.  The Court, nonetheless, believes that, if that same panel confronted the law as it stands today -- nearly two decades later -- it would reach the Court's conclusion, and for the same reasons.

\* \* \* \*

> On the modernized rule of § 108(3) that third parties have no duty to inquire into the extent or exercise of the trustee's powers or the application of assets delivered to the trustee, see Uniform Trust Code § 1012(b) and (c), and the accompanying commentary. See also Scott and Ascher on Trusts, supra, § 30.6.6 (p. 2128): "It seems plainly inappropriate … to compel third parties to supervise the fiduciary's conduct and to hold them liable for failing to do so.".

Restatement (Third) of Trusts § 108 cmt. d.  This interpretation is consistent with recent authority interpreting the relationship between the two Restatements.  See Boston Tomato & packaging, LLC v. Bostonia Produce, Inc., No. 12-11865-DPW, 2013 WL 1793858, at *5-6 (D. Mass. April 8, 2013)(Woodlock, D.J.)(quoting the Restatement (Second) of Trusts § 297 and explaining that "[t]he Restatement (Third) of Trusts continues to disqualify bona fide purchaser status based on constructive knowledge that the trustee is acting improperly, but eliminates the transferee's duty of inquiry." (citations omitted)).

49.     The Restatement (Third of Trusts) reflects modern commercial law.  Many businesses are in financial difficulty, and "financial difficulty" is not a self-defining term.  It is a term that could mean insolvency, lower profits, or slower growth.  Such a legal standard should not impose a duty of inquiry.  The co-beneficiary should know or have reason to know that the co-beneficiary cannot pay other producers to impose a duty to inquire further.

50.     The Court, therefore, declines to adopt the Restatement (Second) of Trusts' duty to inquire.  The Court will, instead, apply the Restatement (Third) of Trusts' standard: Hi-Land Potato is protected from liability unless Hi-Land Potato has shown that it neither knew nor had reason to know that Tan-O-On Marketing acted improperly.  See Restatement (Third) of Trusts § 108.[111]

---

[111] The Court, therefore, declines to adopt Skyline Potato's and the Folson Farm Group's contrary proposed conclusions of law, which rely on the Restatement (Second) of Trusts and

51.    For substantially the reasons that the Court has adopted with respect to Hi-Land Potato's liability as a PACA co-beneficiary, the Court concludes that Hi-Land Potato did not know or have reason to know that Tan-O-On Marketing was acting improperly.  Although Hi-Land Potato had reason to know that Tan-O-On Marketing was experiencing some financial difficulties, that, in itself, does not mean that Hi-Land Potato knew or had reason to know that Tan-O-On Marketing acted improperly by paying Hi-Land Potato preference payments while lacking the assets to pay other producers.  The Court, therefore, concludes that Hi-Land Potato is protected from liability under PACA.[112]

52.    Because Hi-Land Potato and Carl Worley are not liable under PACA, they also need not pay Skyline Potato or the Folson Farm Group attorney's fees or interest.

## II.    THE ANDERSONS HAVE NOT COMPLIED WITH THE FORMALITIES FOR SHAREHOLDER DERIVATIVE SUITS.

53.    The law imposes extensive requirements on parties seeking to sue on behalf of a corporation: generally, plaintiffs so situated must

 (i) allege that the plaintiff was a shareholder or member at the time of the transaction complained of; (ii) allege that the action is not a collusive one to confer jurisdiction that the court would otherwise lack; and (iii) state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the

---

related cases, to interpret cases.  See Skyline Potato's and the Folson Farm Group's FOF and COL, at 48-51.

[112] The Court's decision disposes of the sole federal claim.  Although the Court has supplemental jurisdiction over Tan-O-On Marketing's state claims, see 28 U.S.C. § 1367(a), if the Court had disposed of the federal claim before trial, the Court would have declined to exercise jurisdiction over those state claims.  See Koch v. City of Del City, 660 F.3d 1228, 1248 (10th Cir. 1011)("When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." (internal quotation marks omitted)).  Because the case proceeded to trial, however, the Court decides the state-law claims on the merits.  If the parties had tried the case before a jury, the parties would have learned the result on all claims at the same time, and there is no reason that, because the parties tried the case to the bench, the result should differ.

effort. See Fed. R. Civ. P. 23.1(b). A derivative action may not be maintained if a plaintiff cannot fairly and adequately represent the interests of shareholders or members who are similarly situated in enforcing the right. See Fed. R. Civ. P. 23.1(a).

Hill v. Vanderbilt Capital Advisors, LLC, 834 F. Supp. 2d 1228, 1245 (D.N.M. 2011)(Browning, J.). New Mexico law imposes similar requirements. See 834 F. Supp. 2d at 1246-47.

54.     To the extent that the Andersons, as Tan-O-On Marketing's stockholders, have purported to act on Tan-O-On Marketing's behalf, the Andersons did not comply with those requirements.   Accordingly, all of the Andersons' derivative claims on behalf of Tan-O-On Marketing are dismissed.

55.     No party brought this defect to the Court's attention until months after the Court had heard a five-day bench trial on the matter.   The Court, therefore, proceeds to the merits of the claims.

