# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

SKYLINE POTATO COMPANY, INC.,

       Plaintiff,

vs.                                                               No. CIV 10-0698 JB/LAM

HI-LAND POTATO COMPANY, INC.,
CARL WORLEY, GERALD R. ANDERSON,
JULIE A. ANDERSON, MARK LOUNSBURY,
and BILL METZ;

       Defendants,

and

TAN-O-ON MARKETING, INC.,

       Defendant/Third-Party Plaintiff,

vs.

HIGH-LAND POTATO COMPANY, INC.,
and CARL WORLEY,

       Third-Party Defendants.

FOLSON FARM CORPORATION,
POTANDON PRODUCE, L.L.C.,
MART PRODUCE CORPORATION,
BILLINGSLEY PRODUCE SALES, INC.,
ALSUM PRODUCE, INC., and
PETERSON BROS. RIVER VALLEY
FARMS, INC.,

       Intervening Plaintiffs,

vs.

TAN-O-ON MARKETING, INC., and
HI-LAND POTATO COMPANY, INC.,

       Defendants.

<u>**MEMORANDUM OPINION**</u>[1]

**THIS MATTER** comes before the Court on: (i) the Defendants and Third-Party Defendants Hi-Land Potato Company, Inc.'s, and Carl Worley's Motion for Award of Attorney's Fees and Costs, filed February 28, 2014 (Doc. 374)("Motion"); and (ii) Defendant Tan-O-On Marketing, Inc.'s Motion to File Response Out of Time, filed April 8, 2014 (Doc. 382)("Timing Motion"). The Court held a hearing on July 9, 2014. The primary issues are: (i) whether the Court has the power under general trust law principles to award attorney's fees to Defendants and Third-Party Defendants Hi-Land Potato Company, Inc. and Carl Worley, the prevailing parties in this case under the Perishable Agricultural and Commodities Act, 7 U.S.C. §§ 499a-499t ("PACA"); (ii) whether the Court should award attorney's fees; and (iii) whether the Court should grant Defendant Tan-O-On Marketing's request to file its response to the Motion out of time. First, the Court will deny the Motion. The Court concludes that it will not award attorney's fees, because Hi-Land Potato and Carl Worley do not have a contractual or statutory right to attorney's fees, and general trust law principles do not support the award of attorney's fees under the circumstances of this case. Second, the Court will grant the Timing Motion.

<u>**FACTUAL BACKGROUND**</u>

The Court has explained the facts of this case in four prior Memorandum Opinion and Orders: (i) the Memorandum and Opinion and Order, filed July 4, 2012 (Doc. 214)("Motion to Amend MOO"), <u>see</u> <u>Skyline Potato Co., Inc. v. Tan-O-On Mktg., Inc.</u>, 2012 WL 2922751, at *2

---

[1]The Court issued an Order, filed September 8, 2014 (Doc. 395)("Order on Motion"), denying the Defendants and Third-Party Defendants Hi-Land Potato Company, Inc.'s, and Carl Worley's Motion for Award of Attorney's Fees and Costs, filed February 28, 2014 (Doc. 374). The Court issued a second Order, filed March 3, 2015 (Doc. 396)("Order on Timing Motion"), granting Defendant Tan-O-On Marketing, Inc.'s Motion to File Response Out of Time, filed April 8, 2014 (Doc. 382). In the Order on Motion, the Court stated that it would "at a later date issue a Memorandum Opinion more fully detailing its rationale for this decision." Order at 2 n.1. In the Order on Timing Motion, the Court stated that it might "at a later date issue a Memorandum Opinion more fully detailing the rationale for its decision." Order on Timing Motion at 2 n.1. This Memorandum Opinion is the promised opinion with respect to both orders.

(D.N.M. July 4, 2012); (ii) the Memorandum Opinion and Order, filed June 12, 2012 (Doc. 189)
see Skyline Potato Co., Inc. v. Tan-O-On Mktg., Inc., CIV 10-0698 JB/RHS, 2012 WL 2384087,
at **1-4 (D.N.M. June 12, 2012); (iii) the Memorandum Opinion and Order, filed October 12,
2012 (Doc 101); and (iv) the Memorandum and Opinion and Order, filed Dec. 6, 2012 (Doc. 331),
see Skyline Potato Co., Inc. v. Tan-O-On Mktg., Inc., 2012 WL 6622654, at **1-3 (D.N.M. Dec.
6, 2012).   The Court will therefore integrate those facts herein by reference, and not repeat them.
The Court will restate only some facts that are needed to evaluate and provide context to the
Motion.

This lawsuit arises from Defendant Tan-O-On Marketing's failure to pay Plaintiff Skyline
Potato Company, Inc. ("Skyline Potato"), and Intervening Plaintiffs Folson Farm Corporation,
Mark Produce Corporation, Billingsley Produce Sales, Inc., Alsum Produce, Inc., and Peterson
Bros. River Valley Farms, Inc. (collectively the "Folson Farm Group") for sales of potatoes they
made to Tan-O-On Marketing between October and December, 2009.   During that time period,
Tan-O-On Marketing paid Hi-Land Potato for potatoes that Hi-Land Potato shipped to customers
between October and December, 2009.   The invoices that Billingsley Produce provided to
Tan-O-On Marketing during that time period included the following language:

> The perishable agricultural commodities listed on this invoice are sold subject to
> the statutory trust authorized by section 5(c) of the Perishable Agricultural
> Commodities Act, 1930 (7 U.S.C. 499e(c)).   The seller of these commodities
> retains a trust claim over these commodities, all inventories of food or other
> products derived from these commodities, and any receivables or proceeds from the
> sale of these commodities until full payment is received.
>
> MISCELLANEOUS TERMS.
>
> Should any action be commenced between the parties to this contract concerning
> the sums due hereunder or the rights and duties of any party hereto or the
> interpretation of this contract, the prevailing party in such action shall be entitled to,
> in addition to such other relief as may be granted, an award as and for the actual
> attorney's fees and costs in bringing such action and/or enforcing any judgment
> therein.

1.5% per month will be charged on past due accounts (18% annual percentage rate).

Plaintiff and Intervening Plaintiffs' Joint Motion for Partial Summary Judgment and Incorporated

Memorandum of Law , filed August 8, 2012 (Doc. 253-6)("Billingsley Produce invoice") at 11.

The invoices that Mart Produce provided to Tan-O-On Marketing during that time period included

the following language:

> In compliance with the PACA TRUST, our terms are invoices due 10 days after
> shipment.  The perishable commodities listed on this invoice are sold subject to
> the statutory trust authorized by section 5(c) of the P.A.C.A., 1980 (7 U.S.C.,
> 499e(c)).  The seller of these commodities retains a trust claim over there
> commodities, all inventories of food or other products derived from these
> commodities, and any receivables or proceeds from the sale of these commodities
> until payment in full is received.   Not responsible for claims for shortage, damage,
> shrinkage, or any other allowances unless presented to us with all the proper papers
> within 24 hours after arrival of the goods and proper notation is made on freight bill
> at the time of unloading.  In the event legal action is commenced to collect the
> sums due under this invoice, the prevailing party shall be entitled to recover all
> court costs and attorney fees incurred thereby as damages in addition to any
> principal balance then remaining due.

Plaintiff and Intervening Plaintiffs' Joint Motion for Partial Summary Judgment and Incorporated

Memorandum of Law, filed August 8, 2012 (Doc. 253-7)("Mart Produce invoice") at 9.

## **PROCEDURAL HISTORY**

Skyline Potato and the Folson Farm Group allege that Tan-O-On Marketing, Inc. accepted

delivery of Skyline Potato's and the Folson Farm Group's produce, and delivered the potatoes to

various buyers, but did not pay Skyline Potato and the Folson Farm Group for the produce.   See

Petition for Enforcement of USDA PACA Order and Award of Damages; Complaint for Violation

of Federal Unfair Trade Practices Provision in PACA (7 USC [sic] 499b), Breach of Contract,

Breach of Covenant of Good Faith and Fair Dealing, Fraud, Money Owed on Open Account, and

Prayer for Declaratory Relief and Piercing of the Corporate Veil ¶¶ 22-25, at 5, filed July 23, 2010

(Doc. 2)("Skyline Complaint"); Complaint in Intervention ¶¶ 7-16, at 4-6, filed July 8, 2011 (Doc.

60)("Folson Farm Group Complaint").   Skyline Potato alleges that Hi-Land Potato and Carl

Worley are liable for the same amount and on the same counts, because "Tan-O-On was acquired by Hi-Land Potato Company, Inc."   Skyline Complaint ¶ 7, at 3.   The Folson Farm Group alleges that Hi-Land Potato is liable to them for payment for the produce that they delivered to Tan-O-On Marketing, because Hi-Land Potato and Worley received assets and retained those assets, which were assets of the statutory trust created pursuant to § 499e of PACA.   See Folson Farm Group Complaint ¶¶ 40-44, at 10-11.   Tan-O-On Marketing alleges that Hi-Land Potato and Worley misappropriated its Kroger Co. vender number, and in the process, took over Tan-O-On Marketing's business operation.   See Response to Motion to Dismiss Fraud Claims, filed Jan. 23, 2012 (Doc. 96).   The Court entered its Final Judgment, together with its Findings of Fact, Conclusions of Law, and Order on January 31, 2014.   See Final Judgment, filed January 31, 2014 (Doc. 373); Findings of Fact, Conclusions of Law, and Order, filed January 31, 2014 (Doc. 372). In its Findings of Fact, Conclusions of Law, and Order and Final Judgment, the Court ruled that Hi-Land Potato and Worley were not liable to Skyline Potato or to the Folson Farm Group for PACA violations.   The Court also ruled that neither Hi-Land Potato nor Worley were liable to Tan-O-On Marketing or to the Andersons for theft of trade secrets, fraudulent conveyance, or unjust enrichment.   The Court's ruling terminated this case.   Hi-Land Potato and Carl Worley now ask the Court to award attorney's fees against Tan-O-On Marketing, the Andersons, Skyline Potato, and the Folson Farm Group.

**1.**      **Skyline Potato's Claims.**

In Skyline Potato's Petition for Enforcement of USDA PACA Order and Award of Damages; Complaint for Violation of Federal Unfair Trade Practices Provision in PACA (7 USC 499b), Breach of Contract, Breach of Covenant of Good Faith and Fair Dealing, Fraud, Money Owed on Open Account, and Prayer for Declaratory Relief and Piercing of the Corporate Veil, filed July 23, 2010 (Doc. 2)("Skyline Potato's Original Complaint"), it raised the following causes

of action, without distinguishing among the Defendants: (i) "Petition for Enforcement of Order and Collection Under the PACA Trust," Skyline Potato's Original Complaint at 7-8; (ii) "Violation of PACA Unfair Business Conduct Provision," Skyline Potato's Original Complaint at 9; (iii) "Breach of Written Contract," Skyline Potato's Original Complaint at 9-10; (iv) "Breach of Implied Covenants of Good Faith and Fair Dealing," Skyline Potato's Original Complaint at 10-12; (v) "Quantum Meruit," Skyline Potato's Original Complaint at 12; (vi) "Conversion," Skyline Potato's Original Complaint at 12; (vii) "Fraud," Skyline Potato's Original Complaint at 13-14; (viii) "Money Due on an Open Account," Skyline Potato's Original Complaint at 14-15; and (ix) "Prayer for the Remedy of 'Piercing the Corporate Veil,'" Skyline Potato's Original Complaint at 15-16.   Skyline Potato named the following entities as the Defendants: Tan-O-On Marketing, Hi-Land Potato, G. Anderson, J. Anderson, Mark Lounsbury, and Bill Metz, in their "individual capacity[ies] and as Director[s]/Shareholder[s] of Tan-O-On Marketing"; and Carl Worley, individually, "as Director/Shareholder of Tan-O-On Marketing Inc., and as Director/Shareholder of Hi-Land Potato Company."   Skyline Potato's Original Complaint at 1.

In its Memorandum Opinion and Order, filed January 24, 2011 (Doc. 23)("MTD MOO"), the Court granted: (i) the Motion to Dismiss as to Defendant Bill Metz, filed September 13, 2010 (Doc. 7); (ii) the Motion to Dismiss as to Defendant Mark Lounsbury, filed September 13, 2010 (Doc. 9); and (iii) the Unopposed Motion to Dismiss Defendants Hiland [sic] Potato Company, Mark Lounsbury, Bill Metz, and Carl Worley Without Prejudice, filed September 22, 2010 (Doc. 12), thereby dismissing Bill Metz, Mark Lounsbury, Carl Worley, and Hi-Land Potato.   See MTD MOO at 9.

At a hearing held on October 3, 2011, the Court granted Skyline Potato Company's Opposed Motion for Leave to File Amended Complaint, filed June 7, 2011 (Doc. 54).   The Court memorialized this decision in its Memorandum Opinion and Order, filed November 23, 2011

(Doc. 83), and its Amended Memorandum Opinion and Order, 2011 WL 6626975, at *1 (D.N.M. Dec. 2, 2011).

In its First Amended Petition and Complaint, Prayer for Declaratory Relief and Piercing of the Corporate Veil, filed October 21, 2011 (Doc. 73)("Skyline Potato's First Amended Complaint"), Skyline Potato asserted the following claims, without distinguishing among the Defendants for each claim: (i) "Petition for Enforcement of Order and Collection Under the PACA Trust," Skyline Potato's First Amended Complaint ¶¶ 37-51, at 7-9; (ii) "Violation of PACA Unfair Business Conduct Provision," Skyline Potato's First Amended Complaint ¶¶ 52-57, at 9-10; (iii) "Breach of Written Contract," Skyline Potato's First Amended Complaint ¶¶ 58-65, at 10-11; (iv) "Breach of Implied Covenants of Good Faith and Fair Dealing," Skyline Potato's First Amended Complaint ¶¶ 66-77, at 11-12; (v) "Quantum Meruit," Skyline Potato's First Amended Complaint ¶¶ 78-80, at 12-13; (vi) "Conversion and Unlawful Retention of Plaintiff's Property and PACA Trust Assets," Skyline Potato's First Amended Complaint ¶¶ 81-89, at 13-14; (vii) fraud, see Skyline Potato's First Amended Complaint ¶¶ 90-97, at 14-15; (viii) "Money Due on an Open Account," Skyline Potato's First Amended Complaint ¶¶ 98-101, at 15-16; (ix) "Violation of PACA -- Failure to Maintain PACA Trust Assets and Creation of a Common Fund," Skyline Potato's First Amended Complaint ¶¶ 102-108, at 16-17; (x) fraudulent transfer, see Skyline Potato's First Amended Complaint ¶¶ 109-115, at 17; (xi) "Constructive Trust," Skyline Potato's First Amended Complaint ¶¶ 116-121, at 18; and (xii) "Prayer for the Remedy of 'Peircing [sic] the Corporate Veil,'" Skyline Potato's First Amended Complaint ¶¶ 122-126, at 19-20.

The Court entered default judgment on Skyline Potato's claims under PACA against Tan-O-On Marketing.  See Default Judgment Order at 2, filed March 23, 2012 (Doc. 140).

In the Court's Stipulated Order Granting Joint Motion for Dismissal of Certain Claims by Plaintiff Skyline Potato Company Against Defendant Tan-O-On Marketing, filed April 18, 2012

(Doc. 158)("Stipulated Order"), the Court granted the parties' Joint Motion for Dismissal of Certain Claims by Plaintiff Skyline Potato Company against Defendants Tan-O-On Marketing, Inc.[,] Hi-Land Potato Company, Inc., and Carl Worley, filed April 17, 2012 (Doc. 155), and dismissed a number of claims.   As against Tan-O-On Marketing, the Court dismissed Skyline Potato's claims for: (iv) "Breach of Implied Covenants of Good Faith and Fair Dealing"; (v) "Quantum Meruit"; (vii) fraud; (viii) "Money Due on an Open Account"; (x) fraudulent transfer; (xi) "Constructive Trust"; and (xii) "Prayer for Remedy of Piercing the Corporate Veil." Stipulated Order at 2.   Against Hi-Land Potato and Worley, the Court dismissed: (i) "Petition for Enforcement of Order and Collection Under the PACA Trust," (ii) "Violation of PACA Unfair Business Conduct Provision"; (iii) "Breach of Written Contract"; (iv) "Breach of Implied Covenants of Good Faith and Fair Dealing"; (vii) fraud; (viii) "Money Due on an Open Account"; (ix) "Violation of PACA -- Failure to Maintain PACA Trust Assets and Creation of a Common Fund"; and (xii) "Prayer for the Remedy of Piercing the Corporate Veil."   Stipulated Order at 2-3.

In their Stipulation for Voluntary Dismissal of Claims Asserted by Intervening Plaintiff Potandon Produce, L.L.C. Against Defendant Tan-O-On Marketing, Inc. and Third Party Defendants Hi-Land Potato Company, Inc. and Carl Worley, filed April 25, 2012 (Doc. 167)("Potandon Produce Stipulation"), the parties stipulated to dismiss all of Potandon Produce's claims against Tan-O-On Marketing, Hi-Land Potato, and Carl Worley.   See Potandon Produce Stipulation at 1.

During summary judgment briefing, Skyline Potato abandoned a number of claims.   The Court held a hearing on multiple motions for summary judgment on September 27, 2012, in which

Skyline Potato confirmed that it had abandoned all but the PACA claims.  See Transcript of

Hearing at 4:20-5:5 (taken September 27, 2012)(Bohnhoff, Court, Jaramillo).[2]

In the Pretrial Order, filed October 18, 2012 (Doc. 315), Skyline Potato and the Folson

Farm Group indicated that they brought a claim only with respect to the alleged breach of the

PACA trust.  See Pretrial Order at 4.

### 2.      **The Folson Farm Group**.

In their Complaint in Intervention, filed July 8, 2011 (Doc. 60), Folson Farm, Potandon

Produce, Mart Produce, Billingsley Produce, Alsum Produce, and Peterson Brothers asserted

claims for: (i) "Declaratory Relief Validating PACA Trust Claim" against Tan-O-On Marketing,

Complaint in Intervention ¶¶ 6-16, at 4-6; (ii) "Enforcement of Payment From PACA Trust

Assets" against Tan-O-On Marketing, Complaint in Intervention ¶¶ 17-21, at 6-7; (iii) "Violation

of the PACA: Failure To Maintain PACA Trust Assets and Creation of Common Fund" against

Tan-O-On Marketing, Complaint in Intervention ¶¶ 22-28, at 7-8; (iv) "Violation of PACA:

Failure to Pay Promptly" against Tan-O-On Marketing, Complaint in Intervention ¶¶ 29-34, at

8-9; (v) breach of contract against Tan-O-On Marketing, see Complaint in Intervention ¶¶ 35-39,

at 9-10; (vi) "Conversion and Unlawful Retention of PACA Trust Assets" against Hi-Land Potato,

Complaint in Intervention ¶¶ 40-45, at 10-11; (vii) fraudulent transfer against Hi-Land Potato, see

Complaint in Intervention ¶¶ 46-53, at 11-12; (viii) "Constructive Trust" against Hi-Land Potato,

Complaint in Intervention ¶¶ 54-58, at 12-13; and (ix) unjust enrichment against Hi-Land Potato,

see Complaint in Intervention ¶¶ 59-63, at 13-14.

The Court entered default judgment on the Folson Farm Group's PACA claims against

Tan-O-On Marketing.  See Default Judgment at 1-2, filed June 21, 2012 (Doc. 205).

During summary judgment briefing, the parties abandoned a number of claims.   The Court

_____

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.   Any final transcript may contain slightly different page and/or line numbers.

held a hearing on multiple motions for summary judgment on September 27, 2012, where the Court recognized, and the Folson Farm Group confirmed, that it had abandoned all but the PACA claims.  See Transcript of Hearing at 4:1-9 (taken September 27, 2012)(Court, Esquivel).[3]

In the Pretrial Order, Skyline Potato and the Folson Farm Group indicated that they brought a claim only with respect to the alleged breach of the PACA trust.  See Pretrial Order at 4.

### 3.    G. Anderson, J. Anderson, and Tan-O-On Marketing's Claims.

In G. Anderson and J. Anderson's Third Party Complaint for Fraud, filed February 22, 2011 (Doc. 26)("Andersons' Complaint"), G. Anderson and J. Anderson purported to assert various fraud claims against Hi-Land Potato and Carl Worley.   See Andersons' Complaint at 1-4.

In what is labeled on the docket as Tan-O-On Marketing, G. Anderson, and J. Anderson's Amended Third-Party Complaint for Fraud and Theft of Trade Secrets and Unjust Enrichment, filed October 14, 2011 (Doc. 72), those parties purported to assert, under a single heading, claims for "Fraud, Unjust Enrichment Theft or Conversion of Trade Secrets and Corporate and Personal Assets" against Hi-Land Potato, Worley, and two additional Defendants: RPE, Inc. and Russell Wysocki.   Amended Third-Party Complaint at 3.

In its Motion to Amend MOO, the Court granted in part and denied in part: (i) Tan-O-On Marketing's Motion to Amend Third Party Complaint for Fraud and Theft of Trade Secrets and Unjust Enrichment, filed February 2, 2012 (Doc. 105); and (ii) Defendants Hi-Land Potato Company's and Worley's Motion to Dismiss Fraud and Fraud-Related Claims in Third Party Complaint and to Dismiss Claims Filed by Gerald and Julie Anderson in Their Individual Capacities, filed February 7, 2012 (Doc. 109).   See Motion to Amend MOO at 67-68, 2012 WL

---

[3]Although the transcript of the hearing identifies Katy Koestner Esquivel only as an "unidentified speaker," Transcript of Hearing at 4:9, it is evident from the context that the Folson Farm Group's counsel, Ms. Esquivel, made this statement.

2922751, at *36.   The Court explained:

> The Court will permit Defendant Tan-O-On Marketing to assert only claims for
> unjust enrichment and theft of trade secrets against Third-Party Defendants RPE,
> Inc. and Russell Wysocki consistent with the allegations presented in Tan-O-On
> Marketing's Second Amended Third Party Complaint for Fraud and Theft of Trade
> Secrets and Unjust Enrichment and Unfair Trade Practices, filed February 2, 2012
> (Doc. 105-1).   The Court will not permit Tan-O-On Marketing to assert any other
> claim against the RPE, Inc. Parties.   The Court will not permit Tan-O-On
> Marketing to assert a common-law fraud claim against Defendants Hi-Land Potato
> Company and Carl Worley.   The Court will not permit Tan-O-On Marketing to
> assert a claim under the New Mexico Unfair Practices Act, N.M.S.A. 1978, §§
> 57-12-1 to -26, against the Hi-Land Potato Parties.   The Court will permit
> Tan-O-On Marketing to assert a fraudulent-conveyance claim against Hi-Land
> Potato consistent with the fraudulent-conveyance claim presented in Tan-O-On
> Marketing's Second Amended Third-Party Complaint.   The Court will permit
> Tan-O-Marketing to assert claims for unjust enrichment and theft of trade secrets
> against the Hi-Land Potato Parties consistent with the allegations in its Second
> Amended Third-Party Complaint.

Motion to Amend MOO at 68, 2012 WL 2922751, at *36.

In their Amended Third Party Complaint for Fraudulent Conveyance and Theft of Trade
Secrets and Unjust Enrichment, filed July 26, 2012 (Doc. 240)("Tan-O-On Marketing's Second
Amended Complaint"), Tan-O-On Marketing asserted claims for: (i) fraudulent conveyance
against Hi-Land Potato, see Tan-O-On Marketing's Second Amended Complaint ¶¶ 39-62, at
8-12; (ii) theft of trade secrets and proprietary information against Hi-Land Potato, see Tan-O-On
Marketing's Second Amended Complaint ¶¶ 62-80, at 12-17; (iii) theft of trade secrets against
RPE, Inc. and Russell Wysocki, Tan-O-On Marketing's Second Amended Complaint ¶¶ 81-103,
at 17-22; (iv) "Unjust Enrichment and Unfair Trade Practice" against RPE, Inc. and Russell
Wysocki, Tan-O-On Marketing's Second Amended Complaint ¶¶ 102-108, at 22-23; and (v)
unjust enrichment against Hi-Land Potato and Carl Worley, see Tan-O-On Marketing's Second
Amended Complaint ¶¶ 109-113, at 24-25.

In their Stipulation of Dismissal of All Claims Against RPE, Inc., and Russell Wysocki
with Prejudice, filed August 14, 2012 (Doc. 257), the parties informed the Court that they

stipulated to "dismissal with prejudice of any and all claims that any of them asserted, or could have asserted, in this matter against Third-Party Defendant RPE, Inc., Third-Party Defendant Russell Wysocki, or their respective employees, agents, and/or assigns."   Stipulation of Dismissal of All Claims Against RPE, Inc., and Russell Wysocki with Prejudice at 1.   The parties also informed the Court that, "following said dismissal, there are no claims remaining in this matter against" RPE, Inc. or Wysocki, "and they are no longer parties to this action."   Stipulation of Dismissal of All Claims Against RPE, Inc., and Russell Wysocki with Prejudice at 1-2.

In the Pretrial Order, G. Anderson, J. Anderson, and Tan-O-On Marketing indicated that they brought claims for theft of trade secrets, fraudulent conveyance, and unjust enrichment.   See Pretrial Order at 5.