## III.   NEW MEXICO LAW GOVERNS THE ANDERSONS' AND TAN-O-ON MARKETING'S CLAIMS AGAINST HI-LAND POTATO.

56.     In the Pretrial Order, Hi-Land Potato asserted that: (i) New Mexico's UTSA governs the trade secret claim; that New Mexico's UFTA governs the fraudulent transfer claim; and that New Mexico common law governs the unjust enrichment claim.   See Pretrial Order at 20.  Tan-O-On Marketing and the Andersons "stipulated to the applicable law of this cause of action . . . as stated by [the] Defendants."  Pretrial Order at 19.  The Court will, therefore, apply New Mexico law to these claims.[113]

---

[113] The Court is not convinced that the parties' stipulation is correct: it does not appear to be a faithful application of the *lex loci delicti* rule that New Mexico follows for tort claims.  See Estate of Anderson v. Denny's Inc., --- F. Supp. 2d --, No. CIV 12-0605 JB/GBW, 2013 WL 6506319, at *20 (D.N.M. November 13, 2013)(Browning, J.).  New Mexico law may govern tort claims for the Andersons' injuries in New Mexico, but Colorado law, under New Mexico's choice of law rules, may provide and govern causes of action for Tan-O-On Marketing, a Colorado corporation located in Colorado.  Tan-O-On Marketing and the Andersons do not purport to bring any Colorado claims, but only New Mexico claims.  Thus, the Court will not

### III.   HI-LAND POTATO DID NOT MISAPPROPRIATE TAN-O-ON MARKETING'S TRADE SECRETS.

57.     In New Mexico, the Uniform Trade Secrets Act, N.M.S.A. 1978, §§ 57-3A-1 to -7 (1989) governs trade secrets.    Under the UTSA, a party may recover damages for misappropriation of a trade secret, including exemplary damages if the misappropriation was willful and malicious.  See N.M.S.A. 1978, § 57-3A-4.

58.     A "trade secret" is defined as

information, including a formula, pattern, compilation, program, device, method, technique or process, that:

(1) derives independent economic value, actual or potential, from not being generally known to and not being readily ascertainable by proper means by other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.M.S.A. 1978, § 57-3A-2(D).   The Court of Appeals of New Mexico has stated that this definition "capture[s] the essential elements of a trade secret: confidentiality and value." Pincheira v. Allstate Ins. Co., 2007-NMCA-094, ¶ 55, 142 N.M. 283, 164 P.3d 982, aff'd in part on other grounds, rev'd in part on other grounds, 2008-NMSC-049, 142 N.M. 601, 190 P.3d 322.

59.     Beyond the definition of trade secrets found in N.M.S.A. 1978, § 57-3A-2(D), the Court of Appeals of New Mexico in Pincheira v. Allstate Ins. Co. looked to the six factors listed in the Restatement (First) of Law of Torts to determine whether information is a trade secret:

(1) the extent to which the information is known outside of [the] business; (2) the extent to which it is known by employees and others involved in [the] business; (3) the extent of measures taken by [the owner] to guard the secrecy of the information; (4) the value of the information to [the business] and to [its]

_____

consider any Colorado claims not brought, but only on the New Mexico claims brought. Because the parties have stipulated that New Mexico law governs -- and because, under the New Mexico law to which they stipulated, G. Anderson, J. Anderson, and Tan-O-On Marketing do not carry their burdens of proof -- the Court will adopt the parties' agreement and apply the New Mexico law.

competitors; (5) the amount of effort or money expended . . . in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

Pincheira v. Allstate Ins. Co., 2007-NMCA-094, ¶ 31, 142 N.M. 283, 164 P.3d 982 (quoting

Restatement (First) of Law of Torts § 757 cmt. b).

60.     General knowledge or skills, or recollections of client preferences, and information that can be obtained in a specialized directory do not constitute trade secrets. See Rapid Temps, Inc. v. Lamon, 2008-NMCA-122, ¶¶ 22-23, 144 N.M. 804, 192 P.3d 799 (holding that the database of names constituted a trade secret, because "the information contained in the database goes beyond [the defendant]'s general skills and knowledge, her recollection of client preferences, and information that one could easily obtain by consulting a phone directory").

61.     In Insure New Mexico v. McGonigle, 2000-NMCA-018, 128 N.M. 611, 995 P.2d 1053, an insurance brokerage firm sought a preliminary injunction to prevent the defendant, its former insurance salesman, from using its trade secrets to solicit the brokerage's customer. See 2000-NMCA-018, at ¶ 1.   The insurance brokerage firm alleged that the defendant misappropriated the brokerage firm's trade secrets by selling insurance to a customer that had previously been the defendant's customer while employed by the brokerage firm, because the brokerage firm contended the defendant knew to contact the customer only because of a relationship that developed while the brokerage firm employed the defendant.  See 2000-NMCA-018, at ¶ 23.  The client testified that he often received "cold calls" from insurance salesmen, but only "decided to meet with Defendant because of his personal friendship with him." 2000-NMCA-018, at ¶ 23.  The Court of Appeals of New Mexico held that "the fact that Plaintiff had developed a relationship with [the customer] does not transform that information, generally

- 169 -

known to other insurance agents, into confidential information or a trade secret." Insure New

Mexico, LLC v. McGonigle, 2000-NMCA-018, ¶ 23.

62.     "[M]isappropriation" of a trade secret is defined as

(1) acquisition of a trade secret of another by a person who knows or has reason to
know that the trade secret was acquired by improper means; or

(2) disclosure of use of a trade secret of another without express or implied
consent by a person who:

> (a) used improper means to acquire knowledge of the trade secret; or

> (b) at the time of disclosure or use, knew or had reason to know that his
> knowledge of the trade secret was: 1) derived from or through a person
> who had utilized improper means to acquire it; 2) acquired under
> circumstances giving rise to a duty to maintain its secrecy or limit its use;
> or 3) derived from or through a person who owed a duty to the person
> seeking relief to maintain its secrecy or limit its use; or

> (c) before a material change of his position, knew or had reason to know
> that it was a trade secret and that knowledge of it had been acquired by
> accident or mistake[.]

N.M.S.A. 1978, § 57-3A-2(B).

A.      **NEITHER THE KROGER CO. VENDOR NUMBER NOR THE NAMES
        OF TAN-O-ON MARKETING'S CUSTOMERS TO WHICH HI-LAND
        POTATO SHIPPED POTATOES ARE TRADE SECRETS.**

63.     Neither the Kroger Co. vendor number, the names of Tan-O-On Marketing's

customers, nor Tan-O-On Marketing's relationships with its customers are trade secrets under

the UTSA. A Kroger Co. vendor number has no commercial value in itself; it has value only in

that it facilitates a producer's pre-existing relationship with Kroger Co. Put differently, Kroger

Co.'s decision to enter a business relationship with a producer -- which precedes Kroger Co.'s

assignment of a vendor number -- has value; the Kroger Co. vendor number is an incidental

element of that relationship, but it has no value in itself.