### 4.      Hi-Land Potato and Carl Worley.

In Third-Party Defendant Hi-Land Potato Company, Inc.'s and Carl Worley's Answer to Third-Party Complaint for Fraudulent Conveyance, Theft of Trade Secrets, and Unjust Enrichment, and Counterclaim Against Tan-O-On Marketing, Inc., filed August 10, 2012 (Doc. 256), Hi-Land Potato and Worley contend that, if the Court finds them liable to Skyline Potato or to the Folson Farm Group, they are "entitled to indemnification, contribution, and/or subrogation against [Tan-O-On Marketing] for the amount of such liability."   Third-Party Defendant Hi-Land Potato Company, Inc.'s and Carl Worley's Answer to Third-Party Complaint for Fraudulent Conveyance, Theft of Trade Secrets, and Unjust Enrichment, and Counterclaim Against Tan-O-On Marketing, Inc. at 13.   In Third-Party Defendant Hi-Land Potato Company, Inc.'s and Carl Worley's Amended Answer to Third-Party Complaint for Fraudulent Conveyance, Theft of Trade Secrets, and Unjust Enrichment, and Counterclaim Against Tan-O-On Marketing, Inc., filed August 15, 2012 (Doc. 259), Hi-Land Potato and Worley assert the same theory of liability.   See Third-Party Defendant Hi-Land Potato Company, Inc.'s and Carl Worley's

Amended Answer to Third-Party Complaint for Fraudulent Conveyance, Theft of Trade Secrets, and Unjust Enrichment, and Counterclaim Against Tan-O-On Marketing, Inc. at 13.

In the Pretrial Order, Hi-Land Potato indicates that the Court should offset its liability, if any, from G. Anderson and Tan-O-On Marketing's assets.   See Pretrial Order at 4.

### 5.   Findings of Fact, Conclusions of Law and Order, and Final Judgment.

On January 31, 2014, after three years of litigation, the Court entered its Final Judgment (Doc. 373), together with its Findings of Fact, Conclusions of Law and Order (Doc. 372), ruling that Hi-Land Potato and Worley were not liable to Skyline Potato or to the Folson Farm Group for PACA violations.   The Court also ruled that neither Hi-Land Potato nor Worley were liable to Tan-O-On Marketing or to the Andersons for theft of trade secrets, fraudulent conveyance, or unjust enrichment.   The Court's ruling terminated this case.

In its Findings of Fact, Conclusions of Law, and Order, the Court explained the equitable basis underlying its conclusions:

### C.   HI-LAND POTATO DID NOT BREACH ITS TRUST DUTIES AS A GENERAL CREDITOR OR AS A CO-BENEFICIARY OF TAN-O-ON MARKETING'S PACA TRUST.

18.   The United States Circuit Courts of Appeal, in construing PACA, have uniformly held that "[t]he interpretation of PACA trust interests is guided by general trust principles to the extent there is no conflict with the statute."   In re Arctic Exp. Inc., 636 F.3d 781, 798 (6th Cir. 2011)(quoting Consumers Produce Co. v. Volante Wholesale Produce, Inc., 16 F.3d 1374, 1381 (3d Cir.1994)).   See R Best Produce, Inc. v. Shulman-Robin Marketing Corp., 467 F.3d 238, 242 (2d Cir. 2006)(noting that the Second Circuit has "previously noted that PACA trusts are 'governed by general principles of trust law.'")(quoting Albee Tomato, Inc. v. A.B. Shalom Produce Corp., 155 F.3d 612, 615 (2d Cir 1998)); Bear Mountain Orchards, Inc. v. Mich-Kim, Inc., 623 F.3d 163, 167 (3d Cir. 2010)("General trust principles of trust law apply to trusts created under PACA . . . .")(quoting Nickey Gregory Co., LLC v. AgriCap, LLC, 597 F.3d 591, 595 (4th Cir. 2010)); Reaves Brokerage Co., Inc. v. Sunbelt Fruit & Vegetable Co., Inc., 336 F.3d 410, 413 (5th Cir. 2003)("General principles of trust law govern PACA trusts."); Boulder Fruit Exp. & Heger Organic Farm Sales v. Transp. Factoring, Inc., 251 F.3d at 1271 ("We apply general trust principles to questions involving the PACA trust, unless those principles directly conflict with PACA."); Gargiulo v. G.M. Sales, Inc., 131

F.3d 995, 999 (11th Cir.1997)("General principles of trust law govern the PACA trust . . . ."). This interpretation is sound, because § 499e(2) expressly uses the word trust, thus indicating Congress intended the PACA trusts to be administered under general trust principles like any other trust. See In re Arctic Exp. Inc., 636 F.3d at 794 (6th Cir. 2011)(noting that "common law principles apply to the formation of [Congress' numerous] statutory trusts").

        19.    The United States Circuit Courts of Appeal have consistently looked to the Restatement of the Law of Trusts to provide the general principles of trust law.

> [A] trust involves three elements: (1) a trustee, who holds the trust property and is subject to duties to deal with it for the benefit of one or more others; (2) one or more beneficiaries, to whom and for whose benefit the trustee owes the duties with respect to the trust property; and (3) trust property, which is held by the trustee for the beneficiaries."

In re Arctic Exp. Inc., 636 F.3d at 794 (quoting Restatement (Third) of Trusts § 2, cmt. f). Thus, in Consumers Produce Co. v. Volante Wholesale Produce, Inc., the United States Court of Appeals for the Third Circuit held that, because the transferee met the requirements in Restatements (Second) of Trusts § 284, which exempts a third-party transferee from liability where the third-party is a bona fide purchaser for value without notice that the transfer was in breach of the trust, the transferee was not required to disgorge the payments made in breach of the PACA trust. See 16 F.3d at 1385. Similarly, in C.H. Robinson Co. v. Trust Co. Bank, N.A., the United States Court of Appeals for the Eleventh Circuit concluded that the district court erred in determining that a third-party transferee with knowledge of the existence of the PACA trust was required to disgorge payments made in breach of the trust, because the court did not faithfully apply general trust law principles:

> First, the district court erred in its conclusion that transferee liability under traditional trust law turns on "actual knowledge of the trust." . . . A transferee takes property free of trust if he received it for value and without notice of the breach of trust. "If the trustee transfers trust property in breach of trust to a transferee for value, the transferee takes free of the trust although he had notice of the existence of the trust, unless he has notice that the trustee is committing a breach of trust in making the transfer." Restatement (Second) of Trusts § 296. . . . Second, the district court erroneously created an exception to general trust principles by imposing transferee liability upon lenders which happen to have a security interest in trust assets. We conclude that such an exception is inconsistent with established precedent and the intent of Congress.

C.H. Robinson Co. v. Trust Co. Bank, N.A., 952 F.2d 1311, 1314 (11th Cir.

1992)(emphasis in original).

20.     Under general trust principles, because the merchant's, dealer's, or broker's proceeds from the sales of produce commodities under PACA are held in trust for the suppliers as PACA trust beneficiaries, the merchant, dealer, or broker becomes a PACA trustee subject to a trustee's fiduciary duties.   "An individual who is in a position to control the assets of the PACA trust and fails to preserve them, may be held personally liable to the trust beneficiaries for breach of fiduciary duty."   Coosemans Specialties, Inc. v. Gargiulo, 485 F.3d 701, 705 (2d Cir. 2007). See Weis-Buy Servs., Inc. v. Paglia, 411 F.3d 415, 422 (3d Cir. 2005)(analyzing whether the plaintiff's claim against the PACA trustee failed, because the statute of limitations for a trustee's breach of fiduciary duty claim had run).   "PACA trust rights may be enforced . . . through a court action for breach of fiduciary trust . . . permit[ting] recovery against both the corporation and its controlling officers." Patterson Frozen Foods, Inc. v. Crown Foods Intern., Inc., 307 F.3d 666, 669 (7th Cir. 2002)(citing Golman-Hayden Co. v. Fresh Source Produce, Inc., 217 F.3d 348, 351 (5th Cir.2000)).   See Farm-Wey Produce, Inc. v. Wayne Bowman Co., Inc., 973 F. Supp. 778, 785 (E.D. Tenn. 1997)(concluding that PACA trustee did not violate its fiduciary duty as a trustee, because it did not violate its duty under Restatement (Second) of Trusts § 174 "to exercise the skill and care of a person of ordinary prudence . . . in dealing with his own property").

## 1.   **PACA Beneficiaries' Protections and Remedies to Prevent the Dissipation of Funds.**

21.     The PACA trust was created to protect a supplier and PACA beneficiary by ensuring that the assets of the trust, the proceeds from the shipment of produce, are not dissipated before the suppliers are paid.   The first protection for suppliers from a merchant's, dealer's, or broker's dissipation of PACA trust funds is to seek an injunction.   Section 499e(5) provides the equitable remedies available to suppliers under PACA: "The several district courts of the United States are vested with jurisdiction specifically to entertain (i) actions by trust beneficiaries to enforce payment from the trust, and (ii) actions by the Secretary to prevent and restrain dissipation of the trust."   7 U.S.C. § 499e(c)(5).   Dissipation is defined as "any act or failure to act which could result in the diversion of trust assets or which could prejudice or impair the ability of unpaid suppliers, sellers, or agents to recover money owed in connection with produce transactions."   7 C.F.R. § 46.46. Courts have construed § 499e(5) to mean that both the Secretary of the U.S.D.A. and district courts can enjoin a merchant, dealer, or broker to prevent the dissipation of trust assets.   See Tanimura & Antle, Inc. v. Packed Fresh Produce, 222 F.3d 132, 137 (3d Cir. 2000)("§ 499e(c)(5)(ii) . . . authorizes the district court to entertain . . . injunctive relief on behalf of trust beneficiaries, thereby adding to, instead of detracting from, available common law remedies.")(reversing the district court for failing to enjoin dissipation of PACA trust funds); Frio Ice, S.A. v. Sunfruit, Inc., 918 F.2d 154, 158 (11th Cir. 1990)("[W]e find the district court's interpretation of Section 499e(c)(4), as limiting injunctive relief to suits brought by the Secretary, to be incorrect.")   See also JSG Trading Corp. v. Tray-Wrap Inc.,

917 F.2d 75, 79 (2d Cir. 1990)(noting that the court saw "nothing in the Act that would prohibit the court from exercising its traditional equity powers to grant a preliminary injunction at the instance of a private litigant if the normal standards for such relief are met").

22.     The second protection to PACA beneficiaries is their priority interest in the PACA trust's assets.  Congress designed the 1984 amendment to PACA to provide PACA trust beneficiaries with a superior interest in the PACA trust assets over creditors with security interests in those same assets, allowing the suppliers to recover first in the merchant's, dealer's, or broker's -- the PACA trustee's -- bankruptcy.  Thus, "a PACA trustee holds legal title to PACA trust assets but the seller retains an equitable interest in the assets pending full payment, so that the Bankruptcy Code excludes PACA trust assets from the PACA trustee's bankruptcy estate."  C.H. Robinson Co. v. Alanco Corp., 239 F.3d 483, 487 (2d Cir. 2001)(citing In re Kornblum, 81 F.3d at 284; In re San Joaquin Food Serv., Inc., 958 F.2d 938, 939 (9th Cir. 1992)).  As amongst beneficiaries, when a PACA trustee becomes insolvent, the legislative intent suggests, and courts have enforced PACA to require, the trust's assets are distributed first to the PACA beneficiaries *pro rata*.  See In re Milton Poulos, Inc., 947 F.2d 1351, 1353 (9th Cir. 1991)(holding that all suppliers who had "properly perfected their PACA trust rights [] are entitled to their *pro rata* share of the trust assets"); H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., 597 F. Supp. 2d at 316 ("Included in the trust protection provided by PACA is not only an elevated priority over other creditors but also the right to a *pro rata* distribution of trust assets in the event of insolvency.").  See also 49 Fed. Reg. at 45,735-36 ("Where a court is involved, USDA would recommend to the court that the available trust assets be distributed on a pro-rata basis to all beneficiaries who have protected their right to trust benefits.").  Two United States District Courts have analyzed whether one supplier/beneficiary is liable to another when one beneficiary receives a priority payment before the PACA trustee becomes insolvent, each reaching a different conclusion.  Compare Fresh Kist Produce, LLC v. Choi Corp., Inc., 223 F. Supp. 2d 1 (D.D.C. 2002)(concluding that the defendant produce supplier was required to disgorge payments made to it by the seller), with H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., 597 F. Supp. 2d 313 (E.D.N.Y. 2009)(concluding that the supplier did not have to disgorge payments it received from the buyer).

## 2.     The Fiduciary Relationship of PACA Beneficiaries.

23.     It is a general proposition in debtor/creditor law, and the Supreme Court has held, that "except as forbidden by the bankrupt law, a debtor has the right to prefer one creditor over another, and that the vigilant creditor is entitled to the advantage secured by his watchfulness and attention to his own interests." Blennerhassett v. Sherman, 105 U.S. 100, 117 (1881).  Under trust law, however, because of the nature of a co-beneficiary relationship, creditors who are also co-beneficiaries of a trust additionally owe their co-beneficiaries duties that contain a fiduciary element.  See G. Bogert & G. Bogert, The Law of Trusts and Trustees §

- 16 -

191 (Rev. 2d ed. 1979)("Co-beneficiaries . . . are in a fiduciary relation to each other . . . .")(cited in the Reporter's Notes on Restatement (Third) Trusts § 104).

### a.   General Trust Law Duties of Co-Beneficiaries.

24.    The duties owed to co-beneficiaries under general trust principles govern the duties that suppliers owe to each other as PACA trust beneficiaries. See Fresh Kist Produce, LLC v. Choi Corp., Inc., 223 F. Supp. 2d at 12 (noting that a dispute between two suppliers is "a dispute between two beneficiaries"), amended sub nom. Fresh Kist Produce, LLC v. Choi Corp., Inc., 251 F. Supp. 2d 138 (D.D.C. 2003).   Under general principles of trust law, a beneficiary is liable to its co-beneficiaries for participating in a trustee's breach of the trust.    See Restatement (Second) of Trusts § 256(4) ("If one of several beneficiaries participates with the trustee in a breach of trust . . . , [that] beneficiary is personally liable to the extent of the loss, and [the beneficiary's] interest is subject to a charge for the amount of loss . . . .); Restatement (Third) of Trusts § 104(1)(c) ("A beneficiary is not personally liable to the trust except to the extent . . . the trust suffered a loss resulting from a breach of trust in which the beneficiary participated . . . ."). Comment f to Restatement (Third) of Trusts § 104 describes conduct which constitutes a beneficiary's participation in a breach of the trust:

> Certainly, the beneficiary participates in a breach of trust if the beneficiary performs, or joins in performing, an act the beneficiary knows is a breach. Otherwise, the question of what conduct of the beneficiary constitutes participation in a breach of trust is a question of degree.   For example, a beneficiary has participated in a breach of trust if the beneficiary induced the misconduct knowing that it would or might be a breach of trust. However, mere knowledge of, or consent to, the breach, without more, is insufficient to constitute participation . . . .

Restatement (Third) of Trusts § 104, cmt. f.  The Reporter's Notes on § 104, comment f, direct the reader to A. Scott & M. Ascher, Scott and Ascher on Trusts § 25.2.6.3 (5th ed., 2007), for more information "[o]n a beneficiary's duty to other beneficiaries not to participate in a breach of trust."   Restatement (Third) of Trusts § 104, Reporter's Notes on cmt. f.   Professors Austin W. Scott and Mark L. Ascher suggest that co-beneficiaries have duties to one another beyond the duty not to participate in a breach of the trust: "Although there is not the same fiduciary relationship between trust beneficiaries as there is between them and the trustee, there is enough of a fiduciary element in their relationship to make it inequitable for one to seek to obtain an advantage over another."   Scott and Ascher on Trusts § 25.2.6.3, at 1866.   Similarly, the late Professor George G. Bogert and George T. Bogert, which the Reporter's Notes on § 104 also cite, state that beneficiaries have duties to each other, at least to a certain extent, as fiduciaries.   See G. G. Bogert & G. T. Bogert, The Law of Trusts and Trustees § 191 ("Co-beneficiaries . . . are in a fiduciary relation to each other in the sense that one beneficiary may not secretly secure for himself a special advantage in the trust administration.").   Thus, the

- 17 -

Court concludes that PACA beneficiaries, as co-owners of the equitable interest in the PACA trust, have some limited fiduciary duties to the other beneficiaries of the PACA trust, including at least the duty not to affirmatively seek an advantage over their co-beneficiaries.

### b.    Case Law Addressing the Duties of PACA Co-Beneficiaries.

25.    While no authority is precisely on point with the unique facts and issues in this case, two cases present contrasting conclusions regarding the trust responsibilities of PACA beneficiaries.  In the end, the Court believes that Fresh Kist Produce, LLC v. Choi Corp., Inc. may come closest to reflecting Congress' intent to protect PACA beneficiaries.   What that conclusion means is that general trust principles protect PACA beneficiaries to the extent of trust law, but no more.

### i.    Fresh Kist Produce, LLC v. Choi Corp., Inc.

26.    In Fresh Kist Produce, LLC v. Choi Corp., Inc., a plaintiff supplier, Fresh Kist, and defendant suppliers, J.C. Watson ("JCW"), Norfolk Banana, and Berkley Tomato all sold perishable agricultural commodities to a common produce dealer, Washington Wholesale Produce Company ("WWP").  223 F. Supp. 2d at 4.   On June 5, 2001, JCW filed a complaint against WWP for breach of contract, alleging that WWP owed JCW $75,946.20 for produce sold and also alleging that WWP was insolvent.  See 223 F. Supp. 2d at 5.   WWP and JCW reached an agreement out of court in which WWP would pay a sum certain monthly to JCW until the balance was paid.  See 223 F. Supp. 2d at 5.   After several payments over two months, WWP failed to make the payments, and JCW filed an amended complaint to obtain the balance owed.  See 223 F. Supp. 2d at 5.   Fresh Kist then contacted JCW and asked if it would waive the potential conflict of interest in having a common attorney represent both Fresh Kist and JCW; JCW would not waive the conflict.  See 223 F. Supp. 2d at 5.   On August 28, 2001, Fresh Kist initiated an action against JCW and WWP requesting a temporary restraining order to enjoin WWP from paying the rest of the amount owed to JCW, and establishing a procedure for non-parties to assert PACA claims.  See 223 F. Supp. 2d at 5.   Fresh Kist alleged that JCW, Norfolk Banana, and Berkley Tomato "must disgorge the PACA benefits received from WWP after they learned that WWP was insolvent."  223 F. Supp. 2d at 5-6.

27.    The Honorable Ricardo M. Urbina, United States District Judge for the District of Columbia, framed the issue in front of the court as "whether PACA requires a beneficiary with knowledge of a PACA trust's insolvency to set up a mechanism for all beneficiaries to submit claims for the remaining funds."  Fresh Kist Produce, LLC v. Choi Corp., Inc., 223 F. Supp. 2d at 8.   Recognizing that general trust principles govern PACA trusts, Judge Urbina answered in the affirmative, noting: "Under trust law, co-beneficiaries are in a fiduciary relationship with each other so that one beneficiary may not secretly secure for himself a special advantage in the trust administration."  Fresh Kist Produce, LLC

v. Choi Corp., Inc., 223 F. Supp. 2d at 8 (citing G. Bogert & G. Bogert, The Law Of Trusts And Trustees § 191, at 478 (2d ed. 1979)).  The court found that, under PACA, "the law compels a beneficiary with knowledge of a trust's insolvency to refrain from securing for itself a greater advantage than its co-beneficiaries."  223 F. Supp. 2d at 8.  Thus, Judge Urbina concluded that PACA requires beneficiaries to "employ *pro rata* distribution when one of them has belief or knowledge of the trust's insolvency," rather than waiting until the PACA trustee becomes fully insolvent or bankrupt.  223 F. Supp. 2d at 9.  Judge Urbina based this conclusion on three considerations: (i) that it is a breach of a fiduciary duty to co-beneficiaries where a trustee who is also a creditor "secure[s] itself by the depletion of assets which, in the event of the debtor's insolvency it would be obliged to share ratably with all of the debtor's creditors," 223 F. Supp. 2d at 8 (quoting Dabney v. Chase Nat'l Bank of City of New York, 196 F.2d 668, 672-73 (2d Cir. 1952)(Learned Hand, J.); (ii) that "when a trustee pays one beneficiary and becomes bankrupt, a court may set aside this preference," 223 F. Supp. 2d at 8 (citing G. Bogert & G. Bogert, The Law of Trusts and Trustees § 191, at 478-79); and (iii) that an insolvent PACA trust's "assets are distributed among beneficiaries *pro rata*,"  Fresh Kist Produce, LLC v. Choi Corp., Inc., 223 F. Supp. 2d at 8 (citing In re Milton Poulos, Inc., 947 F.2d at 1352).  Judge Urbina thus required JWC, the supplier who had previously sued WWP, to disgorge the payments it had received since the prior suit, concluding that, because JWC's complaint in that case alleged WWP was insolvent at the time, JCW, the defendant supplier at that time had the requisite knowledge of the PACA trustee's insolvency.  223 F. Supp. 2d at 11.

### ii.   H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc.

28.   In H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., the intervening supplier plaintiff, Amco Produce, Inc. ("Amco Produce"), amended its complaint to add a claim against the original supplier plaintiffs, Wm. Rosenstein & Sons, Co. and Eagle Fruit Traders, LLC (together, "Rosenstein & Sons"), seeking disgorgement of payments made to Rosenstein & Sons for participation in the dissipation of the PACA trust's assets.  597 F. Supp. 2d at 315.  "Specifically, Amco has alleged that Rosenstein, despite either knowing or having information that would have led it to reasonably know of defendants' financial instability or insolvency, received PACA trust assets from defendants in payment of Rosenstein's pre-existing claims."  597 F. Supp. 2d at 315.

29.   The Honorable Brian M. Cogan, United States District Judge for the Eastern District of New York, distilled the issues to two questions that he had to resolve:

> When interpreting the trust provisions of PACA, the Second Circuit has held that "general trust law applies to PACA trusts unless such law directly conflicts with the PACA statute." Thus, we must ask two questions: (1) does general trust law create a cause of action in favor of a creditor of an insolvent corporation to set aside

preferential payments made to another creditor of the corporation; and (2) if not, does PACA modify the general trust law by creating such a claim and enforcement mechanism?

597 F. Supp. 2d at 316 (quoting D.M. Rothman & Co., Inc. v. Korea Commercial Bank of New York, 411 F.3d at 94)(internal citations and alterations omitted).

30.     In answering the first question, Judge Cogan first posited that, under the common law, any insolvent business, not just a PACA trustee, holds its assets in trusts for its creditors, resulting in the directors of the insolvent corporation serving as trustees, imposing upon them a fiduciary duty to the corporation's creditors. See 597 F. Supp. 2d at 316 (citing In re Poseidon Pool & Spa Recreational, Inc., 391 F.R. 234, 241 (Bankr. E.D.N.Y. 2008)).   "This is no different than the duty that exists under PACA, except that PACA arguably expands, or at least clarifies that, this obligation additionally include 'controlling persons, not just directors.'" 597 F. Supp. 2d at 316.   Judge Cogan also stated that payment of bona fide debts of an insolvent corporation to outsiders is not improper under common law, "despite the fact that these payments deplete the remaining assets available for creditors." 597 F. Supp. 2d at 316-17 (citing In re Sharp Int'l Corp., 403 F.3d 43, 54 (2d Cir. 2005)("[A] mere preference between creditors does not constitute bad faith . . . . Nor does it matter that the preferred creditor knows that the debtor is insolvent.")). Judge Cogan pointed out: "By allowing preferential payments, the common law recognizes the business reality that distressed debtors must make hard decisions about who to pay and who not to pay."   H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., 597 F. Supp. 2d at 317.

31.     Judge Cogan noted that the case law has been abrogated: first, by "bar[ring] insolvent corporations from preferring their insiders over outside creditors," Southern Indus., Inc. v. Jeremias, 66 A.D.2d 178, 184, 41 N.Y.S.2d 945 (2d Dep't 1987)); and second, via "the preference recovery provision of the Bankruptcy Code, which establishes a ninety-day (or one year, for insiders) preference recovery," 11 U.S.C. § 547(b)(4)(A).   H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., 597 F. Supp. 2d at 317.   There is no subjective inquiry regarding the preference payments recovered under the Bankruptcy Code's clawback provision.   See H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., 597 F. Supp. 2d at 317 ("It does not matter if the creditor knew or should have known at the time he received the payment that the debtor was insolvent, or if he pressured or refrained from pressuring the debtor for payment.").

32.     Judge Cogan concludes that there is nothing in PACA suggesting a change to the common law's allowance of bona fide preference payments to creditors:

I see nothing in PACA that changes the common law in this regard. As explained above, the purpose of PACA is to elevate the priority of produce sellers over other classes of creditors; PACA does not create any special rights among such produce sellers inter se. An

- 20 -

insolvent corporation in any business owes a fiduciary duty to its creditors not to dissipate assets, but preference payments by definition reflect the payment of bona fide debts and thus are not a breach of any fiduciary duty. PACA appears to merely codify this principle in the produce business under the law of trusts, not change it.

597 F. Supp. 2d at 318.   Judge Cogan did not accept Amco Produce's argument that the distribution of the assets of an insolvent PACA trustee *pro rata* to the PACA beneficiaries implies that Congress intended that a PACA beneficiary/creditor should be required to disgorge any preference payments made just before insolvency:

> [I]t is important not to confuse PACA's clearly stated requirement of *pro rata* distribution with the creation of an implied preference recovery action that could be brought by one creditor against another. . . .   However, it is a far cry from recognizing the concept of *pro rata* distribution to creating a remedy for preference payments that would actually increase the trust and which, at least as the instant case is presently postured, might constitute the entirety of the trust corpus (as no res has yet been identified for this trust). Without some guidance from Congress under PACA, there is no basis for implying such a remedy.