64.     Moreover, New Mexico law does only require that only a trade secret has value,

but that it derives that value from its being not generally known to other persons and not easily ascertained by other people.  See N.M.S.A. 1978, § 57-3A-2(D)(1).  The Kroger Co. vendor number did not derive independent value from it being not generally known to other people or easily ascertained by others.

65.     Further Kroger Co. did not consider a vendor number trade secrets. See Mercuri Depo. at 127:8-10.  The Court, therefore, concludes that the Kroger Co. vendor number was not a trade secret for purposes of the UTSA.

66.     With regard to Tan-O-On Marketing's customer names and relationships that it alleges Hi-Land Potato misappropriated, Tan-O-On Marketing did not expend "efforts that are reasonable under the circumstances to maintain [the information's] secrecy."  N.M.S.A. 1978, § 57-3A-2(D)(2).  Because of the nature of Tan-O-On Marketing's relationship to Hi-Land Potato as a sales agent, wherein Hi-Land Potato would ship its potatoes directly to its customers, Hi-Land Potato has known the names of, and had direct contact and relationships with, the end customers of its potatoes.  In addition, when Tan-O-On Marketing moved its principal place of business into Hi-Land Potato's packing shed, part of the agreement was for Hi-Land Potato to invoice and collect payments for Tan-O-On Marketing from Tan-O-On Marketing's customers. None of these facts indicate that Tan-O-On Marketing expended reasonable effort -- or any effort -- to keep secret the names and relationships of its end customers.

67.     The Court, therefore, concludes that neither the vendor number nor the customer relationships were trade secrets.

**B.     HI-LAND POTATO DID NOT MISAPPROPRIATE THE ALLEGED TRADE SECRETS.**

68.     Even if the Kroger Co. vendor number or Tan-O-On Marketing's customer names and relationships constituted trade secrets under the UTFA, because Tan-O-On Marketing

consented to their disclosure and Hi-Land Potato's use of them, Hi-Land Potato should not be liable for their misappropriation.   Hi-Land Potato did not acquire Tan-O-On Marketing's customer lists "by a person who knows or has reason to know that the trade secret was acquired by improper means."   N.M.S.A. 1978, § 57-3A-2(B)(1).   In October, 2009, when Shannon Casey agreed with Hi-Land Potato to rent space in its shed and asked Hi-Land Potato to take over the bookkeeping, billing, and collection for shipment of the Hi-Land Potato and Metz Potato produce, Shannon Casey had plenary authority over Tan-O-On Marketing's day-to-day operations.   That Shannon Casey had the authority to run Tan-O-On Marketing's operations means that disclosing the customer names and relationships was disclosure of or use of a trade secret with the express consent of the trade secret's owner.   Such a voluntary transfer is not an improper means of acquiring a trade secret.   Further, that Tan-O-On Marketing had no non-compete agreements with Hi-Land Potato or with Shawna Casey shows that Tan-O-On Marketing did not take reasonable steps to ensure that they could not use their relationships without Tan-O-On Marketing's participation.

69.   Further, Hi-Land Potato did not misappropriate the Kroger Co. vendor number. The circumstances of Hi-Land Potato's use of the vendor number do not satisfy any definition of the UFTA's definitions of misappropriate.   Hi-Land Potato did not: (i) knowing that the vendor number was acquired by improper means, acquire the vendor number; (ii) without consent, use improper means to acquire knowledge of the vendor number; (iii) without consent, use the vendor number with reason to know that its knowledge of the vendor number was derived from or through a person who had used improper means to acquire the vendor number; (iv) without consent, use the vendor number with reason to know that the vendor number had been acquired under circumstances giving rise to a duty to maintain its secrecy or to limit its use; (v) without

consent, use the vendor number with knowledge or reason to know that it was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or to limit its use; or (iv) before a material change of its position, know or have reason to know that the vendor number was a trade secret and that knowledge of the vendor number had been acquired by accident or mistake. See N.M.S.A. 1978, § 57-3A-2(B). The Court, therefore, concludes that Hi-Land Potato did not misappropriate Tan-O-On Marketing's Kroger Co. vendor number.

70. Because neither Tan-O-On Marketing's customer names and relationships, nor the Kroger Co. vendor number, are trade secrets, and because, even if this information constituted trade secrets, Hi-Land Potato did not misappropriate these trade secrets, Hi-Land Potato is entitled to judgment on Tan-O-On Marketing's trade-secrets claim.

## IV.    HI-LAND POTATO DID NOT ENGAGE IN A FRAUDULENT TRANSFER.

71. The Court can find no cases discussing common-law fraudulent transfer or conveyance of personal property.[114] The New Mexico common-law fraudulent conveyance cases that the Court has found, dealing with the transfer or conversion of real property, all pre-date the enactment of the Uniform Fraudulent Conveyance Act, N.M.S.A. 1978, §§ 56-10-1 to -13 (1959) (repealed)("UFCA"), which the Uniform Fraudulent Transfer Act replaced. See Dona Ana Sav. & Loan Ass'n v. Dofflemeyer, 115 N.M. 590, 593, 855 P.2d 1054, 1057 (1993)( "The Uniform Fraudulent Transfer Act is a revision of the Uniform Fraudulent Conveyance Act with 'conveyance' being replaced with 'transfer' in recognition of the Act's applicability to transfers of personal property as well as real property."). See also 1989 N.M. Laws, ch. 382, § 13 (repealing the UFCA); 1989 N.M. Laws, ch. 382, §§ 1-12 (enacting the UFTA).