597 F. Supp. 2d at 318.

33.     In response to Amco Produce's argument that Judge Cogan should apply Fresh Kist Produce, LLC v. Choi Corp., Inc.'s "knew or should have known" standard, Judge Cogan noted that the cases from which the "knew or should have known" standard developed were "cases dealing either with the obligation of an interested trustee, *i.e.*, a [bank] who is both holding funds on behalf of creditors and who [it]self has an interest in those funds, or [as in Fresh Kist Produce, LLC v. Choi Corp., Inc.,] an insider with special access to the debtor."   597 F. Supp. 2d at 318-19.   Judge Cogan agreed with a narrow reading of the standard: "To be sure, a co-beneficiary who is an insider may owe a fiduciary duty to his co-beneficiaries. But it is his status as an insider, not as a co-beneficiary, that creates this duty."   597 F. Supp. 2d at 319.   Judge Cogan distinguished his case from Fresh Kist Produce, LLC v. Choi Corp., Inc. and the cases upon which it relied, however, noting that "Rosenstein [is not] an insider; it had no special relationship with the debtor that allowed it to manipulate the debtor other than, perhaps, the debtor wanted to keep doing business with it more than Amco . . . ."   597 F. Supp. 2d at 319.   Judge Cogan therefore dismissed Amco Produce's claims against Rosenstein & Sons. See 597 F. Supp. 2d at 321.

### iii. PACA Beneficiaries Have a Fiduciary Relation to their Co-Beneficiaries Such That They Owe their Co-Beneficiaries a Limited Fiduciary Duty Not to Secure a Secret or Inequitable Benefit Over their Co-Beneficiaries.

34.     Congress acted intentionally in creating a trust to benefit all the produce suppliers, and part of that intent was to create rights for produce suppliers beyond merely extending liability to "controlling persons, not just directors." Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., 597 F. Supp. 2d at 316. If, as Judge Cogan suggests in H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., it was Congress' intention only to extend liability to controlling persons as well as directors, Congress could have done so more short-handedly than by establishing the PACA trust; it could have simply tweaked the common law, which already prevents preference payments to insiders, by also making those insiders or controlling persons personally liable.  If, as some courts have found, Congress' intention in creating the PACA trust was to give produce suppliers, as a class, only priority over financial creditors, as a class, in their claims to the produce sellers' assets, Congress could have also done so without the need to create a trust; it could have drafted a provision like that in the bankruptcy code, which gives preference to secured creditors over general creditors.  See 11 U.S.C. § 507 (setting forth the order of priority for expenses and claims in bankruptcy). Congress' intention in creating the PACA trust, however, was to impose general trust principles on all parties to the trust -- including creating fiduciary relationships, or relationships that have a fiduciary element, between  beneficiary suppliers.   Under general trust principles, a beneficiary is liable to its co-beneficiaries for its participation in a breach of the trust.  See Restatement (Third) of Trusts § 104(1)(c).  Just as PACA beneficiaries are entitled to a *pro rata* share of the PACA trustee's assets when insolvent, an equitable outcome, even where the PACA beneficiaries do not know that a PACA trustee is insolvent, there is enough of a fiduciary element in their relationship as co-PACA beneficiaries to make it inequitable for one to seek to obtain an advantage over another.

35.     It is very difficult in most instances for a creditor to know that a debtor is insolvent.  Black's Law Dictionary defines insolvency as "having liabilities that exceed the value of assets."  Black's Law Dictionary 867 (9th ed. 2009).  In bankruptcy, insolvency has a specific definition: "The term 'insolvent' means . . . financial condition such that the sum of [the] entity's debts is greater than all of [the] entity's property, at fair valuation . . . ."  11 U.S.C. § 101(32)(A). Creditors often know that debtors are struggling to pay them, but may not have an intimate knowledge of the debtor's balance sheet.  To not impose liability unless the co-beneficiary knows the trustee was insolvent may impose a burden that is never or rarely met.  Thus, the Court believes that, rather than bright line rules that would eliminate most beneficiary suits, the better course may be to impose liability for a beneficiary's "inequitable [conduct in] . . . seek[ing] to obtain an advantage over another,"  Scott and Ascher on Trusts § 25.2.6.3, at 1866, or impose liability

- 22 -

where "one beneficiary . . . secretly secure[s] . . . a special advantage in the trust administration," Bogert & Bogert, The Law of Trusts and Trustees § 191.

36.     The Court cannot fairly impose a rule that says any payment to one PACA beneficiary in preference over payments to the other PACA beneficiaries would be a breach of the PACA trust because it dissipates the PACA trust assets. To impose such a rule would, in effect, amount to a finding that Congress did not allow for any preference payments to co-beneficiaries and in fact all payments should be *pro rata.* No intent or knowledge would be necessary to impose liability. Such a rule would effectively impose strict liability upon the PACA beneficiaries if they would ever receive more than their *pro rata* share. The Court recognizes that trust law does not go that far and that Congress did not set up a simple mechanism for *pro rata* payments in all circumstances. Rather, the co-beneficiary must be culpable in some way. For example, consenting to such a breach by receiving these payments is not a breach of a beneficiary's limited fiduciary relationship with its co-beneficiaries. See Restatement (Third) of Trusts § 104, cmt. f (noting that "mere knowledge of, or consent to, the breach, without more, is insufficient to constitute participation" subjecting a co-beneficiary to liability for a breach of the trust). If a co-beneficiary receives a check in the mail, without any knowledge that the trustee is distinguishing between beneficiaries and actually making a preference payment which constitutes dissipation of the trust, no possible liability has been set in motion. Moreover, if a co-beneficiary receives an unusually large check in the mail, and knows that the trustee is in fact differentiating or even preferring the beneficiary, such knowledge still does not rise to the level of participation in the breach or inequitable conduct on behalf of the beneficiary to impose liability. Finally, if a trustee calls a co-beneficiary A and says it will send co-beneficiary A full payment of what it owes, but will only send partial payment to the other co-beneficiaries, and co-beneficiary A consents, that consent does not trigger any liability to the co-beneficiary for co-beneficiary A. There must be more evidence of unfair affirmative action on co-beneficiary A's behalf to seek or secure an advantage to impose liability. In other words, PACA does not completely eliminate the common-law rule allowing preference payments and allowing vigilant creditor/suppliers to be the beneficiaries of a preference payment. Should the PACA trustee's preference payment come as a result of a PACA beneficiary's conduct of attempting to receive or secure a preference payment or other advantage, however, such conduct constitutes participation in the breach, violates the PACA beneficiary's fiduciary relationship with its co-beneficiaries, and subjects the beneficiary to liability for the harm caused by the breach in which it participated. See Restatement (Third) of Trusts § 104(2) ("If a beneficiary is personally liable to the trust, the trust is entitled to a charge against the beneficiary's interest in the trust to secure the payment of the liability.").

37.     As beneficiaries of Tan-O-On Marketing's PACA trust, Hi-Land Potato had the same co-beneficiary duties imposed upon it as those imposed upon Skyline Potato and the Folson Farm Group: the duty not to participate in the breach of the trust by affirmatively securing an advantage over co-beneficiaries. Because the Restatement (Third) of Trusts § 104, cmt. f, states that participating in the

breach requires something more than just knowledge of the breach, because of the definition of dissipation of a PACA trust in 7 C.F.R. § 46.46 and because Hi-Land Potato knew only that Tan-O-On Marketing was having difficulty paying some of its bills, that knowledge and receipt of trust assets, even to the exclusion of the other co-beneficiaries, is not sufficient to constitute a breach of its duty as a PACA trust co-beneficiary.

38.     That Hi-Land Potato handled the billing, bookkeeping, and collection for shipments of Hi-Land Potato's and Metz Potato's potatoes which Tan-O-On Marketing arranged places Hi-Land Potato in a different situation than other producer co-beneficiaries who were merely receiving checks from Tan-O-On Marketing for their shipments.   Hi-Land Potato's special relationship with Tan-O-On Marketing -- handling the billing, bookkeeping, and collection for its potatoes -- allowed Hi-Land Potato to know exactly when and how much Tan-O-On Marketing was receiving in payment for Hi-Land Potato's produce, and also allowed Hi-Land Potato to get paid; although this payment came before Tan-O-On Marketing and the other PACA co-beneficiaries, Hi-Land Potato did not know that fact at the time.   That Tan-O-On Marketing was operating out of an office at Hi-Land Potato's packing shed only adds incentive, whether explicitly or implicitly, to Hi-Land Potato being promptly paid for shipment of its potatoes.

39.     Nevertheless, this arrangement by itself, or this arrangement in conjunction with knowledge that Tan-O-On Marketing was struggling to pay its bills, is still insufficient to constitute Hi-Land Potato affirmatively participating in the breach of the trust by seeking to secure an advantage over Tan-O-On Marketing's PACA trust's other co-beneficiaries.   Hi-Land Potato did not know at the time it was handling the billing, bookkeeping, and collection for the Tan-O-On Marketing arranged-shipment of its potatoes that Tan-O-On Marketing was unable to fully pay all of the PACA trust beneficiaries for shipment of their produce.   It did not, therefore, know that the payments Tan-O-On Marketing was making out of the PACA trust assets to Hi-Land Potato for these shipments was in lieu of payments to other suppliers/beneficiaries of Tan-O-On Marketing's PACA trust. In context, Hi-Land Potato's billing, bookkeeping, and collecting arrangement with Tan-O-On Marketing, and Tan-O-On Marketing's operating out of Hi-Land Potato's facilities, combined with Hi-Land Potato's knowledge that not all the PACA trust beneficiaries were being paid, would constitute Hi-Land Potato participating in the breach of Tan-O-On Marketing's PACA trust.

40.     Although Hi-Land Potato knew that Shannon Casey was under financial pressure, from which it could infer that Tan-O-On Marketing was under financial pressure, Hi-Land Potato did not know that, as part of that financial pressure, Tan-O-On Marketing was unable to pay its PACA trust beneficiaries. For that reason, Hi-Land Potato lacked the degree of knowledge required to find that it was a participant in Tan-O-On Marketing's breach of the PACA trust.

41.     This determination comports with both <u>Fresh Kist Produce, LLC v. Choi Corp., Inc.</u> and <u>H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce,</u>

Inc., the only two opinions that have dealt with the issue of co-beneficiary liability. The supplier/beneficiary who was held liable to the other co-beneficiaries for breach of the PACA trust in Fresh Kist Produce, LLC v. Choi Corp., Inc. had already taken the PACA trustee to court for the trustee's missed payments and alleged that the trustee was insolvent.   Judge Urbina concluded that "the law compels a beneficiary with knowledge of a trust's insolvency to refrain from securing for itself a greater advantage than its co-beneficiaries."   223 F. Supp. 2d at 8.   The court in Fresh Kist Produce, LLC v. Choi Corp., Inc. noted that "the court's narrow ruling . . .   is limited to the circumstance in which a PACA beneficiary knows the debtor is insolvent, not where the beneficiary merely suspects some vague financial trouble."   223 F. Supp. 2d at 11 (emphasis in original).   Judge Urbina's opinion effectively made sure that the substance of a PACA's policy to distribute assets *pro rata* prevailed over form by requiring *pro rata* distribution where the PACA trustee is insolvent, rather than where the PACA trustee has formally declared bankruptcy.   The requirement that a co-beneficiary have knowledge of insolvency, and what constitutes insolvency, does not provide an easy criterion on which the Court may determine whether a co-beneficiary has adequate knowledge so as to impose liability.   Rather than imposing this bright line rule which may not easily be met, the Court believes that knowledge that a PACA trustee cannot fully pay all of its PACA trust beneficiaries is the yard stick by which PACA co-beneficiary knowledge of financial difficulty should be measured.   While it is an undisputed fact that Hi-Land Potato did not know Tan-O-On Marketing was insolvent, the material issue is whether Hi-Land Potato knew that Tan-O-On Marketing was under so much financial pressure that it could not pay its PACA trust beneficiaries; that knowledge may violate Fresh Kist Produce, LLC v. Choi Corp., Inc.'s standard, and in the Court's opinion, would. Regardless whether that knowledge of inability to pay other co-beneficiaries is sufficient to satisfy the standard set forth in Fresh Kist Produce, LLC v. Choi Corp., Inc., which the Court believes to be the case, this knowledge alone, as Restatement (Third) of Trusts § 104, cmt. f. makes clear, is necessary, but not sufficient for liability; there must be more than knowledge.

42.   The Court's conclusion that, in addition to Hi-Land Potato's and Carl Worley's potentially sufficient knowledge, Hi-Land Potato's relationship with Tan-O-On Marketing may have allowed Hi-Land Potato and Carl Worley to have participates in the breach finds support in reading Judge Urbina's conclusion in Fresh Kist Produce, LLC v. Choi Corp., Inc., in conjunction with H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc.   Although Judge Cogan does not distinguish, in H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., between the supplier's role as a beneficiary from its role as a creditor, that issue was not before Judge Cogan, because there were no allegations that the defendant co-beneficiary in that case participated in the PACA trustee's breach of the trust, or, as the opinion analogizes it, was "an insider."   597 F. Supp. 2d at 319.   The position as an "insider" prevents a PACA beneficiary from asserting the common-law maxim that, as a defense to the charge that it received preference payments, "a debtor has the right to prefer one creditor over another, and that the vigilant creditor is entitled to the advantage secured by his watchfulness and

attention to his own interests."  Blennerhassett v. Sherman, 105 U.S. at 117.   This case presents a situation that is distinguishable from that in H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc.; Tan-O-On Marketing had its officers housed and operating from within Hi-Land Potato's warehouse, and Hi-Land Potato performed billing, bookkeeping, and collections for Hi-Land Potato's shipments that Tan-O-On Marketing arranged.  Thus, although Judge Cogan concluded that the defendant co-beneficiary was not liable in H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., the case seems to provide better support to Skyline Potato's and the Folson Farm Group's argument here, noting that "it is [a co-beneficiary's] status as an insider, not as a co-beneficiary, that creates [the duty not to secure a special advantage over the other co-beneficiaries]."   597 F. Supp. 2d at 319.

43.   Neither Carl Worley's nor Hi-Land Potato's relationship with Tan-O-On Marketing during the breach period is a situation which H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc. defines as an "insider." Judge Cogan explained that, although common-law trust principles generally allowed preferential payments, statutes have made targeted changes to this policy: "Statutes like section 719 of the New York Business Corporation Law provide that payments made to shareholders, directors or officers of an insolvent corporation must be set aside even if they would otherwise be bona fide.   In effect, this bars insolvent corporations from preferring their insiders over outside creditors."   H.C. Schmieding Produce Co., Inc. v. Alfa Quality Produce, Inc., 597 F. Supp. 2d at 317. Although Carl Worley had been a director for Tan-O-On Marketing, his involvement was minimal, and his tenure ended before the Andersons sold the company to Shannon Casey.  With respect to Hi-Land Potato, that Tan-O-On Marketing's office was within Hi-Land Potato's packing warehouse, which it rented from  Tan-O-On Marketing by discounting its fee, and Hi-Land Potato arranged to take care of its bookkeeping on shipments of its potatoes arranged by Tan-O-On Marketing, does not place Hi-Land Potato in the same position as a shareholder, director, or officer.  Although Tan-O-On Marketing had a close relationship with Hi-Land Potato, the closeness of their relationship was limited to a few functions: their quasi-landlord-tenant relationship, their physical proximity, and the billing arrangement.  In many other respects -- most importantly, with respect to Tan-O-On Marketing's relationship to other producers -- the arrangement did not give Hi-Land Potato such an intimate degree of knowledge and control over Tan-O-On Marketing that it is analogous to a shareholder, director, or officers.  That Shawna Casey went to work for Hi-Land Potato and arranged sales of its potatoes to Kroger Co., the same job she had been doing at Tan-O-On Marketing before her new job, does not convert Hi-Land Potato into an insider on the level of a shareholder, director, or officer.  Shawna Casey brought some experience to Hi-Land Potato from Tan-O-On Marketing, and performed a similar function for Hi-Land Potato, but that did not give Hi-Land Potato intimate knowledge or control over Tan-O-On Marketing that would allow it to secure an inequitable advantage over the co-beneficiaries of Tan-O-On Marketing's PACA trust.   There is no evidence that she had knowledge that Shannon Casey was not paying Skyline Potato or the Folson Farm Group, but even if the Court could infer

- 26 -

knowledge, there is no evidence she passed on that information to Hi-Land Potato.

> **iv.** **Because Hi-Land Potato Did Not Have Reason to Know that Tan-O-On Marketing Was Acting Improperly, it Does Not Need to Disgorge Those PACA Trust Funds it Took as a General Creditor.**

44.     Under the Restatement (Third) of Trusts,

(1) A trustee may maintain a proceeding against a third party on behalf of the trust and its beneficiaries.

(2) A beneficiary may maintain a proceeding related to the trust or its property against a third party only if:

> (a) the beneficiary is in possession, or entitled to immediate distribution, of the trust property involved; or

> (b) the trustee is unable, unavailable, unsuitable, or improperly failing to protect the beneficiary's interest.

(3) In appropriate circumstances, a trustee ad litem may be appointed to consider and, if appropriate, to maintain a proceeding against a third party on behalf of the trust and its beneficiaries.

Restatement (Third) of Trusts § 107.

45.     There are, however, limits to third-party liability.   The Restatement (Third) of Trust explains:

(1) A third party is protected from liability in dealing with or assisting a trustee who is committing a breach of trust if the third party does so without knowledge or reason to know that the trustee is acting improperly.

(2) A third party who acquires an interest in trust property through a breach of trust is entitled to retain or enforce the interest to the extent the third party is protected as a bona fide purchaser.

(3) In dealing with a trustee, a third party need not:

> (a) inquire into the extent of the trustee's powers or the propriety of their exercise; or

> (b) ensure that assets transferred to the trustee are properly applied to trust purposes.

Restatement (Third) of Trusts § 108.

46.     Some courts have imposed a limited duty to inquire in the PACA context.  The Third Circuit has stated: "In the PACA context, a duty of inquiry arises when a third-party transferee has knowledge that a produce purchaser/trustee is not paying produce suppliers or is in financial difficulty."  Consumers Produce Co. v. Volante Wholesale Produce, Inc., 16 F.3d at 138.   The Honorable Collins J. Seitz, then the former Chief Judge of the Third Circuit, wrote the opinion, which the Honorable Anthony J. Scirica and the Honorable Samuel A. Alito, Jr., then United States Circuit Judge for the United States Court of Appeals for the Third Circuit, continued in a footnote appended to that sentence:

> A third party's knowledge that a transfer involves a PACA trustee and the transfer of trust assets is insufficient alone to create a duty of inquiry.   As noted previously, the explanatory note to the regulations implementing the PACA trust states that, "[t]rust assets are available for other uses by the buyer or receiver. For example, trust assets may be used to pay other creditors.  It is the buyer's responsibility as trustee to insure that it has sufficient assets to assure prompt payment of produce and that any beneficiary under the trust will receive full payment." Explanatory Note, 49 Fed. Reg. 45738 (1984).  The transfer of trust assets is legitimized by the explanatory note and third party transferees should only be put on inquiry as to a breach of the trust if they are aware of facts under the circumstances which indicate that suppliers are not being paid or that the trustee has insufficient assets to both make the transfer and pay suppliers.

16 F.3d at 138 n.6.   The Eleventh Circuit has imposed a similar duty to inquire. See C.H. Robinson Co. v. Trust Co. Bank, N.A., 952 F.2d at 1315-16 & n.4 ("[A] person has notice of a breach of trust when he has actual knowledge of the breach or when he has knowledge of such facts that he should ascertain by inquiry whether the trustee is committing a breach of trust" (citation omitted)).

47.     While the Court agrees that, in the PACA context, a duty of inquiry arises when a co-beneficiary has knowledge that a producer is not being paid, the Court does not agree that duty arises merely from knowing that the trustee These decisions do not, however, reflect the most recent developments in trust law.   The Third Circuit predicated its ruling on the Restatement (Second) of Trusts § 297 comment a, which provides:

> [a] third person has notice of a breach of trust not only when he knows of the breach, but also when he should know of it; that is *when he knows facts which under the circumstances would lead a reasonably intelligent and diligent person to inquire whether the trustee is a trustee and whether he is committing a breach of trust,* and if such inquiry when pursued with reasonable intelligence and

diligence would give him knowledge or reason to know that the trustee is committing a breach of trust.

Consumers Produce Co. v. Volante Wholesale Produce, Inc., 16 F.3d at 1383 (quoting Restatement (Second) of Trusts § 297 cmt. a (emphasis in Third Circuit's opinion, but not in the Restatement (Second) of Trusts). Were that statement of the law the only source before the Court, it would arrive at the same conclusion as did the Third Circuit.[4]

48.     While the Court agrees that, in the PACA context, a duty of inquiry arises when a co-beneficiary is receiving payment and has knowledge that a produce purchaser/trustee is not paying other produce suppliers, the Court does not agree that such a duty arises merely for knowing that the purchaser/trustee is having financial difficulty, or for knowing that the purchaser/trustee, like any other business, needs to pay its bills. The Restatement (Second) of Trusts does not reflect modern practice in this narrow area. The Restatement (Third) of Trusts consciously jettisoned the Restatement (Second) of Trusts' duty to inquire and explained:

> d. No duty to inquire into trustee powers or application of assets. A third party, in dealing with a trustee, need not inquire into the extent of the trustee's powers or the propriety of their exercise, nor is the third party responsible to see that assets transferred to the trustee will be properly applied to trust purposes. Knowledge of and compliance with the powers and duties of the trusteeship are responsibilities of the trustee, whose fiduciary obligations are enforceable by the beneficiaries. In modern law, third parties are ordinarily (Comment b) entitled to assume proper conduct by trustees with whom they deal.
>
> * * * *
>
> On the modernized rule of § 108(3) that third parties have no duty to inquire into the extent or exercise of the trustee's powers or the application of assets delivered to the trustee, see Uniform Trust Code § 1012(b) and (c), and the accompanying commentary. See also Scott and Ascher on Trusts, supra, § 30.6.6 (p. 2128): "It seems plainly inappropriate … to compel third parties to supervise the fiduciary's conduct and to hold them liable for failing to do so.".

Restatement (Third) of Trusts § 108 cmt. d.   This interpretation is consistent with

---

[4]The Court cannot conceive of a Third Circuit panel with which it would be slower to disagree. The Court clerked for then-Chief Judge Seitz; the Honorable Anthony J. Scirica went on to become Chief Judge of the Third Circuit; and the Honorable Samuel A. Alito, Jr. became an Associate Justice of the Supreme Court. The Court, nonetheless, believes that, if that same panel confronted the law as it stands today -- nearly two decades later -- it would reach the Court's conclusion, and for the same reasons.

recent authority interpreting the relationship between the two <u>Restatements</u>.   <u>See</u>
<u>Boston Tomato & packaging, LLC v. Bostonia Produce, Inc.</u>, No. 12-11865-DPW,
2013 WL 1793858, at *5-6 (D. Mass. April 8, 2013)(Woodlock, D.J.)(quoting the
<u>Restatement (Second) of Trusts</u> § 297 and explaining that "[t]he <u>Restatement</u>
<u>(Third) of Trusts</u> continues to disqualify bona fide purchaser status based on
constructive knowledge that the trustee is acting improperly, but eliminates the
transferee's duty of inquiry." (citations omitted)).

49.     The <u>Restatement (Third of Trusts)</u> reflects modern commercial law.
Many businesses are in financial difficulty, and "financial difficulty" is not a
self-defining term.   It is a term that could mean insolvency, lower profits, or
slower growth.   Such a legal standard should not impose a duty of inquiry.   The
co-beneficiary should know or have reason to know that the co-beneficiary cannot
pay other producers to impose a duty to inquire further.

50.     The Court, therefore, declines to adopt the Restatement (Second) of
Trusts' duty to inquire.   The Court will, instead, apply the Restatement (Third) of
Trusts' standard: Hi-Land Potato is protected from liability unless Hi-Land Potato
has shown that it neither knew nor had reason to know that Tan-O-On Marketing
acted improperly.   <u>See</u> Restatement (Third) of Trusts § 108.[5]

51.     For substantially the reasons that the Court has adopted with respect
to Hi-Land Potato's liability as a PACA co-beneficiary, the Court concludes that
Hi-Land Potato did not know or have reason to know that Tan-O-On Marketing
was acting improperly.   Although Hi-Land Potato had reason to know that
Tan-O-On Marketing was experiencing some financial difficulties, that, in itself,
does not mean that Hi-Land Potato knew or had reason to know that Tan-O-On
Marketing acted improperly by paying Hi-Land Potato preference payments while
lacking the assets to pay other producers.   The Court, therefore, concludes that
Hi-Land Potato is protected from liability under PACA.[6]

_____

[5]The Court, therefore, declines to adopt Skyline Potato's and the Folson Farm Group's
contrary proposed conclusions of law, which rely on the <u>Restatement (Second) of Trusts</u> and
related cases, to interpret cases.   <u>See</u> Skyline Potato's and the Folson Farm Group's FOF and
COL, at 48-51.

[6]The Court's decision disposes of the sole federal claim.   Although the Court has
supplemental jurisdiction over Tan-O-On Marketing's state claims, <u>see</u> 28 U.S.C. § 1367(a), if the
Court had disposed of the federal claim before trial, the Court would have declined to exercise
jurisdiction over those state claims.   <u>See</u> <u>Koch v. City of Del City</u>, 660 F.3d 1228, 1248 (10th Cir.
2011)("When all federal claims have been dismissed, the court may, and usually should, decline to
exercise jurisdiction over any remaining state claims." (internal quotation marks omitted)).
Because the case proceeded to trial, however, the Court decides the state-law claims on the merits.
If the parties had tried the case before a jury, the parties would have learned the result on all claims
at the same time, and there is no reason that, because the parties tried the case to the bench, the
result should differ.

52.     Because Hi-Land Potato and Carl Worley are not liable under PACA, they also need not pay Skyline Potato or the Folson Farm Group attorney's fees or interest.

Findings of Fact, Conclusions of Law and Order, at 141-166.