---

[114] The Court has found a number of cases dealing with a common-law action for fraudulent conveyance or transfer of real property. See First Nat'l Bank v. Ruebush, 62 N.M. 42, 45-46, 304 P.2d 569, 571-72 (1956); Nat'l Mut. Savings & Loan Ass'n v. Lake, 47 N.M. 223, 141 P.2d 188 (1943); Van Sickle v. Keck, 42 N.M. 450, 459, 81 P.2d 707, 716 (1938); Douglas Fir Lumber Co. v. Star Lumber Co., 27 N.M. 403, 409, 201 P. 867, 869 (1921).

72.     All of the New Mexico cases that the Court has found discussing fraudulent transfer since enactment of the UFCA and the subsequent enactment of the UFTA analyze the cause of action under the statutory text, and do not refer to any parallel or alternative common-law doctrine.  See, e.g., Ellen Equip. Corp. v. C.V. Consultants & Assocs., Inc., 2008-NMCA-057, ¶ 1, 144 N.M. 55, 183 P.3d 940 (noting that an appeal arising out of an insolvent debtor's transfer of real property "turns on the provisions of the New Mexico Uniform Fraudulent Transfer Act"); First Sw. Fin. Servs. v. Pulliam, 1996-NMCA-032, ¶ 9, 121 N.M. 436, 912 P.2d 828 ("The UFTA expressly limits the right to set aside a transfer to the time period in the statute, notwithstanding the date a party's cause of action might formally accrue."); Dona Ana Sav. & Loan Ass'n v. Dofflemeyer, 115 N.M. at 593, 855 P.2d at 1057 ("To determine whether a debtor fraudulently converted nonexempt assets into exempt assets, we turn to the Uniform Fraudulent Transfer Act.").   With regard to "a cause of action which does not exist at common law [but] is created by the laws of a state," the Supreme Court of New Mexico has held that "[c]auses of action of that character only exist in the manner and form and for the length of time prescribed by the statutes of the state which created them."  In re Blatt, 41 N.M. 269, 287, 67 P.2d 293, 299 (1937).

73.     Under New Mexico law, therefore, a cause of action for fraudulent transfer or fraudulent conversion exists only under the UFTA.  N.M.S.A. § 56-10-18 provides:

A.     A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:

(1)     with actual intent to hinder, delay or defraud any creditor of the debtor; or

(2)     without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:

- 174 -

        (a)      was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

        (b)      intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

B.      In determining actual intent under Paragraph (1) of Subsection A of this section, consideration may be given, among other factors, to whether:

       (1)      the transfer or obligation was to an insider;

       (2)      the debtor retained possession or control of the property transferred after the transfer;

       (3)      the transfer or obligation was disclosed or concealed;

       (4)      before the transfer was made or obligation was incurred, the debtor has been sued or threatened with suit;

       (5)      the transfer was of substantially all the debtor's assets;

       (6)      the debtor absconded;

       (7)      the debtor removed or concealed assets;

       (8)      the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

       (9)      the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

      (10)      the transfer occurred shortly before or shortly after a substantial debt was incurred; and

      (11)      the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

N.M.S.A. 1978, § 56-10-18.  New Mexico courts have referred to these items that subsection (B) lists as "badges of fraud."  Ellen Equip. Corp. v. C.V. Consultants & Assocs., Inc., 2008-NMCA-

057, ¶ 9 (citing <u>First Nat'l Bank in Albuquerque v. Abraham</u>, 97 N.M. 288, 292, 639 P.2d 575, 579 (1982)).  "A creditor may establish a prima facie case through proof of badges of fraud." <u>First Nat'l Bank in Albuquerque v. Abraham</u>, 97 N.M. at 292, 639 P.2d at 579.

74.     Placing the burden of proof on the creditor comports with the Supreme Court of New Mexico in addressing common-law fraudulent conveyance.  <u>See</u> <u>Nat'l Mut. Savings & Loan Ass'n v. Lake</u>, 47 N.M. 223, 141 P.2d at 191 ("[T]he burden of proof is at all times on the creditor who attacks a conveyance on the ground that it is fraudulent and in furtherance of a design to hinder and delay and defraud creditors.").  The Court has held that

> [i]t is not sufficient for a subsequent creditor to make out a case of merely constructive fraud, founded on such facts as lack of consideration or insolvency on the part of the transferor; he must establish fraud in fact or actual fraud, and he must assume the burden of proof in this respect.

<u>Skyline Potato Co., Inc. v. Tan-O-On Marketing, Inc.</u>, 879 F. Supp .2d  1228, 1258 (D.N.M. July 4, 2012)(Browning, J.)(quoting 37 Am. Jur. 2d <u>Fraudulent Conveyances and Transfers</u> § 124, at 623 (2001)).

75.     N.M.S.A. 1978, § 56-10-15(D) defines a creditor as "a person who has a claim." N.M.S.A. 1978, § 56-10-15(D).   A creditor must establish a fraudulent transfer by clear and convincing evidence.  <u>See</u> <u>Ellen Equip. Corp. v. C.V. Consultants & Assocs., Inc.</u>, 2008-NMCA-057, ¶ 9 ("In order for a transfer to be voidable, the creditor must prove either one of the above requirements by clear and convincing evidence.")(citing <u>First Nat'l Bank in Albuquerque v. Abraham</u>, 97 N.M. at 291-92, 639 P.2d at 578-79)  Once a plaintiff proves a fraudulent transfer, the creditor is entitled to "avoidance of the transfer . . . [or] an attachment or other provisional remedy against the asset transferred or other property of the transferree . . . ."  N.M.S.A. 1978, §

56-10-21(A).[115]

76.     N.M.S.A. 1978, § 56-10-15(F) defines a debtor as "a person who is liable on a claim."  N.M.S.A. 1978, § 56-10-15(F).   Where the debtor is a corporation, the N.M.S.A. 1978, § 56-10-15(G)(2) defines an insider as including:

(a) a director of the debtor;

(b) an officer of the debtor;

(c) a person in control of the debtor;

(d) a partnership in which the debtor is a general partner;

(e) a general partner in a partnership described in Subparagraph (d) of this paragraph; or

(f) a relative of general partner, director, officer or person in control of the debtor . . . .