**6.     <u>The Motion</u>.**

Hi-Land Potato and Worley filed the Motion on February 28, 2014.  <u>See</u> Motion at 1. Before filing the Motion, counsel for Hi-Land and Worley contacted counsel for Skyline Potato, Tan-O-On Marketing, the Andersons, and the Folson Farm Group; Skyline Potato, Tan-O-On Marking, and the Andersons oppose the Motion.   Counsel for the Folson Farm Group did not communicate their clients' position before Hi-Land Potato and Worley filed the Motion, but Skyline Potato, Tan-O-On Marketing, and the Andersons oppose the Motion.   <u>See</u> Motion at 2.

Hi-Land Potato and Worley filed a memorandum brief concurrently with the Motion.   <u>See</u> Memorandum Brief in Support of Hi-Land Potato Company, Inc.'s and Carl Worley's Motion for Award of Attorney's Fees and Costs, filed July 28, 2014 (Doc. 378)("Brief in Support of Motion").   Hi-Land Potato and Worley seek their fees and costs "pursuant to general principles of trust law, NMSA 1978, §46A-10-1004 (2003), PACA and the common law of contracts."   Brief in Support of Motion at 2.   Hi-Land Potato and Worley contend that they are entitled to an award of their reasonable attorney's fees and costs incurred in the defense of the claims asserted against them.   <u>See</u> Brief in Support of Motion at 2.   Hi-Land Potato and Worley state that they incurred and paid $490,018.14 in attorney's fees and costs.   <u>See</u> Declaration of Henry M. Bohnhoff, filed February 28, 2014 (Doc. 375)("Bohnhoff Dec."); Declaration of W. Spencer Reid, filed February 28, 2014 (Doc. 376)("Reid Dec.").   Of that amount, to date, they have been reimbursed $4,629.42 pursuant to previous sanctions awards.   <u>See</u> Memorandum Opinion and Order, filed July 4, 2012 (Doc. 215); Order, filed December 22, 2012 (Doc. 333).   Hi-Land Potato and Worley now seek an award of the balance of their attorney's fees and costs, which they contend is $485,388.72.   <u>See</u>

- 31 -

Brief in Support of Motion at 17.   Accordingly, Hi-Land Potato and Worley request the Court to order Skyline Potato, Tan-O-On Marketing, the Andersons, and the Folson Farm Group to pay Hi-Land Potato's and Carol Worley's attorney's fees and costs incurred in connection with their defense of the claims asserted against them in this action, in the amount of $485,388.72.   See Motion for Attorney's Fees at 17.

In support of their Motion, Hi-Land Potato and Worley file two declarations.   See Motion at 2; Bohnhoff Dec.; Reid Dec.   First, Hi-Land Potato and Worley's attorney, Henry M. Bohnhoff, states in his declaration that he had primary responsibility for the representation of Hi-Land Potato and Worley, and that Leslie McCarthy Apodaca and Melanie Stambaugh assisted him.   See Bohnhoff Dec. ¶ 4, at 2.   Mr. Bohnhoff states that he is an employee, director and shareholder of Rodey, Dickason, Sloan, Akin & Robb, P.A, ("Rodey Law Firm"), that he passed the bar in 1982, and that he has been practicing law in New Mexico since 1982 in the areas of real estate and business disputes.   See Bohnhoff Dec. ¶ 2, at 1-2.   He states that Ms. Apodaca is a Rodey Law Firm director and shareholder, that she has been practicing law in Arizona since 1982 and in New Mexico since 1994, and that she was responsible for the day-to-day defense of the parties from the inception of the Rodey Law Firm's representation of Hi-Land Potato and Worley continuing through March 2012.   See Bohnhoff Dec. ¶ 4, at 2.   Mr. Bohnhoff declares that Ms. Stambaugh was a Rodey Law Firm associate who joined the law firm in the fall of 2011, after graduating from the University of New Mexico School of Law and being admitted to the New Mexico bar.   See Bohnhoff Dec. ¶ 4, at 2-3.   Mr. Bohnhoff states that Ms. Apodaca's and his rate was $310.00 per hour, while Ms. Stambaugh's rate for this case was $160.00 per hour.   See Bohnhoff Dec. ¶ 8, at 6-7.   He further states that paralegal and librarian time was billed at $90 per hour.   See Bohnhoff Dec. ¶ 8, at 7.   Mr. Bohnhoff asserts that the attorney's fees and costs were reasonable and necessary.   See Bohnhoff Dec. ¶¶ 9-11, at 7-9.   According to Mr. Bohnhoff, the

bills to Hi-Land Potato were reduced by a total of $105,901.60 through discretionary "no charge" entries and discounts.   Bohnhoff Dec. ¶ 9, at 7-8.   Mr. Bohnhoff states the reasonable value of services provided was $431,018.00, plus tax in the amount of $30,357.58, and the reasonable cost for expenses incurred was $18,405.33, resulting in the total amount of $479,780.91.   <u>See</u> Bohnhoff Dec. ¶¶ 10-12, at 8-9.

Second, Hi-Land Potato and Worley submit the Declaration of W. Spencer Reid, who was asked to provide his opinion on the reasonableness and necessity of the Rodey Law Firm's fees and costs.   <u>See</u> Reid Dec. at 1.   Mr. Reid states that he has been licensed to practice law in New Mexico and in the United Stated District Court for the District of New Mexico since 1979, and is also admitted to the bar for the United States Court of Appeals for the Tenth Circuit.   <u>See</u> Reid Dec. ¶ 1, at 1.   Mr. Reid asserts that he is fit to assess the reasonableness and necessity of the fees and costs in this case, because he has practiced in the Albuquerque area for thirty-four years, represented the Third Party Defendants RPE, Inc., and Wysocki until they were dismissed from this litigation in August 2012, continued to follow the case closely even after his clients' dismissal, and has reviewed Mr. Bohnhoff's Declaration and its exhibits.   <u>See</u> Reid Dec. ¶ 3, at 2.   Mr. Reid declares that the Rodey Law Firm fees and costs billed to Hi-Land Potato and Worley are reasonable and necessary based on the experience of the attorneys, the Albuquerque market, and the complexity of the case.   <u>See</u> Reid Dec. ¶¶ 4-8, at 2-4.

**7.      <u>Skyline Potato and the Intervening Plaintiffs' Response</u>.**

Skyline Potato and the Folson Farm Group filed an opposition to the Motion on April 7, 2014.   <u>See</u> Plaintiff and Intervening Plaintiffs' Opposition to Hi-Land and Worley's Motion for Award of Attorneys Fees and Costs, filed April 7, 2014 (Doc. 380)("Skyline Response").   Skyline Potato and the Folson Farm Group argue that Worley is not entitled to attorney's fees, because he effectively waived his right to attorney's fees when he did not request them when Skyline Potato's

claims were dismissed.  See Skyline Response at 3-4.  In addition, they contend that Hi-Land Potato and Worley are not entitled to attorney's fees, because: (i) the American Rule should apply, see Skyline Response at 4; (ii) this case lacks the requisite elements to award attorney's fees under the principles of equity, see Skyline Response at 10-12; (iii) PACA does not provide a means of awarding attorney's fees to Hi-Land Potato or Carl Worley, see Skyline Response at 13; and (iv) Hi-Land Potato[7] lacks a contractual basis for entitlement to attorney's fees, see Skyline Response at 14-18.

Skyline Potato and the Folson Farm Group argue that the "American Rule," which stands for the proposition that parties to a lawsuit ordinarily pay their own attorney's fees unless a statute or contract provision shifts fees to the losing party, governs Hi-Land Potato's entitlement to attorney's fees.  Skyline Response at 4.  They contend that an exception to the American Rule occurs only if there is a statutory fee-shifting provision that permits a court to order attorney's fees and costs to the prevailing party, or if there is a contractual entitlement to attorney's fees and costs. See Skyline Response at 4.  Skyline Potato and the Folson Farm Group assert that neither of these conditions is present here, and that the American Rule should therefore govern Hi-Land Potato and Carl Worley's claim to attorney's fees.  See Skyline Response at 5.

Skyline Potato and the Folson Farm Group argue that Hi-Land Potato and Worley's argument that they are entitled to attorney's fees under Section 1004 of the New Mexico Uniform Trust Code, N.M. Stat. Ann. 1978, § 46A-10-1004 (2003), does not justify deviation from the American Rule.  See Skyline Response at 5-8.  Skyline Potato and the Folson Farm Group contend that the New Mexico Uniform Trust Code, N.M. Stat. Ann. 1978, §§ 46A-1-101 through 46A-11-1105, is not controlling with regard to Hi-Land Potato's claim for attorney's fees, because

---

[7]Hi-Land Potato and Worley argue that the language of the Billingsley Produce and Mart Produce invoices provide Hi-Land Potato, and not Worley, a contractual right to attorney's fees; therefore, Skyline Potato and the Folson Farm Group's arguments with respect to the Billingsley Produce and Mart Produce invoices pertain to Hi-Land Potato only.

neither the Defendants nor the Court relied on the New Mexico Uniform Trust Code at any point during the litigation.  See Skyline Response at 5-6.  Instead, the Defendants stipulated that federal law applied to the Skyline Potato and the Folson Farm Group's claims against Hi-Land Potato.  See Skyline Response at 5.  Skyline Potato and the Folson Farm Group cite several cases[8] that they insist support their argument that "in cases where jurisdiction has been established under a federal question, as in this case, state law has no application in determining entitlement to attorney's fees."  See Skyline Response at 6-8.  Finally, Skyline Potato and the Folson Farm Group contend that policy considerations support their argument that state laws should not be applied here.  See Skyline Response at 7.  According to Skyline Potato and the Folson Farm Group, applying state law to PACA law would disrupt the uniformity in PACA law from state to state and would promote forum shopping.  See Skyline Response at 7.  Skyline Potato and the Folson Farm Group therefore maintain that § 1004 does not constitute a statutory fee-shifting provision that would create an exception to the American Rule, because it would be inconsistent with federal jurisprudence and policy to apply state law -- Section 1004 of the New Mexico Uniform Trust Code -- to federal law -- PACA.  See Skyline Response at 7-8.

Skyline Potato and the Folson Farm Group argue that, setting aside the issue whether New Mexico state law is applicable here, the Defendants have failed to show that a PACA trust constitutes a trust under the New Mexico Uniform Trust Code.  See Skyline Response at 8.  Skyline Potato and the Folson Farm Group insist that PACA trusts are not trusts under the New Mexico Uniform Trust Code, because the New Mexico Uniform Trust Code applies exclusively to express trusts, and more specifically, to trusts that arise in an estate planning or other donative contexts, and not to commercial trusts that special-purpose legislation like PACA creates.  See

---

[8]Fireman's Fund Ins. Co. v. S.E.K. Constr. Co., 436 F.3d 1345, 1351-1352 (10th Cir. 1971); University of Texas v. Vratil, 96 F.3d 1337, 1340 (10th Cir. 1996); F.D. Rich Co. v. U.S. for the Use of Indus. Lumber Co., 417 U.S. 116 (1974).   See Skyline Response at 6.

Skyline Response at 8.  According to Skyline Potato and the Folson Farm Group, the New Mexico Uniform Trust Code therefore does not apply to PACA trusts and does not establish a means for the Defendants to recover attorney's fees.  See Skyline Response at 9.

Skyline Potato and the Folson Farm Group reject Hi-Land Potato and Worley's argument that N.M. Stat. Ann. 1978, Section 46A-1-107 (2011) ("Section 107 of the New Mexico Uniform Trust Code") provides New Mexico with jurisdiction to construe this PACA trust's terms, because New Mexico has the most significant relationship with the matter at issue.[9]  Skyline Response at 9.  Skyline Potato and the Folson Farm Group contend that the fact that the Pre-Trial Order held that New Mexico's prejudgment interest rate should apply does not establish a "significant relationship" with New Mexico, as the Defendants argued.  Skyline Response at 9.  Rather, Skyline Potato and the Folson Farm Group maintain that the jurisdiction with the most significant relationship is the United States, because the United States promulgated the laws governing PACA, and this matter concerns potato growers located across the United States.  See Skyline Response at 9-10.

Skyline Potato and the Folson Farm Group assert that there is no merit to Hi-Land Potato and Worley's argument that attorney's fees are appropriate under principles of equity.  See Skyline Response at 10-12.  They argue that the Court should consider the five-factors that the Court of Civil Appeals of Oklahoma set forth in Atwood v. Atwood[10] for determining whether attorney's fees should be awarded under the principles of equity.  See Skyline Response at 11.  According to Skyline Potato and the Folson Farm Group, the five factors that the Court should consider under Atwood v. Atwood are:

---

[9]If a jurisdiction has not already been designated, "the meaning and effect of the terms of a trust are determined by . . . the law of the jurisdiction having the most significant relationship to the matter at issue."  Unif. Trust Code § 107(2).

[10]25 P.3d 936, 947 (Okla. Civ. App. 2001).

> (a) the reasonableness of the parties' claims, contentions, or defenses; (b) unnecessarily prolonging litigation; (c) relative ability to bear the financial burden; (d) result obtained by the litigation and prevailing party concepts; and (e) whether a party has acted in bad faith, vexatious, (sic) wantonly, or for oppressive reasons in the bringing or conduct of the litigation.

Skyline Response at 11.   Skyline Potato and the Folson Farm Group argue that each factor weighs against awarding attorney's fees to Hi-Land Potato and Worley, and that Hi-Land Potato and Worley are therefore not entitled to attorney's fees under the principles of equity.   See Skyline Response at 11-12.

In addition to principles of equity not providing a right to attorney's fees in this case, Skyline Potato and the Folson Farm Group assert that PACA does not establish an independent right to attorney's fees or prejudgment interest where a contract including a right to attorney's fees does not exist.   See Skyline Response at 13.   They further maintain that no case law exists supporting the Defendants' argument that New Mexico trust law supersedes PACA trust law such that an award of attorney's fees would be appropriate in this case.   See Skyline Response at 18. Skyline Potato and the Folson Farm Group urge the Court to find that the invoices between Tan-O-On and Billingsley, and Tan-O-On and Mart Produce, do not entitle Hi-Land Potato to an award of attorney's fees.   See Skyline Response at 14.   Skyline Potato and the Folson Farm Group argue that, "[s]ince Hi-Land's claimed entitlement to attorney's fees under PACA is premised upon the existence of valid and enforceable contracts between Tan-O-On and [the Folson Farm Group], this Court must first determine whether such contracts exist."   Skyline Response at 14.   Skyline Potato and the Folson Farm Group maintain that the contracts are not enforceable under Section 2-207 of the Uniform Commercial Code, because the attorney's fee provision was a unilateral inclusion that materially altered the terms of the agreement.   See Skyline Response at 14.   They state: "The Tenth Circuit has noted that a unilateral attorney's fee provision is one that would not be readily expected or anticipated by the buyer, and is not party of the contract."

Skyline Response at 15.   Furthermore, they argue "several courts have held that, in cases involving PACA, attorney's fees provisions on an invoice do not automatically become part of a product seller's contract with the buyer."   Skyline Response at 15.   They maintain that a court must "rely on evidence that Tan-O-On subjectively knew or should have known of the added terms" when determining "whether an addition to a contract constitutes a material alteration." Skyline Response at 15.   They insist that there is no evidence showing that Tan-O-On knew or assented to the attorney's fee provision in the Billingsley and Mart Product invoices.   See Skyline Response at 15.

Skyline Potato and the Folson Farm Group argue that, even if the Court finds that the attorney's fee provisions in the Billingsley and Mart Produce invoices are enforceable, Hi-Land Potato is neither a party nor a third party beneficiary of either contract.   See Skyline Response at 16.   Skyline Potato and the Folson Farm Group maintain that the attorney's fee provision found in the Billingsley invoice contains language[11] that "limits recovery of fees to the parties to the contract -- namely Billingsley and Tan-O-On."   Skyline Response at 16.   With regard to the Mart Product invoice, Skyline Potato and the Folson Farm Group insist the "language refers to the collection of sums due under the invoice -- a breach of contract claim based upon nonpayment by the produce buyer, Tan-O-On" and "the claim against Hi-Land is not a breach of contract claim." Skyline Response at 17.   Skyline Potato and the Folson Farm Group also argue that Hi-Land Potato is not a third-party beneficiary of the invoices, because the "designation of a third party

---

[11]The invoice states:

Should any action be commenced between the parties to this contract concerning the sums due hereunder or the rights and duties of any party hereto or the interpretation of this contract, the prevailing party in such action shall be entitled to, in addition to such other relief as may be granted, an award as and for the actual attorney's fees and costs in bringing such action and/or enforcing any judgment therewith.

Skyline Response at 16 (quoting the invoices issued by Billingsley to Tan-O-On Marketing).

beneficiary to a contract requires evidence that the person claiming to be a third party beneficiary is an intended beneficiary" and no such evidence exists here.   Skyline Response at 17.

Skyline Potato and the Folson Farm Group contend that Worley is not entitled to attorney's fees, because the Folson Farm Group did not assert any claims against him, and Skyline Potato's claims were dismissed long before trial.   See Skyline Response at 19.   Skyline Potato and the Folson Farm Group insist that, if the Court awards attorney's fees to Hi-Land Potato and Worley,

> the attorney's fees sought in the Motion must be apportioned between the work done for Worley in defense of the claims brought by Tan-O-On, Gerald Anderson and Julie Anderson, the work done for Hi-Land in defense of the state laws claims by Tan-O-On, Gerald Anderson and Julie Anderson and the PACA claims by Skyline and the Folson Group.

Skyline Response at 19-20.

Skyline Potato and the Folson Farm Group argue that there is no basis for the imposition of joint and several liability on Hi-Land Potato for attorney's fees in this matter.   See Skyline Response at 21.   They insist that courts are only able to impose joint-and-several liability for attorney's fees where there is joint-and-several liability for the underlying substantive claim, which does not exist in this case.   See Skyline Response at 21.   They further assert that, if the Court were to impose joint-and-several liability on Skyline Potato and the Folson Farm Group, it would lead to inequitable results, and would therefore be reversible error.   See Skyline Response at 21.   They explain: "Here, the equitable result would be for any award to be apportioned among [Skyline Potato], [the Folson Farm Group], Tan-O-On, Gerald Anderson and Julie Anderson based upon the amount of the total claims asserted against Hi-Land."   Skyline Response at 21.   They contend that the equitable apportionment of fees based on the amount of the claims asserted against Hi-Land Potato would be as follows: 89.02% to Tan-O-On Marketing and the Andersons, 3.57% to the Folson Farm Group, 2.19% to Mart Produce, 2.13% to Skyline Potato, 1.59% to Billingsley Produce, 1.34% to Alsum Produce, and 0.17% to Peterson Farms.   See Skyline

Response at 24.   Finally, Skyline Potato and the Folson Farm Group dispute the reasonableness of the amount of attorney's fees that Hi-Land Potato and Worley sought, and request leave to conduct discovery on this issue if the Court finds that Hi-Land and Carl Worley are entitled to attorney's fees.   See Skyline Response at 22-23.

### 8.   Tan-O-On Marketing and the Andersons' Response.

Tan-O-On Marketing and the Andersons filed an opposition to the Motion on April 8, 2014.   See Defendants'/Third Party Plaintiffs' Opposition to Hi-Land Potato Company, Inc., and Carl Worley's Motion for Award of Attorneys Fees and Costs, filed April 8, 2014 (Doc. 381)("Tan-O-On and Anderson Response").   Tan-O-On Marketing and the Andersons adopt the arguments that the Skyline Response sets forth.   See Tan-O-On and Anderson Response at 2.   In addition, Tan-O-On Marketing and the Andersons argue that "these are honest people who deserve their day in court without continued personal damage or penalties."   Tan-O-On and Anderson Response at 2.   Tan-O-On Marketing and the Andersons also renew the arguments they make in their Motion to Compel Discovery of Oral Deposition, filed June 21, 2012 (Doc. 207), and Motion for Sanctions Against Hi-Land Potato Company, Inc. and Carl Worley, Individually, filed September 18, 2012 (Doc. 279).   See Tan-O-On and Anderson Response at 2-26.   They argue that Shannon Casey did not participate in good faith throughout discovery.   See Tan-O-On and Anderson Response at 2-17.   They contend that his deposition testimony was evasive and obstructive, and as such, that they should not have to pay attorney's fees to the Defendants, who obstructed and prevented truthful testimony and evidence in this case.   See Tan-O-On and Anderson Response at 26.

### 9.   The Reply.

Hi-Land Potato and Worley replied on May 9, 2014.   See Defendants and Third-Party Defendants Hi-Land Potato Company, Inc.'s and Carl Worley's Reply Brief in Support of Their

Motion for Award of Attorney's Fees and Costs, filed May 9, 2014 (Doc. 387)("Reply"). Hi-Land Potato and Worley assert that general principles of trust law apply here and entitle them to attorney's fees as the prevailing party. See Reply at 2. They contend that Skyline Potato and the Folson Farm Group's change of heart regarding the applicability of general principles of trust law to this case is "intellectually indefensible." Reply at 2. Hi-Land Potato and Worley insist that Skyline Potato and the Folson Farm Group's claims hinged on the proposition that general principles of trust law broadly apply to PACA trusts and, according to Hi-Land Potato and Worley, "[t]he Court embraced that proposition." Reply at 1-2. Additionally, Hi-Land Potato and Worley argue that Skyline Potato and the Folson Farm Group based their own right to attorney's fees on general principles of trust law. See Reply at 2. Hi-Land Potato and describe Skyline Potato and the Folson Farm Group's argument that the general principles of trust law should apply only to their claims as a "one-way invocation of general trust law principles," resulting in an inequitable one-way right to attorney's fees. Reply at 2. Furthermore, Hi-Land Potato and Worley assert that the Court and other federal courts have previously determined that the 1984 amendments to PACA show Congress intended "to impose general trust principles on all parties to the PACA trust." Reply at 3. Hi-Land Potato and Worley therefore maintain that they are entitled to attorney's fees, because the general principles of trust law apply to their claims, and that the general principles of trust law hold a court may use its discretion to award fees to a prevailing party. See Reply at 3.

Hi-Land Potato and Worley argue that their basis for requesting attorney's fees is rooted in federal law, not state law, as Section 1004 of the New Mexico Uniform Trust Code "distills case law precedent throughout the United States, and thus reflects and embodies the general principles of trust law that Congress has incorporated into PACA." Reply at 4. They contend that PACA is the source of Hi-Land Potato's right to recover attorney's fees from the Plaintiff, and that PACA is

a "federal law which incorporates general trust law principles, including Section 1004 and the case law precedent it embodies."   Reply at 5.   Hi-Land Potato and Worley maintain that state law does not displace federal law, but instead is incorporated into federal law.   See Reply at 5.

In response to the Skyline Potato and the Folson Farm Group's argument regarding N.M. Stat. Ann. 1978, § 46A-2-203 (2007)("§ 203 of the New Mexico Uniform Trust Code"), Hi-Land Potato and Worley direct the Court's attention to the fact that "Section 203 allocates jurisdiction over trust disputes among different state courts; it does not affect federal court jurisdiction." Reply at 5.   Moreover, Hi-Land Potato and Worley contend that there is "no legislative history or other evidence [which] suggests any intention to divest federal courts of their diversity or supplemental jurisdiction over disputes involving a trust, such as the Third-Party Plaintiffs' claims asserted herein."   Reply at 5-6.   Hi-Land Potato and Worley thus argue that the Court may apply § 1004 of the New Mexico Uniform Trust Code to Hi-Land Potato and Worley's claim for attorney's fees against Tan-O-On Marketing and the Andersons, because this Court possesses subject-matter jurisdiction.   See Reply at 6.

Hi-Land Potato and Worley reject Skyline Potato and the Folson Farm Group's argument that "a PACA trust is not a trust covered by the UTC" and therefore the Uniform Trust Code does not apply to PACA trusts.   Reply at 6.   Hi-Land Potato and Worley argue that Skyline Potato and the Folson Farm Group "[did] not accurately quote UTC § 102" when it separated the statute into two prongs.   Reply at 6.   The unmodified reading of Section 102, according to Hi-Land Potato and Worley, states that the Uniform Trust Code includes "trusts created pursuant to a statute judgment or decree that requires the trust to be administered in the manner of an express trust." Reply at 6.   Hi-Land Potato and Worley state: "Pursuant to the federal circuit court case law that the Court cited in its Findings and Conclusions, see Doc. 372, at 154, a PACA trust clearly is to be administered 'in the manner of an express trust.'"   Reply at 6.   Hi-Land Potato and Worley

- 42 -

therefore insist that the New Mexico Uniform Trust Code applies to PACA trusts.   See Reply at 6.
Hi-Land Potato and Worley maintain that Skyline Potato and the Folson Farm Group also
misinterpret N.M. Stat. Ann. 1978, § 46A-1-402 ("§ 402 of the New Mexico Uniform Trust
Code") when they argue that § 402 of the New Mexico Uniform Trust Code excludes PACA trusts,
because produce suppliers become beneficiaries of the PACA trust automatically.   Reply at 7.
Hi-Land Potato and Worley argue that PACA trusts may meet the requirements of § 402 of the
New Mexico Uniform Trust Code, but, even if they do not, Section 102 of the New Mexico
Uniform Trust Code states that the New Mexico Uniform Trust Code applies to statutory trusts that
are administered in the manner of express trusts, which include PACA trusts.   See Reply at 7-8.
Hi-Land Potato and Worley maintain that, even if PACA trusts do not fall under § 402, "Congress
has directed courts to apply the general trust principles that the Uniform Trust Code embodies, i.e.,
as if the Uniform Trust Code did apply to a PACA trust."   Reply at 9.