N.M.S.A. 1978, § 56-10-15 (G)(2).

77.     The UFTA includes a safe-harbor provision: "A transfer or obligation is not voidable under . . . [the UFTA] against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee or obligee."   N.M.S.A. § 56-10-22(A).  This safe-harbor provision is in accord with the general principle in debtor law that a bona fide preference payment is not fraudulent.  The United States Court of Appeals for the Second Circuit has recognized:

[E]ven the preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance, whether or not it prejudices other creditors . . .

---

[115] Under the doctrine of Erie Ry. Co. v. Tompkins, 304 U.S. 64 (1938), and  rule of Palmer v. Hoffman, 318 U.S. 109 (1943), state law governs allocation of the burden of proof in diversity cases.  See 318 U.S. at 117 ("The question of the burden of establishing contributory negligence is a question of local law which federal courts in diversity of citizenship cases . . . must apply."); Brown v. Wal-Mart Stores, Inc., 11 F.3d 1559, 1563("[I]n a diversity action we examine the evidence in terms of the underlying burden of proof as dictated by state law.").  The same principle applies in cases like this one, where the Court has supplemental jurisdiction over the state-law claims.

> [A] conveyance which satisfies an antecedent debt made while the debtor is insolvent is neither fraudulent nor otherwise improper, even if its effect is to prefer one creditor over another. It is of no significance that the transferee has knowledge of such insolvency.  Nor is the transfer subject to attack by reason of knowledge on the part of the transferee that the transferor is preferring him to other creditors, even by virtue of a secret agreement to that effect.

In re Sharp Int'l Corp., 403 F.3d 43, 54-55 (2d Cir. 2005)(citing HBE Leasing Corp. v. Frank, 48

F.3d 623, 634 (2d. Cir. 1995); Ultramar Energy Ltd. v. Chase Manhattan Bank, N.A., 191

A.D.2d 86, 90-91, 599 N.Y.S.2d 816 (1st Dep't 1993))(internal citations omitted)).

78.     Tan-O-On Marketing's transfer of funds to Hi-Land Potato was not a fraudulent

transfer.  First, its claims fail as a matter of law.  Generally, a fraudulent-transfer claim arises

from a particular fact pattern: a debtor fraudulently transfers its assets to a third party to a

creditor's detriment.  See, e.g., First Nat'l Bank v. Abraham, 1982-NMSC-006, ¶ 12, 97 N.M.

288, 291, 639 P.2d 575, 578 (stating that the UFTA's predecessor "Act protects creditors where

a debtor has made a conveyance of his property which diminishes his assets to the prejudice of

the rights of his creditors").  N.M.S.A. 1978, § 56-10-18(A) prohibits a fraudulent transfer by a

debtor of its own assets to a third party, and N.M.S.A. 1978, § 561-10-21 provides remedies for

defrauded creditors.

79.     Tan-O-On Marketing generally was a debtor, because it bought potatoes from Hi-

Land Potato.  Tan-O-On Marketing is a "creditor" only if Shannon Casey, against whom Tan-O-

On Marketing potentially had tort and breach-of-fiduciary-duty claims, is characterized as the

debtor and Hi-Land Potato is characterized as the third-party transferee.[116]  Tan-O-On Marketing

---

[116] To the extent that Tan-O-On Marketing challenges Shannon Casey's authority to sign the checks that Hi-Land Potato received, the argument lacks a sound basis in the evidence. Shannon Casey's authority in controlling Tan-O-On Marketing included the power to open its Sunflower Bank account, and authorize both himself and Shawna Casey to sign checks on the account.  See generally Marron v. Wood, 1951-NMSC-058, ¶ 18, 55 N.M. 367, 376, 233 P.2d 1051, 1057, ("The President and General Manager . . . has the right, authority, and privilege of directing the ordinary, every-day business affairs of the corporation, unless and until the Board

predicates its fraudulent transfer claim on a transfer of its own -- i.e., the creditor's -- assets. Fraudulent transfer law, however, prohibits only a transfer of the debtor's assets. Section 56-10-18(A) applies to a "transfer made . . . by a debtor." A "transfer" is the act of "disposing of . . . an asset." N.M.S.A. 1978, § 56-10-15(L) (1989). An "asset", in turn, is "property of a debtor." N.M.S.A. 1987, § 56-10-15(B) (1989). Thus, § 56-10-18(A) applies only to a debtor's transfer of its assets and not to a debtor's transfer of the creditor's assets. Shannon Casey did not transfer his assets to Hi-Land Potato; he transferred Tan-O-On Marketing's assets to Hi-Land Potato. Tan-O-On Marketing's fraudulent transfer claim, therefore, fails as a matter of law, both with respect to a claim for fraudulent transfer of the money that Tan-O-On Marketing remitted to Hi-Land Potato, and with respect to a claim for fraudulent transfer of Tan-O-On Marketing's customer relationships and its Kroger Co. vendor number.[117]

---

of Directors directs otherwise."). Moreover, although no admissible evidence demonstrates the date on which Shannon Casey resigned, that issue is immaterial to the Court's resolution of the UFTA claim: at the time Hi-Land Potato received the checks, Hi-Land Potato had no reason to believe that Shannon Casey did not have authority to sign checks on Tan-O-On Marketing's behalf. For that reason, any alleged deficiency in Shannon Casey's authority to sign checks on Tan-O-On Marketing's behalf would not undermine the Court's conclusion that Hi-Land Potato took those checks in good faith for reasonably equivalent value.