Hi-Land Potato and Worley again argue that the facts and equities of this case support an
award of attorney's fees in their favor.   See Reply at 8.   Hi-Land Potato and Worley insist that
Atwood v. Atwood stands for the proposition that a court may invoke its discretionary authority to
award attorneys when a party prevails in a judicial proceeding that § 1004 of the New Mexico
Uniform Trust Code contemplates.   See Reply at 8.   According to Hi-Land Potato and Worley,
despite not winning on every issue before trial, as Skyline Potato and the Folson Farm Group
mention, Hi-Land Potato and Worley ultimately prevailed in this lawsuit.   See Reply at 9.
Hi-Land Potato and Worley assert that they are not required to prove the opposing parties acted in
bad faith or engaged in egregious misconduct to be awarded attorney's fees.   See Reply at 9-11.

Hi-Land Potato and Worley reiterate their argument that the invoices used by Billingsley
Produce and Mart Produce contain an attorney fee provision that provides Hi-Land Potato with a
right to attorney's fees through the definition of the term "prevailing party."   Reply at 11.   They

- 43 -

remind the Court that Skyline Potato and the Folson Farm Group relied on the attorney fee provision in the invoices, prevailed on this issue, and are now barred by judicial estoppel from changing their position on the matter.   See Reply at 12.

In response to Skyline Potato and the Folson Farm Group's argument that the attorney fee provisions in the Billingsley Produce and Mart Produce invoices are unenforceable, because they amount to impermissible unilateral additions, Hi-Land Potato and Worley assert that Skyline Potato and the Folson Farm Group are unable to meet both elements required to prove an impermissible unilateral addition.   See Reply at 12-15.   Hi-Land Potato and Worley argue that, to show the attorney fee provision is unenforceable, Skyline Potato and the Folson Farm Group must show a material alteration of a term as well as surprise and hardship resulted from a change to the contract without the other parties' awareness.   See Reply at 12-13.   Hi-Land Potato and Worley insist that Skyline Potato and the Folson Farm Group will not be able to prove surprise, because the use of such attorney fee provisions is a standard practice in the produce supplier industry, Skyline Potato and the Folson Farm Group have been receiving invoices containing the same attorney fee provisions, and Skyline Potato and the Folson Farm Group even use these same attorney's fee provisions in their own invoices.   See Reply at 13-15.   Hi-Land Potato and Worley thus maintain the Billingsley Produce and Mart Produce invoices are enforceable, as Skyline Potato and the Folson Farm Group cannot show that the attorney fee provision resulted in surprise and hardship.   See Reply at 14-15.

Hi-Land Potato and Worley argue that the language in the Billingsley Produce and Mart Produce invoices is broad enough to encompass Hi-Land Potato as an intended third-party beneficiary of the attorney's fee provisions.   See Reply at 15-16.   Hi-Land Potato and Worley maintain that the language common to both invoices states the "prevailing party" to "any" legal action resulting from the invoice is entitled to attorney's fees.   Reply at 15-16.   Hi-Land Potato

- 44 -

and Worley urge the court to construe such ambiguities against the contract's drafters -- Billingsley Produce and Mart Produce.   See Reply at 15-16.

Hi-Land Potato and Worley further argue that the language in the attorney's fee provision that allows for a right to recover attorney's fees for "any act" necessarily means that the provision is not limited to recovery in breach-of-contract claims.   Reply at 16-17.   Hi-Land Potato and Worley direct the Court's attention to the fact that the case that Skyline Potato and the Folson Farm Group cite in support of their argument that the attorney fee provision is limited to contract claims is a case dealing with a contract that explicitly limits the attorney fee provision to contract claims only.   See Reply at 17 (citing Fortier v. Dona Ana Plaza Partners, 747 F.2d 1324, 1337-37 (10th Cir. 1984).   Because the Billingsley Produce and Mart Produce contracts impose no such limitation, according to Hi-Land Potato and Worley, the case cited by Skyline Potato and the Folson Farm Group is not applicable here.   See Reply at 17.   Hi-Land Potato and Worley further argue:

> This Court, acting in equity, should determine that, where Mart and Billingsley claimed a right to recover their attorney's fees from Hi-Land on the basis of these invoices in the event they prevailed on their claims for breach trust co-beneficiary's duties, in fairness Hi-Land, now having prevailed, should recover its attorney's fees from them where the invoice provisions encompass the claim.

Reply at 17-18.

Hi-Land Potato and Worley also insist that the Court should determine that Hi-Land Potato is an intended third-party beneficiary of the invoices.   See Reply at 18.   Hi-Land Potato and Worley state that, to be a third-party beneficiary, the contract's parties must have intended either expressly or impliedly to benefit the third-party.   See Reply at 18.   Hi-Land Potato and Worley contend that, here, the intent is unclear, and because contract ambiguities must be construed against the drafter, the Court should construe the provision broadly to extend, at a minimum, to all

persons and entities that the seller might join as defendants in a suit to recover the amounts due for unpaid invoices, which includes Hi-Land Potato.   See Reply at 18-19.

Hi-Land Potato and Worley argue that none of Skyline Potato and the Folson Farm Group's arguments for the allocation of Hi-Land Potato and Worley's attorney fees among Skyline Potato, the Folson Farm Group, Tan-O-On, and the Andersons are persuasive.   See Reply at 19. Hi-Land Potato and Worley state that the case on which Skyline Potato and the Folson Farm Group rely does not establish a bright-line rule that the Court can impose joint-and-several liability for attorney's fees only where there is joint-and-several liability for the underlying claim.   See Reply at 19-20.   Hi-Land Potato argues that using the divisibility of liability for underlying claims as a guide to joint-and-several liability for attorney's fees is inappropriate where the fees are being awarded to a prevailing defendant, noting that it would be unfair for a prevailing defendant to be bound by the manner in which the claims it prevailed over were divided in litigation.   See Reply at 20.   Moreover, Hi-Land Potato and Worley insist that the fees incurred from the various claims and between the various parties are so similar and intertwined that it would be impossible to segregate the fees.   See Reply at 20-22.

With regard to the Tan-O-On and Anderson Response, Hi-Land Potato and Worley argue that Tan-O-On Marketing and the Andersons provide no valid reason why Hi-Land Potato and Worley cannot recover attorney's fees.   See Reply at 23.   The Tan-O-On and Anderson Response does only two things: first, it adopts the arguments that the Skyline Response makes, and second, it recites a previous motion to compel discovery and motion for sanctions that Tan-O-On Marketing and the Andersons made.   See Reply at 23.   Hi-Land Potato and Worley remind the Court that it denied both the motion to compel discovery and the motion for sanctions.   See Reply at 23.   Hi-Land Potato and Worley thus urge the Court to find that Tan-O-On Marketing and the

Andersons' rationale for denying Hi-Land Potato's attorney's fees application is baseless.  See Reply at 23.

Finally, Hi-Land Potato and Worley argue that Skyline Potato, the Folson Farm Group, Tan-O-On Marketing, and the Andersons waived their right to challenge the reasonableness of Hi-Land Potato and Worley's attorney's fees by not arguing this point in the Skyline Response, or in Tan-O-On and the Anderson Response.  See Reply at 23-24.  Hi-Land Potato and Worley insist that a party merely stating its desire to "conduct discovery" regarding the reasonableness of attorney's fees does not preserve the right to challenge reasonableness.   Reply at 24.

### 10.    The July 9, 2014, Hearing.

The Court held a hearing on July 9, 2014.  See Transcript of Hearing (taken July, 9, 2014)("Tr.").[12]   With regard to Hi-Land Potato and Worley's motion for award of attorney's fees, the Court instructed the parties to address the following three issues: (i) whether federal law allows the award of attorney's fees; (ii) if so, whether it is appropriate to award attorney's fees under these circumstances; and (iii) whether the attorney's fee provisions in Billingsley Produce and Mart Produce's invoices apply to Hi-Land Potato or Worley.  See Tr. at 2:18-3:3 (Court).   In addition to these three issues, the parties also addressed the allocation of the fees and reasonableness of the fees.  See Tr. at 102:21-128:8.

Hi-Land Potato and Worley stated that they did not do research on, and therefore did not know, if there is precedent showing trust principles being used in federal statutes or federal law. See Tr. at 3:24-4:10 (Bohnhoff, Court).   Hi-Land Potato and Worley maintained, however, that their right to attorney's fees is rooted in general trust principles.   See Tr. at 7:23-8:19 (Bohnhoff). According to Hi-Land Potato and Worley, Skyline and the Folson Farm Group's argument that the their request for attorney's fees must fail, because New Mexico state law does not apply, is not

---

[12]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.   Any final transcript may contain slightly different page and/or line numbers.

dispositive, because Hi-Land Potato and Worley are not relying on state law, but on general trust principles.   See Tr. at 9:2-18 (Bohnhoff).   Hi-Land Potato and Worley asserted that the Uniform Trust Code embodies general trust law principles and that PACA incorporates the Uniform Trust Code.   See Tr. at 9:2-18 (Bohnhoff).   They maintained that PACA therefore incorporates general trust principles.   See Tr. at 8:16-19 (Bohnhoff).   More specifically, Hi-Land Potato and Worley contended that general trust law gives the Court broad authority to award attorney's fees, especially when awarding fees to the prevailing party, and that general trust law, Hi-Land Potato and Worley insisted, is applicable and controlling here.   See Tr. at 8:2-9:19 (Bohnhoff).   In response to Skyline Potato and the Folson Farm Group's argument that the Uniform Trust Code does not apply to PACA trusts, Hi-Land Potato and Worley maintained that the Uniform Trust Code applies to PACA trusts, because the Uniform Trust Code applies to express trusts, and case law states PACA trusts are to be administered as express trusts.   See Tr. at 10:4-11:5 (Bohnhoff).

Hi-Land Potato and Worley asked the Court to not deny attorney's fees based on the fact that "to date no Federal Court has awarded attorney's fees in a PACA case on the basis of . . . equitable authority."   Tr. at 11:6-12:12:24 (Bohnhoff).   Hi-Land Potato and Worley argue that this is a rare case, because it involves a beneficiary suing another beneficiary.   See Tr. at 11:22-1211 (Bohnhoff).   They contend that most cases arising from PACA trusts involve a beneficiary suing a trustee, which generally award attorney's fees based on the PACA statute. See Tr. at 12:11-13 (Bohnhoff).   Hi-Land Potato and Worley insisted that the lack of precedent allowing attorney's fees under these unusual conditions is no reason to assume attorney's fees cannot or should not be awarded.   See Tr. at 12:14-18 (Bohnhoff).

> What we have here is not the usual PACA case.   The Court here is in relatively new territory.   This is one of three cases that the parties were able to find [] anywhere . . . in which a PACA trust beneficiary has sued another PACA trust beneficiary.   And it's only the second case of those three to recognize that PACA trust beneficiaries owe each other fiduciary duties and of those two cases, this is the

only case in which the defendant beneficiary has prevailed.   In other words, this is
the first case in which a PACA trust beneficiary doesn't have this usual right to seek
attorneys' fees on the basis of its invoice language, and instead, is in a position of
having to invoke the Court's equitable authority . . . .   But the fact that the Court is
facing a new situation is no reason not to recognize the applicability of established
rules, the general trust law rules and the incorporation of those rules into PACA, to
that situation.

Tr. at 11:22-12:18 (Bohnhoff).

Hi-Land Potato and Worley stated the New Mexico version of the Uniform Trust Code,

N.M. Stat. Ann. 1978, § 46A-10-1004 (2003), authorizes the Court to award attorney's fees

against the third-party plaintiffs, Tan-O-On Marketing and the Andersons, because their claims

were premised on state law and not on federal law.   See Tr. at 13:19-15:22 (Bohnhoff, Court).   In

response, Skyline Potato urged the Court to look to the Restatement, rather than the Uniform Trust

Code, for guidance on what the trust law is and how the Court should decide this issue.   See Tr. at

17:17-19:12 (Court, Pizzonia).   Skyline Potato further argued that the Uniform Trust Code is

directed at trusts arising in estate planning or the donative context, and not at the trusts created

under PACA.   See Tr. at 22:20-23:4 (Pizzonia).

Like Hi-Land Potato and Worley, Skyline Potato stated that it did not know of any federal

statutes or areas of federal law in which trust principles have been used to determine whether to

award attorney's fees.   See Tr. at 22:2-13 (Court, Pizzonia).   Skyline Potato argued, however,

that the cases on which Hi-Land Potato and Worley rely "as federal trust precedent for this

particular issue all have some aspect of vexatious or bad behavior by one of the parties."   Tr. at

20:25-21:4 (Pizzonia).   In response to this argument, the Court noted that, "if they've gotten to the

point of awarding fees from an equitable standpoint for vexatious, they're assuming that equity

allows them in the trust context to award fees."   Tr. at 21:13-17 (Court).   Finally, Skyline Potato

insisted that PACA's drafters made a conscious choice to not include an attorney's fee provision.

See Tr. at 23:4-16 (Pizzonia).   Skyline Potato stated that it did not think "any case law . . .

exist[ed] to justify the granting of attorneys [fees] under PACA under general trust principles without a contract."   Tr. at 23:11-14 (Pizzonia).

The Folson Farm Group joined Skyline Potato in arguing that PACA's drafters purposefully left out an attorney's fees provision and it would be wrong to apply general trust principles to award attorney's fees in this case.   See Tr. at 23:20-24:18 (Esquivel).   The Folson Farm Group conceded that trust principles may be used to fill the gaps in a statute when those principles are not in conflict with the statute, but argued that to do so here would be in conflict with the statute.   See Tr. at 23:20-24:18 (Esquivel).   The Folson Farm Group highlighted that "there is not a single case in this country where the uniform trust code has been applied to PACA."   Tr. at 24:12-13 (Esquivel).

> There are many, many cases that involve PACA trust beneficiaries suing a third party such as a bank or another recipient of PACA trust assets.   There is not a single case where any bank or any third party recipient has been awarded attorney's fees under the premise suggested by Hi-Land, which is the uniform trust code. They're asking the Court to draw a new standard, and there is no legal basis for that.

Tr. at 24:22-25:5 (Esquivel).

The Folson Farm Group stated that, if they had prevailed in the lawsuit, they would not have been entitled to attorney's fees under the principles which Hi-Land Potato and Worley advocate; instead, they would have been entitled to attorney's fees under PACA § 499(e), which states that a creditor can recover all sums owed in connection with a produce sale transaction.   See Tr. at 25:6-28:23 (Esquivel).   The Folson Farm Group argued that Hi-Land Potato could not have relied on this statute, because it was not a buyer or seller of the produce.   See Tr. at 27:12-23 (Court, Esquivel).

Tan-O-On Marketing and the Andersons disagreed with Hi-Land Potato and Worley's argument that they are entitled to attorney's fees pursuant to state law, because the Andersons' claims were brought and argued under state law, and not federal law.   See Tr. at 29:14-31:19

(Court, Robinson).   The Andersons insisted that their claims were federal law claims, because, despite that some are state law claims, all arose from PACA transactions; thus, federal law was at the root of each of their claims.   See Tr. at 29:14-31:19 (Court, Robinson).

Hi-Land Potato and Worley advanced several arguments in response to Skyline Potato, the Folson Farm Group, Tan-O-On Marketing, and the Andersons' arguments why the Court does not have authority to grant Hi-Land Potato and Worley attorney's fees.   See Tr. at 33:23-39:8 (Bohnhoff, Court).   They again argued that the Andersons' claims were state law, not federal law, thus opening the door for the Court to award fees under state law.   See Tr. at 35:6-10 (Bohnhoff). Hi-Land Potato and Worley also argued that general trust law principles are not limited to only filling in a statute's gaps, and therefore can be used to authorize the Court to award attorney's fees when PACA is silent.   See Tr. at 37:24-38:9 (Bohnoff).   Hi-Land Potato and Worley explained: "There [are] no limitations as articulated by the federal circuit courts in the incorporation of general trust law principles . . . ."   Tr. at 38:4-7 (Bohnhoff).   Hi-Land Potato and Worley argued that PACA is supposed to protect the parties, and it is therefore inconsistent to say that a defendant may be exposed to liability by a plaintiff under PACA, but only the plaintiff is entitled to recover attorney's fees.   See Tr. at 38:18-39:8 (Bohnhoff).   Hi-Land Potato and Worley insisted this one-way street to attorney's fees advocated by Skyline Potato and the Folson Farm Group is inequitable, and that the Court should not endorse it.   See Tr. at 38:15-18 (Bohnhoff).   Finally, Hi-Land Potato and Worley argued that, as a matter of equity, the Court should apply the general trust law principles as a means of leveling the playing field.   See Tr. at 39:4-8 (Bohnhoff).

Following the parties' arguments regarding the issue whether the Court has authority to award attorney's fees in this case, the Court informed the parties that it tends to agree that it has the power under state law to shift fees in state law claims and that the Andersons' claims look like state law claims.   See Tr. at 40:13-16 (Court).

The Court then moved to the issue whether, if federal law allows for the award of attorney's fees in this context, the Court should award attorney's fees in this particular case.  See Tr. at 40:22-24 (Court).   The Court began by asking why it should be the first court to hold that it is appropriate to apply general trust law principles to shift fees in a case where the beneficiaries are suing each other.  See Tr. at 44:10-20 (Court).   In response, Hi-Land Potato and Worley argue simply that it is the fair thing to do.  See Tr. at 44:21-45:18 (Bohnhoff).   Hi-Land Potato and Worley maintained that beneficiaries are supposed to be protected and that protection should not only be against trustees or corporations, but also against other beneficiaries.  See Tr. at 47:7-14 (Bohnhoff).   Hi-Land Potato and Worley argued that a beneficiary should be protected regardless of its status as a plaintiff or defendant.  See Tr. at 47:7-14 (Bohnhoff).   Hi-Land Potato and Worley maintained that shifting fees will allow the prevailing beneficiary to be put back in the "position it would have been had there been no lawsuit . . . ."  Tr. at 48:14-16 (Bohnhoff). Hi-Land Potato and Worley were unable to answer the Court's question regarding why a beneficiary who successfully defeats claims brought against it by a fellow beneficiary should be allowed to shift fees, while an insurance company who defeats claims brought against it is not allowed to shift fees.  See Tr. at 48:17-50:6 (Bohnhoff, Court).   Hi-Land Potato and Worley argued that fee shifting is appropriate here, because Hi-Land Potato and Worley did nothing wrong with respect to the PACA trust, and yet they were the ones subjected to extensive litigation when Skyline Potato, the Folson Farm Group, Tan-O-On Marketing, and the Andersons should have been suing the people responsible for the unpaid money.  See Tr. at 51:9-53:19 (Bohnhoff).

> So . . . to sum up, it's the special status of a trust beneficiary . . . . [A] trust beneficiary . . . should be protected, should be given the benefit of this attorney fee shifting protection, whether it's in the PACA context, or whether it's in the Wells Fargo context.  But particularly in the PACA context where a trust beneficiary, if it's sued by another trust beneficiary, is going to face a one way street on attorney's fees.  And then the particular circumstances of this case where we did have unreasonable and inequitable litigation conduct.  For all of those reasons. . .the

Court should exercise the power that it does have under trust law as well as under
the Uniform Trust Code.

Tr. at 53:20-54:9 (Bohnhoff).

Because Tan-O-On Marketing is the trustee and the Andersons are the control persons,
Hi-Land Potato and Worley argued that case law allowing for the shifting of fees when a
beneficiary prevails on a claim brought by a trustee support its right to attorney's fees.   See Tr. at
54:10-55:20 (Bohnhoff, Court).   Hi-Land Potato and Worley insisted that the Court should award
the full amount of attorney's fees based on the fact that they are the prevailing parties; they
contend that the Court should not reduce attorney's fees simply because they failed to prevail on
every contention raised in the lawsuit.   See Tr. at 56:2-58:7 (Bohnhoff, Court).

Skyline Potato and the Folson Farm Group argued they too are beneficiaries, which,
according to the arguments that Hi-Land Potato and Worley make, entitles them to an elevated
degree of protection. See Tr. at 59:4-10 (Esquivel).   Skyline Potato and the Folson Farm Group
also maintained that Hi-Land Potato was not a PACA trust beneficiary, and therefore is not equally
situated with Folson Farm and Skyline Potato.   See Tr. at 59:10-20 (Esquivel).   Finally, Skyline
Potato and the Folson Farm Group argued that it would be inequitable to award attorney's fees to
Hi-Land Potato and Worley, because it would mean that they would be losing twice: they would
not only lose the money owed to them for their product, but would also be liable for attorney's fees
and costs.   See Tr. at 59:21-60:9 (Esquivel).

The Andersons argued that they should not be punished for using the United States justice
system.   See Tr. at 70:20-21 (Robinson).   They further asserted that they had lost their
retirement, their company, their livelihood, and their wealth, and therefore, it would be unfair for
the Court to award attorney's fees to Hi-Land Potato and Worley.   See Tr. at 71:13-15
(Robinson).   Hi-Land Potato and Worley responded by stating that, while Atwood v. Atwood

states that a court may consider a party's ability to pay attorney's fees, the Andersons have not provided any evidence showing that they are financially unable to pay Hi-Land Potato and Worley's attorney's fees.   See Tr. at 72:19-74:2 (Bohnhoff, Court).

Hi-Land Potato further argued that the Court would not be the first court to shift attorney's fees against a beneficiary, stating, with regard to Atwood v. Atwood:

> [T]he Court said the beneficiary, having sued the trustee and having lost, the trustee now can recover its attorneys' fees from the beneficiary.   Well, if that's the case, Your Honor, if this equitable power to fee shift extends that far, there is no reason not to extend it to a beneficiary versus beneficiary situation where defendant beneficiary prevails. . . .

Tr. at 75:19-16:1 (Bohnhoff).

Answering the Court's question regarding the extent of the discretion to award attorney's fees, Hi-Land Potato and Worley maintained the Court has broad discretion to award attorney's fees and should look to the standards that govern the Court's exercise of discretion in other contexts.   See Tr. at 76:8-77:5 (Bohnhoff, Court).   Those standards, Hi-Land Potato argued, find abuse of discretion where a court mischaracterizes the law, applies the wrong law, or relies of something not in the record.   See Tr. at 76:19-77:5 (Bohnhoff).   Thus, Hi-Land Potato insisted that the Court's risk of abusing its discretion is no different here than in other contexts.   See Tr. at 76:8-77:5 (Bohnhoff, Court).   The Court advised the parties that it was "not inclined . . . to shift fees to either the plaintiffs, intervening plaintiffs, or the Tan-O-On group."   Tr. at 80:3-5 (Court).

The Court next addressed the issue whether the attorney's fee provisions in the Billingsley Produce and Mart Product invoices provide attorney's fees for Hi-Land Potato and Worley.   See Tr. at 80:9-10 (Court).   Hi-Land Potato and Worley largely stuck to their briefing with regard to their right to attorney's fees as a third-party beneficiaries under the attorney's fee provision in the Billingsley Produce and Mart Produce invoices.   See Tr. at 81:2-85:5 (Bohnhoff, Court).   Generally, Hi-Land Potato argued that the attorney fee provisions are enforceable and that

Hi-Land Potato can take advantage of those attorney fee provisions.   <u>See</u> Tr. at 82:2-85:5 (Bohnhoff, Court).

In response, the Folson Farm Group argued that the contract language of the contract was not ambiguous.   <u>See</u> Tr. at 86:11-13 (Court, Esquivel).   The Folson Farm Group insisted that the language made it clear that the invoices' attorney's fee provisions applied to the seller and buyer only, and were limited to breach-of-contract claims.   <u>See</u> Tr. at 86:23-87:14 (Esquivel).   The Folson Farm Group also contended that, to prove that the contract was valid under Uniform Commercial Code, § 2-207 and N.M. Stat. Ann. 1978, § 55-2-207 (1961), Hi-Land Potato and Worley had to show that Tan-O-On Marketing was not unfairly surprised and had not suffered any hardship as a result of the attorney's fee provision such that it constituted a material alteration to the contract.   <u>See</u> Tr. at 87:22-91:10 (Court, Esquivel).   The Folson Farm Group further argued Hi-Land Potato and Worley did not satisfy this burden, and therefore did not show that the attorney's fee provision invalidated the invoice pursuant to the Uniform Commercial Code § 2-207.   <u>See</u> Tr. at 87:22-91:10 (Court, Esquivel).   Finally, the Folson Farm Group asserted that Hi-Land Potato is not a third-party beneficiary of the invoice, because Hi-Land Potato failed to show intent for the invoice to benefit third-parties or anyone other than Tan-O-On Marketing, Billingsley Produce, or Mart Produce.   <u>See</u> Tr. at 91:11-92:1 (Esquivel).

Citing to <u>Cooseman's Specialties, Inc. v. Gargiulo</u>, 485 F.3d 701, 708 (2d Cir. 2007), Hi-Land Potato and Worley argued that the burden to prove unfair surprise and hardship belongs to the party asserting that the attorney fee provision in the invoice constitutes a material alteration. <u>See</u> Tr. at 93:15-94:25 (Bohnhoff).   Hi-Land Potato and Worley insisted, however, that this burden could not be satisfied, because Tan-O-On Marketing not only previously used the attorney's fee provisions at issue here, but the provisions were also considered a usage of trade in PACA invoices.   <u>See</u> Tr. at 94:9-11 (Bohnhoff).   Thus, according to Hi-Land Potato and Worley,

there is no way Tan-O-On can be said to have been unfairly surprised by these attorney's fees provisions.  See Tr. at 94:23-25 (Bohnhoff).  Hi-Land Potato and Worley then renewed their argument that the language concerning the attorney fee provision's scope was ambiguous, and therefore should be construed against Billingsley Produce and Mart Produce, the drafters of the invoice.  See Tr. at 95:1-13 (Bohnhoff).  Hi-Land Potato and Worley argued that "the Court should conclude on this independent basis separate and apart from the equitable authority issue that Billigsley and Mart Produce should be liable for Hi-Land's attorneys' fees."  Tr. at 95:18-22 (Bohnhoff).  The Court responded by stating that it was struggling to see "how the parties would have intended . . . this invoice to benefit third parties like Hi-Land."  Tr. 102:4-6 (Court).  The Court further stated that "It seems . . . they just wrote very broad provisions that probably were meant to operate just like the other producers['']."  Tr. 102:15-17 (Court).