[117] Hi-Land Potato asks the Court to conclude that the transferee must have fraudulent intent. See Hi-Land Potato's FOF and COL ¶ 9, at 1.A.37. The Court's previous opinion indicates that this statement of the law is true. See Memorandum Opinion and Order at 45, filed July 4, 2012 (Doc. 214)("Tan-O-On Marketing [must] plead that the Hi-Land Potato Parties had actual intent to defraud Tan-O-On Marketing."). It is true that, many years before the UFTA was adopted, the Supreme Court of New Mexico held that,

> [t]o make a conveyance a fraudulent transfer, a fraudulent intent participated in by both parties to the transaction must exist. The conveyance must be made with the intention of the debtor to delay, hinder or defraud creditors and such intention be known to the party to whom the conveyance is made.

First Nat. Bank of Santa Fe v. Ruebush, 1956-NMSC-104, ¶ 9, 62 N.M. 42, 604 P.2d 569 (citation omitted). This formulation does not, however, survive UFTA's enactment. The UFTA requires that the "debtor [have] made the transfer or incurred the obligation: (1) with actual intent to hinder,

80.     Further, because Tan-O-On Marketing paid Hi-Land Potato the $1.66 million in payment for Hi-Land Potato's prior shipments of potatoes worth the same amount, no transfer was made without exchange of reasonably equivalent value.

_____

delay or defraud any creditor of the debtor; or  (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation" in certain listed circumstances.  N.M.S.A. 1978, § 56-10-18(A).  The statute does not require that the third-party transferee have fraudulent intent.  As one secondary source explains:

> The Uniform Fraudulent Transfer Act allows creditors to seek relief from first transferees without regard to the transferees' intent or wrongful conduct.  The structure of that statute indicates that while fraudulent transfers may or may not include a culpable mental state, once a transfer has been found to be fraudulent, a remedy is available against transferees.

37 Am. Jur. 2d Fraudulent Conveyances and Transfers § 92 (2013)(footnotes omitted).  Although the transferee's intent is relevant to establishing a good-faith defense under N.M.S.A. 1978, § 56-10-22(A), it is not relevant to establishing liability.

Although the Court has disposed of the most sensible construction of Tan-O-On Marketing's and the Andersons' claims, two alternative scenarios under the UFTA would call for a different analysis, but the same result.   In Tan-O-On Marketing's and the Andersons' conclusions of law, they state that "Hi-Land Potato Company, Inc. acted with Tan-O-On Marketing, Inc. as one and the same entity to accomplish the fraudulent conveyance of $1.661 million dollars of PACA trust proceeds."  Tan-O-On Marketing's Proposed FOF and COL at 12, filed February 26, 2013 (Doc. 356-2).  This description suggests that Tan-O-On Marketing is suing itself for transferring its assets to Hi-Land Potato.  The UFTA does not contemplate that remedy, both because it would be illogical to require an entity to sue itself and because a debtor cannot be its own creditor.

A third possibility would comport most easily with the UFTA: the Andersons, as Tan-O-On Marketing's stockholders, could have sued Tan-O-On Marketing for fraudulently transferring its assets to Hi-Land Potato.  That configuration would make the most sense of the claim: it would involve creditors suing a debtor for a transfer to a third party.  The Andersons have not, however, pled such a case.  Further, the evidence before the Court would not support it: there is not clear and convincing evidence that Tan-O-On Marketing acted with actual intent to defraud its creditors.  Finally, Hi-Land Potato took the transfers as payment for a genuine debt in good faith, for reasonably equivalent value.  On the evidence before the Court, such a claim would, therefore, fail.

In the end, the Court suspects that Tan-O-On Marketing and the Andersons have misapprehended the fraudulent transfer cause of action.  One could be forgiven for thinking that a cause of action labeled "fraudulent transfer" provides a remedy for anyone wronged by any transfer of anything that is, in the common sense, fraudulent.  The fraudulent transfer cause of action is, however, narrower than its label suggests: it exists to deter debtors from secreting away their assets in friendly third parties' hands to avoid their creditors' claims, and to compensate creditors defrauded through such a scheme.  These facts do not fit the UFTA's remedial scheme.

81.     Further, even if Hi-Land knew that it received preference payments from Tan-O-On Marketing -- which it did not -- and even if it knew that Tan-O-On Marketing was insolvent -- which it did not -- Hi-Land Potato's receipt of the payments would not be fraudulent.  As the Second Circuit recognized,

> even the preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance, whether or not it prejudices other creditors . . . [A] conveyance which satisfies an antecedent debt made while the debtor is insolvent is neither fraudulent nor otherwise improper, even if its effect is to prefer one creditor over another. It is of no significance that the transferee has knowledge of such insolvency.  Nor is the transfer subject to attack by reason of knowledge on the part of the transferee that the transferor is preferring him to other creditors, even by virtue of a secret agreement to that effect.

In re Sharp Int'l Corp., 403 F.3d at 54-55.

82.     Moreover, even if the evidence showed that Shannon Casey, on Tan-O-On Marketing's behalf, elected to pay its debts to Hi-Land Potato in preference over debts that it owed to other producers or the Andersons -- which it does not -- preference payments alone are not actionable as a fraudulent conveyance.  See In re Sharp Int'l Corp., 403 F.3d at 54-55 ("[E]ven the preferential repayment of pre-existing debts to some creditors does not constitute a fraudulent conveyance, whether or not it prejudices other creditors . . . .").

83.     Even assuming that there was a fraudulent transfer from Shannon Casey to Tan-O-On Marketing, the transfer of any of Tan-O-On Marketing's assets to Hi-Land Potato is not voidable, because Tan-O-On Marketing received equal value in consideration for the transfers it made to Hi-Land Potato -- the payments Hi-Land Potato that received from Tan-O-On Marketing were the value of the potatoes that Hi-Land Potato shipped.

84.     Because the UFTA does not prohibit Hi-Land from receiving a transfer of Tan-O-On Marketing's assets, and because Hi-Land Potato meets the statutory safe harbor for any transfers that Tan-O-On Marketing made to Hi-Land Potato, Tan-O-On Marketing has not

demonstrated by clear and convincing evidence, or otherwise, that Hi-Land Potato or Shannon Casey violated the UFTA.  The Court, therefore, concludes that Tan-O-On Marketing and Shannon Casey did not fraudulently transfer assets to Hi-Land Potato.