Hi-Land Potato largely stuck to its briefing with regard to the issue of allocation, stating that the parties should be jointly and severally liable for the fees as the parties engaged in a common attack against Hi-Land Potato and that it would be impossible to determine what fees were spent defending against which claims.  See Tr. at 102:21-109:6 (Bohnhoff).  Hi-Land Potato further argued that there is no basis to apportion the fees based on the relative amounts of the claims brought against it.   See Tr. at 106:10-109:6 (Bohnhoff).   Hi-Land Potato stated that, if Skyline Potato, the Folson Farm Group, Tan-O-On Marketing, and the Andersons want to divide the fees based on the amounts claimed, such an award is something they should settle amongst themselves.  See Tr. at 108:14-109:6 (Bohnhoff).  Hi-Land Potato and Worley explained: "[t]hey should be held jointly and severally liable to the extent of the amounts that I provided the Court and then if they wish they can approach the Court for some contribution determination about how much the plaintiff should pay versus how much the third party plaintiff should pay."  Tr. at 109:1-6 (Bohnhoff).

Hi-Land Potato and Worley clarified that Worley is not entitled to recover attorney's fees from Skyline Potato or the Folson Farm Group; however, Hi-Land Potato and Worley contend that fact does not reduce the amount of attorney's fees owed to Hi-Land Potato. See Tr. at 111:8-112:7 (Bohnhoff, Court, Esquivel). Hi-Land Potato and Worley explained: "Mr. Worley didn't pay the attorneys' fees. All the money [counsel for Hi-Land Potato and Worley] received came from Hi-Land and . . . any defense work that was done defending Mr. Worley against the claims being made against him necessarily was also conducted in defense of Hi-Land." Tr. at 111:22-112:2 (Bohnhoff). Hi-Land Potato and Worley confirmed that they are arguing that Hi-Land Potato, not Worley, is entitled to attorney's fees against Skyline Potato and the Folson Farm Group. See Tr. at 112:4-7 (Bohnhoff, Court).

The Folson Farm Group advocated for the Court to apportion the attorney's fees based on the relative amount of the claims brought against Hi-Land Potato in the event that the Court determines it should award attorney's fees. See Tr. at 112:10-113:25 (Esquivel). The Folson Farm Group argued that all of Hi-Land Potato's arguments are based on equity, but there is no equity in making a party pay sixty-five times the amount of the claim that it asserted. See Tr. at 112:19-114:7 (Esquivel). The Folson Farm Group stated that allocation is appropriate, and that "to do otherwise would hold each of these creditors liable for many, many more times in fees than the amount that they're claiming." Tr. at 113:18-21 (Esquivel). In response, Hi-Land Potato insisted that the "plaintiffs should have thought about the size of their claim versus the litigation that they were starting before they joined the lawsuit." Tr. at 126:5-8 (Bohnhoff).

The Folson Farm Group argued that, if the Court decides to award attorney's fees to Hi-Land Potato, the Court should hold an evidentiary hearing to determine the reasonableness Hi-Land Potato's attorney's fees. See Tr. at 114:1-117:7 (Court, Esquivel). The Folson Farm

Group also maintained that it did not waive its right to challenge the reasonableness of the attorney's fees, as it contested them in its brief.   See Tr. at 116:14-18 (Court, Esquivel).

The Andersons' argued that the attorney's fees charged by Hi-Land Potato's attorneys were exorbitant.   See Tr. at 117:9-120:21 (Court, Robinson).   Hi-Land Potato and Worley responded by stating:

> They have not criticized our lodestar figure at all.   They submitted no expert or other affidavits addressing the fee.   They made no scrutiny of any of the particulars of the billing records.   They didn't even offer any argument about the reasonableness of the fees.   They lost their opportunity to challenge the reasonableness of the fees.

Tr. at 123:2-9 (Bohnhoff).   Hi-Land Potato and Worley explained: "[N]either the plaintiffs nor the intervening plaintiffs nor the third party plaintiffs get two bites at the apple.   They failed to make any effort at the time they filed their response to address the reasonableness of attorneys' fees.   They can't get a second chance now."   Tr. at 126:24-127:4 (Bohnhoff).   In supporting the reasonableness of its attorney's fees, Hi-Land Potato and Worley stuck to their briefing.   See Tr. at 122:21-125:23 (Bohnhoff).   The Court concluded by again stating that it was not inclined to grant the motion for attorney's fees.   See Tr. at 128:8-24 (Court).

### RELEVANT LAW REGARDING THE AWARD OF ATTORNEY'S FEES

Hi-Land Potato and Worley argue the circumstances of this case provide the Court with several reasons to award attorney's fees against Tan-O-On Marketing, the Andersons, Skyline Potato, and the Folson Farm Group.    For the Court to award attorney's fees to Hi-Land Potato and Worley, it would have to set aside the long-standing tradition of the American Rule.   The Court must consider whether Hi-Land Potato and Worley have a statutory right to attorney's fees, a contractual right to attorney's fees, or whether general trust law principles support the award of attorney's fees under the circumstances of this case.

1.      <u>Law Regarding Attorney's Fees under the American Rule.</u>[13]

"As a general rule, trial courts are without authority to award attorney's fees unless the right exists by contract or statute." <u>Paramount Pictures Corp. v. Thompson Theaters, Inc.</u>, 621 F.2d 1088, 1091 (10th Cir. 1980).   New Mexico also follows the "American Rule" with respect to attorney's fees.   <u>Craft v. Sunwest Bank of Albuquerque</u>, 84 F. Supp. 2d 1226, 1238-39 (D.N.M. 1999)(Black, J.); <u>Monsanto v. Monsanto</u>, 1995-NMCA-048, ¶ 7, 894 P.2d 1034, 1036-37.   "The American Rule is shorthand for the general rule that in the absence of legislation providing otherwise, litigants must pay their own attorney's fees." <u>Christiansburg Garment Co. v. Equal Employment Opportunity Commission</u>, 434 U.S. 412, 415 (1978).   <u>See</u> <u>Garcia v. Jeantette</u>, 2004-NMCA-004, ¶ 16, 82 P.3d 947, 951 ("[G]enerally, a party may recover attorney fees only when authorized by statute, court rule, or an agreement expressly providing for their recovery." (citing <u>Monsanto v. Monsanto</u>, 1995-NMCA-048, ¶ 7, 894 P.2d at 1037)); <u>Craft v. Sunwest Bank of Albuquerque</u>, 84 F. Supp. 2d 1226, 1238-39 (D.N.M. 1999)("In the absence of statutory authority to the contrary, parties pay their own attorney's fees."); <u>Credit Inst. v. Veterinary Nutrition Corp.</u>, 2003-NMCA-010, ¶ 38, 62 P.3d 339, 347 ("As a general rule, litigants are responsible for their own attorney fees absent statutory authority or some other authority such as a contract allowing such fees.")(quoting <u>Springer Group, Inc. v. Wittelsohn</u>, 1999-NMCA-120, ¶ 23, 988 P.2d 1260, 1266)).   Exceptions to the American Rule include: (i) statutory basis; (ii)

_____

[13]The title "American Rule" reflects the sharp contrast between the award of attorney's fees in the United States' legal system and the award of attorney's fees in other legal systems, which automatically shift fees to the losing party.   <u>See</u> Neal H. Klausner, <u>The Dynamics of Rule 11: Preventing Frivolous Litigation by Demanding Professional Responsibility</u>, 61 N.Y.U. L. Rev. 300, 303-04 (1986)("The United State is the only common law jurisdiction in which legal expenses, including attorneys' fees, are not automatically shifted to the losing party."); <u>Middle Mountain Land and Produce Inc. v. Sound Commodities</u>, 307 F.3d 1220, 1225 (9th Cir. 2002)("Unlike the British legal system rule, in which the winner automatically gets attorneys' fees, the rule in American courts, commonly known as the American Rule, looks with disdain upon awarding attorneys' fees unless an independent basis exists for the award.")(citing <u>Alyseka Pipeline Serv. Co. v. Wilderness Soc'y</u>, 421 U.S. at 257-59).

enforceable contract; (iii) willful violation of court order; (iv) bad faith action; and (v) litigation creating common fund for the benefit of others.   See E. Armata, Inc. v. Platinum Funding Corp., 887 F. Supp. 590, 594 (S.D.N.Y. 1995)(Patterson, J.)(citing Alyseka Pipeline Service Co. v. Wilderness Society, 421 U.S. at 257-59).

### 2.   Law Regarding Attorney's Fees Under PACA.

"Although some courts have granted attorneys' fees in cases alleging a breach of PACA trust, those courts have acknowledged that PACA does not expressly provide for attorneys' fees." Overton Distributors, Inc. v. Heritage Bank, 179 F. Supp. 2d 818, 835 (M.D. Tenn. 2002)(Nixon, J.)(citing Golman-Hayden Co., Inc. v. Fresh Source Produce, Inc., 27 F. Supp. 2d 723, 728 (N.D. Tex. 1998)).   While the American Rule generally governs the award of attorney's fees, the common funds exception to the American Rule may apply to cases involving PACA trusts because the trust creates a common fund.

> PACA does not provide attorney's fees, but it does mandate that proceeds from the sale of perishable goods shall be held in trust for the unpaid suppliers.   Based upon the statutory requirement that a commission merchant, dealer, or broker hold the proceeds in trust for the benefit of all unpaid suppliers, some courts have held that recognition of the PACA trust established a common fund from which attorney's fees may be recoverable.

Golman-Hayden Co., Inc. v. Fresh Source Produce, Inc., 217 F.3d 348, 352 (5th Cir. 2000).   "A common fund is a trust having multiple parties sharing an interest."   Golman-Hayden Co., Inc. v. Fresh Source Produce, Inc., 217 F.3d 348 at 352.   Some courts have awarded fees in PACA claims pursuant to the common-fund exception to the American Rule.   See Golman-Hayden Co., Inc. v. Fresh Source Produce, Inc., 217 F.3d 348 at 352.   Conversely, other courts have refused to award attorney's fees from a common fund created under PACA, "concluding that the common fund exception does not apply to PACA."   Golman-Hayden Co., Inc. v. Fresh Source Produce, Inc., 217 F.3d 348 at 352.   See Overton Distributors, Inc. v. Heritage Bank, 179 F. Supp. 2d at 835

(explaining that it would not award attorneys' fees to a PACA trustee, because, "PACA was passed to allow produce sellers to recover funds held in trust, and that it would violate the purpose of the PACA statute to allow fees to be paid out of that fund.   Additionally, the PACA statute does not authorize the payment of separate attorneys' fees.").

Courts have also interpreted the absence of a provision under Section 499e(c)(2) of PACA explicitly allowing for the award of attorney's fees to mean that Congress did not intend for attorney's fees to be awarded in cases brought pursuant to Section 499e(c)(2).   See E. Armata, Inc. v. Platinum Funding Corp., 887 F. Supp. at 594.   An analysis with respect to attorney's fees should begin with the presumption that the American Rule applies.   See Fogerty v. Fantasy, Inc., 510 U.S. 517, 533 (1994)("Congress legislates against the strong background of the American Rule."); Key Tronic Corp v. United States, 511 U.S. 809, 814-815 (1994)("[A]ny analysis of what Congress intended starts with the presumption that fees are not recoverable."); Ruckelshaus v. Sierra Club, 463 U.S. 680, 683 (1983)(explaining that, when construing an attorney's fee provision, "[o]ur basic point of reference is the American Rule").   To award fees under the statutory basis exception "requires a determination that Congress intended to set aside this longstanding American rule of law."   Key Tronic Corp. v. United States, 511 U.S. at 815 (citations omitted)(citing Runyon v. McCrary, 427 U.S. 160, 185-86 (1976)).   Congress must explicitly allow for the award of attorney's fees.   See Key Tronic Corp. v. United States, 511 U.S. at 815 (explaining that a statute offering "mere generalized commands" fails to provide a "sufficient degree of explicitness" to warrant the award of attorney's fees); Unbelievable, Inc. v. N.L.R.B., 118 F.3d 795, 804 (D.C. Cir. 1997)("[T]o determine that the Congress intended to set aside this longstanding American rule of law there must be more in the statute than generalized commands or a broad remedial commission.")(citing Runyon v. McCrary, 427 U.S. at 185-86). In the absence of explicit congressional authority for fee shifting, attorney's fees should not be

awarded.  See Unbelievable, Inc. v. N.L.R.B., 118 F.3d at 802 ("The Supreme Court . . . treats

congressional silence in a particular statute as an indication that the legislature did not intend to

authorize fee shifting.").

Congress explicitly provided an award of attorney's fees under PACA § 499g(c) if an

appellant successfully appeals from a reparation order[14] for a Section 499b violation.

### (c) Appeal from reparation order; proceedings

Either party adversely affected by the entry of a reparation order by the Secretary
may, within thirty days from and after the date of such order, appeal therefrom to
the district court of the United States for the district in which said hearing was held:
*Provided*, That in cases handled without a hearing in accordance with subsections
(c) and (d) of section 499f of this title or in which a hearing has been waived by
agreement of the parties, appeal shall be to the district court of the United States for
the district in which the party complained against is located. Such appeal shall be
perfected by the filing with the clerk of said court a notice of appeal, together with a
petition in duplicate which shall recite prior proceedings before the Secretary and
shall state the grounds upon which the petitioner relies to defeat the right of the
adverse party to recover the damages claimed, with proof of service thereof upon
the adverse party. Such appeal shall not be effective unless within thirty days from
and after the date of the reparation order the appellant also files with the clerk a
bond in double the amount of the reparation awarded against the appellant
conditioned upon the payment of the judgment entered by the court, plus interest
and costs, including a reasonable attorney's fee for the appellee, if the appellee shall
prevail. Such bond shall be in the form of cash, negotiable securities having a
market value at least equivalent to the amount of bond prescribed, or the
undertaking of a surety company on the approved list of sureties issued by the
Treasury Department of the United States. The clerk of court shall immediately
forward a copy thereof to the Secretary of Agriculture, who shall forthwith prepare,
certify, and file in said court a true copy of the Secretary's decision, findings of fact,
conclusions, and order in said case, together with copies of the pleadings upon
which the case was heard and submitted to the Secretary. Such suit in the district
court shall be a trial de novo and shall proceed in all respects like other civil suits
for damages, except that the findings of fact and order or orders of the Secretary
shall be prima-facie evidence of the facts therein stated. Appellee shall not be liable
for costs in said court and if appellee prevails he shall be allowed a reasonable
attorney's fee to be taxed and collected as a part of his costs. Such petition and

---

[14]"If after a hearing on a complaint made by any person under section 499f of [PACA] . . .
the Secretary determines that the commission merchant, dealer, or broker has violated any
provision of section 499b of [PACA], he shall . . . determine the amount of damage, if any, to
which such person is entitled as a result of such violation and shall make an order directing the
offender to pay such person complaining such amount on or before the date fixed in the order."   7
U.S.C.A. § 499g(a).

pleadings certified by the Secretary upon which decision was made by him shall upon filing in the district court constitute the pleadings upon which said trial de novo shall proceed subject to any amendment allowed in that court.

7 U.S.C.A. § 499g(c) (emphasis added).  Congress did not, however, provide any instruction

regarding attorney's fees for claims brought pursuant to § 499e.

**(c) Trust on commodities and sales proceeds for benefit of unpaid suppliers, sellers, or agents; preservation of trust; jurisdiction of courts**

**(1)** It is hereby found that a burden on commerce in perishable agricultural commodities is caused by financing arrangements under which commission merchants, dealers, or brokers, who have not made payment for perishable agricultural commodities purchased, contracted to be purchased, or otherwise handled by them on behalf of another person, encumber or give lenders a security interest in, such commodities, or on inventories of food or other products derived from such commodities, and any receivables or proceeds from the sale of such commodities or products, and that such arrangements are contrary to the public interest. This subsection is intended to remedy such burden on commerce in perishable agricultural commodities and to protect the public interest.

**(2)** Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents.   Payment shall not be considered to have been made if the supplier, seller, or agent receives a payment instrument which is dishonored. The provisions of this subsection shall not apply to transactions between a cooperative association, as defined in section 1141j(a) of Title 12, and its members.

**(3)** The unpaid supplier, seller, or agent shall lose the benefits of such trust unless such person has given written notice of intent to preserve the benefits of the trust to the commission merchant, dealer, or broker within thirty calendar days (i) after expiration of the time prescribed by which payment must be made, as set forth in regulations issued by the Secretary, (ii) after expiration of such other time by which payment must be made, as the parties have expressly agreed to in writing before entering into the transaction, or (iii) after the time the supplier, seller, or agent has received notice that the payment instrument promptly presented for payment has been dishonored. The written notice to the commission merchant, dealer, or broker shall set forth information in sufficient detail to identify the transaction subject to the trust.  When the parties expressly agree to a payment time period different from that established by the Secretary, a copy of any such agreement shall be filed

in the records of each party to the transaction and the terms of payment shall be disclosed on invoices, accountings, and other documents relating to the transaction.

**(4)** In addition to the method of preserving the benefits of the trust specified in paragraph (3), a licensee may use ordinary and usual billing or invoice statements to provide notice of the licensee's intent to preserve the trust. The bill or invoice statement must include the information required by the last sentence of paragraph (3) and contain on the face of the statement the following: "The perishable agricultural commodities listed on this invoice are sold subject to the statutory trust authorized by section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499e(c)). The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received.".

**(5)** The several district courts of the United States are vested with jurisdiction specifically to entertain (i) actions by trust beneficiaries to enforce payment from the trust, and (ii) actions by the Secretary to prevent and restrain dissipation of the trust.

7 U.S.C.A. § 499e(c).   Courts have interpreted this provision to mean that Congress did not intend to award attorney's fees pursuant to § 499e to trust beneficiaries under PACA.   See E. Armata, Inc. v. Platinum Funding Corp., 887 F. Supp. at 594 ("Since Congress provided in PACA for the award of attorneys fees under section 499g(c) following an appeal pursuant to section 499b, the absence of a similar provision for attorneys fees in section 499e(c)(2) is further evidence that Congress did not intend to award attorney's fees to trust beneficiaries under PACA.")(internal quotation marks and citations omitted)(citing In re W.L. Bradley Co., Inc., 78 B.R. 92, 95-96 (Bankr. E.D. Pa. 1987)).

> Section 499e makes no provision for attorney fees.  Other sections of PACA, however, do allow for attorney fees . . . . Clearly, Congress understood that the award of attorney fees in the trust provision would require express language in the statute.  If Congress had intended the trust provision to include attorney fees, it would have included such a statement.

In re Fleming Companies, Inc. 316 B.R. 809, 815-16 (D. Del. 2004)(Robinson, J.); In re Dixie Produce & Packaging, L.L.C., 368 B.R. 533, 538-39 (Bankr. E.D. La. 2007)(Brown, J.)("The court finds it significant that PACA does not provide such statutory authorization for attorneys'

fees.   Congress certainly knew how to provide for attorneys' fees in PACA when it intended to do

so." (internal citations omitted)).

3.    Law Regarding a Contractual Right to Attorney's Fees.[15]

"In addition to a statutory basis, attorney fees can be awarded if there is a contractual basis

for them." In re Fleming Companies, Inc., 316 B.R. at 815 (citing Middle Mountain Land and

Produce Inc. v. Sound Commodities, 307 F.3d 1220, 1225 (9th Cir. 2002)).   Several courts have

held that an invoice containing an attorney's fee provision may provide a contractual basis for the

award of attorney's fees under PACA.   See Coosemans Specialties, Inc. v. Gargiulo, 485 F.3d

701, 709 (2nd Cir. 2007)("[W]e agree with our sister circuits that where the parties' contracts

include a right to attorneys' fees, they can be awarded as 'sums owing in connection with'

perishable commodities transactions under PACA.")(quoting 7 U.S.C. § 499e(c)(2))(citing

Country Best v. Christopher Ranch, LLC, 361 F.3d 629, 632 (11th Cir. 2004); Middle Mountain

---

[15]In this case, the Court has federal question jurisdiction with respect to the PACA claims, and has supplemental jurisdiction over the fraudulent transfer, unjust enrichment, and trade secrets claims.   See 28 U.S.C. § 1367(a).   Generally, when a federal court sits in diversity jurisdiction, the court applies the forum state's choice-of-law rules to determine which state's substantive law to apply.   See Mosley v. Titus, 762 F. Supp. 2d 1298, 1313-14 (D.N.M. 2010)(Browning, J.)(stating that, when a court's jurisdiction rests on diversity of citizenship under § 1332, "the court should look to the forum state's choice-of-law rules to determine which state's substantive law to apply"); Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496-97 (1941); Pepsi-Cola Bottling Co. v. PepsiCo., Inc., 431 F.3d 1241, 1255 (10th Cir. 2005).   Although the Court is not sitting in diversity jurisdiction in this case and is not addressing the substantive merits of a claim under supplemental jurisdiction, it concludes no sound reason why the Court should not also apply New Mexico's choice-of-law rules to determine what law should be used to interpret the invoices.   The Court, sitting in New Mexico, will therefore apply New Mexico choice-of-law rules here.

With respect to choice-of-law issues involving contracts, New Mexico generally follows the doctrine of lex loci contractus -- the law of the place of contracting controls.   See Ferrell v. Allstate Insurance Co.   2008-NMSC-042, ¶ 51, 188 P.3d 1156, 1172.   Like most states, however, New Mexico has a common exception to the rule: "New Mexico respects party autonomy; the law to be applied to a particular dispute may be chosen by the parties through a contractual choice-of-law provision."   Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 7, 188 P.3d 1215, 1218.   "[W]hen application of the law chosen by the parties offends New Mexico public policy," however, a New Mexico court "may decline to enforce the choice-of-law provision and apply New Mexico law instead."   Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 7, 188 P.3d at 1218. As explained in the Court's analysis section, the Court will apply New Mexico law to interpret the Billingsley Produce and Mart Produce invoices.

Land and Produce Inc. v. Sound Commodities, 307 F.3d at 1222-25; Movsovitz & Sons of Fla. v. Axel Gonzalez, Inc., 367 F. Supp. 2d 207, 215 (D.P.R. 2005)(Casellas, J.); JC Produce v. Paragon Steakhouse Rests., 70 F. Supp. 2d 1119, 1123 (E.D. Cal. 1999)(Levi, J.)).   An attorney's fee provision may however be unenforceable if it is an additional provision to the contract that materially alters the contract.   See N.M. Stat. Ann. 1978, § 55-2-207; American Ins. Co. v. El Paso Pipe and Supply Co., 978 F.2d 1185, 1189-92 (10th Cir. 1992).

Whether an additional provision to a contract constitutes a material alteration depends on the case's facts.   See American Ins. Co. v. El Paso Pipe and Supply Co., 978 F.2d at 1190.   A provision materially alters the contract if it "result[s] in surprise or hardship if incorporated without the express awareness by the other party."   Comment 4, N.M. Stat. Ann. 1978, § 55-2-207; Comment 4 to U.C.C. § 2-207.   See American Ins. Co. v. El Paso Pipe and Supply Co., 978 F.2d at 1189.   The party who asserts material alteration has the burden of proof.   See American Ins. Co. v. El Paso Pipe and Supply Co., 978 F.2d at 1192 n.9 ("[P]aragraph 2-207(2)(b) presumes the inclusion of the additional clause unless one of the three exceptions is met.   Thus the party opposing the inclusion of an added term bears the burden of proving an exception.")(internal quotation marks and citations omitted)(citing Comark, 932 F.2d 1196, 1201(7th Cir. 1991); Dale R. Horning Co., 730 F. Supp 962, 966 (S.D. Ind. 1990)).

With regard to surprise, the court must determine whether a party to the contract knew or should have known of the additional provisions.   See American Ins. Co. v. El Paso Pipe and Supply Co., 978 F.2d at 1191; Coosemans Specialties, Inc. v. Gargiulo, 485 F.3d at 708. Therefore, both a subjective and objective analysis is necessary to determine whether a party to a contract was surprised.   See American Ins. Co. v. El Paso Pipe and Supply Co., 978 F.2d at 1191; Coosemans Specialties, Inc. v. Gargiulo, 485 F.3d at 708.   The subjective analysis is necessary to determine if the party was aware of the additional term, and the objective analysis is necessary to

determine if the party should have been aware of the additional term.   See Coosemans Specialties, Inc. v. Gargiulo, 485 F.3d at 708.   When determining whether an additional term unreasonably surprised a party to a contract, there are many objective factors a court should consider such as: (i) prior course of dealing and the number of contracts exchanged between the parties; (ii) industry custom; (iii) whether the addition was clearly marked; and (iv) whether a party includes an attorney fees provision in its own standard contract forms.   See American Ins. Co. v. El Paso Pipe and Supply Co., 978 F.2d at 1191-92 (remanding the case to the district court to apply the "appropriate criteria" for determining unreasonable surprise.)

With regard to hardship, the Tenth Circuit has held that "[i]n a transaction involving the sale of goods the analysis of the existence of hardship focuses on whether the clause at issue would impose substantial economic hardship on the nonassenting party."   American Ins. Co. v. El Paso Pipe and Supply Co., 978 F.2d at 1191 (citing Dale R. Horning Co., 730 F.Supp. at 967).