## V.   HI-LAND POTATO AND CARL WORLEY WERE NOT UNJUSTLY ENRICHED.

85.   "New Mexico has long recognized actions for unjust enrichment[.   .   .] ." Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 3 P.3d 695, 698-99 (citing Tom Growney Equip., Inc. v. Ansley, 119 N.M. 110, 112, 888 P.2d 992, 994 (Ct. App. 1994)).  To prevail on an unjust enrichment claim, a party must demonstrate that: "[i] another has been knowingly benefitted at one's expense [ii] in a manner such that allowance of the other to retain the benefit would be unjust."  Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 3 P.3d at 698-99.  "The theory has evolved largely to provide relief where, in the absence of privity, a party cannot claim relief in contract and instead must seek refuge in equity."  Ontiveros Insulation Co. v. Sanchez, 2000-NMCA-051, ¶ 11, 3 P.3d at 698-99.  The United States Court of Appeals for the Tenth Circuit has stated:

> One who has been unjustly enriched at the expense of another may be required by law to make restitution.  This quasi-contractual obligation is created by the courts for reasons of justice and equity, notwithstanding the lack of any contractual relationship between the parties. New Mexico law recognizes such a cause of action.

United States ex rel. Sunworks Division of Sun Collector Corp. v. Ins. Co. of N. Am., 695 F.2d 455, 458 (10th Cir. 1982)(citing Restatement of Restitution § 1 comments a, b, c (1937)).

86.   "[E]quity will not act if there is a complete and adequate remedy at law."  Sims v. Sims, 122 N.M. 618, 624, 930 P.2d 153, 159 (1996).  See General Tel. Co. of Southwest v. State Tax Comm'n, 69 N.M. 403, 408 367 P.2d 711, 715 (1962)("The general equity jurisdiction of the trial court is not available, although properly pleaded, because appellee in fact had an

adequate remedy at law.").  Cf. Lopez v. Kase, 1999-NMSC-011, ¶ 6, 975 P.2d 346, 348 (stating

that the Supreme Court of New Mexico "generally will not grant equitable relief by way of an

extraordinary writ when there is an adequate remedy available to the petitioner at law, absent

unusual and compelling circumstances").  Moreover, "[a] fundamental principle of equity is the

frequently stated maxim that [the party] who comes into equity must come with clean hands."

Romero v. Bank of the Sw., 2003-NMCA-124, ¶ 37, 135 N.M. 1, 83 P.3d 288 (quoting Danley v.

City of Alamogordo, 91 N.M. 520, 522, 577 P.2d 418, 420 (1978))(internal quotations omitted).

87.     Hi-Land Potato has not been unjustly enriched.  The payments that Tan-O-On

Marketing made to Hi-Land Potato compensated Hi-Land Potato for shipments of potatoes that

Hi-Land Potato company shipped pursuant to an agreement that Shannon Casey had authority to

make.  Tan-O-On Marketing does not, therefore, show that these payments unjustly enriched Hi-

Land Potato.

88.     Moreover, Tan-O-On Marketing's customer relationships did not unjustly enrich

Hi-Land Potato.  Kroger Co. bought Hi-Land Potato's produce after December, 2009 -- and not

through Tan-O-On Marketing as a sales agent -- because of the parties' pre-existing relationship

and the quality of Hi-Land Potato's produce.  Kroger Co.'s decision had nothing to do with

Kroger Co.'s prior relationship with Tan-O-On Marketing.

89.     Further, Kroger Co. understood that Tan-O-On Marketing had gone out of

business and that Hi-Land Potato had begun selling potatoes to Kroger Co. directly.  Kroger Co.

was free to accept or reject that new arrangement, and it chose to accept it.  That Kroger Co.

decided not to continue a relationship with Tan-O-On Marketing -- a middleman that Kroger Co.

believed was defunct -- and chose to enter a direct-sales relationship with Hi-Land Potato

resulted from market forces and not from unjust enrichment.

90.     Moreover, Hi-Land Potato never had a non-compete or confidentiality agreement with Tan-O-On Marketing or Shawna Casey; Hi-Land Potato and Tan-O-On Marketing were free to terminate their relationship at any time; and Hi-Land Potato was under no contractual prohibition from using another broker or sales agent, or from selling potatoes directly to customers.  Thus, no principle of contract, property, or tort law barred Hi-Land Potato from ending its relationship with Tan-O-On Marketing and selling produce to its customers, or from hiring Shawna Casey.  Tan-O-On Marketing has not, therefore, proved that Hi-Land Potato was unjustly enriched when it sold produce to its customers.

91.     Tan-O-On Marketing's unjust-enrichment claim suffers from another fatal flaw: Tan-O-On Marketing knowingly conferred benefits on Hi-Land Potato.  Shannon Casey told Hi-Land Potato that he would be leaving Tan-O-On Marketing, and Hi-Land Potato could not contact G. Anderson to make alternative arrangements. Hi-Land Potato hired Shawna Casey after she terminated her employment relationship with Tan-O-On Marketing.  At this time, pursuant to the arrangement into which Hi-Land Potato entered with Tan-O-On Marketing, Hi-Land Potato was already directly billing and collecting from Kroger Co.  To the extent that Hi-Land Potato may have benefitted, or been enriched, by the internal use of Tan-O-On Marketing's Kroger Co. vendor number, Tan-O-On Marketing properly conferred that benefit on Hi-Land Potato. "A person who without mistake, coercion or request has unconditionally conferred a benefit upon another is not entitled to restitution, except where the benefit was conferred under circumstances making such action necessary for the protection of the interests of the other or of third persons." Restatement (First) of Restitution § 112 (1937).  Because Tan-O-On Marketing conferred that benefit upon Hi-Land Potato on purpose, in making the agreement that Hi-Land Potato would take over the bookkeeping, billing, and collection of its shipments to Kroger Co. directly, it is not

- 184 -

entitled to restitution.