As a general rule, "one who is not a party to a contract cannot maintain suit upon it."   Fleet Mortgage Corp. v. Schuster, 1991-NMSC-046, ¶ 4, 811 P.2d 81, 82.   Despite this general rule, a third party may be a beneficiary of a contract, and may, as a beneficiary, have enforceable rights against another party to the contract.   See Fleet Mortgage Corp. v. Schuster, 1991-NMSC-046, ¶ 4, 811 P.2d at 82.   "There are two classes of third-party beneficiaries: intended beneficiaries and incidental beneficiaries."   Tarin's Inc. v. Tinley, 2000-NMCA-048, ¶ 13, 3 P.3d 680, 685-86. The Supreme Court of New Mexico has explained:

> A third-party may have an enforceable right against an actual party to a contract if the third-party is a beneficiary of the contract. A third-party is a beneficiary if the actual parties to the contract intended to benefit the third-party.   The intent to benefit the third-party must appear either from the contract itself or from some evidence that the person claiming to be a third party beneficiary is an intended beneficiary.

Callahan v. New Mexico Federation of Teachers–TVI, 2006-NMSC-010, ¶ 20, 131 P.3d 51, 58

(internal quotations omitted)(citing Fleet Mortgage Corp. v. Schuster, 1991-NMSC-046, ¶¶ 1-4,

811 P.2d at 82-83).   See Great American Ins. Co. of New York v. W. States Fire Prot. Co., 730 F.

Supp. 2d 1308, 1316 (D.N.M. 2009)(Browning, J.).

> Only intended beneficiaries can seek enforcement of a contract.  The promisor
> must have had reason to know the benefit was contemplated by the promise as one
> of the motivating causes for entering the contract.  The paramount indicator of a
> third party beneficiary status is a showing that the parties to the contract intended to
> benefit the third party, either individually or as a member of a class of beneficiaries.

Tarin's Inc. v. Tinley, 2000-NMCA-048, ¶ 13, 3 P.3d at 686 (internal quotations and citations

omitted).   "The burden is on the person claiming to be a third-party beneficiary to show that the

parties to the contract intended to benefit him."   Fundamental Administrative Services, LLC v.

Patton, 504 F. App'x 694 (10th Cir. 2012)(quoting Tarin's, Inc. v. Tinley, 2000-NMCA-048, ¶ 13,

3 P.3d at 686).

### 4.   Law Regarding Attorney's Fees Under General Trust Principles.

The United States Courts of Appeals, in construing PACA, have uniformly held that "[t]he

interpretation of PACA trust interests is guided by general trust principles to the extent there is no

conflict with the statute."   In re Arctic Exp. Inc., 636 F.3d 781, 798 (6th Cir. 2011)(quoting

Consumers Produce Co. v. Volante Wholesale Produce, Inc., 16 F.3d 1374, 1381 (3d Cir. 1994)).

See R Best Produce, Inc. v. Shulman-Robin Marketing Corp., 467 F.3d 238, 242 (2d Cir.

2006)(noting that the United States Court of Appeals for the Second Circuit has "previously noted

that PACA trusts are 'governed by general principles of trust law'")(quoting Albee Tomato, Inc. v.

A.B. Shalom Produce Corp., 155 F.3d 612, 615 (2d Cir. 1998)); Bear Mountain Orchards, Inc. v.

Mich-Kim, Inc., 623 F.3d 163, 167 (3d Cir. 2010)("General trust principles of trust law apply to

trusts created under PACA . . . .")(quoting Nickey Gregory Co., LLC v. AgriCap, LLC, 597 F.3d

591, 595 (4th Cir. 2010)); Reaves Brokerage Co., Inc. v. Sunbelt Fruit & Vegetable Co., Inc., 336

F.3d 410, 413 (5th Cir. 2003)("General principles of trust law govern PACA trusts."); Boulder

Fruit Exp. & Heger Organic Farm Sales v. Transp. Factoring, Inc., 251 F.3d at 1271 ("We apply

general trust principles to questions involving the PACA trust, unless those principles directly

conflict with PACA."); Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997)("General

principles of trust law govern the PACA trust . . . .").    That general trust principles guide the

interpretation of PACA trust interests is consistent with § 499e(2)'s plain language, which

expressly uses the word trust, indicating Congress' intent that PACA trusts be administered under

general trust principles like any other trust.    See In re Arctic Exp. Inc., 636 F.3d at 794 (6th Cir.

2011)(noting that "common law principles apply to the formation of [Congress' numerous]

statutory trusts").

  The Courts of Appeals have consistently looked to the Restatement of the Law of Trusts to

provide guidance regarding the general principles of trust law.[16]    The Restatement of the Law of

---

[16]"The [American Law Institute] drafts, discusses, revises, and publishes Restatements of
the Law . . . ."   The American Law Institute, https://www.ali.org/about-ali/ (last visited May 13,
2016).

  The [American Law] Institute is composed of two classes of members—elected life
  members and official members. Official members are the justices of the Supreme
  Court of the United States, senior judges of the United States Circuit Courts of
  Appeals, the chief justices of the highest courts of the several States and the District
  of Columbia, the president and members of the Executive Committee of the
  American Bar Association, the presidents of State Bar Associations, the president
  of the National Conference of Commissioners on Uniform State Laws, the
  presidents of certain learned legal societies such as the American Society of
  International Law, and the deans of member schools of the Association of
  American Law Schools. The articles of association provide for 750 elected
  members of whom there are now (1935) 721. The membership is nation-wide.

  The executive body of the Institute is a Council composed of thirty-three members.
  One-third of the members of the Council are elected every three years at a meeting
  of the members of the Institute. They hold office for nine years. The executive
  officer of the Institute is the Director, who is also secretary and executive officer of
  the Council and ex-officio chairman of the legal staff.

Restatement (First) of Trusts intro. note (Am. Law Inst. 1935).

Trusts "draws both on court decisions and on statutes, seeking a seamless statement of the best principles of American trust law and offering intellectual guidance to legislatures, judges, and especially to those who counsel trustees and beneficiaries and seek to draft instruments that reflect the lawful intentions of donors."   Restatement (Third) of Trust Law foreword (Am. Law Inst. 2003).   The Restatement's purpose is:

> to present an orderly statement of the general common law of the United States, including in that term not only the law developed solely by judicial decision, but also the law that has grown from the application by the courts of statutes that have been generally enacted and have been in force for many years.

Restatement (First) of Trusts intro. note (Am. Law Inst. 1935).   "The object of the [American Law] Institute is accomplished in so far as the legal profession accepts the Restatement as prima facie a correct statement of the general law of the United States."   Restatement (First) of Trusts intro. note (Am. Law Inst. 1935).   The Restatement (Third) of Trusts contains two provisions regarding attorneys fees and costs.   Section 88, Power to Incur and Pay Expenses, states: "A trustee can properly incur and pay expenses that are reasonable in amount and appropriate to the purposes and circumstances of the trust and to the experience, skills, responsibilities, and other circumstances of the trustee."   Restatement (Third) of Trusts, § 88.   Section 100, Liability of Trustee for Breach of Trust, states:

> A trustee who commits a breach of trust is chargeable with

> (a) the amount required to restore the values of the trust estate and trust distributions to what they would have been if the portion of the trust affected by the breach had been properly administered; or

> (b) the amount of any benefit to the trustee personally as a result of the breach.

Restatement (Third) of Trusts, § 100.

> *Attorney fees and other costs.*   The "make whole" objective (see Comment *a*) of recovery from a trustee under Clause (a) may include, in an appropriate case, the attorney fees and other litigation costs of a successful plaintiff -- that is, a co-trustee or successor trustee, or a beneficiary who qualifies for reimbursement from the

trust under § 88, Comment *d*.   This element of recovery, however, is a matter of judicial discretion and not a routine part of trustee liability for breach of trust (see *id*.).   Among the facts and circumstances courts consider in exercising their judgment in these matters are the nature and extent of trustee misconduct in committing the breach, the conduct of the trustee in presenting the accounting or defending the surcharge action, and the significance of imposing costs on the trustee as a deterrent to misconduct.

Restatement (Third) of Trusts, § 100, ct. b(2).   The Court has not found any Restatements or comments to the <u>Restatements</u> regarding the award of attorney's fees between co-beneficiaries of a trust.

"The Uniform Trust Code was drafted in close coordination with the writing of the Restatement third."   Unif. Trust Code (2000) Refs & Annos.   "The Uniform Trust Code (2000) is the first national codification of the law of trusts."   Unif. Trust Code (2000) Refs & Annos.   "The Uniform Trust Code, although comprehensive, does not legislate on every issue.   Its provisions are supplemented by the common law of trusts and principles of equity."   Unif. Trust Code (2000) Refs & Annos.   The National Conference of Commissioners on Uniform State Laws promulgates the Uniform Trust Code.   Unif. Trust Code (2000) Refs & Annos.   "It is the purpose of the Conference to promote uniformity in the law among the several states on subjects as to which uniformity is desirable and practicable."   Uniform Law Commission, http://www.uniformlaws.org (last visited April 21, 2016).   The Uniform Trust Code has eleven articles.   <u>See</u> Uniform Trust Code Table of Contents.   Article 10 is titled "Liability of Trustees and Rights of Persons Dealing with Trustee."   Unif. Trust Code §§ 1001-13 (Unif. Law Comm'n 2000).   Article 10, § 1004 of the Uniform Trust Code, titled "Attorneys Fees and Costs," states: "In a judicial proceeding involving the administration of a trust, the court, as justice and equity may require, may award costs and expenses, including reasonable attorney's fees, to any party, to be paid by another party or from the trust that is the subject of the controversy."   Unif. Trust Code § 1004 (Unif. Law Comm'n 2000).   The official comment to § 1004 of the Uniform Trust Code

states:

> This section, which is based on Massachusetts General Laws chapter 215, Section 45, codifies the court's historic authority to award costs and fees, including reasonable attorney's fees, in judicial proceedings grounded in equity.   The court may award a party its own fees and costs from the trust.   The court may also charge a party's costs and fees against another party to the litigation.   Generally, litigation expenses were at common law chargeable against another party only in the case of egregious conduct such as bad faith or fraud.   With respect to a party's own fees, Section 709 authorizes a trustee to recover expenditures properly incurred in the administration of the trust.   The court may award a beneficiary litigation costs if the litigation is deemed beneficial to the trust.   Sometimes, litigation brought by a beneficiary involves an allegation that the trustee has committed a breach of trust. On other occasions, the suit by the beneficiary is brought because of the trustee's failure to take action against a third party, such as to recover property properly belonging to the trust.   For the authority of a beneficiary to bring an action when the trustee fails to take action against a third party, see Restatement (Second) of Trusts Sections 281-282 (1959).   For the case law on the award of attorney's fees and other litigation costs, see 3 Austin W. Scott & William F. Fratcher, The Law of Trusts Sections 188.4 (4th ed. 1988).

Unif. Trust Code § 1004 Cmt. (Unif. Law Comm'n 2000).

The New Mexico Legislature enacted House Bill 48, which provides a "largely faithful adoption of the Uniform Trust Code."[17]   H.B. 48, 46th Leg. (2003).   D. English, The New Mexico Uniform Trust Code, 34 N.M. L. Rev. 1, 1 (2004).   The New Mexico Uniform Trust Code ("NMUTC"), which was drafted in connection with the revision of the Restatement of Trusts, and the Restatement of Trusts is an important source of materials for interpreting the NMUTC.   See English, supra, 34 N.M.L. Rev. at 2-3.   Even after New Mexico's adoption of the NMUTC, New Mexico courts continue to rely on the Restatement of Trusts to inform their interpretation of trust law.   See State ex rel. King v. Lyons, 2011-NMSC-004, ¶ 103, 248 P.3d 878, 906 (citing

---

[17]Before the New Mexico Legislature's enactment of the New Mexico Uniform Trust Code in 2003, the Restatement of Trusts, along with the multi-volume trust treatises by Scott, Scott & Fratcher, The Law of Trusts (4th ed. 1987), and Bogert, G. Bogert & G. Bogert, The Law of Trusts and Trustees (rev. 2d ed. 1977), were the primary sources of trust law in New Mexico.   See, e.g., Matter of Estate of McKim, 1991-NMSC-019, ¶¶ 7, 17, 21-23, 807 P.2d 215, 217, 219-221; Forest Guardians v. Powell, 2001-NMCA-028, ¶¶ 8-13, 24 P.3d 803, 808-09; Matter of Will of Coe, 1992-NMCA-006, ¶¶ 18-19, 35, 826 P.2d 576, 581, 585. See also D. English, The New Mexico Uniform Trust Code, 34 N.M. L. Rev. 1, 2 (2004).

Restatement (Third) of Trusts § 86, cmt. b (2007))*; In re Cable Family Trust*, 2010-NMSC-017, ¶ 12, 231 P.3d 108, 111 (citing the Uniform Trust Code, N.M. Stat. Ann. 1978, §§ 46A-1-101 to 46A-11-1105 (2003, as amended through 2009) and Restatement (Third) of Trusts § 4 (2003)). The NMUTC contains an "attorneys fees and costs" provision identical to § 1004 of the Uniform Trust Code.   N.M. Stat. Ann. 1978, § 46A-10-1004 (2003).   Section 1004 of the NMUTC states: "In a judicial proceeding involving the administration of a trust, the court, as justice and equity may require, may award costs and expenses, including reasonable attorney fees, to any party, to be paid by another party or from the trust that is the subject of the controversy."   N.M. Stat. Ann. 1978, § 46A-10-1004 (2003).   The editor's comments also state that § 1004 of the NMUTC is based upon § 1004 of the Uniform Trust Code.   See N.M. Stat. Ann. 1978, § 46A-10-1004 (2003).   In the sole New Mexico case addressing § 1004 of the NMUTC, the New Mexico Court of Appeals stated:

> While there is no New Mexico case law interpreting Section 46A-10-1004, generally speaking, an award of attorney fees is a matter for the district court's discretion.   See Lenz v. Chalamidas, 1991-NMSC-099, ¶ 2, 113 N.M. 17, 821 P.2d 355 ("Award of attorney fees rests in the discretion of the trial court and this [C]ourt will not alter the fee award absent an abuse of discretion."); see also Garwood v. Garwood, 2010 WY 91, ¶ 38, 233 P.3d 977, 986 (Wyo. 2010)(stating that under the Uniform Trust Code, "[o]nce it has been determined that authority exists to award fees and costs, a trial court has extremely broad discretion to rule on the amount of such an award").

Khalsa v. Puri, 2015-NMCA-027, ¶ 72, 344 P.3d 1036, 1053.

Other jurisdictions that have adopted the Uniform Trust Code have held that statutes equivalent to § 1004 of the Uniform Trust Code "provide a statutory exception to the American Rule . . . when justice and equity may require that fees, costs, and expenses be awarded."   Atwood v. Atwood, 25 P.3d 936, 947 (2001 Okla. Civ. App.).   The phrase "as justice and equity may require" has been interpreted to "serve two functions, first as a criterion for entitlement and second, as a measure of the size of the award."   Atwood v. Atwood, 25 P.3d at 947.   Further, "the

phrase connotes fairness and invites flexibility in order to arrive at what is fair on a case by case basis." Atwood v. Atwood, 25 P.3d at 947. When determining whether justice and equity require the award of attorney's fees, courts have considered the following non-exhaustive factors:

> (a) reasonableness of the parties' claims, contentions, or defenses; (b) unnecessarily prolonging litigation; (c) relative ability to bear the financial burden; (d) result obtained by the litigation and prevailing party concepts; and (e) whether a party has acted in bad faith, vexatiously, wantonly or for oppressive reasons in the bringing or conduct of the litigation.

Atwood v. Atwood, 25 P.3d at 947; In re Trust No. T-1 of Trimble, 826 N.W.2d 474, 491 (Iowa 2013); Garwood v. Garwood, 233 P.3d 977, 986 (Wyo. 2010).

The case law applying and interpreting statutes equivalent to Section 1004 of the Uniform Trust Code concerns litigation between a trustee and a beneficiary. The Court has not found, however, case law interpreting § 1004 of the Uniform Trust Code or an equivalent statute with respect to litigation between co-beneficiaries.

## ANALYSIS

To determine whether Hi-Land Potato and Worley are entitled to an award of attorney's fees against Skyline Potato, the Folson Farm Group, Tan-O-On Marketing, and the Andersons, the Court must first determine whether the Motion is timely. Second, if timely, to determine whether the circumstances of this case provide sufficient reason to not strictly apply the American Rule, the Court must consider the following questions: (i) whether Hi-Land Potato and Worley have a contractual right to attorney's fees; (ii) whether Hi-Land Potato and Worley have a statutory right to attorney's fees under PACA; (iii) whether the common fund exception to the American Rule applies to PACA; and (iv) whether general trust principles provide Hi-Land Potato and Worley with a right to attorney fees. The Court concludes that, although general trust principles provide the Court with the authority to award attorney's fees against Skyline Potato and the Folson Farm Group, a fee shift would be inappropriate here.

I.      **HI-LAND POTATO AND WORLEY'S MOTION IS TIMELY.**

Hi-Land Potato and Worley's motion is timely.

A motion for attorney's fees not brought pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412(d), must be filed and served within thirty (30) days after entry of judgment. Failure to file and serve within this time constitutes waiver of a claim to attorney's fees. Movant must submit a supporting brief and evidence (affidavits and time records). The motion must comply with D.N.M. LR-Civ. 7.

D.N.M. LR-Civ. 54.5(A). The Court entered final judgment on January 31, 2014. See Final Judgment at 1. Hi-Land Potato and Worley filed their Motion, Brief in Support of Motion, the Bohnhoff Dec., and the Reid Dec. twenty-eight days later, on February 28, 2014. The Motion is therefore timely.

II.     **THE COURT WILL NOT SHIFT FEES.**

There can be no dispute that Skyline Potato's, the Folson Farm Group's, Tan-O-On Marketing's, and the Andersons' decisions to file this lawsuit, seek significant damages, and then vigorously pursue the action through final judgment forced Hi-Land Potato and Worley to incur hundreds of thousands of dollars in attorney's fees and costs. The Court will not, however, shift attorney's fees. The Court concludes that: (i) Hi-Land Potato and Worley do not have a contractual right to attorney's fees; (ii) Hi-Land Potato and Worley do not have a statutory right to attorney's fees under PACA; (iii) the common-fund exception to the American Rule does not apply to PACA in this case; and (iv) general trust principles provide the Court with authority to award attorney's fees, but the Court declines to do so under the circumstances of this case.

A.      **HI-LAND POTATO AND WORLEY DO NOT HAVE A CONTRACTUAL RIGHT TO ATTORNEY'S FEES.**

Hi-Land Potato and Worley maintain that the attorney's fee provisions in the Mart Produce invoice, and the Billingsley invoice, provide Hi-Land Potato[18] with a contractual right to

_____

[18]Hi-Land Potato and Worley jointly filed the Motion, but only Hi-Land Potato argues that it is entitled to attorney's fees under the Billingsley and Mart Produce invoices. The Court

attorney's fees.   See Brief in Support of Motion at 14-16; Reply at 11-19.   The Billingsley

invoice states:

> Should any action be commenced between the parties to this contract concerning
> the sums due hereunder or the rights and duties of any party hereto or the
> interpretation of this contract, the prevailing party in such action shall be entitled to,
> in addition to such other relief as may be granted, an award as and for the actual
> attorney's fees and costs in bringing such action and/or enforcing any judgment
> therewith.

Billingsley invoice.   The Mart Produce invoice states:

> In the event legal action is commenced to collect the sums due under this invoice,
> the prevailing party shall be entitled to recover all court costs and attorney fees
> incurred thereby as damages in addition to any principal balance then remaining
> due.

Mart Produce invoice.   Hi-Land Potato argues that it is entitled to attorney's fees, because it is a

third-party beneficiary of the Billingsley and the Mart Produce invoices, and that the invoices'

language allows for the award of attorney's fees to the prevailing party.   See Reply at 15.   The

Court is not persuaded, and concludes that Hi-Land Potato is not an intended beneficiary of the

attorney's fee provision of the Billingsley and Mart Produce invoices.

The Court must first interpret the Billingsley and Mart Produce invoices.   In this case, the

Court has federal question jurisdiction with respect to the PACA claims, and has supplemental

jurisdiction over the fraudulent transfer, unjust enrichment, and trade secrets claims.   See 28

U.S.C. § 1367(a).   Generally, when a federal court sits in diversity jurisdiction, the court applies

the forum state's choice-of-law rules to determine which state's substantive law to apply.   See

Mosley v. Titus, 762 F. Supp. 2d at 1313-14 (stating that, when a court's jurisdiction rests on

diversity of citizenship under § 1332, "the court should look to the forum state's choice-of-law

rules to determine which state's substantive law to apply"); Klaxon Co. v. Stentor Elec. Mfg. Co.,

313 U.S. at 496-97; Pepsi-Cola Bottling Co. v. PepsiCo., Inc., 431 F.3d 1241, 1255 (10th Cir.

---

therefore will consider only whether the invoices provide Hi-Land Potato with a right to attorney's
fees.

2005).   Although the Court is not sitting in diversity jurisdiction in this case and is not addressing the substantive merits of a claim under supplemental jurisdiction, it sees no sound reason why the Court should not also apply New Mexico's choice-of-law rules to determine what law should be used to interpret the invoices.   The Court, sitting in New Mexico, will therefore apply New Mexico choice-of-law rules here.

With respect to choice-of-law issues involving contracts, New Mexico generally follows the doctrine of lex loci contractus -- the law of the place of contracting controls. See Ferrell v. Allstate Insurance Co., 2008-NMSC-042, ¶ 51, 188 P.3d 1156, 1172.   Like most states, however, New Mexico has a common exception to the rule: "New Mexico respects party autonomy; the law to be applied to a particular dispute may be chosen by the parties through a contractual choice-of-law provision."   Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 7, 188 P.3d at 1218. "[W]hen application of the law chosen by the parties offends New Mexico public policy," however, a New Mexico court "may decline to enforce the choice-of-law provision and apply New Mexico law instead."   Fiser v. Dell Computer Corp., 2008-NMSC-046, ¶ 7, 188 P.3d at 1218. Here, neither invoice contains a choice-of-law provision.   See Billingsley Produce invoice at 11; Mart Produce invoice at 9.   There is also no indication of the place of contracting.   The Billingsley Produce invoice provides a Bakersville, California address for Billingsley Produce and an Albuquerque, New Mexico address for Tan-O-On Marketing.   See Billingsley Produce invoice at 11.   The Mart Produce invoice provides a Rupert, Idaho address for Mart Produce and an Albuquerque, New Mexico address for Tan-O-On Marketing.   See Mart Produce invoice at 9. Tan-O-On Marketing is a Colorado corporation with its primary place of business in Albuquerque, New Mexico.   See Findings of Fact, Conclusions of Law, and Order at 167.   Each party, however, relied on New Mexico law in its arguments concerning the invoices.   Moreover, the Court applied New Mexico law to the trade-secret claim, the fraudulent-transfer claim, and the

- 77 -

unjust-enrichment claim pursuant to the stipulation to apply New Mexico law that Hi-Land Potato, the Andersons, and Tan-O-On Marketing in their pre-trial orders.  See Pretrial Order at 19-20; Findings of Fact, Conclusions of Law, and Order at 167.  The parties made no claims under California, Colorado, or Idaho state law.   Because each invoice has some tie to New Mexico, it is not unreasonable or far-fetched that New Mexico law applies to each invoice.   The Court should not set aside the parties' stipulation unless it is plainly incorrect or clearly unlikely that New Mexico law would apply.   In accord with the parties' general preference that the Court apply New Mexico law, and in the absence of any argument to the contrary, the Court will apply New Mexico law to interpret the Billingsley Produce and Mart Produce invoices.

Before the Court analyzes whether the Billingsley Produce and Mart Produce invoices' attorney's fee provisions constitute enforceable contractual provisions, the Court first considers whether Hi-Land Potato or Worley are intended beneficiaries of the invoices.   Hi-Land Potato is not a party to the Billingsley Produce or Mart Produce invoices.   See Billingsly Produce invoice at 11, Mart Produce invoice at 9.   Billingsley and Mart Produce -- produce sellers -- created the invoices for the purpose of selling potatoes to Tan-O-On Marketing, their broker.   The invoices do not mention Hi-Land Potato, and there is no evidence that Billingsley Produce, Mart Produce, or Tan-O-On Marketing intended Hi-Land Potato to be a party to the invoices.   As a general rule, "one who is not a party to a contract cannot maintain suit upon it."   Fleet Mortgage Corp. v. Schuster, 1991-NMSC-046, ¶ 4, 811 P.2d at 82.   Despite this general rule, a third party may be a beneficiary of a contract, and may, as a beneficiary, have enforceable rights against another party to the contract.   See Fleet Mortgage Corp. v. Schuster, 1991-NMSC-046, ¶ 4, 811 P.2d at 82. Hi-Land Potato could therefore have an enforceable right if it is found to be a third-party beneficiary.   "There are two classes of third-party beneficiaries: intended beneficiaries and incidental beneficiaries."   Tarin's Inc. v. Tinley, 2000-NMCA-048, ¶ 13, 3 P.3d at 685-86.   The

Supreme Court of New Mexico has explained:

> A third-party may have an enforceable right against an actual party to a contract if the third-party is a beneficiary of the contract.   A third-party is a beneficiary if the actual parties to the contract intended to benefit the third-party.   The intent to benefit the third-party must appear either from the contract itself or from some evidence that the person claiming to be a third party beneficiary is an intended beneficiary.

Callahan v. New Mexico Federation of Teachers-TVI, 2006-NMSC-010, ¶ 20, 131 P.3d at 58

(internal quotations omitted)(citing Fleet Mortgage Corp. v. Schuster, 1991-NMSC-046, ¶¶ 1-4,

811 P.2d at 82-83).   See Great Am. Ins. Co. of New York v. W. States Fire Prot. Co., 730 F. Supp.

2d 1308, 1316 (D.N.M. 2009).

> Only intended beneficiaries can seek enforcement of a contract.   The promisor must have had reason to know the benefit was contemplated by the promise as one of the motivating causes for entering the contract.   The paramount indicator of a third party beneficiary status is a showing that the parties to the contract intended to benefit the third party, either individually or as a member of a class of beneficiaries.