92.     Tan-O-On Marketing paid Hi-Land Potato only for shipments of potatoes that it shipped pursuant to their agreement.  To the extent Hi-Land Potato was enriched by receiving Tan-O-On Marketing's business with Kroger Co. or its vendor number, Tan-O-On Marketing is precluded from recovering for such enrichment at equity, because Tan-O-On Marketing intentionally conferred such benefits on Hi-Land Potato.

93.     For the same reasons, Carl Worley also was not unjustly enriched.[118]

94.     Because the Court concludes that Hi-Land Potato and Carl Worley are not liable to any party for any damages, the Court will dismiss their counterclaim.

95.     In sum, the law does not require creative destruction's beneficiaries to compensate its victims.  The law, instead, compensates the victims of fraudulent transfer, unjust enrichment, and trade-secret theft.  The Andersons and Tan-O-On Marketing have not proved those claims.

96.     Regarding Skyline Potato's and the Folson Farm Group's PACA claim, the legal standard is too high a bar to clear.  PACA prohibits co-beneficiaries from actively participating in a breach of a co-beneficiary's trust; it does not prohibit being in the right place at the right time or benefitting from legitimately protecting one's own interests, so long as one does not actively participate in breaching the PACA trust.  Although the line between the conduct that PACA prohibits and the conduct that PACA permits may seem finely drawn, it has a sound basis in the real world.  Businesses periodically experience financial stress, and their creditors will

---

[118] Although a close reading of Tan-O-On Marketing's Second Amended Complaint reveals that Tan-O-On Marketing asserted only an unjust enrichment claim against Carl Worley, Tan-O-On Marketing's and the Andersons' pleading is not clear.  The Court, therefore, also concludes that, to the extent that Tan-O-On Marketing and the Andersons intended to assert UTSA or UFTA claims against Carl Worley, he did not violate the UTSA or the UFTA.

frequently become aware of that financial stress in one way or the other.  That reality does not mean, however, that a creditor who knows that a debtor is experiencing financial stress will also know that, if the debtor pays the creditor, the debtor does so without sufficient assets to cover its other obligations, thereby shorting its other creditors.  Corporations -- even very good, profitable ones -- sometimes have to prioritize payments, delay payments, and manage cash flow, but that does not mean that some creditors will not be paid.  PACA and the trust principles that it incorporates require a more fact-specific inquiry into what the creditor knew or should have known.  Because Hi-Land Potato did not know that Tan-O-On Marketing was paying Hi-Land Potato for bona fide debts only to the exclusion of other producers, PACA does not force Hi-Land Potato to compensate Skyline Potato and the Folson Farm Group.

**IT IS ORDERED** that Defendants Hi-Land Potato Company, Inc. and Carl Worley are not liable to Plaintiffs Folson Farm Corporation, Mart Produce Corporation, Billingsley Produce Sales, Inc., Alsum Produce, Inc., and Peterson Bros. River Valley Farms, Inc. (collectively, "the Folson Farm Group"), Skyline Potato Company, Inc., or Defendants/Third-Party Plaintiffs Tan-O-On Marketing, Inc., Gerald R. Anderson, and Julie A. Anderson for: (i) violating the Perishable Agricultural Commodities Act, 7 U.S.C. §§ 499a-t; (ii) violating New Mexico's Uniform Trade Secrets Act, N.M.S.A. 1978, §§ 57-3A-1 to -7 (1989); (ii) violating the New Mexico's Uniform Fraudulent Transfer Act, N.M.S.A. 1978, § 56-10-14 to -25 (1989)("UFTA"); (iii) unjust enrichment; or otherwise.  Because Hi-Land Potato and Carl Worley are not liable for any damages, their counterclaim is dismissed.  Hi-Land Potato and Carl Worley may seek attorney's fees, to the extent that any are available, and costs pursuant to D.N.M.LR-Civ. 54.5.

_____
UNITED STATES DISTRICT JUDGE

_Counsel:_

Justin P. Pizzonia
Johanna A. Pickel
Gonzalez & Pizzonia LLC
Albuquerque, New Mexico

-- and --

James T. Burns
Heather S. Jaramillo
Patrick J. Griebel
Albuquerque Business Law, P.C.
Albuquerque, New Mexico

  _Attorneys for the Plaintiff_

Justin P. Pizzonia
Gonzalez & Pizzonia LLC
Albuquerque, New Mexico

-- and --

Katy Koestner Esquivel
Meuers Law Firm, PL
Naples, Florida

  _Attorneys for Intervening Plaintiffs Folson Farm Corporation, Potandon Produce,_
   _L.L.C., Mart Produce Corporation, Billingsley Produce Sales, Inc., Alsum_
   _Produce, Inc., and Peterson Bros. River Valley Farms, Inc._

Gordon H. Rowe, III
The Rowe Law Firm, P.C.
Albuquerque, New Mexico

-- and --

Henry M. Bohnhoff
Leslie McCarthy Apodaca
Melanie B. Stambaugh
Rodey Dickason Sloan Akin & Robb, P.A.
Albuquerque, New Mexico

*Attorneys for Defendants and Third-Party Defendants Hi-Land Potato Company,*
*Inc. and Carl Worley*

Gordon H. Rowe, III
The Rowe Law Firm, P.C.
Albuquerque, New Mexico

*Attorney for Defendants Mark Lounsbury and Bill Metz*

Shannon Robinson
Albuquerque, New Mexico

*Attorney for Defendants and Third-Party Plaintiffs Tan-O-On Marketing Inc., Gerald R.*
*Anderson, and Julie A. Anderson*

William Spencer Reid
Benjamin F. Feuchter
Keleher & McLeod, P.A.
Albuquerque, New Mexico

*Attorneys for Defendants and Third-Party Defendants RPE, Inc. and Russell Wysocki*