Tarin's Inc. v. Tinley, 2000-NMCA-048, ¶ 13, 3 P.3d at 686 (internal quotations and citations

omitted).   "The burden is on the person claiming to be a third-party beneficiary to show that the

parties to the contract intended to benefit him."   Tarin's, Inc. v. Tinley, 2000-NMCA-048, ¶ 13, 3

P.3d at 686.   Hi-Land Potato and Worley therefore have the burden of proving that the parties to

the contract intended to benefit Hi-Land Potato.   Hi-Land Potato and Worley do not meet this

burden.   The crux of Hi-Land Potato and Worley's argument is that the attorney's fees provisions

were ambiguous as to whom the parties intended the attorney's fee provisions to benefit.   In their

Reply, Hi-Land Potato and Worley maintain that the term "prevailing party" found in each of the

attorney's fees provisions could reasonably be construed to apply to all of the parties in this case.

Reply at 16.   Hi-Land Potato and Worley therefore insist that the provisions are ambiguous and

must be construed against the drafters, Billingsley Produce and Mart Produce.   See Reply at

15-16, 18-19.   Hi-Land Potato and Worley contend that the Court must therefore construe the

attorney's fee provisions to incorporate Hi-Land Potato as a beneficiary because it is a prevailing party.  The Court is unpersuaded.  The invoices were entered into between a produce seller -- Billingsley Produce and Mart Produce -- and a broker -- Tan-O-On Marketing -- who regularly transacted business with one another.  Tan-O-On Marketing and Billingsley Produce were the parties to the Billingsley Produce invoice.  See Billingsley Produce invoice at 11.  Tan-O-On Marketing and Mart Produce were the parties to the Mart Produce invoice.  See Mart Produce invoice at 11.  The invoices do not mention other parties, and there is no reason to believe that Billingsley Produce, Mart Produce, or Tan-O-On Marketing intended Hi-Land Potato to benefit from the invoices.  In the absence of any evidence to the contrary, the Court concludes that Hi-Land Potato is not a third-party beneficiary to the invoices' terms.  The Court therefore need not address whether the invoices' attorney's fee provisions are enforceable because even if they were, they would not provide Hi-Land Potato with a right to attorney's fees.

### B.   HI-LAND POTATO AND WORLEY DO NOT HAVE A STATUTORY RIGHT TO ATTORNEY'S FEES UNDER PACA.

The Court concludes that PACA does not provide Hi-Land Potato and Worley with a statutory right to an award of attorney's fees in this case.[19]   The statute at issue here, § 499e(c) of PACA, does not include explicit language authorizing the award of attorney's fees.  See 7 U.S.C. § 499e(c).  Congress explicitly allows, however, for the award of attorney's fees in a different section of PACA -- § 499g(c).  See 7 U.S.C. § 499g(c).  The Supreme Court has stated that an analysis with respect to attorney's fees should begin with the presumption that the American Rule applies.  See Fogerty v. Fantasy, Inc., 510 U.S. at 533 ("Congress legislates against the strong background of the American Rule.");  Key Tronic Corp v. United States, 511 U.S. at 814-815

_____

[19] The Court recognizes that Hi-Land Potato and Worley did not argue that the common-funds exception to the American Rule applies to trusts created under PACA, a choice that they probably made for good reason, as the argument would have not succeeded.  The common-fund exception is generally applied when a common fund is created as a result of litigation, which is not the case here.

("[A]ny analysis of what Congress intended starts with the presumption that fees are not recoverable."); Ruckelshaus v. Sierra Club, 463 U.S. at 683 (explaining that, when construing an attorney's fee provision, "[o]ur basic point of reference is the American Rule").   The Supreme Court has further stated that an award of fees under the statutory exception to the American Rule requires explicit congressional authority indicating that Congress intended to set aside the American Rule.   See Runyon v. McCrary, 427 U.S. at 185-86; Key Tronic Corp. v. United States, 511 U.S. at 815.   The Supreme Court treats congressional silence "as an indication that the legislature did not intend to authorize fee shifting."   Unbelievable, Inc. v. N.L.R.B., 118 F.3d at 802.   Congress was silent with respect to attorney's fees under § 499e(c), but under § 499g(c), Congress explicitly allows for attorney's fees if an appellant successfully appeals from a reparation order for a violation of Section 499b.   See 7 U.S.C. § 499g(c).   Section 499g(c) indicates that Congress could have provided for the award of attorney's fees under Section 499e if it intended to do so.   The Court can only reasonably conclude, therefore, that Congress' silence with respect to attorney's fees under § 499e(c) was intentional, and that Congress did not intend to award attorney's fees in cases brought pursuant to § 499e(c).[20]   Accordingly, the Court concludes that Hi-Land Potato and Worley do not have a statutory right to attorney's fees under PACA.

---

[20]Courts have held that the "full payment of sums owing in connection with such transactions" language in § 499e(c)(2) allows for the award of attorney's fees where parties' contracts include a right to attorney's fees.   7 U.S.C. § 499e(c)(2).   See Middle Mountain Land and Produce Inc. v. Sound Commodities, Inc., 307 F.3d at 1223 ("A fair reading of the statue brings contractually due attorneys' fees and interest within the scope of the statute's protection and 'full payment owing in connection with the [perishable agricultural commodities] transaction.'").   The Court will not address this argument as the Court has found that Hi-Land Potato and Worley do not have a separate contractual right to attorney's fees.

C.   **UNDER GENERAL TRUST PRINCIPLES, THE COURT HAS AUTHORITY TO AWARD ATTORNEY'S FEES BUT DECLINES TO DO SO.**

1.   <u>**General Principles of Trust Law Provide the Court with the Authority to Award Attorney's Fees in Cases Involving PACA Trusts.**</u>

The Court has the authority under general principles of trust law to award attorney's fees in cases involving PACA trusts.   The Courts of Appeals, in construing PACA, have uniformly held that "[t]he interpretation of PACA trust interests is guided by general trust principles to the extent there is no conflict with the statute."   <u>In re Arctic Exp. Inc.</u>, 636 F.3d at 798 (quoting <u>Consumers Produce Co. v. Volante Wholesale Produce, Inc.</u>, 16 F.3d at 1381).   <u>See</u> <u>R Best Produce, Inc. v. Shulman-Robin Marketing Corp.</u>, 467 F.3d at 242 (noting that the Second Circuit has "previously noted that PACA trusts are 'governed by general principles of trust law'")(quoting <u>Albee Tomato, Inc. v. A.B. Shalom Produce Corp.</u>, 155 F.3d at 615); <u>Bear Mountain Orchards, Inc. v. Mich-Kim, Inc.</u>, 623 F.3d at 167 ("General trust principles of trust law apply to trusts created under PACA . . . .")(quoting <u>Nickey Gregory Co., LLC v. AgriCap, LLC</u>, 597 F.3d at 595); <u>Reaves Brokerage Co., Inc. v. Sunbelt Fruit & Vegetable Co., Inc.</u>, 336 F.3d at 413 ("General principles of trust law govern PACA trusts."); <u>Boulder Fruit Exp. & Heger Organic Farm Sales v. Transp. Factoring, Inc.</u>, 251 F.3d at 1271 ("We apply general trust principles to questions involving the PACA trust, unless those principles directly conflict with PACA."); <u>Gargiulo v. G.M. Sales, Inc.</u>, 131 F.3d at 999 ("General principles of trust law govern the PACA trust . . . .").   That general trust principles guide the interpretation of PACA trust interests is consistent with § 499e(2)'s plain language, which expressly uses the word trust, indicating Congress' intent that PACA trusts be administered under general trust principles like any other trusts.   <u>See</u> <u>In re Arctic Exp. Inc.</u>, 636 F.3d at 794 (6th Cir. 2011)(noting that "common law principles apply to the formation of [Congress' numerous] statutory trusts").   Courts have authority to award attorney's fees under general principles of trust

law.   See G. Bogert & G. Bogert, The Law of Trusts and Trustees § 871 (Rev. 2d ed. 1998)("In suits to enforce the rights of trust beneficiaries the court exercises discretion as to the allowance of attorney fees and costs, either from the trust estate or from other sources."); Dardovitch v. Haltzman, 190 F.3d at 145 ("One of the more common exceptions to the American Rule is that attorney's fees are available at the discretion of the court in cases involving trusts.")(citing Estate of Tose, 482 Pa. 212, 393 A.2d 629 (Pa. 1978).   The Court therefore finds that it has authority to award attorney's fees in cases involving PACA trusts, such as this one.

>       2.       **The Court Has the Authority to Award Attorney's Fees Against Skyline Potato and the Folson Farm Group.**

The Court finds that it has authority to award attorney's fees against Skyline Potato, and the Folson Farm Group under general principles of trust law.   Each of the parties' claims arose from issues concerning a trust created under PACA wherein Tan-O-On Marketing was the trustee and Hi-Land Potato, Skyline Potato, and the Folson Farm Group were the beneficiaries.   Skyline Potato and the Folson Farm Group argued that Hi-Land Potato was not a beneficiary of the PACA trust, but was instead a third party to whom PACA trust assets were transferred in breach of the PACA trust, and should therefore be required to disgorge the trust assets.   See Pretrial Order at 4. Skyline Potato and the Folson Farm Group's claims clearly sounded in trust law and required the extensive interpretation of PACA, which is guided by general trust law principles.   See Findings of Fact, Conclusions of Law and Order, at 141-166.   Tan-O-On Marketing and the Andersons, on the other hand, asserted a fraudulent transfer claim, see Tan-O-On Marketing's Second Amended Complaint ¶¶ 39-62, at 8-12, an unjust enrichment claim, see Tan-O-On Marketing's Second Amended Complaint ¶¶ 109-113, at 24-25, and a theft of trade secrets and proprietary information claim, see Tan-O-On Marketing's Second Amended Complaint ¶¶ 62-80, at 12-17, against Hi-Land Potato and Worley.   See Amended Third Party Complaint for Fraudulent Conveyance

and Theft of Trade Secrets and Unjust Enrichment, filed July 26, 2012 (Doc. 240)("Tan-O-On Marketing's Second Amended Complaint).   Unlike Skyline Potato and the Folson Farm Group's claims, Tan-O-On Marketing and the Anderson's claims were not rooted in trust law.   See Findings of Fact, Conclusions of Law and Order, at 141-166.   The Court therefore finds that it has the authority to award attorney's fees against Skyline Potato and the Folson Farm Group under general trust law principles.

### 3.   Although the Court Has the Authority to Award Attorney's Fees to Hi-Land Potato and Worley, It Declines to Do So.

Having found that it has the authority to award attorney's fees to Hi-Land Potato and to Worley, the Court must determine whether it should exercise its authority to award attorney's fees under the circumstances of this case.   The Court concludes that it would upset the general principles of trust law and underlying PACA policies to award Hi-Land Potato and Worley attorney's fees and costs against Skyline Potato and the Folson Farm Group.   Accordingly, the Court declines to award attorney's fees in this case.

Although general principles of trust law apply to PACA trusts, "[they] are not applicable if they conflict with the language of the statutes, the clear intent of Congress enacting the statue, or the accompanying regulations."   C.H. Robinson Co. v. Trust Co. Bank, N.A., 239 F.3d at 487. The UTC encompasses general principles of trust law.   See Unif. Trust Code (2000) Refs & Annos.   Section 1004 of the UTC provides the Court with broad discretion to award attorney's fees in litigation involving the administration of a trust as justice and equity may require.   See Unif. Trust Code § 1004 (Unif. Law Comm'n 2000)("In a judicial proceeding involving the administration of a trust, the court, as justice and equity may require, may award costs and expenses, including reasonable attorney's fees, to any party, to be paid by another party or from the trust that is the subject of the controversy.").   Skyline Potato, Tan-O-On Marketing, the

Andersons, and the Folson Farm Group argue that Hi-Land Potato and Worley's reliance on

Section 1004 of the NMUTC is misplaced, because federal law, not state law is applicable here.

In response, Hi-Land Potato and Worley assert:

> Plaintiffs are missing the point of Hi-Land's invocation of UTC § 1004.  The provision is not just a part of the law of New Mexico.  Rather, it distills case law precedent throughout the United States, and thus reflects and embodies the general principles of trust law that Congress has incorporated into PACA.  Hi-Land therefore grounds its request for an award of its attorney's fees against Plaintiffs on federal, not state law.

Reply at 4.  The Court agrees.  Section 1004 of the UTC informs the Court's decision whether

general principles of trust law support the award of attorney's fees here.  The Court looks to

Section 1004 of the NMUTC and other state statutes equivalent to Section 1004 of the UTC to

understand how Section 1004 of the UTC has been interpreted.  In the sole New Mexico case

addressing § 1004 of the NMUTC, the Court of Appeals of New Mexico stated:

> While there is no New Mexico case law interpreting Section 46A-10-1004, generally speaking, an award of attorney fees is a matter for the district court's discretion.  See Lenz v. Chalamidas, 1991-NMSC-099, ¶ 2, 113 N.M. 17, 821 P.2d 355 ("Award of attorney fees rests in the discretion of the trial court and this [C]ourt will not alter the fee award absent an abuse of discretion."); see also Garwood v. Garwood, 2010 WY 91, ¶ 38, 233 P.3d 977, 986 (Wyo. 2010)(stating that under the Uniform Trust Code, "[o]nce it has been determined that authority exists to award fees and costs, a trial court has extremely broad discretion to rule on the amount of such an award").

Khalsa v. Puri, 2015-NMCA-027, ¶ 72, 344 P.3d at 1053.   In Atwood v. Atwood, 25 P.3d at 947,

the Court of Civil Appeals of Oklahoma held that statutes equivalent to Section 1004 of the

Uniform Trust Code "provide a statutory exception to the American Rule . . . when justice and

equity may require that fees, costs, and expenses be awarded."   The Atwood v. Atwood court

further explained that, when determining whether justice and equity require the award of

attorney's fees, courts have considered the following non-exhaustive factors:

> (i) reasonableness of the parties' claims, contentions, or defenses; (ii) unnecessarily prolonging litigation; (iii) relative ability to bear the financial burden; (iv) result

obtained by the litigation and prevailing party concepts; and (v) whether a party has acted in bad faith vexatiously, wantonly or for oppressive reasons in the bringing or conduct of the litigation.

Atwood v. Atwood, 25 P.3d at 947; In re Trust No. T-1 of Trimble, 826 N.W.2d at 491; Garwood v. Garwood, 233 P.3d at 986.   The Court will consider each of the five factors that Atwood v. Atwood identifies, but because the Court has broad discretion with respect to an award of attorney's fees, it finds that this list is not exhaustive and does not control the Court's final decision.

a.      **The Parties' Claims, Contentions, and Defenses Were Reasonable.**

This lawsuit arose from Tan-O-On Marketing's failure to pay Skyline Potato and the Folson Farm Group for sales of potatoes they made to Tan-O-On Marketing between October and December, 2009.   See Deposition of Gerald Anderson at 57:11-25 (taken May7-8, 2012), filed August 8, 2012 (Doc. 252-1)("Anderson Depo.").   During that time period, Tan-O-On Marketing paid Hi-Land Potato for potatoes that Hi-Land Potato shipped to customers between October and December, 2009.   See Findings of Fact, Conclusions of Law, and Order at 53.   Skyline Potato and the Folson Farm Group brought this lawsuit in an attempt to recover money due to them under PACA.   Skyline Potato and the Folson Farm Group pursued claims against Hi-Land Potato, because they believed that Hi-Land Potato, whom Tan-O-On Marketing had paid in full, was being paid in preference over Skyline Potato and the Folson Group.   Response to Hi-Land Potato's MSJ at 15.   Despite the Court finding otherwise, the Court notes that Skyline Potato and the Folson Farm Group had reason to believe that Hi-Land Potato was receiving payments in preference from Tan-O-On Marketing.   See Findings of Fact, Conclusions of Law, and Order at 157-161. Congress explained that "the purpose of the [PACA] trust is to increase the legal protection for unpaid sellers and suppliers of perishable agricultural commodities until full payment of sums due

have been received by them."   H.C. Schmieding Produce v. Alfa Quality Produce, 597 F. Supp.

2d at 315-16 (quoting R Best Produce, Inc. v. Shulman-Rabin Marketing Corp., 467 F.3d

241)(internal alterations omitted).   It would therefore be inconsistent for the Court to enforce an

award of attorney's fees against Skyline Potato and the Folson Farm Group when they were only

seeking the legal protections established by Congress in PACA.   Moreover, in its ruling on

Hi-Land Potato and Worley's motion for summary judgment against Skyline Potato and the

Folson Farm Group and Skyline Potato and the Folson Farm Group's motion for summary

judgment against Hi-Land Potato and Worley, the Court created the test for determining whether

Hi-Land Potato breached its duty to the other beneficiaries of Tan-O-On Marketing's PACA trust,

and the Court found a genuine issue of material fact that required a trial.   Thus, there was

sufficient evidence of preferred payment, under the applicable law, to require a trial.   The Court

also sees no reason why it should find that the claims brought by Tan-O-On Marketing and the

Andersons were unreasonable.   Tan-O-On Marketing and the Andersons acted on the good-faith

belief that Hi-Land Potato engaged in theft of trade secrets, fraudulent conveyance, and unjust

enrichment.

### b.      The Parties did not Unnecessarily Prolong Litigation.

The litigation between Skyline Potato, the Folson Farm Group, Tan-O-On Marketing, the

Andersons, Hi-Land Potato and Worley was indeed long, but not unnecessarily so.   The issues

presented to the Court were complex and novel.   Moreover, Hi-Land Potato and Worley stated in

their Reply that

> Hi-Land does not assert that it is entitled to its fees due to Plaintiffs' unnecessary
> prolongation of the litigation.   It is undisputed that the litigation was lengthy,
> complex and hotly contested . . . . Since this factor was not even addressed by
> Hi-Land in its application it should have no bearing in the Court's analysis.

Reply at 10.

c.      **The Court Will Not Rely on the Parties' Relative Ability To Bear The Financial Burden.**

The Court does not have sufficient evidence regarding the Skyline Potato, the Folson Farm Group, Tan-O-On Marketing, or the Andersons' ability to bear the financial burden of paying Hi-Land Potato and Worley's attorney's fees.   Accordingly, the Court will not rely on this factor when determining whether to award attorney's fees.   The Court agrees with Hi-Land Potato and Worley that the "Plaintiffs . . . put forth no evidence of their own net worth or inability to bear the expense.   Without such evidence, this factor is irrelevant and should not be considered."   Reply at 10.

d.      **The Results Obtained by the Litigation and Prevailing Party Concepts Do Not Support the Award of Attorney's Fees.**

Hi-Land Potato and Worley are prevailing parties.   See Final Judgment, filed January 31, 2014 (Doc. 373); Findings of Fact, Conclusions of Law, and Order, filed January 31, 2014 (Doc. 372).   Hi-Land Potato and Worley's status as prevailing parties does not, alone, entitle them to the award of attorney's fees.   Generally, courts award fees to a prevailing party if the prevailing party's action resulted in a benefit to the trust.   In re Delta Produce, LP, No. 5:12-CV-1127-DAE, 2014 WL 4443414, at *11 (W.D. Tex. Sept. 9, 2014)(Ezra, J.)("[Courts] generally require the claimant to demonstrate that its efforts and resultant expenses were directly responsible for the availability of the funds from the PACA trust.")(quotation marks omitted)(citing In Re Milton Poulos, 947 F.2d at 1353).   See In re Southland + Keystone, 132 B.R. 632, 643 (9th Cir. BAP 1991); In re United Fruit & Produce Co., 119 B.R. 10, 13 (Bankr. D. Conn. 1990)(Krechevsky, J.). This case is distinguishable from cases where courts have awarded attorney's fees to prevailing parties in two important ways:   First, Hi-Land Potato and Worley are not asking the Court to award attorney's fees out of a trust; they are asking for attorney's fees against Skyline Potato and the Folson Farm Group directly.   Hi-Land Potato and Worley are asking for fee shifting, not

payment out of a fund that they created.   Second, Hi-Land Potato and Worley's success in defending against Skyline Potato, the Folson Farm Group, Tan-O-On Marketing, and the Andersons' claims did not result in a benefit to the trust.   Although this case is distinguishable from those cases awarding attorney's fees to the prevailing party out of the trust, the Court finds that the policy considerations are applicable here.   In those cases, the courts awarded attorney's fees out of the trust, because the prevailing party had succeeded in bringing a benefit to the trust. This award is consistent with general principles of trust law and PACA statutes.   See H.C. Schmieding Produce v. Alfa Quality Produce, 597 F. Supp. 2d at 315-16 ("[T]he purpose of the [PACA] trust is to increase the legal protection for unpaid sellers and suppliers of perishable agricultural commodities until full payment of sums due have been received by them.")(quoting R Best Produce, Inc. v. Shulman-Rabin Marketing Corp., 467 F.3d at 241)(internal alterations omitted).

### e.     The Parties Did Not Act in Bad Faith, Vexatiously, Wantonly or for Oppressive Reasons in the Bringing or Conduct of the Litigation.

Consistent with the Court's analysis with respect to the reasonableness and length of this litigation, the Court concludes that Skyline Potato, the Folson Farm Group, Tan-O-On Marketing, and the Andersons did not act in bad faith, vexatiously, wantonly or for oppressive reasons in the bringing or conduct of the litigation.   The court sees no reason to conclude that Tan-O-On Marketing and the Andersons acted in bad faith, vexatiously, wantonly or for oppressive reasons in the brining or conduct of the litigation.   Likewise, Skyline Potato and the Folson Farm Group had reason to believe that Hi-Land Potato was being paid by Tan-O-On in preference over Skyline Potato and the Folson Farm Group.   Their conduct throughout the litigation was not in bad faith, and there has been no evidence presented to the contrary.

f.    **Policy Considerations under General Principles of Trust Law Do Not Support the Award of Attorney's Fees.**

General principles of trust law allow for the award of attorney's fees for the purpose of making the trust and its beneficiaries whole, "usually by restoring the trust estate and trust distributions to what they would have been if the portion of the trust affected by the breach had been properly administered . . . ."   Restatement (Third) of Trusts § 100 (2012) General Comment a (internal citations omitted).   It is clear from this comment that the interests of the trust and its beneficiaries are the focus of the award of attorney's fees in cases involving trusts.   Although this comment concerns liability of trustees for breach of trust, which is not the issue presently being addressed, the Court finds the underlying principle informative.   The Court also notes that this principle is consistent with the congressional intent behind trusts created under PACA.   Congress intended for PACA trusts to protect unpaid sellers and suppliers of perishable agricultural commodities interests by providing them with greater legal protections.   See H.C. Schmieding Produce v. Alfa Quality Produce, 597 F. Supp. 2d at 315-16 ("Congress explained that 'the purpose of the [PACA] trust is to increase the legal protection for unpaid sellers and suppliers of perishable agricultural commodities until full payment of sums due have been received by them.'")(quoting R Best Produce, Inc. v. Shulman-Rabin Marketing Corp., 467 F.3d at 241)(internal alterations omitted).   If PACA trusts are created for the purpose of protecting unpaid sellers and suppliers -- PACA trusts beneficiaries -- it follows that courts should consider whether the award of attorney's fees will serve to further protect those beneficiaries, and whether the award of attorney's fees is in the trust and its beneficiaries' best interests.

Under the facts and circumstances of this case, the Court does not find that the award of attorney's fees would be in the trust and its beneficiaries' best interests.   Hi-Land Potato, Skyline Potato, and the Folson Farm Group are all a shared PACA trust's beneficiaries.   Hi-Land Potato is

therefore asking the Court to award attorney's fees against its co-beneficiaries, Skyline Potato and the Folson Farm Group.   The Court does not see how the award of attorney's fees against Skyline Potato and the Folson Farm Group will benefit the trust, or make the trust and all of its beneficiaries whole again.   It prefers one set of beneficiaries over another who had legitimate, good-faith disagreements about how the PACA trust funds were being paid and distributed. General principles of trust law provide a clear message to the Court that it should consider the interests of the trust and all of its beneficiaries.   Furthermore, the Court does not see how the award of attorney's fees against Tan-O-On Marketing and the Andersons will make the parties whole again.   The Court finds no sound reason that awarding attorney's fees against any of the parties in this case will be in the best interest of the trust and all of its beneficiaries.   Thus, the Court concludes that general principles of trust law do not support the award of attorney's fees in this case.

IT IS ORDERED that: (i) Hi-Land Potato Company, Inc.'s and Carl Worley's Motion for Award of Attorney's Fees and Costs, filed February 28, 2014 (Doc. 374), is denied; and (ii) Motion to File Response Out of Time, filed April 8, 2014 (Doc. 382), is granted.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Justin P. Pizzonia
Gonzalez & Pizzonia LLC
Albuquerque, New Mexico

-- and --

Heather S. Jaramillo
Albuquerque Business Law, LLC
Albuquerque, New Mexico

    *Attorneys for the Plaintiff*

Justin P. Pizzonia
Gonzalez & Pizzonia LLC
Albuquerque, New Mexico

-- and --

Heather S. Jaramillo
Albuquerque Business Law, LLC
Albuquerque, New Mexico

-- and --

Katy Koestner Esquivel
Meuers Law Firm, PL
Naples, Florida

    *Attorneys for the Intervening Plaintiffs*

William Spencer Reid
Benjamin F. Feuchter
Keleher & McLeod, P.A.
Albuquerque, New Mexico

    *Attorneys for Defendants and Third-Party Defendants RPE, Inc. and Russell Wysocki*

Henry M. Bohnhoff
Leslie McCarthy Apodaca
Melanie B. Stambaugh
Rodey Dickason Sloan Akin & Robb, P.A.
Albuquerque, New Mexico

    *Attorneys for Third-Party Defendants Hi-Land Potato Company, Inc. and Carl Worley*